IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC, <br><br> Plaintiff, <br><br> v. <br><br> CATERPILLAR INC., KOMATSU AMERICA CORP., VOLVO CONSTRUCTION EQUIPMENT NORTH AMERICA, LLC and ASSOCIATED AUCTION SERVICES, LLC, doing business as Cat Auction Services, <br><br> Defendants. | C.A. No. 15-_____ <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff International Construction Products LLC ("ICP"), by and through its undersigned

attorneys, brings this action for trebled compensatory damages and injunctive relief under the

antitrust laws of the United States, and for compensatory and punitive damages and injunctive relief

under state law, against the above-named Defendants, demanding a trial by jury.  For its Complaint

against Defendants, Plaintiff alleges the following:

**NATURE OF THE CASE**

1.      This case involves an ongoing, multi-faceted and anticompetitive conspiracy among

Defendants Caterpillar Inc. ("Caterpillar"), Komatsu America Corp. ("Komatsu"), Volvo

Construction Equipment North America, LLC ("Volvo") (collectively, the "Manufacturer

Defendants"), and Defendant Associated Auction Services, LLC, doing business as Cat Auction

Services ("Cat Auction Services"), to eliminate the threat of substantial new entry and competition in

the market for new heavy construction equipment.  The new heavy construction equipment market is

1

an oligopoly protected by extremely high barriers to entry, due to the Manufacturer Defendants' policies of requiring exclusivity from their equipment dealers.  Secure from the threat of effective new entry, the Manufacturer Defendants have for years charged prices above competitive levels for their new heavy construction equipment.

2.      ICP's innovative entry into the heavy construction equipment market, selling new, high-quality equipment at low prices directly to consumers through an increasingly popular online marketplace for sales of heavy construction equipment, IronPlanet, promised to substantially increase competition in the new equipment market.  Selling through IronPlanet is a uniquely efficient distribution channel for new entrants into the new heavy construction equipment market and the only realistic means to surmount the distribution barrier to entry erected by the Manufacturer Defendants.

3.      In direct response to ICP's announced entry into that market, Defendants conspired to first eliminate, and then forever bar, ICP's access to IronPlanet.  In a classic example of predation followed by merger, the Manufacturer Defendants first threatened to boycott IronPlanet if it sold ICP's new heavy construction equipment, and Defendants Caterpillar and Cat Auction Services then agreed to remove IronPlanet as an independent entity through a merger of IronPlanet and Cat Auction Services, which is itself owned by Caterpillar and certain of its equipment dealers.

4.      In the first stage of the conspiracy, the Manufacturer Defendants, which are (along with their affiliates) some of the largest sellers of used heavy construction equipment on IronPlanet, applied economic pressure to coerce IronPlanet to discontinue ongoing sales of ICP's products, breach an existing contract with ICP, and otherwise refrain from dealing with ICP.  IronPlanet acceded to the Manufacturer Defendants' pressure, discontinuing sales of ICP's products, thereby breaching its contract with ICP and leaving ICP without feasible means to efficiently bring its products to market.

2

5.      In the second stage of the conspiracy, Cat Auction Services joined the Manufacturer Defendants' ongoing conspiracy to eliminate the threat of ICP's entry by agreeing to merge with IronPlanet, extinguishing any possibility that IronPlanet would deal with ICP or any other new entrants in the future.  Due to the Defendants' conspiracy, the prospect of effective entry into the new heavy construction equipment market is set to vanish.  Defendants have thereby harmed ICP's business, equity, and goodwill, and eliminated innovative, low-price competition that would have benefited U.S. consumers.

6.      Plaintiff brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and pursuant to state law, to recover trebled compensatory damages suffered by the Plaintiff and the costs of suit, including reasonable attorney's fees, and for punitive damages; to enjoin the Manufacturer Defendants' exclusive contracts with their heavy construction equipment dealers, the merger of IronPlanet and Cat Auction Services, and the Manufacturer Defendants' other illegal conduct as alleged herein; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' serial violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14 and 18, and under state law.

## PLAINTIFF

7.      Plaintiff International Construction Products LLC, formed under the laws of the State of Delaware, has its principal place of business at 28 Schenck Parkway, Asheville, North Carolina, 28803.  ICP imports and sells heavy construction equipment into the United States.

## DEFENDANTS

8.      Defendant Caterpillar is incorporated under the laws of the State of Delaware, with its principal place of business at 100 NE Adams Street, Peoria, Illinois, 61629.  Caterpillar manufactures and sells heavy construction equipment, among other products, in the United States, including sales to dealers located in Delaware.

3

9.      Defendant Komatsu, a wholly-owned subsidiary of Komatsu Ltd., is incorporated under the laws of the State of Georgia, with its principal place of business at 1701 Golf Road, Suite 1-100, Rolling Meadows, Illinois, 60008.  Komatsu manufactures and sells heavy construction equipment, among other products, in the United States, including sales to dealers located in Delaware.  Komatsu has registered to do business in the State of Delaware and has consented to the service of process within Delaware by appointing The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, as its registered agent.

10.     Defendant Volvo, a wholly owned subsidiary of Aktiebolaget Volvo, is formed under the laws of Delaware, with its principal place of business at 312 Volvo Way, Shippensburg, Pennsylvania, 17257.  Volvo manufactures and sells heavy construction equipment, among other products, in the United States, including sales to dealers located in Delaware.

11.     Defendant Cat Auction Services is formed under the laws of Delaware, with its principal place of business at 860 Blue Gentian Road, Suite 100, Eagan, Minnesota, 55121.   Cat Auction Services facilitates auctions of used heavy construction equipment within the United States. Defendant Caterpillar is a shareholder in Cat Auction Services, along with more than twenty Caterpillar equipment dealers, themselves governed by coercive exclusive dealing arrangements with Caterpillar.  In December 2014, Cat Auction Services announced an agreement to merge with IronPlanet, in a transaction expected to close in the first quarter of 2015.

## JURISDICTION, STANDING AND VENUE

12.     Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-2, and Sections 3 and 7 of the Clayton Act, 15 U.S.C. §§ 14, 18.

13.     This Court has subject matter jurisdiction of the Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

14.     Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

15.     This Court has subject matter jurisdiction of the Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.  Each of the Plaintiff's state law claims arise out of the same factual nucleus as the Plaintiff's federal law claims.

16.     This Court has personal jurisdiction over each Defendant and venue is proper in the District of Delaware under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§  15, 22, and 28 U.S.C.  § 1391, because each Defendant transacts business and is subject to personal jurisdiction within the District of Delaware.  Each Defendant sells heavy construction equipment in or for delivery into Delaware, and Caterpillar, Komatsu and Volvo all have equipment dealers in Delaware.  Portions of the anticompetitive conduct alleged herein took place in Delaware, and the anticompetitive effects of the conduct alleged herein impacted consumers in Delaware.

17.     Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

## THE HEAVY CONSTRUCTION EQUIPMENT INDUSTRY

18.     Construction equipment is used in infrastructure and building construction applications.  The term "heavy construction equipment" refers to heavy-duty vehicles specifically designed for executing various earthmoving tasks.  Specific types of heavy construction equipment include crawler dozers, rollers, motor graders, scrapers, crawler excavators, wheeled excavators, mini-excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders.  Sales of new heavy construction equipment in the United States exceeded $14 billion in 2013.

19.     Wholesale distributors, known as "equipment dealers," are the primary channel of distribution of heavy construction equipment to end users, who are primarily contractors and equipment rental companies.   Equipment dealers specialize in selling and servicing heavy construction equipment, and employ sales and service personnel dedicated to servicing the needs of end users.

20.     Direct sales of new heavy construction equipment by manufacturers to end users have historically been uncommon.  End users and heavy construction equipment manufacturers alike have historically worked through equipment dealers with locations near project sites.  As a result, heavy construction equipment manufacturers have historically distributed heavy construction equipment through local dealers in each region of the country in order to compete effectively in each such region.

