## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL CONSTRUCTION
PRODUCTS LLC,

        Plaintiff,

        v.

CATERPILLAR INC., KOMATSU
AMERICA CORP., VOLVO
CONSTRUCTION EQUIPMENT NORTH
AMERICA, LLC and ASSOCIATED
AUCTION SERVICES, LLC, doing business
as Cat Auction Services,

        Defendants.

C.A. No. 1:15-cv-00108-RGA

## JOINT OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS COMPLAINT

Robert G. Abrams (*pro hac vice*)
Gregory J. Commins, Jr. (*pro hac vice*)
Danyll W. Foix (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C.  20036-5304
Tel:  (202) 861-1500
rabrams@bakerlaw.com
gcommins@bakerlaw.com
dfoix@bakerlaw.com

POTTER ANDERSON & CORROON LLP
David J. Baldwin (Del. Bar No. 1010)
Janine L. Hochberg (Del. Bar No. 5188)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dbaldwin@potteranderson.com
jhochberg@potteranderson.com

*Attorneys for Defendant Caterpillar Inc.*

Dated:  April 20, 2015

Jeremy Heep (*pro hac vice*)
Robin P. Sumner (*pro hac vice*)
Melissa Hatch O'Donnell (*pro hac vice*)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: 215.981.4000
Facsimile:  215.981.4750
heepj@pepperlaw.com
sumnerr@pepperlaw.com
odonnelm@pepperlaw.com

M. Duncan Grant (Del. Bar No. 2994)
James H. S. Levine (Del. Bar No. 5355)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile:  302.421.8390
grantm@pepperlaw.com
levinejh@pepperlaw.com

*Attorneys for Defendant Volvo Construction
Equipment North America, LLC*

David H. Bamberger (*pro hac vice*)
Katherine M. Ruffing (*pro hac vice*)
James F. Reardon (*pro hac vice*)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: 202.799.4500
Facsimile: 202.799.5500
david.bamberger@dlapiper.com
katie.ruffing@dlapiper.com
james.reardon@dlapiper.com

Denise S. Kraft (Del. Bar No. 2778)
Brian Biggs (Del. Bar No. 5591)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
Telephone: 302.468.5700
Facsimile: 302.394.2341
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com

*Attorneys for Defendant Komatsu America
Corp.*

Quentin R. Wittrock
GRAY PLANT MOOTY
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.632.3000
Facsimile: 612.632.4444
quentin.wittrock@gpmlaw.com

Edward F. Eaton (Del. Bar No. 639)
CONNOLLY GALLAGHER LLP
The Brandywine Building
1000 West Street
Suite 1400
Wilmington, DE 19801
Telephone: 302.888.6204
Facsimile: 302.654.1005
meaton@connollygallagher.com

*Attorneys for Defendant Associated Auction
Services LLC d/b/a Cat Auction Services*

2

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS ................................................................1

SUMMARY OF ARGUMENT ........................................................................................1

STATEMENT OF FACTS ...............................................................................................4

ARGUMENT ....................................................................................................................6

I.   ICP FAILS TO PLEAD A HORIZONTAL CONSPIRACY TO BOYCOTT
     IRONPLANET ..........................................................................................................6

II.  ICP'S EXCLUSIVE DEALING CLAIMS FAIL TO STATE A CLAIM FOR
     RELIEF ...................................................................................................................11

     A.   ICP Fails To Allege that the Manufacturer Defendants' Policies
          Substantially Foreclose Competition in the Alleged Relevant Market
          Because It Admits There Are Multiple Existing And Potential Alternative
          Channels of Distribution. .............................................................................14

     B.   ICP's Allegations Fail To Establish that Any Manufacturer Defendant Has
          Sufficient Market Power To Support a Claim for Exclusive Dealing. .........18

          1.   The Manufacturer Defendants' respective alleged market shares do not
               support a claim of substantial foreclosure. .........................................18

          2.   ICP cannot increase the Manufacturer Defendants' shares by attempting
               to plead smaller product and geographic markets. ..............................19

          3.   ICP fails to allege any basis to aggregate the Manufacturer Defendants'
               market shares. ......................................................................................23

          4.   ICP fails to plead it suffered antitrust injury as a result of the Manufacturer
               Defendants' alleged exclusive dealing and, therefore, lacks standing to
               pursue its exclusive dealing claims. ...................................................24

III. ICP FAILS TO ALLEGE PLAUSIBLE UNLAWFUL MONOPOLIZATION OR
     CONSPIRACY TO MONOPOLIZE .......................................................................25

     A.   ICP Fails To Allege Facts To Suggest Caterpillar Possesses a Monopoly
          or Is Attempting To Monopolize. .................................................................25

     B.   ICP Fails To Allege Facts Plausibly Suggesting a Conspiracy To
          Unlawfully Monopolize. ..............................................................................29

i

IV. ICP FAILS TO STATE A CLAIM FOR UNLAWFUL MERGER ......................................30

    A.    ICP Fails To Allege that AAS Participated in or Possessed Market Power in a Relevant Market. ..................................................................................................31

    B.    ICP Has Not Pleaded a Factual Basis for Any Assertion that the Merger Tends to "Create a Monopoly." ...................................................................................32

    C.    ICP Fails To Identify Antitrust Injury Caused by the Merger of AAS and IronPlanet. ..............................................................................................................33

V. ICP'S PENDENT CLAIMS SHOULD BE DISMISSED FOR LACK OF JURISDICTION ...............................................................................................................36

CONCLUSION ....................................................................................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andela v. Am. Ass'n for Cancer Research,*
  389 F. App'x 137 (3d Cir. 2010) ................................................................22, 26-27

*Apani S.W., Inc. v. Coca-Cola Enters.,*
  300 F. 3d 620 (5th Cir. 2002) .............................................................................22

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................................6, 32

*Axis, S.P.A. v. Micafil, Inc.,*
  870 F.2d 1105 (6th Cir. 1989) ...........................................................................35

*Barr Labs, Inc. v. Abbott Labs,*
  978 F.2d 98 (3d Cir. 1992) ...........................................................................13, 30

*Barton & Pittinos, Inc. v. Smithkline Beecham Corp.,*
  118 F.3d 178 (3d Cir. 1997) ...............................................................................25

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ...................................................................................*passim*

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,*
  142 F. Supp. 2d 296 (E.D.N.Y. 2001), *aff'd*, 35 F. App'x 29 (2d Cir. 2002) ........................22

*Bldg. Materials Corp. of Am. v. Rotter,*
  535 F. Supp. 2d 518 (E.D. Pa. 2008) ..................................................................22

*Bright v. Westmoreland Cty.,*
  443 F.3d 276 (3d Cir. 2006) ...............................................................................36

*Broadcom Corp. v. Qualcomm Inc.,*
  501 F.3d 297 (3d Cir. 2007) .........................................................................34, 35

*Brown Shoe v. U.S.,*
  370 U.S. 294 (1962) ...........................................................................................27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
  429 U.S. 477 (1977) .....................................................................................17, 36

*Capital City Cab Serv. v. Susquehanna Area Reg'l Airport Auth.,*
  2007-1 Trade Cas. (CCH) P75 (M.D. Pa. 2007) ................................................22

iii

*City of Pittsburgh Comm'n on Human Rels. v. Key Bank USA,*
    163 Fed. Appx. 163 (3d Cir. 2006) ................................................................................. 4, 37

*City of Pittsburgh v. West Penn Power Co.,*
    147 F.3d 256 (3d Cir. 1998) ................................................................................. 34

*Collins v. Associated Pathologists, Ltd.,*
    676 F. Supp. 1388 (N.D. Ill. 1987) ................................................................................. 21

*Commer. Data Servers, Inc. v. IBM,*
    166 F. Supp. 2d 891 (S.D.N.Y. 2001) ................................................................................. 23

*Concord Assocs., L.P. v. Entm't Props. Trust,*
    2013 U.S. Dist. LEXIS 186964 (S.D.N.Y. Sept. 18, 2013) ................................................ 10

*Continental T.V., Inc. v. GTE Sylvania,*
    433 U.S. 36 (1977) ................................................................................. 3

*Dickson v. Microsoft Corp.,*
    309 F.3d 193 (4th Cir. 2002) ................................................................................. 23

*E. Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n,*
    357 F. 3d 1 (1st Cir. 2004) ................................................................................. 13, 21

*Fineman v. Armstrong World Indus., Inc.,*
    980 F. 2d 171 (3d Cir. 1992) ................................................................................. 28

*FTC v. Motion Picture Advertising Serv. Co.,*
    344 U.S. 392 (1953) ................................................................................. 23

*Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.,*
    433 F. App'x 598 (9th Cir. 2011) ................................................................................. 31

*Gregory Mktg. Corp. v. Wakefern Food Corp.,*
    787 F.2d 92 (3d Cir. 1986) ................................................................................. 24, 25

*Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.,*
    602 F.3d 237 (3d Cir. 2010) ................................................................................. 11, 29, 30

*ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.,*
    249 F. Supp. 2d 622 (E.D. Pa. 2003) ................................................................................. 27, 29, 30

*In re Insurance Brokerage Antitrust Litig.,*
    618 F.3d 300 (3d Cir. 2010) ................................................................................. 7, 8, 10, 11

*Jefferson Parish Hospital District NO. 2 v. Hyde,*
    466 U.S. 2 (1984) ................................................................................. 18

*Kach v. Hose,*
   589 F.3d 626 (3d Cir. 2009) ................................................................... 36

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. Openband at Lansdowne LLC,*
   2011 U.S. Dist. LEXIS 134477 (E.D. Va. Nov. 22, 2011) ............................... 19, 21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) ........................................................................ 8, 29

*Mayor and City Council of Baltimore, Maryland v. Citigroup, Inc.,*
   709 F.3d 129 (2d Cir. 2013) ..................................................................... 11

*McCullough v. Zimmer,*
   382 F. App'x 225 (3d Cir. 2010) ............................................................. 7, 29

*McCullough v. Zimmer, Inc.,*
   2009 U.S. Dist. LEXIS 21815 (W.D. Pa. Mar. 18, 2009), *aff'd* 382 F. App'x
   (3d Cir. 2010) .................................................................................... 25

*Monsanto Co. v. Spray-Rite Service Corp.,*
   465 U.S. 752 (1984) .............................................................................. 10

*Newcal Indus., Inc. v. Ikon Office Solution,*
   513 F.3d 1038 (9th Cir. 2008) ................................................................. 31

*NYNEX Corp. v. Discon, Inc.,*
   525 U.S. 128 (1998) .............................................................................. 10

*Omega Envtl., Inc. v. Gilbarco, Inc.,*
   127 F.3d 1157 (9th Cir. 1997) ........................................................... *passim*

*Orchard Supply Hardware, LLC v. Home Depot USA, Inc.,*
   967 F. Supp. 2d 1347 (N.D. Cal. 2013) ...................................................... 23

*Pa. Dental Ass'n v. Med. Serv. Ass'n,*
   745 F.2d 248 (3d Cir. 1984) ................................................................ 26, 28

