IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC,<br><br>                Plaintiff,<br><br>    v.<br><br>CATERPILLAR INC., KOMATSU AMERICA CORP., VOLVO CONSTRUCTION EQUIPMENT NORTH AMERICA LLC and ASSOCIATED AUCTION SERVICES, LLC, doing business as Cat Auction Services,<br><br>                Defendants. | C.A. No. 15-108-RGA |

**PLAINTIFF INTERNATIONAL CONSTRUCTION PRODUCTS LLC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

JOHN W. SHAW (No. 3362)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120,
Wilmington, DE 19801
(302) 298-0701
jshaw@shawkeller.com

DAVID BOIES
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
(914) 749-8200

JAMES P. DENVIR
CHRISTOPHER G. RENNER
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
(202) 237-2727
*Counsel for International Construction Products LLC*

Dated:  May 7, 2015

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

NATURE AND STAGE OF THE PROCEEDINGS ................................................................. 1

SUMMARY OF ARGUMENT .................................................................................................1

STATEMENT OF FACTS ........................................................................................................2

ARGUMENT .............................................................................................................................4

   I.   STANDARD OF REVIEW ...............................................................................................4

   II.   OVERVIEW OF THE COMPLAINT ..............................................................................6

   III.  THE COMPLAINT STATES A GROUP BOYCOTT CLAIM ..........................................6

       A.   Unnatural Parallelism, Unmotivated by Common Stimuli, Plausibly Suggests
           a Prior Collusive Agreement........................................................................................10

       B.   Parallelism Would Have Been Against the Manufacturer Defendants'
           Independent Economic Interests Absent a Collusive Agreement...............................15

       C.   Komatsu and Volvo Are Adequately Identified as Conspirators................................18

   IV.  ICP STATES A CLAIM FOR EXCLUSIVE DEALING UNDER SECTION ONE
       OF THE SHERMAN ACT AND SECTION THREE OF THE CLAYTON ACT ............19

       A.   ICP Has Adequately Alleged Agreements to Deal Exclusively .................................21

       B.   ICP Has Adequately Alleged Anticompetitive Exclusive Dealing.............................21

           1.   The Complaint Plausibly Alleges Relevant Product Markets.............................22

           2.   The Relevant Market Includes Sales to End Users and Dealers..........................28

           3.   The Complaint Adequately Alleges Relevant Geographic Markets.....................29

           4.   The Manufacturer Defendants Have Market Power ...............................................33

           5.   The Manufacturer Defendants' Exclusive Arrangements are
               Anticompetitive....................................................................................................36

           6.   ICP Has Alleged Antitrust Injury From the Exclusive Arrangements .................48

   V.   THE COMPLAINT STATES MONOPOLIZATION CLAIMS ......................................50

       A.   ICP Alleges Monopolization and Attempted Monopolization by Caterpillar ............51

       B.   ICP Adequately Alleges Conspiracy to Monopolize by All Defendants....................53

   VI.  THE COMPLAINT STATES A CLAIM FOR UNLAWFUL MERGER.........................55

CONCLUSION...........................................................................................................................60

## TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGES**

*3M v. Appleton Papers Inc.*,
    35 F. Supp. 2d 1138 (D. Minn. 1999) .......................................................................... 37, 39

*Advo v. Philadelphia Newspapers, Inc.*,
    51 F.3d 1191 (3d Cir. 1995) ........................................................................................... 53

*Allen v. Dairy Farmers of Am., Inc.*,
    748 F. Supp. 2d 323 (D. Vt. 2010) ............................................................................. 30, 32

*Allen-Myland, Inc. v. IBM Corp.*,
    33 F. 3d 194 (3d Cir. 1994) ........................................................................................... 28

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
    183 F.3d 568 (7th Cir. 1999) ......................................................................................... 57

*Am. Motor Inns, Inc. v. Holiday Inns, Inc.*,
    521 F.2d 1230 (3d Cir. 1975) ........................................................................................ 39

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) ....................................................................................... 5, 9

*Animal Sci. Prods. v. China Minmetals Corp.*,
    654 F.3d 462 (3d. Cir. 2011) ......................................................................................... 49

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................................ 5

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ...................................................................................................... 51

*Avnet, Inc. v. FTC*,
    511 F.2d 70 (7th Cir. 1975) ........................................................................................... 25

*Axis, S.P.A. v. Micafil, Inc.*,
    870 F.2d 1105 (6th Cir. 1989) ....................................................................................... 68

*Babyage.com, Inc. v. Toys R Us, Inc.*,
    558 F. Supp. 2d 575 (E.D. Pa. 2008) ........................................................................ 25, 27

*Ball v. Paramount Pictures*,
    169 F.2d 317 (3d Cir. 1948) ........................................................................................... 10

*Barr Labs., Inc. v. Abbott Labs.*,
    978 F.2d 98 (3d Cir. 1992) .................................................................................. 20, 39, 52

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................ *passim*

*Bepco, Inc. v. Allied-Signal, Inc.*,
    106 F. Supp. 2d 814 (M.D.N.C. 2000) ..................................................................... 38-39

*Beuff Enters. Fla., Inc. v. Villa Pizza, LLC,*
    2008 U.S. Dist. LEXIS 50591 (D.N.J. June 25, 2008) ................................................... 27

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,*
    142 F. Supp. 2d 296 (E.D.N.Y. 2001) ........................................................................... 28

*Bigelow, Inc. v. Unilever N.V.,*
    867 F.2d 102 (2d Cir. 1989) .......................................................................................... 57

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.,*
    881 F. Supp. 860 (W.D.N.Y. 1994) ............................................................................... 57

*Braden v. Wal-Mart Stores, Inc.,*
    588 F.3d 585 (8th Cir. 2009) ...................................................................................... 9-10

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) .......................................................................................... 60

*Brown Shoe Co. v. United States,*
    370 U.S. 294 (1962) .............................................................................................. *passim*

*Burtch v. Milberg Factors, Inc.,*
    2009 U.S. Dist. Lexis 26872 (D. Del. Mar. 30, 2009) .................................................. 54

*California v. Am. Stores Co.,*
    495 U.S. 271 (1990) ...................................................................................................... 59

*Carpet Group Int'l v. Oriental Rug Importers Ass'n,*
    227 F.3d 62 (3d Cir. 2000) ........................................................................................... 49

*Chao v. Ballista,*
    630 F. Supp. 2d 170 (D. Mass. 2009) ........................................................................... 11

*City of Pittsburg v. West Penn Power Co.,*
    147 F.3d 256 (3d Cir. 1998) .......................................................................................... 60

*Collins v. Associated Pathologists, Ltd.,*
    676 F. Supp. 1388 (N.D. Ill. 1987) ............................................................................... 29

*Commer. Data Servers, Inc. v. IBM,*
    166 F. Supp. 2d 891 (S.D.N.Y. 2001) ........................................................................... 28

*Daniels Sharpsmart, Inc. v. Tyco Int'l (US), Inc.,*
    2006 U.S. Dist. LEXIS 100158 (E.D. Tex. Oct. 18, 2006) ........................................... 41

*Del. Valley Marine Supply Co. v. Am. Tobacco Co.,*
    297 F.2d 199 (3d Cir. 1961) ..................................................................................... 12, 13

*Dickson v. Microsoft Corp.,*
    309 F.3d 193 (4th Cir. 2002) .................................................................................... 41, 42

*E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n,*
    357 F.3d 1 (1st Cir. 2004) ............................................................................................. 29

*E. I. du Pont de Nemours & Co. v. Kolon Indus.,*
    637 F.3d 435 (4th Cir. 2011) .............................................................................. 30, 31, 32

*Eastman Chem. Co. v. AlphaPet Inc.*,
   2011 U.S. Dist. LEXIS 127757 (D. Del. Nov. 4, 2011) ..................................... 5

*Emigra Grp. v. Fragomen, Del Rey, Bernsen and Loewy, L.L.P.*,
   612 F. Supp. 2d 330 (S.D.N.Y. 2009) ............................................................. 34

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F. 3d 33 (1st Cir. 2013) .............................................................................. 5

*Fineman v. Armstrong World Indus., Inc.*,
   980 F.2d 171 (3d Cir. 1992) ........................................................ 22, 24, 33, 47

*Fowler v. UPMC Shadyside*,
   578 F.3d 203 (3d Cir. 2009) ......................................................................... 4, 5

*Full Draw Prods. v. Easton Sports, Inc.*,
   182 F.3d 745 (10th Cir. 1999) ....................................................................... 34

*FTC v. Rhinechem Corp.*,
   459 F. Supp. 785 (N.D. Ill. 1978) .................................................................. 59

*Genico, Inc. v. Ethicon, Inc.*,
   2006 U.S. Dist. LEXIS 96909 (E.D. Tex. March 26, 2006) ........................... 41

*Ginsburg v. InBev NV/SA*,
   623 F.3d 1229 (8th Cir. 2010) ....................................................................... 60

*GN Netcom, Inc. v. Plantronics, Inc.*,
   967 F. Supp. 2d 1082 (D. Del. 2013) ................................................ 22, 27, 49

*Graco Inc. v. PMC Global, Inc.*,
   2012 U.S. Dist. LEXIS 1888865 (D. N.J. March 6, 2012) ...................... *passim*

*Great Hill Equity Partners IV v. SIG Growth Equity Fund*,
   2014 WL 6703980 (Del. Ch. Nov. 26, 2014) ................................................. 54

*Harlem River Consumers Coop., Inc. v. Associated Growers of Harlem, Inc.*,
   1975 U.S. Dist. LEXIS 12600 (S.D.N.Y. Apr. 30, 1975) ................................. 7

*Hartford Ins. Co. v. California*,
   509 U.S. 764 (1993) .......................................................................................... 7

*Haspel v. State Farm Mut. Auto. Ins. Co.*,
   241 F. Appx. 837, 2007 U.S. App. LEXIS 17074 (3d Cir. 2007) ................. 5-6

*Heerwagen v. Clear Channel Commc'ns*,
   435 F.3d 219 (2d Cir. 2006) .......................................................................... 31

*HTI Health Servs. v. Quorum Health Group*,
   960 F. Supp. 1104 (S.D. Miss. 1997) ............................................................ 58

*ID Security Sys. Canada, Inc. v. Checkpoint Sys.*,
   249 F. Supp. 2d 622 (E.D. Pa. 2003) ............................................................ 42

*In re Blood Reagents Antitrust Litig.*,
   756 F. Supp. 2d 637 (E.D. Pa. 2010) .............................................................. 9

*In re Digital Music Antitrust Litig.*,
   592 F. Supp. 2d 435 (S.D.N.Y. 2008)......................................................... 14

*In re Ductile Iron Pipe Fittings Antitrust Litig.*,
   2013 U.S. Dist. LEXIS 29865 (D.N.J. Mar. 5, 2013)................................... 37

*In re Elec. Books Antitrust Litig.*,
   859 F. Supp. 2d 671 (S.D.N.Y. 2012)............................................. 13, 17, 18

*In re Fasteners Antitrust Litig.*,
   2011 U.S. Dist. LEXIS 90076 (E.D. Pa. Aug. 12, 2011)............................... 19

*In re Flat Glass Antitrust Litig.*,
   385 F.3d 350 (3d Cir. 2004)............................................................................ 7

*In re Hypodermic Prods. Antitrust Litig.*,
   2007 U.S. Dist. LEXIS 47438 (D. N.J. June 29, 2007) ................................. 20

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010)............................................................... *passim*

*In re Lithium Ion Batteries Antitrust Litig.*,
   2014 U.S. Dist. LEXIS 7516 (N.D. Cal. Jan. 21, 2014) ............................... 19

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   562 F. Supp. 2d 392 (E.D.N.Y. 2008) ........................................... 33, 34, 35

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) .............................................................. 9

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
   988 F. Supp. 2d 696 (E.D. La. 2013).............................................. 15, 17, 18

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp. 2d 720 (E.D. Pa. 2011) ........................................................ 9, 19

*In re Processed Egg Prods. Antitrust Litig.*,
   902 F. Supp. 2d 704 (E.D. Pa. 2012) .......................................................... 19

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ...................................................................... 10

*Interface Group, Inc. v. Mass. Port Auth.*,
   816 F.2d 9 (1st Cir. 1987)......................................................................... 33, 35

*Interstate Circuit v. United States*,
   306 U.S. 208 (1939)................................................................................. 16, 18

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
   466 U.S. 2 (1984)............................................................................... 33, 41, 48

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
   190 F.3d 775 (7th Cir. 1999) ................................................................. 53, 54

*Landsdowne on the Potomac Homeowners Ass'n, Inc. v. Openband at Landsdowne LLC*,
   2011 U.S. Dist. LEXIS 134477 (E.D. Va. Nov. 22, 2011)............................ 29

*LePage's, Inc. v. 3M Co.*,
    324 F.3d 141 (3d Cir. 2003)...................................................................... 36

*LG Elecs. v. Asko Appliances*,
    2010 U.S. Dist. LEXIS 31571 (D. Del. Mar. 29, 2010) ................................. 51

*Lone Star Milk Producers Inc. v. Dairy Farmers of America*, Inc.,
    2001 U.S. Dist. LEXIS 18716 (E.D. Tex. Jan. 19, 2001)............................... 32

*Loosier v. Unknown Med. Doctor*,
    435 Fed.Appx. 302 (5th Cir. 2010) ........................................................... 21

*Lorain Journal Co. v. United States*,
    342 U.S. 143 (1951)...................................................................... 7, 51

*McElhinney, v. Med. Protective Co.*,
    549 F. Supp. 121 (E.D. Ky. 1982) ............................................................ 17

*McElhinney v. Med. Protective Co.*,
    738 F.2d 439 (6th Cir. 1984) .................................................................. 17

*McWane, Inc. v. FTC*,
    2015 U.S. App. LEXIS 6111 (11th Cir. Apr. 15, 2015) .............................. 36, 27, 44, 52

*Newcal Indus., Inc. v. Ikon Office Solution*,
    513 F.3d 1038 (9th Cir. 2008) ............................................................. 26, 55

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 403 (1988)........................................................................... 7

*Omega Environmental, Inc. v. Gilbarco, Inc.*,
    127 F.3d 1157 (9th Cir. 1997) ................................................................ 38

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
    967 F. Supp. 2d 1347 (N.D. Cal. 2013) .................................................... 42

*Oxbow Carbon & Minerals LLC v. Union Pacific R.R. Co.*,
    2015 U.S. Dis. LEXIS 21734 (D.D.C. Feb. 24, 2015) ................................. 21

*Paddock Publ'ns, Inc. v. Chicago Tribune Co.*,
    103 F.3d 42 (7th Cir. 1996) ............................................................... 41, 42

*PepsiCo, Inc. v. Coca-Cola Co.*,
    114 F. Supp. 2d. 243 (S.D.N.Y. 2000)..................................................... 32

*Peterson v. Village of Downers Grove*,
    2015 WL 1929737 (N.D. Ill. Apr. 27, 2015) .............................................. 13

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993) .......................................................... *passim*

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997).......................................................... 22, 24, 27

*Ralph C. Wilson Indus., Inc. v. Am. Broadcasting Cos.*,
    598 F. Supp. 694 (N.D. Cal. 1984) ........................................................ 42

*Re/Max Int'l, Inc. v. Realty One, Inc.*,
    173 F.3d 995 (6th Cir. 1999) ......................................................................... 15

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ................................................................... 42, 53

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
    381 F.3d 717 (7th Cir. 2004) .......................................................................... 29

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
    249 F. Supp. 2d 463 (M.D. Pa. 2003) ............................................................ 54

*Schuylkill Health Sys. v. Cardinal Health 200, LLC*,
    2014 U.S. Dist. LEXIS 103663 (E.D. Pa. July 30, 2014) .......................... 40, 42

*Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,
    2000 WL 264295 (S.D.N.Y. March 9, 2000) ................................................. 57

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) ......................................................................... 24

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ....................................................................................... 51

*Standard Oil Co. of Cal. v. United States*,
    337 U.S. 293 (1949) ........................................................................... 39, 41, 43

*Starr v. Sony BMG Music Entm't*,
    592 F.3d 314 (2d Cir. 2010) ........................................................................... 14

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*,
    373 F.3d 57 (1st Cir. 2004) ............................................................................ 43

*Syncsort Inc. v. Sequential Software, Inc.*,
    50 F. Supp. 2d 318 (D.N.J. 1999) .................................................................. 27

*Taleff v. Sw. Airlines Co.*,
    828 F. Supp. 2d 1118 (N.D. Cal. 2011) ......................................................... 60

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ....................................................................... 19, 30, 41, 43

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ........................................................................ 22-23

