**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>CATERPILLAR INC., KOMATSU AMERICA CORP., VOLVO CONSTRUCTION EQUIPMENT NORTH AMERICA, LLC and ASSOCIATED AUCTION SERVICES, LLC, doing business as Cat Auction Services,<br><br>                    Defendants. | C.A. No. 15-108-RGA |

**JOINT REPLY BRIEF IN SUPPORT OF DEFENDANTS' MOTIONS TO
DISMISS COMPLAINT**

Robert G. Abrams (*pro hac vice*)
Gregory J. Commins, Jr. (*pro hac vice*)
Danyll W. Foix (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C.  20036-5304
Tel:  (202) 861-1500
rabrams@bakerlaw.com
gcommins@bakerlaw.com
dfoix@bakerlaw.com

Dated:  May 18, 2015

David J. Baldwin (Del. Bar No. 1010)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dbaldwin@potteranderson.com

*Attorneys for Defendant Caterpillar Inc.*

Jeremy Heep (*pro hac vice*)
Robin P. Sumner (*pro hac vice*)
Melissa Hatch O'Donnell (*pro hac vice*)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: 215.981.4000
Facsimile:  215.981.4750
heepj@pepperlaw.com
sumnerr@pepperlaw.com
odonnelm@pepperlaw.com

M. Duncan Grant (Del. Bar No. 2994)
James H. S. Levine (Del. Bar No. 5355)
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: 302.777.6500
Facsimile:  302.421.8390
grantm@pepperlaw.com
levinejh@pepperlaw.com

*Attorneys for Defendant Volvo Construction
Equipment North America, LLC*

David H. Bamberger (*pro hac vice*)
Katherine M. Ruffing (*pro hac vice*)
James F. Reardon (*pro hac vice*)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: 202.799.4500
Facsimile: 202.799.5500
david.bamberger@dlapiper.com
katie.ruffing@dlapiper.com
james.reardon@dlapiper.com

Denise S. Kraft (Del. Bar No. 2778)
Brian Biggs (Del. Bar No. 5591)
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
Telephone: 302.468.5700
Facsimile: 302.394.2341
denise.kraft@dlapiper.com
brian.biggs@dlapiper.com

*Attorneys for Defendant Komatsu America
Corp.*

Quentin R. Wittrock(*pro hac vice*)
Kelly W. Hoversten (*pro hac vice*)
GRAY PLANT MOOTY
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.632.3000
Facsimile: 612.632.4444
quentin.wittrock@gpmlaw.com
kelly.hoversten@gpmlaw.com

Edward F. Eaton (Del. Bar No. 639)
CONNOLLY GALLAGHER LLP
The Brandywine Building
1000 West Street
Suite 1400
Wilmington, DE 19801
Telephone: 302.888.6204
Facsimile: 302.654.1005
meaton@connollygallagher.com

*Attorneys for Defendant Associated Auction
Services LLC d/b/a Cat Auction Services*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................. 1

I.   THE BOYCOTT CONSPIRACY INFERRED BY ICP IS INCONSISTENT
     WITH ICP'S ALLEGATIONS AND NOT PLAUSIBLY ALLEGED .................................. 1

     A.   ICP Has Not Pled Sufficient Facts From Which a Conspiracy to
          Boycott Can Be Plausibly Inferred .................................................................... 1

     B.   The Parallel Conduct Allegations Are Insufficient to Support a
          Conspiracy Claim ............................................................................................... 2

     C.   ICP Fails to State Facts Showing "Plus Factors" Necessary
          to Support the Alleged Boycott Conspiracy ...................................................... 5

II.  ICP'S EXCLUSIVE DEALING CLAIMS FAIL TO STATE A CLAIM ............................. 8

     A.   The Complaint Fails To Allege Substantial Foreclosure of
          Competition, Because There Are Multiple Existing and Alternative
          Channels of Distribution .................................................................................... 8

     B.   The Complaint Does Not Allege Sufficient Market Shares on the
          Part of Defendants to Raise Antitrust Concern ............................................... 11

     C.   ICP Cannot Bulk Up the Manufacturer Defendants' Market Shares
          by Conjuring Ill-Defined Local Geographic Markets for Specific Items ................... 14

     D.   ICP's Allegations of Equipment-Specific Local Markets are Too
          Conclusory and Vague to Support a Claim ...................................................... 16

     E.   ICP Lacks Standing to Challenge the Alleged Exclusive Dealing Arrangements ....... 19

III. ICP'S MONOPOLIZATION AND CONSPIRACY TO MONOPOLIZE
     CLAIMS ARE IMPLAUSIBLE AND CONTRARY TO AUTHORITIES .......................... 20

     A.   ICP's Claim that Caterpillar Monopolized or Is Attempting to
          Monopolize Is Not Plausible ............................................................................ 20

     B.   ICP's Conspiracy to Monopolize Claim Is Inadequately Plead,
          Inconsistent with the Complaint, and Contrary to Authorities ....................... 23

i

IV. ICP'S ATTEMPT TO RECAST ITS MERGER CHALLENGE MUST FAIL ..................... 25

    A.    ICP's New Vertical Merger Theory Is Not Grounded in Pled Facts............................ 25

    B.    ICP Fails to Identify Facts Establishing that a Conspiracy Produced the Merger ....... 27

    C.    ICP Has Not Pled Facts or Argued How the Merger Could Injure
        Competition in the Relevant Market, or Even ICP ...................................................... 29

CONCLUSION............................................................................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Advo, Inc. v. Phil. Newspapers, Inc.,*
   51 F.3d 1191 (3d Cir. 1995) ................................................................................. 24

*Apani S.W., Inc, v. Coca-Cola Enters.,*
   300 F. 3d 620 (5th Cir. 2002) .............................................................................. 18

*Axis, S.P.A. v. Micafil, Inc.,*
   870 F.2d 1105 (6th Cir. 1989) ............................................................................. 30

*Ball v. Paramount Pictures,*
   169 F.2d 317 (3d Cir. 1948) .................................................................................. 4

*Barr Labs. v. Abbott Labs.,*
   978 F.2d 98 (3d Cir. 1992) ............................................................................. 13, 24

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) .................................................................................... passim

*Bepco, Inc. v. Allied-Signal, Inc.,*
   106 F. Supp. 2d 814 (M.D.N.C. 2000) ............................................................. 11-12

*Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,*
   142 F. Supp. 2d 296 (E.D.N.Y. 2001) .................................................................. 17

*In re Blood Reagents Antitrust Litig.,*
   756 F. Supp. 2d 637 (E.D. Pa. 2010) ..................................................................... 4

*Broadcom Corp. v. Qualcomm Inc.,*
   501 F.3d 297 (3d Cir. 2007) ................................................................................. 30

*Brown Shoe Co. v. United States,*
   370 U.S. 294 (1962) ....................................................................................... 26, 29

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) ............................................................................................. 29

*Burtch v. Milberg Factors, Inc.,*
   662 F.3d 212 (3d Cir. 2011) .............................................................................. 5, 6

*Burtch v. Milberg Factors, Inc.,*
   2009 U.S. Dist. LEXIS 26872 (D. Del. Mar. 30, 2009) ...................................... 28

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998)...........................................................................................30

*Collins v. Assoc. Pathologists, Ltd.*,
    676 F. Supp. 1388 (N.D. Ill. 1987) ...............................................................................15

*Daniels Sharpsmart, Inc. v. Tyco Int'l (US), Inc.*,
    2006 U.S. Dist. LEXIS 100158 (E.D. Tex. Oct. 18, 2006) ..........................................13

*E. I. Du Pont de Nemours and Co. v. Kolon Indus. Inc.*,
    637 F.3d 435, 444 (4th Cir. 2011) ..........................................................................16, 18

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)..............................................................................7

*Genico, Inc. v. Ethicon, Inc.*,
    2006 U.S. Dist. LEXIS 96909 (E.D. Tex. Mar. 23, 2006)..............................................13

*Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*,
    433 F. App'x. 598 (9th Cir. 2011) ..................................................................................29

*Heerwagen v. Clear Channel Comm'ns*,
    435 F.3d 219 (2d Cir. 2006).............................................................................................16

*Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*,
    602 F.3d 237 (3d Cir. 2010).......................................................................................3, 23

*ID Sec. Sys., Canada, Inc. v. Checkpoint Sys.*,
    249 F. Supp. 2d 622 (E.D. Pa. 2003) .............................................................................23

*In re Ins. Brokerage Antitrust Litig.*,
    618 F.3d 300 (3d Cir. 2010)....................................................................................4, 5, 6

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
    713 F. Supp. 2d 286 (S.D.N.Y. 2010)..............................................................................8

*Interstate Circuit, Inc. v. United States*,
    306 U.S. 208 (1939)..........................................................................................................7

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984).....................................................................................................11, 13

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
    190 F.3d 775 (7th Cir. 1999) .........................................................................................24

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. Openband at Landsdowne LLC*,
    2011 U.S. Dist. LEXIS 134477 (E.D. Va. Nov. 22, 2011)............................................15

*Lorain Journal Co. v. United States*,
   342 U.S. 143 (1951)..................................................................................................21

*McCullough v. Zimmer, Inc.*,
   382 Fed. App'x. 225 (3d Cir. 2010)........................................................................19

*McCullough v. Zimmer, Inc.*,
   2009 U.S. Dist. LEXIS 21815 (W.D. Pa. Mar. 18, 2009) ................................. 19-20

*McElhinney v. Med. Protective Co.*,
   549 F. Supp. 121 (E.D. Ky. 1982) ............................................................................7

*Omega Envtl. v. Gilbarco, Inc.*,
   127 F.3d 1157 (9th Cir. 1997) ............................................................................8, 11

