**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC, </br></br> *Plaintiff*, </br></br> v. </br></br> CATERPILLAR INC., KOMATSU AMERICA CORP., ASSOCIATED AUCTION SERVICES, LLC D/B/A CAT AUCTION SERVICES, RING POWER CORPORATION, ZIEGLER INC., AND THOMPSON TRACTOR COMPANY, INC. </br></br> *Defendants*. | Civ. No. 15-108-RGA |

**MEMORANDUM OPINION**

John W. Shaw, Esq., Andrew E. Russell, Esq., and Nathan R. Hoeschen, Esq., Shaw Keller LLP, Wilmington, DE; David Boies, Esq., Boies Schiller Flexner LLP, Armonk, NY; James P. Denvir, Esq., Amy J. Mauser, Esq., Christopher G. Renner, Esq., Michael S. Mitchell Esq., Jonathan Shaw, Esq., and William Bloom, Esq., Boies Schiller Flexner LLP, Washington, D.C. *Attorneys for Plaintiff International Construction Products LLC*.

David J. Baldwin, Esq. and Ryan C. Cicoski, Esq., Potter Anderson & Corroon LLP, Wilmington, DE; Robert G. Abrams, Esq., Gregory J. Commins, Jr., Esq., Danyll W. Foix, Esq., and Carey S. Busen, Esq., Baker & Hostetler LLP, Washington, D.C. *Attorneys for Defendant Caterpillar Inc*

Henry E. Gallagher, Jr., Esq., Connolly Gallagher LLP, Wilmington, DE; Quentin R. Wittrock, Esq. and Richard C. Landon, Esq., Gray Plant Mooty, Minneapolis, MN. *Attorneys for Associated Auction Services, LLC and Ziegler Inc.*

Denise S. Kraft, Esq. and Brian A. Biggs, Esq., DLA Piper LLP US, Wilmington, DE; David H. Bamberger, Esq., DLA Piper LLP US, Washington, D.C.; Adam I. Steene, Esq., DLA Piper LLP US, New York, NY. *Attorneys for Komatsu America Corp.*

M. Duncan Grant, Esq. and James H. S. Levine, Esq., Pepper Hamilton LLP, Wilmington, DE; Jeremy Heep, Esq., Robin P. Sumner, Esq., and Melissa Hatch O'Donnell, Esq., Pepper Hamilton LLP, Philadelphia, PA. *Attorneys for Defendant Thompson Tractor Company, Inc.*

Dominick T. Gattuso, Esq., Heyman Enerio Gattuso & Hirzel, LLP, Wilmington, DE 19801; Niels P. Murphy, Esq., Gerry A. Giurato, Esq., and Murphy & Anderson, PA, Jacksonville, FL. *Attorneys for Defendant Ring Power Corporation.*

August 10, 2020
Wilmington, DE

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before the court are motions by Defendants Caterpillar, Komatsu America Corp., and Associated Auction Services (collectively, "Defendants") to dismiss the state law claims Plaintiff International Construction Products ("ICP") asserts in its third amended complaint. (D.I. 259; D.I. 261; D.I. 265). The state law claims are for tortious interference with contract (Counts 3-4), tortious interference with prospective business relations (Counts 5-6), civil conspiracy (Counts 7-8), and aiding and abetting (Counts 9-10). (D.I. 246 ¶¶ 174-219). Defendants contend that the third amended complaint fails to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth herein, the motions to dismiss are granted in part and denied in part.

## I. BACKGROUND

Caterpillar and Komatsu (the "Manufacturer Defendants") manufacture new heavy construction equipment which is distributed and sold to end users through local equipment dealers such as Ziegler, Ring Power, and Thompson Tractor (the "Dealers").[1] (D.I. 246 ¶¶ 8-13, 22-23, 28, 46). In addition to selling new heavy construction equipment through their local dealerships, the Dealers sell used heavy construction equipment through consignment with online marketplaces, such as Defendant Associated Auction Services and non-party IronPlanet. (*Id.* at ¶¶ 10, 50).

In 2013, Plaintiff ICP contracted with Lonking Holdings Ltd., a Chinese manufacturer of new heavy construction equipment, to serve as Lonking's master distributor in the United States. (D.I. 162 at ¶ 65). ICP planned to sell the new equipment directly to end users through ICPDirect.com, an internet store that would be hosted and supported by IronPlanet. (*Id.* at ¶ 66).

