## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL CONSTRUCTION
PRODUCTS, LLC,

        Plaintiff,

    v.

CATERPILLAR INC. and KOMATSU
AMERICA CORP.,

        Defendants.

Civil Action No. 15-108-RGA

## **MEMORANDUM OPINION**

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, DE; William A. Isaacson, Amy J. Mauser, and David E. Cole, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP.

    Attorneys for Plaintiff.

David J. Baldwin, BERGER HARRIS, Wilmington, DE; Joseph A. Ostoyich, BAKER BOTTS LLP, Washington, D.C.

    Attorneys for Defendant Caterpillar, Inc.

Stephanie O'Byrne, DLA PIPER LLP, Wilmington, DE; David H. Bamberger, Paul D. Schmitt, DLA PIPER LLP, Washington, D.C.

    Attorneys for Defendant Komatsu America Corp.

September 26, 2022

*Richard G. Andrews*

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me are Caterpillar Inc. ("Caterpillar") and Komatsu America Corp. ("Komatsu")'s motions for summary judgment (D.I. 390, 394) and Caterpillar's motion to exclude the report and testimony of Dr. Jeffrey Leitzinger (D.I. 392). I held oral argument on August 18, 2022, and I have considered the parties' briefing and supplemental letters. (D.I. 391, 418, 433, 395, 416, 432, 393, 414, 436, 451, 452, 453, 454).

I. **BACKGROUND**

A. **Procedural History**

On January 29, 2015, International Construction Products LLC ("ICP") brought an action against Caterpillar, Komatsu, Volvo Construction Equipment North America LLC ("Volvo"), and Associated Auction Services LLC ("Cat Auction") for unreasonable restraint of trade under Section 1 of the Sherman Act; exclusive dealing under Section 3 of the Clayton Act; monopoly, attempted monopoly, and conspiracy to monopolize under Section 2 of the Sherman Act; unlawful merger under Section 7 of the Clayton Act and Section 1 of the Sherman Act; and state law claims for civil conspiracy, tortious interference with contract, and tortious interference with prospective business relations. (D.I. 1). On January 21, 2016, I granted Defendants' motions to dismiss all claims, dismissing the monopoly and unlawful merger claims with prejudice. (D.I. 45, 46).

ICP filed an amended complaint on February 4, 2015, bringing revised claims against the same defendants for unreasonable restraint of trade under Section 1 of the Sherman Act; exclusive dealing under Section 3 of the Clayton Act; and state law claims for civil conspiracy, tortious interference with contract, and tortious interference with prospective business relations. (D.I. 48). On August 22, 2016, I dismissed ICP's exclusive dealing claims. (D.I. 64, 65). On December 1, 2017, I granted the parties' stipulation to dismiss ICP's claims against Volvo. (D.I. 147)

2

On September 26, 2018, I granted ICP's motion for leave to file its Second Amended Complaint (D.I. 162) adding three Caterpillar equipment dealers, Ring Power Corporation ("Ring Power"), Ziegler, Inc. ("Ziegler"), and Thompson Tractor Company, Inc. ("Thompson"), as defendants. (D.I. 160, 161). On October 10, 2019, I dismissed ICP's claims against Ring Power, Ziegler, and Thompson for lack of personal jurisdiction, dismissed ICP's antitrust claims against Cat Auction with prejudice, and dismissed ICP's state law claims against Cat Auction without prejudice. (D.I. 237, 238).

On December 24, 2019, ICP filed its Third Amended Complaint, bringing claims of unreasonable restraint of trade under Section 1 of the Sherman Act against Caterpillar and Komatsu, and state law claims of aiding and abetting, civil conspiracy, tortious interference with contract, and tortious interference with prospective business relations against Caterpillar, Komatsu, and Cat Auction. (D.I. 246). On August 10, 2020, I dismissed all claims against Cat Auction, as well as the claims of aiding and abetting, civil conspiracy and tortious interference with prospective business relations against Caterpillar and Komatsu. (D.I. 292, 293). That same day, I granted ICP's motion for reargument regarding the dismissal of the three dealer defendants (D.I. 242) and transferred ICP's claims against the dealer defendants to the Northern District of Florida. (D.I. 294, 295). I simultaneously denied ICP's motion to transfer its claims against Caterpillar and Komatsu to the Northern District of Florida. (D.I. 244). *Id.*

Finally, on August 11, 2020, I granted Caterpillar's motion to strike allegations that the merger between IronPlanet and Cat Auction was unlawful from ICP's Third Amended Complaint. (D.I. 296, 297).

The only remaining claims in this case are (1) ICP's claim against Caterpillar and Komatsu for unreasonable restraint of trade under Section 1 of the Sherman Act and (2) ICP's state law claim against Caterpillar and Komatsu for tortious interference with contract.

**B. Factual Background**

In 2013-14, Caterpillar was the world's leading manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives, with 2013 sales and revenue totaling $55.7 billion. (D.I. 399-1 Ex. 4 at 1). Caterpillar, through its "Construction Industries" division, was the largest manufacturer of heavy equipment sold worldwide in 2013-14. (*Id.* at A-107; D.I. 399-1 Ex. 6 ¶ 25). In 2013, Caterpillar's Construction Industries division reported total North American sales and revenues of $7 billion. (D.I. 399-1 Ex. 4 at A-107). Komatsu was also a leading manufacturer and seller of heavy construction equipment. (*Id.* at 2; D.I. 399-1 Ex. 6 ¶ 26). In 2014, Caterpillar's and Komatsu's shares of the U.S. heavy construction equipment manufacturing market were 23% and 4%, respectively. (D.I. 399-1 Ex. 6 ¶ 25, 26).

Rather than sell directly to end-user customers, Caterpillar sold its new heavy equipment through a network of independently owned dealers. (D.I. 399-1 Ex. 4 at 7; D.I. 419-1 at 23:6-24, 25:19-21 (Levenick); D.I. 399-1 Ex. 8 at 182:3-20 (Guilford)). These dealers offered end-users equipment service support and parts. (D.I. 399-1 Ex. 6 ¶ 33). In 2014, Ring Power was one of Caterpillar's largest dealers, with its headquarters in St. Augustine, Florida, and locations in north and central Florida. (D.I. 419-19 at 33:2-6 (Fowler); D.I. 396-1 Ex. 1 ¶ 17). Thompson was a Caterpillar dealer with locations in Alabama and the Florida Panhandle. (D.I. 419-20 at -69-70).[1] Ziegler was a Caterpillar dealer with locations in Minnesota and Iowa. (D.I. 419-21).

---

[1] When the cited pagination has a "-" in front of it, the cite is referring to a Bates number.

Caterpillar sold used equipment through two of its subsidiaries, Cat Financial and Caterpillar Used Equipment Services Inc. ("CUESI"). (D.I. 399-1 Ex. 6 ¶¶ 30-32). Cat Financial's primary business was providing retail and wholesale financing for purchases of Caterpillar products, but it occasionally sold repossessed financed equipment or off-lease equipment returned from customers who did not purchase the equipment after the lease's expiration. (*Id.* ¶ 30). CUESI supported the used equipment business of Caterpillar's dealers, *e.g.*, by purchasing back unsold equipment from dealers, and it would occasionally assist Cat Financial in its sales of repossessed or off-lease equipment. (*Id.* ¶ 31; D.I. 399-1 Ex. 8 at 32:17-34:11 (Guilford)).

Cat Financial and CUESI utilized a "cascade" strategy to sell used equipment, offering it first to its dealers and then to auction houses. (D.I. 399-1 Ex. 8 at 34:4-35:6). The auction houses included Cat Auction, IronPlanet, and Ritchie Bros. Auctioneers Inc. ("Ritchie Bros."). (*Id.* at 35:4-6). Cat Financial and CUESI sold roughly $9.3 million worth of used Caterpillar equipment through Cat Auction and $6.7 million worth of used Caterpillar equipment through IronPlanet on average each year from 2013 to early 2015. (D.I. 399-1 Ex. 6 at 20).

Cat Auction was formed in 2008 by Ziegler and other Caterpillar dealers to provide an auction service for customers and dealers. (D.I. 399-1 Ex. 5 at -664; D.I. 419-8 at -009; D.I. 419-2 at 13:7-20 (Hoeft)). By 2014, Caterpillar had amassed the largest ownership stake in Cat Auction (29.8%), which included a "strike right," *i.e.*, the ability to veto any change in control of the company, and held one board seat, filled by Pablo Koziner, Caterpillar's Vice President of its Americas Distribution Services Division. (D.I. 399-2 Ex. 16 at 61:10-18 (Hoeft), Ex. 17 at 23). The remaining 70.2% of Cat Auction was owned by twenty-five Caterpillar dealers, with Ziegler holding 7.5%. (D.I. 399-1 Ex. 5 at -664; D.I. 419-10 at -793). Cat Auction operated at a loss from

5

2010-2013, and in 2013 reported $8.9 million in revenue and an EBITDA of -$2.7 million. (D.I. 399-1 Ex. 5 at -672).

IronPlanet operated an exclusively online platform for selling and auctioning used heavy construction equipment. (D.I. 419-12 at -037). In 2013, IronPlanet reported a total revenue of $58.3 million and an EBITDA of -$3.4 million. (D.I. 399-1 Ex. 5 at -707). Sales from Cat Financial and CUESI were responsible for 1.2% of IronPlanet's total revenue in 2013. (D.I. 399-2 Ex. 19 at 16). Sales from Komatsu were responsible for 0.2% of IronPlanet's total revenue in 2013, and sales from Ring Power were responsible for 0.9%. (*Id.* at 15-16). Thompson was a "small seller" for IronPlanet. (D.I. 399-1 Ex. 3 at 99:17-22 (Owens)). As of April 24, 2014, Caterpillar was IronPlanet's third-largest shareholder, at 9.45%, and Komatsu its fifth, at 7.3%. (D.I. 419-15). Ring Power also owned IronPlanet stock (0.55%), as did its then-President and CEO, Randy Ringhaver (0.09%), and then-Senior Vice President of Used Sales and of its Heavy Equipment Division, Frank Fowler (0.09%). (*Id.*).

