IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC, | ) ) ) |
| Plaintiff, | ) ) **C.A. No. 15-108-RGA** |
| | ) |
| v. | ) **REDACTED-** ) **PUBLIC VERSION** |
| CATERPILLAR INC., KOMATSU AMERICA CORP., ASSOCIATED AUCTION SERVICES, LLC, doing business as Cat Auction Services, | ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) ) |

### FOURTH AMENDED COMPLAINT

Plaintiff International Construction Products LLC ("ICP"), by and through its undersigned attorneys, brings this action for trebled compensatory damages and injunctive relief under the antitrust laws of the United States, and for compensatory and punitive damages and injunctive relief under state law, against the above-named Defendants, demanding a trial by jury. For its Complaint against Defendants, Plaintiff alleges the following:[1]

### NATURE OF THE CASE

1.     This case involves an ongoing, multi-faceted and anticompetitive conspiracy among Defendants Caterpillar Inc. ("Caterpillar") and Komatsu America Corp. ("Komatsu") (collectively, the "Manufacturer Defendants"), Defendant Associated Auction Services, LLC,

---

[1] ICP files this Fourth Amended Complaint without prejudice to and without waiving its claims against Komatsu America Corporation, Associated Auction Services, LLC, Ring Power Corporation, Thompson Tractor Company, Inc., and Ziegler Inc. or the relief requested in the Motion for Partial Reargument and the Conditional Motion for Transfer Pursuant to 28 U.S.C. § 1404 that it filed simultaneously with the Third Amended Complaint.

doing business as Cat Auction Services ("Cat Auction Services"), non-defendant co-conspirators Ring Power Corporation ("Ring Power"), Ziegler Inc. ("Ziegler"), Thompson Tractor Company, Inc. ("Thompson Tractor") (collectively, the "Dealer Conspirators"), and along with additional as-yet unknown conspirators including the twenty-five Caterpillar dealers who collectively owned Cat Auction Services in April 2014, as well as other Caterpillar dealers, to eliminate the threat of substantial new entry and competition in the market for new heavy construction equipment. The new heavy construction equipment market is an oligopoly protected by extremely high barriers to entry, due to the Manufacturer Defendants' policies of requiring exclusivity from their equipment dealers. Secure from the threat of effective new entry, the Manufacturer Defendants and the Dealer Conspirators have for years charged prices above competitive levels for their new heavy construction equipment.

2.     ICP's innovative entry into the heavy construction equipment market, selling new, high-quality equipment at low prices directly to consumers through the dominant online marketplace for sales of heavy construction equipment, IronPlanet, promised to substantially increase competition in the new equipment market. Selling through IronPlanet is a uniquely efficient distribution channel for new entrants into the new heavy construction equipment market and the only realistic means to surmount the distribution barrier to entry erected by the Manufacturer Defendants.

3.     In direct response to ICP's announced entry into that market, Defendants conspired to first eliminate, and then forever bar, ICP's access to IronPlanet. In a classic example of predation followed by merger, the Manufacturer Defendants and the Dealer Conspirators first threatened to boycott IronPlanet if it sold ICP's new heavy construction equipment, and Defendants Caterpillar and Cat Auction Services then agreed to remove IronPlanet as an

independent entity through a merger of IronPlanet and Cat Auction Services, which is itself owned and controlled by Caterpillar and certain of its equipment dealers, all of whom deal exclusively with Caterpillar and have economic incentives with respect to the exclusion of ICP and other new entrants that are completely aligned with those of Caterpillar.

4.      In the first stage of the conspiracy, the Manufacturer Defendants and the Dealer Conspirators, which are (along with their affiliates) some of the largest sellers of used heavy construction equipment on IronPlanet, applied economic pressure to coerce IronPlanet to discontinue ongoing sales of ICP's products, breach an existing contract with ICP, and otherwise refrain from dealing with ICP.  The Manufacturer and Dealer Conspirators delivered these threats directly to IronPlanet and through Cat Auction Services, which restarted discussions about a potential transaction with IronPlanet.   IronPlanet acceded to the Defendants' pressure, discontinuing sales of ICP's products, thereby breaching its contract with ICP and leaving ICP without feasible means to efficiently bring its products to market.

5.      In the second stage of the conspiracy, Cat Auction Services furthered the ongoing conspiracy to eliminate the threat of ICP's entry by agreeing to merge with IronPlanet, extinguishing any possibility that IronPlanet would deal with ICP or any other new entrants in the future.  Due to the Defendants' conspiracy, the prospect of effective entry into the new heavy construction equipment market is set to vanish.  Defendants have thereby harmed ICP's business, equity, and goodwill, and eliminated innovative, low-price competition that would have benefited U.S. consumers.

6.      Plaintiff brings this lawsuit pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and pursuant to state law, to recover trebled compensatory damages suffered by the Plaintiff and the costs of suit, including reasonable attorney's fees, and for punitive

damages; to enjoin the Defendants' illegal conduct as alleged herein; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' serial violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and under state law.

## PLAINTIFF

7.      Plaintiff International Construction Products LLC, formed under the laws of the State of Delaware, has its principal place of business at 28 Schenck Parkway, Asheville, North Carolina, 28803.  ICP imports and sells heavy construction equipment into the United States.

## DEFENDANTS

8.      Defendant Caterpillar is incorporated under the laws of the State of Delaware, with its principal place of business at 100 NE Adams Street, Peoria, Illinois, 61629.  Caterpillar manufactures and sells heavy construction equipment, among other products, in the United States, and specific local markets therein, including sales to dealers located in Delaware.

9.      Defendant Komatsu, a wholly-owned subsidiary of Komatsu Ltd., is incorporated under the laws of the State of Georgia, with its principal place of business at 1701 Golf Road, Suite 1-100, Rolling Meadows, Illinois, 60008.  Komatsu manufactures and sells heavy construction equipment, among other products, in the United States, and specific local markets therein, including sales to dealers located in Delaware.  Komatsu has registered to do business in the State of Delaware and has consented to the service of process within Delaware by appointing The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801, as its registered agent.

10.      Cat Auction Services is formed under the laws of Delaware, with its principal place of business at 860 Blue Gentian Road, Suite 100, Eagan, Minnesota, 55121.  Cat Auction Services facilitates auctions of used heavy construction equipment within the United States.  Defendant

Caterpillar is a shareholder in Cat Auction Services, along with more than twenty five Caterpillar equipment dealers, themselves governed by coercive exclusive dealing arrangements with Caterpillar.  Defendant Caterpillar also has a seat on the Board of Directors of Cat Auction Services, and Cat Auction Services is routinely described as "an alliance" of Caterpillar and its dealers.  In December 2014, Cat Auction Services announced an agreement to merge with IronPlanet, in a transaction that closed in 2015.

## NON-DEFENDANT CO-CONSPIRATORS

11.     Co-conspirator Ziegler is a Caterpillar dealer incorporated under the laws of the State of Minnesota and has a principal place of business in Minneapolis, Minnesota.  Ziegler currently employs more than 1,800 people across Minnesota, Iowa, Wisconsin, and Missouri, and is one of the largest Caterpillar dealers in North America.  At all relevant times, Ziegler was an investor in Cat Auction Services and held a seat on Cat Auction Services' board of directors.

12.     Co-conspirator Ring Power is a Caterpillar dealer incorporated under the laws of the State of Florida and has a principal place of business in St. Augustine, Florida.  Ring Power is one of the largest Caterpillar dealers in the southeastern United States, and it employs more than 1,800 people and maintains more than 26 locations worldwide, including in Florida, California, Texas, Georgia, North Carolina, South Carolina, New Jersey, Rhode Island, Canada, Ireland, and Brazil.  At all relevant times, Ring Power was an investor in IronPlanet.  Ring Power has physical places of business in the Northern District of Florida, including branch offices in Gainesville and Tallahassee.

13.     Co-conspirator Thompson Tractor is a Caterpillar dealer incorporated under the laws of the State of Alabama and has a principal place of business in Birmingham, Alabama. Thompson Tractor employs more than 1,200 people across almost 30 locations, including in

Alabama, northwest Florida, and Georgia.  In April 2014, Thompson Tractor was not an investor in either Cat Auction Services or IronPlanet.  Thompson Tractor has physical places of business in the Northern District of Florida, including branch offices in Panama City and Pensacola.

## JURISDICTION, STANDING AND VENUE

14.     Plaintiff brings this action to recover damages, including treble damages, cost of suit, and reasonable attorney's fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

15.     This Court has subject matter jurisdiction of the Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

16.     Plaintiff has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

17.     This Court has subject matter jurisdiction of the Plaintiff's pendent state law claims pursuant to 28 U.S.C. § 1367.  Each of the Plaintiff's state law claims arises out of the same factual nucleus as the Plaintiff's federal law claims.

18.     This Court has personal jurisdiction over each Defendant and venue is proper in the District of Delaware under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 28 U.S.C. § 1391, and under Delaware's long-arm statute, 10 Del. C. § 3104(c).  The Manufacturer Defendants, as well as Cat Auction Services, transact business and are subject to personal jurisdiction within the District of Delaware.  The Manufacturer Defendants, and Cat Auction Services, sell heavy construction equipment in or for delivery into Delaware, and the Manufacturer Defendants have equipment dealers in Delaware.  Portions of the anticompetitive conduct alleged herein, including the merger of IronPlanet and Cat Auction Services, took place in Delaware, and the anticompetitive effects of the conduct alleged herein impacted consumers in Delaware.

Personal jurisdiction is proper under Delaware's long-arm statute, as overt acts in furtherance of the conspiracy occurred in Delaware (including the merger of Cat Auction Services and IronPlanet), and the conspiracy caused foreseeable anticompetitive effects in Delaware.

19.    Defendants are engaged in, and their activities substantially affect, interstate trade and commerce.

## THE HEAVY CONSTRUCTION EQUIPMENT INDUSTRY

20.    Construction equipment is used in infrastructure and building construction applications. The term "heavy construction equipment" refers to heavy-duty vehicles specifically designed for executing various earthmoving tasks. Specific types of heavy construction equipment include crawler dozers, rollers, motor graders, scrapers, crawler excavators, wheeled excavators, mini-excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders. Sales of new heavy construction equipment in the United States exceeded $14 billion in 2013.

