## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL CONSTRUCTION
PRODUCTS LLC,

                  Plaintiff,

      v.

CATERPILLAR INC. et al.,

                  Defendants.

Case No. 15-cv-108-RGA-SRF

**PUBLIC VERSION**

---

**PLAINTIFF INTERNATIONAL CONSTRUCTION PRODUCTS LLC'S OPENING
BRIEF IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE CERTAIN
<u>OPINIONS OF CATERPILLAR, INC.'S EXPERT KEVIN M. MURPHY</u>**

*Of Counsel*:

William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
David E. Cole (*pro hac vice*)
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300

Dated:  October 17, 2023

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

Matthew D. Stachel (No. 5419)
500 Delaware Avenue, Suite 200
P.O. Box 32
Wilmington, DE 19899-0032
(302) 655-4410

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 1

    A.    The Relevant Facts Relating to LSI. ............................................................................ 1

    B.    Dr. Murphy's Opinions ............................................................................................... 4

LEGAL STANDARD ................................................................................................................. 5

ARGUMENT .............................................................................................................................. 6

I.    DR. MURPHY'S OPINION THAT THE LSI-IRON DIRECT PARTNERSHIP IS THE MOST RELIABLE MEASURE OF ICP'S BUT FOR PROFITS LACKS ANY FACTUAL FOUNDATION AND SHOULD BE EXCLUDED. ..................................... 6

CONCLUSION ........................................................................................................................... 8

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                           **Page(s)**

*Ace Pallet Corp.* v. *Consol. Rail Corp.*,
   764 F. App'x 197 (3d Cir. 2019) ..................................................................................5, 8

*Daubert* v. *Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993)..............................................................................................5

*United States* v. *Fallon*,
   61 F.4th 95 (3d Cir. 2023) ....................................................................................7

*Johnston Heart & Vasular Center, Inc.* v. *AVR Mgmt., LLC*,
   2019 WL 3573663 (W.D. Pa. Aug. 6, 2018) .............................................................5

*Meadows* v. *Anchor Longwall & Rebuild, Inc.*,
   306 F. App'x 781 (3d Cir. 2009) .........................................................................5, 8

*Phelps* v. *CBS Corp.*,
   2020 WL 7028954 (S.D.N.Y. Nov. 30, 2020) ..........................................................6

*Syngenta Crop Prot. LLC* v. *Azoxystrobin LLC*,
   267 F. Supp. 3d 649 (M.D.N.C. 2017) ...................................................................6

*Tchatat* v. *City of New York*,
   315 F.R.D. 441 (S.D.N.Y. 2016) ..........................................................................8

*In re Wholesale Grocery Prods. Antitrust Litig.*,
   946 F.3d 995 (8th Cir. 2019) ...............................................................................5

*Wilson* v. *Saint-Gobain Universal Abrasives, Inc.*,
   2015 WL 1499477 (W.D. Pa. Apr. 1, 2015)..............................................................8

**Other Authorities**

F.R.E. 702 ...........................................................................................................5

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff International Construction Products LLC ("ICP") respectfully moves the Court for an order precluding specific opinions of Caterpillar' Inc.'s ("Caterpillar") economics expert, Kevin Murphy. ICP claims damages flowing from Caterpillar's and its co-conspirators' antitrust conspiracy, which had as an object termination of a contract between IronPlanet and ICP in April 2014, resulting in the failure of ICP. One year later, ICP sold its assets to Liquidity Services Inc. ("LSI"), an asset liquidator, which launched an entity with the assets called Iron Direct. This motion seeks to exclude any opinions of Dr. Murphy based on his conclusion that LSI is an appropriate benchmark for measuring what ICP's profitability would have been had its agreement with IronPlanet not been terminated in 2014.

## SUMMARY OF ARGUMENT

1.       Dr. Murphy admitted that he reached his conclusions about LSI as an appropriate benchmark without any data comparing IronPlanet and LSI on multiple key metrics. His opinions about LSI being the "next best alternative" and the appropriate benchmark for measuring ICP's profitability, had its agreement with IronPlanet not been terminated is factually unsupported, based on speculation, and has the potential to confuse and mislead the jury. As the gatekeeper for what information may be presented to the jury, the Court should preclude Dr. Murphy from offering opinions based on LSI being the "next best alternative" and the agreement between LSI and Iron Direct being the appropriate benchmark for measuring what ICP's profitability would have been had its contractual relationship with IronPlanet continued.

