**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>CATERPILLAR INC., et al,<br><br>        Defendants, | Case No. 15-cv-108-RGA-SRF<br><br>**PUBLIC VERSION** |

**DEFENDANT CATERPILLAR INC.'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

*Of Counsel:*

Joseph A. Ostoyich
Danielle Morello
Clifford Chance LLP
2001 K Street, NW
Washington, DC  20006-1001
Tel: (202) 253-9077

Paul C. Cuomo
Heather Souder Choi
Adam Dec
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
Tel: (202) 639-7700

**BERGER HARRIS LLP**

David J. Baldwin (DE Bar No. 1010)
Peter C. McGivney (DE Bar No. 5779)
1105 N. Market Street, 11th Floor
Wilmington, Delaware 19801
Tel: (302) 650-1150
Fax: (302) 655-1131
dbaldwin@bergerharris.com
pmcgivney@bergerharris.com

*Attorneys for Defendant Caterpillar Inc.*

Dated: October 17, 2023
Wilmington, Delaware

Public Version Dated:  October 24, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ...................................................... 4

STATEMENT OF UNCONSTESTED MATERIAL FACTS ........................................... 5

    I.     Caterpillar and its many wheel loader and excavator rivals. ............................... 5

    II.    ICP's Untested Business Model and Operations. ................................................ 7

        A.    ICP's start-up with Lonking and IronPlanet ............................................ 7

        B.    ICP and Lonking. ................................................................................ 10

        C.    ICP blamed Lonking for its failing business. ......................................... 14

    III.   IronPlanet remained willing to sell ICP's Lonking equipment in May and June 2014, but ICP turned it down. ........................................................................... 15

    IV.   ICP's continued operation after it turned IronPlanet down. ................................ 16

ARGUMENT ......................................................................................................... 17

    I.     Summary judgment should be granted because ICP cannot establish the required elements of a Sherman Act § 1 claim. .............................................................. 20

        A.    Summary judgment must be granted because there was no refusal to deal: IronPlanet remained willing to do business with ICP but ICP turned it down. ................................................................................................. 20

        B.    Summary judgment should be granted because it is undisputed that ICP did not suffer antitrust injury. ............................................................... 21

            i.     Caterpillar did not harm competition: sales of wheel loaders and excavators were highly competitive before, during, and after the HSA ........................................................................................ 22

            ii.    Caterpillar was not a material cause of any harm to ICP. ............. 23

                a.    There is no evidence ICP complied with EPA requirements for importation and sale of Lonking equipment and that, not Caterpillar, caused any injury it suffered. ......................... 24

                b.    The record does not demonstrate that any action by Caterpillar was a proximate cause of an antitrust injury to ICP. ............................................................................... 26

        C.    Caterpillar is entitled to summary judgment because there is no genuine issue of material fact supporting ICP's claim under the Rule of Reason. . 26

            i.     ICP offers no evidence to support a relevant geographic or product market. .................................................................................. 27

            ii.    ICP concedes Caterpillar did not have market power in any relevant antitrust market. ................................................................. 29

      D.     Summary judgment should be granted because ICP's alleged damages are entirely speculative. ................................................................................ 29

II.    Summary judgment is warranted for ICP's tortious interference claim for lack of subject matter jurisdiction or, alternatively, because its damages are speculative under Illinois and Florida law. ............................................................... 31

      A.     ICP's claim fails under the Illinois "new business rule." ......................... 32

      B.     ICP's claim fails under Florida law because its alleged damages are speculative. ............................................................................................... 34

CONCLUSION ...................................................................................................................... 35

## TABLE OF AUTHORITIES

Page(s)

CASES

*All Care Nursing Serv., Inc v. High Tech Staffing Servs., Inc.*,
  135 F.3d 740 (11th Cir. 1998)....................................................................................22

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*,
  432 F. Supp. 2d 1319 (S.D. Fla. 2006), *aff'd*, 294 F. App'x 501 (11th Cir. 2008) ............34, 37

*Axis S.p.A. v. Micafil, Inc.*,
  870 F.2d 1105 (6th Cir.1989) .................................................................................27

*Bank Fin., FSB v. Brandwein*,
  2015 IL App (1st) 143956, 36 N.E.3d 421 (2015)..................................................34

*Bigelow v. RKO Radio Pictures*,
  327 U.S. 251 (1946).............................................................................................32

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977).............................................................................................24

*Carnegie-Mellon Univ. v. Cohill*,
  484 U.S. 343 (1988).............................................................................................32

*City of Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256 (3d Cir.1998)...............................................................................25, 27

*Conwood Co. v. U.S. Tobacco Co.*,
  290 F.3d 768 (6th Cir. 2002) ...........................................................................23, 25

*Dealer Computer Servs., Inc. v. Ford Motor Co.*,
  No. CIV.A. H-06-175, 2006 WL 801033 (S.D. Tex. Mar. 28, 2006), aff'd, 190 F. App'x 396
  (5th Cir. 2006)....................................................................................................22

*Deborah Heart & Lung Ctr. v. Virtua Health, Inc.*,
  833 F.3d 399 (3d Cir. 2016)..................................................................................23

*Eichorn v. AT & T Corp.*,
  248 F.3d 131 (3d Cir. 2001), *as amended* (June 12, 2001).....................................24

*Erie R. Co. v. Tompkins*,
  304 U.S. 64 (1938)...............................................................................................33

*Ethypharm S.A. France v. Abbott Lab'ys*,
  707 F.3d 223 (3d Cir. 2013)..................................................................................23

*Feinberg v. Saunders, Karp & Megrue, L.P.*,
   1998 WL 863284 (D. Del. Nov. 13, 1998) .........................................................................33

*Gordon v. Lewistown Hosp.*,
   423 F.3d 184 (3d Cir. 2005).............................................................................................31

*Heart v. Virtua Health Inc*.
   , No. CIV. 11-1290 RMB/KMW, 2015 WL 1321674, *16 (D.N.J. Mar. 24, 2015) ..............23

*Host Int'l, Inc. v. MarketPlace, PHL, LLC*,
   32 F.4th 242 (3d Cir. 2022)............................................................................................19

*Illinois Brick v. Illinois*,
   431 U.S. 720 (1977)......................................................................................................32

*In re Canadian Imp. Antitrust Litig*.,
   470 F.3d 785 (8th Cir. 2006) .....................................................................................26, 28

*In re Mallinckrodt PLC*,
   638 B.R. 57 (D. Del. 2021).............................................................................................27

*Insight Equity A.P. X, LP v. Transitions Optical, Inc*.,
   No. 10-635-RGA, 2016 WL 3610155 (D. Del. July 1, 2016) ..............................19, 20, 23, 25

*InterVest, Inc. v. Bloomberg, L.P*.,
   340 F.3d 144 (3d Cir. 2003)............................................................................................19

*Ivey v. Transunion Rental Screening Solus. Inc.*,
   186 N.E.3d 1076 (Ill. App. Ct. 2021) ......................................................................34, 35, 36

*J.T. Gibbons, Inc. v. Crawford Fitting Co.*,
   704 F.2d 787 (5th Cir. 1983) ..........................................................................................22

*Kellam Energy, Inc. v. Duncan*,
   668 F. Supp. 861 (D. Del. 1987)......................................................................................30

*Klaxon Co. v. Stentor Electric Mfg. Co.*,
   313 U.S. 487 (1941)......................................................................................................33

*Link v. Mercedez Benz of N. Am., Inc.*,
   788 F.2d 918 (3d Cir. 1986)............................................................................................32

*Mathews v. Lancaster Gen. Hosp*.,
   87 F.3d 624 (3d Cir. 1996).......................................................................................23, 24, 25

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986)......................................................................................................21

*Mayster v. Santacruz*,
    163 N.E.3d 246 (2020)......................................................................................35

*MindGames, Inc. v. W. Pub. Co.*,
    218 F.3d 652 (7th Cir. 2000) ......................................................................36, 37

*NYNEX Corp. v. Discon, Inc.*,
    525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).........................................18

*Pearl Music Co., Inc. v. Recording Industry Ass'n of America, Inc.*,
    460 F. Supp. 1060 (C.D. Cal. 1978) ................................................................26

*Perrigo Co. v. AbbVie Inc.*,
    No. 21-3026, 2022 WL 2870152 (3d Cir. July 21, 2022)....................................32

*PharmacyChecker.com v. Nat'l Ass'n of Boards of Pharmacy*,
    No. 19-CV-7577 (KMK), 2023 WL 2973038 (S.D.N.Y. Mar. 28, 2023) ................25, 27, 28

*Premier Comp Sols. LLC v. UPMC*,
    377 F. Supp. 3d 506 (W.D. Pa. 2019) ..............................................................30

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
    124 F.3d 430 (3d Cir. 1997)...........................................................................29

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*
    m 614 F.3d 57 (3d Cir. 2010) ........................................................19, 20, 22, 23

*Realnetworks, Inc. v. DVD Copy Control Ass'n, Inc.*,
    No. C 08-4548 MHP, 2010 WL 145098 (N.D. Cal. Jan. 8, 2010) ..........................26

*Rossi v. Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir.1998)............................................................................19

*RSA Media, Inc. v. AK Media Group., Inc.*,
    260 F.3d 10 (1st Cir. 2001)............................................................................26

*SEI Glob. Servs., Inc. v. SS&C Advent*,
    No. 20-3386, 2022 WL 2356730 (3d Cir. June 30, 2022) ....................................23

*SK Hand Tool Corp. v. Dresser Industries, Inc.*,
    672 N.E.2d 341 (Ill. App. Ct. 1996) ................................................................36

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) ...............................................................................33

*Tunis Bros. Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991)......................................................................24, 30

*U.S. Gypsum Co. v. LaFarge N. Am., Inc.*,
    508 F. Supp. 2d 601 (N.D. Ill. 2007) ..............................................................34, 35

*U.S. Horitcultural Supply v. Scotts Co.*,
    367 Fed.Appx. 305 (3d Cir. 2010) ..........................................................................29

*U.S. v. Dentsply*,
    399 F.3d 181 (3d Cir. 2005) ....................................................................................24

*Untracht v. Fikri*,
    454 F. Supp. 2d 289 (W.D. Pa. 2006), *aff'd*, 249 F. App'x 268 (3d Cir. 2007) ......................21

