**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC, <br><br> Plaintiff, <br><br> v. <br><br> CATERPILLAR INC., et al, <br><br> Defendants, | Case No. 15-cv-108-RGA-SRF <br><br> **PUBLIC VERSION** |

**CATERPILLAR INC.'S OPENING BRIEF IN SUPPORT OF ITS**
**MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE**

*Of Counsel:*

Joseph A. Ostoyich
Danielle Morello
Clifford Chance LLP
2001 K Street, NW
Washington, DC  20006-1001
Tel: (202) 253-9077

Paul C. Cuomo
Heather Souder Choi
Adam Dec
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
Tel: (202) 639-7700

**BERGER HARRIS LLP**

David J. Baldwin (DE Bar No. 1010)
Peter C. McGivney (DE Bar No. 5779)
1105 N. Market Street, 11th Floor
Wilmington, Delaware 19801
Tel: (302) 650-1150
Fax: (302) 655-1131
dbaldwin@bergerharris.com
pmcgivney@bergerharris.com

*Attorneys for Defendant Caterpillar Inc.*

Dated: October 12, 2023
Wilmington, Delaware

Public Version Dated:  October 19, 2023

# TABLE OF CONTENTS

**Page**

STATEMENT OF FACTS ........................................................................................ 4

   I.    ICP represented during Phase 1 that it properly preserved documents. ...................... 4

   II.   ICP's Phase 2 deadline production was stunningly deficient due to its spoliation....... 6

   III.  ICP failed to properly preserve evidence related to this litigation.............................. 7

   IV.  ICP witnesses testified they destroyed relevant documents after this litigation
          began. ......................................................................................................... 8

   V.    ICP seeks to take advantage of its spoliation by instructing its experts to make
          material assumptions ungrounded in record evidence. ................................................ 10

ARGUMENT ................................................................................................... 13

   I.    ICP's spoliation should be sanctioned. ..................................................... 14

       a.    ICP's duty to preserve evidence began in April 2014. .................................... 15

       b.    ICP failed to take reasonable steps to preserve critical evidence. ................... 15

       c.    ICP acknowledges it has no ability to resurrect the destroyed evidence......... 16

   II.   Caterpillar is prejudiced by ICP's failure to preserve documents. ............................. 16

       a.    ICP could not legally import or sell Lonking equipment in the United States.16

       b.    ICP was not prevented from selling equipment through IronPlanet. .............. 18

   III.  Evidentiary sanctions are appropriate to remedy the prejudice to Caterpillar............ 19

CONCLUSION ................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
  881 F. Supp. 2d 1132 (N.D. Cal. 2012) ...................................................................8

*Bistrian v. Levi*,
  448 F. Supp. 3d 454 (E.D. Pa. 2020) .............................................................14, 15

*Capogrosso v. 30 River Ct. E. Urb. Renewal Co.*,
  482 F. App'x 677 (3d Cir. 2012) ...........................................................................14

*CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*,
  No. 17-320, 2019 WL 1118099 (D. Del. Mar. 11, 2019) ..................................14, 19

*Dealer Comput. Servs., Inc. v. Ford Motor Co.*,
  2006 WL 801033 (S.D. Tex. Mar. 28, 2006), *aff'd*, 190 F. App'x 396 (5th Cir. 2006)..........19

*GN Netcom, Inc. v. Plantronics, Inc.*,
  930 F.3d 76 (3d Cir. 2019)........................................................................................8

*GN Netcom, Inc. v. Plantronics, Inc.*,
  No. 12-1318-LPS, 2016 WL 3792833 (D. Del. July 12, 2016)...............................16

*Gumbs v. Int'l Harvester, Inc.*,
  718 F.2d 88 (3rd Cir. 1983) ...........................................................................19, 20

*In re Canadian Imp. Antitrust Litig.*,
  470 F.3d 785 (8th Cir. 2006) .................................................................................17

*In re Wechsler*,
  121 F. Supp. 2d 404 (D. Del. 2000)................................................................13, 14

*Indemnity Ins. Co. of N. Am. v. Electrolux Home Prods., Inc.*,
  520 F. App'x 107 (3d Cir. 2013) ...........................................................................20

*J.T. Gibbons, Inc. v. Crawford Fitting Co.*,
  704 F.2d 787 (5th Cir. 1983) .................................................................................19

*Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*,
  886 F. Supp. 2d 466 (D. Del. 2012).............................................13, 15, 19, 20

*Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*,
  348 F. Supp. 2d 332 (D.N.J. 2004) ........................................................................14

*Pelino v. Gilmore*,
    No. 18-1232, 2020 WL 2572361 (W.D. Pa. May 21, 2020) ...........................................19, 20

*PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy*,
    No. 19-CV-7577 (KMK), 2023 WL 2973038 (S.D.N.Y. Mar. 28, 2023) ...............................17

*Rodriguez v. Forthright*,
    665 F. App'x 204 (3d Cir. 2016) .........................................................................................20

*Ronnie Van Zant, Inc. v. Pyle*,
    270 F. Supp. 3d 656 (S.D.N.Y. 2017), rev'd in part on other grounds ...................................14

*Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc.*,
    No. 07-CV-5855, 2010 WL 2652412 (D.N.J. July 1, 2010)...................................................15

*United States v. Cherkasky Meat Co.*,
    259 F.2d 89 (3rd Cir. 1958) .................................................................................................20

*Wagner v. Sea Esta Motel I*,
    No. 13–81–RGA, 2014 WL 4247731 (D. Del. Aug. 26, 2014)..............................................19

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) .........................................................................................15

## OTHER AUTHORITIES

Fed. R. Civ. P. 37(e) ....................................................................................................4, 13, 14, 20