21.     The manufacture and sale of new heavy construction equipment in the United States is a highly concentrated market.  Between 2010 and 2014, the Herfindahl-Hirschman index, a commonly accepted measure of market concentration, for the heavy construction equipment market was over 2500, a level characterized as "highly concentrated" by the federal antitrust enforcement agencies.  Defendant Caterpillar accounts for approximately 40 percent or more of all sales of new heavy construction equipment in the United States, and Komatsu accounts more than 15 percent of all such sales.  Market concentration at the state level is also high.  Collectively, the Manufacturer Defendants accounted for 60 percent of the sales of certain popular types of new heavy construction equipment sold in Delaware between 2010 and 2014.

22.     Many of the markets for specific types of new heavy construction equipment relevant to this case are even more highly concentrated.  Each of the Manufacturer Defendants individually, and all of them collectively, have substantial market shares in the sale of specific types of new heavy

6

construction equipment sold in specific local markets around the country.  Because competition to sell new heavy construction equipment has historically been local in nature, and because each type of heavy construction equipment is generally not a substitute for another type, these product-specific local market shares are more accurate indicators of competitive conditions than are market shares expressed as a percentage of all sales of all types of new heavy construction equipment across the United States.

23.      By itself, Caterpillar has a durably dominant share of certain types of new heavy construction equipment sold in specific local markets throughout the United States.

24.      Caterpillar's share of all new crawler dozer sales between 2010 and 2014 was 80 percent or higher in Alaska, 70 percent or higher in at least three states, including Arizona, California and Colorado, and 60 percent or higher in at least five states, including Michigan, Minnesota, Montana, Oregon, and Wyoming.

25.      Caterpillar's share of new motor grader sales between 2010 and 2014 was 80 percent or higher in at least three states, including Alaska, Nevada, and Wyoming, 70 percent or higher in at least two states, including Michigan and New Hampshire, and 60 percent or higher in at least six states, including Arizona, California, Colorado, Idaho, Montana, and New Mexico.

26.      Caterpillar has a durably dominant share of sales of other types of new heavy construction equipment sold in other specific local markets throughout the United States, as will be proven at trial.

27.      Although smaller than Caterpillar, Komatsu also has durably high market shares of certain types of new heavy construction equipment sold in specific local markets throughout the United States.  Between 2010 and 2014, Komatsu's share of new excavator sales was 45 percent or higher in Alabama, 35 percent or higher in at least four states, including Georgia, Nebraska, New

York, and Ohio, and 30 percent or higher in at least two states, including Oklahoma and West Virginia.

28.     Komatsu has a durably high share of sales of other types of new heavy construction equipment sold in other specific local markets throughout the United States, as will be proven at trial.

29.     Although smaller than Caterpillar or Komatsu, Volvo also has durably high market shares of certain types of new heavy construction equipment sold in specific local markets throughout the United States.  Between 2012 and 2014, Volvo's share of new wheel loader sales was 30 percent or higher in South Carolina, 25 percent or higher in Georgia, and 20 percent or higher in at least three states, including Connecticut, Idaho, and Indiana.

30.     Volvo has a durably high share of sales of other types of new heavy construction equipment sold in other specific local markets throughout the United States, as will be proven at trial.

31.     Together, the Manufacturer Defendants have durably high market shares of certain types of new heavy construction equipment sold in specific local markets throughout the United States.  Between 2010 and 2014, the Manufacturer Defendants' collective share of new wheel loader sales was 80 percent or higher in at least three states, including Arkansas, Utah, and West Virginia, 75 percent or higher in Kentucky, 70 percent or higher in Alabama, 65 percent or higher in at least two states, including Georgia and Pennsylvania, and 60 percent or higher in at least two states, including Delaware and Indiana.

32.     The Manufacturer Defendants have a durably high share of sales of other types of new heavy construction equipment sold in other specific local markets throughout the United States, as will be proven at trial.

## THE RELEVANT MARKETS

33.     The relevant product market in which to evaluate the Defendants' conduct is the marketing and sale of new heavy construction equipment, and narrower relevant markets contained therein (collectively, the "relevant heavy construction equipment markets"), including relevant product markets limited to each of the following specific types of new heavy construction equipment: crawler dozers, rollers, motor graders, scrapers, crawler excavators, wheeled excavators, mini-excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders.

34.     There are no widely used substitutes for new heavy construction equipment, and no other product significantly constrains the prices of new heavy construction equipment.

35.     The closest substitutes for each type of new heavy construction equipment is used heavy construction equipment of that type, but new and used heavy construction equipment trade in different relevant product markets.  New and used heavy construction equipment are differentiated in their risk of breakdown and the vintage, quality, and productivity of embodied technology.  Used equipment normally requires more maintenance and is more likely to break down, increasing maintenance costs and labor downtime.  The relevant heavy construction equipment markets are characterized by frequent introduction of new technologies and product features, and used equipment is typically of lower quality and less productive per hour of use.  Purchasers of heavy construction equipment are differentiated in their preferences with respect to durability and product quality, and in the degree to which they use labor and capital as inputs into production.  Purchasers who value product quality highly and tend to use relatively more capital than labor as factor inputs purchase new heavy construction equipment and, after discarding used equipment, purchase new equipment again.  Purchasers who place a lower value on product quality and tend to use relatively more labor than capital as factor inputs purchase used equipment.  In this way, high valuation and low valuation

purchasers are sorted between the new and used heavy construction equipment markets, allowing suppliers of new heavy construction equipment to profitably charge higher prices to purchasers of new products without being constrained by prices in the used equipment market.  Rental equipment companies are an example of end users that typically purchase all or nearly all of their heavy construction equipment new rather than used.

36.     The Manufacturer Defendants' unlawful conduct, as alleged herein, demonstrates that they regard new heavy construction equipment as a distinct relevant market from used heavy construction equipment.  The Manufacturer Defendants tolerate the sale of many brands of used heavy construction equipment on IronPlanet, but moved to exclude ICP from selling new heavy construction equipment through IronPlanet.  ICP's entry with new products would not have been a competitive threat to the Manufacturer Defendants if their new heavy construction equipment already competed with used heavy construction equipment.  The Manufacturer Defendants' selective exclusion of ICP from IronPlanet shows that they regard a seller of new heavy construction equipment, even one selling at prices far below their own, as a closer competitor than sellers of used heavy construction equipment.

37.     The relevant geographic market is no broader than the United States.  To compete effectively within the United States, manufacturers of new heavy construction equipment need distribution assets and relationships within the United States.  Manufacturers of new heavy construction equipment located outside the United States without such assets and relationships are unable to obtain sufficient distribution or scale to constrain the prices charged by manufacturers of new heavy construction equipment that have such assets and relationships.

38.     Each and every state within the United States is also a relevant geographic market, and smaller markets within the boundaries of many states exist as well, as will be proven at trial.

Manufacturers of new heavy construction equipment can and do engage in price discrimination, charging different prices based on customers' locations.  End users of heavy construction equipment demand convenient and expeditious service and support, and thus typically do not purchase new heavy construction equipment from equipment dealers without an authorized service location within 75 miles.  Equipment dealers typically do not resell new heavy construction equipment to other dealers or end users outside their service areas in any substantial quantity.  As a result, heavy construction equipment manufacturers charge different prices to equipment dealers in different states, and within certain regions within many states.