*Paddock Public., Inc. v. Chicago Tribune Co.,*
   103 F.3d 42 (7th Cir. 1996) ................................................................ 23, 24

*PNY Technologies, Inc. v. SanDisk Corp.,*
   Case No. 11-cv-04689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) ............ 14, 17

*Queen City Pizza v. Domino's Pizza,*
   124 F.3d 430 (3d Cir. 1997) ......................................................... 21, 26, 31

*Race Tires Am. Inc. v. Hoosier Racing Tire Corp.,*
   614 F.3d 57 (3d Cir. 2010) ..................................................................... 12

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................27

*Republic Tobacco Co. v. North Atlantic Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) ................................................................21

*Roland Mach. Co. v. Dresser Indus.*,
    749 F.2d 380 (7th Cir. 1984) ................................................................12

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F. 3d 1379 (5th Cir. 1994) ...............................................................14

*Ryko Mfg. Co. v. Eden Servs.*,
    823 F. 2d 1215 (8th Cir. 1987) .........................................................13, 14

*Santana Prods., Inc. v. Bobrick Corp.*,
    249 F. Supp. 2d. 463 (M.D. Pa. 2003)...............................................27, 29

*Santiago v. Warminster Twp.*,
    629 F.3d 121 (3d Cir. 2010) ...................................................................6

*Schuylkill Energy Resources v. PP&L*,
    113 F.3d 405 (3d Cir. 1997) ................................................................37

*Schuylkill Health Sys. v. Cardinal Health 200, LLC*,
    2014 U.S. Dist. LEXIS 103663 (E.D. Pa. July 30, 2014) .................27, 28

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ..............................................................................27

*Stewart v. Gogo, Inc.*,
    2013 U.S. Dist. LEXIS 51895 (N.D. Cal. Apr. 10, 2013)......................19

*Syncsort Inc. v. Sequential Software, Inc.*,
    50 F. Supp. 2d 318 (D.N.J. 1999).........................................................22

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) .......................................................................*passim*

*U.S. v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956) ..............................................................................27

*U.S. v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957) ..............................................................................31

*U.S. v. Grinnell Corp.*,
    384 U.S. 563 (1966) ..............................................................................28

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko,*
   540 U.S. 398 (2004) ........................................................................................9, 28

*ZF Meritor, LLC v. Eaton Corp.,*
   696 F.3d 254 (3d Cir. 2012) ...................................................................................13

**Statutes & Rules**

15 U.S.C. § 1 ................................................................................................................31

15 U.S.C. § 18 ..............................................................................................................33

28 U.S.C. § 1367 ..........................................................................................................36

28 U.S.C. § 1367(c)(3) .................................................................................................37

Fed. R. Civ. P. 12(b)(6) .......................................................................................*passim*

**Other Authorities**

2A Phillip E. Areeda, *et al.*, *Antitrust Law* (1995) .......................................................14

ABA Section of Antitrust Law, ABA Section of Antitrust Law publication,
   *Antitrust Law and Economics of Product Distribution* (2006)................................13

Jacobson, J., *Exclusive Dealing, "Foreclosure" and Consumer Harm*, 70
   Antitrust L. J. 311 (2002)......................................................................................18

Klein, B., *Exclusive Dealing as Competition for Distribution "On The Merits,"*
   12 Geo. Mason L. Rev. 119 (2003)........................................................................18

## NATURE AND STAGE OF PROCEEDINGS

In its Complaint, Plaintiff International Construction Products LLC ("ICP") purports to

bring 18 claims under federal antitrust and state tort law against four Defendants, Caterpillar Inc.

("Caterpillar"), Komatsu America Corp. ("Komatsu"), Volvo Construction Equipment North

America LLC ("Volvo"), and Associated Auction Services, LLC ("AAS").   ICP filed its

Complaint on January 29, 2015.   This Court granted Defendants an extension of time up to and

including April 20, 2015 to respond to the Complaint.   (D.I. 3).   On April 17, 2015, this Court

entered an order permitting Defendants to file a joint opening brief in support of their motions to

dismiss, which, together with any individual opening briefs, shall not exceed 60 pages in length.

(D.I. 25.)   This is Defendants' Joint Opening Brief in Support of Their Motions to Dismiss ICP's

Complaint.

## SUMMARY OF ARGUMENT

ICP alleges that Defendants Caterpillar, Komatsu and Volvo (the "Manufacturer

Defendants") manufacture heavy construction equipment and sell that equipment through single-

line dealers.   ICP claims that when it tried to market Chinese-manufactured new heavy

construction equipment through IronPlanet, an online marketplace for used heavy construction

equipment, Caterpillar and one other unnamed equipment manufacturer separately threatened to

discontinue their used equipment sales through IronPlanet.   IronPlanet then merged with AAS, a

facilitator of in-person auctions for used heavy construction equipment, which is owned in part

by Caterpillar and some of its dealers.   This, ICP claims, amounts to unlawful conduct to

eliminate the threat of competition for sales of new heavy construction equipment.   The problem

with ICP's theory is that its allegations fail to raise a plausible suggestion of anticompetitive

wrongdoing.   To the contrary, it is consistent with vigorous competition among entities acting

unilaterally in their own self-interests, which the antitrust laws encourage.

Spread across 18 counts and 4 defendants, the Complaint purports to plead illegal anticompetitive conduct in five categories: group boycott, exclusive dealing, monopolization, merger, and state-law torts. The claims in the first four categories should be dismissed because ICP fails to plead any conduct that even comes close to violating federal antitrust law. In the absence of any federal controversy, this Court should decline to exercise pendent jurisdiction over the fifth category of state law claims. The numerous pleading deficiencies associated with each category of claims are discussed in more detail below.

First, ICP claims the Manufacturer Defendants agreed to threaten to boycott IronPlanet to force IronPlanet to stop dealing with ICP. ICP, however, alleges no facts that support a plausible inference that the Manufacturer Defendants actually agreed among themselves to do anything at all, let alone anything unlawful. ICP pleads only that Defendants "agreed and conspired" and "met and conferred with one another" "[u]pon information and belief." (Compl. ¶¶ 98-99.) ICP does not plead the who, where, when or how of the alleged agreement. The Supreme Court has emphatically rejected such conclusory allegations as insufficient to plead the agreement needed to sustain a Section 1 claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564 & n.9-10 (2007). ICP's lone allegation of parallel conduct that is consistent with individual manufacturers' self-interests does not push ICP's allegation from possible to plausible.

Second, ICP alleges that the Manufacturer Defendants' use of single-line dealers (for example, Volvo dealers carrying only Volvo brand equipment) amounts to illegal exclusive dealing because it forecloses distribution for new heavy construction equipment. (*See* Compl. ¶¶ 39, 109.) These allegations are strictly vertical in nature because they pertain to separate agreements between each Manufacturer Defendant and its distributors. Since the Supreme Court discarded the *per se* rule in regard to exclusive territorial arrangements nearly 40 years ago in

2

*Continental T.V., Inc. v. GTE Sylvania*, 433 U.S. 36 (1977), courts have treated vertical exclusivity arrangements, especially those between a manufacturer and its distributors, leniently, rarely finding significant antitrust concern. Exclusive dealing arrangements may run afoul of the antitrust laws only if they "foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (citing *Standard Oil Co. v. United States*, 337 U.S. 293, 314 (1949)). ICP's own allegations, however, acknowledge available alternative means of distributing heavy construction equipment, and the market shares it attributes to the Manufacturer Defendants do not meet the threshold required for substantial foreclosure. The presence of alternative distribution channels and lack of market power belie any plausible claim that competition has been substantially foreclosed.

Third, ICP purports to bring a claim against Caterpillar for unlawful monopolization. But ICP fails to plead a defined relevant market, relying instead on a hodgepodge of speculative and highly conclusory statements about potential or possible markets. More importantly, however, ICP fails to allege that Caterpillar has achieved monopoly power—the power to control prices or exclude competition—in any market. Instead, ICP relies solely on Caterpillar's alleged 40 percent market share, which is insufficient as a matter of law to plead monopoly power.

Fourth, ICP purports to bring a claim against AAS for unlawful merger, but it fails to plead plausibly that the merger will substantially reduce competition in a relevant market. Indeed, ICP acknowledges that AAS and IronPlanet compete in different markets, making a substantial reduction of competition utterly impossible.

For these reasons, ICP's federal antitrust claims should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Because ICP's state law claims are pendent, they should be dismissed along with the federal claims. *See City of Pittsburgh Comm'n on Human Rels. v. Key*

*Bank USA*, 163 Fed. Appx. 163, 166 (3d Cir. 2006) ("[The Supreme Court] stated that when federal claims are dismissed at an early stage, the exercise of pendent jurisdiction should be declined") (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

## STATEMENT OF FACTS

In its Complaint, ICP alleges the following, which Defendants take as true (as they must) only for purposes of this motion to dismiss.  In the United States, manufacturers of new heavy construction equipment typically sell that equipment to dealers, who take title and re-sell to end users.  (Compl. ¶¶ 19, 39.)  These dealers specialize in equipment sales, make equipment physically available for inspection prior to purchase, and employ personnel dedicated to servicing end users' needs.  (*Id.* ¶ 19.)  Many heavy equipment manufacturers, including Manufacturer Defendants Caterpillar, Komatsu and Volvo, require that their dealers sell only their equipment.  (*Id.* ¶ 39.)  Caterpillar accounts for approximately 40 percent of new heavy construction equipment sales in the United States, Komatsu 15 percent, and Volvo at least 5 percent.  (*Id.* ¶¶ 21, 44.)

ICP planned to serve as a "master distributor" in the United States for new heavy construction equipment manufactured by foreign, particularly Chinese, companies.  (*Id.* ¶ 69)  In 2013, it contracted to be the U.S. "master distributor" for Lonking, a Chinese manufacturer, and it talked to other foreign manufacturers about becoming a distributor.  (*Id.* ¶ 73.)  ICP hoped to market directly to end users in the United States via IronPlanet, an online marketplace that connects buyers and sellers of used heavy construction equipment.  (*Id.* ¶¶ 56-60, 74.)  Other online marketplaces also deal in heavy construction equipment, including EquipmentOne.  (*Id.* ¶ 65.)  In March 2014, ICP signed an agreement with IronPlanet that would allow visitors to IronPlanet's website to purchase new heavy construction equipment marketed by ICP.  (*Id.* ¶ 77.)

ICP sold only one piece of new heavy construction equipment via IronPlanet.  (*Id.* ¶ 81.) In April 2014, IronPlanet terminated its agreement with ICP.  (*Id.* ¶ 102.)  IronPlanet later merged with Defendant AAS, a company that sells used heavy construction equipment via traditional, in-person auctions.  (*Id.* ¶¶ 11, 64.)