*Taxi Weekly, Inc. v. Metro. Taxicab Bd. of Trade, Inc.*,
    539 F.2d 907 (2d Cir. 1976) ........................................................................... 10

*Toys "R" Us v. FTC*,
    221 F.3d 928 (7th Cir. 2000) ........................................................ 16,18, 33, 34

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991) ........................................................................... 30

*Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*,
    676 F.2d 1291 (9th Cir. 1982) ....................................................................... 38

*Union Carbide Corp. v. Montell N.V.*,
    944 F. Supp. 1119 (S.D.N.Y. 1996)....................................................................... 57

*United States v. Am. Airlines*, Inc.,
    743 F.2d 1114 (5th Cir. 1984) .......................................................................... 42

*United States v. Am. Cyanamid Co.*,
    719 F.2d 1034 (2d Cir. 1983)............................................................................ 55

*United States v. Consol. Laundries Corp.*,
    291 F.2d 563, 573 (2d Cir. 1961)...................................................................... 54

*United States v. Dean Foods Co.*,
    2010 U.S. Dist. LEXIS 34137 (E.D. Wis. Apr. 7, 2010)........................... 31, 32

*United States v. Dentsply Int'l, Inc.*,
    399 F.3d 181 (3d. Cir 2005).................................................................... *passim*

*United States v. E. I. du Pont de Nemours, Co.*,
    351 U.S. 377 (1956)................................................................................. 25, 33

*United States v. Ford Motor Co.*,
    315 F. Supp. 372 (E.D. Mich. 1970)................................................................. 59

*United States v. Ford Motor Co.*,
    405 U.S. 562 (1972)........................................................................................ 58

*United States v. Gen. Motors Corp.*,
    384 U.S. 127 (1966)........................................................................................ 59

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966)................................................................................. 50, 52

*United States v. H&R Block, Inc.*,
    833 F. Supp. 2d 36 (D.D.C. 2011) ................................................................... 26

*United States v. Microsoft*,
    253 F.3d 34 (D.C. Cir. 2001) .................................................................. *passim*

*United States v. Philadelphia Nat'l Bank*,
    374 U.S. 321 (1963)........................................................................................ 41

*United States v. Rockford Mem'l Corp.*,
    717 F. Supp. 1251 (N.D. Ill. 1989) .............................................................. 31-32

*United States v. Rockford Mem'l Corp.*,
    898 F.2d 1278 (7th Cir. 1990) ......................................................................... 32

*United States v. Visa U.S.A. Inc.*,
    163 F. Supp. 2d 322 (S.D.N.Y. 2001)........................................................ 26, 33

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)....................................................................... 34, 35

*United States v. Yellow Cab Co.*,
    332 U.S. 218 (1947)........................................................................................ 51

*U.S. Steel Corp. v. FTC*,
   426 F.2d 592 (6th Cir. 1970) ................................................................ 57, 58, 59

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko*,
   540 U.S. 398 (2004).......................................................................................... 7

*Wall Prods. Co. v. Nat'l Gypsum Co.*,
   326 F. Supp. 295 (N.D. Cal. 1971) ................................................................ 14

*West Penn Allegheny Health Sys. Inc. v. UPMC*,
   627 F.3d 85 (3d Cir. 2010)................................................................................ 5

*Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*,
   224 F. Supp. 2d 657 (S.D.N.Y. 2002).............................................................. 56

*Yeager's Fuel v. Pa. Power & Light Co.*,
   953 F. Supp. 617 (E.D. Pa. 1997) .................................................................. 40

*ZF Meritor, LLC v. Eaton Corp.*,
   696 F.3d 254 (3d Cir. 2012)..................................................................*passim*

## STATUTES

15 U.S.C. § 1 ........................................................................................................ 3, 6
15 U.S.C. § 2 ..................................................................................................... 3, 56
15 U.S.C. § 14 ................................................................................................... 3, 21
15 U.S.C. § 15 ....................................................................................................... 53
15 U.S.C. §18 .......................................................................................................... 3

## RULES

Fed. R. Civ. P. 8(a) ............................................................................................ 4, 5
Fed. R. Civ. P. 9(b) ................................................................................................ 5
Fed. R. Civ. P. 12(b)(6).......................................................................................... 4

## JOURNALS & TREATISES

Phillip A. Areeda & Herbert Hovenkamp, ANTITRUST LAW (2010) ..................................... 13, 14
ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (6th ed. 2007)................ 26
ABA SECTION OF ANTITRUST LAW, ANTITRUST LAW DEVELOPMENTS (7th ed. 2013)................ 56
Jonathan M. Jacobsen, *Exclusive Dealing, "Foreclosure" and Consumer Harm*,
   70 ANTITRUST L. J. 311 (2002) .................................................................... 39

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff International Construction Products LLC ("ICP") filed this action on January 19, 2015, alleging violations of federal antitrust laws, and of state law, against Defendants Caterpillar Inc. ("Caterpillar"), Komatsu America Corp. ("Komatsu"), Volvo Construction Equipment North America, LLC ("Volvo") (collectively, the "Manufacturer Defendants") and Associated Auction Services, LLC, doing business as Cat Auction Services ("Cat Auction Services"). This is ICP's Answering Brief in Opposition to Defendants' Motions to Dismiss (D.I. 27, 28, 30, 33), filed April 20, 2015 (collectively, the "Motions").

## SUMMARY OF ARGUMENT

The Court should deny the Motions in their entirety for the following reasons:

1.      The Manufacturer Defendants engaged in a group boycott to pressure IronPlanet, an increasingly popular online marketplace for heavy construction equipment, to breach its contract with ICP. The Manufacturer Defendants privately and virtually simultaneously issued identical threats to IronPlanet. These threats to IronPlanet were (absent an agreement) contrary to the Manufacturer Defendants' self-interest, and this risky and improbably precise parallelism in the substance and timing of their threats plausibly suggests an agreement to issue them.

2.      The Manufacturer Defendants' exclusive dealing arrangements with their dealers, which apart from IronPlanet are the only effective channels of distributing heavy construction equipment to consumers, have substantial anticompetitive effects by foreclosing competition.

3.      Caterpillar's role in the exclusion of ICP constitutes illegal monopolization.

4.      The merger of Cat Auction Services and IronPlanet, orchestrated by Caterpillar, perfects the exclusionary scheme that began with the boycott of IronPlanet, and is illegal for its tendency to increase the already high barriers to entry created by the Manufacturer Defendants.

1

## STATEMENT OF FACTS

ICP's Complaint alleges an ongoing conspiracy, first among the Manufacturer Defendants and later joined by Cat Auction Services, to eliminate ICP as a threatening new entrant into the market for new heavy construction equipment.  The new heavy construction equipment market is a highly concentrated oligopoly protected from new entry by substantial barriers to entry, primarily in the form of the Manufacturer Defendants' exclusive dealing arrangements with their equipment dealers, which have historically been the avenue through which suppliers of heavy construction equipment distributed their products to end users.  D.I. 1 ¶¶ 18-32, 39-47.   Secure behind these barriers to entry, the Manufacturer Defendants have for years exercised market power, charging supra-competitive prices for new heavy construction equipment.  D.I. 1 ¶¶ 48-50.

ICP's entry into the new heavy construction equipment market would have changed all of that.  With an experienced management team selling new high-quality, low-priced Chinese heavy construction equipment directly to end users at prices as much as 40 percent below the prices charged by the Manufacturer Defendants, ICP's successful entry promised to make the new heavy construction equipment market substantially more competitive, to the benefit of consumers but to the detriment of the Manufacturer Defendants.  D.I. 1 ¶¶ 69-72, 76, 86, 93. The lynchpin of ICP's entry was its contractual relationship with IronPlanet, an increasingly popular website selling used heavy construction equipment.  D.I. 1 ¶¶ 56-67, 73-85.  The success of IronPlanet in selling used heavy construction equipment to end users over the internet has proven that users of heavy construction equipment will purchase such equipment outside of longstanding channels of distribution in exchange for convenience and lower prices.  D.I. 1 ¶ 60. IronPlanet, with a sales force of over 300 and total sales of over $4 billion, uniquely benefits

from substantial and increasing network effects.  D.I. 1 ¶¶ 56-67.  It is the dominant online marketplace for the sale of heavy construction equipment, and for a new entrant into the new heavy construction equipment market no other alternative form of distribution would be remotely as effective as sales through IronPlanet.  D.I. 1 ¶ 61.  Selling through IronPlanet allowed ICP to surmount the distribution barrier to entry erected by the Manufacturer Defendants' exclusivity arrangements, and for the first time in decades exposed the Manufacturer Defendants to the threat of rapid and effective new entry by a competitor.  D.I. 1 ¶¶ 44-50, 56-67.  The Manufacturer Defendants and industry participants alike appreciated the unique competitive threat that ICP, selling through IronPlanet, posed to the Manufacturer Defendants' market power. D.I. 1 ¶¶ 82-86.

One month after ICP entered the U.S. market and began sales over IronPlanet, the Manufacturer Defendants took swift, decisive, and coordinated steps to eliminate the competitive threat posed by ICP.  D.I. 1 ¶¶ 93-108.  The Manufacturer Defendants threatened to boycott sales of used equipment to IronPlanet if IronPlanet continued to perform under its contract with ICP. D.I. 1 ¶¶ 93-104.  Because the Manufacturer Defendants' sales of used equipment are the commercial lifeblood of IronPlanet, IronPlanet acceded to this heavy economic pressure, breaching its contract without justification or excuse, and leaving ICP with no realistic means to bring its products to market.  *Id*.  Having thwarted ICP's entry in the short term, but sobered by IronPlanet's evident interest in sponsoring new entry into the heavy equipment market, Caterpillar procured the merger of IronPlanet with Cat Auction Services, an entity controlled by Caterpillar and its dealers.  D.I. 1 ¶¶ 105-108.  By merging IronPlanet and Cat Auction Services, Caterpillar changed IronPlanet's incentives with respect to sponsoring new entry, and ensured that IronPlanet would never again support new entry into the heavy construction equipment

market.  *Id*.  Thus, in little over a year, American consumers saw a window of opportunity open for new entry into the oligopolistic new heavy construction equipment market, and then saw that window slammed shut forever by the Defendants' conspiracy.  D.I. 1 ¶¶ 3-5.

This action immediately followed.  The Complaint alleges that Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Sections 3 and 7 of the Clayton Acts, 15 U.S.C. §§ 14 and 18, as well as state law.  ICP seeks damages for Defendants' unlawful conduct, and equitable relief ensuring the possibility of effective competition in the new heavy construction equipment market going forward, including an injunction against the further enforcement of the Manufacturer Defendants' unlawful exclusive dealing arrangements with their dealers, and the divestiture of IronPlanet by Cat Auction Services.  D.I. 1 ¶ 153.

## ARGUMENT

## I.    STANDARD OF REVIEW

Except as provided in Federal Rule of Civil Procedure 9, a complaint is sufficient if it complies with Rule 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  The Complaint must contain factual allegations that, taken as a whole, render the plaintiff's entitlement to relief plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The Court is required to conduct a two-part analysis when considering a Rule 12(b)(6) motion.  First, the factual matters averred in the complaint should be separated from legal conclusions asserted therein.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).  Any facts pled must be taken as true, and any legal conclusions asserted may be disregarded.  *Id*. at 210-11.  Second, the Court must determine whether the factual matters averred are sufficient to show that the plaintiff has a "plausible claim for relief."  *Id*. at 211 (citation omitted).  The

4

Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading, the plaintiff may be entitled to relief." *Id*. at 210. This two-part analysis is "context-specific" and requires the Court to draw on "its judicial experience and common sense" to determine if the facts pled in the complaint have "nudged [plaintiff's] claims" over the line from "[merely] conceivable to plausible." *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009).

*Twombly* does not impose a probability requirement at the pleading stage, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of these [alleged] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citation omitted). "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012). "The choice between two plausible inferences that may be made from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id*. at 185; *accord Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F. 3d 33, 45 (1st Cir. 2013).

Nor does *Twombly* impose a heightened pleading standard on antitrust claims. *Twombly*, 550 U.S. at 569 n.14; *see also West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010) ("We conclude that it is inappropriate to apply *Twombly*'s plausibility standard with extra bite in antitrust and other complex cases"). There is no requirement under *Twombly* that the plaintiff allege the "who, what, when, where and why" of its claims with the specificity required under Rule 9(b). *See Eastman Chem. Co. v. AlphaPet Inc.*, 2011 U.S. Dist. LEXIS 127757, at *21-23 (D. Del. Nov. 4, 2011). Under the more relaxed standards of Rule 8(a), it is sufficient if the complaint contain "either direct or <u>inferential</u> allegations respecting all the

material elements necessary to sustain recovery under some viable legal theory." *Haspel v. State Farm Mut. Auto. Ins. Co.*, 2007 U.S. App. LEXIS 17074, at *4 (3d Cir. 2007) (unpublished) (quoting *Twombly*, 550 U.S. at 562) (emphasis added).

## II.   OVERVIEW OF THE COMPLAINT

ICP's antitrust claims against the Manufacturer Defendants are established by three key sets of factual allegations.  Specifically, the Manufacturer Defendants (1) conspired to exclude ICP from IronPlanet; (2) individually and collectively have substantial market and monopoly power in the sale of new heavy construction equipment; and (3) all have adopted exclusive dealing agreements with their equipment dealers that foreclose the new heavy construction equipment market to new entrants, including ICP.  Together, these three fundamental building blocks establish claims under Sections 1 (group boycott and exclusive dealing, each against all Manufacturer Defendants) and 2 of the Sherman Act (monopolization against Caterpillar and conspiracy to monopolize against all Manufacturer Defendants), and Section 3 of the Clayton Act (exclusive dealing, against all Manufacturer Defendants).  A fourth ingredient – the merger of Cat Auction Services (aligned with Caterpillar) and IronPlanet – gives rise to a claim against Cat Auction Services under Section 7 of the Clayton Act.  As set forth below, all of ICP's antitrust claims are alleged with plausibility, and the Motions should be denied in their entirety.

## III.   THE COMPLAINT STATES A GROUP BOYCOTT CLAIM

Section 1 of the Sherman Act prohibits agreements in restraint of trade.  15 U.S.C. § 1. To prove a violation of Section 1, a plaintiff must prove that (1) the defendant was party to an agreement that (2) unreasonably restrained trade and (3) caused an antitrust injury to the plaintiff. *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314-15 & n.9 (3d Cir. 2010).

A Section 1 agreement requires proof among the Defendants of a "unity of purpose or a common design and understanding or a meeting of minds" or "a conscious commitment to a common scheme." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (citation omitted). Once proven, certain types of Section 1 agreements are condemned more readily than others. Some agreements among direct competitors are *per se* unlawful once proven, without any proof of relevant markets, a defendant's market power or the anticompetitive effect of the agreement, and without regard to any proffered business justification. *See Ins. Brokerage*, 618 F.3d at 316-17. One type of *per se* unlawful agreement is a group boycott. A group boycott is a concerted refusal to deal, where collective effort in one transaction is designed to force the boycotted firm to change its ways with respect to a different transaction. *Hartford Ins. Co. v. California*, 509 U.S. 764, 800-04 (1993). Commercial boycotts can have "great coercive force" because "unrelated transactions are used as leverage to achieve the terms desired." *Id.* at 802-03. Agreements among competitors to threaten to withhold business from third parties unless those third parties help them injure their competitors are *per se* unlawful group boycotts. *See NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1988).[1]

---

[1] Defendants cite *Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 408 (2004), for the proposition that they were "free[] to exercise [their] own independent discretion as to the parties with whom [they would] deal." D.I. 29 at 9. Two exceptions to this general rule govern this case. First, "where a decision not to deal with another is not made individually, *i.e.*, where there is a concerted refusal to deal or a group boycott, actions which would otherwise be perfectly legal constitute *per se* violations of the antitrust laws." *Harlem River Consumers Coop., Inc. v. Associated Growers of Harlem, Inc.*, 1975 U.S. Dist. LEXIS 12600, at *7 (S.D.N.Y. April 30, 1975). Second, as the Supreme Court made plain in *Lorain Journal Co. v. United States*, 342 U.S. 143, 155 (1951), the right to choose trading partners is limited by Section 2 of the Sherman Act: *"In the absence of any purpose to create or maintain a monopoly*, the [Sherman] act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal") (citation omitted, emphasis in original).

The Complaint alleges a *per se* unlawful group boycott claim against the Manufacturer Defendants based on the collective pressure they applied to coerce IronPlanet into discontinuing its relationship with ICP.  D.I. 1 ¶¶ 115, 119.  Defendants challenge the sufficiency of ICP's allegations of that agreement's existence, but not its illegality once proven or whether ICP suffered antitrust injury as a result.  D.I. 29 at 6-11.  Their challenge fails because the Complaint contains more than sufficient factual allegations supporting the inference of an agreement among the Manufacturer Defendants to pressure IronPlanet to refuse to deal with ICP.