*In re OSB Antitrust Litig.*,
   2007 U.S. Dist. LEXIS 56573 (E.D. Pa. Aug. 3, 2007)............................................7

*PepsiCo, Inc. v. Coca-Cola Co.*,
   315 F.3d 101 (2d Cir. 2002)...................................................................9, 15, 21

*Pettruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc*,
   998 F.2d 1224 (3d Cir. 1993).................................................................................24

*In re Plasma-Derivative Protein Therapies Antitrust Litig*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) .......................................................................4

*PNY Techs., Inc. v. Sandisk Corp.*,
   2014 U.S. Dist. LEXIS 58108 (N.D. Cal. Apr. 25, 2014) .......................................9

*In re Pool Prods. Distrib. Mkt. Antitrust Litig*,
   988 F. Supp. 2d 696 (E.D. La. 2013) .......................................................................7

*In re Processed Egg Prods. Antitrust Litig.*,
   821 F. Supp. 2d 709 (E.D. Pa. 2011) ...................................................................4, 7

*Queen City Pizza v. Domino's Pizza*,
   124 F.3d 430 (3d Cir. 1997)...................................................................................18

*Republic Tobacco Co. v. N. Atl. Trading Co.*,
   381 F.3d 717 (7th Cir. 2004) .................................................................................15

*Ryko Mfg. Co. v. Eden Servs.*,
   823 F.2d 1215 (8th Cir. 1987) .................................................................................9

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc*,
   249 F.Supp.2d 463 (M.D. Penn. 2003).............................................................24, 25

*Santiago v. Warminster Twp.,*
   629 F.3d 121 (3d Cir. 2010) ........................................................................10, 21

*Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp,*
   2000 U.S. Dist. LEXIS 2604 (S.D.N.Y. Mar. 9, 2000) .........................................30

*Spectrum Sports, Inc. v. McQuillan,*
   506 U.S. 447 (1993) ..............................................................................................22

*Standard Oil Co. of Cal. v. United States,*
   337 U.S. 293 (1949) ..............................................................................................13

*Tampa Elec. v. Nashville Coal Co.,*
   365 U.S. 320 (1961) ..................................................................................13, 14, 15

*Taxi Weekly, Inc. v. Metro. Taxicab Bd. of Trade, Inc,*
   539 F.2d 907 (2d Cir. 1976) ....................................................................................5

*In re Text Messaging Antitrust Litig.,*
   630 F. 3d 622 (7th Cir. 2010) ..................................................................................4

*Toys "R" Us, Inc. v. FTC,*
   221 F.3d 928 (7th Cir. 2000) .............................................................................7, 12

*Transamerica Computer Co. v. IBM,*
   698 F.2d 1377 (9th Cir. 1983) ...............................................................................22

*United States v. Consol. Laundries Corp.,*
   291 F.2d 563 (2d Cir. 1961) ...................................................................................24

*United States v. Dentsply Int'l, Inc.,*
   399 F.3d 181 (3d Cir. 2005) ......................................................................10, 15, 21

*United States v. Grinnell Corp.,*
   384 U.S. 563 (1966) ..............................................................................................20

*United States v. Microsoft Corp.,*
   253 F.2d 34 (D.C. Cir. 2001) .............................................................................10, 21

*United States v. Am. Cyanamid Co.,*
   719 F.2d 558 (2d Cir. 1983) ...................................................................................26

*United States v. Dean Foods Co.,*
   2010 U.S. Dist. LEXIS 34137 (E.D. Wis. Apr. 7, 2010) .........................................16

*United States v. Rockford Mem'l Corp.,*
   717 F. Supp. 1251 (N.D. Ill. 1989) ........................................................................16

vi

*United States v. Visa USA, Inc.,*
  344 F.3d 229 (2d Cir. 2003)................................................................................................12

*United States v. Visa USA, Inc.,*
  163 F. Supp. 2d 322 (S.D.N.Y. 2001)................................................................................12

*Verizon Comm'ns v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004)...........................................................................................................21

*Yankee Entm't & Sports Network, LLC v. Cablevision Sys. Corp,*
  224 F. Supp. 2d 657 (S.D.N.Y. 2003)................................................................................27

*ZF Meritor, LLC v. Eaton Corp.,*
  696 F.3d 254 (3d Cir. 2012)...............................................................................................10

## STATUTES

15 U.S.C. § 1 ........................................................................................................*passim*

15 U.S.C. § 2 ........................................................................................................*passim*

15 U.S.C. § 14 ......................................................................................................*passim*

15 U.S.C. § 18 ......................................................................................................*passim*

## RULES

Fed. R. Civ. P. 12(b)(6)...........................................................................10, 27, 29

## OTHER AUTHORITIES

ABA Section of Antitrust Law, *Antitrust Law Developments* (7th ed. 2012)................11, 20, 24

Phillip E. Areeda, *et al., Antitrust Law* (3d ed. 2009)...................................................21

## INTRODUCTION

In opposing Defendants' motions to dismiss (*see* D.I. 27, 28, 30, 33), ICP repeatedly recasts its Complaint, abandoning and changing its substantive allegations on everything from the nature of the conspiracy inferred to the type of merger challenged.  ICP's approach cannot disguise its failure to (1) plausibly allege a conspiracy, (2) adequately plead unlawful exclusive dealing, (3) plausibly plead legally-recognized monopolization claims, and (4) support its shifting "merger" cause of action.  ICP's reluctance and inability to defend its actual allegations confirms that Defendants' motions to dismiss should be granted.

## ARGUMENT

## I.   THE BOYCOTT CONSPIRACY INFERRED BY ICP IS INCONSISTENT WITH ICP'S ALLEGATIONS AND NOT PLAUSIBLY ALLEGED

ICP's boycott claim should be dismissed for failure to plead any fact suggesting a plausible agreement among the Manufacturer Defendants.  ICP must state sufficient facts to plausibly support its allegation that Caterpillar, Komatsu, and Volvo each agreed with the others to threaten to boycott IronPlanet if it did not stop dealing with ICP.  *See* Joint Opening Brief at 6-11 (hereafter cited as "D.I. 35".)  ICP fails to do so, despite exaggerating what it actually pled.

### A.   ICP Has Not Pled Sufficient Facts From Which a Conspiracy to Boycott Can Be Plausibly Inferred

The only boycott "fact" pled in the Complaint is a hearsay report that Caterpillar and "at least one other manufacturer" threatened to stop doing business with IronPlanet.  (Compl. ¶ 96, D.I. 1.)  This thin reed of a "fact" is incapable of supporting the boycott conspiracy alleged for two reasons:  First, it identifies only a single party (rendering any conspiracy among three implausible); and second, it does not even allege that the threats – even if made by more than one party – were made pursuant to any agreement.

As to the identities of the parties that allegedly threatened to stop doing business with IronPlanet, ICP's entire boycott theory rests on strained inferences, which it now mischaracterizes in its Answering Brief.  Although ICP states that it pled IronPlanet "confirmed…it had received the very same threats from all three Manufacturer Defendants," the Complaint does not.  (Answering Brief at 11, hereafter cited as "D.I. 36".)  It states only that IronPlanet communicated it received an alleged threat from Caterpillar and "one" other manufacturer.  (Compl. ¶ 96.)  The Complaint does not plead that IronPlanet received three threats, and it fails to identify any Manufacturer Defendant, other than Caterpillar, that allegedly issued a threat.

As to any agreement (as opposed to pure, vertical, independent legal behavior), ICP pleads no facts at all.  Instead, it resorts to arguing that the conspiracy may be inferred.  (*See* D.I. 36 at 9-10.)  But, as explained below, ICP runs headlong into the Supreme Court's requirement that it must allege "enough factual matter (taken as true) to suggest an agreement was made." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  ICP's factual allegations must be "enough to raise [its] right to relief above the speculative level…" *Id.* at 555.  None of the inferences concocted by ICP can be plausibly inferred from the paucity of facts alleged, making the allegations insufficient as to an agreement.

**B.      The Parallel Conduct Allegations Are Insufficient to Support a Conspiracy Claim**

ICP tries to support its implausible conspiracy claim by recasting the Complaint's allegations of parallel conduct.  ICP argues that each Manufacturer Defendant threatened IronPlanet "***within hours***, and at most days, of one another."  (D.I. 36 at 11 (emphasis added).)  ICP also repeatedly argues that these threats were made "***simultaneously***."  (*Id.* at 8, 11, 12, 14 (emphasis added).)  These arguments contradict ICP's actual allegation that the threats were

made some unspecified number of *days* apart by distorting its allegation that IronPlanet *reported* alleged threats to ICP "contemporaneously." (Compl. ¶¶ 95-96.)  Such distortion is improper. The Complaint must stand or fall on its actual allegations. *See Howard Hess Dental Labs., Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 257 (3d Cir. 2010) ("To the extent the Plaintiffs are recasting their allegations in an effort to circumvent a motion to dismiss, we must reject that approach.").

In any event, even ICP's distorted version of its allegations fails to support the claimed boycott agreement.  ICP argues that Manufacturer Defendants must have conspired because they allegedly made threats "unmotivated by common stimuli," which ICP calls "unnatural parallelism." (D.I. 36 at 10-15.)  But the Complaint itself provides the common stimulus, which was that IronPlanet had just announced plans to begin selling new equipment. (*See* Compl. ¶ 82.)  Indeed, ICP's entire case is based upon the notion that IronPlanet had just begun to do something "new" that would change the entire dynamic of the industry.  (D.I. 36 at 2-4 (describing "new entry" by IronPlanet); *see also* Compl. ¶¶ 60-66 (describing IronPlanet's decision to carry "new" machines as a change).)