---

[1] The Dealers have been dismissed from this action for lack of personal jurisdiction. (*See* D.I. 238).

1

On March 3, 2014, ICP and IronPlanet signed a services agreement, called a Hosted Site Agreement, which memorialized the plan. (*Id.* at ¶ 69). ICP publicly announced its partnership with IronPlanet the same day. (*Id.* at ¶ 74).

Associated Auction Services and IronPlanet have held merger discussions in the past. (D.I. 162 at ¶ 87). These merger discussions were renewed in February 2014, before ICP announced its partnership with IronPlanet. (*Id.* at ¶ 85). Associated Auction Services is owned in part by Caterpillar and some of its equipment dealers. (*Id.* at ¶¶ 10-13). In 2015, Associated Auction Services and IronPlanet completed the merger. (*Id.* at ¶ 10).

According to the third amended complaint, Defendants wanted to block ICP's entry as a competitor into the market for new heavy construction equipment by forcing IronPlanet to discontinue its relationship with ICP. (*Id.* at ¶¶ 97, 101). To achieve this goal, Caterpillar used two tools: the consignment of used heavy construction equipment by its equipment dealers and a potential merger between IronPlanet and Associated Auction Services.[2] According to ICP, Caterpillar's equipment dealers would withhold or consign used heavy construction equipment, as a stick or carrot respectively, to induce IronPlanet to end its business relationship with ICP. (*Id.* at ¶ 102).

## II. STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive the motion to dismiss, the complaint must contain sufficient factual matter "to state a claim to relief that is plausible on its

---

[2] The court has previously dismissed with prejudice ICP's claims that the merger was unlawful under Sherman Act § 1 and Clayton Act § 7 and denied ICP's motion to reconsider that dismissal. (D.I. 45 at 23-26, 27; D.I. 64 at 20-22). The allegations in the third amended complaint relating to the merger are now subject to a pending motion to strike. (D.I. 257).

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Twombly*, 550 U.S. at 555. In assessing the plausibility of a claim, the court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *In re Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 311 F.3d 198, 215 (3d Cir. 2002). The court's review is limited to the allegations in the complaint, exhibits attached to the complaint, documents incorporated by reference, and items subject to judicial notice. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.   DISCUSSION

The parties dispute whether the state law claims are governed by the laws of North Carolina, as some Defendants assert, or the laws of Florida or Illinois, as ICP asserts. (D.I. 260 at 5; D.I. 262 at 7 n.7; D.I. 276 at 3-7). ICP concedes, however, that, with the exception of the aiding and abetting claim, there is no conflict between the laws of North Carolina, Florida, and Illinois. (D.I. 276 at 11 n.9, 16 n.13, 17 n.15). Accordingly, the court need not decide which state's law governs, except with respect to the aiding and abetting claim. For all other claims, the court will apply the law of Florida and Illinois, as the parties have primarily done in their briefs.[3] With that understanding, each state law claim is addressed in turn.

---

[3] Associated Auction Services is the only defendant that relied exclusively on North Carolina law to attack the merits of the tortious interference and civil conspiracy claims. (D.I. 260). Although Caterpillar believes North Carolina law applies, it relied only on the laws of Florida and Illinois to argue that all of the state law claims fail. (D.I. 262 at 7 n.7). Komatsu did not state a position on the choice of law issue and relied only on the law of Florida and Illinois. (D.I. 266). Because ICP generally saw no conflict, it applied only Florida and Illinois law. (D.I. 276).

### A. TORTIOUS INTERFERENCE WITH CONTRACT

The elements for a tortious interference claim are (1) the existence of a valid contract between the plaintiff and another; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; and (4) damages. *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (Illinois); *Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998) (Florida); *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 659 S.E.2d 442, 452 (N.C. App. 2008) (North Carolina). Defendants have each attacked this claim in their own separate way, so their individual arguments are addressed in turn.

#### 1. Komatsu

Komatsu argues that there are no allegations of intentional interference. (D.I. 266 at 5-6). The third amended complaint, however, alleges that a Komatsu executive responsible for the consignment of heavy construction equipment "threatened to boycott IronPlanet if it continued to do business with ICP," and communicated that threat to IronPlanet. (D.I. 246 ¶ 110). The business relationship between IronPlanet and ICP was memorialized and governed by the Hosted Services Agreement. Thus, to stop doing business with ICP, IronPlanet would have to break the contract. Komatsu's conclusory argument does not explain why this allegation does not adequately allege interference. Accordingly, Komatsu's motion to dismiss the tortious interference with contract claim is denied.