By the end of 2013, Cat Auction had approached IronPlanet about the possibility of IronPlanet acquiring Cat Auction, and the two had begun discussions regarding a potential merger. (D.I. 419-25 at -1287-88; D.I. 419-3 at 133:11-23 (Guilford)). Caterpillar "pushed" for the potential "marriage" for multiple reasons. (D.I. 419-25 at -1287). First, Caterpillar recognized that Cat Auction was doing poorly financially and faced a choice between considering "a merger with someone" or "go[ing] out of business." (*Id.*; D.I. 419-3 at 131:15-132:23). Second, Caterpillar was concerned about competition to its dealers from Ritchie Bros., and, third, Caterpillar desired "more market intelligence into used equipment" and saw a merger with IronPlanet as an "opportunity for marketing to buyers of [Caterpillar's] used equipment." (D.I. 419-25 at -1287). In lieu of a cash purchase, Cat Auction's vision for the merger was for it to create a "true partnership" in which Cat

6

Auction would acquire an ownership stake in IronPlanet. (*Id.* at -1287-88). IronPlanet and its board viewed the potential transaction as an opportunity to obtain "exclusivity" over used Caterpillar equipment going to auction. (*Id.*).

By February of 2014, Cat Auction had engaged the firm Greene Holcomb & Fisher LLC ("GHF") to act as its financial advisor for its potential merger with IronPlanet. (D.I. 419-30). At a February 28, 2014 Cat Auction board meeting, the board resolved to have its CEO, Gary Trettel, its Chairman of the Board, Bill Hoeft (who also served as the CEO of Ziegler), its counsel, Bill Klein, and representatives from GHF, including Kent Adams, begin negotiating a Letter of Intent with IronPlanet. (*Id.*).

In October 2013, Tim Frank, ICP's CEO and founder, first contacted IronPlanet about the possibility of IronPlanet assisting ICP in implementing its vision for an "online direct sales model" of distribution for Chinese-manufactured, new heavy construction equipment in North America. (D.I. 419-24). Because ICP was a new entrant in the heavy construction equipment market and did not have an established network of equipment dealers, IronPlanet's online sales platform was "critical" to ICP's business. (D.I. 419-23 at 59:5-7 (Frank)).

### 1. Monday, March 3 – Friday, March 7

On Monday, March 3, 2014, ICP and IronPlanet signed a Hosted Store Agreement in which IronPlanet agreed to "develop, operate, and maintain" a section of its website featuring and offering ICP's new equipment for sale directly to customers. (D.I. 399-3 Ex. 28 at 1). The Hosted Store Agreement had an initial term of one year, followed by automatic renewal for up to two successive one-year terms, unless either party gave ninety days' written notice prior to the start of the new term. (*Id.* at 5). The Agreement included a "Termination for Cause" provision, which allowed either party to terminate the Agreement upon giving thirty days' written notice "if the

7

other party breaches any material provision of this Agreement and fails to cure such breach within such thirty (30) day period." (*Id.*).

The following day, March 4, 2014, ICP's store went live on IronPlanet's website and on March 5, ICP announced its partnership with IronPlanet publicly at ConExpo, a large industry trade show. (D.I. 399-3 Ex. 29; D.I. 419-39).

That Friday, March 7, 2014, IronPlanet received a "Customer Care" online chat inquiry about one of the pieces of ICP equipment listed for sale on its website from a person working at CUESI asking, "can this be imported US?" and, "do you have a list of dealers in midwest that I can have warranty work done?" (D.I. 419-49).

### 2. Monday, March 10 – Friday, March 14

On Monday, March 10, IronPlanet's head of development, Jeff Barca-Hall, informed IronPlanet's President of Sales, Jeff Jeter, of the Caterpillar Customer Care inquiry, noting, "you might be interested in the fact that there has been some 'sniffing around' by Caterpillar in response to seeing the ICP items on our site." (*Id.*).

The next day, Tuesday, March 11, Richard Longbottom, Caterpillar's Marketing Liaison for Cat Auction, sent Gary Trettel, Cat Auction's CEO, a link to an article about ICP's ConExpo launch which announced, "ICP's first partnership with a Chinese manufacturer is with Lonking," and, "The up to 40 percent price differential between [Chinese-manufactured] machines and established brands would turn most buyer's [sic] heads." (D.I. 419-45).

On Thursday, March 13, Greg Owens, IronPlanet's CEO, sent a revised offer for the IronPlanet/Cat Auction merger to Bill Hoeft, Ziegler's CEO and the Chair of Cat Auction's board. (D.I. 399-3 Ex. 24 at -83). The next day, Friday March 14, Cat Auction's Gary Trettel informed

Rick Albin, Cat Auction's Executive VP, of the offer from Owens, and Albin responded, "Thanks for the up date. Something has changed." (D.I. 419-51).

That same day, in response to the news of Owens's revised offer, Kent Adams, managing director of GHF (Cat Auctions's financial advisor), sent Gary Trettel, Bill Hoeft, and Mark Allen, a Ziegler employee and Cat Auction board member, an email noting, "I know there is a new 'overhang' with Caterpillar re: Iron Planet's business arrangement with International Construction Products that could abort any potential for a transaction," and, "It would be good to know (and to see) the proposed Caterpillar letter being drafted to go out to Dealers in regards to more support for [Cat Auction]. This is a piece of leverage for us, potentially." (D.I. 419-28 at -89). In that email, Adams also included a draft response to Owens, which stated,

> On a side note, we and Caterpillar noted the recent article in Equipment World which highlighted Iron Planet's new relationship with International Construction Products. Without more full understanding, I have a strong suspicion that such a relationship would kill any hope of a transaction between Iron Planet and Cat Auction Services from Caterpillar's perspective.

(*Id.*).

The same day, Jerome Guilford, Caterpillar's General Manager of Lifecycle Products and Services, sent an email to Caterpillar's Richard Longbottom, Pablo Koziner (VP of Americas Distribution Services Division and board member of Cat Auction), and Steve Gosselin (VP of Customer Services Support) about the ICP/IronPlanet partnership, saying,

> This will not help with our discussions with [IronPlanet], don't think we want a strategic alliance with a company that now selling new Chinese equipment into the US. This is a show stopper.
>
> This is the type of disruption we were worried about but thought it would be Ritchie Bros. with a Chinese equipment company figuring out how to compete here without investing in a strong distribution network.

(D.I. 419-50 at -36).

Gosselin responded, "Absolutely agree …. show stopper," and, "DDBA …. dead deal before arrival!" (*Id.* at -35). Longbottom responded, "I came across the article and told the 'Carbon negotiating team' [Cat Auction's internal name for the team negotiating the merger between IronPlanet and Cat Auction] our deal is dead, if what I was reading is true," although he had not yet informed IronPlanet's Greg Owens, adding, "I agree with dead deal, but what if we could ensure he cancels this arrangement and we govern and manage all future OEM arrangements…", "Should we consider or even go there, or leave it as dead deal before arrival!" (*Id.* at -34-35).

### 3. Monday, March 17 – Friday, March 21

On Monday, March 17, in response to Adams' emails regarding Owens' revised offer and the IronPlanet/ICP news, Gary Trettel emailed Adams. Trettel wrote, "Between you and I," noting he would update Richard Longbottom "verbally" who would then update Pablo Koziner, "CAT is concerned about the ICP deal more than the percentage and would like us to figure out the [IronPlanet] plan before going further but without killing the deal now." (D.I. 419-28 at -86). That same day, Koziner wrote to Adams and others at Caterpillar, "the recent announcements regarding IP's distribution of new Chinese machines has a material impact in our strategy going forward," and, "Given my responsibilities as a board member of [Cat Auction] I cannot comment further but have copied Steve Gosselin on this email who can speak with you more openly on the subject." (D.I. 419-53 at -199).

On Tuesday, March 18, Koziner wrote to Caterpillar's Edward Rapp regarding the IronPlanet/ICP news, "It would appear that the objectives by the Chinese companies to engage with [IronPlanet]: 1) reflect the challenge of establishing a distribution channel in NA; and 2) their desire to position Chinese machines/products as an attractive alternative to used," and,

"Positioning new vs. used is one way the Chinese equipment providers have tempted customers to move away from premium brands elsewhere in the world." (*Id.* at -198).

That same day, Bill Hoeft responded to Greg Owens's revised merger offer, noting,

> On a side note, we, and Caterpillar, noted the recent article in Equipment World, which highlighted Iron Planet's new relationship with International Construction Products. We would like to better understand that relationship, as we are concerned that Caterpillar and the CAT dealers would have significant concerns about any arrangement where Iron Planet is providing auction services for new equipment for a Caterpillar competitor.

(D.I. 399-3 Ex. 24 at -83).

### 4.  Monday, March 24 – Friday, March 28

On Wednesday, March 26, the financial advisor, Adams, sent Gary Trettel, Cat Auction's CEO, a draft letter for Bill Hoeft to send Greg Owens regarding the status of the IronPlanet/Cat Auction merger negotiations. (D.I. 419-54; D.I. 419-55). The draft letter emphasized that Cat Auction's proposed valuation placed "a substantial premium on [Cat Auction]" that "can be justified based on the long-term value that Caterpillar and its dealers will be bringing to the table." (D.I. 419-55 at -82). The draft letter highlighted the "incredible strength" of Caterpillar's dealer network "that will bring substantial opportunity to the combined entity under the CAT brand," noting, "CAT is the global leader, and CAT has the ability to both leverage its global strength, or, alternatively, provide leverage against IP if we are to go our separate ways." (*Id.* at -81).

That same day, at 3:20 pm, Tim Tripas, Vice President of Operations for Komatsu's captive finance company, spoke on the phone with IronPlanet's Greg Owens for 26 minutes. (D.I. 419-56 at -59). Later that day, IronPlanet's President of Sales, Jeff Jeter, emailed IronPlanet's General Counsel, "So, ICP news has generated some interest w our friends." (D.I. 419-57 at -59). Feick responded, "Weird but seems so. Greg thinks, and I see no evidence otherwise, that ICP is what spurred some renewed interest/reactiveness in finding a way to get something done." (*Id.*).

The next day, Thursday, March 27, Komatsu's Kent Van Zanten emailed Komatsu's Director of Remarketing, Lee Haak, with whom Tripas testified he "was in constant communication," a link to a listing for LonKing equipment available on IronPlanet's website. (D.I. 419-58; D.I. 419-7 at 41:19-20 (Tripas)).