21.    Each specific type of heavy construction equipment relevant to this case has a specific configuration and intended functionality, for which these machines are designed and used, as described below. As a result of their specialized design and use, the specific types of heavy construction equipment relevant to this case are not reasonably interchangeable in use with one another, or with other types of equipment such as forestry, mining, or agricultural equipment.

a.    Crawler dozers are tractor units with a metal plate, or blade, attached to their front, designed to push, shear, cut and roll large quantities of soil, sand, rubble or material ahead of the tractor. Crawler dozers are commonly used in embankment construction, and are especially useful on soft soils, despite their relatively low speed.

b.      Motor graders are used in the construction of base courses, grading and other activities that require fine control over the placement of soil, and are often used after crawler dozers and excavators are used to first roughly prepare a given area.  Motor graders consist of a tractor and maneuverable blade mounted on a frame with a long wheelbase.

c.      Rollers are machines attached with large drums or wheels, and are used for flattening or compacting soil, gravel, concrete, or asphalt.

d.      Scrapers are machines designed to load, haul, and dump loose materials in excavation and embankment work.  Scrapers have a vertically moveable bowl positioned in the rear, which is lowered to cut soil and then raised to transport the soil away from the cutting site to the fill area.  Scrapers are designed to move a large volume of soil over considerable distances at relatively high speeds.

e.      Crawler excavators, wheeled excavators, and mini-excavators are all types of machines with a boom, stick, bucket and cab, specifically designed for digging trenches, holes, and foundations, and in demolition.  Crawler excavators, wheeled excavators, and mini- excavators are differentiated from one another by their size, horsepower, functionality, and price.

f.      Wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders are used in construction to load materials including asphalt, debris, earth, and rock into or onto another type of machinery, such as a truck or conveyor belt.  Wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders are differentiated from one another by their size, horsepower, functionality, and price.

22.     Wholesale distributors, known as "equipment dealers," are the primary channel of distribution of heavy construction equipment to end users, who are primarily contractors and equipment rental companies.   Equipment dealers specialize in selling and servicing heavy construction equipment, and employ sales and service personnel dedicated to servicing the needs of end users.

23.     Direct sales of new heavy construction equipment by manufacturers to end users have historically been uncommon.  End users and heavy construction equipment manufacturers alike have historically worked through equipment dealers with locations near project sites.  As a result, heavy construction equipment manufacturers have historically distributed heavy construction equipment through local dealers in each region of the country in order to compete effectively in each such region.

24.     The markets for the manufacture and sale of new heavy construction equipment in the United States are highly concentrated.  Between 2010 and 2014, the Herfindahl-Hirschman index, a commonly accepted measure of market concentration, for the heavy construction equipment market nationwide was over 2500, a level characterized as "highly concentrated" by the federal antitrust enforcement agencies.  Defendant Caterpillar accounts for approximately 40 percent or more of all sales of new heavy construction equipment in the United States, and Komatsu accounts for more than 15 percent of all such sales.  Market concentration at the state level is also high.

25.     Many of the markets for specific types of new heavy construction equipment relevant to this case are even more highly concentrated.  Each of the Manufacturer Defendants individually, and both of them collectively, have substantial market shares in the sale of specific types of new heavy construction equipment sold in specific local markets around the country.

26.     For example, Caterpillar's share of all new crawler dozer sales between 2010 and 2014 was 80 percent or higher in Alaska, 70 percent or higher in at least three states, including Arizona, California and Colorado, and 60 percent or higher in at least five states, including Michigan, Minnesota, Montana, Oregon, and Wyoming.

27.     Although smaller than Caterpillar, Komatsu also has durably high market shares of certain types of new heavy construction equipment sold in specific local markets throughout the United States.  For example, between 2010 and 2014, Komatsu's share of new excavator sales was 45 percent or higher in Alabama, 35 percent or higher in at least four states, including Georgia, Nebraska, New York, and Ohio, and 30 percent or higher in at least two states, including Oklahoma and West Virginia.

28.     Together, the Manufacturer Defendants have durably high market shares of certain types of new heavy construction equipment sold in specific local markets throughout the United States.

### THE RELEVANT MARKETS

29.     The relevant product market in which to evaluate the Defendants' conduct is the marketing and sale of new heavy construction equipment, and narrower relevant markets contained therein (collectively, the "relevant heavy construction equipment markets"), including relevant product markets limited to each of the following specific types of new heavy construction equipment: crawler dozers, rollers, motor graders, scrapers, crawler excavators, wheeled excavators, mini-excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders.

30.     There are no widely used substitutes for new heavy construction equipment, and no other product significantly constrains the prices of new heavy construction equipment.

31.     The specific types of new heavy construction equipment relevant to this case are specifically designed for particular earth-moving and related tasks.  Crawler dozers, rollers, motor graders, scrapers, crawler excavators, wheeled excavators, mini-excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders are all differentiated from one another in price, design, function, and intended and optimal use, and as a result are not reasonably interchangeable in use by end-users.  Prices for new crawler dozers, rollers, motor graders, scrapers, crawler excavators, wheeled excavators, mini-excavators, wheel loaders, skid steer loaders, backhoe loaders, crawler loaders, and track loaders are all distinct from one another, and prices and market shares for each of these products are tracked separately by the Manufacturer Defendants, and by other industry participants and market analysts.

32.     Publicly available materials in the used heavy construction market show the distinct prices and price trends paid by end users for specific types of used machines.  For example, between July 2014 and June 2015, prices for used motor graders declined nationwide by 1.4 percent, while prices for used scrapers increased by 1.9 percent and skid steer loaders increased by 3.3 percent.  Although new and used heavy equipment trade in different markets, this disparity among prices for different types of used heavy construction equipment is also reflected in the prices for new different types of new heavy construction equipment, including all of the specific types of new heavy construction equipment relevant to this case.

33.     The closest substitutes for each type of new heavy construction equipment is used heavy construction equipment of that type, but new and used heavy construction equipment trade in different relevant product markets.  New and used heavy construction equipment are differentiated in their risk of breakdown and the vintage, quality, and productivity of embodied technology.  Used heavy construction equipment normally requires more maintenance and is more

likely to break down, increasing maintenance costs and labor downtime. The relevant heavy construction equipment markets are characterized by frequent introduction of new technologies and product features, and used heavy construction equipment is typically of lower quality and less productive per hour of use. Purchasers of heavy construction equipment are differentiated in their preferences with respect to durability and product quality, and in the degree to which they use labor and capital as inputs into production. Purchasers who value product quality highly and tend to use relatively more capital than labor as factor inputs purchase new heavy construction equipment and, after discarding used heavy construction equipment, purchase new heavy construction equipment again. Purchasers who place a lower value on product quality and tend to use relatively more labor than capital as factor inputs purchase used heavy construction equipment. In this way, high valuation and low valuation purchasers are sorted between the new and used heavy construction equipment markets, allowing suppliers of new heavy construction equipment to profitably charge higher prices to purchasers of new products without being constrained by prices in the used heavy construction equipment market. Rental equipment companies are an example of end users that typically purchase all or nearly all of their heavy construction equipment new rather than used.

34. The Defendants' unlawful conduct, as alleged herein, demonstrates that they regard new heavy construction equipment as a distinct relevant market from used heavy construction equipment. The Defendants tolerate the sale of many brands of used heavy construction equipment on IronPlanet, but moved to exclude ICP from selling new heavy construction equipment through IronPlanet. ICP's entry with new products would not have been a competitive threat to the Manufacturer Defendants and the Dealer Conspirators if their new heavy construction equipment already competed with used heavy construction equipment. The Defendants' selective exclusion

of ICP from IronPlanet shows that they regard a seller of new heavy construction equipment, even one selling at prices far below their own, as a closer competitor than sellers of used heavy construction equipment.

35.     The relevant geographic market is no broader than the United States.  To compete effectively within the United States, manufacturers of new heavy construction equipment need distribution assets and relationships within the United States.  Manufacturers of new heavy construction equipment located outside the United States without such assets and relationships are unable to obtain sufficient distribution or scale to constrain the prices charged by manufacturers of new heavy construction equipment that have such assets and relationships.

## BARRIERS TO ENTRY

36.     The Defendants' market positions have for many years been protected by high barriers to entry.  The most significant barrier to entry has been the success of the largest incumbent manufacturers, including the Manufacturer Defendants, in foreclosing access to distribution by new entrants.  End users historically have purchased new heavy construction equipment from local equipment dealers.  New entrants are generally foreclosed from dealing with existing dealers by the distribution policies of the largest incumbent manufacturers, including the Manufacturer Defendants, which require express or functional, *de facto* exclusivity on the part of the equipment dealer in selling new heavy construction equipment.  Each of the Manufacturer Defendants' dealers purchases and takes title to new heavy construction equipment from the Manufacturer Defendants with the understanding that they are not to deal with competing suppliers of heavy construction equipment, including ICP.

37.     The Manufacturer Defendants' requirements of exclusivity collectively and individually foreclose substantial portions of the dealer market to new entrants into the relevant

heavy construction equipment markets.  In the relevant heavy construction equipment market as a whole, the exclusivity policies of the Manufacturer Defendants and the largest of the domestic incumbent manufacturers foreclose new entrants from 85 percent or more of dealers.  Any remaining dealers not tied up by these exclusivity requirements are small, capital constrained, have weaker reputations among local consumers of new heavy construction equipment, and are too few in number to form a viable distribution network for a new entrant.

38.    For at least 30 years, the distribution barrier to entry has prevented effective entry of new competitors into the relevant heavy construction equipment markets.  The last successful entrant into the relevant heavy construction equipment market as a whole was Komatsu, which entered in the late 1960s.

39.    Unable to gain adequate distribution, recent entrants into the relevant heavy construction equipment markets with high quality products have failed to achieve sufficient distribution to meaningfully discipline the prices charged by the incumbent manufacturers.  For example, SANY Heavy Industry ("SANY") and Guangxi LiuGong Machinery ("LiuGong") have both failed to gain meaningful market shares or impose competitive discipline on the Manufacturer Defendants.  Both SANY and LiuGong attempted to enter the relevant heavy construction equipment markets by building their own network of equipment dealers to distribute their products. SANY's U.S. operation had its first profitable year in 2013, more than six years after its entry into the U.S. market.  On information and belief, in this time, SANY was able to assemble a network of only 50 relatively small, local equipment dealer branches, compared to approximately 500 local equipment dealer branches for Caterpillar and approximately 400 local equipment dealer branches for Komatsu.  SANY's 2014 revenues are projected to be approximately $75 million.  LiuGong's U.S. operation similarly was first profitable in 2013, five years after it entered the U.S. market.

14

Neither SANY nor LiuGong has achieved a market share in excess of 2 percent, or the necessary distribution or scale to affect market-wide price or output, and neither is projected to have sales remotely approaching those of the Manufacturer Defendants for the foreseeable future, if ever.

40.     The distribution barrier to entry has increased since the financial crisis of 2008, which saw dealer groups go out of business and reduced the number of dealers potentially available to new entrants into the relevant heavy construction equipment markets.  At present, and for the foreseeable future, there is a scarcity of distribution services available to new entrants into the relevant heavy construction equipment markets attributable to the exclusivity policies of the Manufacturer Defendants.

41.     Barriers to entry at the equipment dealer level of the market are also high, preventing new entrants into the relevant heavy construction equipment industry from entering the distribution market to self-distribute their products.  Entry into distribution would require manufacturers to have access to a full line of heavy construction equipment, to make substantial investments in sales and service locations in any given territory, and to have access to substantial financing.