## FACTUAL BACKGROUND

### A.       The Relevant Facts Relating to LSI.

ICP planned to introduce into North America new heavy construction equipment manufactured by Chinese manufacturers. ICP's business model had "four legs": (1) "a robust

digital online sales and large sales force, which is what IronPlanet represented;" (2) "high volume quality manufacturers;" (3) "deeply experienced staff;" and (4) "a network of dealers willing to service the equipment." *See* Declaration of David Cole ("Cole Decl."), Ex. A at 30:21-31:5.

ICP chose IronPlanet to satisfy the first leg of its business model because it had built "a trusted brand for transacting" sales of used heavy construction equipment, had "a field sales force that was out calling on customers in the market," and had about 2 million registered users on its website. Cole Decl., Ex. B at 85:7-14. While the heavy construction equipment offered for sale on the IronPlanet website primarily consisted of used heavy construction equipment, it also included some new products. *Id.* at 85:18-24.

At the time ICP entered into an agreement with IronPlanet in March 2014, it did not identify alternatives comparable to IronPlanet. For example, "while Ritchie Brothers was a big, established player, their business model was really built around physical auctions." *Id.* at 89:13-14. Under the Ritchie Brothers model, it would have been necessary to ship equipment to the physical auction 30-45 days prior to the auction, with the equipment exposed to viewers watching the physical auction." *Id.* at 89:21-90:5. In contrast, IronPlanet's model was to review the machine, inspect it, and take photographs of the machine, and then the owner of the machine could market the machine on the IronPlanet platform until it was sold. *Id.* at 91:17-92:8. IronPlanet was the only online platform "just focused on heavy equipment" with a "very large sales force." *Id.* at 102:8-13. As Caterpillar recognized, IronPlanet had the "[s]trongest most robust technology systems in the industry." Cole Decl., Ex. C at -463.

The "emerging equipment brands in Asia pose[d] a potential threat to Caterpillar's long-term growth," with Caterpillar recognizing that exports from China posed "a major threat to our leadership position in the wheel loader business and our price levels on Caterpillar branded

products." Cole Decl., Ex. D at -963.    Although IronPlanet offered primarily used heavy construction equipment, Caterpillar recognized that ICP "could compete in the used market and say well you don't have to buy used, you can buy new at a similar price point." Cole Decl. Ex. K at 179:16-22. In response to "pressure" from Caterpillar, IronPlanet terminated its contract with ICP in April 2014. Cole Decl., Ex. A at 50:13-22. The termination took place when ICP's business had just begun and ICP was collaborating with IronPlanet on "structuring how this machine would work, including how to involve the sales force, who does the follow-up, who does the sales support, when do they get our technical people involved." *Id.* at 44:20-45:2. At the time of the termination of its agreement with IronPlanet, ICP had not yet been given the opportunity to get its business off the ground.

Over a year after ICP failed, Liquidity Services Inc. ("LSI") reached out to Tim Frank, ICP's CEO, expressing an interest in the ICP business model. *Id.* at 24:19-25:3. LSI bought the assets that ICP had left, hired Frank, and launched Iron Direct. *Id.*. In contrast with IronPlanet, Iron Direct did not have "access to a buyer base." *Id.* at 27:17-18. As Frank explained: "When you sell online your success is very predominantly driven by access to the buyer base, the ability for the right buyers to see your product and to trust the platform to buy it." *Id.* at 27:20-23. It takes a matter of years to build an online platform with a significant buyer base, and LSI was never able to generate enough registered users on the Iron Direct platform. *Id.* at 28:2-11.

LSI also did not have expertise in selling heavy construction equipment. The primary service that LSI performed was that of an "asset liquidator." *Id.* at 28:12-13. In its 10-K, LSI described its business as focusing on the "reverse supply chain:"

> The reverse supply chain addresses the redeployment and marketing of surplus and salvage assets. These assets generally consist of retail customers overstock products and end-of-life goods or capital assets from both the corporate and government sectors.