*Van Dyk Research Corp. v. Xerox Corp.*,
    631 F.2d 251 (3d Cir. 1980) ....................................................................................25

## STATUTES

2 P. Areeda & H. Hovenkamp, Antitrust Law § 338, at 320 (2d ed.2000) ....................................25

Cal. Code Regs. tit. 13, §§ 2420-2427 ......................................................................6, 7

## OTHER AUTHORITIES

40 C.F.R. Parts 1039, 1065, and 1068 ..........................................................................6

https://www.constructionequipment.com/big-iron/blog/10748863/three-questions-withmike-
    rhoda-sany-america-ceo (May 2014 interview with Mike Rhoda) ............................................9

https://www.equipmentworld.com/construction-equipment/article/14953251/international-
    construction-products-to-offer-us-contractors-comfort-zone-when-buying-deep-discount-
    chinese-machines ....................................................................................................7

Rule 30(b)(6) ........................................................................................................14, 18

**INTRODUCTION**

After nine years of litigation, the undisputed facts do not establish the required elements of the only two claims remaining in this case: a Sherman Act Section 1 claim and a state law tortious interference claim.  Simply, there are no facts in the record that establish a refusal to deal by IronPlanet, antitrust injury or damages in a properly-defined relevant market caused by any Caterpillar Inc. ("Caterpillar") action. Because the Section 1 count fails, there is no federal court jurisdiction over the tortious interference claim, but regardless, that claim fails because International Construction Products' ("ICP") expert, Dr. Jeffrey Leitzinger, proffered no opinion on damages caused by tortious interference, as required to survive summary judgment.

It is black-letter law that there can be no Section 1 boycott when the company that allegedly refused to deal with plaintiff was, in fact, willing to do so.  That is what happened here: undisputed facts establish that IronPlanet remained willing to advertise and auction ICP equipment after it terminated the Hosted Store Agreement ("HSA") in early April 2014—indeed, the parties signed a contract in late May 2014—but ICP reneged and turned IronPlanet down, not the other way around, because ICP co-owner Joe Frank thought continuing to do business with IronPlanet "would have a potential effect on the claims that are now at issue in this lawsuit."[1]  That, by itself, dooms ICP's Section 1 claim.

It is also black letter law that the antitrust laws were designed to protect competition, not individual competitors.   But, ICP's economic expert conceded he did not provide any opinion on antitrust injury, and his lost profits opinion was based on a single financial projection that ICP Chairman Tim Frank admitted was not based on any underlying sales data from any heavy construction equipment manufacturer, but was, instead, simply his speculation of "sort of this new

---

[1] MSJ Ex. 1, J. Frank Dep. Tr. 161:3-5.

pace of growth that can be fueled from a new product coming in" "filtered" by "my own experience."[2] Dr. Leitzinger applied no expertise to evaluate Mr. Frank's projections: he conceded he was told by ICP's lawyers to use them as the basis for his lost profits opinion and admitted he ignored data from more than two dozen OEMs establishing that no company had ever grown its U.S. wheel loader or excavator sales anywhere close to the pace Mr. Frank speculated.

Undisputed record evidence also shows that heavy construction equipment sales were highly competitive before, during, and after the IronPlanet-ICP HSA.  More than two dozen equipment manufacturers sell wheel loaders and hydraulic excavators in North America, including more than a dozen companies that began selling wheel loaders or excavators, and successfully grew their business, between the 1970s and today, including companies from Europe (*e.g*., Volvo), Japan (*e.g*., Komatsu), Korea (*e.g*., Hitachi, Kubota) and China (*e.g.,* SANY, Yanmar). Undisputed facts also establish that Caterpillar did not and does not dominate sales of either wheel loaders or excavators—on the contrary, it accounts for less than one-third of wheel loader sales and only roughly 25% of excavator sales—and its share of both products declined during the 2014-2018 period at issue here.  Innovation continued throughout this period, as Caterpillar and its many rivals introduced new models each year with improved features ranging from more horsepower to, importantly, significantly upgraded emissions control technology to meet heightened EPA standards.  Finally, undisputed evidence demonstrates that Caterpillar's prices declined between 2014 and 2018 by roughly 6% in this competitive environment.  Dr. Leitzinger concedes his Report does not contain any analysis of, or opinion on, harm to competition and antitrust injury to counter these undisputed facts.  Instead, he offers only his speculation (which he admits is not based on any analysis of pricing or sales data) that ICP went out of business and that must be antitrust injury.

---

[2] MSJ Ex. 2, T. Frank Tr. 243:24-245:45.

That is counter to governing law—which has long held that injury to a competitor is not the same as injury to competition—and insufficient as a matter of law to survive summary judgment.

An additional defect disproves antitrust injury and dooms ICP's Section 1 count: ICP and Lonking did not comply with U.S. Environmental Protection Agency (EPA) and California Air Resources Board (CARB) requirements for importation and sale of construction equipment in the U.S. In fact, ICP produced no evidence at all demonstrating compliance with the EPA/CARB requirements, which mandated use of "Tier 4" engines (with state-of-the-art pollution control) and only allowed a very limited number of lower grade Tier 3 engines to be imported and sold as part of a transition program subject to EPA notification and compliance.  On the contrary, ICP's corporate representative and President conceded that (i) Lonking did not have Tier 4 equipment; (ii) ICP did not comply with EPA requirements to sell Tier 3 equipment in the U.S. under the EPA transition program; and (iii) he did not "know anything about that," could not identify any ICP employee responsible for EPA/CARB compliance and was "unaware" of whether ICP actually complied with EPA regulations.  Yet record evidence also shows that ICP's President knew at the time that ICP imported certain "Tier 2" Lonking equipment, which was ███████ and non-compliant with EPA requirements, and that in another situation Lonking asked ICP to illegally place emissions stickers on machines after they entered the U.S. ICP's claims cannot survive summary judgment, as ICP cannot establish that Caterpillar caused its alleged losses when neither ICP nor Lonking complied with EPA/CARB regulations governing the import and sale of Lonking equipment in the U.S. in the first instance.

Finally, ICP's antitrust and tortious interference claims fail for lack of proof of damages. ICP's antitrust "lost profits" opinion—based solely on ICP's entirely speculative sales projections, not limited to U.S. sales, which it modified after it began to consider filing this case—fails as a

matter of law for reasons set out in detail in Caterpillar's Motion to Exclude and incorporated here. And ICP has not even presented any evidence to support damages for its tortious interference claim—Dr. Leitzinger admitted that he did not have any damages opinions "focused directly on tortious interference" and was "not even sure that phrase even appears in [his] report."[3]

## NATURE AND STAGE OF THE PROCEEDINGS

ICP has changed its theories multiple times after initiating this case on January 29, 2015, with an eighteen-count complaint against "Manufacturer Defendants"—Caterpillar, Komatsu, and Volvo—and Associated Auction Services, LLC ("AAS") for monopoly, unlawful merger, group boycott, and locking up "critical" independent dealers in exclusive contracts. The Court dismissed that complaint in its entirety but granted leave to amend. (D.I. 45 at 8, 18, 27).  ICP subsequently amended its complaint three times (and, years after this Court's deadline, made a request to amend yet again), changing its theory to argue that dealers were not critical to enter the U.S. and, instead, alleging that online sales through the HSA with IronPlanet, a used equipment auction company, was its only viable means to sell new equipment.  The Court granted summary judgment on the allegation that Caterpillar and Komatsu conspired to cause IronPlanet's termination of the HSA and dismissed three independent Caterpillar dealers for lack of personal jurisdiction, transferring the case against them to the Northern District of Florida.  (D.I. 64, 65, 237, 238, 292, 293). Discovery in the two cases was consolidated and, based on the exact same record as in this case, the Court in Florida granted summary judgment for the Caterpillar dealers, finding " that "the summary judgment evidence does not contain any direct evidence" and "no evidence (direct or circumstantial)" "of an explicit agreement between Defendants to pressure IronPlanet into terminating its relationship" with ICP.  (D.I. 411).  This Court found a fact question with regard to

---

[3] MSJ Ex. 3, Leitzinger Tr. at 47:8-12.

Caterpillar and its dealers, however, and thus two claims remain, under Sherman Act § 1 and state law tortious interference.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

**I.    Caterpillar and its many wheel loader and excavator rivals.**

Caterpillar manufactures construction equipment, including wheel loaders and excavators and excluding forklifts, to a network of independent dealers in a highly competitive environment comprised of more than two dozen U.S.-based and international OEM competitors, including Deere, Komatsu, Volvo, Case, Bobcat, Hitachi, JCB, Kubota, SANY, and others.[4]  Many of those competitors entered the U.S. successfully over the years, including during the 2013-2019 time period when Chinese companies  SANY, LuiGong, and XCMG, like every other OEM before them, elected to enter the U.S. through a dealer network, not direct sales.[5]

The market remained competitive before, during, and after the IronPlanet-ICP HSA: Caterpillar lowered its prices 6% between 2014 and 2018, output and innovation increased throughout this period, new models came out every year as Caterpillar and other OEMs spent at least a decade improving their emission control to transition from Tier 2 to Tier 3 and ultimately Tier 4.[6]  In the U.S., Caterpillar's wheel loader and excavator sales—which only accounted for 25-30% of industry-wide sales—declined from 2013-2018,[7] while wheel loader competitors like Deere increased their share of overall sales during that period, and Volvo nearly doubled its share

---

[4] MSJ Ex. 4, 2013 Caterpillar 10-K at 1; MSJ Ex. 5, Murphy Rep. Ex. 6, 7.
[5] *Id.*  ¶¶ 12, 98-99, 112.
[6] *Id.*at Exs. 6, 7.
[7] *Id.* at Ex. 6.  These market shares apply to new heavy construction equipment, not used equipment.  Caterpillar's used equipment sales were made by its two subsidiaries that are not defendants in this case: Cat Financial (through its Remarketing group), which sold approximately 105 pieces of equipment per year during this time, and Caterpillar Used Equipment Services Inc. (CUESI), which sold approximately 718 pieces of equipment per year.

of excavator sales.[8]  Smaller wheel loaders OEMs like Hitachi, Kubota, and JCP grew during that time period.[9]  ICP's economic expert, Dr. Jeffrey Leitzinger, conceded he did not study or offer an opinion on market definition, market share, pricing, innovation, or output.[10]