Fed. R. Civ. P. 37(e)(1)..............................................................................................14, 16, 19, 20

Plaintiff International Construction Products LLC ("ICP") began to foresee this litigation in early April 2014.  At that point, the company was legally obligated to ensure that its employees preserved all documents relevant to its claims and to Caterpillar's potential defenses.  After ICP completed its Phase 1 document production, Caterpillar raised concerns with ICP's preservation efforts, and ICP, through its counsel, represented that it had complied with its obligations and issued adequate preservation notices to eleven employees.  But during Phase 2 discovery, it was clear that ICP did not.  ICP's corporate representative conceded that the company did not issue any hold notices in Spring 2014, and, instead, ICP did not send a written preservation notice to its personnel until six months later—after most had left the company—and then it failed to ensure their compliance.  As a result, ICP produced ***no documents from eight of its eleven custodians by the Phase 2 deadline***, and very few from two others; virtually its entire document production (99.4%) and all produced emails came from a single custodian, ICP founder Tim Frank.

Multiple ICP witnesses testified they destroyed their documents—including after this litigation was well underway—and others were unable to explain whether they took any steps to preserve their documents or even received a hold notice.  Caterpillar promptly raised its concerns after reviewing ICP's Phase 2 production, prior to the close of discovery, and ICP tacitly conceded its preservation was flawed by agreeing in Spring and Summer of this year to try to locate the missing custodial files.  But, not surprisingly, ICP's efforts to rectify those deficiencies in 2023, nearly a decade later, failed.  Even after its belated attempt to collect documents in 2023, ICP produced only a small smattering of additional documents from its CEO, Wes Lee (103 total

documents),[1] and its Director of Sales, Jim Teague (130 documents), and ICP produced **no documents** from the files of many key ICP personnel, including:

- Matt Borum, ICP's President in 2015 (and its Director of Parts Management in 2014), who testified that he has no ICP-related documents ("I have nothing . . . I no longer have anything"), cannot account for his company-issued laptop, and does not remember being asked to preserve his documents ("I don't remember someone telling me");[2]

- John Taaffe, its Senior Director of Customer Support, who testified that at some point after he left ICP he "deleted everything off my laptop that I had at the time."[3] He cannot explain the company's failure to produce a single document from his files: he was unsure whether he received any notice to preserve documents related to the litigation and, while he may have been told to upload his ICP-related material to a shared drive when he left the company in June 2014, he did not do that, stating he "didn't know how to do it."[4] While he thought another ICP employee, Jean Willoughby, the company's Manager of Sales and Marketing Support, may have done that for him, "I'm speculating."[5]

- Ms. Willoughby, who testified, however, that she did not upload *anyone's* files to a shared drive, including her own: "they would have had to show me and tell me how to do it, so I would not have understood what – how to do it."[6]

- Leah Joseph, ICP's Manager of Customer Service, who testified that she deleted an ICP-related folder from her laptop in 2016 or 2017: "I just dumped it" because "there was no purpose in it."  She flatly denied ever receiving an instruction to save ICP-related documents before she left the company in mid-2014 ("No") and testified "I don't recall" taking any steps to preserve her documents.[7]

- John Johnson, ICP's head of Service Support and Sales, who testified that no one asked him to preserve or hold onto records related to ICP ("No") or notified him of any requirement to do so ("No") and, as a result, he did not preserve his documents or turn anything over for production ("No").[8]

---

[1] Mr. Lee testified that he does not remember providing his ICP-related documents to Mr. Frank or uploading them to a shared file site, despite Mr. Frank asking him to do so when he left the company in mid-2014.  Ex. 1, Lee Tr. 239:13-17 ("I do not;" "No").

[2] Ex. 2, Borum Tr. 55:1-24, 56:8-57:3.

[3] Ex. 3, Taaffe Tr. 368:18-369:21, 372:1-5.

[4] *Id.* at 371:13-25.

[5] *Id.* at 373:16-19; *see also id.* at 371:12-22 ("If I am to speculate, which I hate to do").

[6] Ex. 4, Willoughby Tr. 145:7-146:12.

[7] Ex. 5, Joseph Tr. 110:3-111:17.

[8] Ex. 6, Johnson Tr. 52:12-53:2.

- Michelle Teague, 20% owner of ICP, who testified she did not receive a preservation notice and took no steps to preserve her documents. Her husband Eric Teague, an ICP "consultant" responsible for dealer relationships, testified similarly: "I have never received a request directly about preserving documents because I was not an employee of the company;" "I don't recall that, no."[9]

Caterpillar is prejudiced by ICP's document destruction and its failure to meet its preservation obligations: it is now clear that ICP plans to take advantage of the fact that certain evidence is not in its files—evidence that would be necessary to meet its burden of proof—by simply instructing its experts to assume the missing evidence exists. Two examples suffice to make the point.

First, ICP produced no documents showing that ICP (and Lonking, its Chinese equipment supplier) complied with the Environmental Protection Agency (EPA) and California Air Resources Board (CARB) regulations restricting the import and sale of diesel engine powered heavy duty construction equipment in the United States. These requirements applied to both equipment manufacturers (like Lonking) and importers (like ICP). The record here is clear that ICP's business model involved ICP serving as an importer of Lonking equipment.[10] Yet, ICP witnesses testified they took no steps to ensure compliance with the applicable requirements. ICP produced no records or evidence to show that ICP or Lonking complied with EPA requirements or otherwise considered that the total volume of imports of foreign equipment would be severely constrained. In this lawsuit, however, ICP seeks to capitalize on the confusion caused by its own preservation failures (or as likely, its failure to ever comply with EPA requirements) by simply instructing ICP's damages and industry experts to *assume*—without any evidence from its own files or witnesses —that the companies actually complied with EPA requirements and would have legally sold more

---

[9] Ex. 7, E. Teague Tr. 89:1-91:4; Ex. 8, M. Teague Tr. At 81:19-82:6.
[10] Ex. 9, ICP-0020529 (███████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████).

than $1 billion worth of equipment in the U.S. between 2014 and 2018.  Caterpillar is prejudiced by the lack of documents on this key issue.