**BARRIERS TO ENTRY**

39.     The Manufacturer Defendants' market positions have for many years been protected by high barriers to entry.  The most significant barrier to entry has been the success of the largest incumbent manufacturers, including the Manufacturer Defendants, in foreclosing access to distribution by new entrants.  End users historically have purchased new heavy construction equipment from local equipment dealers.  New entrants are generally foreclosed from dealing with existing dealers by the distribution policies of the largest incumbent manufacturers, including the Manufacturer Defendants, which require express or functional, *de facto* exclusivity on the part of the equipment dealer in selling new heavy construction equipment.  Each of the Manufacturer Defendants' dealers purchases and takes title to new heavy construction equipment from the Manufacturer Defendants with the understanding that they are not to deal with competing suppliers of heavy construction equipment, including ICP.

40.     Entrants into the new heavy construction equipment market are generally unable to compete successfully for distribution on the "all or nothing" terms imposed by the Manufacturer Defendants.  A dealer who switches from carrying the products of one of the Manufacturer Defendants to carrying the products of a competing supplier of heavy construction equipment runs

the risk of substantial lost revenues, both from the sales of new machines and from the more lucrative service and repair of existing machines. In contrast, a new entrant will not have an installed base of heavy construction equipment available for dealers to service and repair. While dealers would be willing to pioneer a limited number of machine types but-for the Manufacturer Defendants' exclusivity policies, pioneering a new brand of heavy construction equipment on the "all or nothing" terms imposed by the Manufacturer Defendants is a risk that most dealers are unwilling to run. As a result, dealers are slow to switch to new entrants, in part because these exclusivity requirements effectively require new entrants to have a nearly full-line in order to compete successfully for distribution.

41.    The Manufacturer Defendants' imposition of exclusivity on their dealers is coercive and contrary to the preference of their dealers, who generally would prefer to carry more than one line of heavy construction equipment and thereby garner the benefits of price and service competition among suppliers of heavy construction equipment. Smaller suppliers of heavy construction equipment, without the market power of the Manufacturer Defendants, are not able to impose exclusivity requirements on their dealers.

42.    The Manufacturer Defendants' requirements of exclusivity collectively and individually foreclose substantial portions of the dealer market to new entrants into the relevant heavy construction equipment markets. The foreclosure percentages attributable to each of the Manufacturer Defendants' exclusivity policies, and to their policies collectively, is at least equal to their market shares in relevant markets around the country, as alleged above. *See supra* ¶¶ 21-32. In the relevant heavy construction equipment market as a whole, the exclusivity policies of the Manufacturer Defendants and the largest of the domestic incumbent manufacturers foreclose new entrants from 85 percent or more of dealers, and foreclosure rates in smaller relevant markets around

the country, including those markets where the Manufacturer Defendants individually or collectively exercise monopoly or market power, are often higher.  Any remaining dealers not tied up by these exclusivity requirements are small, capital constrained, have weaker reputations among local consumers of new heavy construction equipment, and are too few in number to form a viable distribution network for a new entrant.

43.     The Manufacturer Defendants' exclusivity policies are effectively of long duration and are not easily terminable.  As alleged above, the risk for dealers in switching from carrying the Manufacturer Defendants' new heavy construction equipment products to those of their rivals is substantial.  As a result, dealer switching is uncommon, and the vast majority of the Manufacturer Defendants' dealers have not carried competitive products in many years, despite their interest in doing so.

44.     For at least 30 years, the distribution barrier to entry has prevented effective entry of new competitors into the relevant heavy construction equipment markets. The last successful entrant into the relevant heavy construction equipment market as a whole was Komatsu, which entered in the late 1960s.  Volvo, which entered approximately 25 years ago, is the only more recent entrant that has achieved more than 5 percent market share nationwide.

45.     Unable to gain adequate distribution, recent entrants into the relevant heavy construction equipment markets with high quality products have failed to achieve sufficient distribution to meaningfully discipline the prices charged by the incumbent manufacturers.  For example, SANY Heavy Industry ("SANY") and Guangxi LiuGong Machinery ("LiuGong") have both failed to gain meaningful market shares or impose competitive discipline on the Manufacturer Defendants.  Both SANY and LiuGong attempted to enter the relevant heavy construction equipment markets by building their own network of equipment dealers to distribute their products.  SANY's

13

U.S. operation had its first profitable year in 2013, more than six years after its entry into the U.S. market.  On information and belief, in this time, SANY was able to assemble a network of only 50 relatively small, local equipment dealer branches, compared to approximately 500 local equipment dealer branches for Caterpillar, approximately 400 local equipment dealer branches for Komatsu, and approximately 300 local equipment dealer branches for Volvo.  SANY's 2014 revenues are projected to be approximately $75 million.  LiuGong's U.S. operation similarly was first profitable in 2013, five years after it entered the U.S. market.  Neither SANY nor LiuGong has achieved the necessary distribution or scale to affect market-wide price or output, and neither is projected to have sales remotely approaching those of the Manufacturer Defendants for the foreseeable future, if ever.

46.     The distribution barrier to entry has increased since the financial crisis of 2008, which saw dealer groups go out of business and reduced the number of dealers potentially available to new entrants into the relevant heavy construction equipment markets.  At present, and for the foreseeable future, there is a scarcity of distribution services available to new entrants into the relevant heavy construction equipment markets attributable to the exclusivity policies of the Manufacturer Defendants.

47.     Barriers to entry at the equipment dealer level of the market are also high, preventing new entrants into the relevant heavy construction equipment industry from entering the distribution market to self-distribute their products.  Entry into distribution would require manufacturers to have access to a full line of heavy construction equipment, to make substantial investments in sales and service locations in any given territory, and to have access to substantial financing.

48.     Secure from the threat of new competitors behind the barriers to entry erected by their exclusive distribution chains, the Manufacturer Defendants have charged supracompetitive prices to U.S. consumers of new heavy construction equipment.

49.     The relevant heavy construction equipment markets are characterized by oligopoly pricing, whereby manufacturers take parallel price increases for similar amounts with similar effective dates.  Industry price increases are typically led by Caterpillar and followed by Komatsu and the other incumbent manufacturers.   At a minimum, the Manufacturer Defendants recognize their interdependence with respect to price and output levels, and through the process of announcing price increases, tracking their rivals' responses, and supporting one another's price increases, are able to set prices above the competitive level.

50.     The exclusive distribution arrangements of the Manufacturer Defendants facilitate this coordinated collusive pricing by erecting substantial barriers to entry by new entrants who would otherwise discipline the coordinated collusive pricing of the Manufacturer Defendants and the other incumbent manufacturers.

## MARKET AND MONOPOLY POWER

51.     Caterpillar has substantial market power in the relevant heavy construction equipment market as a whole, monopoly power within certain of the relevant heavy construction equipment markets within certain local geographic markets, including at least the market for new crawler dozers in Arizona, California, Colorado, Michigan, Minnesota, Montana, Oregon, and Wyoming, the market for new motor graders in Alaska, Arizona, California, Colorado, Idaho, Michigan, Montana, New Hampshire, Nevada, New Mexico, and Wyoming, and substantial market power within certain of the relevant heavy construction equipment markets within certain local geographic markets.

52.     Komatsu has substantial market power within certain of the relevant heavy construction equipment markets within certain local geographic markets, including at least the market for new excavators in Alabama, Georgia, Ohio, Oklahoma, Nebraska, New York, and West Virginia.

53.     Volvo has market power within certain of the relevant heavy construction equipment markets within certain local geographic markets, including at least the market for new wheel loaders in Connecticut, Delaware, Georgia, Indiana, Idaho, and South Carolina.

54.     The Manufacturer Defendants collectively have substantial market or monopoly power within certain of the relevant heavy construction equipment markets within certain local geographic markets, including at least the market for new wheel loaders in Alabama, Arkansas, Delaware, Georgia, Indiana, Kentucky, Pennsylvania, Utah, and West Virginia.

55.     The substantial market and monopoly power of the Manufacturer Defendants are protected by substantial barriers to entry.  *See supra* ¶¶ 39-50.