Based on these allegations, ICP concludes:  (1) that the Manufacturer Defendants conspired to eliminate the threat posed by "ICP's innovative entry into the heavy construction equipment market" by agreeing to refuse to deal with IronPlanet if it continued to deal with ICP (*id.* ¶¶ 1-4); (2) that the Manufacturer Defendants' alleged exclusive arrangements with equipment dealers foreclose distribution for new heavy construction equipment (*id.* ¶¶ 39-42); and (3) that AAS joined the alleged conspiracy by agreeing to merge with IronPlanet (*id.* ¶ 5).

In its Complaint, ICP packages its theories as to why its business plan faltered into 18 claims against Defendants as follows.  Counts 1 and 2 assert that the Manufacturer Defendants conspired to boycott IronPlanet and that each agreed separately with its distributors to engage in exclusive dealing, all in violation of Section 1 of the Sherman Act.  (*Id.* ¶¶ 113-20.)  Counts 3 and 4 assert claims under Section 3 of the Clayton Act based on the same exclusive dealing allegations.  (*Id.* ¶¶ 121-24.)  Counts 5 and 6 allege that Caterpillar monopolized, or attempted to monopolize, the heavy equipment market in violation of Section 2 of the Sherman Act (*id.* ¶¶ 125-28), while Counts 7 and 8 claim Caterpillar, Volvo, and Komatsu conspired to help Caterpillar achieve that monopoly (*id.* ¶¶ 129-32).  Counts 9 and 10 allege that AAS's merger with Iron Planet violates Section 7 of the Clayton Act and Section 1 of the Sherman Act**.** (*Id.* ¶¶ 133-36.)  And finally, Counts 11 through 18 purport to bring a variety of state law claims against Defendants.  (*Id.* ¶¶ 137-152.)

## ARGUMENT

ICP must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  ICP cannot rely on "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Id.*  Instead, the Complaint must contain enough factual "heft" to show ICP "is entitled to relief."  *Id.* at 557.  Plausibility is the key: ICP must offer factual allegations that "nudge" its claims "across the line from conceivable to plausible."  *Id.* at 570.

The Third Circuit prescribes a three-step approach to assessing complaints.  First, courts "must 'tak[e] note of the elements a plaintiff must plead to state a claim.'  Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.'  Finally, 'whe[n] there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'"  *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009) (internal citations omitted)).  ICP's allegations do not meet these requirements.

## I.    ICP FAILS TO PLEAD A HORIZONTAL CONSPIRACY TO BOYCOTT IRONPLANET

ICP's boycott claims should be dismissed, because ICP fails to plead any fact suggesting a plausible agreement among the Defendants, alleging at most parallel conduct that is easily understood on the face of the Complaint as perfectly legal, competitive, unilateral behavior.  Section 1 of the Sherman Act proscribes *agreements* that unreasonably restrain trade.  The Supreme Court has explained that when evaluating a Section 1 claim, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement . . . ."  *See Twombly*, 550 U.S. at 553 (internal quotation marks omitted).

ICP alleges only that the Manufacturer Defendants "agreed" and "conspired" "[o]n information and belief," without any supporting facts about who, when, where, or how the alleged agreement was reached.[1]   These bare conclusions are entitled to no weight.   *See Twombly*, 550 U.S. at 564, n.9-10; *In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) (identifying conclusory allegations that could not satisfy the plaintiffs' pleading burden); *McCullough v. Zimmer*, 382 F. App'x 225, 230, n.6 (3d Cir. 2010) (holding a complaint that "'mentioned no specific time, place, or person involved in the alleged conspiracies'" was deficient because it did not allege who "'supposedly agreed, or when and where the illicit agreement took place'") (quoting *Twombly*, 550 U.S. at 565 n.10).

The only "fact" ICP alleges about the alleged agreement to threaten to boycott IronPlanet is that it heard second-hand from IronPlanet that Caterpillar and one other unnamed heavy construction equipment manufacturer threatened to stop doing business with IronPlanet if it continued to deal with ICP.   (Compl. ¶ 96.)   This threadbare allegation is at best one of parallel conduct by Caterpillar and an unidentified entity from which ICP impermissibly concludes without factual support that they must have agreed to threaten IronPlanet.

Alleging that defendants engaged in similar, or even identical, conduct—referred to in antitrust jurisprudence as parallel conduct—is not enough to sufficiently plead an agreement.   In *Twombly*, the Supreme Court explained:

> [L]awful parallel conduct fails to bespeak unlawful agreement. It makes sense to
> say, therefore, that an allegation of parallel conduct and a bare assertion of

---

[1] *See* Compl. ¶ 98 ("On information and belief, the Manufacturer Defendants agreed and conspired with one another to issue . . . threats to IronPlanet and to pressure IronPlanet to refrain from dealing with ICP"); ¶ 99 ("Upon information and belief, the Manufacturer Defendants met and conferred with one another about the terms on which they would refuse to do business with IronPlanet."); ¶ 110 ("Upon information and belief, the Manufacturer Defendants agreed with one another to issue these threats and refusals to deal.").

7

> conspiracy will not suffice. *Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.* Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. at 556-57 (emphasis added). "A statement of parallel conduct, even conduct

consciously undertaken, needs some setting suggesting the agreement necessary to make out a

Section 1 claim; without the further circumstance pointing toward a meeting of the minds, an

account of a defendant's commercial efforts stays in neutral territory." *Id.* at 557; *see also In re*

*Brokerage*, 618 F.3d at 320-23; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

at 597 n.21 (1986) ("[C]onduct that is as consistent with permissible competition as with illegal

conspiracy does not, without more, support even an inference of conspiracy."). "[W]ithout some

further factual enhancement it stops short of the line between possibility and plausibility . . . ."

*Twombly*, 550 U.S. at 557.

In *Twombly*, plaintiffs alleged that because the defendant regional telephone companies

("ILECs") resisted competition by new entrants ("CLECs") and refrained from competing with

one another, they must have agreed among themselves to do so. *Id.* at 550-51. The Supreme

Court explained, however, that parallel conduct, standing alone, does not plausibly suggest

conspiracy if it is "just as much in line with a wide swath of rational and competitive business

strategy unilaterally prompted by common perceptions of the market." *Id.* at 554. Accordingly,

the Court reversed the ruling that the complaint stated a Section 1 claim because "nothing in the

complaint intimate[d] that the resistance to the upstarts was anything more than the natural,

unilateral reaction of each ILEC intent on keeping its regional dominance" and nothing

suggested the lack of competition among the ILECs was anything other than "former

8

Government-sanctioned monopolists [] sitting tight, expecting their neighbors to do the same thing." *Id.* at 567-68.

Like the ILECs' actions in *Twombly*, an alleged "threat" by Caterpillar to stop doing business with IronPlanet (a website for used construction equipment) if IronPlanet started offering new construction equipment, would be perfectly consistent with Caterpillar's unilateral, legitimate business interests.  As an initial matter, ICP's own complaint contradicts its conclusion that this alleged threat was "a sudden departure from their past practice of tolerating sales of a wide range of *used* heavy construction equipment through IronPlanet." (Compl. ¶ 101 (emphasis added).)  ICP pleads expressly that IronPlanet had not previously dealt in new construction equipment and ICP claims it was this change in IronPlanet's practice to which the Manufacturing Defendants were objecting.  (*Id.* ¶ 36.)

Companies like the Manufacturer Defendants may use a service like IronPlanet to facilitate marketing of their used equipment received from a variety of sources, *e.g.*, return of equipment at the end of lease period, excess inventory, excess fleet in dealer rental stores, etc.  A decision by IronPlanet to change its business model and begin selling new equipment next to used equipment (and in competition with the Manufacturer Defendants) could legitimately be viewed as diluting the value of the used equipment with a consequent negative impact on sales of used equipment.  In addition, equipment manufacturers have an obvious independent business interest in desiring to do business with used equipment vendors that are focused on selling used equipment and not on competing with them for new equipment sales.  Further, the Manufacturer Defendants were each unilaterally motivated to oppose competition from ICP, and were "free[] to exercise [their] own independent discretion as to the parties with whom [they would] deal." *Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004); *see also*

9

*Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984); *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998).

As in *Twombly*, "there is no reason to infer that the companies . . . agreed among themselves to do what was only natural anyway; so natural in fact, that if alleging parallel decisions to resist competition were enough to imply antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing."  550 U.S. at 566; *see also Concord Assocs., L.P. v. Entm't Props. Trust*, 2013 U.S. Dist. LEXIS 186964, at *67-68 (S.D.N.Y. Sept. 18, 2013) ("'[T]he various motives each individual defendant may or may not have had to be rid of plaintiff [does not] give rise to an inference that the defendants conspired to [injure] plaintiff in violation of the antitrust laws.'") (quoting *AD/SAT v. Associated Press*, 885 F. Supp. 511, 520 (S.D.N.Y. 1995)).

Because parallel conduct often is at least as consistent with unilateral conduct as it is with conspiracy, the Third Circuit explained in *In re Brokerage* that "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor,' since plus factors are, by definition, facts that tend to ensure that courts punish concerted action—an actual agreement—instead of the unilateral, independent conduct of competitors."  618 F.3d at 323 (internal quotation marks omitted).  ICP's attempt to fill the gaps with the conclusory allegation that Defendants Manufacturers "had the motive and opportunity to conspire to this end and did not have sufficient unilateral incentives to engage in this costly and risky conduct absent an agreement that all of the Manufacturer Defendants would do so" (Compl. ¶ 98) falls well short of that mark.

Allegations indicating an opportunity to conspire "do not plausibly imply that each [defendant] acted other than independently," and cannot constitute a plus factor.  *In re*

10

*Brokerage*, 618 F.3d at 349.  Plaintiff's allegations of motive and incentive to conspire fare no

better.  ICP suggests that the Manufacturing Defendants were motivated to conspire because

threatening to refuse to deal with IronPlanet was "costly and risky" and the Manufacturer

Defendants would all benefit from excluding ICP.  (Compl. ¶ 100.)  These pleadings, however,

suggest nothing more than "actions taken by market actors who are aware of and anticipate

similar actions taken by competitors, but which fall short of tacit agreement." *Mayor and City

Council of Baltimore, Maryland v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013); *see also

Twombly*, 550 U.S. at 567-68 (holding that plaintiff's pleading that the ILECs did not pursue

additional business in competition with one another was insufficient to plausibly allege a

conspiracy because the ILECs would naturally expect their rivals to "sit[] tight" as well); *In re

Brokerage*, 618 F.3d at 322 (warning that evidence of a motive to enter a conspiracy "may

simply restate the (legally insufficient) fact that market behavior is interdependent and

characterized by conscious parallelism.").  Because ICP fails to allege any facts that push its

conspiracy allegations over the line from possibility to plausibility, the boycott claims in Counts

1 and 2 should be dismissed. *See, e.g., Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*,

602 F.3d 237, 257 (3d Cir. 2010) (affirming dismissal of § 1 claim when complaint did not

plausibly allege agreement).