*Twombly*, as interpreted by the lower courts, provides the authoritative standard for alleging an agreement in an antitrust case.  Under *Twombly*, allegations of agreement resting on parallel conduct "must be placed in a context that raises a suggestion of preceding agreement, not merely parallel conduct that could just as well be independent action."  *Twombly*, 550 U.S. at 557.  *Twombly* instructs that parallel conduct can support the inference of a horizontal agreement at the pleading stage when it "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties."  *Id*. at 556 n.4 (citing AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 1425).

The Complaint adequately alleges a horizontal agreement under this standard.  Specifically, the Complaint alleges that the Manufacturer Defendants simultaneously adopted and implemented identical coercive strategies to threaten IronPlanet, in the absence of any plausible non-conspiratorial means by which to achieve the lock-step coordination in the content and timing of their threats. The boycott of IronPlanet was costly and risky, and thus against the individual economic interests of any of the Manufacturer Defendants absent an agreement. Defendants argue that, as in *Twombly*, the steps taken by the Manufacturer Defendants to resist competition from ICP are insufficiently probative of a conspiracy because each Manufacturer

Defendant had adequate incentives to engage in this conduct unilaterally.  D.I. 29 at 9-11.  Two features of the parallel conduct alleged in this case distinguish it from *Twombly*, and require the denial of Defendants' Motions: (1) the context in which the Manufacturer Defendants' virtually simultaneous threats to IronPlanet were made, making the parallelism of the threats unnatural and inexplicable other than through prior coordination and agreement, and (2) the costly and risky nature of those threats, which no Manufacturer Defendant would have made had it not had assurances that the other Manufacturer Defendants would do the same.

Although the Defendants may (although they have not yet) come forward with alternative and perhaps plausible accounts of their parallel conduct, the Court is not to choose between or weigh the competing plausible accounts offered by the parties on a motion to dismiss.  *See Anderson News,* 680 F.3d at 189 ("The question at the pleading stage is not whether there is a plausible *alternative* to the plaintiff's theory; the question is whether there are sufficient factual allegations to make the complaint's claim plausible").  Instead, to justify a motion to dismiss, there must be an "*obvious alternative explanation,*" rooted either in "common economic experience" or the facts alleged in the complaint. *Twombly*, 550 U.S. at 565-67 (emphasis added).  Indeed, such an explanation cannot prevail unless the Complaint "on its face" "inexorably" supports the defendants' proffered justification. *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 720, 730 (E.D. Pa. 2011) (emphasis added) (internal citation omitted); *see also In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011) (denying motion to dismiss where defendants had presented a "somewhat convincing case that all of plaintiffs' allegations can be explained as behavior

perfectly in line with the firms' independent self-interest" because under *Twombly* "the plaintiffs need only allege a conspiracy which is plausible in light of the competing explanations").[2]

### A. Unnatural Parallelism, Unmotivated by Common Stimuli, Plausibly Suggests a Prior Collusive Agreement

Identical parallel conduct taken simultaneously by multiple competitors makes the inference of agreement plausible, absent common stimuli that compel an obvious non-collusive explanation for that parallelism. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (Posner, J.) (explaining that "changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" is the "kind of 'parallel plus' behavior" that "enables parallel conduct to be interpreted as collusive") (quoting *Twombly*); *Taxi Weekly, Inc. v. Metro. Taxicab Bd. of Trade, Inc.*, 539 F.2d 907, 911 (2d Cir. 1976) (inference of agreement justified where taxi fleet owners each called to cancel subscription to trade publication within one half hour of each other one day after meeting); *Ball v. Paramount Pictures*, 169 F.2d 317, 319 (3d Cir. 1948) (explaining that "conspiracy may be inferred when the concert of action could not possibly be sheer coincidence") (citation omitted).

In evaluating parallel conduct for signs of agreement, *Twombly* directs attention to both the substance of the parallel conduct (*i.e.*, did the defendants engage in the same conduct, and does the surrounding context render the similarity in the defendants' conduct suspicious) and the timing of that conduct. *See Twombly*, 550 U.S. at 556 n.4 (explaining that "complex and

---

[2] *See also In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 637, 642-43 (E.D. Pa. 2010) (denying motion to dismiss based on "obvious alternative explanation" standard); *Starr v. Baca*, 652 F.3d 1202, 1219 (9th Cir. 2011) ("Plaintiff's complaint may be dismissed only when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *im*plausible") (emphasis in original); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 597 (8th Cir. 2009) ("Not every potential lawful explanation for the defendant's conduct renders the plaintiff's theory implausible. Just as a plaintiff cannot proceed if his allegations are merely consistent with a defendant's liability, so a defendant is not entitled to dismissal if the facts are merely consistent with lawful conduct") (internal citations and quotations omitted).

historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason would support a plausible inference of conspiracy"). Here, the Complaint alleges parallelism that can be explained only through prior coordination between the Manufacturer Defendants: the simultaneous delivery of identical boycott threats to IronPlanet. Each of the Manufacturer Defendants threatened IronPlanet in exactly the same way – by threatening to withhold used equipment for sale through IronPlanet. D.I. 1 ¶¶ 95, 96. The Manufacturer Defendants made their threats within hours, and at most days, of one another. *Id*. Specifically, IronPlanet reported on April 3, 2014, that it had just received identical threats from at least two of the Manufacturer Defendants. Just days later, on April 10, 2014, IronPlanet confirmed that by that date it had received the very same threats from all three Manufacturer Defendants. *Id*. The Defendants fail to offer *any* explanation of how this remarkable feat of parallelism, in both the substance and timing of the threats, was achieved other than through prior agreement among the Manufacturer Defendants, let alone an explanation that renders ICP's allegations implausible. *See, e.g., Chao v. Ballista*, 630 F. Supp. 2d 170, 177 (D. Mass. 2009) ("A complaint should only be dismissed at the pleading stage where the allegations are so broad, and the alternative explanations so overwhelming, that the claims no longer appear plausible").

There were no "common stimuli," *Twombly*, 550 U.S. at 556 n.4, which would have induced the Manufacturer Defendants to independently adopt the same strategy at the same time, absent coordination. The Manufacturer Defendants claim they were simply responding in parallel to IronPlanet's relationship with ICP. D.I. 29 at 9. But this does not explain why the Manufacturer Defendants chose to react at the same time or in the same way. ICP had been selling Lonking products through IronPlanet's website for a month before the Manufacturer

Defendants made their threats, and the partnership of ICP and IronPlanet was widely publicized and known to the Manufacturer Defendants well in advance of their simultaneous threats.  D.I. 1 ¶¶ 81-86.  It is inherently *im*plausible that the Manufacturer Defendants issued by mere coincidence identical threats within days of one another, and a full month after the allegedly common stimulus which prompted the parallelism.  The lag between ICP going live on IronPlanet's website and the Manufacturer Defendants' threats, and the close proximity of those threats to one another, make it plausible that some intervening event other than ICP's dealing with IronPlanet caused the Manufacturer Defendants to issue those threats.  That intervening event, most likely, was agreement among the Manufacturer Defendants.

The Manufacturer Defendants also fail to explain why they all issued the same threat to IronPlanet.  The Manufacturer Defendants had not previously threatened to exclude rival sellers from IronPlanet at all, let alone through threats of a boycott.  D.I. 1 ¶ 101.  The Manufacturer Defendants have the heavy burden, therefore, of explaining how they all happened on a boycott – hardly an inevitable or customary response to new entry – in response to IronPlanet's relationship with ICP.  "It is one thing for competitors all to charge the same price, as a perfectly competitive market could lead them to do so."  *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1246 (3d Cir. 1993).  But no such common-sense explanation exists for parallel coercive conduct, and parallelism extending to the adoption of identical coercive strategies makes the inference of agreement plausible.  *Id.* at 1244-45 ("One logical explanation [for parallel coercive conduct] is that the defendants set up the rules this way"); 1246 (agreement is plausible inference when "competitors … use the same enforcement mechanism").

This is not a case where the range of the possible responses of the Manufacturer Defendants was limited to a binary choice, a context that would have limited the inferences that

could be drawn from substantively identical conduct.  *See Del. Valley Marine Supply Co. v. Am. Tobacco Co.*, 297 F.2d 199, 205 (3d Cir. 1961) (when "[t]he situation at bar was not of a sort which allowed much scope of action to the participants," the inference of agreement from substantively identical conduct is weakened).  Instead, the parallelism in this case is the "complex" and "historically unprecedented" parallelism that is suggestive of prior agreement under *Twombly*, 550 U.S. at 556 n.4.  There was a wide range of conduct the Manufacturer Defendants could have adopted in response to ICP's entry, including simple inaction or even competition on the merits, but instead each responded with the same, specific, unprecedented coercive strategy.  On these facts, the "suspicion created by the unlikelihood of numerous firms reaching one of many possible conclusions" to the entry of a competitor plausibly supports the inference of agreement.  *Del. Valley*, 297 F.2d at 205.  In light of the plausibility of ICP's explanation for the Manufacturer Defendants' identical threats to IronPlanet, not even a plausible alternative justification by the Defendants – and they have proffered none at all – entitles them to a dismissal on the pleadings.  *See In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 687-88 (S.D.N.Y. 2012) (denying motion to dismiss; "So long as a plaintiff states a plausible claim, a complaint may not be dismissed on a Rule 12(b)(6) motion even if a court believes it is more likely than not that the defendants reacted independently to 'common stimuli'").[3]

---

[3] Although the argument is not presented in their opening brief and should therefore be considered waived, *Peterson v. Village of Downers Grove*, 2015 WL 1929737, at *5 (N.D. Ill. Apr. 27, 2015), the Defendants may argue on reply that their parallel threats to IronPlanet were somehow insufficiently simultaneous to give rise to the inference of conspiracy.  The Court should reject this argument, adopting instead a functional view of simultaneity, which asks whether the Manufacturer Defendants' conduct occurred before they would have otherwise learned of one another's threats through non-conspiratorial means.  *See* ANTITRUST LAW ¶ 1425c ("'Simultaneous' in this context is not limited to events occurring in a single moment … Rivals' responses at different times … are simultaneous if each would not know the content of another's response" absent collusion").  Under this standard, the Manufacturer Defendants' parallelism was sufficiently simultaneous to support the inference of prior agreement because there was no

The inference of agreement becomes stronger still when the context of the threats is considered, as required by *Twombly*. This is not a typical conscious parallelism case where one defendant – the leader – makes a public announcement or takes other action that is publicly displayed, and the other defendants follow. In that scenario, the public nature of the leader's conduct provides a plausible explanation of how the followers were able to match their actions to the leader's without reaching a private agreement to do so. *See Petruzzi's*, 998 F.2d at 1244. Here, the substantively identical and simultaneous threats of the Manufacturer Defendants were made *privately*, eliminating the possibility that the Manufacturer Defendants could have innocently learned of, and then copied, one another's threats other than through prior coordination and agreement. *See* D.I. 1 ¶¶ 95-96. As the treatise cited by the Court in footnote 4 of *Twombly* makes clear, simultaneous and substantively identical parallelism is suggestive of prior agreement precisely because it cannot be explained by the merely conscious parallelism that can arise innocently from simply observing rivals' public actions and following suit.[4]

In this case, because the boycott of IronPlanet was conducted privately, not publicly, there was no opportunity for Komatsu and Volvo simply to observe and follow the lead of Caterpillar in formulating these threats and coordinating their simultaneous delivery, other than through private communication, and thus there is no innocent explanation for the improbably precise parallelism of the Manufacturer Defendants. *See In re Digital Music Antitrust Litig.*, 592 F. Supp. 2d 435, 445 (S.D.N.Y. 2008) ("an inference of prior agreement may be warranted from simultaneous parallel price conduct where no actor had prior knowledge of or time to consider

---

public announcement of Caterpillar's threat, or any other non-collusive means whereby Komatsu and Volvo could have learned of that threat and decided independently to follow.

[4] *See* ANTITRUST LAW ¶ 1425a (contrasting "(1) parallelism that is virtually impossible (or nearly so) without advance agreement with (2) parallelism that could result from observing rivals in the marketplace").

14

the other actors' conduct"); *rev'd on other grounds sub. nom. Starr v. Sony BMG Music Entm't*, 592 F.3d 314 (2d Cir. 2010); *Wall Prods. Co. v. Nat'l Gypsum Co.*, 326 F. Supp. 295, 319-20 (N.D. Cal. 1971) (inference of agreement supported by parallel, simultaneous adoption of business practices without any public announcement of those changes).

The unnatural parallelism of the Manufacturer Defendants' conduct differentiates this case from *Twombly*, where the parallel conduct alleged was neither identical in its specifics nor simultaneous nor private, but rather included a diverse variety of strategies taken in public to resist competition extending over a seven-year period. *Twombly*, 550 U.S. at 550-51 & n.2, 565 & n.10. Unlike this case, there was nothing unnatural or improbably precise in the alleged parallelism in *Twombly* that could be explained only by prior agreement among the defendants.

**B. Parallelism Would Have Been Against the Manufacturer Defendants' Independent Economic Interests Absent a Collusive Agreement**

The second dispositive difference between ICP's Complaint and the complaint dismissed in *Twombly* is that ICP plausibly alleges that the Manufacturer Defendants' threats to IronPlanet were costly and risky absent a prior exchange of assurances that each would issue those threats. Parallel conduct against defendants' economic self-interest absent a prior agreement is generally considered the strongest circumstantial evidence of agreement. *See In re Ins. Brokerage*, 618 F.3d at 337 (concluding that complaint plausibly alleged a horizontal conspiracy because it suggested that "defendant's decision not to compete was conditioned on an expectation of reciprocity from its competitors"); *Petruzzi's*, 998 F.2d at 1244 (identifying actions against interest as especially probative in cases involving parallel adoption "of practices patently exclusionary of competitors") (citation omitted); *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999) (actions against interest "will consistently tend to exclude the likelihood of independent conduct"); *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 988 F.

15

Supp. 2d 696, 711 (E.D. La. 2013) (explaining that a "plausible allegation that the parallel conduct was not in the alleged conspirators' independent self-interest absent an agreement is generally considered the most important 'plus factor'") (collecting cases).

The Manufacturer Defendants' boycott of IronPlanet was against their individual economic interests, absent an agreement.  Each of the Manufacturer Defendants is a significant seller of used equipment on IronPlanet, and by threatening to withhold used equipment from IronPlanet each of them risked losing sales and market share to one another.  D.I. 1 ¶ 100.   Each Manufacturer Defendant could only be sure that the boycott threat would be successful (and it could continue to sell through IronPlanet) if it knew that others were similarly threatening boycott.   An unsuccessful unilateral threat, on the other hand, would leave that manufacturer without access to IronPlanet and with lost revenues.   These allegations make plausible the inference that each of the Manufacturer Defendants would have agreed to issue these threats only if the others did the same.  In *Interstate Circuit v. United States*, 306 U.S. 208 (1939), for example, the Court held that the uniform, parallel adoption of vertical restraints by competing movie distributors (analogous to the Manufacturer Defendants' threats to IronPlanet) was sufficient to infer the existence of an agreement to adopt those restraints, even in the absence of any evidence of communications among those defendants.   As in this case, the defendants in *Interstate Circuit* were "[e]ach … aware that all were in active competition and that without substantially unanimous action with respect to the restrictions … there was risk of a substantial loss of the business and good will … but that with it there was the prospect of increased profits." *Id*. at 222.   Similarly, in *Toys "R" Us*, a retailer executed a series of agreements with individual toy manufacturers, "in each of which the manufacturer promised to restrict the distribution of its products to low priced warehouse club stores, on the condition that other manufacturers would

do the same." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 930 (7th Cir. 2000).  Agreement among the manufacturers to boycott the warehouse clubs was inferred in part from evidence that each competing toy manufacturer was reluctant to join the boycott, and risk "giv[ing] up a new, fast-growing, and profitable channel of distribution," absent assurances that their rivals would do the same.  *Id*. at 932 (citation omitted).