ICP's "unnatural parallelism" argument also is inconsistent with its own allegations. Manufacturer Defendants make and distribute new equipment (Compl. ¶¶ 8-10), but also distribute used equipment through IronPlanet (*id.* at ¶ 94).  The value of Manufacturer Defendants' used equipment offered by IronPlanet would be diluted if IronPlanet also were to offer new equipment alongside their used equipment.  (*See* D.I. 35 at. 9.)  Therefore, it would be consistent with each Manufacturer Defendant's independent and legitimate business interest to

3

inform IronPlanet independently that it did not want IronPlanet to distribute new equipment[1]. (*See id.*)  Notably, ICP ignores, rather than disputes, this obvious explanation for each Manufacturer Defendant making the same rational decision (but independently) in response to the same change in the marketplace (assuming that each Defendant did, as alleged, communicate this to IronPlanet).[2]  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010) (pursuing the most favorable business outcome in light of market dynamics is an "obvious alternative explanation" for defendants' alleged parallel conduct).  ICP's allegations of parallel conduct in response to common marketplace change are precisely what *Twombly* teaches are insufficient to support an inference of conspiracy. *See* 550 U.S. at 554-56.

ICP's three cases that purportedly infer conspiracy from "identical conduct taken simultaneously…*absent* common stimuli" serve to highlight the Complaint's factual deficiencies.  (D.I. 36 at 10 (emphasis added).)  First, the complaint in *In re Text Messaging Antitrust Litigation*, 630 F. 3d 622, 628 (7th Cir. 2010), presented critical facts absent here, including defendants meeting, exchanging price information, and then making "anomalous" price increases.  Second, *Ball v. Paramount Pictures*, 169 F.2d 317, 319-21 (3d Cir. 1948), pre-

---

[1] Even ICP acknowledges the "general rule" that Manufacturer Defendants are free to exercise their own independent discretion as to the parties with whom they deal.  (D.I. 36 at 7, n.1; *see also* D.I. 35 at 9.)

[2] Instead of disputing the explanation, ICP argues that Manufacturer Defendants have the "heavy burden" of proffering an overwhelmingly strong alternative theory for their alleged parallel conduct.  (D.I. 36 at 10-12.)  ICP's argument disregards *Twombly's* instruction that defendants' explanations be considered "in light of common economic experience," *id.*, 550 U.S. at 565, and overstates ICP's cited cases, which merely held that plausible allegations of conspiracy (which do not exist here) should not be dismissed simply because an alternative theory is proffered *see, e.g., In re Plasma-Derivative Protein Therapies Antitrust Litig*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011) (allowing complaint when conspiracy is "plausible in light of the competing explanations"); *In re Processed Egg Prods. Antitrust Litig.,* 821 F. Supp. 2d 709, 730 (E.D. Pa. 2011) (allowing complaint when allegations "raise enough of a plausible inference") ; *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 637, 642 (E.D. Pa. 2010) (allowing complaint when defendants had no alternative explanation for some allegations).

4

*Twombly*, inferred conspiracy only when all defendants rejected "far more favorable" terms for continuing to do business with plaintiff, which would have been an "amazing coincidence" absent agreement.  Third, *Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc*, 539 F.2d 907, 911 (2d Cir. 1976), affirmed a trial finding of conspiracy based on evidence of defendants meeting and then immediately taking identical, unexpected actions.  ICP pleads no such facts showing agreement.

With little authority on its side, ICP tries, but fails, to distinguish *Twombly* by arguing the Manufacturer Defendants' alleged threats were "costly and risky" absent conspiracy (D.I. 36 at 8-9), but the same against-interest allegation was made – and rejected – in *Twombly* as inadequate to support an inference of conspiracy, *see* 550 U.S. at 568 (dismissing respondents' complaint against local exchange carriers because "a natural explanation for the [carriers' failure to pursue "attractive business opportunit[ies]" in their competitors' territories] is that the[y]…were sitting tight, expecting their neighbors to do the same thing.").  As in *Twombly*, ICP's parallel conduct allegations show nothing more than behavior that is just as consistent with rational and competitive business strategy. *See id.*, 550 U.S. at 557.

### C.   ICP Fails to State Facts Showing "Plus Factors" Necessary to Support the Alleged Boycott Conspiracy

Because "[p]arallel conduct in itself is insufficient to state a plausible claim because it is 'consistent with conspiracy,'" *Burtch v. Milberg Factors, Inc.,* 662 F.3d 212, 227 (3d Cir. 2011) (quoting *Twombly*, 550 U.S. at 554), "plaintiffs relying on parallel conduct must allege facts that, if true, would establish at least one 'plus factor.'" *Ins. Brokerage*, 618 F.3d at 323 (identifying three common "plus factors").  ICP establishes no plus factor.

One of the Third Circuit's plus factors is "evidence implying a traditional conspiracy." *Burtch,* 662 F.3d at 227.  This refers to "non-economic evidence" of agreement, such as

defendants actually meeting and exchanging plans. *Ins. Brokerage*, 618 F.3d at 322.  ICP ignores this factor.  *See Burtch,* 662 F.3d at 227, 230 (affirming factor not met when complaint did not allege defendants "got together and exchanged assurances of common action").

ICP also fails the Third Circuit's next plus factor:  Evidence of "motive to enter into a conspiracy."  *Id.* at 227.  With no factual support, the Complaint asserts that Manufacturer Defendants had incentive to preclude Lonking from selling new equipment through IronPlanet and to protect their investments in IronPlanet.  (*See* ¶¶ 97-99.)  This allegation, however, is legally insufficient to support an inference of motive because all companies would have incentive to take independent action to protect their business and increase profits. *See Twombly*, 550 U.S. at 566 (explaining that "resisting competition is routine market conduct" and cannot support inference of conspiracy); *Burtch,* 662 F.3d at 229 (explaining all companies desire increased business so this "does not on its own constitute evidence of a 'plus factor'") (citation omitted).

The last plus factor is "evidence that the defendant acted contrary to its interests." *Id.* at 227.  ICP argues that absent conspiracy, the alleged boycott of IronPlanet was against the Manufacturer Defendants' economic interests because they risked losing used equipment sales and market shares.  (*See* D.I. 36 at 16.)  This argument is defeated by ICP's allegations elsewhere about the many available sellers of used equipment.  *See* Compl. ¶¶ 64-65 (identifying alternative sellers Richie Bros., EquipmentOne, Machinery Trade, Rock and Dirt, Equipment Trader Online, and others).)  Common economic experience suggests that Manufacturer Defendants could have shifted used equipment to these other many sellers, rendering non-existent the alleged risk of losing sales and shares.

ICP emphasizes *Interstate Circuit* and *Toys "R" Us* to support its argument that
conspiracy may be inferred from Manufacturer Defendants allegedly acting against economic
interest.  (*See* D.I. 36 at 16-17.)  Both cases involve classic "hub and spoke" conspiracies
established by evidence of actual agreement among the "spokes" that was facilitated by the
"hub."  *See Interstate Circuit, Inc. v. U.S*, 306 U.S. 208, 222-24 (1939) (finding agreement
among film distributors based on letter outlining agreement sent to the distributors by a theater
owner); *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000) (finding agreement among
toy manufacturers when Toys "R" Us confirmed that the others had accepted agreement).
However, neither case relied exclusively on inference as ICP does here,[3] and, unlike these cases,
there are no such concrete facts (or allegations) here supporting an agreement among the alleged
conspirators.

Finally, ICP's effort to forestall a reckoning of its inadequate conspiracy allegations is
misplaced.  ICP argues that the determination of whether Komatsu and Volvo are among the
conspirators may be deferred to discovery.  (*See* D.I. 36 at 19.)  Yet, even ICP's cases recognize
that the identity of the alleged conspirators is a "key question" to be resolved on a motion to
dismiss.  *In re Processed Egg Prods. Antitrust Litig*, 821 F. Supp. 2d at 718 ("the key question is
whether the SAC sufficiently alleges that the moving defendant joined the alleged agreement").
Other cases confirm that this answer is not to be kicked down the road. *See In re OSB Antitrust
Litig.*, 2007 U.S. Dist. LEXIS 56573, at *13 (E.D. Pa. Aug. 3, 2007) (explaining "plaintiff must

---

[3] None of ICP's additional cases provide support.  They involve facts supporting conspiracy far
beyond what is alleged here.  *See In re Pool Prods. Distrib. Mkt. Antitrust Litig*, 988 F. Supp. 2d
696, 715 (E.D. La. 2013) (email stating defendants had agreed);*In re Elec. Books Antitrust
Litig.*, 859 F. Supp. 2d 671, 682-83 (S.D.N.Y. 2012) (allegations of "specific conversations"
among defendants showing they "agreed among themselves" to raise prices);*McElhinney v.
Med. Protective Co.*, 549 F. Supp. 121, 130 (E.D. Ky. 1982) (evidence that defendants attended
meetings and discussed subject of alleged agreement).

allege that each individual defendant joined the conspiracy and played some role in it").

Defendants accordingly request dismissal of ICP's boycott claims.[4]

## II.    ICP'S EXCLUSIVE DEALING CLAIMS FAIL TO STATE A CLAIM

As explained in Defendants' Opening Briefs, the Complaint fails to state a claim for exclusive dealing at every level.   First, ICP concedes that there are multiple channels of distribution open to ICP and other sellers of new construction equipment, such that there is no substantial foreclosure of competition.   Without substantial foreclosure, there is no claim. Second, ICP's attempts to artificially inflate market share by aggregating the Manufacturer Defendants' shares, or through irrational and even unexplained slicing and dicing of so-called "markets," have no basis in law, and thus should be soundly rejected.