#### 2. Caterpillar

Caterpillar relies on two elements to attack ICP's tortious interference claim: knowledge of the contract and unjustified interference. Caterpillar contends that there are no non-conclusory allegations that it knew of the existence of the contract. (D.I. 262 at 9). But the third amended

complaint alleges that the contract was publicly announced at an industry expo and "widely covered" by the trade press. (D.I. 246 at ¶ 74). It is reasonable to infer at the pleadings stage that Caterpillar had knowledge of the contract based on these widely disseminated public announcements.

Caterpillar further contends that there was no conduct alleged in the complaint that qualifies as intentional and unjustified interference, because: (i) there are no allegations of communications between Caterpillar and IronPlanet before IronPlanet terminated its contract with ICP, (ii) any communications that did occur do not "show threats on their face," and (iii) any threats made by Caterpillar that interfered with the contract are protected by a competition privilege. (D.I. 262 at 9-10; D.I. 281 at 4).

Caterpillar's first two points fail. The Third Amended complaint does in fact allege direct communications between Caterpillar and IronPlanet, and that these communications were threats directed to the business relationship between ICP and IronPlanet. Specifically, the complaint alleges, "On April 4, 2014, IronPlanet's President, Jeff Jeter, informed ICP's Chairman, Tim Frank, that Caterpillar, and at least one other manufacturer of heavy construction equipment, had earlier that day threatened to stop doing business with IronPlanet if IronPlanet continued to deal with ICP." (D.I. 246 ¶ 114). This alleged threat occurred before IronPlanet terminated its contract with ICP on April 10. (*Id.*).

This leaves Caterpillar's last argument based on the competition privilege. The privilege does not apply here. Under Illinois law, the "privilege extends to the tort of interference with a prospective business relation or economic advantage but does not apply to the tort of interference with a contractual relation." *Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d 1, 8 (Ill. App. Ct. 1995). In Florida, the privilege does apply to the tort of interference with contracts, but only when

5

"the contract is terminable at will." *Perez v. Rivero*, 534 So.2d 914, 916 (Fla. App. Ct. 1988).  It was not terminable at will here.  (D.I. 276 at 12).  For the foregoing reasons, Caterpillar's motion to dismiss the tortious interference with contract claim is denied.

### 3.  Associated Auction Services

Like Caterpillar, Associated Auction Services argues that the complaint fails to allege conduct that was "without justification." (D.I. 260 at 8). Unlike Caterpillar, however, Associated Auction Services succeeds in this argument, because the third amended complaint fails to allege any conduct by Associated Auction Services that can be properly characterized as interference. There are only two communications alleged in the complaint that are potential candidates for being characterized as threats by Associated Auction Services: a March 18 email and a March 26 draft letter.  Both communications arise in the context of merger negotiations between Associated Auction Services and IronPlanet that occurred in the spring of 2014.  (D.I. 246 ¶¶ 95, 115, 133).

The March 18 email was sent by William Hoeft, an individual who wears two hats as the chairman of both Associated Auction Services and Ziegler, to Greg Owens of IronPlanet. The March 18 email is composed of two paragraphs: (i) a first paragraph where Hoeft responds to the terms of IronPlanet's merger offer, and (ii) a second paragraph where Hoeft says, in relevant part, "On a side note, we, and Caterpillar, noted … Iron Planet's new relationship with International Construction Products," and "we are concerned…." (D.I. 246 ¶ 104; D.I. 195-1, Ex. 1). The email concludes with Hoeft's signature block containing only his title and contact information for Ziegler. (D.I. 195-1, Ex. 1).

The third amended complaint describes the second paragraph as a threat delivered "on behalf of Caterpillar and its dealers." (D.I. 246 ¶ 104). Associated Auction Services is not a Caterpillar dealer, and nowhere does the complaint characterize the email as a threat made by

6

Associated Auction Services. Indeed, in a prior motion, ICP characterized the second paragraph as a threat made by Ziegler, one of Caterpillar's dealers (*see* D.I. 200 at 15), which the court accepts for the purposes of a motion for reargument requesting transfer of all the Dealer Defendants to Florida based on the conspiracy theory of jurisdiction. For these reasons, the purported threat in the March 18 email cannot be attributed to Associated Auction Services.