### 5. Monday, March 31 – Friday, April 2

On Monday, March 31, IronPlanet's Greg Owens sent Cat Auction's Gary Trettel a revised proposal for the IronPlanet/Cat Auction merger. (D.I. 399-4 Ex. 31 at -102-04). In this proposal, Owens estimated the total volume of used equipment "from the Cat family" consigned to either Cat Auction or IronPlanet in 2013, commenting,

> We have calculated that there is sufficiently more volume than this currently being sold through auctions each year in North America alone from the Cat family, so if Cat is backing this combined entity with their volume and not sending to [Ritchie Bros.], the dealers in North America alone could produce this incremental volume.

(*Id.* at -103).

Later that day, Komatsu's Tim Tripas called Greg Owens; the call lasted less than one minute. (D.I. 429-28 at -060).

That evening, Caterpillar's Cat Auction liaison, Richard Longbottom, forwarded Owens's proposal of earlier that day to Caterpillar's Pablo Koziner, noting,

> Gary received this proposal from Greg Owens regarding ownership. Greg says if we can come to some for[m] of agreement, then the ICP initiative would go away. I am trying to get a handle on how much our dealers actually place on auctions, unfortunately it seems that nobody is keeping track of this anymore.

(D.I. 399-4 Ex. 31 at -102).

Owens did not mention ICP anywhere in his March 31 email to Gary Trettel or the accompanying written proposal. (*Id.* at -103-04).

The next day, Tuesday, April 1, Ring Power's Senior Vice President Frank Fowler sent an email with the subject line, "*Confidential: Iron Planet," to Randy Ringhaver, Ring Power's CEO, and others, announcing,

> As I reported at the board meeting, Iron Planet is offering new Chinese equipment for sale on their web site.
>
> I also have heard they are trying to sell to end users through their field salesmen. If so, not good. I spoke to Jerome [Guilford] last night and he indicated Cat is not happy with what they have seen and heard as well.
>
> Jerome also told me Peter Blake from Ritchie was trying to set up a meeting with Cat to discuss how they could possibly work together.
>
> As soon as I confirm all the rumors I will call Greg Owens to verify and find out what is going on. Probably tomorrow.

(D.I. 419-61).

The following day, Wednesday, April 2, kicked off a series of phone calls in quick succession among representatives from Caterpillar, its dealers, and IronPlanet.

At 12:14 pm, Ring Power's Frank Fowler spoke on the phone with Thompson's Used Equipment buyer, Billy Seals, for a little over two minutes. (D.I. 419-62 at -386, lines 306-07). Two hours later, at 2:18 pm, Fowler spoke with IronPlanet's Greg Owens for a little over twenty minutes. (*Id.*, line 317).

At 4:58 pm, Fowler called Caterpillar's Richard Longbottom and their phones were connected for around twenty seconds. (D.I. 419-63 at 3, lines 96-97). Starting at 6:28 pm, Fowler exchanged phone calls with Thompson's Used Equipment Manager Richard Lindley multiple times over the course of an hour, (D.I. 419-64 at -417, lines 2890, 2892, 2895), speaking with him at least once. At 7:29 pm, after Fowler and Lindley's calls, Caterpillar's Longbottom called Fowler again and the two spoke for around four minutes. (D.I. 419-62 at -386, lines 331-33).

Finally, later that night, Fowler called IronPlanet's Greg Owens, and the two spoke for ten minutes. (D.I. 419-56 at -061). Owens then immediately called IronPlanet's President of Sales, Jeff Jeter, and its General Counsel, Doug Feick. (*Id.*). Owens then called Fowler a final time. (*Id.*).

The next day, Thursday, April 3, IronPlanet's head of development, Jeff Barca-Hall sent an email to Jeter, Owens, and Feick, with the subject line "ICP items are no longer visible on IronPlanet, but can still be purchased via ICPDirect.com," informing them,

> The ICP items are no longer visible on our site. The ICP Store and its homepage banner are gone. All ICP items have been removed from users' Watch Lists.

> We are still hooked-up to process purchases from ICPDirect, but we've done everything we can to hide that fact. ICP buyers can only make a purchase from ICPDirect.com and they now go directly to our "Confirm Purchase" page when they press ICP's "Buy Now" button, never seeing an IronPlanet item page. (The first thing you see is an IronPlanet login prompt, which certainly reveals that we are still processing their sales, but can't be helped). The same thing will happen if someone with an old bookmark tries to view one of those item pages. We have also submitted a request to Google and Bing to forget they ever found any ICP-related pages on our site (but we may still show up in their searches for about 24-48 hours).

> Note that our logo and our name ("...IronPlanet, our partner site...") are still present on the product pages of ICPDirect.com.

> -JBH

(D.I. 419-65).

That evening, Barca-Hall forwarded the above email to a team of IronPlanet employees, saying, "Thank you all for the scramble these past few hours to react to this sudden decision. Nice teamwork and creative problem-solving to implement a quick, safe, and effective solution!" (*Id.*).

Doug Feick responded to Barca-Hall's email, "and much thanks to you for calm, commanding decision making. appreciate working with you and your ability to turn on a dime." (*Id.*). Barca-Hall responded, "Remember, it's called 'pivoting'. :-)". (*Id.*).

Early the next morning, Friday, April 4, IronPlanet's VP of Sales, Frank Langham, sent an email to several IronPlanet employees, including Bob Winnete, IronPlanet's territory manager for

14

Northern Alabama and Eastern Tennessee, informing them, "I've been informed that the **ICP initiative has been suspended**. This is all the information I have at this point. Stay tuned for further updates." (D.I. 419-66 (emphasis in original)). Winnette immediately forwarded Langham's email to Thompson's Richard Lindley, saying, "This is all I have so far ...stay tuned". (*Id.*). Lindley then forwarded the email to Thompson's Kenny Bishop. (*Id.*).

That same morning, Friday April 4, the day after IronPlanet removed ICP's items from its website, Jeff Jeter informed ICP's Tim Frank for the first time that IronPlanet was considering terminating its relationship with ICP. (D.I. 419-68; D.I. 419-23 at 49:24-52:8 (Frank)). Frank testified in his deposition that the substance of that phone call was as follows:

> He called and said that we have a problem, that Cat and at least one other manufacturer had called earlier in the day and were putting pressure on he and Greg to terminate their contract with us or they would stop doing business with them on the equipment side. He apologized and said we are going to discuss this today and I'll get back to you.

(D.I. 419-23 at 50:16-22).

Jeter summarized the contents of that same phone call with Frank in an 8:30 am email to Greg Owens and Doug Feick:

> Talked w Tim this am:
> - not happy, concerned, wanted to know next steps, but not an emotional conversation
> - understands pressure and said he suspects will be hard to brush off if they are serious
> - said he would talk to Wes now re alternative paths
> - said if wind down would need the 90 days I think support – did not get into details but think this could just be support on their site as now re closing transaction- not mkt facing on ours
> - said confidentially this he thinks he is going to get some of Terex construction line – not including AWP, ie Genie – asked to pls keep this quite[sic]
> - told him I would follow-up ASAP re next steps

(D.I. 419-68).

That evening, Frank followed up with Jeter, sending an email with the subject line, "Any news before I fly off in the morning?" (D.I. 419-69). Jeter responded he did not have any news, to which Frank replied,

> I am in China tomorrow thru Thursday evening Jeff, but if Cat is going to make you pull the plug on us, I would like to know as soon as possible to make other arrangements, even whe[n] traveling. Could you email me? As you can appreciate the timing isn't good.

(*Id.*).

Jeter forwarded Frank's response to IronPlanet's Greg Owens and Doug Feick, noting, "So, I assume I need to tell him definitively he needs to start making alternative plans and we will discuss how to support him in a transition. Thoughts / other positioning?" (*Id.*).

### 6. Monday, April 7 – Friday, April 11

The following Monday, April 7, IronPlanet's Bob Winnette sent an email to IronPlanet's George Massey, stating, "Update on Thompson. We need a statement from Owens, Jeter, or Langham with our status & where we are headed if anywhere with ICP," adding, "Until we have a statement Richard/Thompson is in the holding pattern with us." (D.I. 419-70 at -18). Massey forwarded Winnette's email to IronPlanet's Frank Langham, saying, "Thompson is wanting proof that the ICP deal is dead." (D.I. 419-75 at -88). Langham emailed Jeff Jeter to ask, "What's our official position/where are with ICP initiative? Need to relay to Thompson," (D.I. 419-70 at -18), adding, "We're pitching a deal with Thompson/have Proposal on their desk or I wouldn't be concerned with our 'stance'. Let me know your thoughts re: how we should respond ....appears they are looking for a statement from you, Owens or me." (D.I. 419-75 at -88). Jeter responded, "Our deal with ICP has been terminated and removed from the IronPlanet website." (D.I. 419-70 at -17).

16

Langham forwarded Jeter's email statement to Massey, who sent it to Thompson's Richard Lindley, noting, "If you don't know who Jeff Jeter is he is VP." (*Id.* at -16). Lindley responded, "Can Jeff send me a word document on Iron Planet letterhead with this statement? It will need his name and title at the end." (*Id.*). IronPlanet complied with Lindley's request the next day, Tuesday April 8, and sent Lindley a "formal termination letter ending our relationship with ICP Equipment." (*Id.* at -15).

Lindley forwarded this termination letter to his superior at Thompson, Kenny Bishop,[2] adding, "Attached is Iron Planet's letter stating their termination of an agreement with ICP. Can we proceed with our plans to sell to Iron Planet and follow through with our plans for May in Destin?" (*Id.*). Bishop replied, "yes". (*Id.*).

That same day, a few hours after IronPlanet had supplied Thompson with the "formal termination letter" regarding its relationship with ICP, IronPlanet's Jeter informed ICP's Tim Frank via email,

> Unfortunately IronPlanet will not be able to support ICP efforts going forward. I will work with the IronPlanet Team on a transition solution as you look for alternative platform solutions in addition to your Dealer search / outreach. Will give you another update tomorrow and for now the IronPlanet site remains live on the ICP site and will forward any inquiries as before.
> Speak again tomorrow.
> Jeff

(D.I. 419-79).

---

[2]    A few months later, on June 3, 2014, Bishop sent an email to Caterpillar's Stephan Downing with a link to ICP's website, http://icpdirect.com/, writing, "This Is the company that showed up on Iron Planet's website. After much uproar from Cat dealers they took it off. This marketing idea may be using technology to be disruptive." (D.I. 419-89).