42.     Secure from the threat of new competitors behind the barriers to entry erected by their exclusive distribution chains, the Manufacturer Defendants and the Dealer Conspirators have charged supracompetitive prices to U.S. consumers of new heavy construction equipment.

**MARKET POWER**

43.     Caterpillar has substantial market power in the relevant heavy construction equipment market as a whole, and within certain of the particular relevant heavy construction equipment markets within certain local geographic markets, including at least the market for new crawler dozers in Alaska, Arizona, California, Colorado, Michigan, Minnesota, Montana, Oregon,

and Wyoming, and the markets for new motor graders in Alaska, Arizona, California, Colorado, Idaho, Michigan, Montana, New Hampshire, Nevada, New Mexico, and Wyoming.

44.     Komatsu has substantial market power within certain of the particular relevant heavy construction equipment markets within certain local geographic markets, including at least the market for new excavators in Alabama, Georgia, Ohio, Oklahoma, Nebraska, New York, and West Virginia.

45.     The substantial market power of the Manufacturer Defendants is protected by substantial barriers to entry.  *See supra* ¶¶ 35-41.

## THE SALE OF USED HEAVY CONSTRUCTION EQUIPMENT

46.     Caterpillar heavy construction equipment is distributed through a dealer network. There are 48 Caterpillar dealer entities located in the United States.  Those 48 Caterpillar dealer entities in turn own all of the approximately 500 local Caterpillar dealer branches in the United States.  Caterpillar dealers in the United States are privately-held, independently owned and operated companies.

47.     Caterpillar dealers, including the owners of Cat Auction Services, compete with one another and with Caterpillar and Komatsu in the sale of used construction equipment. Although Caterpillar dealers are typically assigned exclusive service territories for the sale of new heavy construction equipment, they compete with one another nationally in the sale of used heavy construction equipment.

To an auctioneer of used heavy construction equipment such as IronPlanet, all Caterpillar dealers, including the owners of Cat Auction Services, are actually or potentially competing suppliers of

valuable used heavy construction equipment.  When each owner of Cat Auction Services consigns, sells or otherwise disposes of its used heavy construction equipment, it is pursuing its own independent interests, rather than the interests of Cat Auction Services, and each is acting as a separate economic actor pursuing separate economic interests, and for this reason each such dealer is a potential independent center of decision making in the sale of used heavy construction equipment.  Although Cat Auction Services shareholders have common interests such as promoting the Caterpillar brand, they are still separate, profit-maximizing entities, and their interests in selling, consigning or otherwise disposing of their used heavy construction equipment are not necessarily aligned.  Decisions by Cat Auction Services shareholders to collectively direct their used heavy construction equipment towards, or away from, a particular auctioneer are decisions that deprive the marketplace of actual or potential competition.  Significantly, owners of Cat Auction Services have frequently made sales or consignments of used heavy construction equipment outside of Cat Auction Services, and other auctioneers of used heavy construction equipment such as IronPlanet and Richie Bros. compete with Cat Auction Services for the business of Cat Auction Services shareholders.

48.     Through its wholly owned subsidiaries, and apart from any ownership in Cat Auction Services, Caterpillar also competes with its dealers in the consignment of used heavy construction equipment to auctioneers of used equipment.  As of 2014, wholly owned Caterpillar subsidiary Caterpillar Financial Services Corp. ("Cat Financial") was the largest consignor of used heavy construction equipment to IronPlanet.

**ONLINE SALES OF HEAVY EQUIPMENT THROUGH IRONPLANET THREATENED TO ERODE THE DISTRIBUTION BARRIER TO ENTRY**

49.     The rise of IronPlanet, an online marketplace connecting buyers and sellers of heavy construction equipment, provided the means for new entrants to surmount the distribution barrier to entry into the relevant heavy construction equipment markets.

50.     IronPlanet is by far the largest online marketplace for the sale of heavy construction equipment in the United States, and the world.  As of 2015, IronPlanet had over 1 million registered users and had experienced a compound annual growth rate of more than 17 percent over the past seven years.  As of 2015, over $4 billion of used heavy construction equipment had been sold over IronPlanet.

51.     IronPlanet is a rapidly growing platform characterized by accelerating network effects.  Marketplaces like IronPlanet that bring together buyers and sellers in two-sided networks are platforms.  With network effects, the platform's value to any given user largely depends on the number of users on the network's other side.  The value of a platform such as IronPlanet to its users grows as the platform matches demand from both sides, which results in a self-reinforcing feedback loop of increasing participation in IronPlanet's online marketplace by buyers and sellers of heavy construction equipment.  More buyers lead to more sellers, which in turn leads to still more buyers and again to still more sellers.  These network effects accruing to IronPlanet's online marketplace contribute to and reinforce its leading position in the online sale of heavy construction equipment.

52.     In a 2010 filing with the Securities and Exchange Commission, IronPlanet wrote:

> By attracting significant numbers of geographically dispersed sellers and buyers to our marketplace, we believe we have built a network effect that increases the value of our services to all participants in our marketplace. Furthermore, we believe this value continues to increase over time as the size of our marketplace, and the resulting supply of and demand for used heavy equipment, grows.

In the same filing, IronPlanet expanded on the network effect accruing to its platform:

> As the liquidity of our marketplace continues to increase, as the numbers of sellers and buyers in our marketplace grows, and as our geographic coverage expands, we benefit from a network effect. We believe the value of our marketplace to both sellers and buyers increases as we add more users. More registrants to the marketplace allows for more prospective bidding, which yields higher price realization for sellers. More sellers produces a larger number and greater variety of listings, which makes the marketplace more attractive for buyers.

53.     IronPlanet, as an alternative distribution mechanism for new heavy construction equipment, posed a threat to the distribution barrier to entry into the relevant heavy construction equipment markets erected by incumbent manufacturers. IronPlanet's success selling used heavy construction equipment has demonstrated that U.S. consumers are willing to purchase heavy construction equipment online. The Manufacturer Defendants and the Dealer Conspirators, fearing that this willingness would spread to the purchase of new heavy construction equipment sold by ICP at large discounts to the prices charged for new heavy construction equipment in physical dealerships, took immediate and decisive action to prevent that from occurring.

54.     Distribution through IronPlanet is the most efficient and effective means for new entrants into the relevant heavy construction equipment markets to distribute their products and reach end users. All other forms of distribution available to ICP and other new entrants today or in the reasonably foreseeable future involve substantially higher costs of distribution and longer periods of time before entry could be effective in disciplining the prices charged by the

Manufacturer Defendants in the relevant heavy construction equipment markets.  Although these other distribution channels are nominally available to ICP and other new entrants, none of these alternative channels of distribution would allow a new entrant to pose a real threat to the market power of the Manufacturer Defendants.

55.     For a new entrant into the relevant heavy construction equipment markets, physical auctions or their online broadcasts are not a reasonable substitute for IronPlanet.  Physical auctions require sellers to transport heavy construction equipment to the buyer's location before a sale can be made, substantially raising the seller's costs.  The ocean transport cost of a large crawler dozer from China to the United States is approximately $15,000, and once landed, inland transportation costs to an auction site can be as much as $5,000.  The online auctions run by Richie Bros., the largest domestic provider of physical, in-person auction services for heavy construction equipment, are merely broadcasts of physical auctions held at 30 or more sites around the country, requiring sellers through Richie Bros. to incur these substantial upfront transportation costs. Selling through Richie Bros. is especially uneconomical for an entrant like ICP seeking to sell large volumes of new foreign-made equipment without any assurance that a profitable sale will be made.  By contrast, selling through IronPlanet allowed ICP to defer transportation costs until after a sale is made, lowering costs and increasing sales.  Physical auctions, whether broadcast over the internet or not, are also held only 3 to 4 times a year by any given auctioneer, while selling through IronPlanet allows ICP and other sellers to make their products available for purchase continuously throughout the year.  Physical auctioneers also tend to sell only on an unreserved basis, while selling through IronPlanet allowed ICP to offer its products at a fixed price, guaranteeing ICP a margin sufficient to cover costs and an acceptable operating profit.

56.     IronPlanet has publicly differentiated its services from those of traditional auctioneers, claiming that "[u]nlike traditional auctions, sellers at IronPlanet achieve faster and more profitable sales through weekly auctions, fair market value for equipment, low selling costs, and a global audience of buyers.  IronPlanet sells the equipment from the consignor's location, eliminating transportation costs for the seller." In 2008, the then-President of IronPlanet was quoted as saying that the costs of selling through IronPlanet were 6 to 11 percent lower than through alternative venues, including, on information and belief, traditional auctioneers.

57.     For a new entrant into the relevant heavy construction equipment markets, no other existing online marketplace is a substitute for IronPlanet.  EquipmentOne, the online marketplace of Richie Bros., has a fraction of the listings, sales, and active users that IronPlanet has.  In contrast to IronPlanet's 1 million registered users, EquipmentOne had 50,000 unique users in 2013.  Richie Bros. identifies EquipmentOne as a complement to, rather than a substitute for, the internet broadcasts of its physical auctions.  eBay, Machinery Trader, Rock and Dirt, Equipment Trader Online, and Craigslist are similarly not substitutes for IronPlanet, due to their lack of listings for heavy construction equipment, sales, and active qualified users, all of which are necessary to be a viable substitute to IronPlanet for sellers and buyers of heavy construction equipment.

58.     Building a distribution network from scratch is not an effective or timely form of entry into the relevant heavy construction equipment markets, as demonstrated by the recent experience of SANY and LiuGong.  The remaining dealers unforeclosed by the Manufacturer Defendants' exclusivity arrangements are not cost-effective substitutes for entry through IronPlanet, or for selling through the large and capable dealers foreclosed by the Manufacturer Defendants, and by selling through these unforeclosed dealers a new entrant will not gain sufficient market share to threaten for many years, if ever, the market power of the Manufacturer Defendants.

This is so because the unforeclosed dealers generally lack the market share, or ability to gain market share, necessary to support timely and effective entry by a new entrant into the relevant heavy construction equipment market, due to their small size, lack of effective sales forces and strong local reputations, and inability to stock large inventories of product due to credit constraints. The failure of SANY and LiuGong to gain meaningful market shares after six or more years of trying to enter the relevant heavy construction equipment market by selling through the remaining, unforeclosed dealers is direct evidence of the ineffectiveness of entry through this channel.

59.     Due to the substantial network effects that accrue to IronPlanet's rapidly growing platform, developing a new online marketplace comparable in reach to IronPlanet would take many years, if it could be done at all.

60.     In 2014, the Manufacturer Defendants and ▇▇▇▇▇▇▇▇ were minority investors in IronPlanet.  On information and belief, Defendant Komatsu had the right to designate a board observer to IronPlanet's Board of Directors.