Cole Decl., Ex. E at 1.  LSI had no specialization in the liquidation of heavy construction equipment; it liquidated assets in "over 500 product categories," "such as consumer electronics, general merchandise, apparel, scientific equipment, aerospace parts and equipment, technology hardware, energy equipment, industrial capital assets, fleet and transportation equipment, and specialty equipment." *Id.*

Caterpillar recognized the value that a partnership with IronPlanet provided.  Prior to the merger between Cat Auction Services ("CAS") and IronPlanet, Caterpillar executives recognized that IronPlanet provided the ███████████████████████████████████

███████████████████████ Cole Decl., Ex. F, and a merger of IronPlanet and Cat Auction Services would be a ████████ providing ██████████████████████████████████

███████████████████████████████████████████████████████

██████████████ Cole Decl., Ex. G.  Although CAS had been operating for six years, its investment banker estimated that it would take CAS ████████████████████████████

███████████████████████████████████████████████████████

██████████ Cole Decl., Ex. H at -673.

## B.    Dr. Murphy's Opinions

At the time ICP was formed, Mr. Frank prepared a business plan, projecting ICP's profitability over a number of years.  ICP's experts Jeffrey Leitzinger and Michael Rhoda reviewed the projections and the assumptions underlying the projections.  Dr. Murphy has challenged ICP's projected profitability, prior to the termination of the IronPlanet agreement, by opining that "ICP's losses from IP's cancelation of their agreement equal the difference between the profits ICP would have earned but for the cancelation of their agreement and the profits it could have earned with the next best alternative."  Cole Decl., Ex. I ¶ 21.  Dr. Murphy further concluded:  "The most reliable estimate of ICP's but-for profits is its actual profits it earned during its  partnership with LSI

because that was ICP's next best alternative," *id.* ¶ 22, and those profits were a small fraction of the sales it projected when it entered into its agreement with LSI." *Id.* ¶ 18; *see also id.* at 30 ("ICP's experience as Iron Direct demonstrates that it likely would have failed even if IP had not canceled their agreement."); *id.* ¶ 126 (comparing ICP's projections with Iron Direct's profitability during its agreement with LSI); *id.* ¶¶ 146-149.

## LEGAL STANDARD

Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert* v. *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).

As part of its gatekeeper function, the Court must determine whether the expert's testimony will assist the trier of fact; this requirement often referred to as the "fit" requirement "'goes primarily to relevance.'" *Johnston Heart & Vascular Center, Inc.* v. *AVR Mgmt., LLC*, 2019 WL 3573663, at *4 (W.D. Pa. Aug. 6, 2018) (citation omitted). "To be admissible, expert testimony must be 'accompanied by a sufficient factual foundation.'" *Ace Pallet Corp.* v. *Consol. Rail Corp.*, 764 F. App'x 197, 198 (3d Cir. 2019) (affirming the exclusion of expert testimony where it was too speculative) (quoting *Elock* v. *Kmart Corp.*, 233 F.3d 734, 755 (3d Cir. 2000)). "In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded." *Meadows* v. *Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009).

Where, as here, an expert offers opinions based on a benchmark, there must be a factual foundation for the chosen benchmark. Where the benchmark is based on assumptions and speculation—without supporting data—the opinions based on the benchmark should be excluded. *E.g.*, *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1002 (8th Cir. 2019) (concluding that there "was too great an analytical gap between the facts of the case and the

benchmark chosen" by the expert); *Syngenta Crop Prot. LLC* v. *Azoxystrobin LLC*, 267 F. Supp. 3d 649, 660 (M.D.N.C. 2017) (excluding expert opinions that depended on a benchmark that was "not based on sufficient facts or reliable principles"); *Phelps* v. *CBS Corp.*, 2020 WL 7028954, at *4-5 (S.D.N.Y. Nov. 30, 2020) (excluding expert's earning projections based on benchmarks that were based on "unrealistic and speculative assumptions").

## ARGUMENT

### I.    DR. MURPHY'S OPINION THAT THE LSI-IRON DIRECT PARTNERSHIP IS THE MOST RELIABLE MEASURE OF ICP'S BUT FOR PROFITS LACKS ANY FACTUAL FOUNDATION AND SHOULD BE EXCLUDED.

Dr. Murphy opined that the economic viability of ICP's business model did not depend on its agreement with IronPlanet because ICP had alternatives to IronPlanet, with LSI being the "next best alternative" to IronPlanet.  But, in offering that opinion, Dr. Murphy conceded that at the time ICP considered IronPlanet he did not expect LSI to be the "first thing on their radar" because "they did different things . . . than IP."  Cole Decl., Ex. J at 113:17-114:3.  Notwithstanding his acknowledgement that LSI and IronPlanet "did different things," he failed to perform any comparison of IronPlanet and LSI, and had no specific knowledge or understanding of the services that LSI offered compared to the services that IronPlanet offered.