At the time, Caterpillar continued to introduce new innovative new models of wheel loaders and excavators each year with significant improvements to meet tighter federal and state emissions control standards.[11]  EPA/CARB imposed a comprehensive compliance regime applicable to construction equipment and, as of 2014, required machines imported and sold in the U.S. to comply with EPA's Tier 4 emissions standards.[12]  Compliance with this complex suite of EPA/CARB regulations was and is a key component of any viable business strategy in this industry.  Without compliant equipment *as well as* compliance with applicable EPA (and CARB) standards and procedures, foreign diesel-powered heavy duty construction equipment cannot be imported, marketed, or sold in the United States.  If a foreign equipment manufacturer or importer sought to participate in certain narrow "flexibility" programs provided by EPA, like the "Transition Program for Equipment Manufacturers" ("TPEM"), those companies would have needed to follow a complex set of requirements with a litany of notification, recordkeeping and reporting obligations, bonding requirements, equipment labeling, and other conditions, and ultimately, the total number of units of construction equipment permitted to be imported and sold under those

---

[8] MSJ Ex. 5, Murphy Rep. at Ex. 6.
[9] *Id.*
[10] *See* MSJ Ex. 3*,* Leitzinger Tr. 29:22-31:24 ("It wasn't – [prices] wasn't something I studied specifically in this report, no." . . . "I didn't make any study of changes in output over … the period at issue here" … "I did not endeavor in my report to specifically determine whether ... it would have been new Caterpillar equipment that would have been displaced").
[11] MSJ Ex. 6, Caterpillar 2014 10-K ("In those developed economies that are subject to diesel engine emission requirements, we continued our multi-year roll out of products designed to meet those requirements.")
[12] *See generally* 40 C.F.R. Parts 1039, 1065, and 1068; Cal. Code Regs. tit. 13, §§ 2420-2427.

"flexibility" programs would have been severely limited in number and duration.[13]  These requirements applied to both equipment manufacturers and importers.  During 2014-2018, these flexibility programs could have allowed Lonking to sell up to 1,400 total Tier 3 machines over a five-year period, contingent upon full compliance with EPA's TPEM program and other applicable requirements;[14] however, no flexibility program allowed for the import or sale of Tier 2 machines in the U.S. during that time.  Manufacturers and importers who did not fully comply with EPA regulations were strictly prohibited from selling non-Tier 4 equipment in the U.S.[15]

## II.    ICP's Untested Business Model and Operations.

### A.    ICP's start-up with Lonking and IronPlanet

ICP knew that Chinese equipment had a history of terrible performance, and a bad reputation, in the U.S.[16]  Despite that, Tim Frank started ICP in late 2013 with an untested business idea: to import equipment from Lonking, a Chinese manufacturer that had never made and sold equipment to the standards U.S. customers expected.[17]  Mr. Frank admitted he did not conduct any engineering evaluation of the durability or reliability of Lonking equipment before signing a Master Distribution Agreement ("MDA") to import and sell its machines: "I did not . . . No."[18]

Mr. Frank's idea was to sell Lonking equipment directly to consumers online, rather than through a network of independent dealers with the facilities and resources to demonstrate the equipment's reliability to customers, and the inventory of parts and trained technicians to service the equipment if there were problems—something he conceded no other company in the U.S. or

---

[13] *See* MSJ Ex. 7, Lyons Rep. ¶¶ 55-63.
[14] *Id.* at ¶¶ 62, 149.
[15] *Id.* at ¶ 129.
[16] MSJ Ex. 8, ICP-0001862 (ICP investment deck stating "current [Chinese OEMs] have not succeeded" due to lack of "customer trust. . . support. . . parts. . . compliance. . .")
[17] MSJ Ex. 3, Leitzinger Tr. 262:2-265:2.
[18] MSJ Ex. 2, T. Frank Tr. 120:3-17.

the world was doing then or now: ICP "would have been the first," "there was no one doing it."[19] And, while ICP considered multiple marketplaces with physical and/or online auctions for sale of its machines, including Ritchie Bros., ProxiBid, and Bidadoo, in early March it signed a HSA with IronPlanet—an online auction company that specialized in selling *used* equipment and had no experience selling *new* equipment.[20]  IronPlanet told ICP its Lonking equipment would, thus, be positioned against *used* equipment, not against *new* equipment made by Caterpillar or any other OEM: "To be clear, it has been represented to ICP that we would offer up new items to losing bidders alongside yet to be sold used items."[21]  ICP also explored launching its own online marketplace, and specifically noted in its proposal to IronPlanet that ICP retained the right to operate its own online marketplace separate from the IronPlanet Hosted Store site.[22]

ICP's untested direct online sales model was criticized at the time by SANY America CEO (and putative ICP expert in this litigation) Mike Rhoda, who downplayed the potential for online sales and emphasized that the business model "that works here in North America is a dealer that has a local touch to the contractor, to the project, to the customers … it's absolutely critical."  In contrast, he expressed skepticism at ICP's plan to rely on direct internet sales, noting that despite ICP's "business model where Chinese equipment is being sold online," SANY and others would continue to build their businesses by selling through "the classic business model… that's the model

[19] MSJ Ex. 2, T. Frank Tr. 41:20-23 ("Not to my knowledge, no"), 106:21-107:23.
[20] MSJ Ex. 2, T. Frank Tr. 40:23-41:1, 138:21-139:19 ("they had sold used equipment in the U.S."); MSJ Ex. 9, ICP-0001913 (ICP investor document listing IronPlanet, Ritchie Bros, and ProxiBid as "strategic" partners); MSJ Ex. 10, ICP-0005846-7 (ICP equipment sales made through Richie Bros Auction and Bidadoo online auction); MSJ Ex. 11, ICP-0029147 (February 2014 email from Tim Frank to IronPlanet stating "Ritchie came back to me a few weeks back wanting to do something"); MSJ Ex. 12, ICP-0024195 (March 2014 email from Tim Frank to Proxibid regarding potential partnership).
[21] MSJ Ex. 13, IP_00000449.
[22] MSJ Ex. 14, ICP-0000887; MSJ Ex. 15, ICP-0012472.

8

we've chosen."[23]   ICP chose its untested direct-selling model even though it was clear from the start that meant that it would be unable to recruit any dealers.   In February 2014, before the IronPlanet-ICP HSA, ICP Director of Sales reported that ICP's plan to sell direct online, in competition with potential dealers, was a "complete roadblock" to ICP's ability to sign up dealers, who were not interested in partnering with ICP because of the direct sales aspect of ICP's model—"The internet direct sales platform ICP has been an issue with most other dealer prospects I have spoken with" . . . "There don't seem to be any dealers that want these"[24]—and because "Lonking and ICP [are] unknown. . .which means RISK!" and "ICP [is] underfunded."[25]

From the start, ICP was unable to obtain outside financial interest in its untested business plan. No bank and no institutional investor was willing to invest in or loan money to ICP, and private investors expressed concern that ICP's business model "give[s] us pause."[26] Tim Frank himself refused to provide a personal guarantee for a loan to ICP.[27]   Lonking did not invest in ICP or loan it money and the MDA shows, instead, that it was not even willing to "build equipment to fill an order" unless ICP paid a 5% deposit.[28]  IronPlanet, likewise, did not invest in, or loan money,

---

[23]   Construction   Equipment,   Interview   with   Mike   Rhoda,   available   at https://www.constructionequipment.com/big-iron/blog/10748863/three-questions-withmike-rhoda-sany-america-ceo (May 2014).
[24] MSJ Ex. 16, ICP-0022467; MSJ Ex. 17, ICP-0025641; *see also*, MSJ Ex. 18, ICP-0011228 ("Virtually every non-aligned dealer prospect I have talked to had taken the time to do basic research and the internet direct sales was brought up. . .  the passion certainly cooled, the responses and call backs dropped significantly."); MSJ Ex. 19, ICP-0027125 (describing dealers as a "problem area" and stating "I have been in discussion with a statewide JCB CE and Nissan forklift dealer and this very issue was a complete roadblock.").
[25] MSJ Ex. 20, ICP-0023732, MSJ Ex. 21, ICP-0026274 ("we have been unable to land any dealers").
[26] MSJ Ex. 2, T. Frank Tr. 83:10-23 ("They did not"), 268:20-273:20; MSJ Ex. 22, ICP-0004483.
[27] MSJ Ex. 23, ICP-0021588 (March 2014 email chain to potential capital investor: "If a PG is required, we should just stop now. The company will guarantee the loan…").
[28] MSJ Ex. 2, T. Frank Tr. 261:7-262:5 ("They said, you know, politely as the Chinese do, you know, No, thank you"), 263:24-264:15 ("they declined").