Second, IronPlanet was willing to continue selling ICP's Lonking equipment in its online auctions after terminating the Hosted Store Agreement in April 2014—and, in fact, ICP's Director of Sales Jim Teague (whose documents are almost entirely missing) and one of IronPlanet's territory sales managers signed a contract to do so, at the same commission rate in the Hosted Store Agreement, on May 21, 2014—but ***ICP turned down IronPlanet*** and, instead, decided to switch to another auction platform, Ritche Bros.  That is the opposite of ICP's allegations that "Defendants conspired to first eliminate, and then forever bar, ICP's access to IronPlanet" . . . "leaving ICP without feasible means to efficiently bring its products to market."[11]  Again, ICP seeks to take advantage of its own preservation failures and spoliation by simply instructing its experts to assume "they were put out of the market" by IronPlanet's termination of the Hosted Store Agreement, "and in that way, were foreclosed."[12]

In sum, documents that would have been probative to the claims at issue in this case from a significant number of ICP employees, including senior executives, were destroyed.  Caterpillar moves for sanctions under Federal Rule 37(e).[13]

## STATEMENT OF FACTS

**I.      ICP represented during Phase 1 that it properly preserved documents.**

Discovery in this litigation was conducted in two phases: Phase 1 was limited to Defendants' conduct related to ICP's agreement with IronPlanet, and Phase 2 was "[a]ll fact

---

[11] D.I. 1 at ¶¶ 3, 4; Ex. 10, ICP-0036308.
[12] Ex. 11, Leitzinger Tr. 19:2-19 (August 25, 2023).
[13] Caterpillar and ICP met and conferred on potential remedies for ICP's preservation defects and spoliation, including telephonically with Delaware counsel, and are at an impasse.

discovery not included in Phase 1."[14]  During Phase 1, ICP represented in the parties' Stipulation Regarding Discovery of Documents and Electronically-Stored Information that it had "taken reasonable steps to identify and preserve discoverable information in their possession, custody, or control . . . [and] *issued litigation notices to those they have identified as most likely to have relevant information and have undertaken efforts to preserve such information*."[15]

After ICP completed its Phase 1 document production, Caterpillar raised questions about why ICP had produced so few documents from a very limited set of custodians.[16]  In response, ICP indicated that it had produced only documents responsive to Phase 1, and represented that it had properly preserved eleven custodians' documents and, of course, would produce relevant documents from its custodians in Phase 2, if appropriate.

ICP specifically represented that "all relevant and responsive emails and other documents spanning the agreed time period have been preserved" and that it issued legal holds to 11 custodians: Tim Frank (President), Wes Lee (CEO), Joe Hanneman (Senior Director of Marketing), John Taaffe (Senior Director of Customer Support), Jim Teague (Director of Sales), Matthew Borum (Director of Parts Management and President), John Johnson (Service Support and Sales), Jean Willoughby (Manager of Sales & Marketing Support), Joseph Frank (Co-owner), Eric Teague (Co-Owner), and Michelle Teague (Co-owner).[17]  ICP represented that it was not aware of any destruction of relevant emails or documents, or any data gaps, and claimed that the deficiencies Caterpillar identified regarding ICP's preservation of documents were "not grounds for concern," due to Phase 1 discovery only covering one limited issue.[18]

---

[14] D.I. 95 at 3.
[15] D.I. 113 at A-1-A-2 (emphases added).
[16] Ex. 12, Letter from Busen to Mauser at 4-5 (Dec. 11, 2017).
[17] Ex. 13, Letter from Renner to Busen at 2-4 (May 31, 2018) ("Renner Ltr.").
[18] *Id.*

## II.      ICP's Phase 2 deadline production was stunningly deficient due to its spoliation.

ICP produced its Phase 2 documents on January 27, at the Phase 2 deadline, but did not include a cover letter identifying the custodians of those documents.  After promptly reviewing the documents and prior to the close of discovery, Caterpillar identified deficiencies to ICP, noting that its production contained: 1) *zero* documents for eight of the eleven custodians who ICP represented received legal holds (Taaffe, Borum, Jim Teague, Eric Teague, Michelle Teague, Johnson, Joe Frank, and Willoughby), and very few from two others, Wes Lee (only 6 documents) and Joe Hanneman (49 documents); 2) *zero* email records at all from anyone besides Tim Frank, and 3) *zero* hard copy documents.[19]  Over 99% of the documents ICP timely produced—and all of the emails—were the custodial files of a single individual, ICP founder Tim Frank.

Over a series of meet and confers, Caterpillar agreed to stay its depositions of ICP personnel pending ICP counsel's attempt to "re-collect" and produce the missing documents.[20] ICP's after-the-fact effort—in 2023, nearly a decade after the events in question—resulted in a set of fewer than 1,300 documents from its former employees and officers.  Even accounting for new collections made after the document production deadline, ICP still has produced *zero* custodial documents from Matt Borum (President and former Director of Parts Management), John Taaffe (Senior Director of Customer Support), John Johnson (Service Support and Sales), Jean Willoughby (Manager of Sales & Marketing Support), Joseph Frank (Co-owner), and Michelle Teague (Co-owner), and *de minimis* documents Wes Lee (CEO, 103 documents) and Jim Teague (Director of Sales, 130 documents).[21]

---

[19] Ex. 14, Letter from Morello to Cole (March 2, 2023).
[20] Ex. 15, Letter from Cole to Morello (April 10, 2023) ("Cole Ltr.").
[21] *See* Morello Decl. for a summary of produced documents.