## ONLINE SALES OF HEAVY EQUIPMENT THROUGH IRONPLANET THREATENED TO ERODE THE DISTRIBUTION BARRIER TO ENTRY

56.     The rise of IronPlanet, an online marketplace connecting buyers and sellers of heavy construction equipment, provided the means for new entrants to surmount the distribution barrier to entry into the relevant heavy construction equipment markets.

57.     IronPlanet is by far the largest online marketplace for the sale of heavy construction equipment in the United States, and the world.  IronPlanet has over 1 million registered users and has experienced a compound annual growth rate of more than 17 percent over the past seven years.  Over $4 billion of used heavy construction equipment has been sold over IronPlanet.

58.     IronPlanet is a rapidly growing platform characterized by accelerating network effects.  Marketplaces like IronPlanet that bring together buyers and sellers in two-sided networks are platforms.  With network effects, the platform's value to any given user largely depends on the number of users on the network's other side.  The value of a platform such as IronPlanet to its users grows as the platform matches demand from both sides, which results in a self-reinforcing feedback loop of increasing participation in IronPlanet's online marketplace by buyers and sellers of heavy

construction equipment.  More buyers lead to more sellers, which in turn leads to still more buyers and again to still more sellers.  These network effects accruing to IronPlanet's online marketplace contribute to and reinforce its leading position in the online sale of heavy construction equipment.

59.     In a 2010 filing with the Securities and Exchange Commission, IronPlanet wrote:

> By attracting significant numbers of geographically dispersed sellers and buyers to our marketplace, we believe we have built a network effect that increases the value of our services to all participants in our marketplace. Furthermore, we believe this value continues to increase over time as the size of our marketplace, and the resulting supply of and demand for used heavy equipment, grows.

In the same filing, IronPlanet expanded on the network effect accruing to its platform:

> As the liquidity of our marketplace continues to increase, as the numbers of sellers and buyers in our marketplace grows, and as our geographic coverage expands, we benefit from a network effect.  We believe the value of our marketplace to both sellers and buyers increases as we add more users.  More registrants to the marketplace allows for more prospective bidding, which yields higher price realization for sellers.  More sellers produces a larger number and greater variety of listings, which makes the marketplace more attractive for buyers.

60.     IronPlanet, as an alternative distribution mechanism for new heavy construction equipment, posed a threat to the distribution barrier to entry into the relevant heavy construction equipment markets erected by incumbent manufacturers.  IronPlanet's success selling used equipment has demonstrated that U.S. consumers are willing to purchase heavy construction equipment online.  The Manufacturer Defendants, fearing that this willingness would spread to the purchase of new equipment sold by ICP at large discounts to the prices charged for new equipment in physical dealerships, took immediate and decisive action to prevent that from occurring.

61.     Distribution through IronPlanet is the most efficient and effective means for new entrants into the relevant heavy construction equipment markets to distribute their products and reach end users.  All other forms of distribution available to new entrants today or in the reasonably foreseeable future involve substantially higher costs and longer periods of time before entry could be

effective in disciplining the prices charged by the Manufacturer Defendants in the relevant heavy construction equipment markets.

62.     For a new entrant into the relevant heavy construction equipment markets, physical auctions or their online broadcasts are not a reasonable substitute for IronPlanet.  Physical auctions require sellers to transport heavy construction equipment to the buyer's location before a sale can be made, substantially raising the seller's costs.  The ocean transport cost of a large crawler dozer from China to the United States is approximately $15,000, and once landed, inland transportation costs to an auction site can be as much as $5,000.  The online auctions run by Richie Bros., the largest domestic provider of physical, in-person auction services for heavy construction equipment, are merely broadcasts of physical auctions held at 30 or more sites around the country, requiring sellers through Richie Bros. to incur these substantial upfront transportation costs.  Selling through Richie Bros. is especially uneconomical for an entrant like ICP seeking to sell large volumes of new foreign-made equipment without any assurance that a profitable sale will be made.  By contrast, selling through IronPlanet allowed ICP to defer transportation costs until after a sale is made, lowering costs and increasing sales.  Physical auctions, whether broadcast over the internet or not, are also held only 3 to 4 times a year by any given auctioneer, while selling through IronPlanet allows ICP and other sellers to make their products available for purchase continuously throughout the year.  Physical auctioneers also tend to sell only on an unreserved basis, while selling through IronPlanet allowed ICP to offer its products at a fixed price, guaranteeing ICP a margin sufficient to cover costs and an acceptable operating profit.

63.     IronPlanet has publicly differentiated its services from those of traditional auctioneers, claiming that "[u]nlike traditional auctions, sellers at IronPlanet achieve faster and more profitable sales through weekly auctions, fair market value for equipment, low selling costs, and a

global audience of buyers.  IronPlanet sells the equipment from the consignor's location, eliminating transportation costs for the seller."  In 2008, the then-President of IronPlanet was quoted as saying that the costs of selling through IronPlanet were 6 to 11 percent lower than through alternative venues, including, on information and belief, traditional auctioneers.

64.     The Defendants admit that physical auctions are complements to, and not substitutes for, IronPlanet.  In their December 19, 2014, press release announcing the merger of IronPlanet and Defendant Cat Auction Services, the President and CEO of Cat Auction Services was quoted as saying:

> The live auction format from Cat Auction Services, along with IronPlanet's online marketplaces, will give our customers the innovative solutions they are looking for to meet their inventory management requirements.  This is a very significant merger as both companies are industry leading and clearly complement each other.

65.     For a new entrant into the relevant heavy construction equipment markets, no other existing online marketplace is a substitute for IronPlanet.  EquipmentOne, the online marketplace of Richie Bros., has a fraction of the listings, sales, and active users that IronPlanet has.  In contrast to IronPlanet's 1 million registered users, EquipmentOne had 50,000 unique users in 2013.  Richie Bros. identifies EquipmentOne as a complement to, rather than a substitute for, the internet broadcasts of its physical auctions.  eBay, Machinery Trader, Rock and Dirt, Equipment Trader Online, and Craigslist are similarly not substitutes for IronPlanet, due to their lack of listings for heavy construction equipment, sales, and active qualified users, all of which are necessary to be a viable substitute to IronPlanet for sellers and buyers of heavy construction equipment.

66.     Building a distribution network from scratch is not an effective or timely form of entry into the relevant heavy construction equipment markets, as demonstrated by the recent experience of SANY and LiuGong.

67.     Due to the substantial network effects that accrue to IronPlanet's rapidly growing platform, developing a new online marketplace comparable in reach to IronPlanet would take many years, if it could be done at all.

68.     The Manufacturer Defendants are, individually and collectively, minority investors in IronPlanet.  On information and belief, Defendants Caterpillar and Komatsu each have the right to designate a director to IronPlanet's Board of Directors.

## ICP WAS A UNIQUE COMPETITIVE THREAT TO DEFENDANTS

69.     ICP's business model is to serve as a master distributor of foreign, particularly Chinese, heavy equipment manufacturers, and to bring those products to U.S. consumers at substantially lower prices than those charged by the domestic incumbent manufacturers for comparable products.  ICP's prices for comparable new heavy construction equipment products, using many of the same components, are as much as 40 percent below those of the Manufacturer Defendants.  ICP planned to enter first the relevant heavy construction equipment markets, and then to expand its product offering into other, adjacent markets such as materials handling equipment (*e.g.*, aerial lift platforms, cranes), agricultural equipment (*e.g.*, tractors and combines), road construction equipment, as well as parts and accessories for all of these products.  ICP's management team, directors, and advisors collectively had over 100 years of experience in senior positions in the relevant heavy construction equipment markets, including with the Manufacturer Defendants, and in adjacent markets.  ICP's management team had the expertise to successfully enter the relevant heavy construction equipment markets.