## II.     ICP'S EXCLUSIVE DEALING CLAIMS FAIL TO STATE A CLAIM FOR RELIEF

ICP alleges that the Manufacturer Defendants' distribution policies require "express or

functional, *de facto* exclusivity on the part of" equipment dealers;[2] and therefore, "[n]ew entrants

---

[2] ICP does not identify any particular exclusive dealing arrangement entered into by any
Defendants and, instead, alleges only generally and without well-pled factual support that the
Manufacturer Defendants and other manufacturers require "exclusivity" for unidentified
equipment dealers. (*See* Compl. ¶ 39.)  Like ICP's failure to plead the existence of any

11

are generally foreclosed from dealing with existing dealers." (Compl. ¶ 39.)  ICP claims that

these "exclusive" arrangements violate Section 1 of the Sherman Act and Section 3 of the

Clayton Act because they "foreclose[] new entrants from access to efficient distribution

necessary to offer meaningful competition to the Manufacturer Defendants." (*Id.* ¶ 109; *see also*

*id.* ¶¶ 40-42.)

ICP does not allege that the Manufacturer Defendants colluded with each other in regard

to alleged exclusivity requirements, presumably because no such allegation can be made.  The

Manufacturer Defendants' distribution systems pre-date any conspiracy allegation and indeed are

common practices in many industries, including automobile, truck and construction equipment.

Defendants are aware of no case since *Sylvania* in which any court has held a single-line

dealership arrangement violates the antitrust laws.  Indeed, courts in the United States typically

recognize such vertical restraints as procompetitive.  *See, e.g.*, *Roland Mach. Co. v. Dresser*

*Indus.*, 749 F.2d 380, 395 (7th Cir. 1984) (explaining exclusive equipment dealer arrangements

can efficiently allocate resources and are "presumptively lawful").  In this regard, ICP's

exclusive dealing allegations are highly unusual and should be viewed with great skepticism.

Exclusive dealing agreements are often procompetitive and pose little threat to

competition.  Competition to become an exclusive supplier constitutes "a vital form of rivalry,"

inter-brand competition, which the antitrust laws encourage.  *Race Tires Am. Inc. v. Hoosier*

*Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010); *see also Omega Envtl., Inc. v. Gilbarco, Inc.*,

127 F.3d 1157, 1162 (9th Cir. 1997).  In many circumstances, exclusive dealing arrangements

"may be highly efficient – to assure supply, price stability, outlets, investment, best efforts or the

---

horizontal agreement among Defendants, these allegations fail to plead sufficiently the who, what, when, where and how of any alleged vertical agreement between any Manufacturer Defendant and any distributor. *See Twombly*, 550 U.S. at 564, n.9-10.

like – and pose no threat to competition at all." *E. Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F. 3d 1, 8 (1st Cir. 2004). They also can prevent a company like ICP from free-riding on the substantial investments that manufacturers (like the Manufacturer Defendants here) make with dealers to promote their own products. *Ryko Mfg. Co. v. Eden Servs.*, 823 F. 2d 1215, 1234 n.17 (8th Cir. 1987); *see also generally* ABA Section of Antitrust Law publication, *Antitrust Law and Economics of Product Distribution* at 249-50 (2006) (cataloguing the pro-competitive aspects of exclusive dealing arrangements).

In recognition of their procompetitive attributes, exclusive dealing arrangements are analyzed under the rule of reason and may run afoul of the antitrust laws only if a court "believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected." *Tampa Elec.*, 365 U.S. at 327 (citing *Standard Oil*, 337 U.S. at 314.[3] In *Tampa Electric*, the Supreme Court explained that to find that a "substantial share" of the market has been foreclosed, a court must determine that "the opportunities for other traders to enter into or remain in that market must be significantly limited." 365 U.S. at 328. The Third Circuit has recognized that even if a party has a legally significant market share, an exclusive dealing arrangement is unlawful only if its probable effect is to "bar a substantial number of rivals or severely restrict the market's ambit." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 271 (3d Cir. 2012) (quoting *U.S. v. Dentsply, Inc.*, 399 F.3d 181, 191 (3d Cir. 2005)).

---

[3] In *Tampa Electric*, the Supreme Court set forth the test for analyzing exclusive dealing arrangements under Section 3 of the Clayton Act, but recognized that an exclusive dealing arrangement that does not violate Section 3 of the Clayton Act also does not run afoul of the Sherman Act. *See Tampa Electric*, 365 U.S. at 335; *see also Barr Labs, Inc. v. Abbott Labs*, 978 F.2d 98, 110 (3d Cir. 1992).

A.   **ICP Fails To Allege that the Manufacturer Defendants' Policies Substantially Foreclose Competition in the Alleged Relevant Market Because It Admits There Are Multiple Existing And Potential Alternative Channels of Distribution.**

The lynchpin of any exclusive dealing claim is substantial foreclosure, and the key consideration is whether competitors still can reach buyers. *See Omega*, 172 F.3d at 1162. When analyzing the foreclosure effect of any vertical arrangement,

> [t]he relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals, namely all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations.

2A Phillip E. Areeda, *et al.*, *Antitrust Law* at ¶ 570(b), at 278 & n. 6 (1995).  Courts typically find exclusive dealing arrangements imposed on distributors little cause for anticompetitive concern because of existing or potential alternative distribution channels.  *See Omega*, 127 F.3d at 1163 ("[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market."); s*ee also, e.g.*, *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F. 3d 1379, 1384-85 (5th Cir. 1994); *Ryko Mfg. Co.*, 823 F.2d at 1235. Here, ICP's references in the Complaint to alternative distribution channels render facially implausible any substantial foreclosure claim.  *See, e.g.*, *PNY Technologies, Inc. v. SanDisk Corp.*, Case No. 11-cv-04689, 2014 WL 1677521 (N.D. Cal. Apr. 25, 2014) (granting motion to dismiss plaintiff's exclusive dealing claim where the complaint expressly acknowledged alternative distribution channels).

ICP's own allegations flatly contradict its conclusion that single-line dealers substantially foreclose the access to distribution necessary to compete with the Manufacturer Defendants.  *See* Compl. ¶ 109.  ICP alleges that online Internet marketplaces like IronPlanet "provide[] the means

14

for new entrants to surmount the distribution barrier to entry into the relevant heavy construction equipment markets."[4]  *Id.* ¶ 56.  Throughout the Complaint, ICP refers to IronPlanet as "an alternative distribution mechanism" and an "efficient and effective means for new entrants into the relevant heavy construction equipment markets to distribute their products and reach end users."  *Id.* ¶¶ 60-61.  ICP claims that "[t]hrough IronPlanet, ICP would reach approximately 80 percent of end users of heavy construction equipment immediately" and that "[s]elling through IronPlanet would allow ICP to quickly achieve substantial distribution and scale."  *Id.* ¶ 76.  ICP also claims that in anticipation of significant sales through IronPlanet, it established equipment dealers to provide "high levels of post-sale support."  *Id.* ¶¶ 75, 76.  Importantly, ICP acknowledges that the Manufacturer Defendants' exclusivity policies do not extend to post-service repairs.  *Id.* ¶ 75.  Thus, ICP "was successful in entering into arrangements with established equipment dealers around the country for post-sale services for its heavy construction equipment."  *Id.*  It "also arranged for parts depots around the country, ensuring wide and rapid availability of parts for service."  *Id.*  Accepting these allegations as true, as this Court must for purposes of evaluating Defendants' Motion to Dismiss, ICP's claim that single-line dealers somehow substantially foreclose distribution for heavy construction equipment is implausible, indeed impossible, and should be rejected.

---

[4] In addition to IronPlanet, ICP acknowledges the existence of multiple online marketplaces, including EquipmentOne, eBay, Machinery Trader, Rock and Direct, Equipment Trader Online and Craigslist. (*See* Compl. ¶ 65.) Although ICP claims these additional alternative channels of distribution do not offer the existing reach of IronPlanet, they remain potential alternative distribution channels, further undermining any plausible foreclosure claim. *See, e.g.*, *Omega*, 127 F.3d at 1163-64 (rejecting argument that alternative channels of distribution did not render implausible claims of foreclosure because they were "inadequate substitutes for the existing distributors."). Indeed, ICP acknowledges that "U.S. consumers are willing to purchase heavy construction equipment online." (Compl. ¶ 60.) ICP also fails to plead why ICP cannot develop its *own online marketplace*, other than speculation that it would "take many years." (*Id.* ¶ 67.)

15

ICP further undermines its claim that the Manufacturer Defendants' single-line dealers substantially foreclose access to distribution by explicitly acknowledging a significant group of competing manufacturers who have managed to assemble their own dealer networks.  For example, ICP alleges that "as a whole, the exclusivity policies of the Manufacturer Defendants *and the largest of the domestic incumbent manufacturers* foreclose new entrants from 85 percent or more of dealers . . . ."  (Compl. ¶ 42 (emphasis added).)  ICP provides no facts to show how it arrives at 85 percent of dealers, when the Complaint pleads that Manufacturer Defendants account for only 60 percent of the market.  ICP's effort to magically inflate market "foreclosure" is unsupported and should be rejected.  Further, on the face of the Complaint, the Manufacturer Defendants, even collectively, only account for 60 percent of the alleged market, meaning a full 40 percent remains entirely undefined, some portion of which may or may not use single-line dealers, and some portion of which does not.  (*See id.* ¶¶ 21, 42, 44.)

ICP also acknowledges that SANY Heavy Industry ("SANY") and Guzangxi LiuGong Machinery, two competing Chinese manufacturers, have entered the market for new heavy construction equipment in the last eight years by building their own equipment dealer networks. (*See id.* ¶ 45.)  According to the Complaint, those Chinese companies are now profitable in the United States, and SANY has grown its capacity sufficiently to reach five percent of the U.S. market for new heavy construction equipment market, which is comparable to the share the Complaint attributes to Volvo.  (*Id.* ¶¶ 45, 76.)  In *Omega*, the Ninth Circuit found that entry and expansion through a new distributor precluded a finding that an exclusive dealing arrangement was a barrier to entry.  127 F.3d at 1164 (new entrant expanded from six to eight percent, in six years).  Moreover, ICP pleads no facts to show that manufacturers cannot establish new dealers. The Complaint alleges no requirement for entry other than having "a full line" and making a

substantial monetary investment.  Neither requirement is a barrier to entry, nor does ICP allege

any facts to show that companies such as the Chinese manufacturers represented by ICP could

not meet such requirements.  In addition, ICP concedes that there are a significant number of

existing dealers that are not locked into exclusive arrangements and available to ICP now.  (*See*

Compl. ¶ 41 (alleging that "[s]maller suppliers of heavy construction equipment . . . are not able

to impose exclusivity requirements on their dealers."), ¶ 42 (alleging only 85 percent of dealers

are locked into exclusive arrangements).)