As in *Interstate Circuit* and *Toys "R" Us*, the Manufacturer Defendants in this case had powerful unilateral incentives not to threaten IronPlanet and risk lost sale and revenue to one another; the threats made sense only if based on the common and prior understanding that each of the Manufacturer Defendants would issue a similar threat.  These allegations make plausible the inference of agreement to issue those threats and require the denial of the Defendants' Motions.  *See In re Pool Prods.*, 988 F. Supp. 2d at 712-13 (denying motion to dismiss; explaining that "[e]ach Manufacturer Defendant had a reason not to raise their prices to Pool's rivals unilaterally.   Absent parallel action by the other Manufacturer Defendants, such an increase in prices on the part of one manufacturer would risk a loss of market share to the other manufacturers"); *In re Elec. Books*, 859 F. Supp. 2d at 684 (denying motion to dismiss; explaining that "it is at least plausible that no Publisher Defendant would have signed an agency agreement with Apple absent a firm understanding with its rivals that they would do the same"); *McElhinney, v. Med. Protective Co.*, 549 F. Supp. 121, 130 (E.D. Ky. 1982) (denying summary judgment on conspiracy claim when competing doctors made parallel coercive threats to a hospital aimed at excluding a competing doctor ("It's either him or me"); finding that these threats "may be construed to be declarations against economic interests for the simple reason that the doctors, by their ultimatums, placed themselves in the position of possibly losing their positions at Booth Hospital"); *remanded on other grounds*, 738 F.2d 439 (6th Cir. 1984).

These allegations of risky parallelism by the Manufacturer Defendants, or conduct against their independent economic interests absent a prior agreement, also distinguish this case from *Twombly*. *Twombly* involved two alleged agreements. Specifically, the complaint alleged that defendants (1) "engaged in parallel conduct in their respective service areas to inhibit the growth of upstart" competitors, 550 U.S. at 550, and (2) collectively failed to meaningfully pursue "attractive business opportunit[ies] in contiguous markets where they possessed substantial competitive advantages," *id*. at 551, (internal quotation marks omitted). Neither of these allegations of parallel conduct involved, as this case does, allegations that the Defendants' parallel conduct involved the risk of loss *to one another* of sales and market share that they already enjoyed. *See id.* at 566 (explaining that there "was just no need for joint encouragement" to resist competition in *Twombly*). In this case, as in *Interstate Circuit*, *Toys "R" Us*, and *Insurance Brokerage*, the allegations of parallel conduct plausibly suggest prior coordination because the Manufacturer Defendants risked losing substantial business to one another by engaging in parallel conduct, absent assurance that their rivals would follow.

### C. Komatsu and Volvo Are Adequately Identified as Conspirators

Komatsu and Volvo argue that their participation in the group boycott is not adequately alleged. D.I. 32 at 1-2; D.I. 34 at 2. Defendants are incorrect, for two reasons. First, the Complaint specifically alleges that Caterpillar, Komatsu and Volvo issued simultaneous and identical threats to boycott IronPlanet, and provides factual allegations that make plausible the inference that they agreed to do so. D.I. 1 ¶¶ 93-104. IronPlanet identified to ICP the parties that were threatening a boycott ("our investors") in a context that makes plausible the inference that IronPlanet was referring to all three of the Manufacturer Defendants, who are (i) all investors in IronPlanet and (ii) the only investors in IronPlanet that could have been issuing the

threats described by IronPlanet (*i.e.*, to discontinue sales of used heavy equipment through IronPlanet), because the remaining investors were venture capitalists with no equipment to withhold from IronPlanet.  *See* D.I. 1 ¶¶ 96-97.

Second, once a conspiracy has been adequately alleged, its precise scope and membership are subjects for discovery.  *See In re Lithium Ion Batteries Antitrust Litig.*, 2014 U.S. Dist. LEXIS 7516, at *72-73 (N.D. Cal. Jan. 21, 2014) (well-pled allegations of a "conspiracy of at least some scope involving at least some defendants" creates a fact issue as to the participation of specific defendants).  The issue on a motion to dismiss the claims against an individual defendant is "whether the pleading delineates to some sufficiently specific degree that a defendant purposefully joined and participated in the conspiracy."  *In re Processed Egg*, 821 F. Supp. 2d at 720.  Here, the Complaint alleges that IronPlanet identified all of the Manufacturer Defendants as the boycotting parties – identifying first Caterpillar by name and subsequently "our investors" – and it is a fact question whether "our investors" identified Komatsu, Volvo, or both.  *See In re Processed Egg*, 902 F. Supp. 2d 704, 710 (E.D. Pa. 2012) ("antitrust conspiracy allegations need not be detailed on a defendant-by-defendant basis"); *In re Fasteners Antitrust Litig.*, 2011 U.S. Dist. LEXIS 90076, at *25-28 (E.D. Pa. Aug. 12, 2011) ("it is sufficient to allege that all of the named defendants were participants in the conspiracy") (citation omitted) (citing cases).

## IV.   ICP STATES A CLAIM FOR EXCLUSIVE DEALING UNDER SECTION ONE OF THE SHERMAN ACT AND SECTION THREE OF THE CLAYTON ACT

Exclusive dealing can violate Sections 1 and 2 of the Sherman Act, and Section 3 of the Clayton Act.  As explained in Section I above, Section 1 claims require proof that (1) the defendant was party to an agreement that (2) unreasonably restrained trade and (3) caused an antitrust injury to the plaintiff.  *Ins. Brokerage*, 618 F.3d at 314-15 & n.9.

Section 3 of the Clayton Act makes it unlawful for a person to sell goods on the condition, agreement, or understanding that the purchaser shall not deal in the goods of a competitor where the effects of such conditions, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly. *See* 15 U.S.C. § 14. "Recovery under Section 3 of the Clayton Act requires (1) an exclusive dealing arrangement and (2) the probable effect of the exclusion must be substantially to lessen competition." *In re Hypodermic Prods. Antitrust Litig.*, 2007 U.S. Dist. LEXIS 47438, at *24 (D.N.J. June 29, 2007). The Clayton Act's prohibition on exclusive dealing is more stringent than the standard under Section 1 of the Sherman Act. *See Barr Labs., Inc. v. Abbott Labs.*, 978 F.2d 98, 110 (3d Cir. 1992) ("All exclusive dealing agreements must comply with section 1 of the Sherman Act. Contracts for the sale of goods … must also comply with the more rigorous standards of section 3 of the Clayton Act.") (citation omitted).

The Complaint alleges that the Manufacturer Defendants have entered into agreements with their equipment dealers that prohibit those dealers from selling competing products, that these agreements foreclose substantial portions of the distribution available through dealers, and that because dealers have historically been the primary means of distributing new heavy construction equipment to end users, these exclusive agreements erect substantial barriers to entry and expansion of competitors, giving the Manufacturer Defendants market power. D.I. 1 ¶¶ 39-50. The Defendants' challenge to ICP's Section 1 and Section 3 exclusive dealing claims [D.I. 29 at 18-24] fail because ICP has adequately pled each of the elements of these claims, and the Motions to dismiss Counts One, Two, Three and Four should be denied.

**A. ICP Has Adequately Alleged Agreements to Deal Exclusively**

The Complaint alleges that each of the Manufacturer Defendants sells new heavy construction equipment to their dealers with the understanding that their dealers will deal exclusively with that Manufacturer Defendant.  D.I. 1 ¶ 39.  Defendants argue (D.I. 29 at 11 n.2 that this allegation is insufficient to establish an agreement to deal exclusively at the pleading stage, but as discussed above, *Twombly* does not require the specificity that the Defendants' "who, what, when, where, and why" slogan would require.  *See, e.g., Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 2015 U.S. Dis. LEXIS 21734, at *19-21 (D.D.C. Feb. 24, 2015) (finding that "many courts have rejected the argument" that "*Twombly* requires plaintiffs to identify a specific time, place or person involved in the alleged conspiracy") (collecting cases).[5] The Manufacturer Defendants are on notice as to ICP's claims in this regard, the allegation is plausible, and *Twombly* requires nothing more.

**B. ICP Has Adequately Alleged Anticompetitive Exclusive Dealing**

Exclusive dealing agreements are evaluated under the rule of reason, pursuant to which a plaintiff may establish a *prima facie* case of illegality by showing either that the defendant had market power within a relevant market or that the challenged agreement had actual anticompetitive effects.  *See Ins. Brokerage*, 618 F.3d at 315-16.  ICP has alleged both that the Manufacturer Defendants have substantial market power in relevant antitrust markets, and that the Manufacturer Defendants' exclusive arrangements have anticompetitive effects.   Before

---

[5] To the extent the Defendants are arguing that ICP must know the specific terms of the Manufacturer Defendants' exclusive dealing contracts before fact discovery, they overstate the plaintiff's burden at the pleading stage.  *See, e.g., Loosier v. Unknown Med. Doctor*, 435 F. App'x. 302, 307 (5th Cir. 2010) ("As we have said in the past, we do not require plaintiffs to plead facts peculiarly within the knowledge of defendants").

discussing market power, the Complaint first defines the markets in which the Manufacturer Defendants are alleged to possess such power.

### 1.   The Complaint Plausibly Alleges Relevant Product Markets

The relevant markets in which to evaluate the Defendants' conduct are the sale of specific types of new heavy construction equipment (*e.g.*, backhoes) in local geographic markets around the country (*e.g.*, California), and in any event are no broader than the sale of all types of new heavy construction equipment in the United States.  D.I. 1 ¶¶ 33-38.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325 (1962).  Products are reasonably interchangeable if "one product is roughly equivalent to another for the use it is put," analyzed from the perspective of consumers. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 437-38 & n.6 (3d Cir. 1997); *see also FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) (courts assess "whether two products can be used for the same purpose, and, if so, whether and to what extent purchasers are willing to substitute one for the other").  "Cross-elasticity of demand … measures the responsiveness of the demand for one product to changes in the price of a different product." *Queen City Pizza*, 124 F.3d at 438 n.6 (citation omitted).  For example, "[i]f a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 400 (1956).

"[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Queen City Pizza,* 124 F.3d at 436; *see also*

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir. 1992) ("The determination of a relevant product … is a highly factual one best allocated to the trier of fact").  Because market definition depends on fact-intensive inquiries, a motion to dismiss may be granted only when a plaintiff fails to define the market with reference to reasonable interchangeability and cross-elasticity of demand, or if the alleged market "clearly" excludes reasonably interchangeable substitute products, even with all factual inferences made in favor of the plaintiff.  *Queen City Pizza*, 124 F.3d at 436.  Under this standard, only an "inherently implausible" market definition that "makes no economic sense under any set of facts" can be dismissed on the pleadings.  *GN Netcom, Inc. v. Plantronics, Inc.*, 967 F. Supp. 2d 1082, 1087 (D. Del. 2013) (citation omitted); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.) (noting that "market definition is a deeply fact-intensive inquiry"); *id.* at 199-200 (synthesizing case law, including *Queen City Pizza*: "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way") (citations omitted).

The Complaint alleges relevant product markets limited to new heavy construction equipment, and enumerated types of new heavy construction equipment, using the methodologies required by *Brown Shoe* and *Queen City Pizza*.  The Complaint identifies the products in the relevant market, the functionality and use of those products, the products at the outer boundary of those markets, and explains – with reference to the rule of reasonable interchangeability of use and cross-elasticity of demand – why products that are excluded from the market are not reasonable substitutes for those that are included.  *See* D.I. 1 ¶¶ 18, 33-35.

23

The Complaint defines the relevant product market in a stepwise fashion, first delineating heavy construction equipment as a category separate from other potential substitutes, and then differentiating specific types of heavy construction equipment from other types of heavy construction equipment.  First, the Complaint differentiates between heavy construction equipment and other types of equipment.  D.I. 1 ¶¶ 18, 33-34.  Heavy construction equipment is specifically designed for various earthmoving tasks for use in infrastructure and building construction.  D.I. 1 ¶ 18.  No other type of product is reasonably interchangeable with, or significantly constrains the prices of, heavy construction equipment.  D.I. 1 ¶ 34.  Due to the anticompetitive conduct of the Manufacturer Defendants, prices for new heavy construction equipment are set collusively and above competitive levels.  D.I. 1 ¶¶ 49-50.  Allegations concerning the discrete functionality of heavy equipment, the lack of any significant price constraint imposed by other product types, and the ability of the Manufacturer Defendants to collectively raise and maintain prices for new heavy construction equipment above competitive levels, are more than sufficient to identify heavy construction equipment as a relevant antitrust market at the pleading stage.  *See Brown Shoe*, 370 U.S. at 325 (directing attention to "a product's peculiar characteristics and uses … distinct prices, [and] sensitivity to price changes" in defining relevant markets); *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978) (upholding district court's market definition excluding certain antibiotics from the relevant market when they had discrete therapeutic indications and uses from other antibiotics, and displayed limited price elasticity with products included in the relevant market).

Next, the Complaint defines smaller relevant markets limited to specific types of heavy construction equipment.  D.I. 1 ¶¶ 33 (identifying the relevant machine-specific markets).  Specifically, the Complaint alleges that used types of heavy construction equipment are the

closest substitutes for each type of new heavy construction equipment, but that used equipment is in a different relevant market because different customers purchase new and used equipment, and because new and used equipment are not reasonably interchangeable in use (being meaningfully differentiated in their mix of price and features).   As a result, used equipment does not meaningfully constrain the prices of new equipment.   D.I. 1 ¶ 35.   The discrete functionality and use characteristics of new and used heavy equipment, the existence of a distinct set of customers who purchase new rather than used equipment, and the lack of any price constraint imposed by used equipment on new equipment, all allege with plausibility a relevant market under *Brown Shoe*.   *See* 370 U.S. at 325 (directing attention to the presence of "distinct customers" in addition to the factors cited above); *Fineman*, 980 F.2d at 199 (different characteristics, uses and prices for different types of floor coverings support a finding of distinct relevant markets); *Avnet, Inc. v. FTC*, 511 F.2d 70, 77 (7th Cir. 1975) (upholding relevant market limited to new versions of a product in "the absence of any substantial interaction in price" between new and used products).

In accordance with the requirements of *Brown Shoe* and *Queen City Pizza*, the Complaint contains allegations setting forth the outer boundaries of the relevant product markets by identifying *used* heavy construction equipment of each specific machine type as the closest substitute for new equipment of the same type, and then explaining why used equipment is in a different relevant market.   Only the "outer boundaries" of a relevant market must be alleged with reference to reasonable interchangeability and cross-elasticity.   *Queen City Pizza*, 124 F.3d at 436 (citing *Brown Shoe*).   More distant substitutes – products beyond the "outer boundaries" of the relevant market – are by definition not "reasonably interchangeable" and need not be alleged or otherwise accounted for in a relevant market definition.   *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394 (1956) ("Because most products have possible substitutes,

25

we cannot give that infinite range to the definition of substitutes") (citation omitted); *Babyage.com, Inc. v. Toys "R" Us, Inc.*, 558 F. Supp. 2d 575, 581 (E.D. Pa. 2008) (finding no error in omitting allegations relating to distant substitutes once the outer boundary of the product market was defined).  By alleging that, for example, used backhoes are the closest substitute for new backhoes, but that used backhoes are in a different relevant market from the standpoint of reasonable interchangeability and cross-elasticity of demand, the Complaint also adequately alleges the lack of reasonable interchangeability of new backhoes and other, more distant substitutes, including new and used crawler dozers or other types of heavy construction equipment, as well as even still more distant substitutes, such as forestry or mining equipment.

Defendants argue that the Complaint should include detailed allegations as to the lack of substitutability of heavy construction equipment and other types of equipment, and between specific types of new heavy construction equipment and other types of heavy construction equipment.  D.I. 29 at 21-22.  Defendants' arguments invent a requirement that all conceivable substitutes be accounted for in a relevant market, no matter how competitively irrelevant.  Such a requirement does not exist in the case law, and overstates the plaintiff's burden, conflating plausibility, which is required under *Twombly*, with verbose specificity, which is not.  *See Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008) ("There is no requirement that [the market definition] elements of the antitrust claim be pled with specificity"); *Twombly*, 550 U.S. at 570 ("we do not require heightened fact pleading of specifics…").

Contrary to the Defendants' suggestion, a well-defined product market does not include all substitute products.  Instead, relevant markets are limited to the sub-set of competitively relevant products that constrain the prices of one another, and properly exclude more distant substitutes that do not constrain the prices of those products.  *See United States v. H&R Block,*

26

*Inc.*, 833 F. Supp. 2d 36, 58-59 (D.D.C. 2011) (excluding manual tax preparation methods from the market for automated solutions despite their "limited and marginal" substitutability for automated products); *United States v. Visa U.S.A. Inc.,* 163 F. Supp. 2d 322, 338 (S.D.N.Y. 2001) (excluding cash and checks from general purpose credit card market despite limited substitution on the part of consumers); *see also* ABA ANTITRUST LAW DEVELOPMENTS (SEVENTH) 574 (2012) ("The mere fact that *some* customers view products as substitutes – or equivalently, that there is *some* positive cross-elasticity of demand between the products – does not require their inclusion in the same market") (emphasis in original).  Defendants' argument contravenes the well-established principle that a relevant market is properly defined as the <u>smallest</u> grouping of products for which a hypothetical monopolist would find a price increase profitable.  *Beuff Enters. Fla., Inc. v. Villa Pizza, LLC*, 2008 U.S. Dist. LEXIS 50591, at *12-13 (D.N.J. June 25, 2008) (smallest possible market; no need to analyze more distant substitutes); *accord Babyage*, 558 F. Supp. 2d at 581.