### A.    The Complaint Fails To Allege Substantial Foreclosure of Competition, Because There Are Multiple Existing and Alternative Channels of Distribution

In their Opening Brief, Defendants explained that the key consideration in assessing substantial foreclosure is whether competitors still can reach buyers.   (*See* D.I. 35 at 14); *see also Omega Envtl. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).   Accordingly, courts typically find that exclusive dealing arrangements with distributors create little cause for anticompetitive concern.   *Id*. at 1163 ("[i]f competitors can reach the ultimate consumers of

---

[4] ICP blithely asserts in its Answering Brief that the alleged group boycott is *per se* unlawful, (*see* D.I. 36 at 7), even though the Complaint makes no such allegation, *see Twombly*, 550 U.S. at 555 n.3 (complaints must give "'fair notice' of the nature of the claim").   Regardless, the issue of the proper standard to apply in assessing ICP's purported claim is a legal question that is irrelevant to the present motions, which focus on ICP's failure to allege sufficient facts to show any agreement in the first instance.   Were the Court to find the allegations of an agreement sufficient, the standard of review for assessing the agreement would be appropriate for briefing and adjudication at some time in the future. *See Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010) ("While Plaintiff repeatedly asserts that Defendant's conduct constitutes a 'horizontal conspiracy,' and therefore is a *per se* violation, this characterization is a legal conclusion that the Court does not accept as true on a motion to dismiss.").

the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition *any* part of the relevant market") (emphasis in original); *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1235 (8th Cir. 1987); *PNY Techs., Inc. v. Sandisk Corp.*, 2014 U.S. Dist. LEXIS 58108 (N.D. Cal. Apr. 25, 2014) (granting motion to dismiss plaintiff's exclusive dealing claim where complaint expressly acknowledged alternative distribution channels).[5]

Defendants explained how ICP's own allegations show that such alternative modes of distribution are readily available.  (*See* D.I. 35 at 14-17.)  They include multiple existing and potential online marketplaces (*see* Compl. ¶ 65), existing dealers that are not currently aligned exclusively with any manufacturer (*see id.* ¶ 42), and the possibility of additional dealerships that easily could be established (as evidenced by the dealer networks that two new (and now profitable) Chinese manufacturers established when they recently entered) (*see id.* ¶ 45).[6] Moreover, ICP's admission that it could reach 80 percent of end users "immediately" through IronPlanet (*id.* ¶ 76) belies any notion of market "lock up."  In the words of ICP, the success of IronPlanet "has proven that users of heavy construction equipment will purchase such equipment outside of longstanding channels of distribution."  (D.I. 36 at 2.)

---

[5] ICP takes issue with Defendants' assertion that there have been no cases since *Sylvania* in which a court has held that a single-line dealership arrangement violates the antitrust laws. (*See* D.I. 35 at 2-3.)  Yet ICP relies on off-point monopolization cases that it acknowledges are analyzed differently (*see* D.I. 36 at 37, 52), and still fails to identify any case where single-line dealerships have been held to be anti-competitive.  To the contrary, as explained in Defendants' Opening Brief, modern economics and jurisprudence recognize their pro-competitive nature.  (*See* D.I. 35 at 12-13.); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (explaining that exclusive distributorships are presumptively legal).

[6] ICP insists on characterizing IronPlanet itself as a "channel" of distribution.  (*See, e.g.*, D.I. 36 at 43, 45.)  Yet, ICP fails to explain why ICP itself (or someone else) could not develop a similar online marketplace with relative ease.  Its conclusory assertion that it would "take many years" (Compl. ¶ 67) is both unsupported factually and implausible.

In response to this critical point, which undermines ICP's entire contention of "foreclosure," ICP merely characterizes such alternatives as "theoretical," "less effective," and "higher cost." (D.I. 36 at 45.) But the cases cited by ICP to support this argument all concern circumstances where *entire modes* of reaching buyers were foreclosed, not just distribution through one particular company like IronPlanet. *See U.S. v. Microsoft Corp.*, 253 F.2d 34, 70 (D.C. Cir. 2001); *U.S. v. Dentsply Int'l, Inc.*, 399 F.3d 181, 193 (3d Cir. 2005); *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 287 (3d Cir. 2012). ICP cites no case supporting its theory that there is unlawful foreclosure whenever it cannot access what it considers to be the most efficient, least costly distributor.

ICP also alleges no facts to support its conclusory assertions that the available alternatives are foreclosed, ineffective, or prohibitively costly. ICP admits, for example, that the two new Chinese entrants are already profitable, and it describes them as "well-capitalized." (D.I. 36 at 36, 46.) The only "facts" alleged in the Complaint in support of the asserted difficulty of marketing through the available alternative channels (the need for a "full line" and for "substantial financing" (Compl. ¶ 47) are belied by the admission of new entrants. ICP also argues in perfunctory fashion that the alleged exclusive dealing arrangements were "imposed coercively," they are of long duration, and they are not easily terminable. Under the controlling legal standards for adjudicating Rule 12 motions, the truth of such conclusory assertions need not and should not be assumed. *See Santiago v. Warminster Twp.*, 629 F.3d 121, 131 (3d Cir. 2010) (neither conclusions nor "'naked assertions devoid of further factual enhancement'" are entitled to the presumption of truth and should be disregarded) (citing *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009)). This availability of alternative means of reaching end users is fatal to ICP's exclusive dealing claims.

### B.   The Complaint Does Not Allege Sufficient Market Shares on the Part of Defendants to Raise Antitrust Concern

ICP alleges market shares of 40 percent, 15 percent and "more than 5 percent" for Caterpillar, Komatsu and Volvo, respectively.  (Compl. ¶¶ 21, 44.)  It is beyond dispute that the alleged shares of Komatsu and Volvo are far below the threshold for antitrust concern, and even Caterpillar's alleged share is frequently not viewed as a matter of concern in light of other market characteristics, such as the availability of alternatives.  As explained by *Antitrust Law Developments*:

> Since the early 1970s, judicial decisions have established a virtual safe harbor for market foreclosure of 20 percent or less.  Although 20 to 30 percent was a gray area before *Jefferson Parish*, the concurring opinion in *Jefferson Parish*, which found exclusive dealing lawful without detailed analysis when 30 percent of the market was foreclosed, has led many courts to hold that higher market thresholds are a prerequisite to finding exclusive dealing unlawful – and even then, a finding that the arrangement is anticompetitive is not a foregone conclusion. (footnotes with case citations omitted)

ABA Section of Antitrust Law, *Antitrust Law Developments* at 216 (7th ed. 2012).  ICP does not and cannot refute that today this is accepted doctrine.  Instead, ICP strains without success to find some way around it.

First, ICP tries to draw a distinction between claims under the Clayton Act and those under the Sherman Act, in terms of the percentage of foreclosure required under each.  (*See* D.I. 36 at 39-40.)  But the Supreme Court itself made no such distinction concerning the percentage benchmarks in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2 (1984).  Nor have any other cases, and ample case law supports application of these same benchmarks, regardless of the statutory basis. *See, e.g., Omega*, 127 F.3d at 1162-65 (for purposes of claims under both Section 1 of the Sherman Act and Section 3 of the Clayton Act, 55 percent market share that foreclosed 38 percent of the market was not enough); *Bepco, Inc.*

*v. Allied-Signal, Inc.*, 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (for purposes of claims under both statutes, foreclosure rates of 18.5% and 21.5% were "far short" of substantial). The fact that ICP can find a few older cases or outliers with peculiar facts in which a lower percentage did not rule out the possibility of foreclosure does not counter the prevailing modern jurisprudence that market shares such as those alleged in this case are not of antitrust concern in relation to claims of exclusive dealing.

Second, ICP cites various cases for the proposition that high barriers to entry can reduce the level of market share from which market power may be inferred. (*See* D.I. 36. at 34-35.) But these cases are easily distinguishable, and even ICP concedes that the role of barriers to entry depends upon "the specific dynamics of the markets at issue." (*Id.* at 34.) For example, in *United States v. Visa USA, Inc.*, 163 F. Supp. 2d 322, 341-42 (S.D.N.Y. 2001), *aff'd*, 344 F.3d 229, 240 (2d Cir. 2003), Visa and MasterCard together issued 85% of credit cards, and there were high barriers to entry involved in setting up new global credit card networks. *Toys "R" Us*, 221 F.3d 928, was a horizontal boycott case, with no apparent relevance to the issues before this Court. In the instant case, as discussed above, nothing prevented "well-capitalized" Chinese manufacturers from entering the market. That ICP was unable to do so through its first choice of online marketplace IronPlanet does not take this case out of the broad mainstream of accepted doctrine.

Third, ICP challenges the argument that it may not aggregate the Manufacturer Defendants' market shares for foreclosure purposes. (*See* D.I. 36 at 40-44.) In regard to its Sherman Act claims, ICP effectively acknowledges that its out-of-circuit cases did not allow aggregation absent a conspiracy. (*See id.* at 42-43.) But ICP does not allege any conspiracy

in regard to establishing exclusive dealing arrangements with dealers.[7]   In regard to its

Clayton Act claims, ICP argues that Defendants' cases are Sherman Act cases and therefore

do not apply; but the analysis of exclusive dealing arrangements under the Clayton Act follows

the same rule of reason approach as under the Sherman Act.[8]   ICP further urges that the

Supreme Court's decision in *Standard Oil Co. of California v. United States*, 337 U.S. 293

(1949) provides a "requirement of aggregation."   (D.I. 36 at 41-42.)   But *Standard Oil*

imposed no such "requirement."   If aggregation were "required" in every exclusive dealing

analysis, aggregation would appear in ***all*** exclusive dealings cases, and that is not the analysis.