The March 26 letter is from Hoeft to Owens and provides a bulleted list of the various "facts" Hoeft believes should close the gap on the parties' valuations of the two companies they seek to merge. (D.I. 195-1, Ex. 2). One of the bulleted facts states:

> While you state that our Dealer network from a diversity standpoint is a weakness, we view it as an incredible strength and one that will bring substantial opportunity to the combined entity under the [AAS] brand and through [AAS's] committed leadership. [AAS] is the global leader, and [AAS] has the ability to both leverage its global strength, or, alternatively, provide leverage against [IronPlanet] if we are to go our own separate ways.[4]

(D.I. 246 ¶ 106; D.I. 195-1, Ex. 2). Neither the quoted paragraph nor any other part of the letter contains an express or implied reference to ICP. (D.I. 195-1, Ex. 2). The letter concludes with Hoeft's signature block, which contains only his title and contact information for Associated Auction Services. (*Id.*). Finally, the letter is only a draft. (D.I. 246 ¶ 106).

To construe the March 26 letter as a threat by Associated Auction Services to interfere with the contract between ICP and IronPlanet, the court must infer that the draft letter was sent to IronPlanet, the letter was sent without changes, Hoeft intended his comments about "providing leverage against" IronPlanet to read as a threat directed to the contract between IronPlanet and ICP, and IronPlanet would understand that the language was indeed a threat trying to induce a breach of that contract. This simply requires too many inferences to be plausible. Accordingly,

---

[4] In this case, the parties and the court have referred to same company with many names: Associated Auction Services, AAS, Cat Auction Services, and CAT. For consistency, the court uses Associated Auction Services, or AAS where necessary.

the third amended complaint fails to allege any conduct by Associate Auction Services that plausibly shows interference.[5] Because ICP has not alleged an essential element of a claim for tortious interference with contract, its claim against Associated Auction Services is dismissed with prejudice. Dismissal is with prejudice, because ICP has not been able to state a claim after making three amendments and obtaining discovery. This indicates that any further amendments would be futile.

### B. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

To state a claim for tortious interference with prospective business relations, a plaintiff must plausibly allege: "(1) plaintiff's reasonable expectancy of entering into a valid business relationship; (2) defendant's knowledge of that expectancy; (3) defendant's intentional and unjustifiable interference that induced or caused a breach or termination of the expectancy; and (4) damage to plaintiff resulting from defendant's conduct." *F:A J Kikson v. Underwriters Labs., Inc.*, 492 F.3d 794, 800 (7th Cir. 2007); *Ethan Allen, Inc. v. Georgetown Manor*, 647 So. 2d 812, 814 (Fla. 1994). ICP's claims fail on the first element – a reasonable expectancy of entering into a contract.

ICP asserts that it had two prospective business relations: one with IronPlanet "in the future" and another with foreign manufacturers. (D.I. 246 ¶ 191). "As a general rule, an action for tortious interference with a [prospective] business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Ethan Allen*, 647 So.2d at 815.

---

[5] ICP asks the court to impute the acts of other defendants to Associated Auction Services in order to find that Associated Auction Services interfered with the contract. (D.I. 276 at 13). While ICP has shown that such imputation occurs in conspiracy claims, it has not shown that the same imputation is permitted under the law for a tortious interference claim.

8

The only allegations of an agreement between IronPlanet and ICP relate to the "Hosted Services Agreement" which was not prospective but actually executed. (D.I. 246 ¶ 69). This agreement had a one-year term with two automatic renewals of successive one-year terms. (*Id*.). Because the renewals were already a term of an executed contract and occurred automatically, the renewals themselves are not a reasonable expectancy but instead a part of an executed contract. So, if ICP had alleged that Defendants interfered with the renewals, ICP would be alleging tortious interference with contract, not tortious interference with a prospective business relation. There are no allegations that another agreement was in development or that ICP was likely to form another relationship with IronPlanet "in the future." Contrary to ICP's assertions, the allegations in paragraphs 70-72, and 75-77 of the complaint do not show a prospective second business relation. (D.I. 276 at 17). Those paragraphs allege that IronPlanet forecasted substantial sales from 2014 to 2016 due to its relationship with ICP. (D.I. 246 ¶¶ 70-72, 75-77). But ICP's first contract with IronPlanet, with the automatic renewals, was scheduled to run until 2017. (*Id*. at ¶ 69). Thus, the projections in those forecasts were based on the first contract, not an anticipated second contract. Ultimately, ICP cannot assume that because it made one deal with IronPlanet, it would make others. *See*, *e.g*., *Ethan Allen*, 647 So. 2d at 815 (rejecting a tortious interference claim where the relationship was based on the "mere hope" of future sales to past customers). Accordingly, the complaint fails to allege a reasonable expectancy of a second contract with IronPlanet.