A few days later, on Thursday, April 10, Frank responded to Jeter, saying, "I understand that the outside forces involved are quite powerful. That said, I'm very concerned and upset at Iron Planet's decision." (D.I. 419-81). Jeter responded, "Will call you this afternoon if ok". (*Id.*).

The following day, Friday, April 11, Jeter sent Frank a formal termination letter, accompanied by the note, "Sorry didn't reach you today – your voice mail was full. Will try again tomorrow, but wanted to go ahead and get this in your hands as soon as possible. Want to discuss how we can make transition as smooth as possible." (D.I. 399-3 Ex. 30).

The termination letter stated, "Pursuant to our conversation on April 4, 2014, the purpose of this letter is to provide written notification and confirmation of IronPlanet's termination of the Hosted Store Agreement between [IronPlanet and ICP] dated March 3, 2014." (*Id.*). The letter informed ICP IronPlanet had "removed the Hosted Store and all ICP links, marks, and branding from IronPlanet's site," and requested "that [ICP] do the same in regard to IronPlanet's marks, branding and APIs on the ICPDirect site as soon as possible." (*Id.*). The letter closed by saying, "We regret this unfortunate circumstance and will do all we can to provide an orderly transition to a new platform." (*Id.*).

At the time IronPlanet terminated its agreement with ICP, approximately one month after ICP's store went live on IronPlanet's platform, ICP had made one heavy construction equipment sale. (D.I. 399-1 Ex. 1 at 42:4-10 (Frank); D.I. 399-3 Ex. 25 at 109:7-110:5 (Barca-Hall)). The one sale was "nowhere what we were expecting." (D.I. 399-3 Ex. 25 at 110:4-5).

### 7. Monday, April 14 – Friday, April 18

The following Wednesday, April 16, IronPlanet's Jeter called ICP's Frank. Frank summarized the contents of that phone call in his deposition as follows,

> So he called and we had it scheduled, so we were sort of at the, wanted to talk to him about it. He apologized, said that this was wrong, that the pressure that they

were under was very strong. At that point I did ask who besides Caterpillar was putting the pressure on them, and he said, "You know who our investors are." And I asked again for specific names, and he just said, "you know who our investors are."

(D.I. 419-23 at 78:17-25).

Later that day, Komatsu's Tim Tripas called IronPlanet's Owens and their phones were connected for less than a minute. (D.I. 419-56 at -064). Owens later emailed Caterpillar's David Shurson, saying, "You have probably heard, meant to send you and email last week, but we discontinued our program with ICP". (D.I. 419-83). Shurson responded, "Yes, I heard. Good decision." (*Id.*).

The following morning, Thursday, April 17, Tripas called Owens and they spoke on the phone for around 16 minutes. (D.I. 419-56 at -064).

### 8. Deposition Testimony

IronPlanet's CEO, Greg Owens, testified that IronPlanet terminated its agreement with ICP because, "we were not getting traction and we had significant other opportunities and other initiatives that we were pursuing, and I go with – my job is to create shareholder value," "we weren't getting any – we weren't getting any traction with them. It was – we were putting time, effort, resources. I got senior-level people on my team tied up, and we're not – virtually not selling anything at all," "That's what I recall. We were – it's all about volume with us, and we were not producing volume." (D.I. 399-1 Ex. 3 at 139:-10, 93:4-9, 95:2-4).

In their depositions, all the Caterpillar witnesses denied communicating with Komatsu about IronPlanet, ICP, or anything else. (D.I. 399-1 Ex. 9 at 214:20-217:9 (Levenick); D.I. 399-4 Ex. 32 at 190:16-21 (Rapp); D.I. 399-4 Ex. 33 at 186:2-6, 191:8-13 (Gosselin); D.I. 399-2 Ex. 15 at 169:11-13, 211:14-17 (Longbottom); D.I. 399-1 Ex. 10 at 221:8-20 (Koziner); D.I. 399-1 Ex. 8 at 330:13-22, 334:4-8 (Guilford); D.I. 399-2 Ex. 14 at 219:21-220:3 (Adams); D.I. 399-2 Ex. 12

19

at 82:13-21, 83:24-84:3 (Shurson)). Tim Tripas, the only Komatsu fact witness to be deposed, testified he was not aware of any agreement between Komatsu and Caterpillar to threaten IronPlanet. (D.I. 399-4 Ex. 34 at 74:8-12).

In their depositions, Caterpillar's Levenick, Rapp, Gosselin, Longbottom, Koziner, Guilford, Shurson, and GHF's Adams all denied the existence of an agreement between Caterpillar and Thompson, Ring Power, or Ziegler regarding ICP. (D.I. 399-1 Ex. 9 at 214:20-215:25, 217:3-9 (Levenick); D.I. 399-4 Ex. 32 at 182:8-10, 190:16-191:5 (Rapp); D.I. 399-4 Ex. 33 at 186:10-13, 190:12-24 (Gosselin); D.I. 399-2 Ex. 15 at 169:6-10, 211:23-212:24 (Gosselin); D.I. 399-1 Ex. 10 at 221:21-25, 223:2-8 224:2-13; D.I. 399-1 Ex. 8 at 330:19-331:7, 332:3-13, 333:2-8 (Guilford); D.I. 399-2 Ex. 12 at 82:22-83:6 (Shurson);  D.I. 399-2 Ex. 14 at 220:4-7, 221:8-16 (Adams)).

In their depositions, Ring Power's Randy Ringhaver and Frank Fowler denied the existence of an agreement between Ring Power and Caterpillar regarding ICP. (D.I. 399-4 Ex. 35 at 198:20-199:5 (Ringhaver); D.I. 399-4 Ex. 36 at 144:6-12, 152:9-15, 152:21-153:8 (Fowler)).

In their depositions, Thompson's Michael Rooney, Richard Lindley, and Kenny Bishop denied the existence of an agreement between Thompson and Caterpillar regarding ICP. (D.I. 399-4 Ex. 37 at 204:4-205:18, 206:3-4 (Rooney); D.I. 399-4 Ex. 38 at 143:17-24, 144:14-17 (Lindley); D.I. 399-4 Ex. 39 at 85:18-86:2 (Bishop)).

Bill Hoeft, Ziegler's president and CEO and Cat Auction's chairman of the board, denied discussing ICP with anyone from Caterpillar. (D.I. 399-2 Ex. 16 at 42:18-21, 45:19-25).

GHF's Kent Adams testified he did not remember ever discussing ICP with Caterpillar's Richard Longbottom and was not aware of any agreement between Caterpillar and anyone to withhold used equipment from IronPlanet. (D.I. 399-4 Ex. 40 at 61:6-9, 85:22-86:4).

Finally, IronPlanet's Greg Owens, Jeff Jeter, Frank Langham, George Massey, and Bob Winnette testified they were not aware of an agreement among Caterpillar and its dealers to withhold used equipment from IronPlanet. (D.I. 399-1 Ex. 3 at 141:6-17 (Owens); D.I. 399-2 Ex. 18 at 232:6-17 (Jeter); D.I. 399-5 Ex. 41 at 164:8-20, 170:11-24 (Langham); D.I. 399-2 Ex. 20 at 107:8-21); D.I. 399-5 Ex. 42 at 128:5-19 (Winnette)).

## II.    LEGAL STANDARD

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the

absence . . . of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 461.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

The Supreme Court has instructed, "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464, 473 (1962).

"[I]f the opponent has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

**B. Section 1 of the Sherman Antitrust Act**

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Despite its broad language, Section 1 only prohibits contracts, combinations, or conspiracies that *unreasonably* restrain trade." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004).

22

Thus, to prevail on a Section 1 claim, a plaintiff must prove two elements: (1) "that the defendant was a party to a 'contract, combination ... or conspiracy,'" and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008).

## III.   DISCUSSION

### A. Collateral Estoppel

Defendants argue that the Northern District of Florida District Court's opinion, *Int'l Constr. Prods. v. Ring Power Corp.,* 2021 WL 6755717 (N.D. Fla. Dec. 23, 2021), granting summary judgment to the dealers, Ring Power, Thompson, and Ziegler, precludes me from considering various issues in this case, including whether Defendants conspired with the dealers and whether certain evidence should be excluded as hearsay. (D.I. 433 at 5-7; D.I. 432 at 1, 3).

Collateral estoppel[3] prevents parties from relitigating an issue that has already been litigated, where "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *Peloro v. United States*, 488 F.3d 163, 174-75 (3d Cir. 2007) (cleaned up).

---

[3]   Traditionally, collateral estoppel also required "mutuality," that is, that the parties in the prior action be the same as the parties in the action in which estoppel is being asserted. *Peloro v. U.S.*, 488 F.3d 163, 175 (3d Cir. 2007). The doctrine has since shifted to allow "non-mutual" preclusion, where "a litigant may also be estopped from advancing a position that he or she has presented and lost in a prior proceeding against a different adversary." *Id.*

Non-mutual collateral estoppel can be asserted either offensively, that is, by a plaintiff, or defensively, as it is here, by a defendant. For defensive collateral estoppel to apply, "the party to be precluded must have had a 'full and fair' opportunity to litigate the issue in the first action." *Id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 328, 332 (1979) and *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 331, 333 (1971)).

Here, I do not think I am collaterally estopped from reaching my own independent conclusions, because the issues before me now are different than the ones decided by the Florida Court. The theory of ICP's case against Caterpillar and Komatsu in this action is not the same as the theory of its case against Ring Power, Thompson, and Ziegler in that action. In its opinion granting summary judgment, the Florida Court defined the "fairly simple question" before it as, "Did [Ring Power, Thompson, and Ziegler] conspire to keep Plaintiff out of the heavy construction equipment sales market in North America by threatening to withhold their used equipment from the online auction site that Plaintiff had contracted with to sell its new equipment?" *Int'l Constr. Prods.*, 2021 WL 6755717, at *1.

Here, the questions are different. The issues before me now are (1) whether Caterpillar and/or Komatsu conspired to remove ICP as a competitor in the new heavy construction equipment market by participating in a coordinated pressure campaign against IronPlanet to compel it to terminate its relationship with ICP, and (2) whether IronPlanet terminated its relationship with ICP in response to that pressure, thereby joining the conspiracy. The Florida Court's finding that there was insufficient evidence to show that the dealers agreed to threaten to withhold equipment from IronPlanet does not preclude a finding that Caterpillar and/or Komatsu conspired with some or all of the dealers to pressure IronPlanet in various ways, including but not limited to threatening to withhold business from IronPlanet until it agreed to terminate its partnership with ICP.