**ICP WAS A UNIQUE COMPETITIVE THREAT TO DEFENDANTS**

61.     ICP's business model is to serve as a master distributor of foreign, particularly Chinese, heavy equipment manufacturers, and to bring those products to U.S. consumers at substantially lower prices than those charged by the domestic incumbent manufacturers for comparable products.  ICP purchased and took title to imported, new heavy construction equipment, and resold those products through IronPlanet to end users.  ICP's prices for comparable new heavy construction equipment products, using many of the same components, are as much as 40 percent below those of the Manufacturer Defendants.  ICP planned to enter first the relevant heavy construction equipment markets, and then to expand its product offering into other, adjacent markets such as materials handling equipment (*e.g.*, aerial lift platforms, cranes), agricultural

equipment (*e.g.*, tractors and combines), road construction equipment, as well as parts and accessories for all of these products.  ICP's management team, directors, and advisors collectively had over 100 years of experience in senior positions in the relevant heavy construction equipment markets, including with the Manufacturer Defendants, and in adjacent markets.   ICP's management team had the expertise to successfully enter the relevant heavy construction equipment markets.

62.    China accounts for about 40 percent of global heavy construction equipment production.   Since 2012, excess production capacity for heavy construction equipment has developed in China, and Chinese producers have looked for opportunities to export their products abroad, including to the United States.

63.    In 2011, Caterpillar's CEO acknowledged publicly that Chinese competitors in the U.S. would eventually emerge as a "serious threat."

64.    "Chinese companies have not yet learned how to make world-class cars, but they have now cracked how to make top-quality construction equipment at attractive prices," reported The Economist in December 2013, "and their foreign rivals should be worried."

65.    In 2013, ICP contracted with Lonking Holdings Ltd. ("Lonking"), one of the world's largest heavy construction equipment manufacturers and the world's leading manufacturer of wheel loaders, to serve as Lonking's master distributor in the United States and other markets outside China.  ICP also negotiated with or received expressions of interest from other foreign manufacturers of heavy construction, materials handling, and agricultural equipment interested in appointing ICP as a master distributor for sales of their products into the United States.

66.    ICP planned to bring these foreign-made products to market in the U.S. primarily by selling directly to end users through the internet.  ICP's internet store, ICPDirect.com, was to

be hosted and supported by IronPlanet.  Sales through IronPlanet would have allowed ICP to benefit from the substantial base of end users using IronPlanet to purchase heavy construction equipment, as well as IronPlanet's sales force of 300 sales representatives.   Access to the IronPlanet sales force was important to ICP's entry because it gave ICP turnkey access to a large and experienced sales force to stimulate demand for ICP's products and to recruit new heavy construction equipment dealers.

67.    Even though equipment dealers are generally prevented from selling ICP equipment by the exclusivity requirements of the largest incumbent manufacturers, including the Manufacturer Defendants, those policies generally do not require exclusivity for maintenance and repair services.  ICP was successful in entering into arrangements with established equipment dealers around the country, including in Alabama, Alaska, Arizona, Arkansas, California, Connecticut, Delaware, Georgia, Idaho, Indiana, Kentucky, Michigan, Minnesota, Montana, Nevada, New Hampshire, New York, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Virginia, West Virginia, and Wyoming, among other states, for post-sale services for its heavy construction equipment, and identified leads for interested equipment servicers in still more states. These arrangements with local service dealers, combined with ICP's market access through IronPlanet, made ICP a direct and immediate competitive threat to the Manufacturer Defendants nationwide and in at least Alabama, Alaska, Arizona, California, Georgia, Idaho, Michigan, Minnesota, Montana, Nevada, New Hampshire, New York, Ohio, Oklahoma, Oregon, West Virginia, and Wyoming, where the Manufacturer Defendants individually or collectively exercise market power.  ICP's successful and unobstructed entry through IronPlanet would have brought prices down in each of these local markets, thereby constraining the exercise by the Manufacturer

Defendants of market power in each of these local markets.  ICP also arranged for parts depots around the country, ensuring wide and rapid availability of parts for service.

68.     In this way, ICP's business model promised to combine low priced, high-quality new heavy construction equipment with high levels of post-sale support, sold through an innovative and uniquely efficient distribution channel, IronPlanet.  ICP's entry through IronPlanet would have been exponentially more disruptive than prior entrants.  Through IronPlanet, ICP would directly and effectively reach approximately 80 percent of end users of heavy construction equipment immediately.  By contrast, through its small network of local dealers, SANY has limited and ineffective access to at most approximately 5 percent of the addressable U.S. market after 7 years of costly expenditure in building a dealer network, due to the fact that sales through dealer networks are inherently local in nature, and SANY's actual market share is lower still.  Selling through IronPlanet would allow ICP to quickly achieve substantial distribution and scale selling its low-priced, high-quality products to end users, putting downward pressure on the Manufacturer Defendants' revenues and profits.

69.     ICP and IronPlanet signed a services agreement, called a Hosted Site Agreement ("Agreement"), on March 3, 2014.  The Agreement required IronPlanet to maintain on the IronPlanet website links that would allow visitors to that website to purchase ICP's product (the "Hosted Store"), as well as to provide pre-sale customer support and transaction processing. Visitors to ICP's ICPDirect.com site expressing an interest in purchasing ICP's product would be linked to the Hosted Store, where they could complete their transaction.  In return, IronPlanet would earn commissions on sales of ICP's products.  Once the Hosted Store was commercially deployed, which it was on March 3, 2014, the Agreement was not terminable at will.  Upon commercial deployment of the Hosted Store, the Agreement had an initial term of one year, with

automatic renewals of up to two successive one-year terms, subject to either party's right to terminate within 90 days of the end of each one-year period.

70.    IronPlanet was highly motivated to sell ICP's products.  IronPlanet had been attempting to expand its existing business, which focused on used heavy construction equipment, through the sale of new heavy construction equipment products on its website.  The sale of new products would allow IronPlanet (currently a privately-held company) to achieve more stable and predictable revenues and profits, which are desirable to investors in public equity markets, and thus to IronPlanet's venture capitalist investors.  IronPlanet's interest in selling ICP's products included an interest in selling heavy construction equipment, materials handling equipment, and agricultural equipment, and the Agreement covered sales of all of these products.

71.    ICP reasonably forecast making hundreds of millions of dollars in U.S. sales, and over 50 million dollars in U.S. profits, from its relationship with IronPlanet by no later than 2016, with accelerating rates of growth in sales and profits in successive years.  Access to IronPlanet's substantial customer base, the accelerating network effects that accrue to the IronPlanet platform and the benefit of IronPlanet's sales force conferred efficiencies and benefits on ICP that were not reasonably obtainable for ICP either on its own or through any other source.

72.    In addition to U.S. sales, ICP forecast making substantial international sales through its services agreement with IronPlanet.  More than twenty-five percent of IronPlanet's sales of heavy construction equipment are made to buyers outside the United States, and the Chinese products sold by ICP have met wide acceptance in certain international markets over the past decade.

73.    The Hosted Store went live and became commercially available to consumers on March 3, 2014.  Nineteen models of excavators, wheel loaders, and forklifts were offered for sale.

Consumers searched for ICP products on the IronPlanet Hosted Store, displaying increasing interest in successive weeks.  IronPlanet made a sale of an ICP product within just one week after the Hosted Store became operational and before the IronPlanet sales force had even started to market ICP's products.

74.     ICP announced its partnership with IronPlanet on March 3, 2014, at the 2014 CONEXPO-CON/AGG show, a widely-attended industry event.   Representatives of the Defendants attended ICP's live announcement of its entry plans and its contract with IronPlanet and/or visited its booth at the trade show.  The existence of a business relationship between ICP and IronPlanet was widely covered in the trade press.  Over fifty journalists covered the live announcement of the partnership of ICP and IronPlanet.  Defendants knew from these sources, and from their relationships with IronPlanet, that ICP had a contract with IronPlanet.

75.     The trade press also covered ICP's projections of rapid sales success and market share growth through IronPlanet.  ICP's Chairman was quoted in a trade press article as saying that ICP would sell 300 pieces of heavy construction equipment in the last three quarters of 2014 and make revenues of $150 million in 2015.  This article, or coverage of the same or similar statements by ICP, was available to Defendants.

76.     Defendants were aware of these projections, and understood that they depended on ICP's access to IronPlanet and IronPlanet's continued course of dealing with ICP.  On March 8, 2014, ICP's CEO was quoted in a trade press article as saying, "IronPlanet will be the engine that drives our online sales, with pricing, warranty, financing, etc., on to the shopping cart and check out." This article, or coverage of the same or similar statements by ICP, was available to Defendants.

77.     Defendants were aware that ICP planned to rapidly expand both its product offering of heavy construction equipment as well as other product categories, such as materials handling and agricultural equipment.  On March 5, 2014, ICP's Chairman was quoted in a trade press article as saying, "By the end of the year, we may have the fullest product line of anyone but Caterpillar." In the same article, ICP's CEO was quoted as saying, "There are hundreds of manufacturers who want to expand in the prime market here, but they fail because they don't know how.  This gives them an avenue to market." This article, or coverage of the same or similar statements by ICP, was available to Defendants.  ICP also announced publicly its intention to add additional manufacturers to its product line at the live announcement of its entry and partnership with IronPlanet on March 3, 2014.

78.     Industry observers agreed that ICP's relationship with IronPlanet posed a significant competitive threat to the incumbent manufacturers.  As reported in industry trade press on April 4, 2014:

> ICP plans to sell several models of Lonking excavators, wheel loaders, compactors and industrial lift trucks over the Internet ...  The ICP strategy could be very disruptive for the North American equipment business, if they succeed.  Up to now all manufacturers have spent huge amounts to develop and maintain distributors that serve local markets.  If the ICP business model works it could cause a sea change in the marketplace, and other foreign manufacturers are likely to try it as well.

This article, or coverage of the same or similar statements about ICP, was available to Defendants.

**ICP'S ENTRY ATTRACTED INTEREST FROM ADDITIONAL MANUFACTURERS**

79.     During and after the 2014 CONEXPO-CON/AGG show, major foreign manufacturers of heavy construction, materials handling, and agricultural equipment expressed

substantial interest in partnering with ICP for the sale of their products in the United States through IronPlanet.

80.     Shantui Construction Machinery Co., Ltd. ("Shantui") is a Chinese heavy construction equipment manufacturer and the world's largest supplier of dozers by units sold. Shantui's U.S. sales manager traveled to the 2014 CONEXPO-CON/AGG show specifically to meet with ICP personnel and attended ICP's public announcement of its entry into the heavy construction equipment market and its partnership with IronPlanet.  Representatives of both of the Manufacturer Defendants attended this same public announcement.  Expressions of interest by Shantui's management at the 2014 CONEXPO-CON/AGG show in contracting with ICP led to further top-level meetings between Shantui and ICP in China.  Shantui expressed an interest in selling Shantui products through ICP, particularly if ICP's entry through IronPlanet was successful.