While IronPlanet specialized in the sale of heavy construction equipment, Dr. Murphy had no knowledge as to whether LSI had any experience dealing with heavy construction equipment prior to its agreement with Iron Direct:

> Q.    Do you know if LSI ever had any experience in dealing with heavy construction equipment prior to what you were -- what you were mentioning with respect to ICP?
>
> A.    You know, I don't recall off the top of my head.  I can't -- I can't say I recall.

*Id.* at 108:17-23.

While IronPlanet offered a dedicated sales team knowledgeable about heavy construction equipment, Dr. Murphy had no knowledge of the sales support, if any, that LSI provided:

> Q.   Do you know if LSI had a dedicated sales team that was knowledgeable about heavy construction equipment?
>
> A.   I -- I don't know specifically whether or not they did or not.

*Id.* at 115:20-116:3. Similarly, Dr. Murphy did not know what type of marketing support LSI would provide, *id.* at 115:20-116:9, whether LSI had a customer base specifically interested in heavy construction equipment, *id.* at 116:10-15, or whether LSI had experience in setting up a dealer network, *id.* at 119:6-23. Nor did Dr. Murphy consider the timing of LSI's agreement with Iron Direct—over a year after IronPlanet terminated its agreement with ICP, preventing ICP's business from ever getting off the ground.

In offering his "next best alternative" opinions, Dr. Murphy did not consider any data comparing the sale of heavy construction equipment on IronPlanet with the sale on LSI. For example, he conceded he did not have data on "the number of bidders on heavy construction equipment on the LSI website," *id.* at 137:6-21. Nor did he have data that allowed him to compare "the number of registered users on IronPlanet and LSI who purchased heavy construction equipment." *Id.* at 137:23-138:2. He also did not have data on the number of sales of new or used heavy construction equipment made through LSI. *Id.* at 138:13-139:22.

Because Dr. Murphy's "next best alternative" opinions are not based on any data or facts, these opinions have the serious potential to mislead and confuse a jury and prejudice ICP. Dr. Murphy's "next best alternative" opinions should therefore be excluded. *E.g. United States* v. *Fallon,* 61 F.4th 95, 109 (3d Cir. 2023) (finding that a trial court did not abuse its discretion in excluding expert testimony on the grounds that "having a well-credentialed law professor" testify as an expert on a non-dispositive issue could cause the jury to confuse the dispositive issue);

*Meadows*, 306 F. App'x at 791 (affirming exclusion of expert testimony that lacked a sufficient factual foundation); *Ace Pallet Corp.*, 764 Fed. App'x at 198 (same); *Wilson* v. *Saint-Gobain Universal Abrasives, Inc.*, 2015 WL 1499477, *23-24 (W.D. Pa. Apr. 1, 2015) ("Each of [the expert's] opinions as to possible defects—but particularly his theory about retapping—depend on his own assumptions and lack a sufficient factual foundation in the record.   Thus, in addition to failing the reliability requirement, they do not 'fit' the facts of the case and must be excluded."); *Tchatat* v. *City of New York*, 315 F.R.D. 441, 447 (S.D.N.Y. 2016) (excluding expert's conclusions because "what little value they have is far outweighed by the danger that the jury would accord too much weight to such opinions because they come from the mouth of a medical professional.").

## **CONCLUSION**

For the foregoing reasons, the Court should grant ICP's motion to preclude Dr. Murphy's from testifying that LSI was the "next best alternative" and that the agreement between Iron Direct and LSI provides the appropriate measure of ICP's profitability had its agreement with IronPlanet not been terminated.

*Of Counsel*:

William A. Isaacson (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
David E. Cole (*pro hac vice*)
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
wisaacson@paulweiss.com
amauser@paulweiss.com
dcole@paulweiss.com

Dated: October 17, 2023

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

By: */s/ Matthew D. Stachel*
     Matthew D. Stachel (No. 5419)
     500 Delaware Avenue, Suite 200
     P.O. Box 32
     Wilmington, DE 19899-0032
     (302) 655-4410
     mstachel@paulweiss.com

*Attorneys for Plaintiff International*
*Construction Products LLC*