9

to ICP. ████████████████████████████████████████████████

████████████████████████████████████████[29]  Joe Frank's investment was never meant to,

and could not, keep ICP running long term,[30] and by mid-February—*before* ICP's launch at

ConExpo and *before* the IronPlanet-ICP HSA was even signed—ICP was already strapped for

cash and asking Lonking to waive its contractual obligation under the MDA's terms to pay the 5%

down payment for new orders, and asking for a loan.[31]  Lonking refused.[32]

   **B.      ICP and Lonking.**

   ICP was the "importer of record" under the MDA with Lonking, and was "responsible for

all . . . Authorizations" required to sell Lonking equipment in the US, including "all consents,

licenses, permits, approvals registrations and authorization required by applicable laws and/or

regulations for the . . . importation, storage, marketing, distribution and sale of Products in the

Territory[.]"[33]  Under that contract, ICP was also required to "establish and maintain record-

keeping and administrative procedures for compliance with any . . . emissions laws and regulations

applicable to Distributor as an importer or distributor of Products in the Territory[.]"[34]  ICP did

not have distribution agreements with any other equipment manufacturer besides Lonking.[35]

   ICP ordered 10 machines from Lonking for the annual ConExpo industry event in March

2014.  All of the machines ordered for ConExpo and subsequently sold to customers had material

---

[29] MSJ Ex. 24, ICP-0033102 (████████████████████████████████████████████████
████████).
[30] *See, e.g.,* MSJ Ex. 25, ICP-0020917 (November 2013 "investment scenarios" ICP proposed to
Lonking); MSJ Ex. 24, ICP-0033102 (December 2013 emails between Tim Frank and Eric Teague
describing necessity of a loan or investment from Lonking by March 2014).
[31] MSJ Ex. 2, Tim Frank Tr. 263:2-265:21; MSJ Ex. 26, ICP-0025913 ("until we have the
additional funding we cannot place the 5% deposit"); MSJ Ex. 27, ICP-0030216 ($2M operating
loan request from ICP); MSJ Ex. 28, ICP-0019978.
[32] MSJ Ex. 2, Tim Frank Tr. 378:18-380:25; MSJ Ex. 29, ICP-0019809.
[33] MSJ Ex. 82, ICP-0019695 (MDA Sections 5.5, 10.1, 10.2, 12.2).
[34] *Id.*
[35] *See* MSJ Ex. 30, Plaintiff's R&O to Caterpillar's 2d and 3d Set of RFAs at 11-12, Nos. 12-14.

defects, leading to "customers [being] dissatisfied" and lost sales.  In April 2014, Jim Teague emailed, "[w]e have lost one sale and are in danger of losing the second strictly due to poor quality of production and final factory inspections . . .  I have lost three more sales this week because we do not have properly operating machines . . . [t]o date 100 percent of wheel loader deliveries have failed"[36] and he later noted to Lonking, "**You shipped me a machine with major transmission fluid leakage with tape used to fix and hide the problem!!! This machine was 4 months delayed, and I had to give discounts to the customer just to get him to take the machine**. . . You told me that you deeply inspected these machines before shipping them to me."[37]  Lonking machines were of "poor quality, [with] even poorer final inspections," and Lonking demonstrated "no sense of urgency"[38] and "unacceptable quality" such that ICP told Lonking that "[o]ur business model" … "was stopped in its tracks."[39]  "We cannot get a satisfactory testimony from a single customer to support the Lonking brand in the marketplace," and "all four of the Tier 3 ConExpo machines … have defects and are not working."[40]

In addition to defects, equipment delays were prevalent.  Lonking regularly missed shipment deadlines by months, causing customers to cancel orders and costing ICP money; for example, multiple orders were sent 3-5 months late:  "delays have caused one of the customers to sue us" … "are creating customer dissatisfaction and costing ICP money" … and "customers want

---

[36] MSJ Ex. 31, ICP-0017534; *see also* MSJ Ex. 32, ICP-0009159 ("defects … not working."); MSJ Ex. 33, ICP-0027235 ("defects / problems"); MSJ Ex. 34, ICP-0027226 (" many product defects … inoperative … customer dissatisfaction."); MSJ Ex. 35, ICP-0008341 ("now been returned by its second owner due to quality issues"); MSJ Ex. 36, ICP-0010454 ("quality issue has already cost me multiple new orders."); MSJ Ex. 37, ICP-0007971 ("unable to sell these units."); MSJ Ex. 38, ICP-0024242 (describing defects and problems with each Lonking machine).
[37] MSJ Ex. 39, ICP-0027048 (emphasis in original); *see* MSJ Ex. 40, ICP-0019955.
[38] MSJ Ex. 36, ICP-0010454.
[39] MSJ Ex. 36, ICP-0010454.
[40] MSJ Ex. 32, ICP-0009159.

to cancel orders and have lost confidence in ICP, and ICP is paying contract penalties."[41]  And ICP remarked that "[i]t is obvious we cannot rely on Lonking to have parts ready to ship when ordered" … "its [sic] just one lie or excuse after another" … "Lonking is months, years away from being able to properly service their customer and us with parts …."[42]  Lonking did not supply sufficient parts to allow ICP and customers to service its machines, which Tim Frank explained to Lonking "will kill the Lonking effort here,"[43]  "you will remember this was my great fear, that Lonking would NOT support me on parts, and now it seems to be happening."[44]  The Lonking machines sold by ICP suffered from material defects, were frequently delayed in shipping equipment, and parts orders were often late and incomplete.  The defects were so bad that CEO Wes Lee asked internally, "is Lonking using this as a ploy?  Are they forcing ICP out of business?"[45]  And Lonking was unwilling to assist ICP financially.  Tim Frank complained, "I don't mind if we work together to solve these issues, but you won't help me financially when its Lonking who caused the problem", that "Lonking has cause severe financial damage to ICP and has broken our contract in several ways….", and that ████████████████████████████████████████████████████████

████████████████████████████████████████████████

---

[41] MSJ Ex. 38, ICP-0024242 ("just delivering today, 5 months later…delays have caused one of the customers to sue us"); MSJ Ex. 34, ICP-0027226 (Delays are "creating customer dissatisfaction … costing ICP money"); MSJ Ex. 42, ICP-0007964 (customers want to cancel orders … have lost confidence in ICP, … ICP is paying contract penalties.).

[42] MSJ Ex. 43, ICP-0009266 ("obvious we cannot rely on Lonking to have parts ready to ship when ordered."); MSJ Ex. 44, ICP-0006840 ("Its [sic] just one lie or excuse after another..."); MSJ Ex. 45, ICP-0029787 ("Lonking is months, years away from being able to properly service the customer and us with parts. . . .").

[43] MSJ Ex. 46, ICP-0027825.

[44] MSJ Ex. 47, ICP-0024825.

[45] MSJ Ex. 48, ICP-0015837.

[46] MSJ Ex. 49, ICP-0028093; MSJ Ex. 50, ICP-0025172; MSJ Ex. 51, ICP-0019980.

Lonking did not manufacture EPA Tier 4 equipment in 2014 to 2018. Of the 10 Lonking machines ICP purchased for ConExpo, only four were Tier 3 and potentially subject to EPA flexibility programs for possible legal sale of equipment in the U.S. ICP did not produce any evidence in this litigation demonstrating that it (or Lonking) complied with EPA TPEM flexibility program requirements to legally sell equipment in the U.S. And, in fact, ICP determined in November 2014 that certain Tier 2 Lonking machines it imported had "███████████████████ ███████"[47] ICP was also aware of instances where engines in Lonking machines were not imported with proper emissions labels, and instances where Lonking improperly sent engine labels to ICP—after ICP illegally imported machines without emissions labels—for ICP itself to affix to those Lonking machines.[48]

As part of EPA compliance, both ICP and Lonking were required to ensure equipment was powered by certified and labeled engines and affirmatively report the importation and sale of machines under the TPEM program to EPA.[49] ICP was aware that it had to comply with EPA regulations.[50] But no evidence shows that ICP or Lonking took all necessary steps to comply with the TPEM Program. ICP's records are virtually non-existent on this topic, and ICP's corporate representative, Tim Frank, testified in a Rule 30(b)(6) deposition that the company was unable to identify any records showing compliance with EPA's Tier 4 standards or EPA's TPEM Program.

ICP President and corporate representative Tim Frank conceded the company did not receive a copy of, or see, any EPA approval to Lonking to sell its Tier 3 equipment in the U.S.

---

[47] MSJ Ex. 52, ICP-0019133.
[48] MSJ Ex. 53, ICP-0005611 ("Mr Bo Xie is going to the states to support ICP. He is taking two labels of cummins engines for two 835 arriving in Philadelphia with himself").
[49] MSJ Ex. 7, See Lyons Rep. at 28-36.
[50] MSJ Ex. 54, Deposition of Eric Teague 345:13 to 351:23; MSJ Ex. 55, ICP-0033742; MSJ Ex. 56, ICP-0033737-38.

under the TPEM program and "do[esn't] know anything about that."  He "is not aware if [ICP] did or if we didn't" obtain EPA approval to sell Lonking equipment in the U.S., "can't recall if I saw something like that or not," is "unaware" of whether ICP filed a notice of intent to sell Tier 3-compliant equipment with the EPA, and "wouldn't be able to answer" if the machines the company imported had the EPA-required TPEM Tier 3-compliant labels on their engines.[51]

### C.     ICP blamed Lonking for its failing business.

By March 2014, before IronPlanet terminated ICP's HSA, Tim Frank's frustration with Lonking's defects and delays had, again, boiled over and he threatened that "we probably should stop marketing the products."[52]  ICP executives conceded that "Lonking is killing the business for ICP," that its defects and delays "cost [ICP] a lot of money," and that ICP was "being financially damaged by Lonking."[53] In discussing quality issues and Lonking's unwillingness to assist ICP financially, Tim Frank complained to Lonking, "you won't help me financially when it's Lonking who caused the problem;"[54] "Lonking has caused severe financial damage to ICP … broken our contract in several ways, … delivery times, quality … product line reductions …"things that Lonking caused.  . . . ████████████████████████ ██ ███████████████████████ ████████████████████████████ . . . caused by the actions from Lonking.... I lost all of my life-savings….I just don't think Lonking was ever ready to come to the US."[56]

---

[51] MSJ Ex. 57, ICP 30(b)(6) Tr. 24:6-13, 174:23-175:19, 210:21-212:7; MSJ Ex. 2, Tim Frank Tr. 203:3-8, 203:21-204:3, 213:18-23, 219:4-11.
[52] MSJ Ex. 58, ICP-0006804; MSJ Ex. 59, ICP-0016317.
[53] MSJ Ex. 60, ICP-0020153, MSJ Ex. 61, ICP-0027735, MSJ Ex. 62, ICP_0006068, MSJ Ex. 63, ICP-0019229, MSJ Ex. 64, ICP-0016852.
[54] MSJ Ex. 65, ICP-0019907
[55] MSJ Ex. 66, ICP-0022851 (emphasis in the original).
[56] MSJ Ex. 49, ICP-0028093; MSJ Ex. 50, ICP-0025172; MSJ Ex. 51, ICP-0019980 (emphasis in the original).