### III.    ICP failed to properly preserve evidence related to this litigation.

It is undisputed that ICP contemplated this litigation in early April 2014.[22]  It is also undisputed that ICP did not provide any instruction to preserve documents specific to this litigation until *six months* later, in October 2014, months after many of the employees who received that legal hold left ICP, and that ICP sent the belated hold instructions to those former employees' ICP business email addresses, addresses it is highly unlikely those former employees monitored.[23]  In short, ICP completely failed to ensure preservation of evidence related to this litigation prior to the departure of nearly all of its employees in June 2014.

ICP President Tim Frank held a "very quick" meeting in June 2014—wholly unrelated to this litigation—where he orally instructed certain ICP employees to upload general ICP-related documents to a cloud storage site before they left the company in mid-2014.[24]  ICP did not create an attendance list for that meeting, nor could Mr. Frank, as ICP's 30(b)(6) corporate representative, identify which employees were present at that meeting.[25]  ICP did not keep a record of which employees uploaded documents to that cloud storage file or how many documents those employees loaded, did not ask for any confirmation that employees loaded documents to that cloud storage site, and did not remind employees to load files to the storage site.[26]  And Matt Borum, Wes Lee, Jim Teague, Jean Willoughby, John Johnson, Eric Teague, Michelle Teague, and Leah Joseph all testified that they do not recall uploading any documents to a cloud storage site at all, nor receiving

---

[22] Ex. 16, ICP's Revised Privilege Log (Part 1) shows entries as early as April 9, 2014 related to this litigation.  *See* lines 15, 20.

[23] Ex. 13, Renner Ltr.; Ex. 17, ICP 30(b)(6) Dep. Tr. 234:18-24 (July 10, 2023) (Q: … you just told me the company issued a hold notice in October.  And what did you mean a hold notice? "To ICP employees."  Q:… did you send it to his icpdirect.com e-mail or to a personal e-mail, or how did you send it?  "we still maintained the ICP Directs.  So I don't recall which one it was to, but we could have -- I would assume we used ICP").

[24] Ex. 17, ICP 30(b)6 Dep. 224:24, 216:9-25 (July 10, 2023).

[25] *Id.* at 218:10-19 ("I don't recall . . . I did not . . .").

[26] *Id.* at 220:11-221:9, 222:17-22, 225:1-23 ("I did not, no. . . I did not.").

any such instruction to upload documents, and in some instances that they would not have known how to do so.[27]  ICP cannot dispute any of this because it is all confirmed by its the recent 30(b)(6) testimony, its documents, and its privilege log.

ICP's privilege log confirms that ICP was considering this litigation in early April 2014, but its corporate witness testified the company did nothing until months later.[28]  ICP also admits that it did not preserve its company email domain server data, and instead claims to have relied on individual ICP employees to upload their ICP-domain emails to its cloud storage site.  Review of ICP's document production and testimony of ICP's former employees demonstrates that individual uploads did not occur: ICP produced virtually no emails between any of its employees or between the employees and other entities, like Lonking, unless Tim Frank was the sender, recipient, or was copied.[29]  Additionally, ICP employees, including Tim Frank, used non-ICP email addresses to conduct business for the company, yet testified that they did not recall preserving those emails.[30]  And it is unclear whether ICP preserved any hard copy documents at all.

## IV.   ICP witnesses testified they destroyed relevant documents after this litigation began.

Witnesses whom ICP claimed it sent preservation notices to or collected documents from, including senior ICP executives, *testified that they were never instructed to preserve or provide documents for this litigation*.[31]  For example, ICP failed to collect or preserve *any* documents from Matt Borum, President of ICP in late 2014 and 2015, who ran ICP after Tim Frank left the

---

[27] *See* Appendix A.
[28] Ex. 17, ICP 30(b)6 Dep. Tr. 224:24, 216:9-25 (July 10, 2023); Ex. 16, ICP Revised Privilege Log (Part 1) at line 10.
[29] *See, e.g.*, Appendix A.
[30] *Id.*
[31] *Id.* As courts have recognized, senior executives are likely to have communications "especially probative" to claims at issue.  *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 881 F. Supp. 2d 1132, 11150 (N.D. Cal. 2012); *see also*, *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76 (3d Cir. 2019) (affirming sanctions where executives destroyed relevant evidence).

company in late 2014.  As President of ICP Mr. Borum was directly responsible for day-to-day management of the company and due diligence in connection with the sale of ICP in 2015— including valuation of the company, which directly speaks to ICP's alleged damages—and involved in correspondence with government agencies about the legality of ICP's sale of Chinese-manufactured equipment.  ICP produced *zero* custodial documents from Mr. Borum, who testified that he does not recall being told to preserve documents, that he **cannot account for his ICP-issued laptop**, and has "nothing" related to ICP remaining in his possession.[32]  This destroyed evidence is central to the issues in this case, as shown by ICP's "expert" analyses in which ICP counsel instructed its expert to assume that ICP could legally import and sell Lonking equipment in the U.S., and extrapolates damages figures from ICP-created financial projections with no underlying data and were discounted by third parties.[33]  From the limited documents ICP did produce, it is apparent that Mr. Borum was primarily responsible for those issues.