70.     China accounts for about 40 percent of global heavy construction equipment production.  Since 2012, excess production capacity for heavy construction equipment has developed in China, and Chinese producers have looked for opportunities to export their products abroad, including to the United States.

71.     In 2011, Caterpillar's CEO acknowledged publicly that Chinese competitors in the U.S. would eventually emerge as a "serious threat."

72.     "Chinese companies have not yet learned how to make world-class cars, but they have now cracked how to make top-quality construction equipment at attractive prices," reported The Economist in December 2013, "and their foreign rivals should be worried."

73.     In 2013, ICP contracted with Lonking Holdings Ltd. ("Lonking"), one of the world's largest heavy construction equipment manufacturers and the world's leading manufacturer of wheel loaders, to serve as Lonking's master distributor in the United States and other markets outside China.  ICP also negotiated with or received expressions of interest from other foreign manufacturers of heavy construction, materials handling, and agricultural equipment interested in appointing ICP as a master distributor for sales of their products into the United States.

74.     ICP planned to bring these foreign-made products to market in the U.S. primarily by selling directly to end users through the internet.  ICP's internet store, ICPDirect.com, was to be hosted and supported by IronPlanet.  Sales through IronPlanet would have allowed ICP to benefit from the substantial base of end users using IronPlanet to purchase heavy construction equipment, as well as IronPlanet's sales force of 300 sales representatives.  Access to the IronPlanet sales force was important to ICP's entry because it gave ICP turnkey access to a large and experienced sales force to stimulate demand for ICP's products and to recruit new equipment dealers.

75.     Even though equipment dealers are generally prevented from selling ICP equipment by the exclusivity requirements of the largest incumbent manufacturers, including the Manufacturer Defendants, those policies generally do not require exclusivity for maintenance and repair services. ICP was successful in entering into arrangements with established equipment dealers around the

country for post-sale services for its heavy construction equipment.  ICP also arranged for parts depots around the country, ensuring wide and rapid availability of parts for service.

76.     In this way, ICP's business model promised to combine low priced, high-quality new heavy construction equipment with high levels of post-sale support, sold through an innovative and uniquely efficient distribution channel, IronPlanet.  ICP's entry through IronPlanet would have been exponentially more disruptive than prior entrants.   Through IronPlanet, ICP would reach approximately 80 percent of end users of heavy construction equipment immediately.  By contrast, SANY was able to reach approximately 5 percent of the U.S. market after 7 years of costly expenditure in building a dealer network.  Selling through IronPlanet would allow ICP to quickly achieve substantial distribution and scale selling its low-priced, high-quality products to end users, putting downward pressure on the Manufacturer Defendants' revenues and profits.

77.     ICP and IronPlanet signed a services agreement, called a Hosted Site Agreement ("Agreement"), on March 3, 2014.  The Agreement required IronPlanet to maintain on the IronPlanet website links that would allow visitors to that website to purchase ICP's product (the "Hosted Store"), as well as to provide pre-sale customer support and transaction processing.  Visitors to ICP's ICPDirect.com site expressing an interest in purchasing ICP's product would be linked to the Hosted Store, where they could complete their transaction.  In return, IronPlanet would earn commissions on sales of ICP's products.  Once the Hosted Store was commercially deployed, which it was on March 3, 2014, the Agreement was not terminable at will.  Upon commercial deployment of the Hosted Store, the Agreement had an initial term of one year, with automatic renewals of up to two successive one-year terms, subject to either party's right to terminate within 90 days of the end of each one-year period.

78.     IronPlanet was highly motivated to sell ICP's products.  IronPlanet had been attempting to expand its existing business, which focused on used heavy construction equipment, through the sale of new heavy construction equipment products on its website.  The sale of new products would allow IronPlanet (currently a privately-held company) to achieve more stable and predictable revenues and profits, which are desirable to investors in public equity markets, and thus to IronPlanet's venture capitalist investors.  IronPlanet's interest in selling ICP's products included an interest in selling heavy construction equipment, materials handling equipment, and agricultural equipment, and the Agreement covered sales of all of these products.

79.     ICP reasonably forecast making hundreds of millions of dollars in revenues, and over 50 million dollars in profits, from its relationship with IronPlanet by no later than 2016, with accelerating rates of growth in sales and profits in successive years.  Access to IronPlanet's substantial customer base, the accelerating network effects that accrue to the IronPlanet platform and the benefit of IronPlanet's sales force conferred efficiencies and benefits on ICP that were not reasonably obtainable for ICP either on its own or through any other source.

80.     In addition to U.S. sales, ICP forecast making substantial international sales through its services agreement with IronPlanet.  More than twenty-five percent of IronPlanet's sales of heavy construction equipment are made to buyers outside the United States, and the Chinese products sold by ICP have met wide acceptance in certain international markets over the past decade.

81.     The Hosted Store went live and became commercially available to consumers on March 3, 2014.  Nineteen models of excavators, wheel loaders, and forklifts were offered for sale. Consumers searched for ICP products on the IronPlanet Hosted Store, displaying increasing interest in successive weeks.  IronPlanet made a sale of an ICP product within just one week after the Hosted

Store became operational and before the IronPlanet sales force had even started to market ICP's products.

82.     ICP announced its partnership with IronPlanet on March 3, 2014, at the 2014 CONEXPO-CON/AGG show, a widely-attended industry event.  Representatives of the Defendants attended ICP's live announcement of its entry plans and its contract with IronPlanet and/or visited its booth at the trade show.  The existence of a business relationship between ICP and IronPlanet was widely covered in the trade press.  Over fifty journalists covered the live announcement of the partnership of ICP and IronPlanet.  On information and belief, Defendants knew from these sources, and from their relationships with IronPlanet, that ICP had a contract with IronPlanet.

83.     The trade press also covered ICP's projections of rapid sales success and market share growth through IronPlanet.  ICP's Chairman was quoted in a trade press article as saying that ICP would sell 300 pieces of heavy construction equipment in the last three quarters of 2014 and make revenues of $150 million in 2015.  This article, or coverage of the same or similar statements by ICP, was available to Defendants.

84.     On information and belief, Defendants were aware of these projections, and understood that they depended on ICP's access to IronPlanet and IronPlanet's continued course of dealing with ICP.  On March 8, 2014, ICP's CEO was quoted in a trade press article as saying, "IronPlanet will be the engine that drives our online sales, with pricing, warranty, financing, etc., on to the shopping cart and check out."  This article, or coverage of the same or similar statements by ICP, was available to Defendants.

85.     On information and belief, Defendants were aware that ICP planned to rapidly expand both its product offering of heavy construction equipment as well as other product categories, such as materials handling and agricultural equipment.  On March 5, 2014, ICP's Chairman was quoted in

a trade press article as saying, "By the end of the year, we may have the fullest product line of anyone but Caterpillar." In the same article, ICP's CEO was quoted as saying, "There are hundreds of manufacturers who want to expand in the prime market here, but they fail because they don't know how. This gives them an avenue to market." This article, or coverage of the same or similar statements by ICP, was available to Defendants. ICP also announced publicly its intention to add additional manufacturers to its product line at the live announcement of its entry and partnership with IronPlanet on March 3, 2014.

86.     Industry observers agreed that ICP's relationship with IronPlanet posed a significant competitive threat to the incumbent manufacturers. As reported in industry trade press on April 4, 2014:

> ICP plans to sell several models of Lonking excavators, wheel loaders, compactors and industrial lift trucks over the Internet … The ICP strategy could be very disruptive for the North American equipment business, if they succeed. Up to now all manufacturers have spent huge amounts to develop and maintain distributors that serve local markets. If the ICP business model works it could cause a sea change in the marketplace, and other foreign manufacturers are likely to try it as well.

This article, or coverage of the same or similar statements about ICP, was available to Defendants.