   ICP's conclusory arguments that the admittedly available existing dealers are "small,"

"weaker" and "too few in number" (*id.* ¶ 42), and that competitors who have chosen to build

their own dealer networks "have failed to achieve sufficient distribution" (*id.* ¶ 45), are not only

implausible in light of ICP's admission that these dealers make up at least 40 percent of the

existing dealer network, but also cannot save ICP's claim of substantial foreclosure. *See, e.g.,*

*PNY Tech.*, 2014 WL 1677521, at \*8 (granting motion to dismiss and finding insufficient the

plaintiff's conclusory allegations that existing channels did not provide "competitors with the

opportunity to achieve economies of scale," and "no manufacturer ha[d] been successful in

building a direct sales presence that successfully compete[d] with established retail distribution

outlets").  If "[c]ompetitors are free to sell directly, to develop alternative distributors or to

compete for the services of existing distributors," all of which ICP pleads in its own Complaint,

"[a]ntitrust laws require no more."  *Omega*, 127 F.3d at 1163.  Given the acknowledged

alternative existing and potential distribution channels, ICP's allegations belie any claim of harm

to *competition*, let alone substantial foreclosure of the alleged relevant market. *See Brunswick*

*Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (concern of the antitrust laws is not

to protect individual competitors from competition but to protect competition itself).

**B.**    **ICP's Allegations Fail To Establish that Any Manufacturer Defendant Has Sufficient Market Power To Support a Claim for Exclusive Dealing.**

    **1.**    **The Manufacturer Defendants' respective alleged market shares do not support a claim of substantial foreclosure.**

In addition to failing to allege any plausible theory of foreclosure, ICP has failed to allege that any Manufacturer Defendant has sufficient market share to result in "substantial" foreclosure, where, as here, the greatest share alleged by ICP is 40 percent. *Jefferson Parish Hospital District NO. 2 v. Hyde*, 466 U.S. 2, 45-46 (1984) (O'Connor J., concurring) (30 percent foreclosure was not an unreasonable restraint on trade); Jacobson, J., *Exclusive Dealing, "Foreclosure" and Consumer Harm*, 70 ANTITRUST L. J. 311, 324, 335 (2002) (exclusive dealing arrangements with foreclosure percentages of 40 percent or less are "routinely sustained"); Klein, B., *Exclusive Dealing as Competition for Distribution "On The Merits,"* 12 GEO. MASON L. REV. 119, 126 (2003) ("40 percent should be thought of as a useful screening device or 'safe harbor,' not an indication that anticompetitive effects are likely to exist above this level.").

Although ICP's market share allegations are a confusing hodge-podge, in regard to the alleged market for all new heavy construction equipment in the United States, ICP alleges a 40 percent share for Caterpillar, a 15 percent share for Komatsu, and an unspecified "smaller" but "more than 5 percent" share for Volvo. (Compl. ¶¶ 21, 29, 44.) Komatsu's alleged 15 percent market share and Volvo's even smaller market share are far below the threshold for antitrust concern under any circumstances, and even Caterpillar's alleged 40 percent market share is overstated and not a basis for antitrust concern in light of ICP's allegations regarding multiple existing and potential alternative distribution channels.

18

### 2.   ICP cannot increase the Manufacturer Defendants' shares by attempting to plead smaller product and geographic markets.

ICP cannot artificially inflate the alleged and inadequate market shares described above

by slicing geographies and products into micro-bits.  Essentially conceding insufficient market

shares to plead substantial foreclosure of the dealer market, ICP alleges that certain Manufacturer

Defendants have larger shares of purported "markets" for specific types of equipment in certain

cherry-picked states.  *For example, ICP claims that Caterpillar has an 80 percent share of "new*

*crawler dozer sales" in Alaska and upwards of a 60 percent share in a handful of other states.*

(*See, e.g.*, Compl. ¶¶ 24, 27, 29.)  These alleged product and geographic markets are both legally

irrelevant to ICP's substantial foreclosure claim and far too conclusory and vague to fulfill ICP's

burden of adequately pleading a defined relevant market.  *See, e.g.*, *Stewart v. Gogo, Inc.*, 2013

U.S. Dist. LEXIS 51895, at *11-13 (N.D. Cal. Apr. 10, 2013) (granting motion to dismiss

exclusive dealing claim where plaintiff failed to plead a plausible relevant market that included

the "full range of selling opportunities reasonably open to [competitors], namely all product and

geographic sales they readily compete for."); *Lansdowne on the Potomac Homeowners Ass'n,*

*Inc. v. Openband at Lansdowne LLC*, 2011 U.S. Dist. LEXIS 134477, at *13-14 (E.D. Va. Nov.

22, 2011) (recognizing "dismissal is appropriate where the complaint 'defines a geographic

market in an unreasonably and implausibly narrow manner.'").

The gravamen of ICP's exclusive dealing claim is that the alleged exclusivity agreements

between each of the Manufacturer Defendants and its dealers foreclose new entrants from the

nationwide dealer distribution channel for new heavy construction equipment.[5]  ICP pleads that

---

[5] *See* Compl. ¶ 109 ("The Manufacturer Defendants' imposition of exclusive distribution arrangements on their equipment dealers *has foreclosed new entrants from access to efficient distribution* necessary to offer meaningful competition to the Manufacturer Defendants."); *see also id.* ¶ 39 ("New entrants are generally *foreclosed from dealing with existing dealers* by the

19

the Manufacturer Defendants and their competitors compete for sales of heavy construction equipment to dealers.[6] And ICP further pleads that the Manufacturer Defendants and their competitors compete for these sales nationwide.[7]

To plead substantial foreclosure, a plaintiff must allege both "the type of goods, wares, or merchandise, etc. involved" and "the area of effective competition in the known line of commerce . . . by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Electric,* 365 U.S. at 327. Here, the explicitly pleaded "area of effective competition in the known line of commerce" is nationwide sales of new heavy construction equipment to dealers. Accordingly, to the extent ICP alleges micro markets based on how and where equipment dealers can practicably sell particular products to end users (*see* Compl. ¶¶ 20, 38), those micro markets are legally irrelevant to ICP's foreclosure claims. *See Tampa Electric*, 365 U.S. at 322-27 (finding the relevant market for

---

distribution policies of the largest incumbent manufacturers, including the Manufacturer Defendants . . . ."); ¶ 40 ("Entrants into the new heavy construction equipment market are generally *unable to compete successfully for distribution* on the 'all or nothing' terms imposed by the Manufacturer Defendants."); ¶ 42 ("The Manufacturer Defendants' requirements of exclusivity collectively and individually *foreclose substantial portions of the dealer market* to new entrants into the relevant heavy construction equipment markets.") (emphasis added).

[6] *See, e.g.*, Compl. ¶ 19 ("Wholesale distributors, known as 'equipment dealers,' are the primary channel of distribution of heavy construction equipment to end users."); ¶ 20 ("Direct sales of new heavy construction equipment by manufacturers to end users have historically been uncommon . . . . As a result, heavy construction equipment manufacturers have historically distributed heavy construction equipment through local dealers in each region of the country in order to compete effectively in each such region.").

[7] *See, e.g.*, Compl. ¶ 8 ("Caterpillar manufactures and sells heavy construction equipment [] in the United States . . . ."); ¶ 9 (same with respect to Defendant Komatsu); ¶10 (same with respect to Defendant Volvo); ¶ 37 ("To compete effectively in the United States, manufacturers of new heavy construction equipment need distribution assets and relationships within the United States.").

purposes of analyzing foreclosure the area in which the supplier and its competitors competed for buyers of coal).[8]

In addition to being legally irrelevant, ICP's allegations of equipment- and state-specific markets are too conclusory and vague to plead any relevant market.  Where a complaint fails to define the proposed product market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 436 (3d Cir. 1997).[9]  Although ICP states that "each type of heavy construction equipment is generally not a substitute for another type," it does not, as it must, describe the equipment, distinguish between it, or provide

---

[8] *See also Republic Tobacco Co. v. North Atlantic Trading Co.,* 381 F.3d 717, 738-39 (7th Cir. 2004) (when analyzing an exclusive distributor arrangement, consumers and retailers are not relevant purchasers if the manufacturer does not sell to them); *E. Food Servs., Inc.*, 357 F.3d at 6-9 (granting motion to dismiss claim that a food and beverage distributor's exclusive arrangement with a university substantially foreclosed competition because there was no "hope of showing substantial foreclosure in a properly defined market" to supply vending services, which necessarily extended beyond the university); *Lansdowne*, 2011 U.S. Dist. LEXIS 134477, at *19-20 (granting motion to dismiss an antitrust challenge to an exclusive contract between a homeowners' association and telecom services provider, noting "[i]n determining the relevant market, the Court's focus is not on the exclusive contract's effect on the Lansdowne residents, but on OpenBands' position relative to other providers of telecom services."); *Collins v. Associated Pathologists, Ltd.*, 676 F. Supp. 1388, 1395 (N.D. Ill. 1987) (in determining whether an exclusive arrangement between a hospital and a pathology group forecloses competition, "one must view the situation from the point of view of pathologists competing for work, rather than from the point of view of patients in the Hospital and the choices available (or foreclosed) to them when they need pathological services.").

[9] Reasonable interchangeability of use "implies that one product is roughly equivalent to another for the use to which it is put; while there may be some degree of preference for the one over the other, either would work effectively." *Queen City Pizza*, 124 F.3d at 437.

21

any factual support for the conclusion that, for example, crawler loaders and track loaders are not reasonably substitutable. *See* Compl. ¶¶ 22, 33; *see also Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 525 (E.D. Pa. 2008) (rejecting alleged product market where plaintiff failed to "explain why asphalt shingle roof ridge vents are distinct from . . . any other roofing products"); *Commer. Data Servers, Inc. v. IBM*, 166 F. Supp. 2d 891, 896-97 (S.D.N.Y. 2001) (rejecting alleged product market where "the Amended Complaint does not explain why . . . other types of computers would not be functionally interchangeable with, and/or exhibit cross-elasticity of demand for 'mainframes'"); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001), *aff'd*, 35 F. App'x 29 (2d Cir. 2002) (granting motion to dismiss for failure to plead relevant product market).

Similarly, ICP does not suggest why a political sub-unit such as a state would constitute a relevant geographic market, nor does it define the amorphous intra-state geographic markets it alleges. *See* Compl. ¶ 38 ("Each and every state within the United States is also a relevant geographic market, and smaller markets within the boundaries of many states exist as well, as will be proven at trial."); *see also Apani S.W., Inc. v. Coca-Cola Enters.*, 300 F. 3d 620, 626-27 (5th Cir. 2002) (economic significance of a geographic area "does not depend upon singular elements such as . . . political boundaries"). As such, even if these alleged markets were legally relevant to ICP's foreclosure claim (which they are not), ICP fails to meet its burden of pleading this essential element with requisite specificity. *See, e.g.*, *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318, 331 (D.N.J. 1999) (explaining the relevant market "must be defined in the pleadings").[10]

---

[10] *See also Andela v. Am. Ass'n for Cancer Research*, 389 F. App'x 137, 141 (3d Cir. 2010) (holding inadequate plaintiff's conclusory allegation that the relevant geographic market was "the world"); *Capital City Cab Serv. v. Susquehanna Area Reg'l Airport Auth.*, 2007-1 Trade

ICP's efforts to "bulk up" the appearance of market power have nothing to do with the foreclosure of the alleged *nationwide dealer distribution channel for new heavy construction equipment* that ICP claims results from the Manufacturer Defendants' alleged exclusivity agreements.