Moreover, Defendants themselves recognize the heavy construction equipment market as distinct from the markets for other types of heavy equipment.  In its SEC filings, defendant Caterpillar regularly publishes sales data broken down by categories that almost exactly correspond to the product market alleged in the Complaint, separating heavy construction equipment from the other equipment types, including mining and forestry equipment, that Defendants now suggest are substitutes for heavy construction equipment.  *Compare* D.I. 29 at 26 *with* Caterpillar Inc. 8-K, April 22, 2015 at 3-4 (Renner Decl. Ex. A) (distinguishing mining, forestry, and other types of equipment from heavy construction equipment).[6]   Indeed,

---

[6] The Court may properly take judicial notice of Caterpillar's 8-K filing on the pleadings and without converting the Motions into summary judgment motions.   *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000).

Caterpillar's 8-K includes within the "Construction Industries" almost all of the product types that are included within the Complaint's definition of heavy construction equipment. *Compare* D.I. 1 ¶ 33 (identifying as "heavy construction equipment" crawler dozers, motor graders, excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders and track loaders) *with* Ex. A at 4 (same, using "track-type tractors" to refer to crawler dozers). Defendants' recognition of the same market alleged by the Plaintiff is supportive of that market definition, and cuts against dismissal on the pleadings. *See GN Netcom*, 967 F. Supp. 2d at 1088 & n.4.[7]

### 2. The Relevant Market Includes Sales to End Users and Dealers

Defendants claim that ICP has alleged a market limited to sales of new heavy construction equipment to dealers. D.I. 29 at 19-20. But this market definition appears nowhere in the Complaint. *See* D.I. 1 ¶ 33 (defining the relevant market as "the marketing and sale of new heavy construction, and narrower relevant markets contained therein); ¶¶ 19-20 (alleging that equipment dealers have historically been the main path by which heavy construction

---

[7] A case relied upon by the Defendants, *Syncsort Inc. v. Sequential Software, Inc.*, 50 F. Supp. 2d 318 (D.N.J. 1999), well illustrates the adequacy of ICP's market definition allegations. In *Syncsort* the antitrust plaintiff failed to allege "pricing trends and practices in the industry, the ability of consumers to substitute comparable goods or services from outside the market or consumer demand," "to mention other products available from other suppliers which are comparable to or substitutable for the product of [the antitrust defendant], from the point of view of consumers," or to "explain its rationale for ignoring other existing or potential sources of supply in favor of a more restrictive definition." *Id.* at 330, 332-33. In sharp contrast, the Complaint in this case includes all of the allegations missing in *Syncsort*. *See* D.I. 1 ¶¶ 33-38. Defendants' other cited cases are similarly inapposite because the product markets in those cases made no reference to and provided no facts concerning the rule of reasonable interchangeability or use and cross-elasticity of demand. *See, e.g.*, *Commer. Data Servers, Inc. v. IBM*, 166 F. Supp. 2d 891, 896-97 (S.D.N.Y. 2001) (rejecting market defined as "mainframes" without explaining why the "many types of computers other than 'mainframes'" should be excluded from the relevant product market); *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001) (rejecting proposed market definition of "fluid milk products" because complaint "does not explain what [those] are," "what the sources for such products are . . . or if there are other, substitute products available").

equipment reaches end users).   Defendants' argument misreads the Complaint, and repeats an argument already rejected by the Third Circuit in *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005).   In *Denstply*, which also involved a market where sales through middlemen distributors had historically accounted for the vast majority of sales, the defendant – as the Defendants here – argued that the market for sales to dealers is distinct from the market for sales to end users.   The Third Circuit rejected the argument that "a relevant market cannot include sales both to the final consumer and a middleman."   *Dentsply*, 399 F.3d at 188 (citing *Allen-Myland, Inc. v. IBM Corp.*, 33 F. 3d 194 (3d Cir. 1994)).

As in *Dentsply*, Defendants invite the Court to conflate the relevant market (sales of heavy construction equipment) with the means by which sales in the relevant market have historically been made (through dealers).   Although in some cases a specific channel of distribution may be a relevant market, this is not the market alleged, which focuses on direct competition between ICP and the Manufacturer Defendants to sell heavy construction equipment to end users, through local equipment dealers, through IronPlanet, or otherwise.   *See* D.I. 1 ¶¶ 1-4, 60, 76, 85-86, 93, 95, 100.   Indeed, the Complaint specifically alleges cross-elasticity of demand between the products sold by ICP and those sold by the Manufacturer Defendants.   D.I. 1 ¶¶ 76, 93.  Because the Complaint alleges a market where end users are willing to purchase the relevant product from a number of different distribution channels, the relevant market encompasses the sale of that product to end users through each of those channels.   *See PepsiCo, Inc. v. Coca-Cola Co.*, 114 F. Supp. 2d. 243, 249-50 (S.D.N.Y. 2000) (rejecting market definition confined to a particular mode of distribution when end users were willing to purchase through different distribution channels); *aff'd* 315 F.3d 101 (2d Cir. 2002).

**3.  The Complaint Adequately Alleges Relevant Geographic Markets**

The relevant geographic market is the area in which consumers ordinarily look to buy the products offered in the relevant product market. *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991). The geographic market must conform to commercial reality. *Brown Shoe*, 370 U.S. at 336-37 ("although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area"); *see also Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (defining the relevant geographic market as "the area of effective competition" and "the market area in which the seller operates, and to which the purchaser can practicably turn for supplies"). As with a relevant product market, "[d]ismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to certain types of glaring deficiencies, such as failing to allege a relevant market." *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 444 (4th Cir. 2011) (citation omitted); *see also Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 339 (D. Vt. 2010) (dismissals are "generally limited to instances in which the complaint either: (1) fails to allege a geographic market or the boundaries of a relevant geographic market; (2) defines a geographic market in an unreasonably and implausibly narrow manner; or (3) alleges a contradictory and vague delineation of the relevant geographic market") (citations omitted).

The Complaint alleges that the relevant geographic markets are no broader than the United States, and that narrower relevant markets, including state-wide markets, and smaller markets within many states, exist as well. D.I. 1 ¶¶ 37-39. Competitors outside the United States are unable to compete effectively inside the United States without access to local distribution assets. *See* D.I. 1 ¶¶ 37, 45, 66, 70-72, 85-86. For this reason, competitors located outside the United States are unable to discipline the prices charged by the Manufacturer Defendants, and do not compete in the relevant market. *Id.*

Although the Manufacturer Defendants operate on a nationwide basis, the relevant geographic markets in which to evaluate the competitive effects of the Manufacturer Defendants' anticompetitive conduct are local in nature.  *See Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006) ("Local markets for tickets sales are not transformed into a national market simply because concert tours are coordinated nationally").  To ensure rapid service and support, end users historically have tended to purchase new heavy construction equipment from equipment dealers located within 75 miles of the end user.  D.I. 1 ¶ 38.  Because end users are relatively immobile, they can be targeted for discriminatory price increases, and in fact the prices charged by the Manufacturer Defendants for new heavy construction equipment vary between states, and within certain regions within many states.  *Id.*  Regional price differentials could be eroded if dealers in one region sold their products into other, higher priced regions, but arbitrage of this sort has been rare.  *Id.*

The state-wide and intrastate relevant geographic markets alleged in the Complaint are price discrimination markets, a legally well-established and economically uncontroversial phenomenon.  *See Kolon,* 637 F.3d at 444-45 (reversing dismissal on the pleadings when the plaintiff plausibly alleged a geographic market limited to the location of customers, rather than the location of suppliers); *United States v. Dean Foods Co.,* 2010 U.S. Dist. LEXIS 34137, at *9-10, 12-15  (E.D. Wis. Apr. 7, 2010) (describing price discrimination markets, denying a  motion to dismiss for failure to allege a proper geographic market, finding that the plaintiff "alleged sufficient facts to make it plausible that targeted customers could not defeat price discrimination through arbitrage"); *United States v. Rockford Mem'l Corp.*, 717 F. Supp. 1251, 1267 n.12 (N.D. Ill. 1989) (recognizing that price discrimination makes it possible to exercise market power over

31

certain customers with fewer alternatives and not others with more potential alternatives), *aff'd*,

898 F.2d 1278 (7th Cir. 1990).[8]

The Defendants argue that ICP has failed to adequately identify the state and intrastate

markets alleged in the Complaint, or to explain why the relevant geographic markets are so

limited.   D.I. 29 at 22, 26-27.   But the Complaint contains detailed allegations identifying the

specific states where the competitive effects of the Defendants' conduct should be assessed, and

explaining why this is the case.   *See* D.I. 1 ¶¶ 23-32, 38, 51-54.   There is no requirement that ICP

go further and identify, before any discovery, the precise contours of every local market within

those states.   The same argument was rejected in *Dean Foods*, where allegations that "many

purchasers" in "Wisconsin, Michigan's Upper Peninsula, and northeastern Illinois" would suffer

higher prices as a result of the challenged conduct was held sufficient at the pleading stage.   *See*

---

[8] Defendants argue that ICP's product-specific and state-wide (or narrower) geographic markets "based on how and where equipment dealers can practicably sell particular products to end users" are "legally irrelevant."   D.I. 29 at 20-21 & n.8.   But in each of the cases Defendants cite for that proposition, the court rejected a proposed market definition limited to end users because end users were not the relevant group of purchasers on the facts of those cases.   *See Republic Tobacco Co. v. N. Atlantic Trading Co.*, 381 F.3d 717, 737-39 (7th Cir. 2004) (rejecting geographic market based on location of retailers and consumers of roll-your-own cigarette paper in certain states because the foreclosed plaintiff sold only to national distributors and wholesalers); *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n*, 357 F.3d 1, 6-9 (1st Cir. 2004) (explaining that relevant purchasers of vending machine services were not students and faculty on a university campus but purchasers of vending machine services in the municipality, region, or island of Puerto Rico); *Collins v. Associated Pathologists, Ltd.*, 676 F. Supp. 1388, 1396-97 (N.D. Ill. 1987) (finding the relevant market could not be defined as patients of pathology services at a single hospital because the pathologist's relevant purchasers were not patients, but other hospitals).   Here, by contrast, relevant markets are based on the foreclosed options of end users, who purchase new heavy construction equipment both through dealers and (but-for the Defendants' conspiracy) online, and the effects of ICP's exclusion by Defendants will be felt by consumers in each of those markets.   In *Landsdowne on the Potomac Homeowners Ass'n, Inc. v. Openband at Landsdowne LLC*, 2011 U.S. Dist. LEXIS 134477, at *18 (E.D. Va. Nov. 22, 2011), the plaintiff conflated market power, which is of concern to the antitrust laws, and contract power, which is not.   No such issue arises here, as ICP's market definition is not defined by the scope of the Manufacturer Defendants' exclusive contracts, but by the area in in end users "can practicably turn for supplies." *Tampa Elec.*, 365 U.S. at 327.

32

*Dean Foods*, 2010 U.S. Dist. LEXIS 34137, at *11-12 ("the court simply has no basis to impose the type of highly specific pleading standard advocated by the defendant" in demanding greater specificity about intrastate scope of relevant market); *see also Kolon*, 637 F.3d at 443 (recognizing that the "relevant market has been found to be a single city, a group of cities, a state, or several states") (citation omitted); *Allen*, 748 F. Supp. 2d 323, 338-39 (declining to resolve disputes about intrastate scope of relevant market on the pleadings); *Lone Star Milk Producers Inc. v. Dairy Farmers of Am.*, *Inc.*, 2001 U.S. Dist. LEXIS 18716, at *15-16 (E.D. Tex. Jan. 22, 2001) (refusing to dismiss relevant markets defined as "Texas, Arkansas, Louisiana, Oklahoma, Kansas, and Southern Missouri").

### 4.   The Manufacturer Defendants Have Market Power

Having defined the relevant markets, the Complaint plausibly alleges that the Manufacturer Defendants have market power within those markets.  Market definition is not an end in itself, but rather a tool to assist the fact finder in assessing the defendants' market power. *See Toys "R" Us*, 221 F.3d at 937.  Market power is the "power to control prices or exclude competition," *E. I. du Pont,* 351 U.S. at 391.  Market power may be proven through direct evidence of the defendant's power to control prices or exclude competition, or it may be inferred based on the defendant's large share of the relevant market when viewed in the context of the competitive dynamics therein (*United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993)), including "the size and strength of competing firms, freedom of entry into the field, pricing trends and practices in the industry, ability of consumers to substitute comparable goods or services from outside the market, and consumer demand factors." *Fineman*, 980 F.2d at 202.

Whether a market has substantial barriers to entry and expansion of competitors is a key factor to a finding of substantial market power.  "Higher entry barriers make it easier for existing

firms to exploit whatever power they have to raise prices above the competitive level because they have less to fear from potential new entrants." *Interface Grp., Inc. v. Mass. Port Auth.*, 816 F.2d 9, 11 (1st Cir. 1987) (Breyer, J.); *see also Visa,* 163 F. Supp. 2d at 342 ("The higher the barriers to entry, and the longer the lags before new entry, the less likely it is that potential entrants would be able to enter the market in a timely, likely, and sufficient scale to deter or counteract any anticompetitive restraints"); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.,* 562 F. Supp. 2d 392, 402 (E.D.N.Y. 2008) (noting that "whereas a seller in a market with low entry barriers could not raise its prices without the risk that a new seller would enter the market and offer the same product for a lower price, a competitor in a market with high entry barriers could raise its prices unfettered by the prospect of a new entrant into the market who would undercut prices").  Importantly, the defendants' conduct can be the barrier to entry that creates or maintains substantial market power.  *See Dentsply*, 399 F.3d at 194-96 (exclusive dealing contract created entry barriers and maintained monopoly); *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 756-57 (10th Cir. 1999) (successful boycott identified as a barrier to entry); *Emigra Grp. v. Fragomen, Del Rey, Bernsen and Loewy, L.L.P.*, 612 F. Supp. 2d 330, 362 (S.D.N.Y. 2009) (noting that "[m]arket power can persist only when entry barriers – market circumstances, governments, or the defendants – block rivals' entry or expansion").

In markets characterized by very high barriers to entry or expansion by competitors, based on the specific dynamics of the markets at issue, courts have held that market power can be plausibly inferred from market shares as low as 20 percent.  *See United States v. Visa U.S.A., Inc.,* 344 F.3d 229, 240 (2d Cir. 2003) (firm with 26 percent market share had market power); *Toys "R" Us*, 221 F.3d at 937 (finding firm exercised market power with a 20 percent market

share); *Payment Card*, 562 F. Supp. 2d at 402-403 (recommending denial of motion to dismiss allegations of monopoly power against a firm with less than 30 percent share).

Under these standards, all Manufacturer Defendants have market power.[9]  Caterpillar has durably high market shares above 60 percent in 14 states (and above 80 percent in 4 states), Komatsu has durably high shares above 30 percent in 7 states (and above 35 percent in 4 states), and Volvo has durably high market shares above 20 percent in 6 states (and above 30 percent in 1 state).  D.I. 1 ¶¶ 24-30; 39-50; 51-53.[10]  In addition to their substantial individual shares, the Manufacturer Defendants together have durably high market shares above 60 percent in certain product markets in 9 more states, and over 80 percent in 3 more states.  D.I. 1 ¶¶ 32-32; 39-50; 54.  The market shares of all Manufacturer Defendants in all relevant markets are protected by substantial barriers to entry, primarily in the form of their exclusive dealing policies that have protected them from new entry.  As then-Judge Breyer presciently observed:

> Thus, for example, one might worry about long term exclusive dealing contracts between a small group of firms making most of the nation's light bulbs and the firms that make light bulb filaments; if potential light bulb manufacturers are deterred from entering the market by a fear that they will be unable to obtain filaments, the existing light bulb manufacturers may be able to keep prices high.

*Interface*, 816 F.2d at 11; *see also Visa*, 344 F.3d at 240-41 (condemning exclusivity policies adopted in parallel by one defendant with a 47 percent share and another with a 26 percent share when those restraints excluded competitors and led to higher prices).  So too in this case, as the Complaint alleges that the Manufacturer Defendants' exclusive dealing arrangements with their

---

[9] As discussed in Section V.A., below, Caterpillar also has monopoly power, or a dangerous probability of achieving monopoly power, under Section 2 of the Sherman Act, as do all of the Manufacturer Defendants together, for purposes of the conspiracy to monopolize claim under Section 2.