*See, e.g., Barr Labs. v. Abbott Labs.*, 978 F.2d 98, 110-12 (3d Cir. 1992) (considering market

concentration, based on shares of rivals, in regard to the Section 2 attempted monopolization

claim, but not in regard to the Section 1 exclusive dealing claim).   Additionally, *Standard Oil*'s

65-year-old mode of analysis has been refined and amended over time. *See Tampa Elec. v.*

*Nashville Coal Co.*, 365 U.S. 320, 334 (1961); *Jefferson Parish*, 466 U.S. at 32, *et seq.*

(O'Connor, J., concurring); *Barr Labs.*, 978 F.2d at 111.[9]

---

[7] ICP admits this implicitly, insofar as it twice refers to the alleged "exclusionary scheme *that*
*began with the boycott of IronPlanet*"   (D.I. 36 at 1, 56 (emphasis added).)

[8] To the extent that ICP purports to allege "direct evidence" of market power in the form of
supposedly supra-competitive pricing (*e.g.*, D.I. 36 at 33, 36) that contention is merely a
conclusory assertion.

[9] ICP also cites two unpublished orders by the same trial Judge in the Eastern District of Texas in
support of its position, *Daniels Sharpsmart, Inc. v. Tyco International (US), Inc*, 2006 U.S. Dist.
LEXIS 100158 (E.D. Tex. Oct. 18, 2006) and *Genico, Inc. v. Ethicon, Inc.*, 2006 U.S. Dist.
LEXIS 96909 (E.D. Tex. Mar. 23, 2006).  In each case, two companies controlled approximately
90-95 percent of the relevant market.  Significantly, the court issued these orders before the
Supreme Court's decision in *Twombly*, and it cited the now-discredited *Conley* "no set of facts"
standard for pleading in denying the motions to dismiss. *Daniels Sharpsmart*, 2006 U.S. Dist.
LEXIS 100158, at *5; *Genico*, 2006 U.S. Dist. LEXIS 96909, at *8-9.

### C. ICP Cannot Bulk Up the Manufacturer Defendants' Market Shares by Conjuring Ill-Defined Local Geographic Markets for Specific Items

ICP implicitly recognizes that the Manufacturer Defendants' shares of nationwide distribution for new heavy construction equipment are too low to plead substantial foreclosure. (*See* D.I. 36 at 33-36.)  Accordingly, to artificially increase the purported shares, ICP improperly attempts to slice and dice the alleged market into micro-markets for specific types of equipment in local geographies.  ICP claims that the "relevant markets in which to evaluate the Defendants' conduct are the sale of specific types of new heavy construction equipment (*e.g.*, backhoes) in local geographic markets around the country (*e.g.*, California)."  (D.I. 36 at 22.)  But the Complaint does not allege any facts that plausibly suggest ICP seeks to compete for particular products in small geographic segments of the market, such as a sliver of backhoes in California. To the contrary, ICP pleads that Manufacturer Defendants and their rivals compete for distribution of *full* heavy construction equipment lines, *without any reference to specific geographic locales.*  (*See, e.g.*, Compl. ¶¶ 8-10, 19, 20, 37.)  Indeed, national distribution of full lines is exactly what ICP claims it attempted to do through IronPlanet.  (*See id.* ¶ 76 (alleging that "[t]hrough IronPlanet, ICP would reach approximately 80 percent of end users of heavy construction equipment immediately"); *see also id.* ¶¶ 56-57, 69, 85, 108; D.I. 36 at 29 (stating that the Complaint "focuses on direct competition between ICP and the Manufacturer Defendants to sell heavy construction equipment to end users, *through local equipment dealers, through IronPlanet, or otherwise.*") (emphasis added); *id.* at 32 n. 8 (similar).)

As explained more fully in the Opening Brief, courts have repeatedly rejected attempts to gerrymander markets to create higher shares in the way that ICP has tried to do here.  (*See* D.I. 35 at 19-20.)  In the seminal case of *Tampa Electric*, a Florida public utility company contracted to purchase from one supplier all of the coal needed to fuel two of its electricity generating units

over a period of 20 years.  365 U.S. at 322.  The Court rejected an attempt to inflate shares by

claiming a micro-market within Florida (or, at most, within Florida and Georgia) because Tampa

Electric could purchase from any of the 700 coal suppliers in the Appalachian coal area. *Id.* at

331-32.  Similarly, the Seventh Circuit held in *Republic Tobacco Co. v. North Atlantic Trading*

*Co.* that when analyzing an exclusive arrangement between a product manufacturer and its

distributors, the locations of consumers and retailers were of no consequence, because the

manufacturer did not sell to them.  381 F.3d 717, 738-39 (7th Cir. 2004); *see also Lansdowne on*

*the Potomac Homeowners Ass'n, Inc. v. Openband at Landsdowne LLC,* 2011 U.S. Dist. LEXIS

134477, at *19-20 (E.D. Va. Nov. 22, 2011); *Collins v. Assoc. Pathologists, Ltd.*, 676 F. Supp.

1388, 1395 (N.D. Ill. 1987).

ICP's cases cited in response do nothing to undermine the longstanding rule of *Tampa*

*Electric* that the relevant market in exclusive-dealing cases must be defined by "careful selection

of the market area in which the seller operates, and to which the purchaser can practicably turn

for supplies."  365 U.S. at 327.  In *Dentsply*, the Third Circuit rejected the defendant's effort to

artificially slice off part of the market to lower its share because the full range of selling

opportunities there included both end users and dealers.  399 F.3d at 188.  Similarly, in *PepsiCo*,

the Second Circuit rejected "PepsiCo['s attempt] to define the elements of the relevant market to

suit its desire for high Coca-Cola market share, rather than letting the market define itself."  315

F.3d at 106.  The Second Circuit rejected PepsiCo's attempt to artificially inflate Coca-Cola's

market share by limiting an alleged "market" "by distributor and customer" because it failed to

take into account the full range of selling opportunities available to PepsiCo and Coca-Cola. *Id.*

*Heerwagen* is not to the contrary because there the local nature of concert ticket sales limited

defendant's selling opportunities to local markets. *Heerwagen v. Clear Channel Comm'ns*, 435 F.3d 219 (2d Cir. 2006).

ICP makes no headway by alluding to "price discrimination markets." (D.I. 36 at 31-32.) ICP's alleged injury is its inability to sell to the 60 percent of dealers, nationwide, which allegedly entered exclusive arrangements with the Manufacturer Defendants. For the reasons explained above, the competitive circumstances in particular states, including the prices charged to local dealers in those states, are irrelevant to ICP's alleged exclusion. Unsurprisingly, ICP has not cited a single exclusive dealing case relying on the concept of "price discrimination markets,"[10] and Defendants know of none.

### D.   ICP's Allegations of Equipment-Specific Local Markets are Too Conclusory and Vague to Support a Claim

Even if the purported local equipment-specific markets were relevant (which they are not), the Complaint's equipment-specific product market allegations are far too thin to support a claim. In its Answering Brief, ICP represents that four paragraphs of its Complaint "identif[y] the products in the relevant market, the functionality and use of those products, the products at the outer boundary of those markets, and explains – with reference to the rule of reasonable interchangeability of use and cross-elasticity of demand – why products that are excluded from the market are not reasonable substitutes for those that are included." (D.I. 36 at 23 (citing Compl. ¶¶ 18, 33-35).) They do no such thing. The only allegations in those paragraphs – or anywhere else in the Complaint – concerning equipment-specific markets are: (1) "[s]pecific

---

[10] *United States v. Rockford Memorial Corp.*, 717 F. Supp. 1251 (N.D. Ill. 1989), and *United States v. Dean Foods Co.*, 2010 U.S. Dist. LEXIS 34137 (E.D. Wis. Apr. 7, 2010), are merger cases brought by the Department of Justice, where the relevant injury was higher prices for particular consumers. *E. I. Du Pont de Nemours and Co. v. Kolon Industries Inc.* is an exclusive dealing case, but the court there determined that the United States was the relevant geographic market because purchasers could not "practicably turn for supplies" in the broader area Du Pont suggested. 637 F.3d 435, 444 (4th Cir. 2011).

types of heavy construction equipment include crawler dozers, rollers, motor graders, scrapers, crawler excavators, wheeled excavators, mini-excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders;" and (2) "[t]he closest substitutes for each type of new heavy construction equipment is used heavy construction equipment of that type." (Compl. ¶¶ 18, 35).

Nowhere in the Complaint does ICP attempt to explain, as it must, "the functionality and use" of these twelve sophisticated pieces of equipment, let alone describe what they are. (D.I. 36 at 23); *see also Beyer Farms, Inc. v. Elmhurst Dairy, Inc*, 142 F. Supp. 2d 296, 303 (E.D.N.Y. 2001) (dismissing a complaint alleging a relevant product market consisting of "fluid milk products" because the complaint did not "explain what 'fluid milk products' are"). For example, the Complaint leaves to one's imagination what a "scraper" is or does. Nor does the Complaint identify "why products that are excluded from the market are not reasonable substitutes for those that are included." (D.I. 36 at 23.) Indeed, although ICP seeks to secure judicial notice of Caterpillar's April 22, 2015 8K – implicitly conceding the limitations of the Complaint's market allegations – that document neither explains what the various pieces of equipment are, nor does it suggest that the items of equipment are not reasonably interchangeable for one another. Instead, ICP relies on the Court to read these materials and attempt to discern, for example, what a crawler loader is and why it is not a reasonable substitute for a track loader.