The claims based on a prospective relation with the foreign manufacturers fails for the same reason. As the complaint itself admits, these foreign manufacturers did no more than "express[] interest." (D.I. 246 at ¶¶ 80-84). Speculative prospective business deals do not rise to the level of "reasonable business expectancies." *See*, *e.g*., *Israeli Aircraft Indus., Ltd. v. Sanwa Bus. Credit Corp*., 850 F. Supp. 686, 693 (N.D. Ill. 1993) (finding that a "speculative prospective

9

business deal[]" did not rise to the level of a "reasonable expectancy" where "parties were still negotiating and no firm offer had been made"); *Ethan Allen*, 647 So. 2d at 815. Because ICP has failed to allege the existence of a reasonable expectancy of entering into a valid business relationship, which is an essential element of a claim for tortious interference with a prospective business relation, counts 5 and 6 of the third amended complaint are dismissed with prejudice. Dismissal is with prejudice because any further amendments would be futile.

### C. CIVIL CONSPIRACY

To state a claim for civil conspiracy, Plaintiff must adequately allege: (i) the existence of an agreement between two or more persons; (ii) to do an unlawful act or to do a lawful act by unlawful means, (iii) an overt act to further the conspiracy, and (iv) damage to plaintiff as a result of the overt act. *See Lewis v. Lead Indus. Assoc.*, 2020 WL 2562929, at *4 (Ill. May 21, 2020); *Philip Morris USA, Inc. v. Russo*, 175 So.3d 681, 686 n.9 (Fla. 2015).

"[A] conspiracy is not an independent tort." *Indeck N. Am. Power Fund, L.P. v. Norweb PLC*, 735 N.E.2d 649, 662 (Ill. App. Ct. 2000*); Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014). "[A]n actionable conspiracy requires an actionable underlying tort or wrong." *Raimi v. Furlong*, 702 So.2d 1273, 1284 (Fla. Dist. Ct. App. 1997)); *Indeck*, 735 N.E.2d at 662. Thus, to state a claim for civil conspiracy, the complaint must, among other things, identify the underlying tort or wrong. *See Nexus Tech., Inc. v. Unlimited Power Ltd.*, 2019 WL 4941178, at *7 (W.D.N.C. Oct. 7, 2019) (dismissing civil conspiracy claim where plaintiff failed to "specifically identify an underlying tort"); *Gas Tech. Inst. v. Rehmat*, 2006 WL 3743576, at *35 (N.D. Ill. Dec. 15, 2006) ("[B]ecause 'a bare claim of conspiracy' is unenlightening, a claim of civil conspiracy does require allegations as to the parties, *the purpose*, and approximate date of the conspiracy." (emphasis added) (quoting *Loubser v. Thacker*, 440 F.3d 439, 442 (7th Cir. 2006))).

Here, the civil conspiracy counts do no more than identify dozens of paragraphs in the body of the complaint and state that those paragraphs allege an element of the civil conspiracy claim. For example, the complaint states, "As alleged in Paragraphs 96-134, the object of the agreement entered into by [defendant] was an unlawful act." (*See* D.I. 246 at ¶¶ 245-47, 266-68). This type of puzzle pleading does not satisfy the requirements of Fed. R. Civ. P. 8 that the plaintiff set forth a "short and plain" statement of its claims and make each allegation "simple, concise and direct." *See Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 2017 WL 3891676, at *3 (D. Del. 2017) (dismissing complaint under Fed. R. Civ. P. 8 because it relied on "puzzle pleading").

Because the third amended complaint does not identify the underlying tort or wrong, the civil conspiracy counts (Counts 7 and 8) are dismissed with prejudice. Dismissal is with prejudice because amendment would be futile, particularly when the court dismissed the state law claims in the previous complaint based on a failure to comply with Fed. R. Civ. P. 8(a). (*See* D.I. 238 at 21).

### D. AIDING AND ABETTING

The parties dispute whether the laws of Florida, Illinois, or North Carolina govern the claim for aiding and abetting.