Moreover, the Florida Court's determination regarding the admissibility of hearsay evidence was premised on its finding that IronPlanet was not a coconspirator with the dealers in that alleged conspiracy. *Id.* at *4 n.6. That conclusion does not preclude a finding that IronPlanet may have been a coconspirator with Caterpillar and/or Komatsu and/or the dealers in the conspiracy at issue here.

## B. Antitrust Claim

To survive summary judgment on its Sherman Act Section 1 claim, ICP must show there is genuine dispute of material fact as to (1) whether Defendants were party to a conspiracy, and (2) whether that conspiracy imposed an unreasonable restraint on trade. *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008). I will consider each element in turn.

### 1. Concerted Action

"The existence of an agreement is the very essence of a section 1 claim." *In re Flat Glass*, 385 F.3d at 356 (cleaned up). "Unilateral activity, no matter what its motivation, cannot give rise to a § 1 violation, [] because a manufacturer 'has the right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.'" *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 465 (3d Cir. 1998) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 761 (1984)). Accordingly, courts have construed the first element of a Section 1 claim to require "some form of concerted action," defined as, "a unity of purpose or a common design and understanding or a meeting of the minds ora conscious commitment to a common scheme." *In re Flat Glass*, 385 F.3d at 357 (cleaned up).

A plaintiff can prove the existence of concerted action through direct or circumstantial evidence. "Direct evidence is explicit and requires no inferences to establish the proposition or conclusion being asserted." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (cleaned up). "While direct evidence, the proverbial 'smoking-gun,' is generally the most compelling means by which a plaintiff can make out his or her claim," in recognition of the difficulty antitrust plaintiffs often face in obtaining direct evidence, "plaintiffs have been permitted

to rely solely on circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy." *Rossi*, 156 F.3d at 465.

While the traditional summary judgment standard generally applies in antitrust actions, when a plaintiff relies solely on circumstantial evidence to prove concerted action, "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case." *In re Flat Glass*, 385 F.3d at 357 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 576, 588 (1986)). "This higher threshold is imposed in antitrust cases to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *In re Flat Glass*, 385 F.3d at 357.

Therefore, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *InterVest*, 340 F.3d at 160 (quoting *Matsushita*, 475 U.S. at 588)). *Matsushita*, however,

> does not mean that antitrust defendants are entitled to summary judgment merely by showing that there is a plausible explanation for their conduct; rather the focus must remain on the evidence proffered by the plaintiff and whether that evidence tends to exclude the possibility that the defendants were acting independently.

*Rossi*, 156 F.3d at 467 (cleaned up).

"Thus, where the nonmoving party has put forth evidence that provides an inference of concerted action, the moving party bears the burden of proving that drawing the inference of unlawful behavior is unreasonable." *Id.* (cleaned up). "While ambiguous conduct cannot create a triable issue of fact, when the alleged conduct is facially anticompetitive and exactly the harm the antitrust laws aim to prevent, no special care need be taken in assigning inferences to circumstantial evidence." *Id.* (cleaned up).

The Third Circuit has explained, "the acceptable inferences which can be drawn from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the dangers associated with such inferences." *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998

F.2d 1224, 1232 (3d Cir. 1993). That is, in a situation where (1) a plaintiff's "theory of conspiracy is not implausible," but rather makes "perfect economic sense," and (2) "the challenged activities [cannot] reasonably be perceived as procompetitive," "more liberal inferences from the evidence should be permitted than in *Matsushita* because the attendant dangers from drawing inferences recognized in *Matsushita* are not present." *In re Flat Glass*, 385 F.3d at 358 (cleaned up).

Nevertheless, "the mere facts that a plaintiff alleges a plausible conspiracy and that that allegation does not threaten to chill procompetitive behavior do not mean that there are no restrictions on the inferences that can be drawn from the evidence it puts forward." *Petruzzi's*, 998 F.2d at 1232. "[A] plaintiff cannot withstand a summary judgment motion by establishing only consciously parallel behavior on the part of the defendants." *Id.* "Instead, in a conscious parallelism case, a plaintiff also must demonstrate the existence of certain 'plus' factors, for only when these additional factors are present does the evidence tend to exclude the possibility that the defendants acted independently." *Id.* These "plus factors" can include: (1) "evidence implying a traditional conspiracy," *e.g.*, evidence "relating to the defendants' opportunity to conspire and the solicitation of others to partake in common action," (2) evidence that "defendants had a motive to conspire," and (3) evidence that defendants "acted contrary to their self-interest." *Id.* at 1244 & n.17.

"[A]t the summary judgment stage, a court is not to weigh the evidence or make credibility determinations." *Petruzzi's*, 998 F.2d at 1230. "[A] court should not tightly compartmentalize the evidence put forward by the nonmovant, but instead should analyze it as a whole to see if together it supports an inference of concerted action." *Id.*

ICP argues that Defendants conspired to remove ICP as a competitor in the market for selling new heavy construction equipment. ICP claims this conspiracy unfolded in two stages. First, upon learning that IronPlanet had contracted with ICP to sell Chinese-manufactured new

heavy construction equipment on its website, Defendants conspired to pressure IronPlanet to terminate its arrangement with ICP. Second, IronPlanet joined the conspiracy when, in response to the coordinated pressure, it terminated its agreement with ICP and removed the new equipment from its site.

To survive Defendants' motions for summary judgment, ICP must present direct or circumstantial evidence that tends to "exclude the possibility" that Defendants acted independently. This means that for each defendant, ICP must present evidence showing (1) that the defendant pressured IronPlanet to terminate its agreement with ICP, and (2) that the application of that pressure was part of a conscious agreement with at least one other actor to restrain trade, and/or that the pressure resulted in a conscious agreement with at least one other actor to restrain trade.

### a.  Komatsu

ICP cites the following evidence to support its claim that Komatsu pressured IronPlanet to terminate its relationship with ICP:

- At 3:20 pm on March 26, 2014, Komatsu's Tim Tripas spoke on the phone with IronPlanet's Greg Owens for 26 minutes. (D.I. 429-28 at -59).

- At 10:25 pm on March 26, 2014, Kent Van Zanten, a member of Komatsu's Remarketing team, sent an email to other Komatsu employees with a link to IronPlanet's website and the subject, "one way to sell products in North America…" (D.I. 429-27). Tim Tripas was not copied on this email.

- The next day, on March 27, 2014, Komatsu's Van Zanten emailed Komatsu's Director of Remarketing, Lee Haak, a link to LonKing equipment posted on IronPlanet's website, with the subject, "SEE IF THIS COMES THROUGH." (D.I. 429-32). Tripas was not copied on

28

this email either, although Tripas testified he "was in constant communication" with Haak in 2014. (D.I. 429-52 at 41:19-20).

- On March 31, 2014, Tripas called Owens; the call lasted less than one minute. (D.I. 429-28 at -60).

- ICP's Tim Frank testified in his deposition that on April 4, 2014, IronPlanet's Jeff Jeter "called and said that we have a problem, that Cat and at least one other manufacturer had called earlier in the day and were putting pressure on he and Greg to terminate their contract with us or they would stop doing business with them on the equipment side." (D.I. 429-57 at 50:11-22).

- Frank also testified in his deposition that on April 16, 2014, IronPlanet's Jeff Jeter called him again regarding IronPlanet's termination of ICP and IronPlanet's Hosted Store Agreement. Frank testified that Jeter "apologized, said that this was wrong, that the pressure that they were under was very strong," and that, in response to Frank asking "who besides Caterpillar was putting the pressure on them," Jeter responded, "You know who our investors are." (*Id.* at 78:17-25).

- In April 2014, the only heavy construction equipment manufacturer investors in IronPlanet were Caterpillar (9.45%), Komatsu (7.27%), and Volvo (3.63%). (D.I. 429-44).

- On April 16, 2014, Komatsu's Tripas called IronPlanet's Owens and their phones were connected for less than a minute. (D.I. 429-28 at -64).

- On the morning of April 17, 2014, Owens and Tripas spoke on the phone for approximately sixteen minutes. (*Id.*).

This evidentiary record is insufficient to reasonably support an inference that anyone from Komatsu pressured IronPlanet to terminate its relationship with ICP. There is no evidence

regarding the substance of Tripas's phone conversations with Owens. There is no direct evidence that anyone from Komatsu other than Tripas had any communication with anyone from IronPlanet during the relevant time period. There is no evidence that Tripas was even aware of IronPlanet's agreement with ICP at the time of those conversations.[4] Moreover, Tripas testified that in 2014, he normally communicated with IronPlanet's Greg Owens "one to five times a month," due to his role as an observer for the IronPlanet board from 2007 to 2015. (D.I. 397-21 at 14:13-15:16, 48:9-49:7).

"Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 149 (3d Cir. 2003) (cleaned up). Here, in light of the uncontroverted evidence regarding the nature of the business relationship between Tripas and IronPlanet, the phone calls between Tripas and Owens are insufficient on their own to support any inference that Komatsu pressured IronPlanet.

The only other evidence ICP cites to support the inference that Komatsu pressured IronPlanet is Tim Frank's testimony that IronPlanet's Jeter told him over the phone that IronPlanet had been pressured by both Caterpillar and another manufacturer/investor in IronPlanet. Even assuming these statements would be admissible against Komatsu,[5] they are far too ambiguous to

---

[4]     Tripas testified that he had not heard of ICP until Komatsu was "notified about a potential lawsuit," from ICP, well after the relevant 2014 time period. (D.I. 397-21 at 38:17-39:8).

[5]     Because there is no evidence outside of Jeter's statements showing an agreement existed between Komatsu and IronPlanet, the coconspirator exclusion from hearsay, Fed. R. Evid. 801(d)(2)(E), would not apply to Jeter's statements in ICP's case against Komatsu. *United States v. Ammar*, 714 F.2d 238, 245 (3d Cir. 1983) (for a coconspirator statement to be admitted under Rule 802(d)(2)(E) "there must be independent evidence establishing the existence of the conspiracy and connecting the declarant and defendant to it"). After *Ammar*, the Rule was amended in 1997: "The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it." In other words, if there is not some other evidence that Komatsu

create a triable issue of fact in ICP's case against Komatsu. *Rossi*, 156 F.3d at 467. Indeed, Frank himself assumed the "other" manufacturer/investor to whom Jeter was referring was Volvo, not Komatsu. (D.I. 397-25 at -4527 (Tim Frank writing in a July 4, 2014 email, "We launched at ConExpo successfully, and 2 weeks later, Cat and Volvo forced Iron Planet to terminate their contract with us.")).