81.     Sunward Equipment Group ("Sunward") is a Chinese manufacturer of heavy construction and materials handling equipment and one of the largest manufacturers of heavy construction equipment in the world.  Sunward's owner traveled to the 2014 CONEXPO-CON/AGG show specifically to meet with ICP personnel and attended ICP's public announcement of its entry into the heavy construction equipment market and its partnership with IronPlanet. Representatives of both of the Manufacturer Defendants attended this same public announcement. Expressions of interest by Sunward at the 2014 CONEXPO-CON/AGG show in contracting with ICP led to further top-level meetings between Sunward and ICP in China.  Sunward expressed an interest in selling Sunward products through ICP, particularly if ICP's entry through IronPlanet was successful.

82.     Xuzhou Construction Machinery Group ("XCMG") is a Chinese manufacturer of heavy construction and materials handling equipment and one of the largest manufacturers of heavy construction equipment in the world.  The CEO of Schwing, a U.S. subsidiary of XCMG, visited ICP to discuss selling XCMG products in the United States through ICP and expressed an interest in doing so, particularly if ICP's entry through IronPlanet was successful.

83.     KOMAC America, Inc. is a subsidiary of KOMAC, a South Korean manufacturer of heavy construction equipment.  Initial discussions between KOMAC and ICP representatives at the 2014 CONEXPO-CON/AGG show were sufficiently positive as to induce KOMAC's owner to visit the United States with the express purpose of meeting ICP's management.  KOMAC expressed an interest in selling KOMAC products through ICP, particularly if ICP's entry through IronPlanet was successful.

84.     Talleres Betoño S.A., d/b/a Tabe Hammer ("Tabe") is a Spanish manufacturer of accessories for heavy construction equipment.  After several communications with ICP, Tabe expressed a readiness to appoint ICP as Tabe's North American distributor.

## DEFENDANTS BLOCKED ICP'S ENTRY

85.     In February 2014, Cat Auction Services and Caterpillar desired to merge Cat Auction Services and IronPlanet.  A merger would allow the Caterpillar family to participate in the growing success of IronPlanet's online marketplace.  Cat Auction believed that a merger of Cat Auction Services with IronPlanet would enhance Cat Auction Services' revenue and profits through the elimination of direct competition in the procurement and sale of used heavy construction equipment between the merging parties.

86.     Caterpillar's support for a potential merger was understood to be necessary by both Cat Auction Services and IronPlanet.

87.     Although discussions about the terms of a potential transaction between Cat Auction Services and IronPlanet had been held in the past, these discussions had failed to culminate in a transaction due to several factors, one of which was the relative valuation to be afforded to the merging parties.  Caterpillar and Cat Auction Services sought a higher valuation for Cat Auction Services in a merged entity, and IronPlanet sought a lower valuation for Cat Auction Services in a merged entity.

88.     The valuation of Cat Auction Services' shares in a merger with IronPlanet depended on, among other things, the volume of Caterpillar used heavy construction equipment that Caterpillar and Caterpillar dealers would consign for sale through the merged entity.  Caterpillar recognized that it had significant leverage over IronPlanet through its ability to influence the volume of used heavy construction equipment made available to IronPlanet by Caterpillar's affiliates and dealers.

89.     In the past, Caterpillar and Caterpillar dealers, including the Caterpillar dealers who owned and controlled Cat Auction Services, had made substantial sales of used heavy construction equipment outside of Cat Auction Services.  As of February 2014, twenty-five Caterpillar dealers in the U.S. were members of Cat Auction Services.  Of those twenty-five, less than half utilized Cat Auction Services exclusively for the disposal via auction of their used heavy construction equipment.  The remaining Caterpillar dealers in the United States, including many owners of Cat Auction Services, allowed Cat Auction Services, IronPlanet, and others to compete for their used heavy construction equipment consignments.  This competition between Cat Auction Services, IronPlanet and others forced Cat Auction Services to offer lower commissions, and extend less desirable contract terms, to Caterpillar dealers to win their business.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Similarly, Caterpillar's

wholly owned subsidiaries Cat Financial and Caterpillar Used Equipment Services, Inc.

("CUESI") also consigned equipment to competitors of Cat Auction Services, including

IronPlanet.

90.     IronPlanet and Cat Auction Services executives recognized that a merger

agreement that afforded a relatively higher valuation to Cat Auction Services' share in the merged

entity than had been discussed in the past would require Caterpillar to consign more of its used

heavy construction equipment to the merged entity, and to force or induce Caterpillar dealers to

do the same.

91.     Between November 2013 and February 2014, and before becoming aware of ICP's

entry into the relevant heavy equipment markets, Caterpillar and Cat Auction Services agreed that

(i) Caterpillar would as part of any agreement cause its dealers to consign used heavy construction

equipment to the successor entity of a merger between IronPlanet and Cat Auction Services, and

(ii) that Caterpillar would as part of any agreement cause its wholly owned subsidiaries, Cat

Financial and CUESI, to consign used heavy construction equipment to the successor entity of a

merger between IronPlanet and Cat Auction Services.

92.     Caterpillar communicated to its dealers its expectation that those dealers would

consign increasing amounts of used heavy construction equipment to the successor of a merger of

Cat Auction Services and IronPlanet.  Caterpillar had a significant degree of leverage over its

dealers in these communications, as recognized by Cat Auction Services and others.  Although the

parties considered implementing formal agreements between Caterpillar and its dealers that the dealers would increase consignments of used heavy construction equipment to the successor entity of a Cat Auction Services/IronPlanet merger, in the end Caterpillar and its dealers opted for ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ This ████

████████ between Caterpillar and its dealers was collective action within the meaning of Section 1 of the Sherman Act.

93.     Caterpillar also communicated to Cat Financial and CUESI its expectation that Cat Financial and CUESI would consign increasing amounts of used heavy construction equipment to Cat Auction Services, and eventually to the successor of a Cat Auction Services/IronPlanet merger.

94.     Caterpillar's ability to drive its dealers to consign increasing amounts of used heavy construction equipment to IronPlanet as the result of a merger with Cat Auction Services was communicated by Cat Auction Services to IronPlanet.

95.     While IronPlanet welcomed the prospect of additional business from the Caterpillar family as a result of a merger, renewed discussions about a transaction once again foundered and reached impasse in March of 2014, as IronPlanet refused to agree to afford the shareholders of Cat Auction Services more than a ████████ of the merged entity.

96.     At the same time, Caterpillar became aware of ICP's entry into the relevant heavy construction equipment markets, and of ICP's relationship with IronPlanet.

97.     Caterpillar executives were concerned about the competitive implications of ICP's relationship with IronPlanet. ████████████████████

████████████████████████████████████████████████



98.

99.     Cat Auction Services executives were aware of ICP's relationship with IronPlanet, and the competitive implications of that relationship for Caterpillar.

Cat Auction Services worked with Caterpillar and with Caterpillar dealers to help extinguish the competitive threat to Caterpillar and Caterpillar dealers posed by ICP's relationship with IronPlanet.

100.    Defendants understood that IronPlanet's relationship with ICP would likely result in the disruptive and rapidly successful entry of ICP into the relevant heavy construction equipment markets, driving prices down to the detriment of the Defendants and the benefit of consumers.

101.    Thereafter, Caterpillar formulated a plan to achieve both its long-held goal of merging Cat Auction Services and IronPlanet, while also achieving its newly formulated goals of (i) forcing IronPlanet to discontinue its relationship with ICP and (ii) bringing IronPlanet under

the control of Caterpillar to ensure that IronPlanet would never again be free to support new entrants into the relevant heavy construction equipment markets.  Acting from Illinois, Caterpillar communicated this plan to Cat Auction Services, the Dealer Conspirators, and other Caterpillar dealers.

102.    To achieve these goals, Caterpillar turned to three tools at its disposal.  The first such tool was the leverage Caterpillar had over its dealers.  Instead of shifting the support of the Caterpillar family towards IronPlanet, as a way of inducing IronPlanet to agree to a merger with Cat Auction Services on terms that ascribed a significant share of the merged entity to the shareholders of Cat Auction Services, Caterpillar and its dealers, including the Dealer Conspirators, would now threaten to withhold used Caterpillar heavy construction equipment from IronPlanet if IronPlanet continued to deal with ICP.  The second tool at Caterpillar's disposal was its ability to block a transaction between Cat Auction Services and IronPlanet, a transaction that IronPlanet's management desired under certain conditions.  The third tool was the large volume of used heavy construction equipment that Caterpillar had itself built up through its subsidiaries Cat Financial and CUESI, used heavy construction equipment that Caterpillar could consign to IronPlanet, as an inducement to IronPlanet to drop its relationship with ICP, or withhold from IronPlanet, as a stick to force IronPlanet to drop its relationship with ICP.

103.    Caterpillar, the Dealer Conspirators, Cat Auction Services, and as yet-unknown co-conspirators, used all these tools to force IronPlanet to first discontinue its relationship with ICP, and then to agree to a transaction on terms that gave Caterpillar and its dealers control over IronPlanet.  Caterpillar, the Dealer Conspirators, Cat Auction Services, each of the Caterpillar dealers who own and control Cat Auction Services, and as-yet unknown co-conspirators, conspired to this end.

104.     With Caterpillar's knowledge and consent, the Chairman of Cat Auction Services, and the Chairman, President and CEO of Conspirator Ziegler, one of Caterpillar's dealers, sent IronPlanet's CEO Greg Owens an email on March 18, 2014. ██████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

█████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████

105.     The Manufacturer Defendants and their affiliates are some of the highest-volume sellers of used heavy construction equipment through IronPlanet.  IronPlanet has in the past publicly acknowledged the risks to its revenues and profitability if one or both of the Manufacturer Defendants stopped selling their used heavy construction equipment though IronPlanet. Leveraging the importance to IronPlanet of their used heavy construction equipment sales, the Manufacturer Defendants and the Dealer Conspirators threatened to boycott and refuse to deal with IronPlanet if it did not refrain generally from doing business with ICP.

106.     On or about March 26, 2014, and again with Caterpillar's knowledge and consent, Cat Auction Services again communicated with IronPlanet, this time sharpening the threat by making clear that IronPlanet risked the loss of used heavy construction equipment from Caterpillar dealers—including Cat Auction Services shareholders—if it continued dealing with ICP.  As the parties had reached impasse after IronPlanet refused to agree to Cat Auction Services' shareholders controlling more than 22 percent of a merged entity, IronPlanet executives had expressed

skepticism about the ability of the Caterpillar family, including Caterpillar, its dealers, and Cat Auction Services, to increase used heavy construction equipment consignments towards the merged entity.   Faced with the threat of ICP's rapid and effective entry through IronPlanet, Defendants now turned the collective unity of the Caterpillar family against IronPlanet—and against ICP—as a club to force IronPlanet into submission.   A draft Cat Auction Services letter to IronPlanet succinctly summarized the position of Caterpillar, Caterpillar dealers, including the Dealer Conspirators, and Cat Auction Services: ██████████████████████████

████████████████████████████████████████████████

████████████████████████ Cat Auction Services and IronPlanet alike understood this as a reference to withholding used heavy construction equipment from IronPlanet if IronPlanet continued its relationship with ICP.   On information and belief, this threat was delivered to IronPlanet on or about March 26, 2014.