### III.   IronPlanet remained willing to sell ICP's Lonking equipment in May and June 2014, but ICP turned it down.

IronPlanet executive Jeff Barca-Hall testified that ICP's sales did not meet IronPlanet's expectations: we are "not seeing the kind of volume that we'd been promised by ICP," and ICP only sold one piece of equipment through its site in a month of operation.[57]  Tim Frank conceded that customers thought ICP was just another Chinese brand "dumping product" in the U.S.[58]

While IronPlanet decided the HSA did not make sense, it remained willing to advertise and auction ICP equipment.   On May 21, 2014, ICP's Director of Sales Jim Teague signed an agreement with IronPlanet to sell ICP equipment on the IronPlanet website, and IronPlanet fully executed that agreement.[59]  The terms of that agreement were similar to the HSA: it contained the same 8% commission rate and provided ICP access to IronPlanet's registered user base and sales force—each of the elements described by ICP expert Leitzinger as important to the ICP/IronPlanet relationship.[60]  And IronPlanet's sales team also would have marketed ICP's equipment.[61]

IronPlanet regional sales manager Justin Whitlock told Mr. Teague, "[w]e thank you for your business and look forward to serving your needs in the future."[62]  But after advising his colleagues that ICP planned to sell equipment through IronPlanet, Mr. Teague received pushback internally at ICP.  Joe Hanneman, ICP's Senior Director of Marketing, expressed surprise at the decision to conduct business with IronPlanet and asked Mr. Teague whether doing business with

---

[57] MSJ Ex. 69, Barca Hall Tr. 159:11-18; MSJ Ex. 2, Frank Tr. 42:9;
[58] MSJ Ex. 70, Tim Frank Tr. 43:3-8 (July 29, 2021).
[59] MSJ Ex. 71, ICP-0003926 (Listing Agreement); MSJ Ex. 72, ICP-0036308.
[60] MSJ Ex. 3, Leitzinger Tr. 286:7-287:10; *Compare* MSJ Ex. 73, IP_00000006 Exhibit C (HSA showing "8% of Gross Merchandise Value" commission) *with* MSJ Ex. 72, ICP-0036308 ("commission rate is 8%").
[61] MSJ Ex. 74, ICP-0004406 (Jim Teague email asking IronPlanet to "put a hold on" advertising); MSJ Ex. 73, IP_00000006 ("ICP shall be solely responsible for marketing the Equipment and the Representative Brands…").
[62]  MSJ Ex. 75, ICP-0003933

IronPlanet would "give us any legal complications should we end up initiating litigation."[63]   ICP President Tim Frank asked his brother, ICP co-owner Joseph Frank, whether ICP should sell equipment on either IronPlanet or Ritchie Bros., a competing site, providing reasoning for why ICP preferred to conduct business and had better terms with IronPlanet versus Ritchie Bros., including that IronPlanet allowed ICP to set a minimum price.  Joe Frank asked if the "Chinese" would make up any "shortfall" if ICP sold on Ritchie Bros. versus IronPlanet, and then definitively responded to sell the equipment on "Ritchie Bros."[64]   And on June 4, 2014, after Mr. Whitlock inquired about an update, President Tim Frank told Jim Teague to sell equipment through "anyone but IP."[65]   ICP stopped doing business with IronPlanet due to legal considerations, not because IronPlanet refused to deal with ICP.

## IV.   ICP's continued operation after it turned IronPlanet down.

After ICP refused to conduct business with IronPlanet and failed to secure outside investment, it continued to import and sell equipment directly to customers and look for investors. In 2015, Liquidity Services Investment ("LSI"), a multi-billion public company, agreed to pay roughly $1.5M for 80% of ICP, dependent on meeting sales targets under a new LLC named Iron Direct.  Tim Frank remained president of Iron Direct, and the company business model remained the same.  LSI was a larger online marketplace than IronPlanet, and injected millions of dollars of capital into ICP's business plan under Iron Direct; the initial cash contribution was $2.5M during an initial incubation period, which would end in January 2016, and commitment to make capital contributions up to $16M.[66]   In addition to actually investing in ICP (which IronPlanet declined to

---

[63] *Id.*
[64] MSJ Ex. 76, ICP-0036299.  Mr. Joe Frank testified that he was not sure if by "Chinese" he meant Lonking or some other company. MSJ Ex. 1, J. Frank Vol. 2, Tr. 162:14-163:19.
[65] MSJ Ex. 77, ICP-0030177.
[66] MSJ Ex. 78, ICP-0006491; MSJ Ex. 79, ICP-0011789.

do), LSI had thirteen warehouses, a large online presence, and more registered users, bidders, and buyers than IronPlanet.[67]

ICP's projected sales model that it developed internally and submitted to LSI was similar to the projections it created at the inception of ICP.[68]  ICP projected tens of millions of dollars in revenue in its first expected year of operation, 2016, ultimately projecting that it would become a ▮▮▮▮▮▮▮▮▮▮ business within five years.[69]  This projection was not even close to being accurate – ICP's revenue was only .▮▮▮▮▮▮▮▮▮▮▮▮▮ projection for 2015-17.[70]  Mr. Frank's projections of profitability were off by even more:  he projected ▮▮▮▮▮▮ in gross profit and ▮▮▮▮▮ in EBITDA profit, but the company's actual gross and EBITDA profit was ▮▮▮▮ over the period.[71]  In October 2017, LSI terminated Tim Frank's employment agreement because IronDirect failed to meet sales milestones and was losing money.  Despite restructuring IronDirect after Tim Frank's departure, LSI continued to lose money on the ICP business plan and exited the business in January 2019.

## ARGUMENT

This Court declined during the motion to dismiss stage of the case to decide "[w]hether the rule of reason or *per se* standard applies here," which it deemed "a close call." D.I. 238 at 16, 20. Now that discovery is complete, the issue is ripe and the call is no longer close.  The court should find that the rule of reason applies because Caterpillar is the only manufacturer among the alleged conspirators; the others (Thompson and Ring) are independent dealers who are its vertically-

---

[67] MSJ Ex. 5, Murphy Rep. ¶¶ 145-49.
[68] MSJ Ex. 78, ICP-0006491 at -520.
[69] MSJ Ex. 5, Murphy Report ¶¶ 148-49 and Exhibit 3.
[70] MSJ Ex. 5, Murphy Report ¶¶ 126 and Exhibits 3 and 4 (citing MSJ Ex. 80, LSI000315 and MSJ Ex. 81, LSI000316).
[71] MSJ Ex. 5, Murphy Report ¶¶ 126 and Exhibits 3 and 4 (citing MSJ Ex. 80, LSI000315 and MSJ Ex. 81, LSI000316).

aligned customers, not its competitors.[72]  As this Court has recognized, Supreme Court precedent "limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors."  *Id.* (citing *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998)).  There is no genuine issue of material fact that Caterpillar is the only equipment manufacturer in the alleged conspiracy; this Court has already recognized that fact.  D.I. 237 at 17.

"In order to survive summary judgment in cases where [the rule of reason] applies, the plaintiff must show concerted action, antitrust injury, evidence that the conspiracy produced 'adverse, anti-competitive effects within the relevant product and geographic markets,' and evidence 'that the objects of and the conduct pursuant' to the conspiracy were illegal." *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003) (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 464-65 (3d Cir. 1998)).  However, regardless of whether the *per se* rule or rule of reason applies, the Court should grant summary judgment because undisputed evidence disproves two required elements of ICP's Section 1 boycott claim:  1) there was no refusal to deal because the record establishes that ICP decided to stop doing business with IronPlanet and 2) there is no genuine issue of material fact that ICP suffered antitrust injury.

Antitrust laws were designed for the protection of competition, not competitors.  *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010); *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, No. 10-635-RGA, 2016 WL 3610155 at *9 (D. Del. July 1, 2016).  And "[a]ntitrust plaintiffs cannot simply frame their contract claims in a clever way to pursue treble damages."  *Host Int'l, Inc. v. MarketPlace, PHL, LLC*, 32 F.4th 242, 253 (3d Cir. 2022).  ICP's

---

[72] D.I. 292 at 1 (Caterpillar . . ."manufacture[s] new heavy construction equipment which is distributed and sold to end users through local equipment dealers such as Ziegler, Ring Power, and Thompson Tractor"); To the extent ICP alleges IronPlanet also conspired, it too was in a vertical relationship with Caterpillar and the dealers who consigned it small volumes of used equipment.

antitrust claim fails as a matter of law because there is no genuine issue of material fact that there was harm to the competitive process.  Instead, ICP only points to its own grievances.  It is well-settled, however, that "antitrust injury" requires proof of: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful."  *Insight Equity*, 2016 WL 3610155, at *9 (citing *Race Tires*, 614 F.3d at 76).  "To establish [the first element of] antitrust injury, a plaintiff must show harm to competition, not just harm to the plaintiff competitor."  *Id*.  To establish the second element, plaintiff must prove defendant's violation was "a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage."  *Id*.

Summary judgment should be granted here because the undisputed facts unambiguously demonstrate that IronPlanet did not refuse to deal with ICP and ICP did not suffer antitrust injury.

- There is no boycott or refusal to deal because IronPlanet remained willing to advertise and auction ICP equipment, but ICP turned it down.  Those same undisputed facts also establish that ICP's injury was not "the type of harm the antitrust laws were designed to prevent" and did not "flow from" Caterpillar's conduct at all, let alone competition-reducing conduct.  Instead, ICP's decision to rebuff IronPlanet (to manufacture its Section 1 claim by suggesting that IronPlanet's termination of the HSA "forever bar[red]" ICP) is not antitrust injury.

- There is no antitrust injury here because sales of wheel loaders and excavators remained highly competitive before, during and after ICP's HSA with IronPlanet, with more than two dozen manufacturers selling their equipment in the U.S., including numerous successful entrants.  Caterpillar was hardly dominant: its share of wheel loaders and excavators was 30% or less at all times and declined over the 2014-18 period.  Instead, it competed tooth and nail - - making significant investments in new models each year and greatly improving its emissions-control technology, while lowering its prices.  That undisputed evidence flatly disproves any harm to competition.  ICP offers pure only pure speculation on the other side of the scale.

- There is no antitrust injury because ICP did not import EPA-compliant equipment in the first place.  Any inability to sell Lonking equipment was thus caused by government regulation, not something the antitrust laws were designed to prevent.  It is undisputed Lonking had no Tier 4-compliant equipment.  And there is no evidence that Lonking (as manufacturer) or ICP (as importer) met EPA's TPEM

requirements and, thus, could not lawfully sell even the limited quantities of Tier 3-compliant machines that flexibility program might have allowed.