ICP CEO Wes Lee similarly testified that he never provided any documents related to this litigation to ICP, nor did he load them to any cloud storage site.[34]  As CEO, Mr. Lee was involved in the day-to-day running of the company and managerial decisions on an executive level, yet ICP failed to preserve his documents and only produced 103 of his custodial documents.  ICP also failed to preserve custodial documents of Jim Teague, ICP's Director of Sales, who had direct contact with IronPlanet and was directly involved in ICP's decision to cease conducting business with IronPlanet and ICP's communication of that decision to IronPlanet.  Despite Mr. Teague's

---

[32] Ex. 2, Borum Dep. Tr. 55:7-10, 56:8-57:3 ("I don't recall a specific time or email saying -- stating that  . . . No, I have nothing. . . . I don't remember, to be honest").

[33] Ex. 18, Leitzinger Rep. fn. 70 (███████████████████████████████████████████
████████████); Ex. 11, Leitzinger Dep. Tr. 67:15-68:14, 69:1-24 (Leitzinger admits that he was aware that ICP did not have any "underlying factual information" or "underlying data" to support the ICP financial projection counsel instructed him to use for his damages analysis).

[34] Ex. 1, Lee Dep. Tr. 239:9-17 (July 7, 2023) ("No. . . I do not.").

direct responsibility for selling ICP equipment, and his direct communication with IronPlanet and other companies distributing ICP equipment, Mr. Teague testified that no one instructed him to preserve ICP-related documents, he did not preserve relevant documents, and that neither ICP nor ICP's counsel approached him about collecting his documents until 2023.  By then it was too late.

Similarly, Mr. Johnson—who was "the main guy… that talked to the customer" responsible for identifying and troubleshooting the significant problems with ICP's equipment—testified that he was never asked to preserve records related to ICP, never looked through his emails for ICP-related documents, and never "handed over any documents to any attorney associated with ICP."[35]  Jean Willoughby, one of the only ICP employees to remain at the company until its 2015 sale to LSI, testified that she did not receive a legal hold and does not recall providing documents related to this litigation to ICP.[36]  Ms. Willoughby was also copied on emails with IronPlanet in late May 2014 offering to sell ICP's Lonking machines on its site, but ICP failed to preserve any of her documents, either.  And co-owner Michelle Teague testified that she did not receive a legal hold, nor did she provide any documents related to this litigation to ICP prior to 2023.[37]

## V.    ICP seeks to take advantage of its spoliation by instructing its experts to make material assumptions ungrounded in record evidence.

ICP's spoliation of evidence impacts at least two critical issues: 1) ICP's ability to legally sell equipment in the U.S., and 2) ICP's decision not to do business with IronPlanet, despite IronPlanet's willingness to have its sales force sell ICP-Lonking equipment on its auctions in May and June 2014—at the same commission rate—after it terminated the Hosted Store Agreement. On both of these issues, ICP seeks to take advantage of its spoliation by instructing its experts to assume facts not in evidence—that ICP complied with EPA/CARB regulations and could have

---

[35] Ex. 6, Johnson Dep. Tr. 52:13-53:1.
[36] Ex. 4, Willoughby Dep. Tr. 144:4-145:25 (June 21, 2023).
[37] Ex. 8, M. Teague Dep. Tr. 81:19-82:23 (June 23, 2023).

legally sold $1 billion worth of equipment from 2014-2018 and that ICP's alleged bar from IronPlanet foreclosed it from the market—to prop up a severely inflated damages allegation entirely disconnected from the reality of this case.  Each of these issues is key to ICP's allegations.

First, the record is devoid of evidence that ICP took the steps necessary to legally import and sell Lonking equipment in the United States; on the contrary, ████████████████████ ████████████████████████████████████████████████████████████████[38]  EPA regulations in effect in 2014 mandated that imported construction equipment comply with EPA's Tier 4 emissions standards.  Lonking did not produce any Tier 4-compliant equipment in 2014 (or anytime thereafter relevant to this case), and as a result, there was only one other viable option available to Lonking and ICP to legally sell in the U.S.: take all necessary steps to comply with EPA's "TPEM" Program to import and sell a very limited number of machines with Tier 3 engines for a limited number of years.  But there is no evidence that ICP or Lonking took the necessary steps to comply with the TPEM Program.  ████████████████████████████████████ ███████████████████████████████  ICP's corporate representative, Tim Frank, conceded that the company was unable to identify any records showing compliance with EPA's Tier 4 standards or EPA's TPEM Program.  Nor could he identify who, if anyone, at ICP or Lonking oversaw satisfying EPA requirements.  The company's fact witnesses, similarly, confirmed that complying with EPA requirements for importing and selling Lonking's Tier 3 machines was not among their responsibilities.  There are no contemporaneous business records demonstrating that ICP did get EPA approval, and yet ICP attempts to avoid the consequences of its failure to adequately preserve documents demonstrating EPA compliance by

---

[38] Ex. 19, ICP-0019133 (████████████████████████████████████████████████ ██████████████████████████████████████████████████).

[39] *Id.*

simply instructing its expert witness to *assume* that ICP and Lonking would have had equipment that was compliant with EPA requirements, and ICP's October 9, 2023 responses to Caterpillar's request for admission claim without any support that "███████████████████████ ████████████████"[40]  If ICP ever made any attempt to satisfy EPA requirements, as it claims and instructs its expert to assume, there is no evidence of that attempt because whatever documents may have existed were not preserved.