## ICP'S ENTRY ATTRACTED INTEREST FROM ADDITIONAL MANUFACTURERS

87.     During and after the 2014 CONEXPO-CON/AGG show, major foreign manufacturers of heavy construction, materials handling, and agricultural equipment expressed substantial interest in partnering with ICP for the sale of their products in the United States through IronPlanet.

88.     Shantui Construction Machinery Co., Ltd. ("Shantui") is a Chinese heavy construction equipment manufacturer and the world's largest supplier of dozers by units sold. Shantui's U.S. sales manager traveled to the 2014 CONEXPO-CON/AGG show specifically to meet with ICP personnel and attended ICP's public announcement of its entry into the heavy construction

equipment market and its partnership with IronPlanet.  Representatives of each of the Manufacturer Defendants attended this same public announcement.  Expressions of interest by Shantui's management at the 2014 CONEXPO-CON/AGG show in contracting with ICP led to further top-level meetings between Shantui and ICP in China.  Shantui expressed an interest in selling Shantui products through ICP, particularly if ICP's entry through IronPlanet was successful.

89.     Sunward Equipment Group ("Sunward") is a Chinese manufacturer of heavy construction and materials handling equipment and one of the largest manufacturers of heavy construction equipment in the world.  Sunward's owner traveled to the 2014 CONEXPO-CON/AGG show specifically to meet with ICP personnel and attended ICP's public announcement of its entry into the heavy construction equipment market and its partnership with IronPlanet.  Representatives of each of the Manufacturer Defendants attended this same public announcement.  Expressions of interest by Sunward at the 2014 CONEXPO-CON/AGG show in contracting with ICP led to further top-level meetings between Sunward and ICP in China.  Sunward expressed an interest in selling Sunward products through ICP, particularly if ICP's entry through IronPlanet was successful.

90.     Xuzhou Construction Machinery Group ("XCMG") is a Chinese manufacturer of heavy construction and materials handling equipment and one of the largest manufacturers of heavy construction equipment in the world.  The CEO of Schwing, a U.S. subsidiary of XCMG, visited ICP to discuss selling XCMG products in the United States through ICP and expressed an interest in doing so, particularly if ICP's entry through IronPlanet was successful.

91.     KOMAC America, Inc. is a subsidiary of KOMAC, a South Korean manufacturer of heavy construction equipment.  Initial discussions between KOMAC and ICP representatives at the 2014 CONEXPO-CON/AGG show were sufficiently positive as to induce KOMAC's owner to visit the United States with the express purpose of meeting ICP's management.  KOMAC expressed an

interest in selling KOMAC products through ICP, particularly if ICP's entry through IronPlanet was successful.

92.     Talleres Betoño S.A., d/b/a Tabe Hammer ("Tabe") is a Spanish manufacturer of accessories for heavy construction equipment.  After several communications with ICP, Tabe expressed a readiness to appoint ICP as Tabe's North American distributor.

## DEFENDANTS BLOCKED ICP'S ENTRY

93.     Defendants understood that IronPlanet's relationship with ICP would likely result in the disruptive and rapidly successful entry of ICP into the relevant heavy construction equipment markets, driving prices down to the detriment of the Defendants and the benefit of consumers.

94.     The Manufacturer Defendants and their affiliates are some of the highest-volume sellers of used heavy construction equipment through IronPlanet.  IronPlanet has in the past publicly acknowledged the risks to its revenues and profitability if one or more of the Manufacturer Defendants stopped selling their used heavy construction equipment though IronPlanet.  Leveraging the importance to IronPlanet of their used equipment sales, the Manufacturer Defendants threatened to boycott and refuse to deal with IronPlanet if it did not refrain generally from doing business with ICP.

95.     Each of the Manufacturer Defendants communicated the same or similar threat to IronPlanet within days of one another, whereby the Manufacturer Defendants would stop selling used heavy construction equipment through IronPlanet if IronPlanet continued to do business with ICP.  The Manufacturer Defendants induced IronPlanet's breach of its contract with ICP with the sole purpose of maintaining their market power in the relevant heavy construction equipment markets by eliminating ICP as a threatening and disruptive new market entrant selling new heavy construction equipment from Lonking or other new heavy construction equipment manufacturers.

The Manufacturer Defendants do not themselves sell new heavy construction equipment through IronPlanet, and had no interest in competing with ICP to do so.

96.     IronPlanet contemporaneously communicated the fact and substance of these communications to ICP.  On or about April 3, 2014, IronPlanet's President informed ICP's Chairman that Caterpillar, and at least one other manufacturer of heavy construction equipment, had threatened to stop doing business with IronPlanet if IronPlanet continued to deal with ICP.  On or about April 10, 2014, IronPlanet's President, in response to a question from ICP's Chairman as to the identity of the other manufacturers (in addition to Caterpillar) that were forcing IronPlanet to breach its contract with ICP, replied "you know who our investors are."

97.     IronPlanet's investors are the Manufacturer Defendants and venture capital firms. IronPlanet's venture capital investors could not have made the threats described by IronPlanet to ICP because they have no heavy construction equipment to withhold from IronPlanet and because, as alleged above, IronPlanet saw a substantial economic opportunity in the contract with ICP, including smoother financial earnings that could lead to an IPO and a selling opportunity with substantial economic benefits for IronPlanet's venture capital investors.  The Manufacturer Defendants, on the other hand, had every incentive to prevent ICP from selling Lonking new heavy construction equipment through IronPlanet, and to prevent ICP from entering into agreements with other manufacturers of new heavy construction equipment enabling ICP to sell those manufacturers' new heavy construction equipment through IronPlanet, as ICP had disclosed in the March 5, 2014 trade press article.  Thus, the threats to IronPlanet made by its "investors" and relayed to ICP by IronPlanet could have come only from the Manufacturer Defendants.

98.     On information and belief, the Manufacturer Defendants agreed and conspired with one another to issue these threats to IronPlanet and to pressure IronPlanet to refrain from dealing

with ICP.  The Manufacturer Defendants had the motive and opportunity to conspire to this end and did not have sufficient unilateral incentives to engage in this costly and risky conduct absent an agreement that all of the Manufacturer Defendants would do so.

99.     The Manufacturer Defendants' investments in IronPlanet make them highly interdependent with respect to the terms on which they would be willing to deal with IronPlanet, and give the Manufacturer Defendants the incentive and ability to coordinate those terms.  A refusal to deal with IronPlanet by any Manufacturer Defendant would tend to impair the value of all of the Manufacturer Defendants' investments in IronPlanet, and would have called for and triggered coordination among the Manufacturer Defendants to avoid conflicts of interest.  Upon information and belief, the Manufacturer Defendants met and conferred with one another about the terms on which they would refuse to do business with IronPlanet.

100.     The Manufacturer Defendants lacked the incentive to issue their threats to IronPlanet absent an agreement that they would each engage in this conduct.  The Manufacturer Defendants' threats were costly and risky, exposing each individually to the risk of substantial lost sales through IronPlanet, if IronPlanet did not accede to their demands, and to the possibility of legal action from demanding conduct they knew to be a breach of contract with ICP, if IronPlanet did accede.  In contrast, the benefits of excluding ICP from the relevant heavy construction equipment markets would be felt commonly among the Manufacturer Defendants and their competitors.  This concentrated-cost but distributed-benefit dynamic would have resulted in parallel conduct only when coordinated by communication and agreement among the Manufacturer Defendants.

101.     The Manufacturer Defendants' threats to IronPlanet marked a sudden departure from their past practice of tolerating sales of a wide range of used heavy construction equipment through IronPlanet.  Upon information and belief, the Manufacturer Defendants have not previously

demanded that IronPlanet refrain from dealing with any manufacturer or supplier of heavy construction equipment.