### 3. ICP fails to allege any basis to aggregate the Manufacturer Defendants' market shares.

Nor can ICP increase the alleged market shares of the Manufacturer Defendants by aggregating them. ICP alleges no facts that plausibly suggest a horizontal conspiracy among the Manufacturer Defendants with regard to their alleged exclusive dealer arrangements. As such, there is no legal basis to aggregate the Manufacturer Defendants' market shares in connection with the claim of exclusive dealing. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002) (refusing to consider separate vertical conspiracies in the aggregate in the absence of an alleged overarching conspiracy); *Paddock Public., Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996) (refusing to consider cumulative effect of the defendants' exclusive licensing agreements);[11] *see also Orchard Supply Hardware, LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1363 (N.D. Cal. 2013) ("[i]f an individual supplier could be held liable for the cumulative impact of all suppliers' conduct, a company would have to investigate what other

---

Cas. (CCH) P75, 677, at *5-8 (M.D. Pa. 2007) (dismissing an exclusive dealing claim because the complaint failed to adequately support its proposed market, the Harrisburg International Airport)*; Commer. Data Servers*, 166 F. Supp. 2d at 897 (holding plaintiff "failed to allege any facts explaining why the relevant geographic market is domestic rather than worldwide").

[11] In *Paddock*, Judge Easterbrook distinguished *FTC v. Motion Picture Advertising Serv. Co.*, 344 U.S. 392, 395 (1953), because that case was decided under Section 5 of the FTC Act. He also noted that "[n]o subsequent case has read *Motion Picture Advertising Service* to abolish the requirement of concerted action under § 1 of the Sherman Act." *Paddock*, 103 F.3d at 46-47.

businesses were doing before it acted in order to make sure its own conduct was not anticompetitive, a burden the antitrust law does not impose").

For all of the reasons above, ICP has failed to allege facts sufficient to show that the Manufacturer Defendants' alleged exclusive dealing arrangements substantially foreclose competition, and its claims based upon the alleged exclusivity policies of the Manufacturer Defendants should be dismissed.

> **4. ICP fails to plead it suffered antitrust injury as a result of the Manufacturer Defendants' alleged exclusive dealing and, therefore, lacks standing to pursue its exclusive dealing claims.**

In addition to the myriad deficiencies in ICP's exclusive dealing claims, ICP lacks antitrust standing to bring them because it fails to plead antitrust injury. *See Barton & Pittinos, Inc. v. Smithkline Beecham Corp.*, 118 F.3d 178, 181-82 (3d Cir. 1997) (antitrust injury is a necessary condition of antitrust standing). Typically, only consumers and competitors in the allegedly restrained market suffer injuries the antitrust laws were designed to prevent. *See id.* at 181-82, 184.[12] Here, the alleged relevant market is the sale of new heavy construction equipment to dealers. *See, e.g.*, Compl. ¶ 33; Section II.B., *supra*. ICP is not a consumer or a competitor in that market. It does not claim that it purchases new heavy construction equipment from equipment dealers or that it sells to them. Indeed, ICP does not allege that any dealer refused to sell its products or that it ever approached any dealer and asked that dealer to carry its products. ICP does not claim that the Manufacturer Defendants' alleged exclusive arrangements

---

[12] In addition, plaintiffs that are neither consumers nor competitors often suffer only indirect injury and present an increased possibility of duplicative liability, further undermining their standing. *See, e.g.*, *Gregory Mktg. Corp. v. Wakefern Food Corp.*, 787 F.2d 92, 97-98 (3d Cir. 1986).

prevented it from distributing equipment or caused it to pay higher prices.  In short, ICP has pled no injury at all.[13]

## III.   ICP FAILS TO ALLEGE PLAUSIBLE UNLAWFUL MONOPOLIZATION OR CONSPIRACY TO MONOPOLIZE

ICP asserts that Caterpillar unlawfully monopolized or attempted to monopolize the alleged market for heavy construction equipment and that Defendants Caterpillar, Komatsu, and Volvo conspired to create the alleged monopoly, all in violation of Section 2 of the Sherman Act. (Compl. ¶¶ 125-32.)  ICP's Complaint fails to state a cause of action under either theory.

### A.   ICP Fails To Allege Facts To Suggest Caterpillar Possesses a Monopoly or Is Attempting To Monopolize.

A Section 2 monopolization claim requires proof of "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  *U.S. v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  The Complaint does not state facts plausibly supporting these elements.

---

[13] Even if ICP had pled—which it has not—that *its* suppliers tried to sell new heavy construction equipment to existing dealers and were unable to because of the Manufacturer Defendants' alleged policies, ICP would still lack standing to pursue its exclusive dealing claim.  ICP merely acts as a pass-through broker for foreign manufacturers of new heavy construction equipment sold to U.S. end-users.  (Compl. ¶¶ 69, 73, 92.)  In general, brokers have no standing to bring an antitrust claim because any injury suffered by these middlemen—typically lost commissions—does not result directly from the anticompetitive nature of the allegedly unlawful arrangement. *See Gregory Mktg.*, 787 F.2d at 95-96 (affirming grant of a motion to dismiss where plaintiff was "simply a broker"); *Barton*, 118 F.3d at 181-84 (finding marketer of vaccine lacked antitrust injury because "advertisers and brokers of a good or service are not competitors of companies that actually supply the good or service"); *McCullough v. Zimmer, Inc.*, 2009 U.S. Dist. LEXIS 21815, at *19-21 (W.D. Pa. Mar. 18, 2009) (dismissing complaint for lack of antitrust injury when plaintiffs were "nothing more than distributors, or intermediaries"), *aff'd* 382 F. App'x at 229 (3d Cir. 2010).

First, as shown in Section II.B., *supra*, ICP fails to allege any plausible relevant market, which requires dismissal. *See Queen City Pizza*, 124 F.3d at 436-37 (dismissing complaint lacking well pled relevant markets). ICP asserts the relevant product market is "new heavy construction equipment" plus "narrower" markets consisting of various individual types of equipment such as crawler loaders and track loaders (Compl. ¶ 33), but alleges no facts supporting its conclusory assertions. ICP does not, for example, allege why heavy construction equipment is not interchangeable with medium equipment, or why construction equipment is not interchangeable with mining or forestry equipment. Likewise, ICP asserts that the geographic market is no bigger than the United States (*id.* ¶ 37), but that "[e]ach and every state within the United States is also a geographic market," and "smaller markets within the boundaries of many states exist as well" (*id.* ¶ 38). ICP does not identify the states that allegedly contain markets, or define any boundaries for markets allegedly within those states. With no identification and definition of the numerous (51 plus) geographic markets mentioned in the Complaint, Caterpillar lacks notice of the bounds of the alleged markets at issue. Moreover, ICP alleges ***nothing*** about how consumers or suppliers perceive any of the alleged geographic markets or, in particular, where they can rationally look for heavy construction equipment.[14] ICP's numerous asserted markets, lacking necessary explanation, are not facially sustainable. *See Andela*, 389 F. App'x

---

[14] With respect to a U.S. geographic market, Plaintiff alleges that foreign manufacturers need distribution within the United States. (Compl. ¶ 37.) This allegation is irrelevant—and fails to support a U.S. market—because it says nothing about the area potential buyers may rationally look for purchases of heavy construction equipment. *See Pa. Dental Ass'n v. Med. Serv. Ass'n*, 745 F.2d 248, 260 (3d Cir. 1984) (explaining geographic market is "area in which a potential buyer may rationally look for the goods"); *Tampa Elec.*, 365 U.S. at 327 (explaining geographic market is "area in which the seller operates, and to which the purchaser can practicably turn for supplies").

137 at 141 (holding conclusory allegation that relevant geographic market was "the world" did not adequately plead relevant market).

Assuming, *arguendo*, that ICP adequately pled relevant markets, ICP has not stated facts supporting "monopoly power"—"the power to control prices or exclude competition and may ordinarily be inferred from a predominant share of the relevant market." *U.S. v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). ICP states no facts plausibly showing Caterpillar ***acting on its own*** controlled prices or excluded competition. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (explaining Section 2 concerns single firm conduct); *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1443 (9th Cir. 1995) ("one firm *alone* must have the power to control market output and exclude competition") (emphasis in original).[15] Nor has ICP alleged facts showing Caterpillar controls a predominant market share. ICP alleges Caterpillar accounts for about 40 percent of the new heavy construction equipment sales in the United States. (Compl. ¶ 21.)[16] This alleged market share, even if combined with entry barriers

---

[15] To the extent Plaintiff suggests a "shared monopoly" theory that would aggregate all Defendants' market shares (Compl. ¶ 21) this theory is rejected by courts, *see Schuylkill Health Sys. v. Cardinal Health 200, LLC*, 2014 U.S. Dist. LEXIS 103663, at *37-38 n.14 (E.D. Pa. July 30, 2014) ("This Court similarly rejects a shared or joint monopoly argument"); *Santana Prods., Inc. v. Bobrick Corp.*, 249 F. Supp. 2d. 463, 519 (M.D. Pa. 2003) (explaining shared monopoly is not cognizable claim); *ID Sec. Sys. Canada, Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622, 649-50 (E.D. Pa. 2003) ("as a matter of law, ID Security cannot maintain a § 2 attempted monopoly claim" based on the alleged…duopoly").

[16] ICP also alleges Caterpillar has larger shares during certain years, for certain types of equipment, sold in certain states. (Compl. ¶¶ 23-24.) But these "sub-markets" are not adequately pled. *See* Section II.B.2., *supra*. Furthermore, ICP alleges no economic basis for restricting a market share to cherry-picked slices of a larger time period and market. *See Brown Shoe v. U.S.*, 370 U.S. 294, 336-37 (1962) (explaining relevant market must "correspond to commercial realities").

27

or other factors, is insufficient to plead monopoly power.[17]  *See, e.g., Fineman v. Armstrong World Indus., Inc.*, 980 F. 2d 171, 201 (3d Cir. 1992) ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power."); *Schuylkill Health Sys.*, 2014 U.S. Dist. LEXIS 103663, at *36 ("Most lower courts across the country have held that a 70% to 80% market share is necessary to indicate monopoly power.").