[10] Even if the Court deems the Complaint's allegations of machine and region-specific markets to be inadequate, Caterpillar is still alleged to have a 40 percent share of the broader new equipment market (D.I. 1 ¶ 21), which is sufficient to establish substantial market power as to Caterpillar.  *See, e.g., Payment Card*, 562 F. Supp. 2d at 402-403.

dealers (historically, a critical path to reach end users) have prevented effective entry of new competitors for three decades. *See* D.I. 1 ¶ 44. More specifically, the Complaint alleges that the Manufacturer Defendants, secure from the threat of new entry, charge supra-competitive prices for new heavy construction equipment, which shows the market power that each has as a result of their collective imposition of exclusivity on their dealers. *See* D.I. 1 ¶¶ 48-50.

Although the Defendants argue (D.I. 29 at 16, 29) that the insignificant market share gained by Chinese entrants over the past decade shows that entry barriers are low, the reverse is true: "The paltry penetration in the market by competitors over the years" exemplifies the barriers to entry erected by the Manufacturer Defendants' exclusivity policies.[11] *See Denstply*, 399 F.3d at 194-96; *see also McWane, Inc. v. FTC*, 2015 U.S. App. LEXIS 6111, at *33-37 (11th Cir. Apr. 15, 2015) (rejecting argument that entry and expansion of new competitor to 10 percent share in 2 years – much more effective than the Chinese entry cited by Defendants – showed low entry barriers) (collecting cases); *Graco Inc. v. PMC Global, Inc.*, 2012 U.S. Dist. LEXIS 188865, at *38-39 (D. N.J. March 6, 2012). The fact that new entry of well-capitalized competitors has failed to constrain the prices charged by the Manufacturer Defendants illustrates their market power. *See Visa*, 344 F.3d at 240-41.

### 5. The Manufacturer Defendants' Exclusive Arrangements are Anticompetitive

Having shown that the Manufacturer Defendants have market power within well-defined relevant markets, we address next the substantial anticompetitive effects attributable to the Manufacturer Defendants' exclusive dealing arrangements.

---

[11] Contrary to the Defendants' claim (D.I. 29 at 16), the Complaint does not allege that the Chinese entrants have achieved a five percent market share. Indeed, the Complaint alleges that the Chinese entrants have been largely unsuccessful. D.I. 1 ¶ 45. Defendants' citation of Paragraph 76 of the Complaint, which alleges that one of the Chinese entrants is able to reach 5 percent of the U.S. market, but only after 7 years of effort, is an allegation about the limited scope of sales opportunities available to the Chinese entrants, not to their actual market share.

Defendants' assertion that they "are aware of no case since *Sylvania* in which any court has held a single-line dealership arrangement violates the antitrust laws" strains credulity.  D.I. 29 at 12.  The seminal plaintiff verdicts in exclusive dealing cases of the past decade have been decided in the Third Circuit, and all of those cases involved exclusive dealing with middlemen dealers, retailers or OEM manufacturers reselling the relevant product to consumers.  *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) (liability for exclusive dealing with OEM truck manufacturers); *Dentsply*, 399 F.3d 181 (liability for exclusive dealing with dealers); *LePage's, Inc. v. 3M Co.,* 324 F.3d 141, 156 (3d Cir. 2003) (upholding, in relevant part, a verdict for exclusive dealing with retailers) (*en banc*).  District courts in this Circuit have denied summary judgment on claims of exclusive dealing with dealers, s*ee Graco*, 2012 U.S. Dist. LEXIS 188865, at *33-4, as well as motions to dismiss allegations of the same.  *In re Ductile Iron Pipe Fittings Antitrust Litig.*, 2013 U.S. Dist. LEXIS 29865, at *40-57 (D.N.J. March 5, 2013).

The Third Circuit is not alone.  In fact, five days *before* the Defendants filed their Motions, the Eleventh Circuit affirmed a finding of the Federal Trade Commission that a pipe supplier had unlawfully imposed an exclusive dealing policy on its dealers.  *See McWane,* 2015 U.S. App. LEXIS 6111.  In its landmark decision in *United States v. Microsoft*, 253 F.3d 34, 58-59, 70-71 (D.C. Cir. 2001), the D.C. Circuit affirmed liability for unlawful exclusive dealing with personal computer OEMs and internet access providers which functioned as distributors of the relevant software products to consumers.  And in the Eighth Circuit, a district court denied summary judgment to the defendant in a case alleging unlawful exclusive dealing with dealers.  *3M v. Appleton Papers Inc.*, 35 F. Supp. 2d 1138, 1142-46 (D. Minn. 1999).  It is the

Defendants' advocacy before this Court, and not ICP's exclusive dealing claims, which is "highly unusual and should be viewed with great skepticism." D.I. 29 at 12.

"The legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition." *ZF Meritor*, 696 F.3d at 271. The Third Circuit has prescribed a non-exhaustive set of factors to be considered in evaluating the legality of an exclusive dealing arrangement, including: (i) market power of the defendants; (ii) substantial foreclosure; (iii) contracts of sufficient duration to prevent meaningful competition by rivals; (iv) actual or likely anticompetitive effects, in light of any procompetitive effects; (v) coercion by the firm imposing the requirement of exclusivity; (vi) the ability of customers to terminate those arrangements; and (vii) in some cases, the use by rivals of similar exclusive dealing arrangements. *See id.* at 271-72 (citations omitted). The plausibility of ICP's pleading of the Manufacturer Defendants' market power has already been established. *See* Section IV.B.4, *supra.* As shown below, application of the remaining *ZF Meritor* factors to the allegations of the Complaint (addressing factors (iii) and (vi) together) shows that ICP has adequately alleged that the Manufacturer Defendants' exclusive dealing arrangements have had actual anticompetitive effects.

### i. The Manufacturer Defendants' Exclusive Dealing Arrangements Have Resulted in Substantial Foreclosure

The Complaint alleges that the Manufacturer Defendants' exclusive dealing arrangements foreclose competitors from sales to dealers to a degree proportional to their sales (*see* D.I. 1 ¶ 42), which is plausible in light of the allegation that the exclusivity policies of the Manufacturer Defendants generally cover all of their sales in the relevant market. *See* D.I. 1 ¶¶ 20, 39; *see also Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (calculating foreclosure percentage as the share of downstream sales opportunities affected by the challenged

38

exclusive).  These allegations establish foreclosure percentages in certain relevant markets of 80

percent or more for Caterpillar, of 45 percent or more for Komatsu, of 30 percent or more for

Volvo, and of 80 percent or more for the Manufacturer Defendants collectively.  Because the

Manufacturer Defendants each have market power, and because these exclusive arrangements

have been effective in barring the effective entry of new competitors for decades, this degree of

foreclosure is more than enough to state a claim against each of the Manufacturer Defendants

under the Sherman Act.  *See Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.*, 676

F.2d 1291, 1304-05 (9th Cir. 1982) (24 percent foreclosure unlawful); *Bepco, Inc. v. Allied-

Signal, Inc.*, 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (foreclosure in excess of 20 percent may

be actionable); *Appleton Papers*, 35 F. Supp. 2d at 1143 (30 percent foreclosure may suffice).[12]

Because the degree of market foreclosure attributable to the Manufacturer Defendants'

exclusivity arrangements is sufficient to state a claim under the Sherman Act, it is necessarily

sufficient under the Clayton Act.  Because the Clayton Act subjects exclusive dealing

arrangements to more demanding scrutiny than does the Sherman Act, the degree of market

foreclosure associated with an exclusive dealing arrangement that must be proven to establish

liability is lower in a Clayton Act challenge than under the Sherman Act.  *See Barr Labs.*, 978

F.2d at 110; *see also Microsoft*, 253 F.3d at 69 (canvassing case law and identifying the Third

Circuit as requiring as lower degree for foreclosure under the Clayton Act than under the

---

[12]  Defendants cite Jacobsen, *Exclusive Dealing, "Foreclosure" and Consumer Harm*, 70
ANTITRUST L. J., 311, 324 (2002), for the proposition that "foreclosure percentages of 40 percent
or less are 'routinely sustained.'"  D.I. 29 at 145.  The cited language describes an outmoded,
decades-old approach to foreclosure that has been superseded by a pragmatic approach focusing
on the defendant's market power and the competitive effects of the exclusive arrangement, a
development the cited author endorses: "consistent with the recent decisions, consumer harm
may be found even where foreclosure, by traditional measures, is zero.  Accordingly, the focus
of the suggested analysis is not on the percentage of business foreclosed, but instead on whether
the restraint has created, enhanced, or protected the defendant's market power through the
impairment of competitors' ability to act as a meaningful constraint." *Foreclosure* at 313.

Sherman Act).  Foreclosure rates from exclusive dealing arrangements as low as 15 percent can state a claim under Section 3, when accompanied by allegations that the exclusive arrangements are a barrier to entry or expansion of competitors, are difficult to terminate, and are deployed in a market where other distribution outlets are already foreclosed by other exclusive dealing arrangements.  *See Standard Oil Co. v. United States*, 337 U.S. 293, 295, 309 (1949) (finding that foreclosure of 6.7 percent of sales was substantial in a industry where other suppliers already foreclosed substantial portions of the market through exclusive dealing arrangements); *American Motor Inns, Inc. v. Holiday Inns, Inc.*, 521 F.2d 1230, 1251-52 (3d Cir. 1975) (14.7 percent foreclosure could violate the Clayton Act); *Schuylkill Health Sys. v. Cardinal Health 200, LLC*, 2014 U.S. Dist. LEXIS 103663, at *19 (E.D. Pa. July 30, 2014) (denying motion to dismiss claims of unlawful exclusive dealing under Section 3 when the defendants' exclusives foreclosed 19.5 and 16.5 percent of the relevant market, coupled with allegations that the exclusives were a barrier to entry, were difficult to terminate and were thus functionally of long duration); *Yeager's Fuel v. Pa. Power & Light Co.*, 953 F. Supp. 617, 663 (E.D. Pa. 1997) (foreclosure of 21 percent could violate the Clayton Act) (citing cases),

The Defendants argue that the market shares of the Manufacturer Defendants may not be aggregated in considering the cumulative foreclosure of their exclusive dealing policies.  D.I. 29 at 23-24.  This is irrelevant because, as explained immediately above, aggregation is unnecessary to state a claim against any of the Manufacturer Defendants individually under either Section 1 of the Sherman Act or Section 3 of the Clayton Act.  However, the Defendants are wrong to claim that aggregation is improper.  In fact, for some of ICP's claims, it is required.

Aggregating market shares among the Manufacturer Defendants is proper for a number of reasons.  First, aggregating the Manufacturer Defendants' market shares, and the foreclosure

percentages attributable to their exclusive dealing policies, for purposes of ICP's claims under Section 3 of the Clayton Act is expressly contemplated under controlling precedent, and no case cited by the Defendants is to the contrary.  Second, aggregation under ICP's Sherman Act claims is appropriate because the Manufacturer Defendants are alleged to have conspired with one another to exclude ICP from the new heavy construction equipment market, in violation of both Sections 1 and 2 of the Sherman Act.  Conspiracy is a classic and uncontroversial predicate for aggregating market shares and foreclosure percentages.  Third, even if aggregation were not appropriate, the foreclosure attributable to the Manufacturer Defendants, and to the other domestic OEMs, is a crucial part of the competitive landscape that bears on the likely purpose and effect of the Defendants' exclusion of ICP from IronPlanet, the last remaining efficient distribution channel available to support the timely and effective entry of new competitors.

### ii.  Aggregation Is Appropriate for ICP's Clayton Act Claims

Controlling Supreme Court precedent requires the aggregation of foreclosure created by exclusionary vertical agreements of multiple manufacturers in challenges to those vertical agreements under Section 3 of the Clayton Act, even absent any allegation of conspiracy.  *See Standard Oil*, 337 U.S. at 295, 309 (assessing foreclosure by aggregating defendant's exclusive contracts with those of its competitors).  Aggregation of foreclosure from exclusive arrangements under the Clayton Act is proper to prevent "the established suppliers individually to maintain their own standing and at the same time collectively, even though not collusively, to prevent a late arrival from wresting away more than an insignificant portion of the market."  *Id.* at 309.  The Supreme Court has cited favorably to *Standard Oil's* aggregation of the foreclosure attributable to multiple manufacturers' exclusionary contracts on three occasions.  *Tampa Elec.*, 365 U.S. at 334; *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 365-66 (1963); *Jefferson*

*Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 30 n.51 (1984). Courts continue to follow *Standard Oil's* requirement of aggregation. *See Genico, Inc. v. Ethicon, Inc.*, 2006 U.S. Dist. LEXIS 96909, at *12-14 (E.D. Tex. March 26, 2006) (denying motion to dismiss filed by a firm with a 25 percent share, relying on an aggregation theory); *Daniels Sharpsmart, Inc. v. Tyco Int'l (US), Inc.*, 2006 U.S. Dist. LEXIS 100158, at *11-12 (E.D. Tex. Oct. 18, 2006) (denying motion to dismiss filed by a firm with a 20 percent share, relying on an aggregation theory).

None of the Defendants' cases address aggregation under the Clayton Act. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 198-99 (4th Cir. 2002) (refusing to aggregate under the Sherman Act); *accord Paddock Publ'n., Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996); *Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1363 (N.D. Cal. 2013) (same). Due to the heightened scrutiny that exclusive arrangements receive under the Clayton Act, this distinction is dispositive.

### iii.   Aggregation Is Appropriate for ICP's Sherman Act Claims

The Complaint alleges that the Manufacturer Defendants conspired to exclude IronPlanet as part of a conspiracy to restrain trade and to monopolize. "The aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize." *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995) (citing *United States v. Am. Airlines*, Inc., 743 F.2d 1114, 1122 (5th Cir. 1984); *see also Ralph C. Wilson Industries, Inc. v. American Broadcasting Cos.*, 598 F. Supp. 694, 704 n.10 (N.D. Cal. 1984) (recognizing that market shares can be aggregated in challenge to exclusivity policies under Section 1 if the defendants conspired and at least one defendant had market power).

The cases cited by Defendants to oppose aggregation are distinguishable, as none of them sufficiently alleged an antitrust conspiracy. *See Dickson*, 309 F.3d at 198-99 (no conspiracy

allegation among computer OEMs); *Paddock*, 103 F.3d at 46 (recognizing that there was no conspiracy allegation); *Orchard Supply,* 967 F. Supp. 2d at 1363 (no conspiracy allegations among suppliers); *Schuylkill Health Sys. v. Cardinal Health 200, LLC*, 2014 U.S. Dist. LEXIS 102663, *36 (E.D. Pa. July 30, 2014) ("While it is true that once aggregated, Defendants' collective market share is sufficient to impose § 2 liability, SHS has filed to state a claim for conspiracy."); *ID Security Sys. Canada, Inc. v. Checkpoint Sys.*, 249 F. Supp. 2d 622, 649-50 (E.D. Pa. 2003) (no conspiracy alleged).

### iv. Cumulative Foreclosure Is Relevant to the Purpose and Effect of the Defendants' Exclusive Dealing Arrangements

Even if the cumulative foreclosure attributable to the Manufacturer Defendants' were not aggregated (which it should be, for the reasons set forth above), the cumulative foreclosure is still highly relevant to determining the anticompetitive effect of the exclusive dealing arrangements of each of the Manufacturer Defendants' considered individually.  In a market where 85 percent of available dealers are foreclosed to competition *and* where IronPlanet, the remaining channel of efficient entry and expansion for a new entrant, is foreclosed due to the Defendants' ongoing conspiracy, the incremental exclusion attributable to each of the Manufacturer Defendants' exclusivity arrangements forecloses a substantial portion of the remaining sales opportunities available to ICP and other new entrants, and thereby substantially harms competition.  *See Microsoft*, 253 F.3d at 72 (assigning liability for foreclosure of a "relatively small channel for browser distribution because … Microsoft had largely foreclosed the two primary channels to its rivals"); *see also Standard Oil*, 337 U.S. at 309, 314 (considering cumulative foreclosure of all exclusivity policies of defendants and non-defendants in assessing likely anticompetitive effects of the defendant's exclusives); *Tampa Elec.*, 365 U.S. at 334 (emphasizing the "industry-wide practice of relying on exclusive contracts" that existed in

*Standard Stations*); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield*, 373 F.3d 57, 66

(1st Cir. 2004) (analysis of the effects of exclusive dealing arrangement must account for the

foreclosure due to the challenged exclusive "and other existing foreclosures" in the market).