ICP argues that by alleging "used backhoes are the closest substitute for new backhoes," and new and used backhoes are not reasonably interchangeable, it has *a fortiori* "allege[d] the lack of reasonable interchangeability of new backhoes and…new…crawler dozers." (D.I. 36 at 26.) That approach not only defies common sense, but is flatly contradicted by ICP's Answering Brief, which admits that a complaint may be dismissed for "'failure even to attempt a plausible

17

explanation as to why a market should be limited in a particular way.'" (*Id.* at 23 (quoting

holding in *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001)).)  ICP's burden at the

pleading stage is to define the relevant market "with reference to the rule of reasonable

interchangeability and cross elasticity of demand." *Queen City Pizza v. Domino's Pizza*, 124

F.3d 430, 436 (3d Cir. 1997).  It cannot satisfy that burden by erecting a "used equipment" straw

man and ignoring obvious questions as to how 12 types of construction equipment differ from

one another and whether their uses overlap.

Further, ICP fails in its Complaint to adequately and coherently identify or support the

geographic micro-markets it purportedly alleges with well-pled facts.  (*See* D.I. 35 at 19.)

Ignoring that the economic significance of a geographic area "does not depend upon singular

elements such as...political boundaries," the Complaint alleges that "each and every state within

the United States is...a relevant geographic market and smaller markets within the boundaries of

many states exist as well." (Compl. ¶ 38); *Apani S.W., Inc, v. Coca-Cola Enters.*, 300 F. 3d 620,

626-27 (5th Cir. 2002).  ICP's Answering Brief merely compounds the problem by asserting that

the Complaint "identif[ies] the specific states where the competitive effects of Defendants'

conduct should be assessed" and that local markets exist only within the "specific[ly] [identified]

states."  (D.I. 36 at 32.)  ICP acknowledges that an antitrust claim may be dismissed where a

complaint "(1) fails to allege a geographic market or the boundaries of a relevant geographic

market; (2) defines a geographic market in an unreasonably and implausibly narrow manner; or

(3) alleges a contradictory and vague delineation of the relevant geographic market."  *Id.* at 30

(quoting *Kolon*, 37 F.3d at 444).)  ICP's vague, conclusory, and contradictory allegations of local

geographic markets fail this test at every level.

### E.    ICP Lacks Standing to Challenge the Alleged Exclusive Dealing Arrangements

In their Opening Brief, Defendants explained that ICP has not suffered injury (and therefore lacks antitrust standing) because it does not allege that it desired or attempted to sell to those dealers allegedly locked in exclusive contracts with any of the Manufacturer Defendants.[11] (D.I. 35 at 24-25); *McCullough v. Zimmer, Inc.*, 382 Fed. App'x. 225, 229 (3d Cir. 2010) (to allege standing, a plaintiff must "allege[] 'antitrust injury' that was causally connected to Defendants' alleged anticompetitive conduct.").  In response, ICP cites only inapposite cases in which the plaintiffs were manufacturers that actually desired to sell to buyers foreclosed by the defendants' alleged exclusive deals.  (*See* D.I. 36 at 50.)  Unlike the plaintiffs in the cases cited, ICP has alleged no facts to show that it tried, or even desired, to access dealers, and so it can have no claim to injury arising out of such denial of access.

ICP argues that it is a direct competitor to the Manufacturer Defendants, that it takes title to the equipment it sells, and that its injury was not "limited to lost commissions" because it "bears the risk of loss on the sale of that equipment, and is the residual claimant to profit on those sales."  (D.I. 36 at 48-49).  These factual averments, unmentioned in the Complaint, cannot save ICP's claim.  Indeed, in *McCullough v. Zimmer, Inc.*, the district court held that the plaintiffs lacked standing because they were mere distributors of orthopedic products for the defendants' competitors and did not compete with defendants in the manufacture of orthopedic devices, even though the plaintiffs took title to the products they sold.  2009 U.S. Dist. LEXIS

---

[11] Plaintiff attempts to muddy the waters by suggesting that the relevant market is broader than sales to dealers.  (*See* D.I. 36 at 48-49.)  The reasons why ICP can have no successful claim in any such broader market (*e.g.*, the available alternative channels of distribution, etc.) are set forth in previous sections of this brief.  The standing issue, however, relates specifically to ICP's allegations of its supposed inability to access *dealers*.  ICP has alleged no facts to that effect.

21815, at *13-29 (W.D. Pa. Mar. 18, 2009), *aff'd*, 382 Fed. App'x. 225 (3d Cir. 2010).

Similarly, ICP does not manufacture heavy construction equipment; it "imports and sells heavy

construction equipment into the United States." (Compl. ¶ 7.)  Even if ICP had suffered any

injury as a result of the Manufacturer Defendants' alleged exclusive arrangements with dealers –

and it has not – Lonking and the other manufacturers supplying ICP would be more direct

victims.  This suit also threatens duplicative recovery or complex apportionment of damages.

Therefore, like plaintiffs in *McCullough*, ICP lacks standing to pursue its exclusive dealing

claim.

For all of the reasons set forth above and in the Defendants' Opening Briefs, ICP's

exclusive dealing claims under both the Sherman Act and the Clayton Act should be dismissed.

## III.   ICP'S MONOPOLIZATION AND CONSPIRACY TO MONOPOLIZE CLAIMS ARE IMPLAUSIBLE AND CONTRARY TO AUTHORITIES

ICP's Section 2 claims should be dismissed for failure to plead facts necessary to satisfy

the basic claim elements in accordance with established law.  As shown in Defendants' Opening

Brief, ICP failed to state facts plausibly showing, *inter alia*, relevant markets, market power, or

intent to monopolize.  (*See* D.I. 35 at 14-30.)  The Answering Brief largely ignores these fatal

defects, and instead summarily argues that ICP's allegations of unlawful exclusive dealing,

unlawful merger, and boycott satisfy Section 2.  (*See* D.I. 36 52-54.)  ICP's conclusory

arguments fail and the Section 2 claim should be dismissed.

### A.   ICP's Claim that Caterpillar Monopolized or Is Attempting to Monopolize Is Not Plausible

ICP argues that a firm monopolizes "when it seeks to exclude competitors through

anticompetitive conduct." (D.I. 36 at 51.)  But the law requires more.  ICP also must show

possession of monopoly power in relevant markets. *See United States v. Grinnell Corp.*, 384

U.S. 563, 570-71 (1966).  ICP has not pled facts that satisfy these elements, as explained in §

II.B-C, *supra*.  Indeed, presumably ICP cited their best cases.  But they generally recognize that shares under 50 percent are insufficient indicators of market power.  (*See* D.I. 36 at 34-35); *see also Antitrust Law Developments* at 231-32 ("courts virtually never find monopoly power when market share is less than about 50 percent.").  In fact, in the *PepsiCo* litigation, referenced by ICP, the Second Circuit held that even "a 64 percent market share is insufficient to infer monopoly power."  315 F.3d at 109.  Caterpillar's alleged 40 percent share falls well short of constituting plausible monopoly power.

In addition, ICP must show that Caterpillar's alleged market power was achieved or maintained by anticompetitive conduct.  *See Verizon Comm'ns v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).  For this, ICP merely references the same allegations of exclusive dealing, merger, and boycott discussed above.  (*See* D.I. 36 at 51-52.)  But none of these assertions are supported by facts showing anticompetitive acts.

First, ICP's argument that exclusive dealing is a "special concern when adopted by a monopolist" (D.I. 36 at 52) is unfounded because: (a) ICP has not alleged facts showing Caterpillar to be a monopolist, *see* § II.C, *supra*, and (b) that proposition is not supported in this context by ICP's cited *Lorain Journal, Dentsply,* or *Microsoft* decisions, all of which concerned parties with extremely-high market power and/or extra-restrictive provisions within exclusive dealing agreements, rather than the general "*de facto*" exclusive dealing alleged here.

Second, ICP's conclusory allegation that the IronPlanet merger is "anticompetitive" (Compl. ¶ 111) cannot be a basis for Section 2 claims because it lacks factual enhancement and should be disregarded, *see Santiago*, 629 F.3d at 131, and because mergers are not presumptively anticompetitive, *see, e.g.*, Phillip E. Areeda, *et al.*, Antitrust Law at § 901 (3d ed. 2009) ("one

cannot reasonably presume that every horizontal merger…will have any anticompetitive effect at all.").

Finally, ICP's reference to the alleged boycott fares no better.  To serve as a basis for Section 2 claims, the alleged boycott must actually harm competition, as opposed to ICP. *See, e.g., See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  The Complaint, however, stated no facts that show the required harm to competition.  ICP attempts to gloss over this deficiency by repeatedly classifying its allegations as "exclusionary" (D.I. 36 at 52), but these "labels and conclusions" in its Answering Brief and Complaint "will not do," *Twombly*, 550 U.S. at 555 ("labels and conclusions…will not do").

The same deficiencies doom ICP's attempted monopoly claim.  It requires facts showing Caterpillar engaged in anticompetitive conduct, with the intent to monopolize a relevant market, and with dangerous probability of succeeding. *See Spectrum Sports*, 506 U.S. at 456.  Yet, as shown in § II.B, *supra*, ICP has not adequately pled relevant markets.[12]  Also, as just explained above, ICP's references to the same exclusive dealing, merger, and boycott allegations as a basis for this claim are inadequate. *See, e.g., Transamerica Computer Co. v. IBM*, 698 F.2d 1377, 1382 (9th Cir. 1983) (explaining conduct that falls short of supporting monopolization also cannot support attempt to monopolize).

Overall, ICP fails to allege facially plausible relevant markets, fails to allege market power, and makes no effort, beyond recycling existing allegations, to allege or show any anticompetitive conduct in the Section 2 context.  These implausible claims should be dismissed.