ICP argues first and foremost that the court should not undertake any choice of law analysis because "discovery is far from complete." (D.I. 276 at 5). If the court does undertake a choice of law analysis, it must apply Delaware's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under those rules, the court engages in a two-step inquiry. First, the court must determine whether the laws of the competing jurisdictions actually conflict. *Pa. Emp., Benefit Trust Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466 (D. Del. 2010). Second, if an actual conflict exists, the court must apply the "most significant relationship" test from the Restatement

11

(Second) of Conflict of Laws to determine which state's laws govern. *Id*. Each of these issues are addressed in turn, starting with whether the court may appropriately undertake a choice of law analysis at this stage of the proceedings.

### 1.  Engaging in a Choice of Law Analysis on a Motion to Dismiss

ICP cites several cases where courts declined to undertake a choice of law analysis at the motion to dismiss stage because, for example, it was unknown where the plaintiffs resided or no discovery had taken place. (D.I. 275 at 3-4, citing *Zazzali v. Hirschler Fleischer, P.C*., 482 B.R. 495, 517 (D. Del. 2012) (declining to decide which state's law governed a fraud claim asserted by a trustee in a bankruptcy proceeding because "there were investors who were defrauded throughout the United States," and their locations had not yet been determined); *Arçelik A.Ş v. E. I. du Pont de Nemours & Co*., 2018 WL 1401327, at *8 (D. Del. Mar. 20, 2018) (declining to undertake a choice of law analysis at the motion to dismiss stage where "virtually no discovery has taken place")). The circumstances are different here. We know exactly where ICP resides. Discovery has taken place. Indeed, ICP has relied on this discovery to assert allegations in support of its claims. Accordingly, it is not premature to engage in a choice of law analysis that will allow the court to resolve Defendants' motions to dismiss.

### 2.  The Existence of a Conflict

Because the court finds no reason to delay a choice of law analysis, it must first determine whether the laws of Illinois, Florida, and North Carolina actually conflict. Defendants suggest that there is a conflict on the grounds that some jurisdictions recognize a cause of action for aiding and abetting whereas others do not. At least one Defendant argues that each of the jurisdictions doe not recognize a cause of action for aiding and abetting. Caterpillar makes the argument as to Illinois and Florida, while Associated Auction Services makes the argument as to North Carolina.

12

(D.I. 262 at 13-14; D.I. 260 at 10). Meanwhile, ICP argues that Illinois and Florida do recognize the claim, but does not respond to the contentions regarding North Carolina. (D.I. 276 at 20).

The United States Court of Appeals for the Seventh Circuit has stated that "there is no tort of aiding and abetting." *E. Trading Co. v. Refco, Inc.*, 229 F.3d 617, 623 (7th Cir. 2000) (describing the idea as "the dominant approach in Illinois")(citing among other cases *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 452 (7th Cir.1982)). But, as the court explained, that does not mean that one who aids and abets a tort has no liability. *E. Trading*, 229 F.3d at 623. "The distinction is between a separate tort of aiding and abetting, and aiding and abetting as a basis for imposing tort liability." *Id.* Under Illinois law, "[a]iding and abetting may provide a theory for tort liability, but does not present a separate cognizable cause of action," *Catlett v. Infinity Healthcare Mgmt. of Ill. LLC*, 2016 WL 7116589, at *6 (N.D. Ill. Dec. 7, 2016), because "[t]here is nothing to be gained by multiplying the number of torts." *E. Trading*, 229 F.3d at 623; *see also Cenco*, 686 F.2d at 453 ("The only utility of a separate tort of aiding and abetting in the commission of a tort would be to give plaintiffs' lawyers one more charge to fling at the jury in the hope that if enough charges are made the jury may accept at least one."). Thus, "an actor who aids and abets the commission of a tort is liable for the underlying tort...." *Catlett*, 2016 WL 7116589, at *6 (quoting *F.D.I.C. v. Parzygnat*, 2011 WL 3704731, at *6 (N.D. Ill. Aug. 23, 2011)). Accordingly, under Illinois law, the court should dismiss the aiding and abetting counts although ICP could still rely on the theory of aiding and abetting to assert liability for tortious interference of contract, the only common law tort remaining in the case.