Because no factfinder could reasonably infer from the evidence in the record that Komatsu pressured IronPlanet to terminate its relationship with ICP,[6] Komatsu's motion for summary judgment on ICP's antitrust claim is GRANTED.

### b.   Caterpillar

There is, on the other hand, sufficient evidence from which a factfinder could infer that Caterpillar conspired with at least Thompson, Ring Power, and IronPlanet to remove ICP as a competitor in the new heavy construction equipment market. ICP has cited a combination of direct and circumstantial evidence showing (1) that Caterpillar, Thompson, Ring Power, and IronPlanet each took parallel actions in furtherance of the goal of removing ICP as a competitor, and (2) that the evidence tends to exclude the possibility that these actions were taken independently.

### i.   Conscious Parallelism

To demonstrate conscious parallelism, ICP need not show that Caterpillar, Ring Power, Thompson, and IronPlanet took identical actions. *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 442 (E.D. Pa. 2018) ("the Third Circuit has found that a showing of parallel pricing requires only evidence that defendants 'acted similarly,' and not evidence that they charged

---

was a conspirator, it does not matter what Jeter said. I need not decide here whether the other hearsay exceptions ICP raises apply. (*See* D.I. 416 at 11-12).

[6]     There is also no evidentiary record to support any communications between anyone at Komatsu and Caterpillar or its dealers.

the same prices or engaged in identical conduct.") (quoting *Petruzzi's*, 998 F.2d at 1243). Rather, conscious parallelism can be established by showing that all alleged co-conspirators took actions "around the same time in response to similar market conditions," *i.e.*, here, in response to ICP's entrance as a price-cutting competitor in the market for new heavy equipment. *In re Generic Pharms.*, 338 F. Supp. 3d at 441 n.209 (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015)).

Therefore, evidence (1) that Caterpillar, Ring Power, and Thompson each pressured IronPlanet to terminate its relationship with ICP around the same time, and (2) that IronPlanet did terminate its relationship with ICP around that same time, is sufficient to make a showing of conscious parallelism by Caterpillar, Ring Power, Thompson, and IronPlanet.

For the following reasons, I find that ICP has met its burden of establishing consciously parallel action by Caterpillar, Ring Power, Thompson, and IronPlanet.

Caterpillar

There is both direct and circumstantial evidence showing that Caterpillar pressured IronPlanet to terminate its relationship with ICP.

First, there is evidence showing that Caterpillar, using its position as a controlling shareholder in Cat Auction with veto rights over any potential change in ownership, predicated the continuation of merger negotiations between Cat Auction and IronPlanet on IronPlanet terminating its relationship with ICP. Upon learning about IronPlanet and ICP's arrangement, Kent Adams, managing direct of the bank representing Cat Auction in its merger negotiations, wrote in a draft letter to IronPlanet's Greg Owens, "Without a more full understanding, I have a strong suspicion that [Iron Planet's new relationship with ICP] would kill any hope of a transaction between Iron Planet and Cat Auction Services *from Caterpillar's perspective*." (D.I. 419-28 at -89 (emphasis

added)). Caterpillar executive Richard Longbottom referred to the deal internally as "a show stopper," and Caterpillar executive Steve Gosselin agreed, but also expressly noted, "I agree with dead deal, but what if we could ensure he cancels this arrangement and we govern and manage all future OEM arrangements..." (D.I. 419-50 at -34-36).

Bill Hoeft, chairman of the Cat Auction board, alluded to Caterpillar's intention to condition the Cat Auction/IronPlanet merger on the termination of IronPlanet's relationship with ICP when he informed Owens in an email, "We would like to better understand [IronPlanet's new relationship with ICP], as we are concerned that Caterpillar and the CAT dealers would have significant concerns about any arrangement where Iron Planet is providing auction services for new equipment for a Caterpillar competitor." (D.I. 399-24 at -83). Moreover, Caterpillar's Pablo Koziner's statement in an internal email to Caterpillar's Richard Longbottom, "Greg [Owens] says if we can come to some for[m] of agreement, then the ICP initiative would go away," demonstrates both (1) that Owens understood Caterpillar's *quid pro quo* position regarding the IronPlanet/Cat Auction merger and IronPlanet's relationship with ICP, and (2) that Caterpillar and IronPlanet discussed the ICP issue outside of the documented email/written correspondence between them that is in the record.

Second, there is direct evidence showing that IronPlanet's Jeff Jeter told Tim Frank in a contemporaneous phone conversation that IronPlanet was terminating its relationship with ICP in response to pressure from Caterpillar and others.

In his deposition, Frank testified[7] that when Jeter first called to inform him IronPlanet intended to terminate its partnership with ICP, Jeter expressly told him, "Cat and at least one other

---

[7]     Caterpillar argues Frank's testimony regarding what Jeter told him over the phone is inadmissible hearsay. I disagree. Under Fed. R. Evid. 801(d)(2)(E), Frank's testimony would not qualify as hearsay, because IronPlanet became a coconspirator (within the meaning of the Rule)

manufacturer had called earlier in the day and were putting pressure on he and Greg to terminate their contract with us or they would stop doing business with them on the equipment side." (D.I. 419-23 at 50:16-22). Jeter's contemporaneous notes regarding that same conversation corroborate Frank's testimony: "Talked w Tim this am: . . . understands pressure and said he suspects will be hard to brush off if they are serious." (D.I. 419-68).

That evening, Frank followed up with Jeter about their phone conversation, saying, "if Cat is going to make you pull the plug on us, I would like to know as soon as possible to make other arrangements." (D.I. 419-69). When Jeter forwarded this email from Frank to IronPlanet's Greg Owens and Doug Feick, he did not refute (or even acknowledge) Frank's statement about Caterpillar, instead simply stating, "So, I assume I need to tell him definitively he needs to start making alternative plans and we will discuss how to support him in a transition. Thoughts / other positioning?" (*Id.*).

A few weeks later, Frank testified that Jeter called him again to discuss the termination of IronPlanet and ICP's relationship, at which time Jeter "apologized, said that this was wrong, that the pressure that they were under was very strong." (D.I. 419-23 at 78:17-25). Frank testified that he asked Jeter, "who besides Caterpillar was putting the pressure on them," and that, rather than refute that Caterpillar had been responsible for pressuring IronPlanet, Jeter responded, "you know who our investors are," and then, upon being asked again, repeated, "you know who our investors are." (*Id.*).

Caterpillar argues that, as a Cat Auction shareholder, with a "strike right," it had the right to unilaterally veto Cat Auction's merger with IronPlanet, and therefore any pressure it put on

---

with Caterpillar at the time it removed ICP's hosted store from its website. The record shows this happened the day before Frank and Jeter's phone conversation. (D.I. 419-65).

IronPlanet to that effect cannot be considered the basis of an antitrust violation. The law is clear, however, that perfectly legal actions can form the basis of an unlawful antitrust conspiracy claim where, as here, there is evidence showing that the defendant took those lawful actions "to effectuate the conspiracy which the statute forbids." *American Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). "It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts." *Id.*

Ring Power and Thompson

There is evidence sufficient to support an inference that Ring Power and Thompson pressured IronPlanet to terminate its relationship with ICP.

On Tuesday, April 1, Ring Power's Frank Fowler sent an email to other Ring Power executives about IronPlanet "offering new Chinese equipment for sale on their web site," commenting on the news, "If so, not good." (D.I. 419-61). Fowler wrote that he "spoke to Jerome [Guilford] last night and he indicated Cat is not happy with what they have seen and heard as well," and that Guilford had told him Ritchie Bros. had reached out to Caterpillar "trying to set up a meeting with Cat to discuss how they could possibly work together." (*Id.*). Fowler then stated he intended to call IronPlanet's Greg Owens the next day "to verify and find out what is going on." (*Id.*).

The next day, April 2, Fowler contacted or spoke with the following people on the phone, in chronological order, over the course of a single day: (1) Thompson's used equipment buyer, Billy Seals, (2) IronPlanet's Greg Owens, (3) Caterpillar's Richard Longbottom, (4) Thompson's used equipment manager, Richard Lindley, (5) Caterpillar's Longbottom, (6) IronPlanet's Owens.

The very next day, April 3, IronPlanet suddenly, and without informing ICP, removed all traces of ICP from its website. IronPlanet's head of development, Jeff Barca-Hall, informed IronPlanet's Jeter, Owens, and Feick in an email:

> The ICP items are no longer visible on our site. The ICP Store and its homepage banner are gone. All ICP items have been removed from users' Watch Lists.
>
> We are still hooked-up to process purchases from ICPDirect, but we've done everything we can to hide that fact. ICP buyers can only make a purchase from ICPDirect.com and they now go directly to our "Confirm Purchase" page when they press ICP's "Buy Now" button, never seeing an IronPlanet item page. (The first thing you see is an IronPlanet login prompt, which certainly reveals that we are still processing their sales, but can't be helped). The same thing will happen if someone with an old bookmark tries to view one of those item pages. We have also submitted a request to Google and Bing to forget they ever found any ICP-related pages on our site (but we may still show up in their searches for about 24-48 hours).
>
> Note that our logo and our name ("...IronPlanet, our partner site...") are still present on the product pages of ICPDirect.com.
>
> -JBH

(D.I. 419-65).

The following week, a sales representative from Thompson expressly informed a sales representative from IronPlanet that it could not move forward with ongoing negotiations over an equipment sale until it had received written confirmation from IronPlanet's Vice President of Sales, Jeff Jeter, on formal IronPlanet letterhead, that IronPlanet had terminated its relationship with ICP. (D.I. 419-70).

Finally, on June 3, 2014, a few months after IronPlanet removed ICP from its website, Kenny Bishop, the same Thompson executive who gave the final approval for Thompson to resume business with IronPlanet upon receiving proof of termination of IronPlanet's relationship with ICP, alluded to the role Caterpillar dealers had played in pressuring IronPlanet in an email to Caterpillar's Stephan Downing. Bishop sent Downing a link to ICP's website, noting, "This Is the

company that showed up on Iron Planet's website. After much uproar from Cat dealers they took it off." (D.I. 419-89).