107.   Caterpillar dealers, including dealers not members of Cat Auction Services and therefore not involved in the negotiation of the potential merger between IronPlanet and Cat Auction Services, also threatened to withhold used heavy construction equipment from IronPlanet if it continued to deal with ICP.   For example, Conspirator Thompson Tractor, a Caterpillar dealer in the Southeastern United States, refused to consign used heavy construction equipment to IronPlanet absent confirmation that IronPlanet was discontinuing its relationship with ICP.  ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

108.    Conspirator Ring Power, an investor in IronPlanet, made numerous telephone calls to IronPlanet's CEO on April 3, 2014, and, on information and belief, communicated its opposition to IronPlanet's relationship with ICP.  Ring Power was one of the Caterpillar dealers party to the ███████████████ that they would shift used heavy construction equipment consignments to IronPlanet after its merger with Cat Auction Services.  Ring Power also joined Caterpillar's conspiracy to exclude ICP by threatening to withhold used equipment from IronPlanet if IronPlanet continued its relationship with ICP.

109.    During the relevant time period, Caterpillar was aware of, encouraged, and directed communications between Ring Power and other Caterpillar dealers in the Southeastern United States to threaten IronPlanet with a boycott of used equipment.  One of the dealers with whom Ring Power communicated about IronPlanet was Thompson Tractor, which was threatening not to deal with IronPlanet if IronPlanet continued its relationship with ICP.  For example, a representative of Ring Power had a telephone call with a representative of Thompson Tractor on April 2, 2014, and the same Ring Power representative initiated a twenty-minute telephone call with IronPlanet's CEO about two hours later.  Later that day, the same Ring Power representative had numerous telephone calls with Caterpillar executive Richard Longbottom, who at the time was regularly communicating by telephone and email with Cat Auction Services CEO Gary Trettel regarding the potential merger between Cat Auction Services and IronPlanet.  On information and belief, the call from Ring Power's representative to IronPlanet's CEO on April 2 expressed Ring Power's opposition to IronPlanet's relationship with ICP.  Ring Power also threatened to boycott IronPlanet if it continued to do business with ICP.

110.    The Caterpillar family did not act alone to exclude ICP.  On March 26, 2014, Komatsu's Tim Tripas, an executive involved in the consignment by Komatsu of used heavy

construction equipment to IronPlanet, called IronPlanet CEO Greg Owens.  The two spoke for 26 minutes.  The next day, Komatsu executives exchanged emails relating to ICP's relationship with IronPlanet.  Several days after that, Komatsu executives exchanged emails about the distribution barrier to entry that had been protecting their market position before ICP's entry.  On information and belief, the call from Mr. Tripas to IronPlanet's CEO on March 26 expressed Komatsu's opposition to IronPlanet's relationship with ICP.  Komatsu also threatened to boycott IronPlanet if it continued to do business with ICP.

111.    The communications to IronPlanet by Caterpillar, Caterpillar dealers, Cat Auction Services and Komatsu of their opposition to IronPlanet's relationship with ICP were of significant concern to IronPlanet executives, ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████

112.    The same or similar threats to IronPlanet were communicated within days of one another (and in at least two cases, on the same day), whereby the Manufacturer Defendants and Dealer Conspirators would stop selling used heavy construction equipment through IronPlanet if IronPlanet continued to do business with ICP.  For example, Caterpillar, acting through Cat Auction Services, and Komatsu both delivered such a threat on or about March 26, 2014.  The Manufacturer Defendants induced IronPlanet's breach of its contract with ICP with the sole purpose of maintaining their market power in the relevant heavy construction equipment markets by eliminating ICP as a threatening and disruptive new market entrant selling new heavy construction equipment from Lonking or other new heavy construction equipment manufacturers. The Manufacturer Defendants and the Dealer Conspirators do not themselves sell new heavy construction equipment through IronPlanet, and had no interest in competing with ICP to do so.

113.    IronPlanet's CEO Greg Owens acceded to the improper threats of the Defendants,

███████████████████████████████████████████████████████████████

114.    IronPlanet contemporaneously communicated the fact and substance of these communications to ICP.  On April 4, 2014, IronPlanet's President, Jeff Jeter, informed ICP's Chairman, Tim Frank, that Caterpillar, and at least one other manufacturer of heavy construction equipment, had earlier that day threatened to stop doing business with IronPlanet if IronPlanet continued to deal with ICP.  IronPlanet's President stated that IronPlanet was distressed about the threats, which he characterized as "wrong" and stated that IronPlanet was convening its board members in the next several days to discuss the threats and to determine IronPlanet's response.  On April 10, 2014, IronPlanet's President confirmed that IronPlanet board members had met and that IronPlanet was forced to terminate its relationship with ICP because of the boycott threats.  In that same conversation, IronPlanet's President stated that "other manufacturers" besides Caterpillar had made the same boycott threat.  In response to a question from ICP's Chairman as to the identity of the other manufacturers (in addition to Caterpillar) that were making the threats and thereby forcing IronPlanet to terminate its relationship, with ICP, IronPlanet's President responded "you know who our investors are." Caterpillar, Komatsu, and a third company are the only manufacturer investors in IronPlanet.  As ICP later learned, Conspirator Ring Power was also an investor in IronPlanet, and like Caterpillar and Komatsu, was a consignor of used heavy construction equipment on IronPlanet.

115.    On April 4, 2014, the same day that IronPlanet first communicated to ICP the threats received by IronPlanet from Defendants, the CEOs of Cat Auction Services and IronPlanet met to discuss a potential merger.  After Mr. Jeter communicated with ICP's Tim Frank on April 4, Mr. Jeter emailed IronPlanet's CEO Greg Owens, and IronPlanet's General Counsel, recounting

his discussion with Mr. Frank, ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

116.    IronPlanet's CEO Greg Owens communicated with Caterpillar about ICP directly, ███████████████████████████████████ The Caterpillar executive who received this email was Dave Shurson, an executive at Cat Financial, who responded █████ ████████████ Messrs.  Owens and Shurson had had previous discussions in which Mr. Owens complained to Mr. Shurson about the slow pace of discussions with Cat Auction Services. Mr. Shurson is involved in the consignment of used heavy construction equipment to IronPlanet by Caterpillar.

117.    On the same day that Mr. Owens communicated with Mr. Shurson, Mr. Tripas at Komatsu called Mr. Owens, and Messrs. Tripas and Owens spoke for 16 minutes the following day.

118.    The telephone conversations between Messrs. Tripas and Owens on March 26, 2014, and on April 16, 2014, were unusual.  These two individuals do not routinely communicate by telephone.

119.    IronPlanet's investors were the Manufacturer Defendants, another manufacturer, venture capital firms, and certain Caterpillar dealers, including Conspirator Ring Power. IronPlanet's venture capital investors could not have made the threats described by IronPlanet to ICP because they have no heavy construction equipment to withhold from IronPlanet and because, as alleged above, IronPlanet saw a substantial economic opportunity in the contract with ICP,

including smoother financial earnings that could lead to an IPO and a selling opportunity with substantial economic benefits for IronPlanet's venture capital investors. The Manufacturer Defendants and the Dealer Conspirators, on the other hand, had every incentive to prevent ICP from selling Lonking new heavy construction equipment through IronPlanet, and to prevent ICP from entering into agreements with other manufacturers of new heavy construction equipment enabling ICP to sell those manufacturers' new heavy construction equipment through IronPlanet, as ICP had disclosed in the March 5, 2014 trade press article. Thus, the threats to IronPlanet made by its "investors" and relayed to ICP by IronPlanet could have come only from the Manufacturer Defendants and certain Caterpillar dealers, acting in conspiracy with Caterpillar, including Ring Power.

120. The Defendants agreed and conspired with one another to issue these threats to IronPlanet and to pressure IronPlanet to refrain from dealing with ICP. The Defendants had the motive and opportunity to conspire to this end and did not have sufficient unilateral incentives to engage in this costly and risky conduct absent an agreement that all of the Defendants would do so.

121. The Manufacturer Defendants' investments in IronPlanet make them highly interdependent with respect to the terms on which they would be willing to deal with IronPlanet, and give the Manufacturer Defendants the incentive and ability to coordinate those terms. A refusal to deal with IronPlanet by any Manufacturer Defendant would tend to impair the value of all of the Manufacturer Defendants' investments in IronPlanet, and would have called for and triggered coordination among the Manufacturer Defendants to avoid conflicts of interest. Upon information and belief, the Manufacturer Defendants met and conferred with one another about the terms on which they would refuse to do business with IronPlanet.

122.    The Manufacturer Defendants and the Dealer Conspirators lacked the incentive to issue their threats to IronPlanet absent an agreement that they would each engage in this conduct. The Manufacturer Defendants' and the Dealer Conspirators' threats were costly and risky, exposing each individually to the risk of substantial lost sales through IronPlanet, if IronPlanet did not accede to their demands, and to the possibility of legal action from demanding conduct they knew to be a breach of contract with ICP, if IronPlanet did accede.  In contrast, the benefits of excluding ICP from the relevant heavy construction equipment markets would be felt commonly among the Manufacturer Defendants and their competitors, and among the Dealer Conspirators. This concentrated-cost but distributed-benefit dynamic would have resulted in parallel conduct only when coordinated by communication and agreement among the Manufacturer Defendants and the Dealer Conspirators.

123.    Komatsu recognized that IronPlanet's dominance in the online distribution of heavy equipment made unilateral threats to IronPlanet unacceptably risky. ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

124.    The threats of the Manufacturer Defendants and the Dealer Conspirators to IronPlanet marked a sudden departure from their past practice of tolerating sales of a wide range

of used heavy construction equipment through IronPlanet.  Upon information and belief, the Manufacturer Defendants and the Dealer Conspirators have not previously demanded that IronPlanet refrain from dealing with any manufacturer or supplier of heavy construction equipment.

125.    IronPlanet acceded to the heavy economic pressure applied by the Defendants. IronPlanet informed ICP that IronPlanet would not perform the terms of the Agreement. IronPlanet discontinued sales and transaction support for ICP's products, delivering written notice of termination on April 7, 2014.  These acts by IronPlanet constituted an unlawful breach of the Agreement with ICP.  IronPlanet's termination letter identified no excuse or justification for its breach, and characterized IronPlanet's breach as "an unfortunate circumstance."

126.    The Defendants knew that IronPlanet's termination of its contract with ICP, and its sales and transaction support of ICP's products, would cause other new heavy equipment manufacturers to stop attempting to expand their sales in the United States by dealing with ICP or by working through ICP to gain access to IronPlanet's sales platform.