- Plaintiff offers nothing to counter-balance this undisputed evidence. Its expert conceded he did not study, and his Report contains no opinion on, antitrust injury or output, innovation, or prices at all (or even define the relevant market, a necessary predicate to assessing whether there was antitrust injury). In his deposition, he went beyond his Report—by itself, reason this Court should disregard it—and opined that ICP's injury *was* antitrust injury. But, that is contrary to the law: harm to a competitor is not harm to competition.

Plaintiff's claims also fail for lack of damages. ICP's expert offers only a wholly speculative and unreliable lost profits opinion that this Court should exclude for reasons set out in Caterpillar's Motion to Exclude Dr. Leitzinger. To survive summary judgment ICP must establish "a genuine issue of material fact . . . that [Defendant's actions] caused respondents to suffer a cognizable injury." *Matsushita Elec. Indus. Co.. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 575, 585–86 (1986).

## I. Summary judgment should be granted because ICP cannot establish the required elements of a Sherman Act § 1 claim.

### A. Summary judgment must be granted because there was no refusal to deal: IronPlanet remained willing to do business with ICP but ICP turned it down.

Regardless of whether the Court decides whether the *per se* standard or the rule of reason applies, ICP's Section 1 boycott claim fails as matter of law because there was no refusal to deal by IronPlanet. *Untracht v. Fikri*, 454 F. Supp. 2d 289, 309-310 (W.D. Pa. 2006), *aff'd*, 249 F. App'x 268 (3d Cir. 2007) (granting summary judgment because plaintiff "was not, in fact, shut out from competing in the market by Defendants' actions" but instead "had an active avenue of competition … that he chose to voluntarily foreclose."). The undisputed material facts here demonstrate that ICP—not IronPlanet—made the decision to end the companies' business relationship: they show that IronPlanet was willing to conduct business with ICP and signed an agreement to sell ICP's Lonking equipment on its website in May 2014, but, in June 2014, <u>ICP</u>

made the affirmative decision not to conduct business with IronPlanet.[73] As ICP's President Tim Frank told his colleagues, ICP chose to sell equipment through "anyone but IP."[74] These undisputed material facts are fatal to ICP's claims. Where a plaintiff can continue to do business with a company after a contract termination but chooses not to do so, there is no refusal to deal. *See, e.g., All Care Nursing Serv., Inc v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 748 (11th Cir. 1998) (affirming finding no refusal to deal where plaintiff was able to participate in a bidding process); *see also J.T. Gibbons, Inc. v. Crawford Fitting Co.,* 704 F.2d 787 (5th Cir. 1983) (directing verdict against plaintiff on all antitrust claims where plaintiff rejected business proposal of defendant, holding "[t]he *sine qua non* of the injury caused by a refusal to deal would be inability to obtain the product."); *Dealer Comput. Servs., Inc. v. Ford Motor Co*., No. H-06-175, 2006 WL 801033, at *4 (S.D. Tex. Mar. 28, 2006) ("the new contract was not acceptable to DCS, but its terms were not unreasonable. An unacceptable offer is not, by itself, a refusal to deal"), *aff'd*, 190 F. App'x 396 (5th Cir. 2006). On this basis alone, ICP's claims cannot survive.

### B. Summary judgment should be granted because it is undisputed that ICP did not suffer antitrust injury.

An antitrust plaintiff is required to establish antitrust injury in every case. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341-45 (1990) ("The *per se* rule … does not indicate whether a private plaintiff has suffered antitrust injury and thus whether he may recover damages"); *Race Tires*, 614 F.3d at 74 ("to survive summary judgment in cases where [the rule of reason] applies, the plaintiff must show … antitrust injury'"). Antitrust injury has two elements: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Insight Equity*, 2016 WL 3610155,

---

[73] MSJ Ex. 67, ICP-0003934.
[74] MSJ Ex. 77, ICP-0030177.

at *9 (citing *Race Tires*, 614 F.3d at 76).  As this Court has explained, "[t]o establish [the first element of] antitrust injury, a plaintiff must show harm to competition, not just harm to the plaintiff competitor." *Id.* at *8.  To establish the second element, plaintiff must prove the defendant's violation was "a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage." *Id.*  Thus, ICP must demonstrate that its alleged injury is of the type for which the antitrust laws were intended to provide redress and causation of injury-in-fact.  *See, e.g., SEI Glob. Servs., Inc. v. SS&C Advent*, No. 20-3386, 2022 WL 2356730, *2 (3d Cir. June 30, 2022); *Ethypharm S.A. France v. Abbott Lab'ys*, 707 F.3d 223, 232-33 (3d Cir. 2013).  The law is clear that antitrust injury is a threshold determination at the summary judgment stage and summary judgment is proper where there is no genuine issue of fact that a plaintiff suffered antitrust injury.[75]

> ### i.  Caterpillar did not harm competition: sales of wheel loaders and excavators were highly competitive before, during, and after the HSA.

Because the antitrust laws were enacted "for the protection of competition not competitors," *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*., 429 U.S. 477, 488 (1977), there "must be proof that competition, not merely competitors, ha[ve] been harmed." *U.S. v. Dentsply Int'l, Inc.,* 399 F.3d 181, 187 (3d Cir. 2005).  To establish that, the Third Circuit has "consistently held that an individual plaintiff personally aggrieved by an alleged anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider impact on the competitive market." *Eichorn v. AT & T Corp*., 248 F.3d 131, 140 (3d Cir. 2001), *as amended* (June 12, 2001).  Namely,

---

[75] *See, e.g.*, *Mathews v. Lancaster Gen. Hosp*., 87 F.3d 624, 641 (3d Cir. 1996) (affirming summary judgment where the evidence did not establish antitrust injury); *Race Tires* , 614 F.3d at 83-84 (affirming summary judgment because plaintiff failed to show harm to competition); *Heart v. Virtua Health Inc*., No. 11-1290 RMB/KMW, 2015 WL 1321674, at *16 (D.N.J. Mar. 24, 2015), *aff'd sub nom. Deborah Heart & Lung Ctr. v. Virtua Health, Inc*., 833 F.3d 399 (3d Cir. 2016) (granting summary judgment where plaintiff failed to demonstrate harm to the competitive process: "at most, there has been harm to [p]laintiff and a portion of its customers").

the plaintiff must demonstrate that the "challenged conduct affected the prices, quantity, or quality of goods or services" in the market context, "not just [its] own welfare." *Mathews*, 87 F.3d at 641 (quoting *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991)).

Here, ICP's antitrust claims cannot survive summary judgment because the record is clear that U.S. sales of wheel loaders and excavators were competitive before, during, and after IronPlanet terminated the HSA with ICP.  Indeed, the facts establish that the more than two dozen companies sold wheel loaders and excavators in the U.S., including multiple new entrants, that Caterpillar had only a 25-30% and declining share of those sales, and that it reduced its prices and invested in significant innovations, including improved emissions-control capabilities.[76]  ICP's economic expert Dr. Leitzinger did not even evaluate any harm to competition or antitrust injury, and testified that the harm solely to ICP itself is the basis of ICP's claim of antitrust injury.[77] It is well-established an antitrust plaintiff must show more than "just harm to the plaintiff competitor," *Insight Equity*, and ICP's Sherman Act allegations cannot survive summary judgment because there is no dispute of material fact that competition was not harmed.  *See Mathews*, 87 F.3d at 641.

### ii.     Caterpillar was not a material cause of any harm to ICP.

The second element of antitrust injury requires a plaintiff to show the defendant's violation was "a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage."  *Insight Equity*, 2016 WL 3610155, at *11 (quoting *Conwood Co. v. U.S. Tobacco Co.*, 290 F.3d 768, 788-89 (6th Cir. 2002)).  A plaintiff must establish a direct causal line between a Defendants' actions and the full injury it alleges.  As the Third Circuit held in *Van Dyk Rsch. Corp. v. Xerox Corp.*, a plaintiff "ha[s] to prove that

---

[76] MSJ Ex. 5, Murphy Rep. Exhibit 5 illustrates that Caterpillar's "average "prices fell by about six percent" between 2014-2019.  Exhibits 6 and 7 show Caterpillar's market share of both product categories was flat, and even declining at some points, throughout the relevant time period.
[77] *See Atl. Richfield Co.*, 495 U.S. at 344; MSJ Ex. 3, Leitzinger Dep. Tr. 21:14-24.

[defendant] was a material cause of its financial difficulties, assuming arguendo that [defendant's] activities violated the antitrust laws." 631 F.2d 251, 255 (3d Cir. 1980); *see also* 2 P. Areeda & H. Hovenkamp, Antitrust Law § 338, at 320 (2d ed.2000) (explaining that antitrust standing is lacking where "a force other than the antitrust violation fully accounts for the plaintiff's injury").

a.      **There is no evidence ICP complied with EPA requirements for importation and sale of Lonking equipment and that, not Caterpillar, caused any injury it suffered.**

"While legality is not formally an element of the antitrust inquiry . . . a plaintiff cannot suffer an antitrust injury if its asserted harm is based on illegal conduct." *PharmacyChecker.com v. Nat'l Ass'n of Bds of Pharmacy*, No. 19-CV-7577 (KMK), 2023 WL 2973038, at *13 (S.D.N.Y. Mar. 28, 2023) (granting summary judgment "where the plaintiff's enterprise is completely or almost completely illegal, or completely or almost completely geared toward facilitating illegality, that plaintiff cannot plead and antitrust injury"); *City of Pittsburgh v. W. Penn Power Co.,* 147 F.3d 256, 265 (3d Cir.1998) (granting motion to dismiss due to lack of antitrust injury because "any injury suffered by the City did not flow from the defendants' conduct, but, rather, from the realities of the regulated environment in which all three were actors"). And specifically, a defendant cannot cause plaintiff's antitrust harm where alleged that harm is "caused by the federal statutory scheme adopted by the United States government, not by the conduct of the defendants." *In re Canadian Imp. Antitrust Litig*., 470 F.3d 785, 791 (8th Cir. 2006) (holding that plaintiff's lacked antitrust standing because "[t]he absence of competition from Canadian Sources in the domestic prescription drug market . . . is caused by the federal statutory scheme adopted by the United States government"); *see also*, *RSA Media, Inc. v. AK Media Grp., Inc*., 260 F.3d 10, 15 (1st Cir. 2001) (affirming summary judgment because plaintiff "was not excluded from the market for outdoor billboards because of [defendant's] threats," but rather "because of the Massachusetts regulatory scheme that prevents new billboards from being built"); *Realnetworks, Inc. v. DVD*

24

*Copy Control Ass'n, Inc.*, No. C 08-4548 MHP, 2010 WL 145098, at *6 (N.D. Cal. Jan. 8, 2010) (finding no antitrust injury where the plaintiff "manufacture[d] and traffic[ked] in a device that [was] almost certainly illegal").