Second, ICP's Phase 2 documents show that ICP decided not to conduct business with IronPlanet, not the other way around as ICP alleges.  In late May 2014, IronPlanet territory sales manager Justin Whitlock provided ICP Director of Sales Jim Teague with a fully executed agreement for ICP to sell equipment through IronPlanet and told Mr. Teague, "[w]e thank you for your business and look forward to serving your needs in the future."[41]  But after advising his colleagues that ICP planned to sell equipment through IronPlanet, Mr. Teague immediately received pushback from other ICP executives, including the company's President, Tim Frank. ███

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████[42]  And in June 2014, after IronPlanet inquired about the ICP equipment it planned to sell on its site, ██████████████████████ ██████████████████████[43]

The limited records ICP has produced on this topic shows that this decision was made at the highest levels of ICP, by ███████████████████████████████[44]  This

---

[40] D.I. 595 at 4-6.
[41] Ex. 20, ICP-0003933.
[42] *Id.*
[43] Ex. 21, ICP-0030177.
[44] Ex. 22, ICP-0036325; Ex. 23, ICP-0036299.

decision to not conduct business with IronPlanet—despite IronPlanet's willingness to advertise and place ICP-Lonking equipment in its auctions at the same commission rate—is inconsistent with the very basis of ICP's allegations that IronPlanet refused to do business with ICP and is central to this litigation.  However, ICP's document productions are devoid of key documents detailing ICP's decision to reject IronPlanet—including drafts or negotiations leading to the May 2014 contract signed by Mr. Teague, meeting notes or emails about ICP's decision not to sell equipment on IronPlanet, communications between IronPlanet and Mr. Teague about ICP's decision not to sell equipment through IronPlanet, internal communications about the Frank brothers' decision or IronPlanet's response—because ICP failed to preserve those documents.  ICP failed to preserve *any* custodial documents from Mr. Teague besides the scant few collected in 2023, and Mr. Teague testified that he was never instructed to preserve his ICP-related documents, nor was he instructed to upload them to an ICP cloud file.[45]  As a result, when ICP finally attempted to collect Mr. Teague's documents *nearly a decade later*, very few documents still existed.  In the absence of documents from Mr. Teague and other custodians relevant to this issue, ICP has argued without basis for nine years—including in its recent and out-of-time Fourth Amended Complaint —that IronPlanet refused to deal with ICP due to Caterpillar's alleged interference.[46]  Not so.

## ARGUMENT

The duty to preserve evidence "begins when litigation is pending or reasonably foreseeable."  *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 480 (D. Del. 2012) (imposing sanctions where party failed to preserve evidence, including where evidence was not intentionally destroyed).  Specifically, "[a] party who has reason to anticipate litigation has an affirmative duty to preserve evidence which might be relevant to the lawsuit."  *In re*

---

[45] *See* Appendix A.
[46] D.I. 563 at ¶¶ 3, 4.

*Wechsler*, 121 F. Supp. 2d 404, 415 (D. Del. 2000).  Federal Rule 37(e) allows for sanctions for failure to preserve electronically stored information. Fed. R. Civ. P. 37(e); *CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*, No. 17-320, 2019 WL 1118099, at *3 (D. Del. Mar. 11, 2019) ("[w]here … the issue of spoliation turn[s] on the party's loss or destruction of ESI, Rule 37(e) appears to govern the analysis.").  And the Court has an "inherent authority" to sanction a party for spoliation of evidence, including hard copy documents that were improperly destroyed.  *Mosaid Techs. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004).  The Court may order curative measures "upon a finding of prejudice to another party from the loss of the information," Fed. R. Civ. P. 37(e)(1).  Spoliation includes "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Capogrosso v. 30 River Ct. E. Urb. Renewal Co.*, 482 F. App'x 677, 682 (3d Cir. 2012).

## I.     ICP's spoliation should be sanctioned.

Rule 37(e)(1) allows for curative measures when a party's loss of ESI causes prejudice to another party.  Fed. R. Civ. P.  37(e)(1).[47]  Under Rule 37(e), failure to preserve ESI is sanctionable when: "(1) litigation is ongoing or anticipated, (2) the party failed to take reasonable steps to preserve the ESI, and (3) the information lost cannot be restored or replaced through additional discovery." *CIGNEX*, 2019 WL 1118099 at *2.  All three elements are satisfied here.  ICP's complete and total failure to meet its burden to preserve evidence warrants significant sanction.

---

[47] Rule 37(e)(1) does not require a showing of bad faith, but under 37(e)(2), "[s]elective preservation" that that ICP undertook here "can … reflect intent" and "tends to indicate intentionality." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 477-76 (E.D. Pa. 2020) (imposing sanctions and finding bad faith where a party did not take reasonable steps to preserve evidence); *see also*, *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017), rev'd in part on other grounds (finding intent to deprive and imposing sanctions based on selective preservation of text messages and phone data).

**a.      ICP's duty to preserve evidence began in April 2014.**

The duty to preserve evidence "begins when litigation is pending or reasonably foreseeable." *Magnetar*, 886 F. Supp. 2d at 480.  By ICP's own admission and privilege log entries, ICP contemplated this litigation in early April 2014, triggering its duty to preserve evidence.[48]

**b.      ICP failed to take reasonable steps to preserve critical evidence.**

The duty to preserve evidence extends to "items that are relevant, reasonably calculated to lead to the discovery of admissible evidence, or reasonably likely to be requested during discovery" and requires the party to execute on that preservation. *Bistrian v. Levi*, 448 F. Supp. 3d 454, 473 (E.D. Pa. 2020) (finding evidence was within the scope of duty to preserve and party did not take reasonable steps to preserve by failing to prevent overwriting of that evidence).  The duty extends to "relevant evidence that might be useful to an adversary" and a simple oral instruction or issuance of a litigation hold is not sufficient: a party must ensure that evidence is actually preserved. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003); *Zubulake*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce the relevant documents. … Once a 'litigation hold' is in place, a party and her counsel must make certain that all sources of potentially relevant information are identified and placed 'on hold'[]"); *see also Sanofi-Aventis Deutschland GmbH v. Glenmark Pharms. Inc*., No. 07-CV-5855, 2010 WL 2652412 (D.N.J. July 1, 2010) ("[A] party's discovery obligations do not end with the implementation of a litigation hold." … "Counsel must oversee compliance with the litigation hold, monitoring the party's efforts to retain and produce relevant documents[.]") (quoting *Zubulake*, 229 F.R.D. at 432). ICP failed

---

[48] Ex. 16, ICP Revised Privilege Log (Part 1) at lines 15, 20.

to ensure that it preserved all relevant evidence as required under the Federal Rules.