102.    IronPlanet acceded to the heavy economic pressure applied by the Defendants. IronPlanet informed ICP that IronPlanet would not perform the terms of the Agreement.  IronPlanet discontinued sales and transaction support for ICP's products, delivering written notice of termination on April 7, 2014.  These acts by IronPlanet constituted an unlawful breach of the Agreement with ICP.  IronPlanet's termination letter identified no excuse or justification for its breach, and characterized IronPlanet's breach as "an unfortunate circumstance."

103.    The Manufacturer Defendants knew that IronPlanet's termination of its contract with ICP, and its sales and transaction support of ICP's products, would cause other new heavy equipment manufacturers to stop attempting to expand their sales in the United States by dealing with ICP or by working through ICP to gain access to IronPlanet's sales platform.

104.    The incentives of the Manufacturer Defendants and IronPlanet were not aligned with respect to IronPlanet's dealing with ICP.  IronPlanet's coerced termination of its contract with ICP was contrary to IronPlanet's economic interest, as this conduct exposed IronPlanet to legal liability and was unprofitable for IronPlanet.  As alleged above, IronPlanet was highly motivated to deal with ICP.  IronPlanet breached the Agreement just days after senior executives of ICP and IronPlanet met and discussed ways to further expand sales of ICP products on IronPlanet.  The heavy economic pressure applied by the Manufacturer Defendants to IronPlanet was intended to further their own commercial interests at the expense of IronPlanet's interests.  In the telephone call between ICP and IronPlanet that occurred on or about April 10, 2014, IronPlanet's President said that the Manufacturer Defendants' actions in forcing IronPlanet's breach were "wrong" and "make no sense to me."

**THE DEFENDANTS CONSPIRED TO ELIMINATE THE THREAT OF NEW ENTRY BY ELIMINATING IRONPLANET AS AN INDEPENDENT CHANNEL FOR NEW ENTRY**

105.     Having eliminated the immediate threat of ICP's rapid and effective entry through IronPlanet, Defendants Caterpillar and Cat Auction Services then conspired to forever eliminate that threat by bringing IronPlanet under the control of Caterpillar and its dealers, the owners of Defendant Cat Auction Services.  The merger of these two entities in which Caterpillar holds minority stakes could not have reasonably been achieved except through Caterpillar's knowing participation and support, and Caterpillar's influence with its equipment dealers, the other shareholders in Cat Auction Services.  In the alternative, Cat Auction Services knowingly offered substantial assistance to the Manufacturer Defendants' ongoing conspiratorial and anticompetitive campaign to eliminate the threat of ICP's entry through IronPlanet by agreeing to merge with IronPlanet.

106.     Due to Caterpillar's policy of requiring exclusivity on the part of its dealers, the incentives of Caterpillar and its dealers are aligned with respect to erecting barriers to ICP's effective entry into the relevant heavy construction equipment markets.  Thus, Cat Auction Services had the motive to join the Manufacturer Defendants' ongoing conspiracy to eliminate the threat of ICP's entry through IronPlanet.  The merger of IronPlanet and Cat Auction Services will align IronPlanet's incentives with those of Caterpillar and its dealers with respect to dealing with ICP and other new entrants and will ensure that IronPlanet will never again facilitate the entry of ICP and other new competitors into the relevant heavy construction equipment markets.

107.     Deprived of efficient distribution through IronPlanet, ICP has no feasible way to reach consumers in the heavy construction equipment markets.  ICP's equity and goodwill have been damaged as a result of Defendants' actions.  ICP's flagship partner, IronPlanet, has broken off any business relationship with ICP, and ICP's products are no longer available through IronPlanet.

31

Market participants are aware of these facts.  ICP's 2014 revenues were a small fraction of what they would have been but-for the Defendants' conduct.  These effects will continue for years to come as ICP suffers from lack of distribution and harm to its reputation with consumers and suppliers of heavy construction equipment alike.  Foreign manufacturers of heavy construction, materials handling, and agricultural equipment have been deterred from dealing with ICP by the Defendants' conduct.

108.    ICP has taken all reasonable steps to mitigate its damages, including trying to set up equipment dealers in an attempt to challenge frontally the Manufacturer Defendants' distribution barrier to entry.  These efforts have been unsuccessful in challenging the Manufacturer Defendants' collective dominance of the relevant heavy construction equipment markets, or in mitigating ICP's damaged equity, damaged goodwill, lost sales, and lost profits caused by the Defendants' conduct.

## DEFENDANTS' UNLAWFUL CONDUCT

109.    The Manufacturer Defendants' imposition of exclusive distribution arrangements on their equipment dealers has foreclosed new entrants from access to efficient distribution necessary to offer meaningful competition to the Manufacturer Defendants.  The Manufacturer Defendants' exclusivity arrangements with their dealers create substantial barriers to entry that facilitate coordinated oligopoly pricing by the Manufacturer Defendants and the other domestic incumbent manufacturers of heavy construction equipment.  The Manufacturer Defendants' exclusivity arrangements have no legitimate business justification that outweighs their anticompetitive effect of excluding new entrants and facilitating coordination among the Manufacturer Defendants and the other domestic incumbent manufacturers of heavy construction equipment.  Plaintiff has standing to challenge these exclusivity arrangements because they have erected barriers to Plaintiff's entry and created the environment whereby the Manufacturer Defendants could exclude Plaintiff from the relevant markets by excluding Plaintiff from making sales through IronPlanet.

110.    The Manufacturer Defendants' threats to boycott and refuse to deal with IronPlanet if IronPlanet continued dealing with ICP foreclosed ICP from the most efficient distribution channel for a new entrant that had not already been foreclosed by the exclusivity arrangements of the Manufacturer Defendants and the other incumbent manufacturers, leading to damaged equity and goodwill for ICP, lower revenues and profits for ICP, and higher prices for end users of these products.  Upon information and belief, the Manufacturer Defendants agreed with one another to issue these threats and refusals to deal.  In the alternative, each of the Manufacturer Defendants acted unilaterally in threatening to refuse to deal with IronPlanet if IronPlanet continued dealing with ICP.

111.    The merger of Cat Auction Services and IronPlanet is anticompetitive due to its tendency to substantially reduce competition in the relevant heavy construction equipment markets and to foreclose the possibility of effective entry into those markets by new entrants.

112.    Defendants' conduct has caused damage to ICP's equity and goodwill and caused ICP lost sales and lost profits.

## CLAIMS FOR RELIEF

## COUNT ONE:

### The Manufacturer Defendants Have Unreasonably Restrained Trade
### (Lost Profits)

113.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  The Manufacturer Defendants' conduct as alleged therein are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

114.    The Manufacturer Defendants' exclusivity arrangements with dealers in the relevant heavy construction equipment markets unreasonably restrain trade by erecting substantial barriers to entry by new entrants and facilitating coordinated collusive pricing among the Manufacturer Defendants and the other incumbent manufacturers of heavy construction equipment.

115.     The Manufacturer Defendants' agreements with one another that each would threaten to boycott IronPlanet if IronPlanet did not breach its contract with ICP and otherwise refrain from dealing with ICP was an unlawful group boycott.

116.     This conduct has damaged ICP in the form of lost profits.

## COUNT TWO:

### The Manufacturer Defendants Have Unreasonably Restrained Trade
### (Damaged Equity and Goodwill)

117.     Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint. The Manufacturer Defendants' conduct as alleged therein are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118.     The Manufacturer Defendants' exclusivity arrangements with dealers in the relevant heavy construction equipment markets unreasonably restrain trade by erecting substantial barriers to entry by new entrants and facilitating coordinated collusive pricing among the Manufacturer Defendants and the other incumbent manufacturers of heavy construction equipment.

119.     The Manufacturer Defendants' agreements with one another that each would threaten to boycott IronPlanet if IronPlanet did not breach its contract with ICP and otherwise refrain from dealing with ICP was an unlawful group boycott.