Even further assuming Caterpillar possessed monopoly power, ICP alleges no facts satisfying the requirement that the power was willfully acquired by "anticompetitive conduct." *Verizon Comm'ns*, 540 U.S. at 407.  ICP's conclusory claims do not disclose the conduct allegedly underlying the monopoly charge (Compl. ¶¶ 125-28), but assuming it is the "unlawful conduct" generally mentioned in the Complaint (*id.* ¶¶ 109-10), none of that conduct is inherently anticompetitive.  ICP mentions exclusive dealing (*id.* ¶ 109), but these arrangements are presumptively ***pro***competitive as explained in Section II.B., *supra*, and ICP alleges nothing to show otherwise with respect to Caterpillar.  ICP also alleges a conspiracy to threaten to boycott (*id.* ¶ 110), but this is not single-firm conduct and there is a complete absence of facts necessary to support the existence of such a conspiracy, *see* Section I, *supra*.  Further, ICP proffers no explanation of Caterpillar's willful intent other than to allege it desired to exclude ICP (Compl. ¶¶ 109-10), but courts uniformly recognize that every rational business desires to defeat rivals.  *See Pa. Dental,* 745 F.2d at 260-61 (explaining "mere intention to prevail over rivals or improve market position is insufficient"); *Dentsply*, 602 F.3d at 258 (dismissing complaint for lack of intent and explaining antitrust laws do not prohibit efforts to "acquire, retain and/or increase" one's business).

---

[17] The alleged entry barriers are contradicted by facts also alleged in Complaint, *see* Section II.A., *supra*.

**B.     ICP Fails To Allege Facts Plausibly Suggesting a Conspiracy To Unlawfully Monopolize.**

A Section 2 conspiracy claim requires proof of: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Dentsply*, 602 F.3d at 253. Third Circuit courts also consider whether there is a "dangerous probability" of the alleged conspiracy succeeding. *ID Sec. Sys.*, 249 F.Supp.2d at 657, n.15. Plaintiff does not plausibly allege these elements.

First, ICP fails to allege any facts suggesting that the manufacturers agreed among themselves to monopolize any market, *see Dentsply*, 602 F.3d at 255-57 (affirming dismissal of conspiracy to monopolize when complaint did not plausibly allege agreement), or when, where, how or among whom the alleged agreement was reached, *see McCullough*, 382 F. App'x at 230, n.6. Furthermore, ICP's cross-reference to its general conspiracy allegation involving *all Defendants* (Compl. ¶¶ 129-32) cannot establish a conspiracy to monopolize, as there is no legally recognized cause of action for "shared" monopoly and ICP does not allege that Caterpillar, Volvo, and Komatsu agreed to confer monopoly power onto a *single entity*. *See Santana Prods.*, 249 F. Supp. 2d at 519-20 (dismissing conspiracy to monopolize when plaintiff failed to allege conspirators agreed to create a single dominant firm); *ID Sec. Sys.*, 249 F. Supp. 2d at 660 (explaining conspiracy to monopolize requires conspirators agreeing to "endow[] one conspirator with monopoly power"). Nor would any such allegation be plausible, as there is no reason why Komatsu and Volvo (worldwide competitors of Caterpillar) would agree to cede monopoly power to Caterpillar. Such a theory makes no sense. Indeed, the Supreme Court in *Twombly* repeatedly cited its earlier decision in *Matsushita,* 475 U.S. 574, in which it explained that an inference of conspiracy fails if the allegation of conspiracy makes no economic sense.

29

In addition, ICP does not allege specific intent by Caterpillar to monopolize, as explained in Section III.A., *supra*, let alone the necessary specific intent by Caterpillar *and* Volvo *and* Komatsu.  *See Dentsply*, 602 F.3d at 258 (affirming dismissal when complaint did not plausibly allege specific intent to monopolize for each alleged conspirator); *ID Sec. Sys.*, 249 F. Supp. 2d at 662 (ruling no conspiracy to monopolize as matter of law when an alleged conspirator lacked intent).  And ICP's pleadings also fail to plausibly allege the dangerous probability of success element because, as explained above, ICP has not alleged facts showing Caterpillar possesses significant enough share of the relevant markets to come dangerously close to monopolizing. *See Barr Labs.*, 978 F.2d at 112 (affirming 50 percent market share is insufficient).[18]

## IV.   ICP FAILS TO STATE A CLAIM FOR UNLAWFUL MERGER

Of the 18 counts and 153 paragraphs contained in the Complaint, the merger challenge set forth in Counts Nine and Ten comprise the only substantive claims directed at defendant Associated Auction Services ("AAS").[19]  Like the other counts, the two attacking the merger must be dismissed for failure to state a viable cause of action.  First, ICP fails to allege that either AAS or the merged entity participate in or control any relevant market from which ICP is excluded.  Second, the insinuation that the merger could create a monopoly in the only relevant market the plaintiff postulates remains as implausible as it is unsupported by pleaded facts. Third, ICP does not identify any realistic antitrust injury caused or likely to be caused by the merger.

---

[18] Plaintiff also does not allege a causal connection between the alleged conspiracy and injury for the same reasons stated in Section II.B.4., *supra*.

[19] These claims also appear to be directed at IronPlanet, although it is not named as a defendant. Because these two counts address only the merger, the defendants understand them to apply only to AAS and not to the other named defendants, who were not parties to the merger.

**A.      ICP Fails To Allege that AAS Participated in or Possessed Market Power in a Relevant Market.**

To state an antitrust claim challenging a merger, a plaintiff must identify a relevant market within which the defendant has market power. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir. 2008). As explained in Section II.B. above, failure to properly plead a proposed relevant market—"with reference to the rule of reasonable interchangeability and cross-elasticity of demand"—requires that the complaint be dismissed pursuant to Rule 12(b)(6). *Queen City Pizza*, 124 F.3d at 436; *see also U.S. v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957) (showing of "relevant market is a necessary predicate to a finding of a violation of the Clayton Act"). This mandate applies whether the merger challenge is made under Section 7 of the Clayton Act (15 U.S.C. § 18), or Section 1 of the Sherman Act (15 U.S.C. § 1), or both. *Golden Gate Pharmacy Services, Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 598 (9th Cir. 2011). ICP's bare-bones pleading of Counts Nine and Ten purports to assert a claim under both of those provisions. (*See* Compl. ¶¶ 133, 135.)

ICP consistently alleges in its merger-related claims that the relevant market is "heavy construction equipment." (*Id.* ¶¶ 111, 133, 135.) While ICP has attempted to allege a product market, it definitely has not alleged a product market within which AAS participates or has market power. AAS, as its name implies, provides only auction services. ICP acknowledges as much in its Complaint, which avers that this particular defendant just "facilitates auctions." (*Id.* ¶ 11.) AAS is not alleged to be part of the heavy construction equipment market. In the entire section of the Complaint entitled "Market and Monopoly Power," there is no mention of AAS or any market in which it does business. (*See id.* ¶¶ 51-55.)

Moreover, in its section of the Complaint entitled "The Relevant Markets," ICP goes out of its way to define the proposed market as "the marketing and sale of *new* heavy construction

31

equipment." (*Id.* ¶ 33 (emphasis added).)  Paragraphs 34 through 36 elaborate at length on how "new" and "used" heavy construction equipment are not substitutes for each other, driving home the point that the only market ICP will ask the Court to evaluate is that for new heavy construction equipment.  By limiting its focus to new equipment, ICP's own pleading defeats its claim against AAS, which admittedly "facilitates auctions of *used* heavy construction equipment." (*Id.* ¶ 11 (emphasis added).)[20]

Rule 12(b)(6) analysis is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.  In this case, ICP's Complaint nowhere alleges any market for auction services, which is the only business of AAS, and the plaintiff expressly limits the relevant market to new heavy construction equipment, a product AAS does not sell.  Accordingly, under *Iqbal*, it is clear that Counts Nine and Ten fail to state a plausible claim against AAS.  ICP's Complaint completely lacks the requisite identification of a relevant market in which AAS could have market power.  That reason alone is sufficient to dismiss the claims challenging AAS' merger with IronPlanet.

### B.     ICP Has Not Pleaded a Factual Basis for Any Assertion that the Merger Tends to "Create a Monopoly."

In the same fashion as it does in Counts Three through Eight of its Complaint, ICP in Counts Nine and Ten alludes to the possibility that a "monopoly" could be created by the merger.  (Compl. ¶¶ 133, 135.)  To advance any plausible monopoly-based theory against AAS, ICP would need to allege that the feared monopoly would come to exist *in the market in which the merging parties participate*, which ICP clearly has not done.  In addition, as explained

---

[20]  Similarly, non-party IronPlanet, the entity with which AAS has merged, is alleged to be "an online marketplace" (Compl. ¶ 56), through which "[o]ver $4 billion of *used* heavy construction equipment has been sold." (*Id.* ¶ 57 (emphasis added); *see also id.* ¶¶ 59-60 (further referencing IronPlanet's sale of used equipment).)

elsewhere in this brief, nowhere in the Complaint does ICP plead facts that, even if true, could give rise to a claim that a monopoly exists or is reasonably likely to occur in any market (*see* Section II.B., *supra*), let alone the market in which AAS has operated.

Inclusion of the "tendency to create a monopoly" theory in Counts Nine and Ten also fails on its face because there are no plausible evidentiary facts pleaded to support the illogical notion that the merger of two service-providing entities that auction and sell used machinery will substantially alter the market for new heavy construction equipment, which is put forth as the market threatened with monopoly.  ICP's Complaint does not even attempt to explain how the merger could change the status quo in the new heavy construction equipment market.  In fact, ICP's own allegations indicate that the merger had no effect whatsoever on that market, as ICP alleges it was excluded from the relevant market prior to the merger, a point that will be addressed more fully in the "antitrust injury" section to follow.  Suffice it to say here that a merger only gives rise to a Section 7 claim if it is "the effect *of such acquisition*" that will "tend to create a monopoly."  *See* 15 U.S.C. § 18 (emphasis added).  Not so in this case.

### C.   ICP Fails To Identify Antitrust Injury Caused by the Merger of AAS and IronPlanet.

The Complaint also lacks any indication of how ICP plausibly could suffer antitrust injury caused by the merger.  Because antitrust injury is a necessary element under the Sherman and Clayton Acts, the Complaint should be dismissed on this separate ground, as well.

ICP's fundamental problem relating to antitrust injury is that it claims to have been "blocked" from entering the "relevant heavy equipment markets" by and since alleged events that occurred in April of 2014 and earlier. (Compl. ¶¶ 4, 93-104.)  IronPlanet and AAS did not announce their planned merger until December 2014, some eight months later. (Compl. ¶ 11.) The Complaint concedes that the merger was not scheduled to close until 2015. (*Id.*)  ICP has

33

not pleaded any facts demonstrating how the merger announcement in December 2014 or the

merger itself in 2015 did, would, or might harm both ICP and competition in any relevant

market.

      The implausibility of antitrust injury to ICP flowing from the merger is obvious for

reasons beyond the timing alone.  First, it is important to remember this is a merger of two

service providers operating in a market wholly distinct from the relevant market pleaded.  ICP

did not even bother to name one of the merging parties (IronPlanet) as a defendant in this

lawsuit.  In addition, ICP does not claim to have competed against the merging parties, nor was it

a customer of either of them.  ICP does not seek to enter the auction services market in which

AAS has competed, nor does it complain of an inability to compete with either merging party in

their market for services.  On top of all this, ICP's Complaint suffers from the previously-

mentioned defect that AAS has dealt only with used equipment, whereas the alleged relevant

market pointedly involves only new equipment.