### v.  The Manufacturer Defendants' Exclusive Dealing Arrangements Are Effectively of Long Duration and Not Easily Terminable

Although the nominal durations of the Manufacturer Defendants' exclusive dealing

arrangements are presently unknown to ICP, the Complaint alleges facts plausibly establishing

that the practical effect of these arrangements, in the economic realities of the relevant market, is

equivalent to a long-term arrangement not easily terminable by the dealers.  *See* D.I. 1 ¶¶ 40-45.

When dealers have a "strong economic incentive" to continue doing business on the exclusive

terms required by a manufacturer, such an arrangement is economically equivalent to a long-term

exclusive arrangement that is not easily terminable.  *Dentsply*, 399 F.3d 193-94; *Graco*, 2012

U.S. Dist. LEXIS 188865 at *38 ("In the Third Circuit, the emphasis is on evaluating the

defendant's actual success in excluding competitors from its distributor network").   The

Complaint alleges in detail why dealers are "not free to walk away from the agreements and

purchase products from the supplier of their choice," *ZF Meritor*, 696 F.3d at 287, including the

substantial and long-term revenue sacrifice that a dealer makes in switching manufacturers, and

the difficulty that new entrants have in competing for distributors on the "all-or-nothing" terms

demanded by the Manufacturer Defendants.  D.I. 1 ¶¶ 40, 43; *see McWane*, 2015 U.S. App.

LEXIS at *41-43 (relying on similar evidence that switching by dealers subject to exclusivity

policies was costly and rare); *accord Graco*, 2012 U.S. Dist. LEXIS 188865 at *38-39; *Appleton

Paper*, 35 F. Supp. 2d at 1144.  The Complaint alleges that, as a result, dealers are slow to switch

suppliers, and provides detailed factual allegations of the slow and laborious entry of recent

unsuccessful entrants that corroborate and make plausible these allegations.  D.I. 1 ¶¶ 40, 43-45.

**vi. The Defendant Manufacturers' Exclusive Arrangements Have Substantial Anticompetitive Effects**

In evaluating the anticompetitive effects of exclusive dealing arrangements, courts in this Circuit look to a number of factors, including (i) the importance of access to dealers; (ii) the ability of competitors to reach consumers through alternate distribution channels; and (iii) the extent to which the exclusives form a barrier to entry. *See Dentsply*, 399 F.3d 192-96; *Graco*, 2012 U.S. Dist. LEXIS 188865 at *36. Evaluated against these criteria, the Manufacturer Defendants' exclusive arrangements have substantial anticompetitive effects.

The Complaint alleges that there are presently two cost-effective means of reaching end users in the new heavy construction equipment market: equipment dealers and IronPlanet. *See* D.I. 1 ¶ 1, 2, 4, 60-67, 107-110. With ICP and other new entrants foreclosed from IronPlanet, *see* D.I. 1 ¶ 106, equipment dealers are the only cost-effective means of reaching end users, which magnifies the competitive effects of the Manufacturer Defendants' exclusive dealing arrangements. *See Microsoft*, 253 F.3d at 72 (assessing significance of challenged foreclosure in the context of other channels already foreclosed by the defendant's conduct).

Relying entirely on out-of-circuit precedent, Defendants make much of other alternative theoretical means by which ICP and other new entrants could reach end users, including dealers unforeclosed by the Manufacturer Defendants but in exclusive relationships with other suppliers of new heavy construction equipment, dealers unforeclosed by any exclusive dealing arrangement, and internet marketers other than IronPlanet. D.I. 29 at 14-17. Incredibly, Defendants also point to *IronPlanet* as an alternative means of distribution, when it is Defendants' foreclosure of access to IronPlanet that directly excluded ICP from the market. But in the Third Circuit, the theoretical possibility of alternative, less-effective, higher-cost distribution does not bar a plaintiff's exclusive dealing claim. "The proper inquiry is not whether

[alternative forms of distribution] enable a competitor to 'survive' but rather whether [selling through those alternative forms of distribution] 'poses a real threat' to defendant's monopoly." *Denstply*, 399 F.3d at 193 (quoting *Microsoft*, 253 F.3d at 71).  *Microsoft* illustrates the point.  In that case the defendant excluded a competitor, Netscape, from the most efficient distribution channels for its internet browser, leaving any number of alternative ways of reaching end users – for example, "carpet bombing" consumers with CD-ROM discs pre-loaded with Netscape Navigator and sent via U.S. mail – available to Netscape.  253 F.3d at 70.  The mere presence of higher cost, less-efficient distribution channels left unforeclosed by the defendant's conduct was not a defense in that case, and is not in this case.  Instead, foreclosure of the "most efficient channels" of distribution, and the relegation of competitors to "more costly and less effective methods" of distribution, establishes an anticompetitive effect from exclusive dealing.  *See Microsoft*, 253 F.3d at 70-71; see *also ZF Meritor*, 696 F. 3d at 287 ("the mere existence of potential alternative avenues of distribution, without an assessment of their overall significance to the market, is insufficient to demonstrate that Plaintiffs' opportunities to compete were not foreclosed"); *Dentsply*, 399 F.3d at 193 (exclusive dealing is anticompetitive where remaining sales channels are not "practical or feasible in the market as it exists and functions").

Here, the Complaint alleges that theoretical alternatives posited by the Defendants are either not reasonably available to ICP, are higher-cost and less-effective than those avenues of distribution foreclosed by the Defendants, or both, and alleges with specificity the inability of competitors to enter in a timely and effective fashion through those other channels.  *See* D.I. 1 ¶¶ 61-67, 40-47.  The slow and unsuccessful entry of two recent well-capitalized Chinese entrants demonstrates the magnitude of the barriers to entry confronting new entrants, and the relative lack of success that new entrants have in selling through the remaining dealers available to new

entrants.  D.I. 1 ¶¶ 45-46; *see also Dentsply*, 399 F.3d at 193 ("minuscule 5% and 3% market shares eked out by" competitors foreclosed from defendant's distribution network show that alternative forms of distribution pose "little threat" to defendant).  The Complaint also explains why new entrants cannot simply open their own equipment dealerships.  D.I. 1 ¶¶ 47, 66.

Finally, the Manufacturer Defendants' exclusive arrangements have erected substantial barriers to entry.  Coupled with their exclusion of ICP from IronPlanet, the exclusive arrangements have left ICP without an efficient or effective means of reaching end users.  D.I. 1 ¶¶ 39-46, 107, 110; *see also Fineman*, 980 F.2d at 202-03 (noting that there was "evidence of significant barriers to entry" where jury found that "quick penetration of the market [was] impossible without purchasing an existing distribution network"); *Graco*, 2012 U.S. Dist. LEXIS 188865 at *30-31 ("The existence of a dominant and difficult to duplicate distribution network may be a barrier to entry and indicate market power").  Foreclosure from efficient distribution harms consumers and competition by raising the costs of rivals and making them less effective competitors.  *See Dentsply*, 399 F.3d at 192-93 (exclusion from dealers can be anticompetitive when dealers are the most efficient ways to reach end users); *accord Graco*, 2012 U.S. Dist. LEXIS 188865 at *36-37.  In addition to erecting entry barriers, the exclusivity policies facilitate coordinated pricing among the Manufacturer Defendants, who have been – before the rise of IronPlanet and the arrival of ICP – secure from the threat of new entry, and have charged prices above competitive levels as a result.  D.I. 1 ¶¶ 48-50.

### vii.  The Exclusive Arrangements Were Imposed Coercively

Coercively imposed exclusivity policies are indicative of the acquisition or maintenance of market or monopoly power, and consumer harm, and not of procompetitive conduct.  *See McWane*, 2015 U.S. App. LEXIS at *43; *ZF Meritor*, 696 F.3d at 285; *Dentsply*, 399 F.3d at

184; *Graco*, 2012 U.S. Dist. LEXIS 188865 at *40.   The Complaint alleges that the Manufacturer Defendants' exclusive arrangements were imposed coercively, and are undesirable from the standpoint of dealers.   D.I. 1 ¶¶ 41, 43.   The Complaint also alleges that smaller manufacturers are unable to coercively impose requirements of exclusivity, which is consistent with and makes plausible the allegations that the Manufacturer Defendants have market power, and that their policies of exclusivity are anticompetitive.   *See* D.I. 1 ¶ 41; *Jefferson Parish,* 466 U.S. at 13-14 (defining market power as the ability "to force a purchaser to do something that he would not do in a competitive market").

### viii.  Many of the Defendants' Rivals Have Entered into Exclusive Arrangements with Dealers

The Complaint alleges that some, but not all, of the Manufacturer Defendants' existing competitors in the new heavy construction equipment market also require exclusivity from their dealers, and that the cumulative foreclosure from all of these exclusive arrangements is approximately 85 percent.   D.I. 1 ¶ 42.   These exclusive arrangements are a market fact that magnifies the anticompetitive effect of excluding ICP and other new entrants from IronPlanet and, as the Manufacturer Defendants have done, from their own dealers.   D.I. 1 ¶¶ 42, 107.

### 6.  ICP Has Alleged Antitrust Injury From the Exclusive Arrangements

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" may maintain a private action for treble damages.   Defendants contest ICP's standing to challenge the exclusivity arrangements of the Manufacturer Defendants, arguing that ICP has not suffered antitrust injury because it is neither a consumer nor competitor in the relevant market.   D.I. 29 at 24-25.   This argument depends on a misreading of the Complaint, which Defendants represent as

alleging that the "relevant market is the sale of new heavy construction equipment to dealers." D.I. 29 at 24.  But this is simply wrong; the Complaint contains no such allegation.

As explained in Section IV.B.1-2, *supra*, the Complaint alleges that the relevant market is the sale of new heavy construction equipment, and that ICP competes with the Manufacturer Defendants in that market.  Because ICP and the Manufacturer Defendants compete in the same market (or would have absent Defendants' anticompetitive conduct), ICP has standing to challenge their exclusionary conduct, including their conspiracy to exclude ICP from IronPlanet and their exclusive dealing arrangements with equipment dealers.  *See, e.g., ZF Meritor*, 696 F.3d at 289 ("no difficulty" concluding that an excluded rival had standing to challenge exclusionary conduct); *GN Netcom*, 967 F. Supp. 2d at 1086 (denying motion to dismiss on antitrust injury grounds a challenge to exclusive dealing arrangements by excluded rival).

Defendants also argue that ICP lacks standing because "ICP merely acts as a pass-through broker for foreign manufacturers of new heavy construction equipment sold to U.S. end-users."  D.I. 29 at 25 n.13.  But again nowhere does the Complaint allege that ICP was a mere "broker" or "advertiser" of heavy construction equipment, that ICP did not take title to the equipment that it sold, or that ICP's injury was limited to lost commissions.  See D.I. 1 ¶ 7 ("ICP imports and sells heavy construction equipment into the United States").  Moreover, even if ICP were a mere broker (which it is not; ICP takes title to the equipment it sells, bears the risk of loss on the sale of that equipment, and is the residual claimant to the profit on those sales), it would still have standing to challenge the Manufacturer Defendants' conduct as a competitor in the relevant market.  *See Carpet Grp. Int'l v. Oriental Rug Importers Ass'n*, 227 F.3d 62, 77 (3d Cir. 2000) (importer-broker that "endeavored to forge a link in a chain of the sale" of oriental rugs between foreign rug manufacturers and domestic rug dealers had standing to challenge

anticompetitive conduct of domestic rug wholesalers), *overruled on other grounds by Animal Sci. Prods. v. China Minmetals Corp.*, 654 F.3d 462, 467 (3d. Cir. 2011).   In *Carpet Group* the Third Circuit relied on allegations of cross-elasticity of demand between the products of the plaintiff and the defendants in reversing a dismissal on the pleadings for failure to allege antitrust injury.   *Id.*   The Complaint alleges such cross-elasticity, and the Defendants' Motions to dismiss the Complaint for failure to allege antitrust injury should be denied on this ground.   *See* D.I. 1 ¶ 93 (alleging cross-elasticity between the products of ICP and the Manufacturer Defendants); *see also id.* ¶¶ 1-4, 60, 76, 85-86, 95, 100 (additional allegations of direct competition between ICP and the Manufacturer Defendants).

Finally, the Defendants argue that ICP has failed to allege injury-in-fact from the exclusive arrangements of the Manufacturer Defendants.   D.I. 29 at 24-25.   According to the Defendants, "ICP does not allege that any dealer refused to sell its products or that it ever approached any dealers and asked that dealer to carry its products.   ICP does not claim that the Manufacturer Defendants' alleged exclusive arrangements prevented it from distributing equipment[.]"   *Id*. To the contrary, the Complaint alleges that ICP has tried and failed to sell heavy construction equipment to dealers foreclosed by the Manufacturer Defendants' exclusive arrangements.   D.I. 1 ¶ 108; *see also Graco*, 2012 U.S. Dist. LEXIS 188865 at *19 (denying summary judgment to defendant on antitrust injury grounds in an exclusive dealing case when the plaintiff "may have lost the opportunity to compete for sales to [defendant's] distributors").

## V.   THE COMPLAINT STATES MONOPOLIZATION CLAIMS

Section 2 of the Sherman Act, 15 U.S.C. § 2, proscribes monopolization, attempted monopolization and conspiracy to monopolize.   Monopolization is: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that

power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966). Attempted monopolization requires proof: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). A Section 2 conspiracy claim requires: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged. *United States v. Yellow Cab Co.*, 332 U.S. 218, 224-25 (1947).

### A.  ICP Alleges Monopolization and Attempted Monopolization by Caterpillar

Monopoly power is the ability "to control prices or exclude competition." *Dentsply*, 399 F.3d at 187. Monopoly power is evaluated using the same evidence as for market power, namely "the size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand." *Id.* In the Third Circuit, "a less than predominant share of the market combined with other relevant factors may suffice to demonstrate monopoly power …" *Id.* at 187-88; *see also LG Elecs. v. Asko Appliances*, 2010 U.S. Dist. LEXIS 31571, at *13 (D. Del. Mar. 29, 2010) (allegation that defendant enjoyed 50-75 percent share was sufficient to state a monopolization claim).

A firm monopolizes or attempts to monopolize when it seeks to exclude competitors through anticompetitive conduct. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985). Caterpillar's threat to boycott IronPlanet for dealing with ICP (even standing alone without any conspiracy with Komatsu or Volvo) is a classic form of exclusionary conduct supporting a monopolization or attempted monopolization claim. Caterpillar's threats to punish

51

IronPlanet are indistinguishable from the conduct in *Lorain Journal Co. v. United States,* 342 U.S. 143, 152 (1951), where a monopolist's refusal to deal with customers that also dealt with rivals was held to be exclusionary conduct supporting liability under Section 2.

For all of the reasons discussed in Section IV.B.5, *supra*, Caterpillar's exclusive dealing arrangements with its dealers are the kind of conduct frequently condemned as a form of exclusionary conduct under Section 2.  Exclusive dealing is of special concern when adopted by a monopolist.  *See Dentsply*, 399 F.3d at 187 ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist"); *Microsoft*, 253 F.3d at 70 (lower foreclosure required for liability under Section 2 than under Section 1).

 Caterpillar's role in masterminding the merger of IronPlanet and Cat Auction Services, was also exclusionary within the meaning of Section 2.   As discussed in Section VI, *infra*, the IronPlanet/Cat Auction Services merger is anticompetitive and violates Section 7 because it forecloses new entry and cements Caterpillar's monopoly position.  For the same reasons, Caterpillar's role in that transaction also constitutes exclusionary conduct and supports a Section 2 claim against Caterpillar.  *See Grinnell*, 384 U.S. at 567, 576 ("By those acquisitions [the defendant] perfected the monopoly power to exclude competitors and fix prices").