---

[12] The observation that ICP need only show a "dangerous probability of success" of monopolizing (D.I. 36 at 53) is putting the cart before the horse.  ICP must allege plausible relevant markets (which it has not done) before it can show any chance of monopolizing.

**B.     ICP's Conspiracy to Monopolize Claim Is Inadequately Plead, Inconsistent with the Complaint, and Contrary to Authorities**

The Opening Brief described some of the flaws with ICP's conspiracy to monopolize claim – complete lack of alleged facts about Defendant Manufacturers agreeing to monopolize, implausibility that Defendants (who are competitors) would agree to confer monopoly on some other entity, and absence of any alleged facts showing "specific intent" to monopolize[13] (D.I. 35 at 29-30.)  The Answering Brief not only exacerbates these flaws, but also confirms the existence of additional grounds for dismissal.

The Answering Brief makes ICP's allegations even more implausible.  Indeed, it confirms that ICP's alleged conspiracy to monopolize now involves Associated Auction Services ("AAS") as a conspirator.  (*See* D.I. 36 at 53.)  As explained in § IV, *infra*, the Complaint states absolutely no facts that could plausibly support AAS's participation in any alleged conspiracy.  With no factual pleading showing AAS's participation in this expanding conspiracy, this claim should be dismissed in full.  *See Dentsply*, 602 F.3d at 255 (affirming dismissal of entire conspiracy claim when complaint lacked allegations against some alleged conspirators).

Similarly, the Answering Brief offers no plausible explanation of Defendants' alleged "specific intent" to conspire to monopolize.  (D.I. 35 at 29-30.)  ICP argues that conspirators may have divergent interests (*see* D.I. 36 at 54); while that may be correct, it does not excuse ICP from plausibly alleging that the conspirators at least share a specific intent to create a monopoly for one of the Defendants.  *See, e.g., ID Sec. Sys., Canada, Inc. v. Checkpoint Sys*, 249 F. Supp. 2d 622, 660 (E.D. Pa. 2003) (explaining conspiracy to monopolize requires agreement to create a

---

[13] To show a Section 2 conspiracy, ICP must allege facts establishing "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Dentsply*, 602 F.3d at 253.

single dominant firm).  ICP also argues that Manufacturer Defendants could have an intent to

conspire to exclude their rivals (*see* D.I. 36 at 54), but this says nothing about AAS's intent to

conspire.  ICP thus fails to solve the problem that it cannot plausibly allege why all Defendants

would conspire to create a single dominant firm in their market.[14]  (*See* D.I. 35 at 29 (citing

cases).)[15]

Finally, the Answering Brief also confirms that ICP relies on aggregating the

Manufacturer Defendants' market shares to try to show a dangerous probability of success.  ICP

cites no Third Circuit case endorsing combining alleged shares for this purpose in a Section 2.

(*See* D.I. 36 at 42 (citing three old, out-of-circuit cases).)  This is because cases within this

Circuit recognize that aggregating shares is inconsistent with Section 2, which concerns single

firm conduct.  (*See* D.I. 35 at 27 & n.15 (citing cases)); *see also* ABA, *Antitrust Law*

*Developments* at 329 ("Even where competitors allegedly have conspired to monopolize the

market, the traditional view has been that the offense of monopolization requires that a single

---

[14] Plaintiff mischaracterizes *Santana Products., Inc. v. Bobrick Washroom Equipment, Inc*, 249 F.Supp.2d 463, 520 (M.D. Penn. 2003), as standing for the proposition that "diminished competition among conspirators is sufficient for a conspiracy to monopolize claim."  (D.I. 36 at 54.)  Indeed, *Santana Products*, at 520, refers to the "possibility of a group of firms conspiring to monopolize, *if the aim of the conspiracy is to form a single entity to possess the illegal market power.*"  (emphasis in original.)

[15] As with the other Section 2 claims, ICP does nothing but reference the same exclusive dealing, merger, and boycott allegations as supposedly showing "overt acts" necessary to allege a conspiracy to monopolize.  (D.I. 36 at 53.)  These references are inadequate for the reasons explained above.  Further, the cases cited by Plaintiff, D.I. 36 at 53-54, are generally inapposite to the conspiracy to monopolize alleged in the Complaint. *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 779-80 (7th Cir. 1999) (mentioning a "puzzling offense" and limiting applicability to specific set of facts); *Barr Labs.*, 978 at 112-14 (attempted monopoly, not a conspiracy to monopolize); *Advo, Inc. v. Phil. Newspapers, Inc.*, 51 F.3d 1191, 1199 (3d Cir. 1995) (predatory pricing claim with no mention of conspiracy to monopolize); *Pettruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc*, 998 F.2d 1224 (3d Cir. 1993) (conscious parallelism pursuant to Section 1); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 573 (2d Cir. 1961) (antecedent to modern antitrust theory).

firm possess monopoly power."). ICP surely knows this, as the Answering Brief carefully characterizes *Barr Labs.* to make it appear as if the Third Circuit sanctioned aggregation for Section 2 conspiracy (*see* D.I. 36 at 53-54), when in fact the court considered defendant's share by itself for Section 2 purposes, and then considered combined shares for the limited purpose of overall market context and concentration, *see Barr Labs.*, 978 F.2d at 112-14. Because ICP relies on an unsupported aggregation theory, its claim should be dismissed. *See Santana Prods*, 249 F. Supp. at 518-20 (dismissing so-called "shared monopoly" as antithetical to Section 2).

## IV. ICP'S ATTEMPT TO RECAST ITS MERGER CHALLENGE MUST FAIL

In their Opening Brief, Defendants explained why the Complaint fails to state a claim for unlawful merger. AAS – the only Defendant named in the merger Counts[16] – is not even alleged to participate in the relevant markets ICP alleges. The merger of two *used* equipment auction companies could not possibly tend to create a monopoly in the market for *new* heavy construction equipment, and the merger also could not have caused antitrust injury to ICP, even theoretically. These defenses and others were obvious from the Complaint.

ICP does not even attempt to address these shortcomings and, likely recognizing it has no viable rebuttal, changes course. In its Answering Brief, ICP now seeks to recast its claim as attacking a different merger – a purported "vertical merger." ICP's newly-minted theory cannot salvage its merger claims.

### A. ICP's New Vertical Merger Theory Is Not Grounded in Pled Facts

ICP's vertical merger argument is premised on the notion that Caterpillar, in furtherance of its alleged conspiracy with Komatsu and Volvo, somehow gained control over both merging entities through the combination. This revised theory is couched as one to which authorities like

---

[16] ICP appears to confirm that the merger "gives rise to a claim against [only] Cat Auction Services under Section 7 of the Clayton Act." (D.I. 36 at 6.)

the old case of *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), would be applicable.
ICP's attempt to re-characterize the merger fails, however, for multiple reasons.  Foremost is that
the Complaint is not pled as a vertical merger case.  Every time the Complaint references the
merger or the merging parties, it concedes that it is a merger of AAS and IronPlanet (*see* Compl.
¶¶ 3, 5, 11, 105, 106, 111, 133, 135), which were competitors at the same level of commerce.
This, by definition, was a horizontal merger.

  It is unclear how ICP contends Caterpillar – let alone the other Manufacturer Defendants
– even theoretically can be viewed as the acquiring party, or a merging party at all.  The
Complaint pleads only that Caterpillar is a "shareholder" of AAS (Compl. ¶ 11) and is a
"minority investor in IronPlanet" (*id.* ¶ 68), conceding that "[t]he merger [involved] two entities
in which Caterpillar holds minority stakes" (*id.* ¶ 105).  ICP cites no authority and makes no
legal or factual argument as to how a manufacturing company's minority ownership in two
merging entities that sell used equipment of many brands could support a plausible argument that
the new, merged company is under the one manufacturer's control and should be analyzed as a
vertical merger.[17]  In addition, Caterpillar and the other manufacturing defendants are not alleged
to sell new equipment through IronPlanet, AAS, or the merged entity, so there can be no vertical
relationship in that way, either.  Because this case does not involve a vertical merger, ICP's
lengthy discussion of vertical mergers and the vertical merger cases it cites are irrelevant.[18]

---

[17]  The futility of ICP's attempt to classify this as a vertical merger is revealed in part by its
failure to cite even a single case to support its argument that an ostensible merger of two
downstream horizontal competitors is transmogrified into a "vertical" merger merely because a
manufacturer owns a minority stake in the merging entities.

[18]  Even if this were a vertical merger case, the authority upon which ICP relies still would be
inapposite.  It cites, for example, *United States v. American Cyanamid Co.*, 719 F.2d 558 (2d Cir.
1983), on the subject of whether the Court can dismiss this case.  The Second Circuit's decision,
however, was an appeal of a trial court's decision to terminate a consent order. *American
Cyanamid* has nothing to do with a motion to dismiss or the relevant standard for such a motion.

### B.     ICP Fails to Identify Facts Establishing that a Conspiracy Produced the Merger

Going far beyond even the sweeping conclusory allegations in the Complaint itself, the Answering Brief argues that the merger of AAS and IronPlanet was "orchestrated" by Caterpillar.  (D.I. 36 at 1.)  Further, ICP says Caterpillar "procured" the merger (*id.* at 3) and talks of "Caterpillar's role in masterminding the merger" (*id.* at 52).  ICP postulates that the merger "changed" IronPlanet's "incentives."  (*Id.* at 3, 58.)  None of these allegations, however, are supported by facts properly pled in the Complaint.[19]  For this reason alone, these brief statements must be disregarded and the merger claim dismissed.