In contrast, North Carolina appears not to recognize a claim for aiding and abetting tortious interference as either a standalone count or as a theory of liability. In general, the elements of "aiding and abetting" are drawn from the Restatement (Second) of Torts § 876(b). *Cent. Bank of*

13

*Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 177 (1994); *Stoller v. Johnson*, 2017 WL 1052277, at \*6 (Ill. App. Ct. Mar. 16, 2017). "However, the North Carolina Court of Appeals has indicated that § 876 should be applied restrictively." *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 820 S.E.2d 322, 328 (N.C. Ct. App. 2018). "The Restatement of Torts ... is not the law of North Carolina unless a section has specifically been adopted." *Hinson v. Jarvis*, 660 S.E.2d 604, 607 (N.C. Ct. App. 2008). North Carolina has "only adopted Section 876 in limited circumstances." *North Carolina II, LP v. Branch Banking & Trust Co.*, 2012 WL 6597764, at \*2 (N.C. Ct. App. Dec. 18, 2012). Those limited circumstances do not appear to include claims of tortious interference. *See id*. (listing the few cases where North Carolina has adopted § 876 for negligence of joint tortfeasors). Thus, under North Carolina law, the court should dismiss the aiding and abetting counts, and ICP could not rely on the theory of aiding and abetting to assert liability for tortious interference of contract.

This leaves Florida. The Florida cases cited by the parties do not directly address the issue in the same manner as the Illinois and North Carolina cases. Instead, the parties infer Florida's position from the claims asserted and the court's response. In *Lawrence v. Bank of America, N.A.*, plaintiff relied on the theory of aiding and abetting to hold defendant liable for three torts that were not standalone claims for "aiding and abetting." *See* 455 F. App'x 904, 906 (11th Cir. 2012) (identifying the three torts as common law fraud, conversion, and breach of fiduciary duty). The *Lawrence* court analyzed the claims after identifying the elements of aiding and abetting under Florida law, which track the same elements identified in § 876 of the Restatement. *Id*. This case thus suggests that Florida recognizes aiding and abetting as a theory to hold defendant liable for the underlying tort. In *ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Md.*, plaintiff asserted a standalone tort for "aiding and abetting a fraud," and the court concluded that "aiding and abetting

14

a fraud may well be a valid cause of action in Florida." 917 So.2d 368, 371 (Fla. Dist. Ct. App. 2005). Thus, at least where fraud is at issue, Florida will recognize a standalone claim for aiding and abetting. Finally, the parties have cited no cases indicating the Florida takes a restrictive approach to a standalone claim of aiding and abetting in the same manner as North Carolina. Thus, the *Fidelity* case suggests that Florida would recognize a standalone claim for aiding and abetting tortious interference.

In summary, Illinois does not recognize a standalone claim for aiding and abetting, although ICP could still rely on the theory of aiding and abetting to hold Defendants liable for the underlying tort. North Carolina does not recognize either a standalone claim for aiding and abetting or a theory of aiding and abetting to hold Defendants liable for the underlying tort. Florida appears to recognize aiding and abetting as both a theory of liability and a standalone claim. Because the laws of these states conflict, the court must proceed with the most significant relationship test.

### 3. The Most Significant Relationship Test

In Delaware, courts use the most significant relationship test from Restatement (Second) of Conflict of Laws § 145 to determine which state's law governs a tort claim. *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 828 F. Supp. 2d 720, 725 (D. Del. 2011). Under that test, the court must evaluate the relative importance of four factors: "(a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship, if any, between the parties is centered." *Id.* For tort claims, "the applicable law will usually be the

local law of the state where the injury occurred," unless some other state has a more significant relationship.[6] Restatement (Second) of Conflict of Laws § 156.

The factors identified in § 145 are to be considered in light of the principles identified in § 6 which are:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws §§ 6, 145.

Turning to the first factor under § 145, where the loss is pecuniary in nature, as it is in a tortious interference claim, the injury "will normally be felt most severely at the plaintiff's headquarters or principal place of business." *Eureka Res., LLC v. Range Resources-Appalachia, LLC*, 62 A.3d 1233, 1238 (Del. Super. Ct. 2012); *Hidrovia, S.A. v. Great Lakes Dredge & Dock Corp.*, 2002 WL 31509689, at *3 (N.D. Ill. Nov. 7, 2002) (concluding that plaintiff's injury from tortious interference was felt at its principal place of business in Argentina). ICP's principal place of business is in North Carolina. (D.I. 246 ¶ 7).

For the second factor, Defendants' conduct causing the injury presumably occurred at their respective principal places of business. *See Eureka*, 62 A.3d at 1238 (presuming for purposes of a motion to dismiss that injurious conduct occurred where defendant had its principal place of business). The principal places of business of the Defendants are Illinois and Minnesota, and the

---

[6] Caterpillar cites *TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320 (D. Del. 2014) for the proposition that the first two factors should be given the greatest weight (*see* D.I. 262 at 15), but that case is applying the most significant relationship test under § 188 of Restatement (Second) of Conflict of Laws, which governs contract claims, not tort claims. *See Terex*, 54 F. Supp. 3d at 327.