A factfinder could reasonably infer from this combination of evidence that both Ring Power and Thompson pressured IronPlanet to terminate its agreement with ICP.

IronPlanet

Finally, it is undisputed that IronPlanet abruptly terminated its Hosted Store Agreement with ICP prior to the expiration of its term, without invoking the "for cause termination" provision of the Agreement.

### ii.  Plus Factors

A showing that Caterpillar, Ring Power, Thompson, and IronPlanet engaged in consciously parallel behavior is insufficient to establish concerted action. "Instead, in a conscious parallelism case, a plaintiff also must demonstrate the existence of certain 'plus' factors, for only when these additional factors are present does the evidence tend to exclude the possibility that the defendants acted independently." *Petruzzi's*, 998 F.2d at 1232. Courts traditionally cite three plus factors as pertinent to the independent action inquiry: (1) "evidence implying a traditional conspiracy," *e.g.*, evidence relating to the coconspirators' "opportunity to conspire and the solicitation of others to partake in common action"; (2) evidence that the coconspirators had a motive to conspire; and (3) evidence that the coconspirators acted contrary to their individual self-interest. *Id.* at 1244 & n.17.

For the following reasons, I find that ICP has met its burden of showing that multiple plus factors are satisfied with respect to each coconspirator and, therefore, the evidence tends to exclude the possibility (1) that Caterpillar, Ring Planet, and Thompson acted independently in pressuring IronPlanet, and (2) that IronPlanet acted independently in terminating its relationship with ICP.

Traditional Conspiracy

There is evidence showing that Caterpillar, Ring Power, Thompson, and IronPlanet had an opportunity to conspire. The record shows that, one day after raising concerns internally to other Ring Power executives about IronPlanet and ICP's arrangement, Frank Fowler, Ring Power's Senior Vice President, contacted or spoke on the phone with the following people over the course of a single day: Thompson's used equipment buyer, Billy Seals; IronPlanet's Greg Owens; Caterpillar's Richard Longbottom; Thompson's used equipment manager, Richard Lindley; Caterpillar's Richard Longbottom, again; IronPlanet's Greg Owens, again; and finally, Greg Owens, a final time, immediately following Greg Owens's phone conversation with IronPlanet's President of Sales, Jeff Jeter, and General Counsel, Doug Feick.

Standing alone, this series of phone calls is evidence that the conspirators had an opportunity to conspire. The probative value of the calls as circumstantial evidence of an agreement – or rather, two successive agreements – only increases when considered in context. The fact that IronPlanet abruptly removed ICP from its website the very next day reinforces the inference that the purpose of the phone calls among Ring Power, Thompson, and Caterpillar was to coordinate a pressure campaign against IronPlanet.

The timing of the phone calls relative to IronPlanet's decision also strongly supports an inference that IronPlanet capitulated to that pressure and agreed to terminate its relationship with ICP, thereby joining the conspiracy to remove ICP as a seller of new heavy construction equipment. Indeed, there is extensive evidence not only supporting the inference that IronPlanet's decision to terminate its agreement with ICP was the direct result of pressure from Caterpillar and its dealers, but also that the explanation IronPlanet gave later for its decision was pretextual. *See Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358 (3d Cir. 1992) (holding inference of concerted action sufficient to survive summary judgment on Sherman Act § 1

concerted refusal to deal claim was supported by evidence showing BMW NA's decision not to grant plaintiff a dealership franchise was the result of complaints from BMW dealers and BMW NA's explanations for the denial were pretextual).

In addition to Tim Frank's testimony that IronPlanet's Jeff Jeter told him on two separate occasions that IronPlanet's decision to terminate its relationship with ICP was made in response to "pressure" from Caterpillar and others, there is also substantial circumstantial evidence corroborating that testimony. The abruptness and timing of IronPlanet's decision coming one day after a flurry of phone calls among the coconspirators, the lack of evidence of any forewarning to ICP, the fact that IronPlanet did not inform ICP of its decision until after it had already removed ICP's store from its site, and the remarkably rushed, comprehensive measures IronPlanet took to ensure all traces of ICP had been removed from IronPlanet's website all support an inference that IronPlanet terminated its agreement with ICP as a direct result of pressure from Caterpillar and the dealers.

IronPlanet claims that its decision to terminate its agreement with ICP after just one month, despite the Agreement's one-year term, was due to ICP's disappointing sales. There is not, however, any contemporaneous evidence in the record indicating that was IronPlanet's position at the time of the termination. There is no record of anyone from IronPlanet communicating any concerns about disappointing sales either internally or to ICP in March or April 2014. A factfinder could reasonably conclude from this lack of contemporaneous evidence supporting IronPlanet's poor sales explanation, combined with the abundance of contemporaneous evidence showing the decision was made in response to pressure, that IronPlanet's poor sales explanation is pretextual, and not even very plausible pretext.

For these reasons, I find that the "traditional elements of conspiracy" plus factor is satisfied.

### Motive to Conspire

There is evidence showing that Caterpillar, the dealers, and IronPlanet each had a motive to conspire.

As an initial matter, the record shows that Caterpillar knew, through its internal competitive analysis, that ICP's Chinese-manufactured new heavy construction equipment would be offered at prices that were up to 45% lower than Caterpillar's new heavy construction equipment sold through its dealers. (D.I. 419-48 at -25). Therefore, there is evidence to support a finding that Caterpillar and its dealers had a significant economic motive to eliminate ICP's price-cutting competition.

In addition, as Caterpillar insists and ICP's expert concedes, Caterpillar did not have sufficient leverage based solely on its used equipment sales to IronPlanet to be able to unilaterally affect IronPlanet's behavior. (D.I. 391 at 7-8). Nor did Ring Power or Thompson, based solely on their individual used equipment sales to IronPlanet. (D.I. 399-2 Ex. 19 at 12, 15-16 (Ring Power represented less than 1% of IronPlanet's revenue in 2013); D.I. 399-1 Ex. 3 at 99:20-22 (Thompson was a "small seller" for IronPlanet)).

Caterpillar did, however, have considerable leverage over IronPlanet in the form of the Cat Auction/IronPlanet merger negotiations. Caterpillar had veto rights over any change in control of Cat Auction, and there is evidence showing that both Caterpillar and IronPlanet understood that the promise of Caterpillar dealers' cooperation and increased future business was a critical component of that leverage. (*See* D.I. 419-28 at -89 ("It would be good to know (and to see) the proposed Caterpillar letter being drafted to go out to Dealers in regards to more support for [Cat Auction]. This is a piece of leverage for us potentially") (Caterpillar/Cat Auction internal email); D.I. 399-4 Ex. 31 at -103 ("if Cat is backing this combined entity [IronPlanet/Cat Auction] with

40

their volume and not sending to [Ritchie Bros.], the dealers in North America alone could produce this incremental volume") (IronPlanet email to Cat Auction board members)).

Therefore, the dealers had a motive to conspire with Caterpillar, as they did not have leverage over IronPlanet on their own but could agree to reinforce Caterpillar's merger-related leverage. Caterpillar, likewise, had a motive to conspire with its dealers in order to increase its leverage over IronPlanet. Finally, with Caterpillar and the dealers working together, IronPlanet had a strong motive to acquiesce to their combined pressure and to agree to renege on its agreement to an on-line sales platform for ICP. From IronPlanet's perspective, a successful merger between IronPlanet and Cat Auction could "provide exclusivity to [IronPlanet] for the CAT product that was going to auction." (D.I. 419-25; *See* D.I. 399-4 Ex. 31 at -103).

For these reasons, I find that the "motive to conspire" plus factor is satisfied with respect to all coconspirators.

Actions Contrary to Self-Interest

There is evidence showing that at least Caterpillar, Thompson, and IronPlanet acted contrary to self-interest.

First, the record shows that Caterpillar was financially invested in overseeing a successful merger between Cat Auction and IronPlanet because Cat Auction, which had been operating at a loss for years, was a financial liability for Caterpillar, its largest shareholder. (D.I. 399-1 Ex. 5 at -672; D.I. 419-3 at 131:15-133:23). Therefore, threatening to abandon merger negotiations with IronPlanet was an action contrary to Caterpillar's pecuniary self-interest.

Second, there is evidence showing that Thompson acted against its economic self-interest by pausing an already in-progress business deal with IronPlanet until it had received written assurances of IronPlanet's termination of its agreement with ICP.

41

Finally, IronPlanet acted against its self-interest by breaching its Hosted Store Agreement with ICP without providing any legal justification, knowingly exposing itself to litigation risk from ICP for breach of contract.

### 2. Unreasonable Restraint

To determine whether a restraint on trade is "unreasonable," courts apply one of two standards, depending on the nature of the conduct at issue. Under the default "rule of reason" standard, the court must weigh "all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Rossi*, 156 F.3d at 461 (cleaned up). "Under the *per se* standard, conduct that is manifestly anticompetitive or would always or almost always tend to restrict competition is conclusively presumed to unreasonably restrain competition without elaborate inquiry into the precise harm it has caused or the business excuse for its use." *Id.* (cleaned up).

Per my February 24, 2017 Revised Discovery Plan and Scheduling Order, discovery in this case is split into two phases. Phase 1 Discovery was limited to the conspiracy element of ICP's antitrust claim. (D.I. 95 at 2). Issues related to "antitrust injury …, market definition, and damages" were expressly excluded from the scope of Phase 1 Discovery. (*Id.*). Defendants filed the instant motions for summary judgment following the close of Phase 1, and prior to the beginning of Phase 2. Because evidence that will be produced during Phase 2 is necessary for a complete analysis of the "unreasonable restraint" element of ICP's antitrust claim, the parties have not briefed that issue in connection with Defendants' motions for summary judgment. Thus, I will defer that analysis until after Phase 2 Discovery has been completed.

For now, I find that ICP has met its burden of showing a genuine issue of material fact exists with respect to whether the conspiracy ICP has alleged placed an "unreasonable restraint" on trade.

### 3. Conclusion

For the reasons stated above, Caterpillar's motion for summary judgment on ICP's Sherman Act Section 1 claim is DENIED.