127.    The incentives of the Defendants and IronPlanet were not aligned with respect to IronPlanet's dealing with ICP.  IronPlanet's coerced termination of its contract with ICP was contrary to IronPlanet's economic interest, as this conduct exposed IronPlanet to legal liability and was unprofitable for IronPlanet.  As alleged above, IronPlanet was highly motivated to deal with ICP.  IronPlanet breached the Agreement just days after senior executives of ICP and IronPlanet met and discussed ways to further expand sales of ICP products on IronPlanet.  The heavy economic pressure applied by the Defendants to IronPlanet was intended to further their own commercial interests at the expense of IronPlanet's interests.  In the telephone call between ICP

and IronPlanet that occurred on or about April 10, 2014, IronPlanet's President said that the Defendants' actions in forcing IronPlanet's breach were "wrong" and "make no sense to me."

128.    Caterpillar's dealers, including the Dealer Conspirators, curtailed their consignment of used heavy construction equipment to other auctioneers after the merger of IronPlanet and Cat Auction Services was agreed.  For example, after the merger was agreed, Ring Power abruptly discontinued its relationships with IronPlanet's competitors, in furtherance of this agreement, and communicated with competing Caterpillar dealers in an effort to convince them to do the same.

### THE DEFENDANTS CONSPIRED TO ELIMINATE THE THREAT OF NEW ENTRY BY ELIMINATING IRONPLANET AS AN INDEPENDENT CHANNEL FOR NEW ENTRY

129.    Having eliminated the immediate threat of ICP's rapid and effective entry through IronPlanet, Defendant Caterpillar and Cat Auction Services then conspired to forever eliminate that threat by bringing IronPlanet under the control of Caterpillar and its dealers, the owners of Defendant Cat Auction Services.  The merger of these two entities, in each of which Caterpillar holds minority stakes, was achieved through Caterpillar's knowing participation and support, and Caterpillar's influence with its equipment dealers, the other shareholders in Cat Auction Services.

130.    The incentives of Cat Auction Services and Caterpillar are aligned with one another, including with respect to the exclusion of new competitors, such as ICP, that pose a threat to the market share and profitability of Caterpillar and its dealers.  Since its founding in 2008, Cat Auction Services, which has licensed Caterpillar's intellectual property and operates with Caterpillar's endorsement, has promoted Caterpillar's interests, including by promoting financing, service, and insurance offered by Caterpillar, and by operating with the benefit of Caterpillar-trained employees.  When Caterpillar in 2012 took a financial stake in Cat Auction

Services, the President of Cat Auction Services stated publicly that Cat Auction Services was "a part of the extended Caterpillar network," and Cat Auction Service's CFO stated publicly that "throughout the entire process of closing this transaction, the business strategy and expectations of Caterpillar Inc. and independent Cat dealers have been in direct alliance with each other."

131.    Due to Caterpillar's policy of requiring exclusivity on the part of its dealers, the incentives of Caterpillar and its dealers – and thus the incentives of Cat Auction Services, wholly controlled and operated by Caterpillar and its exclusive dealers – are aligned with respect to erecting barriers to ICP's effective entry into the relevant heavy construction equipment markets. Thus, Cat Auction Services had the motive to join the Manufacturer Defendants' ongoing conspiracy to eliminate the threat of ICP's entry through IronPlanet.

132.    The merger of IronPlanet and Cat Auction Services will align IronPlanet's incentives with those of Caterpillar and its dealers with respect to dealing with ICP and other new entrants and will ensure that IronPlanet will never again facilitate the entry of ICP and other new competitors into the relevant heavy construction equipment markets.  Before the merger, an independent IronPlanet actively sought to deal with new entrants into the relevant new heavy construction equipment markets, as demonstrated through its contract with ICP and the fact that it had to be coerced and restrained by the Manufacturer Defendants into breaching that contract. Although the entry of ICP through IronPlanet would have harmed Caterpillar, Caterpillar dealers, and the other Manufacturer Defendants, IronPlanet would have benefitted financially from ICP's entry, and had strong incentives to support it.  After the merger, IronPlanet will be, as Cat Auction Services has been since 2012, "part of the extended Caterpillar network," and will have incentives aligned with Caterpillar with respect to the entry of disruptive new competitors.  By making IronPlanet "part of the extended Caterpillar network," the merger of Cat Auction Services and

IronPlanet will make IronPlanet less interested in supporting the entry of new and disruptive competitors into the relevant heavy construction equipment markets, thereby harming competition in the relevant heavy construction equipment markets.

133.    The pressure applied by Caterpillar, Cat Auction Services, the Dealer Conspirators, and other Caterpillar dealers in March and April of 2014 caused IronPlanet to accede to terms of a merger that gave the Caterpillar family control over the merged entity. ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

134.    Deprived of efficient distribution through IronPlanet, ICP has no feasible way to reach consumers in the heavy construction equipment markets.  ICP's equity and goodwill have been damaged as a result of Defendants' actions.  ICP's flagship partner, IronPlanet, has broken off any business relationship with ICP, and ICP's products are no longer available through IronPlanet.  Market participants are aware of these facts.  ICP's 2014 revenues were a small fraction of what they would have been but-for the Defendants' conduct.  These effects will continue for years to come as ICP suffers from lack of distribution and harm to its reputation with consumers and suppliers of heavy construction equipment alike.  Foreign manufacturers of heavy construction, materials handling, and agricultural equipment have been deterred from dealing with ICP by the Defendants' conduct.

135.    ICP has taken all reasonable steps to mitigate its damages, including trying to set up equipment dealers in an attempt to challenge frontally the Manufacturer Defendants' distribution barrier to entry.  These efforts have been unsuccessful in challenging the Manufacturer

Defendants' collective dominance of the relevant heavy construction equipment markets, or in mitigating ICP's damaged equity, damaged goodwill, lost sales, and lost profits caused by the Defendants' conduct.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY TOOK PLACE IN FLORIDA

136.    Defendants Ring Power and Thompson Tractor have historically not consigned significant amounts of equipment through Cat Auction Services, instead consigning used equipment through venues such as IronPlanet or Richie Bros.

137.    In its merger negotiations with Cat Auction Services, IronPlanet had cited its relationship with Ring Power, in particular, as a trump card entitling it to a higher valuation.  All parties, including Caterpillar, Ziegler, Cat Auction, and IronPlanet, understood Ring Power's support for a merger to be critical to determination of the ultimate valuation to be ascribed to the respective merging parties.  This was so because Ring Power is one of the largest Caterpillar dealers in the United States, because Ring Power was an investor in IronPlanet, and because Ring Power had historically not consigned large volumes of used equipment to Cat Auction Services.

138.    In addition to having access to substantial volumes of used equipment for consignment, Ring Power was perceived by all parties involved in the transaction, including Caterpillar, Ziegler, Cat Auction Services, and IronPlanet, to be able to influence the consignment decisions of other Caterpillar dealers in the Southeastern United States.

139.    According to Cat Auction Services' CEO, and as communicated to Caterpillar, IronPlanet's CEO ███████████████████████████████████████████
███████████████████████████████████████████████

140.     Similarly, Caterpillar communicated to Ziegler that ████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████

141.     Similarly, Ziegler communicated to Cat Auction Services its perception that Caterpillar dealers, including Ring Power, ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████

142.     Ziegler communicated to IronPlanet ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

143.     On March 31, 2014, as a result of the pressure applied by Caterpillar, Ziegler, Komatsu and Cat Auction Services, ████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ control over IronPlanet and in that way extinguish forever the threat of new entry by ICP.

144.     Caterpillar perceived the opportunity to enlist Ring Power and Thompson Tractor into the conspiracy to pressure IronPlanet to discontinue its relationship with ICP, and to agree to

a merger with Cat Auction Services on terms that conferred on the Caterpillar family control over IronPlanet.

145.    On March 31, 2014, ███████████████████████████████████ ███████████████████████████████ and after Cat Auction Services had received that offer, Caterpillar contacted Ring Power in Florida, communicated its opposition to IronPlanet's relationship with ICP, and enlisted the support of Ring Power in pressuring IronPlanet to discontinue that relationship.

146.    On April 2, 2014, Caterpillar again communicated to Ring Power in Florida Caterpillar's opposition to IronPlanet's relationship with ICP, and enlisted the support of Ring Power in pressuring IronPlanet to discontinue that relationship.  Caterpillar did so with the understanding that Ring Power exercised a degree of influence and control over the consignment of used equipment by other Caterpillar dealers in the Southeastern United States, including Thompson Tractor, and on information and belief with the expectation that Ring Power would use that influence and control to affect the consignment decisions of those other Caterpillar dealers.

147.    On April 2, 2014, after again being contacted by Caterpillar, from Florida Ring Power contacted Thompson Tractor.  In placing this call, Ring Power committed an overt act in furtherance of the conspiracy of Caterpillar, Komatsu, Ziegler, and Thompson.

148.    On or about April 2, 2014, Thompson Tractor conveyed a threat to IronPlanet that Thompson Tractor would not consign used equipment to IronPlanet unless IronPlanet discontinued its relationship with ICP. ████████████████████████████████ ████████████████████████████████████████

149.    Thompson Tractor would have learned of IronPlanet's relationship with ICP only from Ring Power or Caterpillar.

150.    In making these threats, Thompson committed in overt act in furtherance of the conspiracy of Caterpillar, Komatsu, Ziegler, and Ring Power.

151.    On April 3, 2014, from Florida, Ring Power contacted the CEO of IronPlanet, to convey its opposition to IronPlanet's relationship with ICP, as Ring Power had previously committed to Caterpillar to doing.  On this call, Ring Power communicated to IronPlanet its unwillingness to consign used equipment to IronPlanet in the future unless IronPlanet discontinued its relationship with ICP.  In making these threats, Ring Power committed an overt act in furtherance of the conspiracy of Caterpillar, Komatsu, Ziegler, and Thompson.

152.    The CEO of IronPlanet reacted to Ring Power's communication immediately. Within minutes he called the General Counsel of IronPlanet and then Jeff Jeter, and all three then participated in a conference call. ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████

153.    That same day, IronPlanet's CEO then confirmed to Ring Power that it had removed the products of ICP from its website.

154.    The next day, IronPlanet's Jeff Jeter informed ICP of its decision to terminate IronPlanet's relationship with ICP, citing the threats it had received.

155.    Mr. Jeter sent to IronPlanet's CEO a written summary of his discussion with ICP. After receiving this written summary, IronPlanet's CEO again called Ring Power.

156.    IronPlanet then confirmed in writing to Thompson that IronPlanet had terminated its relationship with ICP.

157.    The actions in furtherance of their conspiracy taken by Caterpillar, Komatsu, Ziegler, Ring Power and Thompson were directed at, occurred within, and caused anticompetitive effects, including the paying of prices above competitive levels by consumers in, the Northern District of Florida.

158.    All parties understood that one key term of the conspiracy was that Ring Power would consign increased amounts of used equipment to the successor to the merger of IronPlanet and Cat Auction, rather than to IronPlanet's competitor Richie Bros.

159.    As another overt act in furtherance of the conspiracy, and after IronPlanet had agreed to merge with Cat Auction on terms acceptable to the Caterpillar family, Ring Power boycotted an auction held in Florida by Richie Bros., instead consigning used equipment through IronPlanet and Cat Auction.