In *City of Pittsburgh v. W. Penn Power Co.*, the Third Circuit affirmed that a plaintiff cannot maintain antitrust claims where "[t]he statutory scheme precluded competition without the requisite regulatory permission" and "the interposition of the regulatory scheme and actions of the parties—both defendants and plaintiff—interferes with the chain of causation."  147 F.3d at 268. And "a plaintiff cannot be injured in fact by private conduct excluding him from the market when a statute prevents him from entering that market in any event."  *Id.*  (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 363(b), at 222 (1995) (citing *Axis S.p.A. v. Micafil, Inc.,* 870 F.2d 1105 (6th Cir.1989)).  Where a "regulatory barrier br[eaks] the chain of causation, . . .  the [plaintiff] [is] unable to prove that the harm they experienced was connected to and in fact cause by the [defendants'] alleged anticompetitive conduct."  *In re Mallinckrodt PLC*, 638 B.R. 57, 75 (D. Del. 2021).  In *PharmacyChecker.com*, plaintiff imported foreign medication into the U.S. "despite the carefully controlled congressional scheme designed to keep consumers safe" as implemented by the Food and Drug Administration ("FDA").  The court granted summary judgment on plaintiff's Sherman Act claim because it acted "in direct contravention of FDA guidance" on importation regulations, and "does not have standing to maintain its claim pursuant to Sec. 1 of the Sherman Act." *PharmacyChecker.com*, 2023 WL 2973038, at *30.  Similarly, in *In re Canadian Imp. Antitrust Litig.*, the Eighth Circuit affirmed dismissal of Sherman Act claims where "federal law prohibits the importation" of mislabeled Canadian prescription drugs under the FDA regulatory regime, holding antitrust injury could not exist.  470 F.3d at 791.

As discussed above, ICP established zero evidence that it, or Lonking, complied with EPA/CARB regulatory requirements.  Thus, here, Caterpillar could not have been the cause of any harm to ICP for sales of equipment it could not legally import or sell in the United States.

### b. The record does not demonstrate that any action by Caterpillar was a proximate cause of an antitrust injury to ICP.

A plaintiff must also demonstrate that the defendant is the proximate cause of an injury to survive summary judgment.  In affirming summary judgment in *Xerox*, the Third Circuit specifically described patent issues that "might preclude Van Dyk from manufacturing its proposed copier," differences between Van Dyk and Xerox machines that could lead consumers not to purchase from Van Dyk—such as a lack of automatic feed, copy size reduction, or duplexing capability on Van Dyk machines, funding difficulties encountered by Van Dyk, and a merger agreement between Van Dyk and a third company that failed to resurrect the troubled company. *Id*.  The Third Circuit specifically noted that Xerox "had nothing to do with" Van Dyk's engagement with investors or funders, the third party it chose to merge with, or Van Dyk's contracts with retail customers and, specifically, that Xerox did not "by any unlawful conduct prevent Van Dyk from securing adequate funding." *Id.*  ICP cannot show evidence of causation here for the same reasons:  Caterpillar had nothing to do with Lonking's significant quality problems and shipping delays, or ICP's engagement with investors or retail customers—in fact, ICP failed despite LSI's $6.5 million investment and larger online presence than IronPlanet. Caterpillar had nothing to do with ICP's merger with LSI or its subsequent operation, had nothing to do with barring ICP from selling to retail customers, and did not "prevent" ICP "from securing adequate funding."

### C. Caterpillar is entitled to summary judgment because there is no genuine issue of material fact supporting ICP's claim under the Rule of Reason.

i. **ICP offers no evidence to support a relevant geographic or product market.**

ICP has the burden to define a geographic and product market to maintain its Sherman Act claim, yet provides no factual evidence in support of its alleged geographic or product market, and its expert concedes that he offers no opinion on the relevant markets.[78]  First, ICP "has the evidentiary burden of establishing the relevant geographic markets" and  "[t]he evidence of the geographic market presented by the party claiming a Section 1 violation must [] speak to buyer behavior" to survive summary judgment.  *U.S. Horitcultural Supply v. Scotts Co.*, 367 F. App'x. 305, 309 (3d Cir. 2010) (affirming summary judgment where plaintiff "failed to provide sufficient evidence of buyer behavior to survive summary judgment with regard to its definition of the geographic markets").  "[T]he geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product.  Further, the size of the relevant geographic market will differ depending upon the price, durability and size of the product; in practical terms, one would comparison shop in a larger geographic market for a tractor, as compared to a grocery item." *Tunis Bros.*, 952 F.2d at 725 (holding plaintiffs did not adequately define geographic market reversing denial of motion for judgment n.o.v. on antitrust claim).

This Court has already held that ICP's Second Amended Complaint "fail[ed] to plead a geographic market" under a rule of reason analysis.  D.I. 238 at fn 3.  "Specifically, there are no allegations in the complaint regarding the geographic confines in which a potential buyer of new heavy construction equipment rationally looks for that equipment . . ." and "[e]ven the complaint

---

[78] D.I. 238 at 18; MSJ Ex. 3, Leitzinger Dep. Tr. 15:23-17:11.  ICP's procedurally improper and out-of-time Fourth Amended Complaint introduces a dubious "negative tying" allegation. Although ICP's Fourth Amended Complaint is not operative in this case—and should be rejected by this Court—that negative tying claim also fails in its entirety due to ICP's lack of evidence defining a relevant product market.

acknowledges that buyers did not traditionally purchase new construction equipment online. . . Instead, buyers traditionally looked to a local equipment dealer." *Id.* ICP failed to heed the Court's admonition and its Third Amended Complaint repeated the very same relevant allegations this Court already ruled are insufficient, *compare* D.I. 162 ¶¶ 36, 53-60, 70 *with* D.I. 246 ¶¶ 36, 53-60, 70, and its expert did not even bother to attempt to define a relevant geographic market. ICP's claim cannot survive summary judgment for this failure, independent of its other failures.

Second, ICP's allegations involve multiple levels of the market structure and "two distinct product markets," as this Court has recognized, yet ICP does not even attempt to establish an alleged product market of "the marketing and sale of new heavy construction equipment, and narrower relevant markets contained therein," nor did ICP provide any expert testimony or opinion on market definition *at all* regarding the new or used equipment markets.[79]  A plaintiff cannot merely rely on the court to probe unclear market definitions, and "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997).  ICP provides zero evidence of reasonable interchangeability or cross-elasticity of demand related to vague "new heavy construction equipment" and "used heavy construction equipment" markets as required to survive summary judgment; there is no

---

[79] Further, courts have warned that it is critical to put forward an antitrust expert on these elements of an antitrust claim. *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506, 526 (W.D. Pa. 2019) ("Construction of the relevant market, as well as a showing of monopoly power, must be based on expert testimony."); *Kellam Energy, Inc. v. Duncan*, 668 F. Supp. 861, 888 n.40 (D. Del. 1987) (entering judgment on an antitrust claim where expert had "not even attempted to demonstrate a monopoly in the market").

record evidence related to the differences between types of heavy construction equipment, the interchangeability and cross-elasticity of demand across types of equipment, reasoning for the inclusion or absence of specific types of equipment in the alleged definition, and no discussion of the range of equipment in each "narrower relevant market" contained within the broader "heavy construction equipment" markets.[80]   Simply, ICP has done absolutely nothing to establish its alleged product market, and as a result its claims fail as a matter of law.

ii.   **ICP concedes Caterpillar did not have market power in any relevant antitrust market.**

Summary judgment should be granted as to ICP's Sherman Act claim because undisputed facts establish that Caterpillar accounted for only 25-30% of North American wheel loader and excavator sales and that its share declined between 2014-18.  It, thus, had no market power in any relevant market.  Proof of market power is an essential prerequisite for a plaintiff in satisfying its burden of proving likely competitive effect for a Sherman Act § 1 case.  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 213 (3d Cir. 2005) (holding market power necessary in order for the court to "presume anticompetitive effects").   ICP's expert provides no opinion regarding Caterpillar's market power, and ICP fails to provide any evidence to establish market power and the undisputed facts show that Caterpillar had less than 30% of market share in wheel loaders and excavators; the market was competitive before, during, and after the termination of the HSA.

D.   **Summary judgment should be granted because ICP's alleged damages are entirely speculative.**

ICP alleges damages here that are based entirely on guesswork, unfounded in fact or data, and reliant on dispositive assumptions that are divorced from the reality of the facts in this case.

---

[80] Indeed, the evidence shows that all equipment may not be reasonably interchangeable even within a single product category.  For example, Tim Frank explained that ICP was "losing sales" on wheel loaders "due to its low horse power" because "[t]he engine in the cdm835 is a 130hp" but "[a]ll of the machines sold in the US are at least 160hp."  MSJ Ex. 68, ICP-0025856.

An antitrust plaintiff's damages that are based on "speculation or guesswork" fail as a matter of law. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264 (1946) ("[T]he jury may not render a verdict based on *speculation or guesswork*.") (emphasis added); *see Perrigo Co. v. AbbVie Inc.*, No. 21-3026, 2022 WL 2870152 (3d Cir. July 21, 2022). Here, ICP's alleged damages are unreliable and speculative. It is undisputed that ICP's expert Dr. Leitzinger relied on a single ICP financial projection created after ICP contemplated this litigation, that he concedes is not based on underlying data, and that ICP counsel instructed him to rely on.[81] This damages model ignores the undisputed record evidence, including that it was ICP—not IronPlanet—that terminated the companies' business relationship.