### c. ICP acknowledges it has no ability to resurrect the destroyed evidence.

There is no "replacement" evidence available to compel or otherwise discover here—ICP represents that it is not withholding any tranche of documents in its possession for production in this litigation;[49] the documents that existed in ICP's possession in 2014 and 2015 when ICP contemplated and first engaged in this litigation no longer exist.  And now, nearly ten years later, ICP witnesses were unable to testify on many key issues.  And, tellingly, ICP has not identified any additional discovery that may restore or replace the evidence it failed to preserve; instead, despite the fact that ICP represented to this Court and Caterpillar in 2017 and 2018 that all relevant evidence was preserved, ICP now changes its story and erroneously maintains that it had no duty to preserve any more evidence than it collected and produced.[50]

### II. Caterpillar is prejudiced by ICP's failure to preserve documents.

In determining the degree of sanctions appropriate for spoliation, courts consider prejudice suffered by the non-spoliating party.  Fed. R. Civ. Pro. 37(e)(1); *see, e.g.*, *GN Netcom, Inc. v. Plantronics, Inc.*, No. 12-1318-LPS, 2016 WL 3792833 (D. Del. July 12, 2016) (granting motion for sanctions in part and noting the consideration of prejudice in determining sanctions).  ICP's failure to preserve evidence is staggeringly widespread and substantively contradicts ICP's claims and impacts several of Caterpillar's defenses.  This spoliation prejudices Caterpillar on at least two critical issues—ICP's alleged foreclosure and ICP's inability to legally sell equipment in the U.S.—and other issues key to ICP's claims and damages.

### a. ICP could not legally import or sell Lonking equipment in the United States.

---

[49] Notwithstanding the "thousands" of documents from custodian Joe Frank that ICP refuses to produce and are the subject of a separate discovery dispute.  D.I. 591.
[50] Ex. 15, Cole Ltr.

It is ICP's burden to prove that Caterpillar's conduct caused it to lose sales of Lonking equipment in the U.S. and that, but-for Caterpillar's allegedly illegal conduct, ICP would have been able to sell Lonking equipment in the U.S. The lack of records related to ICP's attempts to comply with EPA requirements go to a critical issue in the case—because without proof it was lawfully entitled to import and sell Lonking machines in the U.S., ICP does not have a claim that it suffered antitrust injury and damages caused by Caterpillar. *See In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (affirming dismissal because plaintiffs lacked antitrust standing where, as here, "[t]he absence of competition from Canadian Sources in the domestic prescription drug market . . . is caused by the federal statutory scheme adopted by the United States government, not by the conduct of the defendants."); *PharmacyChecker.com v. Nat'l Ass'n of Bds. of Pharmacy*, No. 19-CV-7577 (KMK), 2023 WL 2973038, at **13, 30 (S.D.N.Y. Mar. 28, 2023) (dismissing Sherman Act claim because plaintiff's business of connecting consumers with foreign pharmacies for personal prescription drug importation is "completely or almost completely geared towards facilitating illegality."). ███████████████████████████████████████████████ ████████████████████████████████████ ■ Yet ICP produced *zero* documents showing it or Lonking complied with EPA requirements.  In fact, ICP's testimony and the few documents it did produce demonstrate anything but compliance.  The limited information ICP has produced shows its confusion and ignorance of its responsibilities under EPA regulations and, damningly, its knowledge ICP's imported Lonking machines "████████████████████"[52]

Whether ICP and Lonking complied with the EPA regulations required to sell Lonking equipment in the U.S. is critical to ICP's alleged damages model.  Put simply, ICP has no basis to claim lost profits on tens of thousands of pieces of equipment that it was not legally permitted to

---

[51] Ex. 24, ICP-0033955-65.
[52] Ex. 19, ICP-0019133.

sell in the U.S.[53]  Despite the lack of evidence, ICP's economic expert based his entire damages

model on ██████████████████████████████████████████████████████████

████████████████████████████████████████  when, in reality, ICP could not

lawfully sell *any* Lonking machines in the U.S.[54]  And ICP claims—without evidence— that it

was operating under a TPEM exemption.  This issue underpins ICP's entire damages model, and

ICP's failure to collect or preserve evidence from the custodians with responsibility for this issue—

while instructing its expert to assume it met all regulatory requirements—is highly prejudicial to

Caterpillar.  ICP and its expert should not be able to exploit its deficient preservation efforts by

filling the evidentiary holes in its case with assumptions.

> **b.    ICP was not prevented from selling equipment through IronPlanet.**

ICP's group boycott claim is premised on allegations that Caterpillar and its dealers

orchestrated an agreement for IronPlanet to terminate its business relationship with ICP.  However,

during Phase 2 discovery ICP produced a handful of documents showing that IronPlanet was very

interested in continuing the business relationship and, in fact, offered to sell ICP equipment on its

website in mid-2014 and that ICP took steps to do so—including signing a listing agreement to

sell ICP equipment on IronPlanet in late May 2014.[55]  But *ICP* ultimately decided not to sell

equipment on IronPlanet, as evidenced by an email from ██████████████████████████

---

[53] *See* Ex. 25, Lyons Rep. ¶ 97 ("███████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████).