120.     This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

## COUNT THREE:

### The Manufacturer Defendants' Exclusivity Policies Violate the
### Clayton Act (Lost Profits)

121.     Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint. The Manufacturer Defendants' conduct in requiring exclusivity of their equipment dealers substantially

lessens competition, or tends to create a monopoly, in the relevant heavy construction equipment markets in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

122.    This conduct has damaged ICP in the form of lost profits.

## COUNT FOUR:

### The Manufacturer Defendants' Exclusivity Policies Violate the Clayton Act (Damaged Equity and Goodwill)

123.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  The Manufacturer Defendants' conduct in requiring exclusivity of their equipment dealers substantially lessens competition, or tends to create a monopoly, in the relevant heavy construction equipment markets in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

124.    This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

## COUNT FIVE:

### Caterpillar Has Monopolized Relevant Heavy Construction Equipment Markets (Lost Profits)

125.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Caterpillar's conduct as alleged therein constitutes monopolization and attempted monopolization of relevant heavy construction equipment markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Caterpillar acted with the specific intent to acquire or maintain monopoly power.  Caterpillar's conduct is reasonably capable of maintaining monopoly power, or has a dangerous probability of success in attaining monopoly power.

126.    This conduct has damaged ICP in the form of lost profits.

## COUNT SIX:

### Caterpillar Has Monopolized Relevant Heavy Construction Equipment Markets (Damaged Equity and Goodwill)

127.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Caterpillar's conduct as alleged therein constitutes monopolization and attempted monopolization of relevant heavy construction equipment markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Caterpillar acted with the specific intent to acquire or maintain monopoly power.  Caterpillar's conduct is reasonably capable of maintaining monopoly power or has a dangerous probability of success in attaining monopoly power.

128.    This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

## COUNT SEVEN:

### The Manufacturer Defendants Conspired to Monopolize (Lost Profits)

129.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  The Manufacturer Defendants' conduct as alleged therein constitutes a conspiracy to monopolize relevant heavy construction equipment markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The Manufacturer Defendants acted with the specific intent to acquire or maintain monopoly power and took overt acts in furtherance of their conspiracy.  The Manufacturer Defendants' conduct is reasonably capable of maintaining monopoly power or has a dangerous probability of success in attaining monopoly power.

130.    This conduct has damaged ICP in the form of lost profits.

## COUNT EIGHT:

### The Manufacturer Defendants Conspired to Monopolize (Damaged Equity and Goodwill)

131.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.    The Manufacturer Defendants' conduct as alleged therein constitutes a conspiracy to monopolize relevant heavy construction equipment markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. The Manufacturer Defendants acted with the specific intent to acquire or maintain monopoly power and took overt acts in furtherance of their conspiracy.  The Manufacturer Defendants' conduct is reasonably capable of maintaining monopoly power or has a dangerous probability of success in attaining monopoly power.

132.    This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

## COUNT NINE:

### Cat Auction Services' Merger with IronPlanet is Anticompetitive (Lost Profits)

133.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  The merger agreement of Cat Auction Services and IronPlanet violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 1 of the Sherman Act, 15 U.S.C. § 1, by substantially lessening competition, tending to create a monopoly and unreasonably restraining trade in the relevant heavy construction equipment markets.

134.    This conduct has damaged ICP in the form of lost profits.

## COUNT TEN:

### Cat Auction Services' Merger with IronPlanet is Anticompetitive (Damaged Equity and Goodwill)

135.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  The merger agreement of Cat Auction Services and IronPlanet violates Section 7 of the Clayton Act, 15 U.S.C. §

18, and Section 1 of the Sherman Act, 15 U.S.C. § 1, by substantially lessening competition, tending to create a monopoly and unreasonably restraining trade in the relevant heavy construction equipment markets.

136.   This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

## COUNT ELEVEN:

### Manufacturer Defendants' Tortious Interference with Contract (Lost Profits)

137.   Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Each of the Manufacturer Defendants' conduct as alleged therein constitutes tortious interference with contract.

138.   This conduct has damaged ICP in the form of lost profits.

## COUNT TWELVE:

### Manufacturer Defendants' Tortious Interference with Contract (Damaged Equity and Goodwill)

139.   Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Each of the Manufacturer Defendants' conduct as alleged therein constitutes tortious interference with contract.

140.   This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

## COUNT THIRTEEN:

### Manufacturer Defendants' Tortious Interference with Prospective Business Relations (Lost Profits)

141.   Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Each of the Manufacturer Defendants' conduct as alleged therein constitutes tortious interference with ICP's prospective business relations with IronPlanet in the future, and with foreign manufacturers of heavy construction, materials handling, and agricultural equipment, including Shantui, Sunward, XCMG, KOMAC and Tabe.

142.    This conduct has damaged ICP in the form of lost profits.

## COUNT FOURTEEN:

**Manufacturer Defendants' Tortious Interference with Prospective
Business Relations (Damaged Equity and Goodwill)**

143.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Each of the

Manufacturer Defendants' conduct as alleged therein constitutes tortious interference with ICP's

prospective business relations with IronPlanet in the future, and with foreign manufacturers of heavy

construction, materials handling, and agricultural equipment, including Shantui, Sunward, XCMG,

KOMAC and Tabe.

144.    This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP

as a going concern.

## COUNT FIFTEEN:

**Civil Conspiracy (Lost Profits)**

145.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Each of the

Defendants' conduct as alleged therein constitutes civil conspiracy.

146.    This conduct has damaged ICP in the form of lost profits.

## COUNT SIXTEEN:

**Civil Conspiracy (Damaged Equity and Goodwill)**

147.    Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  Each of the

Defendants' conduct as alleged therein constitutes civil conspiracy.

148.    This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP

as a going concern.

## COUNT SEVENTEEN:
### Aiding and Abetting (Lost Profits)

149.     Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  The conduct of

the Defendants, including the merger of Cat Auction Services and IronPlanet, constitutes aiding and

abetting of the Defendants' ongoing tortious and anticompetitive conduct aimed at ICP.

150.     This conduct has damaged ICP in the form of lost profits.

## COUNT EIGHTEEN:
### Aiding and Abetting (Damaged Equity and Goodwill)

151.     Plaintiff hereby restates Paragraphs 1 through 112 of this Complaint.  The conduct of

the Defendants, including the merger of Cat Auction Services and IronPlanet, constitutes aiding and

abetting of the Defendants' ongoing tortious and anticompetitive conduct aimed at ICP.

152.     This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP

as a going concern.

## REQUEST FOR RELIEF

153.     To remedy these illegal acts, Plaintiff requests the Court:

a.       Enter an injunction permanently enjoining the Manufacturer Defendants from

entering into, or permitting to exist or continue, exclusivity arrangements with dealers in the

relevant markets that unreasonably restrain trade, substantially lessen competition, or tend to

create a monopoly by erecting substantial barriers to new entry or facilitating coordinated

pricing among manufacturers in the relevant markets, as well as the other unlawful conduct

of the Manufacturer Defendants as alleged herein;

b.       Order the divestiture of IronPlanet by Cat Auction Services;

c.       Award compensatory and trebled damages in favor of the Plaintiff and against

all Defendants, jointly and severally, and punitive damages, including all interest thereon;

d.      Award Plaintiff reasonable costs and expenses incurred in this action,

including attorney's fees and expert fees; and

e.      Any such further relief as the Court deems appropriate.


*/s/ John W. Shaw*
JOHN W. SHAW (No. 3362)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120,
Wilmington, DE 19801
(302) 298-0701
jshaw@shawkeller.com

DAVID BOIES
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
7th Floor
New York, NY 10022
(212) 446-2300

JAMES P. DENVIR
CHRISTOPHER G. RENNER
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
(202) 237-2727

*Counsel for International Construction
Products LLC*

Dated:  January 29, 2015