      In *Broadcom Corp. v. Qualcomm Inc.*, the United States Court of Appeals for the Third

Circuit addressed a similar situation in an antitrust case.  501 F.3d 297 (3d Cir. 2007).  The

district court in *Broadcom* had dismissed a merger challenge under Section 7 of the Clayton Act.

On appeal, the Third Circuit stated that, to survive a Rule 12(b)(6) motion, a merger challenge

must show "'a threat of antitrust injury' which produces 'directly harmful effects' that are

'closely related to the violation.'"  *Id.* at 321 (quoting *Alberta Gas Chems. Ltd. v. E.I. du Pont de

Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987)).  Important to the Third Circuit's

consideration was that "[t]he prospective harm to competition must not, however, be

speculative."  *Broadcom*, 501 F.3d at 321; *see also City of Pittsburgh v. West Penn Power Co.*,

147 F.3d 256, 268 (3d Cir. 1998) ("[A]ntitrust injury must be caused by the antitrust violation—
not a mere causal link, but direct effect.").

The standard applied by the Third Circuit led to affirmance of the dismissal because that
plaintiff's allegation of harm was unduly speculative. *Broadcom*, 501 F.3d at 322. In short, the
appellate court and district court both found the plaintiff's antitrust injury "theory" to be
inadequate. Part of the problem was the alleged harmful effects of the merger would be felt only
by companies that actually competed in the markets of the merging companies, which the
plaintiff could not show. *Id.* In addition, the plaintiff's theories were based on "assumptions"
about events that might confer monopoly power. *Id.* One inadequate assumption was that the
defendant would "intentionally engage in anticompetitive conduct" by refusing to deal with the
plaintiff after the merger. *Id.* "Hypothetical anticompetitive conduct, speculative monopoly
power, and remote injuries" failed to warrant relief under Section 7 of the Clayton Act. *Id.*

ICP's Complaint, like the one at issue in *Broadcom*, relies on misplaced assumptions and
theories about the merger being challenged. Upon scrutiny, the assumptions about the post-
merger conduct of the merged entity are just as hypothetical as those the Third Circuit found
lacking. Any antitrust injury also is just as speculative, especially because, as in *Broadcom*, the
market in which the merging entities compete (auction and online services) is not the same
market the plaintiff claims is anticompetitive (new heavy construction equipment).

ICP does not really attempt to plead any theory of antitrust injury flowing from the
merger. Instead, it points to harm allegedly caused at an earlier time, from alleged torts and
breaches unrelated to the merger, and by the alleged actions of entities other than AAS. When a
plaintiff attempts to challenge a merger on such misplaced bases, its lawsuit must be dismissed.
*Id.*; *see also Axis, S.P.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107-08 (6th Cir. 1989) (affirming Rule

12(b)(6) dismissal of Section 1 and Section 7 claims for damages after merger because same alleged "antitrust injury" would have occurred without the merger; complaint made clear plaintiff was shut out of United States market prior to the merger and by other events, thus harm could not result from the merger itself). Because any harm alleged by ICP could not be said to "flow from" the merger, ICP cannot possibly plead antitrust injury through the Sherman and Clayton Acts claims in Counts Nine and Ten. *Brunswick Corp.*, 429 U.S. at 489; *see also Axis*, 870 F.2d 1110 (merger challenge dismissed when "exclusion from the United States . . . market did not result from the [defendant's acquisition]," as plaintiff was "shut out of the desired market" by other circumstances and parties).

## V.   ICP'S PENDENT CLAIMS SHOULD BE DISMISSED FOR LACK OF JURISDICTION

If the Court dismisses ICP's antitrust claims, its pendent state law claims should be dismissed for lack of jurisdiction. ICP claims jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. (Compl. ¶ 15.) Section 1367 provides that the Court "may decline to exercise supplemental jurisdiction over a claim" if the court "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Third Circuit, however, instructs lower courts not to exercise supplemental jurisdiction unless required for "judicial economy, convenience, and fairness." *Bright v. Westmoreland Cty.*, 443 F.3d 276, 286 (3d Cir. 2006) ("[w]here the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so") (internal quotations omitted and emphasis added); *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) ("That discretion, however, is not unbridled.... the decision should be based on considerations of judicial economy, convenience and fairness") (internal quotations omitted).

36

None of the considerations for continued exercise of pendent jurisdiction are satisfied. Indeed, this litigation has not proceeded beyond the filing of a complaint and motion to dismiss. When dismissal of federal claims occurs at such an early stage, there is no basis for exercising supplemental jurisdiction. *See Key Bank USA*, 163 F. App'x at 166 ("[The Supreme Court] stated that when federal claims are dismissed at an early stage, the exercise of pendent jurisdiction should be declined") (citing *United Mine Workers*, 383 U.S. at 726); *Schuylkill Energy Resources v. PP&L*, 113 F.3d 405, 410 (3d Cir. 1997) (affirming decision not to exercise supplemental jurisdiction over pendent claims following dismissal of antitrust claims). According to well-established precedent, the pendent claims should be dismissed for lack of jurisdiction following dismissal of Plaintiff's antitrust claims. *See* 28 U.S.C. § 1367(c)(3).

## CONCLUSION

The Supreme Court directed courts—particularly in antitrust cases—to apply Rule 12(b)(6) standards rigorously to prevent a "'largely groundless claim'" from imposing the enormous burden and expense of discovery on litigants and courts. *Twombly*, 550 U.S. at 557-58. The Supreme Court has "counsel[ed]" courts "against sending the parties into discovery when there is no reasonable likelihood that the plaintiff[] can construct a claim from the events related in the complaint." *Id.* at 558. This admonition is particularly apt here. For the foregoing reasons, Defendants respectfully request the Court to dismiss all Counts of the Complaint.

Respectfully submitted,

OF COUNSEL:                                   POTTER ANDERSON & CORROON, LLP

Robert G. Abrams (*pro hac vice*)
Gregory J. Commins, Jr. (*pro hac vice*)
Danyll W. Foix (*pro hac vice*)            By:   /s/ David J. Baldwin
BAKER & HOSTETLER LLP                            David J. Baldwin (Del. Bar No. 1010)
1050 Connecticut Ave., N.W., Ste. 1100           Janine L. Hochberg (Del. Bar No. 5188)
Washington, D.C.  20036-5304                     Hercules Plaza, 6th Floor
Tel:  (202) 861-1500                             1313 N. Market Street
rabrams@bakerlaw.com                             Wilmington, DE  19801
gcommins@bakerlaw.com                            Tel:  (302) 984-6000
dfoix@bakerlaw.com                               dbaldwin@potteranderson.com
                                                 jhochberg@potteranderson.com


                                              *Attorneys for Defendant Caterpillar Inc.*


OF COUNSEL:                                   By:   /s/ M. Duncan Grant
                                                    M. Duncan Grant (Del. Bar No. 2994)
Jeremy Heep (*pro hac vice*)                        James H. S. Levine (Del. Bar No. 5355)
Robin P. Sumner (*pro hac vice*)                    PEPPER HAMILTON LLP
Melissa Hatch O'Donnell (*pro hac vice*)            Hercules Plaza, Suite 5100
PEPPER HAMILTON LLP                                 1313 Market Street
3000 Two Logan Square                               P.O. Box 1709
Eighteenth and Arch Streets                         Wilmington, DE 19899-1709
Philadelphia, PA 19103-2799                         Telephone: 302.777.6500
Telephone: 215.981.4000                             Facsimile: 302.421.8390
Facsimile: 215.981.4750                             grantm@pepperlaw.com
heepj@pepperlaw.com                                 levinejh@pepperlaw.com
sumnerr@pepperlaw.com
odonnelm@pepperlaw.com                        *Attorneys for Defendant Volvo Construction*
                                              *Equipment North America, LLC*

OF COUNSEL:

David H. Bamberger (*pro hac vice*)
Katherine M. Ruffing (*pro hac vice*)
James F. Reardon (*pro hac vice*)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: 202.799.4500
Facsimile: 202.799.5500
david.bamberger@dlapiper.com
katie.ruffing@dlapiper.com
james.reardon@dlapiper.com

By:   */s/ Denise S. Kraft*
      Denise S. Kraft (Del. Bar No. 2778)
      Brian Biggs (Del. Bar No. 5591)
      DLA PIPER LLP (US)
      1201 North Market Street, Suite 2100
      Wilmington, DE 19801-1147
      Telephone: 302.468.5700
      Facsimile: 302.394.2341
      denise.kraft@dlapiper.com
      brian.biggs@dlapiper.com

*Attorneys for Defendant Komatsu America Corp.*

OF COUNSEL:

Quentin R. Wittrock
GRAY PLANT MOOTY
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.632.3000
Facsimile: 612.632.4444
quentin.wittrock@gpmlaw.com

By:   */s/ Edward F. Eaton*
      Edward F. Eaton (Del. Bar No. 639)
      CONNOLLY GALLAGHER LLP
      The Brandywine Building
      1000 West Street
      Suite 1400
      Wilmington, DE 19801
      Telephone: 302.888.6204
      Facsimile: 302.654.1005
      meaton@connollygallagher.com

*Attorneys for Defendant Associated Auction Services LLC d/b/a Cat Auction Services*

Dated:  April 20, 2015

1187328

39

## CERTIFICATE OF SERVICE

I, David J. Baldwin, hereby certify that on April 20, 2015, the attached documents were electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the documents have been filed and are available for viewing and downloading:

John W. Shaw
Shaw Keller LLP
300 Delaware Avenue - Suite 1120
Wilmington, DE 19801
jshaw@shawkeller.com

*Attorneys for Plaintiff*

Denise Seastone Kraft
Laura D. Hatcher
Brian A. Biggs
DLA Piper LLP
1201 N. Market Street - Suite 2100
Wilmington, DE 19801
denise.kraft@dlapiper.com
laura.hatcher@dlapiper.com
brian.biggs@dlapiper.com

*Attorneys for Defendant Komatsu
America Corp.*

M. Duncan Grant
James H. S. Levine
Pepper Hamilton LLP
Hercules Plaza – Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
grantm@pepperlaw.com
levinejh@pepperlaw.com

*Attorneys for Defendant Volvo Construction
Equipment North America LLC*

Edward F. Eaton
Connolly Gallagher LLP
Brandywine Building
1000 West Street – Suite 1400
Wilmington, DE 19801
meaton@connollygallagher.com

*Attorneys for Defendant Associated
Auction Services LLC d/b/a Cat
Auction Services*

/s/ David J. Baldwin
David J. Baldwin (No. 1010)
Janine L. Hochberg (No. 5188)
POTTER ANDERSON & CORROON LLP
Hercules Plaza – Sixth Floor
1313 North Market Street
Wilmington, DE  19801
(302) 984-6000
dbaldwin@potteranderson.com
jhochberg@potteranderson.com

*Attorneys for Defendant Caterpillar Inc.*