The Complaint's allegations of group boycott, exclusive dealing and unlawful merger also adequately allege the anticompetitive conduct element of an attempted monopolization claim against Caterpillar. Instead of needing to prove monopoly power, however, a plaintiff claiming attempted monopolization need only demonstrate that the defendant has a dangerous probability of achieving monopoly power by virtue of the anticompetitive conduct alleged. *Spectrum Sports,* 506 U.S. at 456.  Caterpillar's role in the elimination of ICP as a competitor, against the backdrop of the extremely high entry barriers alleged to protect its position in the

relevant markets, establishes a dangerous probability of success, *see Barr Labs.*, 978 F.2d at 114

("Evidence of a significant net reduction in the number of producers in the market could be

evidence of some reasonable hope of success"), as do Caterpillar's durably high market shares in

the relevant markets.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995)

("the minimum showing of market share required in an attempt case is a lower quantum than the

minimum showing required in an actual monopolization case").   Caterpillar acted with the

specific intent to monopolize (D.I. 1 ¶¶ 125, 127); that intent may also be inferred from

Caterpillar's exclusionary conduct and monopoly power.  *See Advo v. Phila. Newspapers, Inc.*,

51 F.3d 1191, 1199 (3d Cir. 1995).

## B.  ICP Adequately Alleges Conspiracy to Monopolize by All Defendants

The Complaint alleges a conspiracy, first among the Manufacturer Defendants and then

joined by Cat Auction Services, to exclude ICP and other new entrants by eliminating the

possibility of entry into the new heavy construction equipment market through IronPlanet.  D.I. 1

¶¶ 93-107.  As explained in Section III, s*upra*, the Complaint adequately alleges an agreement

among the Manufacturer Defendants, and that Cat Auction Services joined this conspiracy.  The

Complaint also alleges numerous overt acts in furtherance of the conspiracy, including the

Manufacturer Defendants' coordinated threats to punish IronPlanet and the merger of IronPlanet

and Cat Auction Services.  D.I. 1 ¶¶ 93-107; *see also JTC Petroleum Co. v. Piasa Motor Fuels,

Inc.,* 190 F.3d 775, 779-780 (7th Cir. 1999) (Posner, J.) (group boycott under Section 1 can

constitute the requisite overt act supporting a conspiracy to monopolize).  Because market shares

of conspirators are aggregated in a Section 2 conspiracy to monopolize claim, and because the

conspirators successfully excluded ICP in a market characterized by extremely high entry

barriers, the Complaint adequately alleges a dangerous probability of success.  *See Barr Labs.*,

978 F.2d at 114.   As with the attempted monopolization claim, specific intent can be inferred

from the Manufacturer Defendants' exclusionary conduct.   *Advo,* 51 F.3d at 1199.

Defendants argue that all of the conspirators in a conspiracy to monopolize must share a

common intent to confer monopoly upon a single conspirator.   D.I. 29 at 29.   But a conspiracy's

members may have divergent interests, as long as they all share the common intent to exclude

competitors.   *See Petruzzi's*, 998 F.2d at 1243 (explaining that for an antitrust conspiracy

"defendants need not share the *same* motive.   Rather, all that is required is that they each have a

motive to conspire") (emphasis in original).   The Manufacturer Defendants may plausibly have

conspired to exclude ICP to maintain each of their market positions, including Caterpillar's

monopoly power, and several courts have recognized that conspiracies among competitors to

exclude rivals can violate Section 2.   *See JTC Petroleum*, 190 F.3d at 779-780, *United States v.*

*Consol. Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961).   Unlike the conspiracy in *Santana*

*Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 249 F. Supp. 2d 463, 519-20 (M.D. Pa. 2003),

cited by Defendants, the group boycott of IronPlanet necessarily diminished competition among

the Manufacturer Defendants, in addition to excluding ICP.   *Id.* (explaining that diminished

competition among conspirators is sufficient for a conspiracy to monopolize claim).[13]

---

[13] Cat Auction Services argues that ICP has failed to state a civil conspiracy against it because it is "exponentially more plausible" that it merged with IronPlanet "as a perfectly rational response to modern demand for online auctions."   D.I. 31 at 2.   But, as explained in Section I, *supra*, that is not the law; dismissal is warranted only if a defendant's alternative plausible explanation renders the plaintiff's explanation implausible, and the Defendants' alternative explanation does nothing to render ICP's explanation implausible.   *Burtch v. Milberg Factors, Inc.*, 2009 U.S. Dist. LEXIS 26872 (D. Del. Mar. 30, 2009), cited by Cat Auction Services, does not hold otherwise.   In contrast with ICP's Complaint, in *Burtch*, there was "significant merit to Defendants' contention that the complaint fails to even allege parallel conduct" (*id.* at *28); and the complaint failed to "describe the 'concerted action' Defendants took" (*id.* at *39).   Cat Auction Services also argues that the aiding and abetting claim fails because ICP "fails to plead "any evidentiary facts to support the sweeping allegations" of what it "'knew' or 'offered' to do to 'assist' the other defendants."   D.I. 31 at 3.   Given the relationship between Cat Auction

## VI.    THE COMPLAINT STATES A CLAIM FOR UNLAWFUL MERGER

The Complaint alleges that the merger of Cat Auction Services and IronPlanet violates Section 7 of the Clayton Act when evaluated as a vertical merger, or one bringing a buyer (IronPlanet) under the control of a seller (Caterpillar), with anticompetitive effects being felt in the new heavy construction equipment markets where Caterpillar competes.  *See* D.I. 1 ¶¶ 105-106, 133-36 (identifying the markets affected by the merger as the new equipment market).[14] The anticompetitive effects of the merger are the same in kind as the boycott of IronPlanet – the exclusion of new heavy equipment competition from the market through foreclosure of the only remaining channel of efficient distribution – made permanent.

Significantly, in moving to dismiss ICP's Section 7 claim, Defendants fail to address or apply the legal framework applicable to a vertical merger.   None of the cases Defendants cite even involve vertical mergers.   There is an established framework for analyzing the anticompetitive effects of a vertical merger, and because Defendants' arguments disregard this framework, their Motions should be denied for that reason alone.  *Cf. United States v. Am. Cyanamid Co.*, 719 F.2d 1034 (2d Cir. 1983) (vacating and remanding because lower court had not applied the applicable standards for evaluating "the legality of vertical mergers").   But, even if Defendants had applied the proper framework, ICP has properly pled Section 7 claims.

---

Services and Caterpillar, it is reasonable to infer that Cat Auction Services had the same knowledge as Caterpillar, as the Complaint alleges.  *See, e.g., Great Hill Equity Partners IV v. SIG Growth Equity Fund*, 2014 WL 6703980, at *23 (Del. Ch. Nov. 26, 2014) (for aiding and abetting claim, knowledge was inferred); D.I. 1 ¶¶ 105-106.

[14]  Defendant cites *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038 (9th Cir. 2008) for the proposition that, in a merger challenge, "a plaintiff must identify a relevant market within which the defendant has market power."  D.I. 29 at 31.  *Newcal* did not involve a challenge to a merger, and emphasized that a relevant market need not be pled with specificity.  *Id.* at 1045.  As explained in Section IV.B.1, *supra*, ICP has properly alleged relevant markets.

Like exclusive dealing, the "primary vice of a vertical merger or other arrangement tying a customer to a supplier is that, by foreclosing competitors of either party from a segment of the market otherwise open to them, the arrangement may act as a clog on competition, which deprives rivals of a fair opportunity to compete." *Brown Shoe*, 370 U.S. at 324-25 (citation omitted); *see generally* ANTITRUST LAW DEVELOPMENTS (Seventh) at 386-87 ("the principal concern with vertical transactions is the possibility that companies will be denied significant access to suppliers and customers"). The Clayton Act forbids vertical arrangements "whose effect may be substantially to lessen competition, or tend to create a monopoly in any line of commerce in any section of the country." *Brown Shoe*, 370 U.S. at 324 (citation omitted). As is the case with exclusive dealing evaluated under Section 3 of the Clayton Act, the "the legislative history of § 7 indicates clearly that the tests for measuring the legality of any particular economic arrangement under the Clayton Act are to be less stringent than those used in applying the Sherman Act." *Id*. at 328-29. In assessing a vertical merger, courts consider the degree of foreclosure it creates, the nature and purpose of the vertical arrangement, the concentration levels in the affected markets, and the ease with which potential entrants may overcome barriers to entry and compete effectively with existing companies, among other factors. *Id*. at 330. Cat Auction Services' merger with IronPlanet violates Section 7 under this standard.

*First*, the merger has created a "clog on competition," and has deprived ICP of a fair opportunity to access customers and compete by foreclosing the last remaining efficient channel of distribution available to a new entrant. By orchestrating Cat Auction Services' acquisition of IronPlanet, Caterpillar was able to ensure that ICP had "no feasible way to reach consumers in the heavy construction equipment markets," thereby perfecting the exclusionary scheme that began with the boycott of IronPlanet and giving ICP standing to challenge the merger. D.I. 1 ¶

107.  *See, e.g., Yankees Entm't & Sports Network, LLC v. Cablevision Sys. Corp.*, 224 F. Supp.

2d 657, 673 (S.D.N.Y. 2002) (denying motion to dismiss vertical merger claim where plaintiff

had "standing to assert that the acquisition has deprived it of a fair opportunity to compete in a

market it has already entered"); *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.*,

2000 U.S. Dist. LEXIS 2604, at *87 (S.D.N.Y. Mar. 9, 2000) (denying motion to dismiss

challenge to vertical merger that tended to impair the ability of the plaintiff to compete in the

relevant market).[15]  As in *Six West*, the anticompetitive tendencies of the combination of Cat

Auction Services and IronPlanet are not purely hypothetical, but entirely plausible in light of

Caterpillar's past history of exclusionary conduct aimed at ICP.  *See id.* ("Plaintiff alleges that

prior to the merger, Defendants already engaged in activity that frustrated Plaintiff's ability to

obtain films for exhibition. The merger presents Defendants with an opportunity and an avenue

through which they can further thwart Plaintiff's and other exhibitors' access to movies").  The

near-total foreclosure effected by this merger dwarfs that found illegal in previous cases, in light

of the concentrated and already-foreclosed nature of the heavy construction equipment market.

*See U.S. Steel Corp. v. FTC*, 426 F.2d 592, 600-01 & n.18 (6th Cir. 1970) (upholding finding

that the combination of a buyer with a less than 10 percent share of the relevant product and a

seller of an 11 percent share "was economically extremely significant" and "anticompetitive,"

---

[15] *See also AlliedSignal, Inc. v. B.F. Goodrich Co.*,183 F.3d 568 (7th Cir. 1999) (aircraft wheel and brake manufacturer alleged antitrust injury where merger would foreclose its access to landing gear manufactured by one of the merging parties); *Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102 (2d Cir. 1989) (tea supplier had standing where merger between rival herbal tea suppliers would foreclose its access to supermarket shelf space); *Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119 (S.D.N.Y. 1996) (competitor challenge to joint venture sustained based on evidence that plaintiff-competitor would no longer have access to necessary inputs supplied by joint venture partner, which would have forced plaintiff to exit the market); *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 878 (W.D.N.Y. 1994) (competing retail chain had standing where acquisition threatened retailer's access to commercial real estate).

especially in light of the concentrated nature of the relevant markets and pre-existing market foreclosure from other vertical restraints) (citation omitted) (citing cases).

*Second*, the nature and purpose of the merger, as orchestrated by Caterpillar, was to permanently foreclose ICP – a "significant competitive threat" (D.I. 1 ¶ 86) – from accessing customers and distributing new heavy construction equipment to them through IronPlanet, and thereby to deprive ICP of "efficient distribution." D.I. 1 ¶ 107. Specifically, the Complaint alleges that the merger will realign IronPlanet's incentives to ensure that IronPlanet will never again support or facilitate the entry of new competitors to the Manufacturer Defendants in the new heavy construction equipment markets. D.I. 1 ¶¶ 106, 133-36. Whereas IronPlanet had been motivated to do business with ICP and other new entrants, and had to be coercively restrained by the Manufacturer Defendants from doing so, the merger ensures that IronPlanet will no longer be available to competitors of Caterpillar. D.I. 1 ¶ 106. The case law recognizes that these shifts in the incentives of the acquired firm can be anticompetitive under *Brown Shoe*. *See U.S. Steel*, 426 F.2d at 601 (condemning transaction where "[t]he important consideration is that the acquired company would not be free to choose for itself who shall supply its needs solely on the basis of price, service and quality of goods because the acquiring company has the power to substitute its own suppliers, and the intention of doing so"); *HTI Health Servs. v. Quorum Health Gp.*, 960 F. Supp. 1104, 1114 (S.D. Miss. 1997) (finding that allegations of a change in incentives in the merged firm's willingness to deal with the plaintiff, and thereby impair the plaintiff's ability to compete in the downstream market, established antitrust injury).

*Third*, the merger will frustrate the substantial deconcentrating effects that would have followed ICP's unobstructed entry. "The manufacture and sale of new heavy construction equipment in the United States is a highly concentrated – oligopolistic – market. Between 2010

58

and 2013, the Herfindahl-Hirschman index, a commonly accepted measure of market concentration, for the heavy construction equipment market was over 2500, a level characterized as 'highly concentrated' by the federal antitrust enforcement agencies." D.I. 1 ¶ 21. ICP's unobstructed entry would have disrupted the Manufacturer Defendants' cozy oligopoly, bringing prices down and disrupting the price coordination that characterizes this industry today. D.I. 1 ¶¶ 1-2, 48-50, 85-86, 93. Accordingly, the market dynamic here "falls squarely within the principle that where there has been a 'history of tendency toward concentration in the industry' tendencies toward further concentration 'are to be curbed in their incipiency.'" *Brown Shoe Co.*, 370 U.S. at 294; *see also United States v. Ford Motor Co.*, 315 F. Supp. 372 (E.D. Mich. 1970) (compelling divestiture in vertical merger that eliminated potential competition in a concentrated market), *aff'd* 405 U.S. 562 (1972).

*Fourth*, the already high barriers to entry into the heavy construction equipment market will become virtually insuperable as a result of the merger. *See U.S. Steel*, 426 F.2d at 605 (condemning acquisition where entry barriers were already "quite significant" and "very little of the market" remained for any new entrant); *FTC v. Rhinechem Corp.*, 459 F. Supp. 785, 789-90 (N.D. Ill. 1978) (lack of entry for 20 years was evidence of entry barrier in a Section 7 case).

Defendant Cat Auction Services argues (D.I. 31 at 4-5) that the remedy of divestiture is inappropriate in this case, apparently because ICP did not move for a preliminary injunction before the transaction closed, which ICP understands occured in March 2015. The availability of divestiture as an equitable remedy in a private challenge to a merger under Clayton Act Section 7, however, was established in *California v. Am. Stores Co.*, 495 U.S. 271, 284 (1990), where the Court identified divestiture as the cornerstone of a Congressional scheme "to encourage vigorous private litigation against anticompetitive mergers." In the Clayton Act, "Congress also made

express its view that divestiture was the most suitable remedy in a suit for relief from a § 7

violation." *Id.*  Cat Auction Services claims that because ICP filed suit little more than a month

after learning of the merger, and several months before the transaction was consummated, that

ICP is barred as a matter of law from seeking divestiture.  D.I. 31 at 5.  Unsurprisingly, the cases

cited by Cat Auction Services to support this argument fail to do so.  *See Ginsburg v. InBev*

*NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) (affirming dismissal of complaint filed nearly two

months after transaction was announced); *Taleff v. Sw. Airlines Co.* 828 F. Supp. 2d 1118, 1121

(N.D. Cal. 2011) (dismissing complaint filed the day after the challenged transaction closed).

Cat Auction Services makes no effort to show that it has integrated the operations of IronPlanet

in any way that would be costly to unwind, or indeed to establish any facts at all that would

support its self-serving claim that divestiture of IronPlanet would be a hardship.[16]

## CONCLUSION

For all of the reasons stated above, ICP respectfully requests that the Court deny the

Defendants' Motions in their entirety.[17]

---

[16] The cases Defendants cite in seeking dismissal of ICP's Section 7 claim are inapposite.  In *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 322 (3d Cir. 2007), the plaintiff did not compete in the market where the anticompetitive effects of the transaction would be felt.  In contrast, ICP competes directly with the Manufacturer Defendants in the market where the harmful effects of the merger will be felt; accordingly, its injury is not merely "secondary," as in *Broadcom*. *Id.*  In *City of Pittsburg v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998), the "purported lessening of competition was not caused by the premerger agreement and proposed merger", but rather "the regulated nature of the utility services" at issue; here, by contrast, it was the acquisition of IronPlanet – not the impact of regulation – that simultaneously harmed ICP and consumers.  In *Axis, S.P.A. v. Micafil, Inc.*, 870 F.2d 1105, 1107-08 (6th Cir. 1989), the challenged acquisition did not cause the plaintiff antitrust injury because it was the patents and licenses owned by other parties – not the challenged acquisition – that precluded the plaintiff from entering the relevant market.  *Id.* at 1111-12.  Here, by contrast, there was a direct link between the acquisition of IronPlanet and the foreclosure of ICP from the affected market.

[17] Because their Motions to dismiss ICP's federal law claims should be denied, the Defendants' Motions to dismiss ICP's state law claims should be denied as well.

Respectfully submitted,

*/s/ John W. Shaw*
JOHN W. SHAW (No. 3362)
SHAW KELLER LLP
300 Delaware Avenue, Suite 1120,
Wilmington, DE 19801
(302) 298-0701
jshaw@shawkeller.com

DAVID BOIES
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, York, NY 10504
(914) 749-8200

JAMES P. DENVIR
CHRISTOPHER G. RENNER
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue NW
Washington, DC 20015
(202) 237-2727

*Counsel for International Construction
Products LLC*

Dated:  May 7, 2015