Instead of heeding *Twombly's* mandate to plead plausible facts to support the claim that AAS and Caterpillar conspired to cause the merger, *see also* 550 U.S. at 570 (claims must be plausible, not just conceivable), ICP merely pleads the conclusion that AAS "joined the Manufacturer Defendants' ongoing conspiracy…by agreeing to merge with IronPlanet." (Compl. ¶ 5.)  Without so much as alleged "information and belief" on this point – which would be insufficient – ICP simply has surmised that AAS "had the motive" to conspire and that Caterpillar and AAS "conspired to forever eliminate the threat of ICP selling through Iron Planet."  (*Id.* ¶¶ 105-06.)

---

Plaintiff also cites to *Yankee Entertainment & Sports Network, LLC v. Cablevision System Corp*, 224 F. Supp. 2d 657 (S.D.N.Y. 2003), with a parenthetical that says "denying motion to dismiss vertical merger claim where plaintiff had 'standing to assert that the acquisition has deprived it of a fair opportunity to compete in a market it has already entered.'"  In that case, the court rejected the defendant's argument that the plaintiff did not have standing to challenge the vertical merger because the plaintiff actually had been able to enter the market.  The defendants are not making an analogous argument in this case.

[19]  As explained in the Opening Brief, the Complaint itself contradicts the argument that it was the merger which changed IronPlanet's incentives.  ICP's own allegations say the events that harmed it took place long before the merger.  (*See* D.I. 35 at 35.)  Because ICP has not pled facts to support its theories that Caterpillar actually *did something* to "shift" anyone's "incentives" through the merger, the cases cited at page 58 of the Answering Brief, which involve alleged shifting incentives of merged entities, are inapposite.

ICP's bald assertion that AAS had motive to conspire does not provide the factual support a plaintiff needs to survive a Rule 12(b)(6) motion. Arguably having a conspiratorial motive does not prove conspiracy. As recognized in *Burtch v. Milberg Factors, Inc.*, 2009 U.S. Dist. LEXIS 26872 (D. Del. Mar. 30, 2009), adopted by 2009 U.S. Dist. LEXIS 48431 (D. Del. May 31, 2009), when a party takes action that is just as likely "the result of wholly lawful independent reaction[] to economic stimuli" as it is a proffered conspiracy, dismissal must follow. *Id.* at *25, 44. Contrary to ICP's current theory of why the merger occurred, the significant facts as pled by ICP are that AAS facilitated only live, physical auctions of used equipment (*see* Compl. ¶ 11), whereas the much larger IronPlanet hosted online auctions with great success (*id.* ¶¶ 56-59). The Complaint itself elucidates the independent, pro-competitive reasons AAS would desire to merge with IronPlanet in these circumstances. First, "physical auctions [like Associated Auction Services facilitated] or their online broadcasts are not a reasonable substitute for IronPlanet." (*Id.* ¶ 62.) In addition, "physical auctions are complements to" the online auctions offered by IronPlanet. (*Id.* ¶ 64.) These statements reflect the most plausible explanation, which is that AAS merged legitimately in order to achieve efficiencies from integrating the complementary physical and online auctions for used equipment. Moreover, if IronPlanet already had refused to deal with ICP eight months earlier, in April of 2014 (*see id.* ¶ 102), no Defendant would have needed AAS to merge with IronPlanet to keep IronPlanet from dealing with ICP. Accordingly, ICP's motive-based theories – which are insufficient substitutes under *Twombly* for pled facts – do not make sense in any event and are overcome by other allegations in the Complaint.

In the end, the conclusory argument in ICP's brief that Caterpillar "orchestrated" and "procured" the merger is not supported by and is inconsistent with the Complaint. The lack of

facts to undergird any of the conclusions ICP originally pled or its current argument manifests the biggest weakness in the conspiracy-to-merge claim.

### C.      ICP Has Not Pled Facts or Argued How the Merger Could Injure Competition in the Relevant Market, or Even ICP

The Answering Brief does not attempt to refute Defendants' showing that a merger of two auction companies that do not participate in the relevant market cannot injure competition in that market.  Nor does ICP explain how any harm it suffered could have been caused by a merger that occurred more than *eight months after* ICP allegedly was precluded from using IronPlanet. ICP presents no case law to contradict Defendants' positions on these points.  These logical grounds for dismissal, like those referenced above, remain persuasive and unrebutted.

To survive a Rule 12(b)(6) motion on a claim under Section 7 of the Clayton Act, ICP first needs to define properly a relevant market, *see Golden Gate Pharm. Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x. 598, 598 (9th Cir. 2011), and then provide factual support and explanation as to how the merger could harm competition in the pled market, *see Brown Shoe*, 370 U.S. at 320 (explaining Section 7 concerns "the protection of *competition,* not *competitors"* and it may "restrain mergers only to the extent that such combinations may tend to lessen competition"). Despite these requirements, ICP alleges no facts showing harm to competition.  *See* Compl. ¶¶ 105-08.)  ICP's vertical merger claim cannot proceed lacking these factual allegations. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485-89 (1977).

It would be impossible for ICP to show the merger harmed the relevant market it asserts. In the Answering Brief, ICP reiterates that the only relevant market is for new heavy construction equipment.  (*See* D.I. 36 at 49.)  Used equipment, ICP again stresses, is not part of that market.  (*Id*. at 25; *see also* Compl. ¶¶ 34-36.)  Because neither IronPlanet nor AAS participated in the new heavy construction equipment market, and their merged entity also does

not participate in that market, the merger inherently cannot violate Section 7 of the Clayton Act. The cases cited by ICP in its attempt to sidestep this compelling logic are off point. *See, e.g., Six W. Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp*, 2000 U.S. Dist. LEXIS 2604 (S.D.N.Y. Mar. 9, 2000) (unlike AAS, the defendant involved in a vertical merger actually did compete in the relevant market, which was characterized by a history of antitrust violations).

Similarly, the reasoning of the Third Circuit's decision in *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007), and the other antitrust injury cases Defendants cite,[20] remains undiminished by ICP's minimal response in footnote 16 of its Answering Brief.  ICP has not pled and cannot explain how a subsequent merger – months after IronPlanet's decision not to deal with ICP – could have been the cause of injury to ICP.  For that reason, too, the merger challenge must fail.

## **CONCLUSION**

For the foregoing reasons and those in the Opening Brief, ICP's Complaint should be dismissed.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:   */s/ David J. Baldwin*

Robert G. Abrams (*pro hac vice*)
Gregory J. Commins, Jr. (*pro hac vice*)
Danyll W. Foix (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C.  20036-5304
Tel:  (202) 861-1500
rabrams@bakerlaw.com
gcommins@bakerlaw.com
dfoix@bakerlaw.com

David J. Baldwin (Del. Bar No. 1010)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dbaldwin@potteranderson.com

*Attorneys for Defendant Caterpillar Inc.*

---

[20]  *See City of Pittsburgh v. W. Penn Power Co.,* 147 F.3d 256 (3d Cir. 1998); *Axis, S.P.A. v. Micafil, Inc.*, 870 F.2d 1105 (6th Cir. 1989).

30

OF COUNSEL:

Jeremy Heep (*pro hac vice*)
Robin P. Sumner (*pro hac vice*)
Melissa Hatch O'Donnell (*pro hac vice*)
PEPPER HAMILTON LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Telephone: 215.981.4000
Facsimile: 215.981.4750
heepj@pepperlaw.com
sumnerr@pepperlaw.com
odonnelm@pepperlaw.com

By:   /s/ James H. S. Levine
      M. Duncan Grant (Del. Bar No. 2994)
      James H. S. Levine (Del. Bar No. 5355)
      PEPPER HAMILTON LLP
      Hercules Plaza, Suite 5100
      1313 Market Street
      P.O. Box 1709
      Wilmington, DE 19899-1709
      Telephone: 302.777.6500
      Facsimile: 302.421.8390
      grantm@pepperlaw.com
      levinejh@pepperlaw.com

*Attorneys for Defendant Volvo Construction Equipment North America, LLC*

OF COUNSEL:

David H. Bamberger (*pro hac vice*)
Katherine M. Ruffing (*pro hac vice*)
James F. Reardon (*pro hac vice*)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: 202.799.4500
Facsimile: 202.799.5500
david.bamberger@dlapiper.com
katie.ruffing@dlapiper.com
james.reardon@dlapiper.com

By:   /s/ Denise S. Kraft
      Denise S. Kraft (Del. Bar No. 2778)
      Brian Biggs (Del. Bar No. 5591)
      DLA PIPER LLP (US)
      1201 North Market Street, Suite 2100
      Wilmington, DE 19801-1147
      Telephone: 302.468.5700
      Facsimile: 302.394.2341
      denise.kraft@dlapiper.com
      brian.biggs@dlapiper.com

*Attorneys for Defendant Komatsu America Corp.*

OF COUNSEL:

Quentin R. Wittrock (*pro hac vice*)
Kelly W. Hoversten (*pro hac vice*)
GRAY PLANT MOOTY
500 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: 612.632.3000
Facsimile: 612.632.4444
quentin.wittrock@gpmlaw.com
kelly.hoversten@gpmlaw.com

Dated: May 18, 2015
1190224

By:   */s/ Edward F. Eaton*
    Edward F. Eaton (Del. Bar No. 639)
    CONNOLLY GALLAGHER LLP
    The Brandywine Building
    1000 West Street
    Suite 1400
    Wilmington, DE 19801
    Telephone: 302.888.6204
    Facsimile: 302.654.1005
    meaton@connollygallagher.com

*Attorneys for Defendant Associated Auction
Services LLC d/b/a Cat Auction Services*

32