16

principal places of business of the non-defendant co-conspirators are Minnesota, Florida, and Alabama. (D.I. 246 ¶¶ 8-13). Thus, this factor does not favor any state.[7]

Likewise, the third factor – "the domicile, residence, nationality, place of incorporation and place of business of the parties" – does not favor any particular state because these considerations implicate numerous states. *Id*. at ¶¶ 7-13; *Eureka*, 62 A.3d at 1238 (considering the third factor "a wash" when it implicated several different states). Finally, the fourth factor does not point to any particular state, because there was no relationship between the parties prior to this lawsuit.

Considering all these factors together, I conclude that no state has a more significant relationship to ICP's aiding and abetting claim than North Carolina, which is the state where ICP's injury was felt.[8] *See Eureka*, 62 A.3d at 1238 (concluding that Pennsylvania had the most significant relationship to the tortious interference claim because plaintiff suffered injuries from defendant's interference at its principal place of business, which was Pennsylvania); *Xcell Energy & Coal Co., LLC v. Energy Inv. Grp., LLC*, 2014 WL 2964076, at *6 (Del. Ch. June 30, 2014) (finding that Kentucky law governed plaintiff's tortious interference claim because that was where plaintiff "was … based"); *see also Von Ribbeck v. Negroni*, 2019 WL 6894400, at *5 (N.D. Ill. Dec. 18, 2019) (finding that Illinois had most significant relationship to tortious interference claim because that is where plaintiff resided and, therefore, where injury was felt).

---

[7] ICP relies on *CAE Inc. v. Gulfstream Aerospace Corp.*, 203 F. Supp. 3d 447, 456 n.10 (D. Del. 2016) for the proposition that the location of defendant's conduct should be given the greatest weight. (D.I. 276 at 6). But the persuasiveness of any statement in that case about the most significant relationship test is undercut by the fact that there was barely any dispute to resolve: (1) the court acknowledged that there was no conflict of law between Georgia and Delaware; and (2) the parties "effectively agree[d]" that Georgia law applied. *Gulfstream*, 203 F. Supp. 3d at 456.

[8] Concluding that North Carolina law governs ICP's state law claims does not affect my rulings on any other claims because, as ICP asserts, there is no conflict between the law of North Carolina and the laws of Florida or Illinois with respect to the other claims. (*See* D.I. 276 at 11 n.9, 16 n.13, 17 n.15). Thus, the outcome for those claims would be the same regardless of which state's law was applied.

The principles identified in § 6 of the Restatement do not change my conclusion. ICP cites *Hidrovia* for the proposition that Illinois has an overriding public policy interest in regulating the conduct of in-state defendants who tortiously interfere with a contract. (D.I. 275 at 7 (citing *Hidrovia, S.A. v. Great Lakes Dredge & Dock Corp.*, 2002 WL 31509689 (N.D. Ill. Nov. 7, 2002))). *Hidrovia*, however, demonstrates the correctness of the Court's conclusion. The *Hidrovia* court recognized Illinois' public policy interest in regulating a defendant's tortious conduct, but nevertheless found that Argentina had the most significant relationship to the claim, because among other things, the plaintiff was an Argentine corporation based in Argentina and, therefore, suffered injuries in Argentina. *Hidrovia*, 2002 WL 31509689, at *2-3.

Because North Carolina governs ICP's aiding and abetting claims, and North Carolina does not recognize an aiding and abetting claim as either an independent tort or a theory of liability, Counts 9 and 10 of the complaint for aiding and abetting are dismissed with prejudice.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss for failure to state a claim pursuant to Fed. R. Civ. P 12(b)(6) are granted in part and denied in part. (D.I. 259; D.I. 261; D.I. 265). For tortious interference with contract (Counts 3 and 4), the motion to dismiss is granted for Associated Auction Services, but denied for Caterpillar and Komatsu. The claim for tortious interference with contract asserted against Associated Auction Services is dismissed with prejudice. All other state law claims—i.e., tortious interference with prospective business relations (Counts 5 and 6), civil conspiracy (Counts 7 and 8), and aiding and abetting (Counts 9 and 10)—are dismissed with prejudice. An appropriate order will be entered.