### C. Tortious Interference Claim

The elements of a tortious interference claim[8] are (1) the existence of a valid contract between the plaintiff and another; (2) the defendant's knowledge of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; and (4) damages. *Healy v. Metro. Pier & Exposition Auth.*, 804 F.3d 836, 842 (7th Cir. 2015) (Illinois); *Johnson Enter. of Jacksonville, Inc.*, 162 F.3d 1290, 1321 (11th Cir. 1998) (Florida).

### 1. Komatsu

For the reasons I explained above, *supra* III.B.1.a, there is no evidence from which a reasonable jury could conclude that Komatsu took any actions to induce IronPlanet to breach its contract with ICP. Therefore, Komatsu's motion for summary judgment on ICP's claim of tortious interference with contract is GRANTED.

### 2. Caterpillar

---

[8]     At the motion to dismiss stage, I analyzed ICP's tortious interference claim under Florida and Illinois law. (D.I. 292 at 3). In their summary judgment briefing, none of the parties have re-argued the choice of law issue, so I will continue to apply the laws of Florida and Illinois. ICP argued in its motion to dismiss briefing that its tortious interference claim should be governed by Florida or Illinois law, as what is at the center of ICP's tortious interference claim is "a conspiracy in which substantial misconduct occurred in Florida [where Ring Power and Thompson, Caterpillar's alleged coconspirators, reside] and Illinois [where Caterpillar resides]." (D.I. 276 at 6).

There are two questions at the heart of ICP's tortious interference claim against Caterpillar. The first is the factual question of whether Caterpillar induced IronPlanet to breach its contract with ICP by threatening to block a potential merger between Cat Auction and IronPlanet and coordinating with its dealers to withhold used equipment sales from IronPlanet until IronPlanet terminated its relationship with ICP. For the reasons I have explained above, *supra* III.B.1.b, this question involves genuine issues of material fact. Therefore, it is for the jury, and not this Court, to decide.

The second is the threshold legal question of whether such a factual showing would satisfy the elements of a tortious interference with contract claim. Caterpillar argues it would not for two reasons: (1) Caterpillar, as a Cat Auction shareholder, was justified in using its "protection privilege" to protect its investment in Cat Auction by ensuring Cat Auction did not deal with IronPlanet if IronPlanet was going to deal with ICP, and (2) Caterpillar could not have tortiously interfered with IronPlanet and ICP's contract because, as a shareholder in IronPlanet, Caterpillar was not a "stranger" to the contractual relationship. (D.I. 391 at 37-39). I consider each of these arguments in turn.

First, both Illinois and Florida law recognize "a conditional privilege to interfere with contracts where the defendant was acting to protect an interest which the law deems to be of equal or greater value than the plaintiff's contractual rights." *Nation v. Am. Cap., Ltd.*, 682 F.3d 648, 651 (7th Cir. 2012) (cleaned up); *Ethyl Corp. v. Balter*, 386 So. 2d 1220, 1224-25 (Fla. Dist. Ct. App. 1980). "This privilege covers the acts of corporate officers, directors, and shareholders undertaken on behalf of the corporation." *Nation*, 682 F.3d at 652. This broad statement generally refers to the acts of such individuals in relation to contracts to which the corporation is a party. *See id.* Nevertheless, the privilege also "protects . . . entities." (*Id.*). In *Nation*, the privilege

44

conditionally applied as the corporate defendant was the majority shareholder trying to protect the value of the company in which it had invested. The privilege, however, is not without limitation. The privilege does not apply if the defendant seeking to exercise the privilege (1) "induced the breach to further its personal goals or to injure the other party to the contract," and (2) "acted contrary to the best interest of the corporation." *Id.* at 653 (cleaned up).

Here, because Caterpillar is a minority shareholder in both Cat Auction and IronPlanet, it is unclear whether Caterpillar intends to invoke this privilege to justify threatening to block Cat Auction's merger with IronPlanet, or to justify inducing IronPlanet to terminate its contract with ICP, or both. I assume a minority shareholder has as much interest in protecting its investment as a majority shareholder. Regardless, there are genuine issues of material fact with respect to either theory. In both situations, there is a dispute of material fact since ICP has presented evidence from which a jury could conclude that (1) Caterpillar's actions were taken to further its own interest of removing ICP as a competitor to itself and its dealers, and (2) in the case of Cat Auction, halting merger negotiations with IronPlanet was against Cat Auction's best interest, or, in the case of IronPlanet, breaching its contract with ICP was against IronPlanet's best interest.

Second, both Illinois and Florida law recognize that the defendant in a tortious interference with contract case must be a third party, or a stranger, to the contractual relationship. *Quist v. Bd. of Tr. of Cmty. Coll. Dist. No. 525*, 258 Ill. App. 3d 814, 821 (1994) (Illinois); *Palm Beach Cty. Health Care Dist. v. Prof'l Med. Educ., Inc.*, 13 So. 3d 1090, 1094 (Fla. 4th DCA 2009). Caterpillar argues that, as a shareholder in IronPlanet, it could not have been a stranger to IronPlanet's contractual relationship with ICP. (D.I. 392 at 38-39 (citing *Bridge Fin., Inc. v. J. Fischer & Assocs.*, 310 So. 3d 45, 50 (Fla. Dist. Ct. App. 2020) (holding defendant owning 5% interest in contracting company was not a third party to that company's contractual relationship with plaintiff

45

due to defendant's ownership interest in that company))). Both Illinois and Florida law, however, acknowledge that, like the protection privilege, the privilege to interfere is not absolute.

Under Illinois law, "a party – which includes corporate officers – cannot interfere with its own contract unless the officer's conduct is malicious or without justification, namely that the conduct is unrelated or antagonistic to the corporation's interest." *Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 718 (N.D. Ill. 2017). Under Florida law, the "privilege to interfere" enjoyed by a non-third party to a contractual relationship, *e.g.*, an officer or employee, or here, a shareholder, of a contracting party "is destroyed where an employee acts solely with ulterior purposes, without an honest belief that his actions would benefit the employer, and the employee's conduct concerning the contract or business relationship is not in the employer's best interest." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d 381, 386 (Fla. Dist. Ct. App. 1999).

There are genuine issues of material fact regarding whether Caterpillar acted "solely with ulterior purposes," and not in IronPlanet's best interest, in inducing IronPlanet to breach its contract with ICP. Therefore, Caterpillar's motion for summary judgment on ICP's tortious interference claim is DENIED.

### D. Dr. Leitzinger's Opinion (D.I. 396-1 Ex. 1-7)

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (cleaned up).[9]

Caterpillar moves to exclude the testimony of ICP's economic expert, Dr. Leitzinger. (D.I. 392). Its scattershot argument in support of its motion boils down to three objections: Dr. Leitzinger (1) "ignored the parties' used equipment data," (2) "did not employ any peer-accepted economics methodology" in forming his opinions, and (3) relied on dismissed allegations and considered as coconspirators parties who are not defendants and were not specifically alleged by ICP to be coconspirators. (D.I. 393 at 7-20). I am not persuaded by any of these arguments for the following reasons.

---

[9] The Court wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

First, Dr. Leitzinger's failure to refer to used equipment sale numbers for each of the defendants in his report does not render his opinions unreliable. Dr. Leitzinger's assignment was limited in scope. He was asked to consider whether the evidence supported the existence of any plus factors supporting an inference of concerted action. (D.I. 396-1 Ex. 1 ¶ 8). Dr. Leitzinger considered the evidence as a whole and offered an opinion, based on facts in the record related to the market structure and unique dynamics of the U.S. heavy construction equipment industry, and communications among the coconspirators, that the evidence supported the existence of four plus factors. If Caterpillar believes that Dr. Leitzinger did not sufficiently account for contradictory evidence in the record, that goes to the weight and not the admissibility of his opinions. Caterpillar's concerns can easily be addressed through cross-examination.

Second, Caterpillar's argument that Dr. Leitzinger does not employ "skill or knowledge greater than the average layman" because he did not perform any "data analysis" is baseless. (D.I. 393 at 8). Throughout his report, Dr. Leitzinger employs his expertise in industrial organization by using economic principles and literature to buttress his opinions. (*See*, *e.g.*, D.I. 396-1 Ex. 1 at ¶ 7 n.1 (surveying economic literature describing types of economic evidence, *i.e.*, plus factors, that "affect the inferences one can draw about the existence of an alleged antitrust conspiracy"), ¶ 35 (discussing the Herfindahl-Hirschman Index for measuring market concentration in antitrust analysis and DOJ guidelines defining various levels of market concentration)).

Courts have consistently found similar economic analyses of characteristics that make markets especially conducive to collusion to be a legitimate application of an expert witness's expertise. *In re Processed Egg Prods. Antitrust Litig.*, 81 F. Supp. 3d 412, 422 (E.D. Pa. 2015) (rejecting *Daubert* challenge and noting, "The field of economics contains a field of study on the features of markets that make them particularly conducive to collusion, and [the expert witness]

appears to be drawing from that field in his report."); *In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *4 (D. Md. May 1, 2013) ("Courts regularly admit expert testimony regarding whether conduct is indicative of collusion") (cleaned up). If Dr. Leitzinger attempts to offer testimony at trial that veers into the territory of lay opinion testimony not grounded in his specialized expertise, that can be addressed at trial. Based on what is contained in his report, however, Caterpillar's concerns do not warrant wholesale exclusion of Dr. Leitzinger's opinions.

Finally, as I explained at oral argument, the fact that I dismissed and struck ICP's unlawful merger allegations does not mean evidence relating to the negotiations leading up to that merger between IronPlanet and Cat Auction is irrelevant to ICP's Sherman Act § 1 concerted refusal to deal claim. Moreover, there is no requirement that ICP join each coconspirator as a defendant, nor that ICP specifically name each coconspirator as a coconspirator in its complaint. Therefore, it is not improper for Dr. Leitzinger to consider evidence related to the merger negotiations or to treat IronPlanet and Cat Auction as coconspirators in his analysis.

For these reasons, Caterpillar's motion to exclude Dr. Leitzinger's testimony and report is DENIED.

## IV. CONCLUSION

For the reasons stated above, Komatsu's motion for summary judgment (D.I. 394) is GRANTED. Caterpillar's motions for summary judgment (D.I. 390) and to exclude the testimony of Dr. Leitzinger (D.I. 392) are DENIED.

An appropriate order will issue.