## DEFENDANTS' UNLAWFUL CONDUCT

160.    The Defendants' threats to boycott and refuse to deal with IronPlanet if IronPlanet continued dealing with ICP foreclosed ICP from the most efficient distribution channel for a new entrant that had not already been foreclosed by the exclusivity arrangements of the Manufacturer Defendants and the other incumbent manufacturers, leading to damaged equity and goodwill for ICP, lower revenues and profits for ICP, and higher prices for end users of these products.

161.    The conduct of Cat Auction Services in influencing whether and to what extent the twenty-five independent and competing Caterpillar dealers who were Cat Auction Services' owners would consign or otherwise make available used heavy construction equipment to auctioneers of used heavy construction equipment other than Cat Auction Services was the collective action of those twenty-five Caterpillar dealers, each of whom conspired with one another, and with the Defendants, to exclude ICP.  In acting through Cat Auction Services and

with Caterpillar and the other Defendants to exclude ICP, Cat Auction Services' owners were acting as a combination and conspiracy, rather than as a single entity, for purposes of Section 1 of the Sherman Act.

162.    The merger of Cat Auction Services and IronPlanet is anticompetitive due to its tendency to substantially reduce competition in the relevant heavy construction equipment markets and to foreclose the possibility of effective entry into those markets by new entrants.

163.    Defendants' conduct has caused damage to ICP's equity and goodwill and caused ICP lost sales and lost profits.

## CLAIMS FOR RELIEF

## COUNT ONE:

### The Defendants Have Unreasonably Restrained Trade (Lost Profits)

164.    Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  The non-Cat Auction Services Defendants' conduct as alleged therein are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

165.    The non-Cat Auction Services Defendants' agreements with one another, and with coconspirators not named as Defendants, that each would threaten to boycott IronPlanet if IronPlanet did not breach its contract with ICP and otherwise refrain from dealing with ICP was an unlawful group boycott.

166.    Caterpillar's agreement with IronPlanet, as described above, to sell its used heavy construction equipment on IronPlanet but only on the condition that IronPlanet discontinue ongoing sales of ICP's products, including its new heavy construction equipment on IronPlanet, breach an existing contract with ICP, and otherwise refrain from dealing with ICP was an unlawful negative tying arrangement.

167.    This conduct has damaged ICP in the form of lost profits.

168.    As alleged in Paragraphs 28-35, the relevant product market is marketing and sale of new heavy construction equipment, and narrower relevant markets contained therein.

169.    As alleged in Paragraph 35, the United States is a relevant geographic market. Purchasers of heavy construction equipment located in the United States do not purchase heavy construction equipment from suppliers located outside the United States and without distribution assets and relationships within the United States.

**COUNT TWO:**

**The Defendants Have Unreasonably Restrained Trade**
**(Damaged Equity and Goodwill)**

170.    Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  The non-Cat Auction Services Defendants' conduct as alleged therein are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

171.    The non-Cat Auction Services Defendants' agreements with one another, and with coconspirators not named as Defendants, that each would threaten to boycott IronPlanet if IronPlanet did not breach its contract with ICP and otherwise refrain from dealing with ICP was an unlawful group boycott.

172.    Caterpillar's agreement with IronPlanet, as described above, to sell its used heavy construction equipment on IronPlanet but only on the condition that IronPlanet discontinue ongoing sales of ICP's products, including its new heavy construction equipment on IronPlanet, breach an existing contract with ICP, and otherwise refrain from dealing with ICP was an unlawful negative tying arrangement.

173.     This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

174.     As alleged in Paragraphs 29-35, the relevant product market is marketing and sale of new heavy construction equipment, and narrower relevant markets contained therein.

175.     As alleged in Paragraph 35, the United States is a relevant geographic market. Purchasers of heavy construction equipment located in the United States do not purchase heavy construction equipment from suppliers located outside the United States and without distribution assets and relationships within the United States.

**COUNT THREE:**

**Defendants' Tortious Interference with Contract (Lost Profits)**

176.     Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  Each of the Defendants' conduct as alleged therein constitutes tortious interference with contract under the law of the States of Illinois and, in the alternative, Florida.

177.     This conduct has damaged ICP in the form of lost profits.

178.     As alleged in Paragraph 69, ICP had a valid contract with IronPlanet.

179.     As alleged in Paragraph 74, Defendants knew of the existence of that contract.

180.     As alleged in Paragraphs 85–128 and 136–163, Defendants used wrongful means to interfere with that contract.

181.     As alleged in Paragraph 3–4 and 112, Defendants acted with an improper purpose.

## COUNT FOUR:

### Defendants' Tortious Interference with Contract
### (Damaged Equity and Goodwill)

182.     Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  Each of the Defendants' conduct as alleged therein constitutes tortious interference with contract under the law of the States of Illinois and, in the alternative, Florida.

183.     This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

184.     As alleged in Paragraph 69, ICP had a valid contract with IronPlanet.

185.     As alleged in Paragraph 74, Defendants knew of the existence of that contract.

186.     As alleged in Paragraphs 85-128 and 136-163, Defendants used wrongful means to interfere with that contract.

187.     As alleged in Paragraph 3–4 and 112, Defendants acted with an improper purpose.

## COUNT FIVE:

### Defendants' Tortious Interference with Prospective Business Relations
### (Lost Profits)

188.     Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  Each of the Defendants' conduct as alleged therein constitutes tortious interference with ICP's prospective business relations with IronPlanet in the future, and with foreign manufacturers of heavy construction, materials handling, and agricultural equipment, including Shantui, Sunward, XCMG, KOMAC and Tabe under the law of the States of Illinois and, in the alternative, Florida.

189.     This conduct has damaged ICP in the form of lost profits.

190.     As alleged in Paragraphs 75-7 and 126, Defendants were aware of these prospective business relations.

191.   As alleged in Paragraphs 85-128 and 136-163, Defendants used wrongful means to interfere with these prospective business relations.

192.   As alleged in Paragraph 2–4 and 112, Defendants acted with an improper purpose.

## COUNT SIX:

### Defendants' Tortious Interference with Prospective Business Relations
### (Damaged Equity and Goodwill)

193.   Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  Each of the Defendants' conduct as alleged therein constitutes tortious interference with ICP's prospective business relations with IronPlanet in the future, and with foreign manufacturers of heavy construction, materials handling, and agricultural equipment, including Shantui, Sunward, XCMG, KOMAC and Tabe under the law of the States of Illinois and, in the alternative, Florida.

194.   This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

195.   As alleged in Paragraphs 75-77 and 112, Defendants were aware of these prospective business relations

196.   As alleged in Paragraphs 85-128 and 136-163, Defendants used wrongful means to interfere with these prospective business relations.

197.   As alleged in Paragraph 3–4 and 112, Defendants acted with an improper purpose.

## COUNT SEVEN:

### Civil Conspiracy (Lost Profits)

198.   Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  Each of the Defendants' conduct as alleged therein constitutes civil conspiracy under the law of the States of Illinois and, in the alternative, Florida.

199.   This conduct has damaged ICP in the form of lost profits.

200.     As alleged in Paragraphs 85–135, Defendants entered into an agreement between two or more parties.

201.     As alleged in Paragraphs 85–135, the object of that agreement was an unlawful act.

202.     As alleged in Paragraphs 136–63, an overt act in furtherance of that agreement was committed.

203.     As alleged in Paragraphs 136–63, the overt act in furtherance of that agreement was tortious or unlawful.

204.     As alleged in Paragraph 163, ICP was harmed as a result of acts done under the

conspiracy.

## COUNT EIGHT:

## Civil Conspiracy (Damaged Equity and Goodwill)

205.     Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  Each of the Defendants' conduct as alleged therein constitutes civil conspiracy under the law of the States of Illinois and, in the alternative, Florida.

206.     This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP as a going concern.

207.     As alleged in Paragraphs 85–135, Defendants entered into an agreement between two or more parties.

208.     As alleged in Paragraphs 85–135, the object of that agreement was an unlawful act.

209.     As alleged in Paragraphs 136–63, an overt act in furtherance of that agreement was committed.

210.     As alleged in Paragraphs 136–63, the overt act in furtherance of that agreement was tortious or unlawful.

211.     As alleged in Paragraph 163, ICP was harmed as a result of acts done under the

conspiracy.

## COUNT NINE:

### Aiding and Abetting (Lost Profits)

212.     Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  The conduct

of the Defendants, including the merger of Cat Auction Services and IronPlanet, constitutes aiding

and abetting of the Defendants' ongoing tortious and anticompetitive conduct aimed at ICP under

the law of the States of Illinois and, in the alternative, Florida.

213.     This conduct has damaged ICP in the form of lost profits.

214.     As alleged in Paragraphs 136–63, the Defendants aided or abetted a party that

performed a wrongful act that caused an injury.

215.     As alleged in Paragraphs 85–163, the Defendants were regularly aware of their role

as part of the tortious activity.

216.     As alleged in Paragraphs 85–163, the Defendants knowingly and substantially

assisted the principal violation.

## COUNT TEN:

### Aiding and Abetting (Damaged Equity and Goodwill)

217.     Plaintiff hereby restates Paragraphs 1 through 163 of this Complaint.  The conduct

of the Defendants, including the merger of Cat Auction Services and IronPlanet, constitutes aiding

and abetting of the Defendants' ongoing tortious and anticompetitive conduct aimed at ICP under

the law of the States of Illinois and, in the alternative, Florida.

218.     This conduct has damaged ICP's equity and goodwill, diminishing the value of ICP

as a going concern.

219.    As alleged in Paragraphs 136–63, the Defendants aided or abetted a party that performed a wrongful act that caused an injury.

220.    As alleged in Paragraphs 85–163, the Defendants were regularly aware of their role as part of the tortious activity.

221.    As alleged in Paragraphs 85–163, the Defendants knowingly and substantially assisted the principal violation.

## REQUEST FOR RELIEF

222.    To remedy these illegal acts, Plaintiff requests the Court:

a.      Enter an injunction permanently enjoining the Defendants from the other unlawful conduct of the Defendants as alleged herein;

b.      Order the divestiture of IronPlanet by Cat Auction Services;

c.      Award compensatory and trebled damages in favor of the Plaintiff and against all Defendants, jointly and severally, and punitive damages, including all interest thereon;

d.      Award Plaintiff reasonable costs and expenses incurred in this action, including attorney's fees and expert fees; and

e.      Any such further relief as the Court deems appropriate.

Dated: July 12, 2023

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*Of Counsel*:

By: */s/ Matthew D. Stachel*

William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
David E. Cole (*pro hac vice*)
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
wisaacson@paulweiss.com
amauser@paulweiss.com
dcole@paulweiss.com

    Daniel A. Mason (No. 5206)
    Matthew D. Stachel (No. 5419)
    500 Delaware Avenue, Suite 200
    P.O. Box 32
    Wilmington, DE 19899-0032
    (302) 655-4410
    dmason@paulweiss.com
    mstachel@paulweiss.com

*Attorneys for Plaintiff International
Construction Products LLC*