ICP's Section 1 claim also fails as a matter of law because any injury it might have suffered was too remote. It is undisputed that ICP was not in privity, and had no contact, with Caterpillar. Instead, it claims harm because a different entity that is not joined as a defendant here, IronPlanet, terminated the HSA. Plaintiffs whose injuries are once-removed from any conduct of the defendant and were, instead, caused by an entity that is not joined as a defendant are precluded from obtaining monetary damages in antitrust cases because their harm is too remote. There is no exception to this rule in the Third Circuit simply because a plaintiff alleges the intervening party was a co-conspirator. *Link v. Mercedes Benz of N. Am., Inc.*, 788 F.2d 918, 931-33 (3d Cir. 1986) (affirming summary judgment, "[w]e decline to recognize this exception where, as here, the alleged co-conspirators are not also joined as defendants."). Instead, the Third Circuit has repeatedly applied a "bright line rule" in every Section 1 case, whether the alleged conspiracy is vertical or between competitors, that requires the intervening entity to be joined as a defendant and dismissing the case where, as here, they are not. *McCarthy v. Recordex, Serv., Inc.*, 80 F.3d 842,

---

[81] MSJ Ex. 3, Leitzinger Tr. 67:15-68:14; 69:1-24.

848-54 and n. 14 (3d Cir. 1996) (affirming summary judgment because "the alleged co-conspirators immediately upstream were not also joined as codefendants").

## II.   Summary judgment is warranted for ICP's tortious interference claim for lack of subject matter jurisdiction or, alternatively, because its damages are speculative under Illinois and Florida law.

Because ICP's Sherman Act claim fails, this Court has no jurisdiction over ICP's single remaining state law tortious interference claim, because there is no longer a federal question under 28 U.S.C. § 1331 and there is no diversity jurisdiction under 28 U.S.C. §1333, given that ICP and Caterpillar are both incorporated in Delaware. *See, e.g., Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, … judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims").

Even if this Court retains ICP's state law tortious interference claim, it cannot survive summary judgment; there is no genuine issue of material fact as to the existence of tortious interference because ICP's alleged injury is too speculative to survive summary judgment. The undisputed evidence establishes that factors besides Caterpillar's alleged actions—ICP's decision not to conduct business with IronPlanet, its untested business model, and failure to comply with EPA regulations, among other issues—prevented ICP from succeeding. And it has no evidence of damages: Dr. Leitzinger concedes did not have "any opinions . . . focused directly on tortious interference" and that he was "not even sure that phrase even appears in [his] report."[82]

This Court previously applied Florida and Illinois law to ICP's state law claims.[83] There is no remaining connection to Florida at issue in this case, as the dealer defendants were dismissed

---

[82] MSJ Ex. 3, Leitzinger Tr. at 47:8-12.
[83] D.I. 292 at 3. The Court has never received full briefing on choice of law for this claim and Caterpillar reserves all rights in that regard.

(and subsequently granted summary judgment in Florida). Under Illinois law, ICP's tortious interference claim cannot survive summary judgment. And even if the Court determines that Florida law applies, ICP's purported damages are too speculative to survive summary judgment.

### A. ICP's claim fails under the Illinois "new business rule."

To succeed on a tortious interference with contract claim under Illinois law, ICP must demonstrate "(1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) that [the] defendant was aware of the contract, (3) that [the] defendant intentionally and unjustifiably induced a breach of the contract, (4) that the wrongful conduct of [the] defendant caused a subsequent breach of the contract by the third party, and (5) that the plaintiff was damaged as a result." *Bank Fin., FSB v. Brandwein*, 36 N.E.3d 421, 430 (Ill. App. Ct. 2015). ICP bears the burden of presenting evidence of each element of its claim, including damages. *See Ivey v. Transunion Rental Screening Sols. Inc.*, 186 N.E.3d 1076, 1090 (Ill. App. Ct. 2021). Specific to the fifth element, damages, ICP has failed to show that (i) that ICP sustained actual damages, (ii) the damages resulted from Caterpillar's actions, and (iii) a proper measurement of those damages. *See U.S. Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601 (N.D. Ill. 2007), *adhered to in part on reconsideration*, No. 03 C 6027, 2007 WL 2091020 (N.D. Ill. July 18, 2007); *Ivey*, 186 N.E.3d at 1090.

Caterpillar is entitled to judgment as a matter of law because ICP failed to demonstrate that it suffered damages resulting from Caterpillar's alleged tortious interference with an agreement with IronPlanet. *Ivey*, 186 N.E.3d at 1085; *U.S. Gypsum Co.*, 508 F. Supp. 2d at 639–40 (dismissing contract and tortious interference with contract claims where plaintiff relied on the allegations in its complaint to show damages at summary judgment). It is undisputed that IronPlanet signed an agreement in May 2014 to continue doing business with ICP on the IronPlanet website—for the same commission rate, using the same sales representatives, and with access to

the same pool of registered users as applicable under the HSA—but ICP turned down IronPlanet in June 2014 prior to acting under that agreement, deciding on its own not to conduct business with IronPlanet based on a legal consideration.  Even if ICP could somehow demonstrate tortious interference damages—which it does not—ICP failed to take steps to avoid damages by refusing to continue doing business with IronPlanet.  *See*, *e.g*., *Mayster v. Santacruz*, 163 N.E.3d 246, 256 (Ill. App. Ct. 2020) ("the law does not assess damages against a plaintiff who fails to mitigate, it just 'fails to compensate him for any injury he reasonably could have avoided.'")  Accordingly, ICP fails to demonstrate evidence of actual damages, a necessary element for its tortious interference claim, and the claim fails as a matter of law.

Additionally, ICP's tortious interference with contract claim fails because ICP failed to demonstrate any evidence of any measurement of tortious interference damages.  Under Illinois law, "the proper measure of damages is the amount necessary to place the nonbreaching party into the position it would have been in had the defendant properly performed."  *Ivey*, 186 N.E.3d at 1085 (citations omitted).  Damages must be shown "with reasonable certainty without resort to conjecture or speculation" because "lost profits are frequently the result of several intersecting causes."  *Id.*  To ensure damages are "reasonably certain" and to guard against speculative damages claims, courts in Illinois preclude claims of lost profits by new businesses without any "track record" or "historical data demonstrat[ing] a likelihood of future profits."  *Id.*  Businesses must be "established before the interruption [or interference] so that the evidence of lost profits is not speculative."  *Id.*  This rule ensures that plaintiffs can "show with reasonable certainty that the defendant's conduct caused a specific portion of lost profits."  *Id.* (quoting *SK Hand Tool Corp.*, 672 N.E.2d at 427).

33

Here, ICP should be precluded from claiming lost profits under the "new business" rule because ICP's estimated lost profits rely on pure speculation. ICP had no track record of profits and its own expert, Dr. Leitzinger, failed to opine on the existence or amount of damages related to the tortious interference claim or specifically accrued by the alleged interference with the HSA.[84] Dr. Leitzinger admitted that he did not have "any opinions . . . focused directly on tortious interference" and that he was "not even sure that phrase even appears in [his] report."[85] And it is undisputed that Dr. Leitzinger's report and testimony regarding his computation of damages flowing from ICP's antitrust claim relies exclusively on one cherry-picked sales projection created after ICP contemplated this litigation. ICP's April 2014 sales projection is a prediction of *future* profits with no underlying supporting data and cannot be used to support its damages claim. Therefore, the record "leaves uncertain whether [ICP] would have made any profits at all" even if its HSA with IronPlanet was not terminated. *See MindGames, Inc. v. W. Pub. Co., Inc.*, 218 F.3d 652, 658 (7th Cir. 2000). Consistent with the purpose of the "new business" rule, ICP cannot show with "reasonable certainty" which portion of its claimed lost profits were caused by Caterpillar. ICP cannot substitute its own projections of future profits for a proven "track record" of past profits. Relying on these sales projections is too speculative as a matter of law to support ICP's claim of tortious interference with contract damages. The Court should therefore bar ICP from claiming tortious interference under the "new business" rule.

### B.   ICP's claim fails under Florida law because its alleged damages are speculative.

Even if Florida law applies, ICP's purported damages claim is still too speculative to survive summary judgment. While the majority of jurisdictions, including Florida, have abrogated

---

[84] *See generally* MSJ Ex. 41, Leitzinger Rep.
[85] MSJ Ex. 3, Leitzinger Tr. at 47:8-12.

the traditional "new business" rule, these jurisdictions nevertheless apply the new business rule as

an evidentiary standard (rather than a *per se* rule).  *Id.*  The law is clear:

> **newness enters into judicial consideration of the damages claim not as a rule
> but as a factor in applying the standard**.  Just as a start-up company should not
> be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed
> out before it could begin to operate ... capitalizing fantasized earnings into a huge
> present value sought as damages, so a novice writer should not be permitted to
> obtain damages from his publisher on the premise that but for the latter's laxity he
> would have had a bestseller, when only a tiny fraction of new books achieve that
> success.

*Alphamed Pharms. Corp. v. Arriva Pharms., Inc.*, 432 F. Supp. 2d 1319, 1341 (S.D. Fla. 2006),

*aff'd*, 294 F. App'x 501 (11th Cir. 2008) (quoting *MindGames,* 218 F.3d at 658).  And a plaintiff

cannot recover lost profits where "plaintiff's proof leaves uncertain whether plaintiff would have

made any profits at all."  *Id.* at 1342 (quoting Robert L. Dunn, Recovery of Lost Profits § 1.8 (6th

ed.2005)).

## CONCLUSION

There is no genuine issue of material fact as to either of ICP's remaining claims.  Caterpillar

respectfully requests that the Court grant summary judgment.

[Signature on next page.]

Respectfully submitted,

*Of Counsel:*                                    **BERGER HARRIS LLP**

Joseph A. Ostoyich                               */s/ David J. Baldwin*
Danielle Morello                                 David J. Baldwin (DE Bar No. 1010)
Clifford Chance LLP                              Peter C. McGivney (DE Bar No. 5779)
2001 K Street, NW                                1105 N. Market Street, 11th Floor
Washington, DC  20006-1001                       Wilmington, Delaware 19801
Tel: (202) 253-9077                              Tel: (302) 650-1150
                                                 Fax: (302) 655-1131
Paul C. Cuomo                                    dbaldwin@bergerharris.com
Heather Souder Choi                              pmcgivney@bergerharris.com
Adam Dec
BAKER BOTTS L.L.P.                               *Attorneys for Defendant Caterpillar Inc.*
700 K Street NW
Washington, D.C. 20001
Tel: (202) 639-7700

Dated: October 17, 2023
Wilmington, Delaware

36