[54] Ex. 18, Leitzinger Rep. fn. 70 (███████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████); *see also* Ex. 26, Murphy Rep. ¶ 137 (████████████████████
████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████).
[55] Ex. 27, ICP-0003926 (████████████████████████████████████
██████████████████████████████).

██████████████████████████[56] ICP cannot claim that Caterpillar caused IronPlanet to "forever bar" ICP when, in fact, it was ICP that decided not to do business with IronPlanet of its own accord. *See Dealer Comput. Servs., Inc. v. Ford Motor Co.*, 2006 WL 801033, at *4 (S.D. Tex. Mar. 28, 2006), *aff'd*, 190 F. App'x 396 (5th Cir. 2006) ("The new contract was not acceptable to [plaintiff], but its terms were not unreasonable. An unacceptable offer is not, by itself, a refusal to deal."); *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787 (5th Cir. 1983) (directing verdict against plaintiff on all antitrust claims where defendant rejected offer to deal on terms it did not prefer). However, due to the major gaps in ICP's production, it is unclear why ICP elected to stop doing business with IronPlanet and why it has been arguing to the contrary for the last nine years.

### III.    Evidentiary sanctions are appropriate to remedy the prejudice to Caterpillar.

A party who breaches the duty to preserve, "either by destroying evidence or allowing evidence to be destroyed, may be sanctioned by the Court." *Wagner v. Sea Esta Motel I*, No. 13–81–RGA, 2014 WL 4247731, at *1 (D. Del. Aug. 26, 2014). "Rule 37(e)(1) does not impose a burden on any party to either prove or disprove prejudice – rather, the Court is to use its discretion to assess whether prejudice exists from the loss of ESI (including which party should bear the burden)." *CIGNEX*, 2019 WL 1118099, at *4. In deciding on appropriate sanctions, the Rule "permits [courts] to order measures necessary to cure the prejudice caused by the loss of information a party failed to preserve," including Rule 37's "veritable arsenal of sanctions." *Pelino v. Gilmore*, No. 18-1232, 2020 WL 2572361, at *6 (W.D. Pa. May 21, 2020) (citations omitted).

In this Court, sanctions for spoliation range from evidentiary inferences and monetary penalties to outright dismissal. *See, e.g.*, *Magnetar*, 886 F. Supp. 2d at 481 (citing *Gumbs v. Int'l*

---

[56] Ex. 10, ICP-0036308; Ex. 20, ICP-0003933; Ex. 21, ICP-0030177.

*Harvester, Inc.*, 718 F.2d 88, 96 (3rd Cir. 1983); *United States v. Cherkasky Meat Co.*, 259 F.2d 89 (3rd Cir. 1958)).  In cases where a party fails to preserve evidence relevant to core claims or allegations, common sanctions include granting adverse inferences related to the sanctioned party's failure to preserve evidence and ordering the sanctioned party to reimburse attorney and filing fees related to the Motion for Sanctions.  *See, e.g.*, *Pelino*, 2020 WL 2572361, at *6; *Indemnity Ins. Co. of N. Am. v. Electrolux Home Prods., Inc.*, 520 F. App'x 107, 111 (3d Cir. 2013) (affirming decision that "the jury could draw an adverse inference as a result of" spoliation where party failed to preserve evidence relevant to the claims or defenses in the case).  And sanctions due to spoliation are properly considered at summary judgment.  *See, e.g.*, *Rodriguez v. Forthright*, 665 F. App'x 204 (3d Cir. 2016) (holding spoliation could be considered on summary judgment).

ICP should not benefit from its spoliation; the proper remedy for such spoliation is an evidentiary inference.  *See, e.g.*, *Magnetar*, 886 F. Supp. 2d at 481.  The appropriate sanctions here are that ICP cannot offer fact or expert evidence that: 1) ICP could import and sell Tier 4-compliant equipment from Lonking or any other supplier in the US during the 2014-18 period; 2) ICP and Lonking did satisfy or could have satisfied EPA TPEM requirements to import and sell Tier 3-compliant equipment into the US during the 2014-18 period; and 3) IronPlanet boycotted or refused to deal with ICP in 2014 or afterwards.  Additionally, because ICP failed to meet its obligation to preserve evidence the Court should instruct that missing evidence would have been unfavorable to ICP, order ICP to pay Caterpillar's attorneys' fees related to this motion and related discovery disputes and issue any additional sanctions as appropriate.

## CONCLUSION

Caterpillar moves under Federal Rule 37(e)(1) and this Court's inherent authority for sanctions against ICP for the spoliation of critical evidence and an award of attorneys' fees.

Respectfully submitted,

*Of Counsel:*

**BERGER HARRIS LLP**

Joseph A. Ostoyich

*/s/ David J. Baldwin*

Danielle Morello

David J. Baldwin (DE Bar No. 1010)

Clifford Chance LLP

Peter C. McGivney (DE Bar No. 5779)

2001 K Street, NW

1105 N. Market Street, 11th Floor

Washington, DC  20006-1001

Wilmington, Delaware 19801

Tel: (202) 253-9077

Tel: (302) 650-1150

Fax: (302) 655-1131

Paul C. Cuomo

dbaldwin@bergerharris.com

Heather Souder Choi

pmcgivney@bergerharris.com

Adam Dec

BAKER BOTTS L.L.P.

*Attorneys for Defendant Caterpillar Inc.*

700 K Street NW

Washington, D.C. 20001

Tel: (202) 639-7700

Dated: October 12, 2023
Wilmington, Delaware

Public Version Dated:  October 19, 2023