## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS LLC, <br><br>         Plaintiff, <br><br>     v. <br><br> CATERPILLAR INC., et al., <br><br>         Defendants. | Case No. 15-cv-108-RGA-SRF |

## [JOINT PROPOSED] PRE-TRIAL ORDER

This matter comes before the Court at a pretrial conference held pursuant to Rule 16 of the Federal Rules of Civil Procedure.  Trial is scheduled to begin on April 5, 2024.  In advance of the Pretrial Conference on March 22, 2024, Plaintiff International Construction Products LLC and Defendant Caterpillar Inc. submit this Joint Proposed Pretrial Order governing trial of this action pursuant to Federal Rule of Civil Procedure 16, District of Delaware Local Rule 16.3, and the Scheduling Order (D.I. 532).

**Dated: March 19, 2024**

**PAUL, WEISS, RIFKIND,**
**WHARTON & GARRISON LLP**

*/s/ Matthew D. Stachel*
Matthew D. Stachel (DE Bar No. 5419)
500 Delaware Avenue, Suite 200
Post Office Box 32
Wilmington, DE 19899
(302) 655-4410
mstachel@paulweiss.com

*Of Counsel:*

William A. Isaacson
Amy J. Mauser
David Cole
PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP
2001 K Street, NW
Washington, D.C. 20006-1047
(202) 223-7300

*Attorneys for the Plaintiff*
*International Construction Products LLC*

**BERGER MCDERMOTT LLP**

*/s/ David J. Baldwin*
David J. Baldwin (DE Bar No. 1010)
Peter C. McGivney (DE Bar No. 5779)
1105 N. Market Street, 11th Floor
Wilmington, Delaware 19801
Tel:  (302) 650-1150
Fax:  (302) 655-1131
dbaldwin@bergermcdermott.com
pmcgivney@bergermcdermott.com

*Of Counsel:*

Joseph A. Ostoyich
Danielle Morello
CLIFFORD CHANCE LLP
2001 K Street, NW
Washington, DC 20006-1001
Tel:  (202) 253-9077
joseph.ostoyich@cliffordchance.com
danielle.morello@cliffordchance.com

Paul C. Cuomo
Heather Souder Choi
BAKER BOTTS L.L.P.
700 K Street NW
Washington, D.C. 20001
Tel:  (202) 639-7700
paul.cuomo@bakerbotts.com
heather.choi@bakerbotts.com

*Attorneys for Defendant Caterpillar Inc.*

# TABLE OF CONTENTS

I.      NATURE OF THE CASE ......................................................................................... 1
        A.      The Parties ................................................................................................... 1
        B.      Pleadings ...................................................................................................... 1
II.     JURISDICTION AND STANDING ........................................................................ 2
III.    FACTS ...................................................................................................................... 2
        A.      Joint Statement of Uncontested Facts .......................................................... 2
        B.      Plaintiff's Statement of Contested Facts ...................................................... 4
        C.      Defendant's Statement of Contested Facts ................................................... 7
V.      WITNESSES ............................................................................................................ 41
        A.      Witness Lists ................................................................................................. 41
        B.      Testimony by Deposition............................................................................... 42
VI.     EXHIBITS ................................................................................................................ 43
VII.    DISCLOSURES OF WITNESSES AND EXHIBITS DURING TRIAL ................... 46
        A.      Opening Statements ....................................................................................... 46
        B.      Witnesses ....................................................................................................... 46
        C.      Deposition Testimony.................................................................................... 47
        D.      Exhibits and Demonstratives ........................................................................ 50
        E.      Copies ............................................................................................................ 51
VIII.   PLAINTIFF'S STATEMENT OF INTENDED PROOF............................................ 51
IX.     DEFENDANT'S STATEMENT OF INTENDED PROOF........................................ 54
X.      CERTIFICATION OF GOOD-FAITH SETTLEMENT EFFORTS ........................... 58
XI.     AMENDMENTS OF THE PLEADINGS ................................................................. 58
XII.    OTHER MATTERS .................................................................................................. 58
        A.      Treble Damages ............................................................................................. 58
        B.      Length of Trial .............................................................................................. 58
        C.      Motions *in Limine* ...................................................................................... 59
        D.      *Voir Dire*, Jury Instructions, and Verdict Form......................................... 60
        E.      Jurors and Jury Procedures ........................................................................... 60
        F.      Objections to Expert Testimony ................................................................... 61
        G.      Other Stipulations......................................................................................... 61

I.     **NATURE OF THE CASE**

1.     This is an action for: (i) unreasonable restraint of trade in violation Section 1 of the Sherman Act, 15 U.S.C. § 1; and (ii) state common law tortious interference with contract. The parties agree that the tortious interference claim is governed by Illinois law.

A.     **The Parties**

2.     Plaintiff International Construction Products LLC ("ICP") is a limited liability company formed under the laws of the State of Delaware that has its principal place of business in Asheville, North Carolina.  ICP was formed to import new heavy construction equipment into the United States and other countries and to sell it to heavy construction equipment customers.

3.     Defendant Caterpillar Inc. ("Caterpillar") is a Delaware corporation that, at the time of the events at issue in this action, was headquartered in Illinois.  Beginning in 2022, Caterpillar transitioned its headquarters to Irving, Texas.  Caterpillar is a manufacturer of heavy construction equipment.

B.     **Pleadings**

4.     ICP originally filed this case against Caterpillar on January 29, 2015.

5.     ICP alleges that Caterpillar violated Section 1 of the Sherman Act by conspiring with others.

6.     ICP also alleges that Caterpillar tortiously caused IronPlanet to terminate its March 3, 2014 Hosted Store Agreement with ICP.

7.     ICP's claims are set forth in its Third Amended Complaint ("TAC") (D.I. 246), filed on October 24, 2019, as amended by this Court's Orders dated August 10 and 11, 2020 (D.I. 293, 297) and September 26, 2022 (D.I. 457).

8.     Based on the prior rulings by the Court (D.I. 292, 293, 456), the only remaining defendant in the case is Caterpillar.

9.    ICP's Sherman Act Section 1 and state law tortious interference claims against Caterpillar are the only two claims in this case.  There are no counterclaims or crossclaims.

## II.    JURISDICTION AND STANDING

10.    This Court has subject matter jurisdiction over ICP's Sherman Act claim pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation).

11.    ICP and Caterpillar dispute whether this Court can or should exercise supplemental jurisdiction over ICP's state law tortious interference claim if it grants Caterpillar's motion for summary judgment on ICP's Sherman Act Section 1 claim.

12.    No party contests venue in this Court.

## III.    FACTS

### A.    Joint Statement of Uncontested Facts

13.    In accordance with Local Rule 16.3(c)(3) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, ICP and Caterpillar submit the following joint statement of the facts that are admitted and require no proof.  The parties stipulate to the following uncontroverted facts, which will become a part of the evidentiary record in the case, and which may be read to the jury.  The parties are not precluded from offering evidence of the facts stated in this section at trial.

14.    International Construction Products LLC, the plaintiff, is based in Asheville, North Carolina.  International Construction Products is often referred to as ICP.

15.    ICP was founded in 2013 by Tim Frank.[1]

16.    Caterpillar is a manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines and diesel-electric locomotives.[2]

17.    Caterpillar sells its new heavy construction equipment products through an established network of independently owned dealers.[3]

18.    In 2014, Ring Power Corporation ("Ring Power") was an independently owned and operated Caterpillar dealer, with its headquarters in St. Augustine, Florida, and locations in north and central Florida.[4]

19.    Thompson Tractor Company ("Thompson") was also an independently owned and operated Caterpillar dealer serving Alabama and the Florida Panhandle.[5]

20.    Neither Ring Power nor Thompson is a defendant in this action.

21.    In 2008, five Caterpillar dealers formed an auction service for customers and dealers that wanted to dispose of used construction equipment via public auction. The official name of the company was Associated Auction Services, LLC ("AAS"). In 2012, Caterpillar became a co-owner of AAS and licensed the "Cat" name to AAS to allow it to do business under the name Cat Auction Services ("CAS").[6]

22.    In 2014, Caterpillar was a shareholder of AAS/Cat Auction Services, with 29.8%.[7]

---

[1]  July 29, 2021 Dep. of Tim Frank, 23:4-24:12.
[2]  Caterpillar Statement of Uncontested Material Facts (D.I. 391)("CAT SOUMF") p.4.
[3]  D.I. 419-1 at 23 :3-14 ; D.I. 419-2 at, 18 :4-19 :24, 141 :21-142 :8 ; CAT SOUMF pp. 4-5.
[4]  Op. at 4; D.I. 419-19 at 33:5; D.I. 396-1 ¶ 17.
[5]  Op. at 4; D.I. 419-20 at -69-70.
[6]  D.I. 419-8 at -009, D.I. 399-5 at -664; CAT SOUMF p. 8.
[7]  D.I. 399-5 at -653, -666 ; D.I. 419-9 at -180 ; D.I. 419-10 at -791-93 ; D.I. 419-11 at -010-11 ; CAT SOUMF p. 8; Op. at 5.

3

23. IronPlanet was an online marketplace that was founded in 1999 for the purpose of auctioning used construction, mining, and agriculture equipment on an online auction platform.[8]

24. As of 2014, Caterpillar owned a 9.45% interest in IronPlanet.[9]

25. In December 2014, IronPlanet and Cat Auction Services announced that they had agreed to merge.[10]

26. IronPlanet and Cat Auction Services completed their merger in April 2015.[11]

**B.    Plaintiff's Statement of Contested Facts**

27. Pursuant to Fed. R. Civ. P. 26(a)(3) and Local Rule 16.3(c)(4) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, Plaintiff submits the below statement of contested facts.  Plaintiff's statement of contested facts is based on the parties' pleadings, documentary and testimonial evidence, and on Plaintiff's current understanding of the parties' claims and defenses and the Court's rulings to date.  Pursuant to Fed. R. Civ. P. 26(a)(3) and Local Rule 16.3(c)(4) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, ICP submits the below statement of contested facts.

28. ICP reserves the right to revise, amend, supplement, or modify its statement of contested facts based upon any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence or other developments in the case, including

---

[8]  CAT SOUMF p. 8.
[9]  D.I. 419-14; CAT SOUMF p. 9; Op. at 6.
[10]  Business Wire, *IronPlanet and Associated Auction Services dba Cat Auction Services to Merge* (Dec. 19, 2014), https://www.businesswire.com/news/home/20141219006014/en/IronPlanet-and-Associated-Auction-Services-dba-Cat-Auction-Services-to-Merge.
[11]  D.I. 419-13.

edits to the draft pretrial order, any meet and confers or other negotiations between the parties, pending and anticipated motions, and similar developments.  ICP further reserves the right to supplement this statement to rebut or otherwise address the contested facts identified by Caterpillar.  Should the Court determine that any issue identified in this statement is more properly considered an issue of law, it shall be so considered and ICP incorporates it by reference into its Statement of Issues of Law.

29.     ICP contends that the issues of fact (or mixed questions of fact and law) that remain to be litigated at trial and decided by the jury are as follows.

  i.     **Liability**

1.  **Caterpillar's Violation of Section 1 of the Sherman Act**

30.     Whether ICP has proven by a preponderance of the evidence that Caterpillar violated Section 1 of the Sherman Act by entering into an unlawful agreement or conspiracy with others, including IronPlanet, Ring Power Corporation, and/or Thompson Tractor Company to restrain trade by causing IronPlanet to terminate its Hosted Store Agreement with ICP.

2.  **Caterpillar's Tortious Interference with Contract**

31.     Whether ICP has proven by a preponderance of the evidence that Caterpillar tortiously interfered with ICP's contract with IronPlanet.

  ii.    **Damages**

32.   If Caterpillar is found to have violated Section 1 of the Sherman Act and/or Illinois common law, whether ICP is entitled to compensatory damages, and the amount of damages based on a just and reasonable estimate.[12]

33.   If Caterpillar is found to have tortiously interfered with ICP's contract with IronPlanet, whether ICP is entitled to punitive damages for Caterpillar's willful, malicious, and/or otherwise outrageous conduct, and if so, in what amount.

34.   ICP contests the truth of each of Caterpillar's Statements of Contested Facts and contends that by them Caterpillar is improperly trying to reargue issues previously decided against Caterpillar by this Court, as well as misstate the applicable legal standards.   For example, as the record demonstrates IronPlanet terminated its contract with ICP as a direct result of pressure from Caterpillar and others; Lonking planned to sell equipment through ICP with EPA-complaint Cummins engines and, as Caterpillar's expert recognized, Lonking could initially sell non-Tier 4 equipment with EPA credits; Caterpillar's conduct was a *per se* violation of the antitrust laws, eliminating any requirement that ICP prove anticompetitive effects but, even if a rule of reason analysis applies, there is direct evidence of anticompetitive harm; and Caterpillar mischaracterizes Dr. Leitzinger's opinions and the factual record on which they rest.   Caterpillar has included in its statement of disputed facts over one hundred forty paragraphs of alleged facts that it contends are undisputed, but through these paragraphs, Caterpillar is presenting argument rather than facts.   ICP stands ready to stipulate to any truly undisputed facts rather than to Caterpillar's self-serving arguments improperly presented as facts.

---

[12] If ICP prevails, the issue of attorneys' fees and other expenses will be the subject of post-trial motions.

## C.     Defendant's Statement of Contested Facts

35.     ICP apparently contests a full recital of the procedural history of this case, and the proceedings that were transferred to Florida, in the pleading section above. ICP appears to object to the below history because it is damaging to their case, but not because it is inaccurate. Indeed, it is based on this Court's docket entries, and ICP has pending motions *in limine* about whether this procedural history should be presented to the jury. Regardless, Caterpillar sets out the brief summary below as context for the Court. Though these are under the "contested" facts section, it should be undisputed. ICP's refusal to accept the full procedural history in this case, and their losses here and in Florida, is improper and self-serving.

36.     The Court previously dismissed or granted summary judgment to all other defendants on all of ICP's claims in the Third Amended Complaint, including all claims against Cat Auction Services, Volvo Construction Equipment North America, LLC ("Volvo"), and Komatsu America Corp. ("Komatsu"), and the Court dismissed ICP's claims of aiding and abetting, civil conspiracy and tortious interference with prospective business relations against Caterpillar.  (D.I. 292, 293.) On September 26, 2022, the Court granted summary judgment on ICP's Sherman Act claim that Caterpillar conspired with Komatsu, and found no evidence of any such agreement.  (D.I. 456.)

37.     The Court transferred ICP's claims against three independently owned and operated Caterpillar dealers Ring Power, Thompson Tractor, and Ziegler (the "Dealers") to the Northern District of Florida.  (D.I. 294, 295.)  ICP filed a complaint identical to the TAC in the Northern District of Florida against the Dealers; ICP's claims in that

litigation were the exact same as the claims in this case, and discovery was consolidated between the two cases and was, thus, the same.

38.    The Eleventh Circuit Court of Appeals fully affirmed that decision on October 30, 2023, and held ICP's claims "must fail" because "the summary judgment record does not contain *any* direct evidence of an agreement between Defendants to boycott IronPlanet[,]" "nothing permits the inference that Defendants illegally conspired to boycott IronPlanet in an effort to thwart the IronPlanet-ICP deal[,]" and "ICP has also failed to put forth sufficient evidence to preclude summary judgment on its state-law tortious interference claims."  (D.I. 635) (emphasis in original).

39.    Pursuant to Fed. R. Civ. P. 26(a)(3) and Local Rule 16.3(c)(4) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, Caterpillar submits the below statement of contested facts. Caterpillar's statement of contested facts is based on the parties' pleadings, documentary and testimonial evidence, and on Caterpillar's current understanding of the parties' claims and defenses and the Court's rulings to date.  Pursuant to Fed. R. Civ. P. 26(a)(3) and Local Rule 16.3(c)(4) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, Caterpillar submits the below statement of contested facts.

40.    Caterpillar reserves the right to revise, amend, supplement, or modify its statement of contested facts based upon any pretrial rulings by the Court and/or to address any additional issues, arguments, evidence or other developments in the case, including edits to the draft pretrial order, any meet and confers or other negotiations

between the parties, pending and anticipated motions, and similar developments. Caterpillar further reserves the right to supplement this statement to rebut or otherwise address the contested facts identified by ICP.  Should the Court determine that any issue identified in this statement is more properly considered an issue of law, it shall be so considered and Caterpillar incorporates it by reference into its Statement of Issues of Law.

41.    Under the current Scheduling Order, the parties are submitting this Proposed Pretrial Order while multiple motions, including dispositive motions, are pending. Caterpillar reserves its right to supplement, amend, or otherwise modify its statement of contested facts to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

42.    Caterpillar contends that the issues of fact (or mixed questions of fact and law) that remain to be litigated at trial and decided by the jury are as follows.

43.    **ICP Failed to Prove its Sherman Act Claim.**  Undisputed evidence disproves three elements of ICP's Section 1 boycott claim: 1) there was no refusal to deal because the record establishes that ICP decided to stop doing business with IronPlanet; 2) ICP has failed to show any agreement between Caterpillar, Ring Power, or Thompson to threaten IronPlanet; and 3) there is no genuine issue of material fact that ICP suffered antitrust injury.  There is no genuine issue of material fact that there was harm to the competitive process.  Caterpillar, nor anyone else, threatened to boycott IronPlanet.

44.     Ring Power and Thompson won their summary judgment motions against ICP in the Northern District of Florida, where the court found that they did not "conspire[] with each other (or anyone else)" against ICP and "the summary judgment evidence establishes that [the Dealers] did not intentionally or unjustifiably interfere with Plaintiff's business relationship with IronPlanet[.]" The Eleventh Circuit affirmed that decision, and that case is now closed.

45.     **Refusal to Deal**.  IronPlanet did not refuse to deal with ICP.

46.     **Antitrust Injury.**  ICP did not suffer antitrust injury because ICP failed to show any evidence of harm to competition in a relevant antitrust market, of the type that the antitrust laws were designed to prevent.

47.     ICP did not suffer antitrust injury because it did not suffer harm caused by any violation by Caterpillar.

48.     ICP did not suffer antitrust injury because they could not legally import or sell Lonking equipment in the United States.  ICP did not comply with EPA or CARB requirements for the import and sale of foreign equipment.

49.     Caterpillar was not a material cause of any harm to ICP.  The record does not demonstrate that any action by Caterpillar was a proximate cause of antitrust injury to ICP.

50.     **Lack of Damages.** ICP offers only a wholly speculative and unreliable lost profits opinion.

51.     ICP's alleged damages are not disaggregated by country and includes sales outside of the United States, which are not part of ICP's alleged geographic market.

52.     ICP's alleged damages are not disaggregated by legal sales.

53.    ICP's alleged damages are based on speculation and guesswork, and must fail as a matter of law.

54.    ICP's alleged damages do not take into account the EPA-imposed "volume limits" applicable to non-Tier 4 equipment.

55.    **Regulatory Compliance.**  Lonking did not have any "Tier 4" equipment. Neither ICP nor Lonking complied with EPA requirements for importation and sale of non-Tier 4 equipment in the United States. Antitrust injury does not exist where the relevant product(s) cannot be imported and sold in the United States. ICP illegally imported Lonking machines into the United States.

56.    ICP concedes that Caterpillar did not have market power in any relevant market.

57.    **Geographic Market.**  ICP has not defined or offered any proof of a geographic market as required to maintain its Sherman Act claim.  ICP's expert, Jeffrey Leitzinger, concedes that he did not study and has no opinion on geographic market.

58.    **Product Market.** ICP has not defined or offered any proof of a product market as required to maintain its Sherman Act claim.  ICP's expert, Jeffrey Leitzinger, concedes that he did not study and has no opinion on product market.

59.    **Illinois Tortious Interference.** Caterpillar did not tortiously interfere with the Hosted Store Agreement.

60.    ICP has not demonstrated that it sustained actual damages.

61.    Caterpillar was not responsible for any alleged damages related to tortious interference.

62.    ICP failed to demonstrate any measurement of tortious interference damages.

11

63.   ICP's expert, Jeffrey Leitzinger, conceded that he did not offer any opinion on tortious interference damages. Dr. Leitzinger did not study or provide any opinion on tortious interference.

64.   Any alleged damage asserted by ICP for tortious interference is entirely speculative and unfounded in the data.

65.   **Illinois New Business Rule.** ICP's alleged lost profits are not based on data, but on speculation.

66.   ICP's sales projections were a projection of future profits, not based on actual sales data.

67.   ICP cannot show a track record of actual sales that aligns with the lost profits calculation underlying its claim for damages.

68.   **Punitive Damages.**  ICP is not entitled to punitive damages.

69.   **ICP did not agree to include the following paragraphs (¶¶ 68-209) in the Joint Statement of Uncontested Facts, purportedly contesting these facts, which are otherwise uncontested in the record.**

70.   Tim Frank had more than 20 years of experience in the construction equipment industry, including at Volvo Construction Equipment, CNH Industrial, Caterpillar, and SANY America.[13]

71.   ICP was funded by a single $750,000 investment from Tim Frank's brother, Joseph Frank, in exchange for 40% ownership in ICP.[14]

72.   One of Caterpillar's primary business segments—Construction Industries—sells new equipment and parts to Caterpillar's independent dealers which they resell to

---

[13]  D.I. 419-21 at -036-37.
[14]  ICP-0033102.

contractors, rental houses and other customers.   In 2013, Caterpillar reported $21.762 billion in sales and revenue in North America, with $7.008 billion in sales from Construction Industries.[15]

73.     In 2014, Caterpillar's new heavy construction equipment sales in the U.S. across equipment types accounted for 23% of total new equipment sales from all manufacturers, including Volvo, Komatsu, SANY, Deere, Kubota, and others.[16]

74.     In the U.S., Caterpillar's wheel loader and excavator sales—the types of construction equipment ICP sold in the U.S.— accounted for only 25-30% of industry-wide sales, and declined from 2013-2018.[17]

75.     Caterpillar's approval was required for any material changes to AAS' business model or ownership.[18]

76.     AAS operated at a loss from 2010-13 and was "struggling financially.".[19]

77.     IronPlanet derived its revenue substantially from commissions and fees for sales of used heavy equipment that took place through its online auction platform, and had no material sales or experience selling new heavy construction equipment.

78.     As of 2014, Caterpillar owned a small minority interest of shares in IronPlanet, did not have a representative on the IronPlanet Board, and was a "passive" investor with a 9.45% ownership.[20]

79.     Caterpillar's used equipment sales were made by its two subsidiaries that are not defendants in this case: Cat Financial (through its Remarketing group) and

---

[15]  CAT SOUMF p. 4; Op. at 4.
[16]  CAT SOUMF p. 4.
[17]  Murphy Rep. Ex. 6 (2023).
[18]  D.I. 399-5 at -653, -666 ; D.I. 419-9 at -180 ; D.I. 419-10 at -791-93 ; D.I. 419-11 at -010-11 ; CAT SOUMF p. 8; Op. at 5.
[19] CAT SOUMF at 8.
[20]  D.I. 419-14; CAT SOUMF p. 9; Op. at 6.

Caterpillar Used Equipment Services Inc. (CUESI).[21]  CUESI primarily facilitated the efforts of Caterpillar dealers to buy and sell used equipment amongst each other.

80.    The sale of used equipment made through Cat Financial's small "Remarketing" group was "ancillary" to Cat Financial's primary business of extending loans and financing for new equipment to Caterpillar's dealers and customers.[22]  On occasion, Cat Financial's Remarketing group would re-purchase equipment from a dealer or end-user at the end of its lease life or if the owner could not re-pay its loan.  The Remarketing Group would then sell those pieces of equipment, using a "cascade strategy" first offering it to Caterpillar's dealers.  If no dealer wanted the equipment, Caterpillar would then consign it to a physical or online auction held by Ritchie Brothers, AAS, IronPlanet, or another auction company.   In the two years and four months from January 2013 through April 2015, the Remarketing Group sold 2,460 units of used equipment (worth approximately $200 million), roughly 1,100 per year, while only 795 of those units (worth approximately $40 million) were consigned to auction houses—roughly 350 per year—and of those auction house sales, just $11,391,268 worth of equipment was consigned to IronPlanet over that two-plus year period.[23]

81.    Cat Financial did not sell a significant volume of used equipment through IronPlanet.

82.    CUESI existed to purchase used equipment wholesale when a dealer could not find a buyer and wanted to get the equipment out of its inventory, and then to find

---

[21]  CAT SOUMF at 5.
[22]  Adams Tr. 137:4-16, 211:8.
[23] CAT SOUMF at 6.

another dealer willing to buy that piece of used equipment.[24]  CUESI "was not a lucrative business for Caterpillar," but rather a way to "offer support to [Caterpillar's] end-user dealer network."[25]  CUESI sold 1,617 units of used equipment (worth approximately $200 million) from January 2013 to April 2015— roughly 718 per year—but only 237 of those units (worth approximately $20 million) were consigned to auction houses—roughly 105 per year—and of those 237 units, only $4,179,917  worth of equipment was consigned to IronPlanet.[26]

83.  CUESI did not sell a significant volume of used equipment through IronPlanet.

84.  Caterpillar was "not [a] significant source of activity on IronPlanet," "Caterpillar did not control the distribution or sale of its used equipment, leaving that up to its dealers" which were independently owned and operated, and ICP's own expert, Dr. Leitzinger, conceded that Caterpillar, acting alone, had no ability to influence IronPlanet to terminate the ICP agreement; Caterpillar was "not significant source[] of activity on IronPlanet, and therefore did not directly possess the kind of customer leverage that might unilaterally influence IronPlanet to break its agreement with ICP."[27]

### 1. ICP's Business Plan and Its Agreements with Lonking and IronPlanet.

85.  ICP's business plan was to sell Chinese-made heavy construction equipment in the United States using a website hosted by IronPlanet, in addition to selling through a "traditional" sales stream of independent dealers Mr. Frank intended to recruit.[28]

---

[24] CAT SOUMF at 6-7.
[25] Guilford Tr. 38:8-16.
[26] CAT SOUMF at 7.
[27] Leitzinger Report at ¶ 61.
[28]  D.I. 419-21 at -25.

86. ICP signed a Master Distribution Agreement ("MDA") dated August 29, 2013, with Chinese government-owned company Lonking (Fujian) International Trading Co., Ltd, a construction equipment manufacturer, granting ICP exclusive rights to distribute Lonking construction equipment in the United States east of the Mississippi River, all provinces of Canada excluding Alberta and Saskatchewan, Puerto Rico, and Central America, and non-exclusive rights to distribute its products in the United States west of the Mississippi River, the Canadian provinces of Alberta and Saskatchewan, Mexico, Costa Rica, and the Caribbean Islands for one year renewable terms.[29] The Master Distribution Agreement also provided that ICP's exclusive territory could expand to include the non-exclusive territory if ICP purchased 100 or more units within a 12 month period.[30]

87. ICP was the "importer of record" under the MDA with Lonking, and was "responsible for all . . . Authorizations" required to sell Lonking equipment in the US, including "all consents, licenses, permits, approvals registrations and authorization required by applicable laws and/or regulations for the . . . importation, storage, marketing, distribution and sale of Products in the Territory[.]" ICP was also required to "establish and maintain record-keeping and administrative procedures for compliance with any . . . emissions laws and regulations applicable to Distributor as an importer or distributor of Products in the Territory[.]"

88. To prevent air pollution, the Clean Air Act (CAA) prohibits the import and sale of foreign equipment unless stringent emissions standards and other compliance requirements are met. *See* 42 U.S.C. § 7547.  Under this statutory authority, the

---

[29] D.I. 419-34; ICP-0001727.
[30] D.I. 419-34.

U.S. Environmental Protection Agency (EPA) implements and enforces regulations governing the importation and sale of heavy-duty diesel-powered construction equipment in the U.S. *See generally* 40 C.F.R. Parts 1039, 1065, and 1068. The California Air Resources Board (CARB) implements and enforces similar regulatory regulations for purposes of selling heavy-duty diesel-powered construction equipment in the State of California.

89.     EPA requirements applied to "manufacturers" of heavy-duty diesel-powered construction equipment and to "importers" of that equipment. *See generally* 40 C.F.R. Part 1068, Subpart D ("Imports"); *see also* 40 CFR §1068.301(a) (rules applicable to importers); 40 C.F.R. 1039.626(b) (TPEM requirements for importers).

90.      Heavy-duty construction equipment imported and sold in the U.S. had to meet EPA's "Tier 4" emissions standards as of 2014. During the relevant time period for this case, non-Tier 4 engines (e.g., older "Tier 3" engines) could not be imported or sold in the U.S. except in compliance with EPA's special provisions such as the "Transition Program for Equipment Manufacturers" (TPEM).

91.     Thus, in order to comply with EPA regulations, manufacturers and importers of foreign equipment were required to ensure that heavy-duty diesel-powered construction equipment was powered by certified and labeled "Tier 4" engines. For any equipment that used "Tier 3" engines (instead of the mandated Tier 4 engines), the manufacturer and importer would have needed to comply with the applicable provisions of the TPEM program including, for example, affirmatively reporting

the importation and sale of machines to EPA and otherwise complying with the bonding, recordkeeping, reporting, and other TPEM program requirements.[31]

92. Lonking did not manufacturer Tier 4 equipment in 2014 to 2018.

93. The record contains no evidence of any work Lonking had undertaken to re-design its wheel loaders and excavators to incorporate Tier 4-compliant engines.

94. The record contains no evidence that Lonking attempted to buy Tier 4-compliance engines from any engine manufacturer.

95. There is no record evidence that Lonking provided the EPA or CARB with the documentation necessary to obtain either agency's approval to export or sell non-Tier 4 compliant equipment in the United States.

96. Manufacturers and importers who did not fully comply with EPA regulations were strictly prohibited from selling non-Tier 4 equipment in the U.S.

97. ICP admits that it did not seek and/or receive legal permission from EPA to sell non-Tier 4 heavy construction equipment in the United States.[32]

98. No flexibility program allowed for the import or sale of Tier 2 machines in the U.S. in 2014 or subsequently.

99. To participate in the TPEM program, ICP and Lonking were both required to follow all notification, recordkeeping and reporting obligations, bonding requirements, equipment labeling, and other conditions for the TPEM program.

100. Ultimately, the total number of units of construction equipment permitted to be imported and sold under the TPEM program would have been severely limited in number and duration. Specifically, under the TPEM program, equipment

---

[31] Lyons Rep. at 28-36.
[32] ICP's Second Amended Responses to Caterpillar's Requests for Admission.

manufacturers wishing to sell equipment in the U.S. with non-Tier 4 engines had a choice between two "volume" limit options: the first is known as "percent-of-production" (because it limited the volume of engines that could be sold to a cumulative 80% of the total U.S.-directed production volume within each power category during the specified time period as set forth in EPA's regulations), and the second is known as the "small volume allowance" (because volume limits were based on a specific number of allowable engines for a time period).

101. ICP did not have any contract or distribution agreement with any other equipment manufacturer besides Lonking in 2014.[33]

102. Frank admitted he did not conduct any engineering evaluation of the durability or reliability of Lonking equipment before signing the MDA.[34]

103. ICP considered multiple marketplaces with physical and/or online auctions for sale of its machines, including Ritchie Bros., ProxiBid, and Bidadoo.[35]

104. On March 3, 2014, ICP signed a Hosted Store Agreement with IronPlanet.[36]\

105. IronPlanet's President of Sales, Jeff Jeter, testified that the ICP deal was "a departure from our normal business practices of only selling used equipment."[37]

106. Mr. Jeter wrote to Greg Owens, IronPlanet's CEO, in February, that he was concerned about selling new equipment: "I still remain a bit concerned re selling new equip, Chinese brand – getting away from used – and noise from OEMs and dealers."

---

[33] Plaintiff's R&O to Caterpillar's 2d and 3d Set of RFAs at 11-12, Nos. 12-14.
[34] T. Frank Tr. 120:3-17.
[35] ICP-0024195; ICP-0029147; ICP-0005846-7; ICP-0001913.
[36]  CAT SOUMF p. 12.
[37] Jeter Tr. 144:25-145:2.

107.   Mr. Barca-Hall testified that IronPlanet was "built for used equipment," and it would be difficult to distinguish between new and used equipment to buyers, and that listing "new items mixed with used items" could "totally tick off our consigner OEMs and dealers."[38]

108.   IronPlanet told ICP its Lonking equipment would, thus, be positioned against used equipment, not against new equipment made by Caterpillar or any other OEM: "To be clear, it has been represented to ICP that we would offer up new items to losing bidders alongside yet to be sold used items."[39]

### 2.   ICP's Launch

109.   ICP launched its business at the CONEXPO trade show, which took place March 4-8, 2014 at the Las Vegas Convention Center.[40]

110.   ICP ordered 10 non-Tier 4 compliant machines from Lonking for the annual ConExpo industry event in March 2014.  Four of those machines were EPA Tier 3 machines.

111.   All of the machines ordered for ConExpo and subsequently sold to customers had material defects.[41]

112.   The Hosted Store went live on March 4, 2014, showing 20 items for sale.

113.   Mr. Barca Hall noted that "pretty quickly [IronPlanet] realized it was more confusing for our buyers" to have "new items, these import items being seen right alongside with everything else."[42]

---

[38] Barca-Hall Tr. 109:7-15; 111:4-113:16; 188:9-17.
[39] IP_00000449.
[40] Op. at 6.
[41] ICP-0024242; ICP-0017534; ICP-0009159; ICP-0027235; ICP-0027226; ICP-0008341; ICP-0010454; ICP-0007971.
[42] Barca Hall Tr. 145:23-146:2, 148:1-24.

### 3.  ICP's Relationship with Lonking

114.   Prior to ICP's launch, ICP expressed concern about Lonking's approach to sourcing and supplying parts for its customers.  ICP employee Matt Borum, who was Manager of Parts and Service for ICP at the time and later became its President, stated in March 2014 that if ICP and Lonking did not change the way it handled parts fulfillment, "we should probably stop marketing the products."[43]

115.   Prior to ICP's launch, ICP requested that Lonking invest in ICP.  Lonking refused.

116.   Prior to ICP's launch, ICP requested that Lonking waive the MDA requirement that ICP pay 5% down on any machines it ordered from Lonking.  Lonking refused.

117.   Soon after ICP's launch, ICP complained about material defects, delays, and problems with the few Lonking machines it sold at ConExpo.

118.   In April 2014, ICP's Director of Sales Jim Teague emailed Tim Frank, "[w]e have lost one sale and are in danger of losing the second strictly due to poor quality of production and final factory inspections . . . I have lost three more sales this week because we do not have properly operating machines . . . [t]o date 100 percent of wheel loader deliveries have failed."[44]

119.   Mr. Teague emailed Lonking, "**You shipped me a machine with major transmission fluid leakage with tape used to fix and hide the problem!!! This machine was 4 months delayed, and I had to give discounts to the customer just to get him to take the machine**. . . You told me that you deeply inspected these machines before shipping them to me."[45]

---

[43] ICP-000006804 (Borum Dep. Ex. 4)
[44] ICP-0017534.
[45] ICP-0027048 (emphasis in original).

120.   ICP expressed that Lonking machines were of "poor quality, [with] even poorer final inspections," and Lonking demonstrated "no sense of urgency" and "unacceptable quality" such that ICP told Lonking that "[o]ur business model" … "was stopped in its tracks."[46]

121.   ICP complained to Lonking: "We cannot get a satisfactory testimony from a single customer to support the Lonking brand in the marketplace," and "all four of the Tier 3 ConExpo machines … have defects and are not working."[47]

122.   Lonking equipment was frequently delayed.

123.   ICP was sued by a customer due to machine delivery delay.[48]

124.   ICP expressed that its "customers want to cancel orders … have lost confidence in ICP," and "ICP is paying contract penalties" due to delivery delays from Lonking.[49]

125.   According to ICP, Lonking did not supply sufficient parts to allow ICP and its customers to service Lonking machines purchased from ICP.  Tim Frank emailed Lonking, stating that a lack of parts "will kill the Lonking effort here" and explaining "you will remember this was my great fear, that Lonking would NOT support me on parts, and now it seems to be happening."[50]

126.   ICP CEO Wes Lee asked in an internal ICP email, "is Lonking using this as a ploy? Are they forcing ICP out of business?"[51]

127.   ICP blamed Lonking for financial damage to ICP.  Tim Frank complained, "I don't mind if we work together to solve these issues, but you won't help me financially

---

[46] ICP-0010454; ICP-0010454.
[47] ICP-0009159.
[48] ICP-0024242.
[49] ICP-0007964.
[50] ICP-0027825; ICP-0024825.
[51] ICP-0015837.

when its Lonking who caused the problem", that "Lonking has cause severe financial damage to ICP and has broken our contract in several ways....", and that "I lose $400,000 for things Lonking caused, and Lonking doesn't have any losses?" Later, Tim Frank blames Lonking for losing all $750,000 that his brother, Joe Frank, invested in ICP.[52]

### 4. Cat Auction Services' Merger Discussions with IronPlanet and Cat Auction Services' and Caterpillar's Discussions with IronPlanet Concerning IronPlanet's Relationship With ICP.

128.    Before IronPlanet entered into the Hosted Store Agreement with ICP, IronPlanet had been in discussions with Cat Auction Services about a potential merger. Those discussions began in 2013.[53]

129.    By February 2014, Cat Auction Services had engaged the firm Greene Holcomb & Fisher LLC ("GHF") to act as its financial advisor for its potential merger with IronPlanet. On February 28, 2014, at a Cat Auction Services board meeting, the board resolved to have its CEO, Gary Trettel, its Chairman of the Board, Bill Hoeft (who also served as CEO of Ziegler, a Caterpillar dealer), Cat Auction Services' counsel, Bill Klein, and representatives of GHF, including Kent Adams, begin negotiating a letter of intent ("LOI") with IronPlanet.[54]

130.    On March 10, 2014, Cat Auction Services and IronPlanet negotiating teams, plus Caterpillar executive Richard Longbottom, acting as Caterpillar's liaison to protect its shareholder interests in IronPlanet, met to further discuss a potential deal. The meeting was focused on ownership percentages in the potential merged entity.[55]

---

[52] ICP-0028093; ICP-0025172; ICP-0019980.
[53] CAT SOUMF p. 10 ; Op. at 6.
[54] Op. at 7; D.I. 419-30.
[55] CAT SOUMF p. 10.

131.    Caterpillar officials became aware of IronPlanet's Hosted Store Agreement with ICP in March 2014.

132.    Shortly after the March 10, 2014 meeting concerning the proposed IronPlanet-Cat Auction Services merger, Caterpillar's Longbottom learned about IronPlanet's new relationship with ICP by reading about it in an article on equipmentworld.com, an online news site covering the construction equipment industry.  IronPlanet had not previously told Cat Auction Services about its agreement with ICP to host ICP's website, which would sell new Chinese-made equipment ICP imported from Lonking.[56]

133.    On Monday, March 10, 2014, IronPlanet's head of development, Jeff Barca-Hall, told IronPlanet's president of sales, Jeff Jeter, that "you might be interested in the fact that there has been some 'sniffing around' by Caterpillar in response to seeing ICP items on our site."[57]

134.    The next day, Tuesday March 11, 2014, Longbottom sent by email a copy of the equipmentworld.com news article to Cat Auction Services' President and CEO Gary Trettel.[58]

135.    Pablo Koziner, a Caterpillar executive and member of the Cat Auction Services Board of Directors, concluded that it was not in Caterpillar's interest to continue to spend money pursuing the merger with IronPlanet for two reasons:  (1) there was not alignment on ownership percentages; and (2) IronPlanet's distribution strategy for new equipment did not align with Caterpillar's strategy, as Cat Auction Services

---

[56] CAT SOUMF p. 10.
[57] Op. at 8.
[58] D.I. 419-44.

did not offer new construction equipment at its online auctions and Caterpillar was not did not want to expand the merged entity's distribution to other brands of new equipment.[59]   Caterpillar built its business over more than 75 years by selling new equipment and parts exclusively through its independently owned and operated dealers, which invested exclusively in Caterpillar machines and parts, trained specialists to service Caterpillar machines with the goal of minimizing downtime for their customers, and have deep ties to local companies and customers. Caterpillar's business plan did not include becoming a shareholder in a business that sold other brands of new equipment direct to end-customers against the investments and interests of its dealers.

136.   Mr. Koziner instructed Longbottom to advise members of the Cat Auction Services negotiating team of Caterpillar's position.[60]

137.   Mr. Koziner testified that it was not in Caterpillar's interest to continue to pursue a merger with an entity that did not agree on the ownership percentages, and potentially did not align with Caterpillar's distribution strategy for new equipment.[61]   Mr. Koziner instructed Mr. Longbottom to advise Mr. Trettel and other members of the AAS negotiating team of Caterpillar's position, as a shareholder with unilateral veto rights over any change in ownership, that IronPlanet owed them "more information about what you're doing here and what we potentially may be buying into."[62]

---

[59]  CAT SOUMF p. 10.
[60]  CAT SOUMF p. 11.
[61]  Koziner Tr. 125:2-21; 148:9-22; 149:17-150:7; 150:22-151:5; 153:10-154:17.
[62]  Koziner Tr. 149:17-150:7.

138.   On Thursday, March 13, 2014, Greg Owens, IronPlanet's CEO, sent a revised offer for the IronPlanet/Cat Auction Services merger to Bill Hoeft, the chairman of the Cat Auction Services Board of Directors.

139.   On March 14, Cat Auction Services's Gary Trettel told Rick Albin, Cat Auction Services's Executive VP, of the offer from Owens, and Albin responded, "Thanks for the update.  Something has changed."[63]

140.   Caterpillar, as a shareholder of AAS, was not interested in owning a company that hosted the sales site for a different brand of new construction equipment. Caterpillar's witnesses testified that it was not in Caterpillar's strategic interest to support a merger with a company that sold new equipment alongside used equipment, regardless of the manufacturer, because it could undermine Caterpillar's distribution strategy and its relationship with its dealers.[64]   It was Caterpillar's right as a shareholder of AAS to express its opinion on a potential merger of AAS with IronPlanet.

141.   On March 14, 2014, Jerome Guilford, Caterpillar's General Manager of Lifecycle Products & Services, sent an email to Longbottom, Koziner, and Steve Gosselin, Caterpillar's Vice President for Customer Support, stating:

142.   The former head of Sany America has started a company to sell Lonking equipment (another Chinese equipment manufacturer) in the US using IronPlanet.  This will not help our discussions with IP, don't think we want a strategic alliance with a

---

[63]  Op. at 8-9.
[64]  Guilford Tr. 189:23-190:10, 193:9-16, 194:5-14; Gosselin Tr. 110:15-24, 111:9-16, 114:16-24, 120:24-124:3.

company that now selling new Chinese equipment into the US.  This is a show stopper.[65]

143.   Gosselin responded to Guilford's email, stating:

   a.   Absolutely agree . . . . show stopper.  If you haven't, watch the ICP video on IP website.  Also, blatant alliance with LonKing equipment in ENR article.  DBBA . . . . dead deal before arrival.[66]

144.   Longbottom then wrote:

   a.   We spent a day negotiating the non binding [letter of intent] and it came down to only ownership.  Not once did they bring up Lonking, which annoys me.  We stood our ground on what percentage we required for a combined entity, got Greg Owens [of Iron Planet] up over 10%.  He could not go any higher unless his board approved.  So the meeting was adjourned and he was going to get back to us today.

   b.   After our meeting I came across the article and told the "Carbon negotiating team" our deal is dead, if what I was reading is true, this was Tuesday.  We have not informed Greg Owens but was waiting for him to come back to us on the percentage and find out more information. I agree with dead deal, but what if we could ensure he cancels this arrangement and we govern and manage all future OEM arrangements, that is only if we can also come to an agreed upon percentage. Should we consider or even go there, or leave it as dead deal before arrival![67]

145.   Koziner responded:

   a.   Richard, we need to advise the negotiating team of our position and then have Gary

-----

[Trettel] advise Greg [Owens]. Unless something significant changes there is no sense in spending any more time or money.[68]

146. On March 17, 2014, Dave Shurson, Remarketing General Manager for Caterpillar Financial Services Corp., spoke with Greg Owens of IronPlanet to get more information about IronPlanet's agreement with ICP.[69]

147. In an email to Kent Adams and others on March 17, 2014, Koziner wrote: "[T]he recent announcements regarding IP's distribution of new Chinese machines has a material impact on our strategy going forward. We are reviewing this with CAS and our negotiation team."[70] He added: "Given my responsibilities as a board member of CAS I cannot comment further but have copied Steve Gosselin on this email who can speak with you more openly on the subject."[71]

148.  March 18, 2014, Koziner wrote to Caterpillar's Edward Rapp, "It would appear that the objectives by the Chinese companies to engage with [IronPlanet]:  1) reflect the challenge of establishing a distribution channel in NA; and 2) their desire to position Chinese machines/products as an attractive alternative to use," and "Positioning new vs. used is one way the Chinese equipment providers have tempted customers to move away from premium brands elsewhere in the world."[72]

149. Hoeft testified that, after that e-mail, he never had any conversation with Owens about ICP, and Owens testified the same.[73]

150. On March 20, 2014, two competitive analysis consultants at Caterpillar, Wende

---

[70] *Id.*
[71] *Id.*

[73] Hoeft Tr. 109:24; Owens Tr. 76:5-15.

Reeser and Jane Chen, sent an email, including to certain Caterpillar executives that, in part, summarized Lonking's partnership with ICP.[74]

151.    On March 26, 2014, Kent Adams (BMO) emailed Gary Trettel at AAS that AAS "have intentionally at this point been silent on [the] ICP issue" to IronPlanet.[75]

152.    On March 31, 2014, Longbottom told Koziner in an email that Gary Trettel of Cat Auction Services had received a proposal from Greg Owens of IronPlanet regarding ownership, and that Owens said that "if we can come to some for[m] of agreement, then the ICP initiative would go away."[76]

### 5.  Phone Records

153.    At 12:14 pm on April 2, 2014, a phone number associated with Ring Power's Frank Fowler called a phone number associated with Thompson's Used Equipment buyer, Billy Seal, for a connection that lasted two minutes.  ICP concedes it has no knowledge of the contents of any phone call between Fowler and Seal, or any evidence that Fowler and Seal ever discussed ICP or IronPlanet, let alone on that phone call.  When asked "[d]id you discuss with Mr. Seals [sic] Iron Planet's offering of new Chinese equipment on its platform," Fowler testified "no" and instead that the conversation "was in reference to selling him a compactor."[77]

154.    At 2:18 pm on April 2, 2014, Fowler spoke with IronPlanet's Greg Owens for a little over twenty minutes.  ICP concedes it has no evidence that phone call related in any way to either ICP or IronPlanet.  Both Frank Fowler and Greg Owens denied under oath that their April 2 phone call contained any conversation about ICP or

---

[74]  D.I. 419-47.
[75]  AAS00008080.
[76]  D.I. 419-59 ; Op. at 12.
[77]  Fowler Tr. at 103:25-104:12.

contained any threats against IronPlanet.  When asked whether he was "aware of any threats made by either Caterpillar, Komatsu, Ring Power, Thompson Tractor, or Ziegler to withhold used equipment sales because of IronPlanet's relationship with ICP[,]" Owens testified "I'm not aware of any threats, and they certainly didn't threaten me."[78]

155.   At 4:58 pm on April 2, 2014, Fowler called a number associated with Caterpillar's Richard Longbottom, for a connection that lasted less than twenty seconds.  ICP concedes there is no evidence whether they spoke very briefly or if it was a voicemail, and ICP concedes that there is no evidence if a call occurred that it had anything to do with ICP or IronPlanet.  When asked "you don't have any recollection of discussing International Construction Products with Fowler," Longbottom testified "I do not."[79]

156.   At 6:28 pm on April 2, 2014, Fowler called a number associated with Thompson's Used Equipment Manager Richard Lindley twice, speaking with him once about a customer who was looking for a particular model of machine.[80]  ICP admits there is no evidence that the call between Fowler and Lindley included any topic besides that machine, and that there is no evidence Fowler and Lindley discussed anything related to ICP or IronPlanet.  Fowler testified he did not recall this conversation.

157.   At 7:29 pm on April 2, 2014, Caterpillar's Longbottom called Fowler for a connection that lasted for around four minutes.  ICP admits there is no evidence as to the contents of that phone call, and no evidence that Longbottom and Fowler

---

[78] Owens Tr. at 140:9-19.
[79] Longbottom Tr. at 175:12-16.
[80] Fowler Tr. 149:18-24.

discussed anything related to ICP or IronPlanet.  Both Fowler and Longbottom testified that they do not recall discussing ICP or IronPlanet.

158.   On the evening of April 2, Fowler called IronPlanet's Greg Owens, and the two spoke for ten minutes.  ICP admits it has no evidence as to the contents of that phone call, and no evidence that Owens and Fowler discussed anything related to ICP or IronPlanet.  Both Frank Fowler and Greg Owens deny under oath that that phone call contained any threats against IronPlanet.  Owens testified that Fowler called him frequently about equipment Ring Power, and that calls from Fowler related to equipment Ring Power was interested in auctioning on IronPlanet were normal in the ordinary course of business.

159.   Also on April 2, Owens called IronPlanet's President of Sales, Jeff Jeter, and its General Counsel, Doug Feick.  ICP admits it has no evidence that the call from Owens was connected to Jeter or Feick and no evidence that Owens left a voicemail for either Jeter or Feick.  ICP admits it has no evidence about the contents of a call between Owens and his employees, and no evidence that this call had anything to do with ICP or IronPlanet.

160.   Later in the evening, Owens called Fowler.  Again, ICP admits there is no evidence that Owens was connected to Fowler or that Owens left a voicemail for Fowler. ICP further admits it has no evidence as to the contents of any call between Fowler and Owens, and no evidence that Fowler and Owens discussed anything related to ICP or IronPlanet.  And again, Owens testified that he and Fowler communicated regularly in the ordinary course of business.

161.   ICP's expert Dr. Leitzinger testified that not a single one of the documents that he

reviewed said a word about withholding used equipment sales from IronPlanet unless it terminated ICP: "I don't have any reason to believe that the calls were – specifically involved withholding equipment."[81]   And he agreed that he identify any documents or testimony showing that anyone from Caterpillar discussed withholding used equipment from IronPlanet with anyone from RingPower, Thompson Tractor, or Ziegler: "I didn't find in looking back through [the report] any – any direct evidence of communication about – having to do with reducing sales of equipment."[82]   Finally, Dr. Leitzinger conceded that he didn't "cite anything that shows what the substance of any of these phone calls was" and that his "opinion is not based on knowing what the substance of any of these phone calls was."[83]

### 6.  IronPlanet Terminates ICP.

162.   During the approximate month that ICP's website was hosted by IronPlanet, ICP sold one piece of construction equipment through ICP's IronPlanet-hosted website.[84]

163.   ICP projected, based on no underlying data, and represented to IronPlanet that it would sell hundreds of machines in its first year of operation.

164.   IronPlanet executive Jeff Barca-Hall testified that ICP's sales did not meet IronPlanet's expectations: we are "not seeing the kind of volume that we'd been promised by ICP."[85]

---

[81] Leitzinger Tr. at 217:9-218:6.
[82] Leitzinger Tr. at 234:14-235:11.
[83] Leitzinger Tr. at 227:5-17.
[84] T. Frank Tr. 42:9
[85] Barca Hall Tr. 159:11-18.

165.   By early April, IronPlanet thought it was "unlikely" ICP would bring in any "significant volume."[86]

166.   Mr. Jeter testified that ICP was strapping IronPlanet's limited resources.[87]

167.   Greg Owens, IronPlanet's CEO, testified that he made the decision to terminate the relationship with ICP, and it was Mr. Jeter's job to inform ICP.[88]

168.   Mr. Owens explained why he made that decision: "we were not getting traction and we had significant other opportunities and other initiatives that we were pursuing, and I go with -- my job is to create shareholder value."[89]

169.   All IronPlanet's witnesses specifically denied being threatened or pressured by Caterpillar to terminate the ICP agreement.[90]

170.   All IronPlanet witnesses specifically denied being threatened or pressured by Ring Power or Thompson to terminate the ICP agreement.

171.   ICP's expert, Jeffrey Leitzinger, conceded that he did not cite any evidence showing that Caterpillar, Ring Power, or Thompson threatened IronPlanet to terminate its agreement with ICP.

172.   ICP's expert, Jeffrey Leitzinger, conceded that he did not cite any evidence showing that Caterpillar agreed with Ring Power, Thompson, or anyone else to withhold used equipment from IronPlanet unless IronPlanet terminated its agreement with ICP.

173.   On April 3, 2014, IronPlanet's head of development, Jeff Barca-Hall, emailed other

---

[86] Barca-Hall Tr. 161:20-162:5.
[87] Jeter Tr. 243:17-244:23.
[88] Owens Tr. at 92:5-18.
[89] Owens Tr. at 138:25-139:11, 144:7-9
[90] Owens Tr. 140:9-19; Jeter Tr. 232:18-21; Barca-Hall Tr. 180:12-15; Langham Tr. 165:7-11; Massey Tr. 108:9-10; Winnette Tr. at 126:16-20.

officials at IronPlanet that ICP had been removed from the IronPlanet website. The email stated "The ICP items are no longer visible on our site. The ICP Store and its homepage banner are gone. All ICP items have been removed from users' Watch Lists."[91]

174.    Later that evening, Barca-Hall emailed the other IronPlanet officials again, saying: "Thank you all for the scramble these past few hours to react to this sudden decision. Nice teamwork and creative problem-solving to implement a quick, safe, and effective solution!"[92]

175.    IronPlanet's general counsel, Doug Feick, responded to Barca-Hall's email, stating, "and much thanks to you for calm, commanding decision making. [A]ppreciate working with you and your ability to turn on a dime," to which Barca-Hall responded: "Remember, it's called 'pivoting'. :-)"[93]

176.    The next morning, at 7:40 am on April 4, 2014, Franklin Langham, Vice President of Sales for IronPlanet, sent an email to several IronPlanet employees, telling them: "I've been informed that **the ICP initiative has been suspended**. This is all the information I have at this point. Stay tuned for further updates."[94]

177.    Later on April 4, 2014, IronPlanet's President of Sales, Jeff Jeter, called ICP's Tim Frank and for the first time and told him that IronPlanet was suspending its relationship with ICP.[95]

178.    Jeter summarized the contents of his phone call with Frank in an email to Greg

---

[91] D.I. 419-64.
[92] D.I. 419-64.
[93] *Id.*
[94] D.I. 419-65 (emphasis in original); Op. at 14-15.
[95] CAT SOUMF p. 14; Op. at 15.

Owens, IronPlanet's CEO, and Doug Feick, its General Counsel:

a. Talked w Tim this am:
- not happy, concerned, wanted to know next steps, but not an emotional conversation

- understands pressure and said he suspects will be hard to brush off if they are serious

- said he would talk to Wes now re alternative paths

- said if wind down would need the 90 days I think support – did not get into details but think this could just be support on their site as now re closing transaction – not mkt facing on ours

- said confidentially this he thinks he is going to get some of Terex construction line – not including AWP, ie Genie – asked to pls keep this quite

- told him I would follow-up ASAP re next steps[96]

179. Jeter testified that Caterpillar never threatened IronPlanet to end its relationship with ICP, and specifically testified that he never told Tim Frank that Caterpillar threatened IronPlanet.[97]

180. That evening, Frank followed up with Jeter, sending any email with the subject line, "Any news before I fly off in the morning?" Jeter responded that he did not have any news, to which Frank replied:

a. I am in China tomorrow thru Thursday evening Jeff, but if Cat is going to make you pull the plug on us, I would like to know as soon as possible to make other arrangements, even whe[n] traveling. Could you email me? As you can appreciate the timing isn't good.[98]

181. Jeter did not respond to Frank's email.

182. Jeter forwarded Frank's email to IronPlanet's Greg Owens and Doug Feick, saying, "So, I assume I need to tell him definitively he needs to start making alternative

---

[96] Op. at 15; D.I. 419-68.
[97] Jeter Tr. 232:18-21; 233:7-11; 242:10-11.
[98] Op. at 16; D.I. 419-69.

plans and we will discuss how to support him in a transition.  Thoughts / other positioning?"[99]

183.    A few days later, on Thursday, April 10, 2014, ICP's Frank emailed Jeter, saying, "I understand that the outside forces involved are quite powerful.  That said, I'm very concerned and upset at Iron Planet's decision."  Jeter responded, "Will call you this afternoon if ok."[100]  Jeter did not otherwise respond to Frank's email.

184.    The following day, Friday, April 11, 2014, Jeter sent Frank a formal termination letter, accompanied by a note that said, "Sorry didn't reach you today – your voice mail was full.  Will try again tomorrow, but wanted to go ahead and get this in your hands as soon as possible.  Want to discuss how we can make transition as smooth as possible."[101]

185.    The termination letter stated:  "Pursuant to our conversation on April 4, 2014, the purpose of this letter is to provide written notification and confirmation of IronPlanet's termination of the Hosted Store Agreement between [IronPlanet and ICP] dated March 3, 2014.  The letter informed ICP that IronPlanet had "removed the Hosted Store and all ICP links, marks, and branding from IronPlanet's site," and requested "that [ICP]do the same in regard to IronPlanet's marks, branding and APIs on the ICPDirect site as soon as possible."  The letter closed by saying, "We regret this unfortunate circumstance and will do all we can to provide an orderly transition to a new platform.[102]

186.    On April 16, 2014, IronPlanet's Greg Owens emailed Caterpillar's David Shurson,

---

[99] Op. at 16; D.I. 419-69.
[100] Op. at 18; D.I. 419-81.
[101] Op. at 18; D.I. 399-3 Ex. 30
[102] CAT SOUMF p. 14; Op. at 18; D.I. 399-3 Ex. 30.

saying, "You have probably heard, meant to send you an[] email last week, but we discontinued our program with ICP.  Shurson responded:  "Yes, I heard.  Good decision."[103]  Both Shurson and Owens testified that Shurson did not threaten or pressure IronPlanet to terminate its relationship with ICP.

187.    While IronPlanet decided the HSA did not make sense, it remained willing to advertise and auction ICP equipment.

188.    On May 21, 2014, ICP's Director of Sales Jim Teague signed an agreement with IronPlanet to sell ICP equipment on the IronPlanet website, and IronPlanet fully executed that agreement.[104]

189.    The terms of that Listing Agreement were similar to the HSA: it contained the same 8% commission rate and provided ICP access to IronPlanet's registered user base and sales force—each of the elements described by ICP expert Leitzinger as important to the ICP/IronPlanet relationship, and IronPlanet's sales team would have marketed ICP's equipment.[105]

190.    Joe Hanneman, ICP's Senior Director of Marketing, expressed surprise at the decision to conduct business with IronPlanet and asked Mr. Teague whether doing business with IronPlanet would "give us any legal complications should we end up initiating litigation."[106]

191.    ICP President Tim Frank asked his brother, ICP co-owner Joseph Frank, whether ICP should sell equipment on either IronPlanet or Ritchie Bros., a competing site, providing reasoning for why ICP preferred to conduct business and had better terms

---

[103]  Op. at 19; D.I. 419-83.
[104] ICP-0003926; ICP-0036308.
[105] ICP-0036308; ICP-0004406.
[106] ICP-0003933.

with IronPlanet versus Ritchie Bros., including that IronPlanet allowed ICP to set a minimum price.

192. Joe Frank asked if the "Chinese" would make up any "shortfall" if ICP sold on Ritchie Bros. versus IronPlanet, and then definitively responded to sell the equipment on "Ritchie Bros."[107]

193. Joe Frank then advised Tim Frank that ICP should sell equipment through Richie Brothers instead of IronPlanet. Joe Frank testified under oath that the question and decision were made in consideration of "how it would impact potential claims in this case."[108]

194. Then, on June 4, 2014, Tim Frank told Jim Teague to sell equipment through "anyone but IP."[109]

### 7. Cat Auction Services and IronPlanet Merge, and Ritchie Bros. Then Acquires the Combined Company.

195. In December 2014, IronPlanet and Cat Auction Services announced that they had agreed to merge.[110]

196. IronPlanet and Cat Auction Services completed their merger in April 2015.[111]

197. In August 2016, Ritchie Bros., the world's largest industrial auctioneer, announced that it was acquiring the combined IronPlanet-Cat Auction Services company, and that it was entering into a strategic alliance with Caterpillar under which Ritchie Bros. would become Caterpillar's preferred global partner for live onsite and online

---

[107] ICP-0036299.
[108] J. Frank Vol. 2 Tr. 160:4-11.
[109] ICP-0030177.
[110] Business Wire, *IronPlanet and Associated Auction Services dba Cat Auction Services to Merge* (Dec. 19, 2014), https://www.businesswire.com/news/home/20141219006014/en/IronPlanet-and-Associated-Auction-Services-dba-Cat-Auction-Services-to-Merge.
[111] D.I. 419-13.

auctions with respect to used Caterpillar equipment.[112]

### 8. ICP's Business After IronPlanet Terminated the HAS.

198.   ICP sought outside investment from its inception in 2013 through mid-2015, but was unsuccessful.  ICP approached multiple potential investors from 2013 through April 2014, and none agreed to invest in the ICP business plan besides Tim Frank's brother, Joseph Frank.

199.   ICP continued to import and sell Lonking equipment directly to customers until September 2015.

200.   Matt Borum was President of ICP from mid-2014 through September 2015.

201.   In September 2015, Liquidity Services Investment ("LSI"), a multi-billion public company, agreed to pay roughly $1.5M for 80% of ICP, dependent on meeting sales targets, under a new LLC named Iron Direct.

202.   Tim Frank remained president of Iron Direct, and the company business model remained the same.  Other ICP employees, including Matt Borum, Joe Hanneman, and Jean Willoughby, were employed by Iron Direct.

203.   LSI was a larger online marketplace than IronPlanet.  LSI had more registered users, bidders, and buyers than IronPlanet.  LSI had thirteen warehouses to store equipment.

204.   LSI injected millions of dollars of capital into ICP's business plan under Iron Direct; the initial cash contribution was $2.5M during an initial incubation period, which would end in January 2016, and commitment to make capital contributions up to $16M.

---

[112] August 29, 2016 Ritchie Bros. News Release.

205. ICP's projected sales model that it developed internally and submitted to LSI was included higher revenues projected than in the projections it created at the inception of ICP.

206. ICP projected tens of millions of dollars in revenue in its first expected year of operation, 2016, ultimately projecting that it would become a $615 million dollar business within five years.

207. ICP's projection was not based on data, but was an estimate created by Tim Frank.

208. ICP's revenue was only .01 of Mr. Frank's $615 million projection for 2015-17.

209. Mr. Frank projected $153 million in gross profit and $81 million in EBITDA profit, but the company's actual gross and EBITDA profit was negative over the period.

210. In October 2017, LSI terminated Tim Frank's employment agreement because IronDirect failed to meet sales milestones and was losing money.

211. Despite restructuring IronDirect after Tim Frank's departure, LSI continued to lose money on the ICP business plan and exited the business in January 2019.

## IV.    ISSUES OF LAW

212. Plaintiff's statement of issues of law that remain to be litigated is attached as **Exhibit 1**. Defendant's statement of issues of law that remain to be litigated is attached as **Exhibit 2**.

213. Under the current Scheduling Order, the parties are submitting this Proposed Pretrial Order while multiple motions, including dispositive motions, are pending. Caterpillar reserves its right to supplement, amend, or otherwise modify its issues of law to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's

pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

## V.   **WITNESSES**

### A.   **Witness Lists**

214.   The parties have prepared lists of witnesses expected to be called at trial, either live or by deposition.  Plaintiff's list of witnesses to be called at trial, and Defendant's objections thereto, is attached as **Exhibit 3**.  Defendant's list of witnesses to be called at trial, and Plaintiff's objections thereto, is attached as **Exhibit 4**.

215.   Under the current Scheduling Order, the parties are submitting this Proposed Pretrial Order while multiple motions, including dispositive motions, are pending. Caterpillar reserves its right to supplement, amend, or otherwise modify its witness list to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

216.   The listing of a witness on a party's pre-trial witness list does not require that party to call that witness to testify and does not necessarily mean that the listing party has the power to compel the live testimony of that witness.

217.   The parties are not permitted to recall fact or expert witnesses to testify multiple times, unless the expert witness is recalled for rebuttal purposes.

218.   Any witness not listed will be precluded from testifying, absent good cause shown.

219.   The parties' witness lists represent the parties' good faith understanding and expectation about which witnesses are expected to be called live, or by deposition, at trial.  If a witness becomes unavailable after the entry of this Pretrial Order, the

parties shall meet and confer in good faith to determine a mutually agreeable solution, including presentation of the witness by deposition. After meeting and conferring, if the parties are unable to determine a mutually agreeable solution, either party may seek relief from the Court.

**B.**    **Testimony by Deposition**

220.   Plaintiff's list of deposition designations; Defendant's objections and counter-designations; Plaintiff's objections to the counter-designations and counter-counter designations; and Defendant's objections to the counter-counter designations are attached hereto as **Exhibit 5**.

221.   Defendant's list of deposition designations; Plaintiff's objections and counter-designations; Defendant's objections to the counter-designations and counter-counter designations; and Plaintiff's objections to the counter-counter designations are attached hereto as **Exhibit 6**.

222.   Under the current Scheduling Order, the parties are submitting this Proposed Pretrial Order while multiple motions, including dispositive motions, are pending. Caterpillar reserves its right to supplement, amend, or otherwise modify its deposition designations, objections, and counter-designations to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

223.   If applicable, a party's designation of a page and line from a particular transcript shall be automatically deemed to include any errata indicated for that page and line in the attached errata sheets.

224.   The parties will endeavor to resolve objections in the deposition record before presenting any deposition from any unavailable witness testimony at trial and, for any objections that they cannot resolve, will bring them to the Court's attention in advance to allow the Court to rule on those objections before offering that testimony. The parties agree that exhibit(s) referenced in a designated deposition excerpt may be presented and shown to the jury at the same time that the excerpt is played or read.

225.   The parties may not introduce designations or provide new objections to the listed designations that are not included in this Pretrial Order except in accord with the parties' reservation of rights, for good cause shown, or by agreement of the parties.

## VI.   **<u>EXHIBITS</u>**

226.   The parties propose a joint trial exhibit list attached as **<u>Exhibit 7</u>.** These exhibits will be identified with JTX numbers, starting with JTX0001.

227.   Plaintiff's trial exhibit list is attached as **<u>Exhibit 8</u>**. Defendant's trial exhibit list is attached as **<u>Exhibit 9</u>**. Both lists include objections from the other party.

228.   Under the current Scheduling Order, the parties are submitting this Proposed Pretrial Order while multiple motions, including dispositive motions, are pending. Caterpillar reserves its right to supplement, amend, or otherwise modify its exhibits to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

229. Plaintiff's trial exhibits will be identified with PTX numbers, starting with PTX0001. Defendant's trial exhibits will be identified with DTX numbers, starting with DTX0001.

230. On or before the first day of trial, counsel will deliver to the Courtroom Deputy a completed AO Form 187 exhibit list for each party.

231. Exhibits authenticated during a deposition that a party seeks to move into evidence to which no objection has been made will be received into evidence without the need for additional foundation testimony once introduced through and shown to a testifying witness, either live or by deposition.

232. The parties agree that any description or date of a document on an exhibit list is provided for convenience only and may not be used as an admission or otherwise as evidence regarding the listed document or any other listed document.

233. Any documents, deposition transcripts, or portions thereof, or other items, not specifically identified herein or offered into evidence, may still be used at trial for purposes of impeachment, if otherwise competent for such purposes.

234. In order to reduce the number of duplicate exhibits, where a deposition excerpt references a document by exhibit number and that identical document was also marked with a different trial exhibit number, a party may substitute one exhibit for the other.  In addition, the parties will promptly meet and confer regarding replacing any poor print or digital quality copies of exhibits with substantively identical improved or higher quality or color copies.

235. Legible photocopies of documents may be offered and received in evidence in lieu of originals thereof.  Electronic versions of document exhibits in their native

format, such as spreadsheets or presentations, may be offered into evidence in lieu of paper or PDF versions.  The parties will timely exchange replacement versions and/or native versions of exhibits prior to use in trial.

236.    The parties agree that demonstrative exhibits the parties and experts intend to use at trial do not need to be included on their respective lists of trial exhibits attached hereto.

237.    The parties agree that any party may offer as evidence an exhibit present on another party's exhibit list.

238.    Subject to other provisions of this Pretrial Order, no party may offer as evidence an exhibit not present on either party's exhibit list absent Court order or by agreement of the parties.

239.    The parties will meet and confer regarding their respective objections in an effort to resolve all objections and issues prior to presenting them to the Court.

240.    The parties may use demonstrative exhibits, which do not need to be identified on their respective lists of trial exhibits. Each demonstrative exhibit shall identify by exhibit number all trial exhibits that form the basis of the demonstrative exhibit. Plaintiff's demonstrative exhibits will be identified with PDX numbers, starting at PDX0001. Defendant's demonstrative exhibits will be identified with DDX numbers, starting with DDX0001.

241.    The parties stipulate to the authenticity of the documents listed in the attached exhibit lists unless such objections are specifically and expressly preserved therein. The parties further agree that they will not dispute the authenticity of any document that was produced by a party during discovery, which on its face appears to have

been authored by an employee, officer or agent of the producing party in the ordinary course of business, and that such documents shall be deemed *prima facie* authentic, subject to the right of the party against whom such a document is offered to adduce evidence to the contrary or to require the offering party to provide authenticating evidence if the opposing party has a reasonable basis to believe that the document is not authentic.

## VII.   DISCLOSURES OF WITNESSES AND EXHIBITS DURING TRIAL

### A.   Opening Statements

242.   Any exhibits or demonstratives to be used during opening statements are to be exchanged by 4:00 p.m.[113] the day before the opening statements.  Any objections to those exhibits or demonstratives must be provided by 6:30 p.m. the same day they are received (the day before the opening statements).  The parties shall meet and confer telephonically or in person in an attempt to resolve any objections to these exhibits or demonstratives at 8:30 p.m.  If objections cannot be resolved by the parties, the unresolved issues will be raised with the Court before opening statements are to be presented to the jury.  Any exhibit listed on a party's own exhibit list as to which no objection remains pending at the time of opening statements may be shown to the jury by that party during opening statements if the exhibit will be introduced at trial.

### B.   Witnesses

243.   Each party shall disclose, with its best good faith understanding, by email the identity of any witnesses it intends to call, including rebuttal witnesses, the order in

---

[113]   All times referenced herein are in Eastern Daylight Time.

which witnesses will be called, and whether each such witness will be called live or by deposition, by 6:30 p.m. two days before the day of trial during which the witness will testify.  In other words, if a witness will testify on a Wednesday, the witness must be identified by 6:30 p.m. on Monday prior to said Wednesday.  The parties reserve the right to revise, in good faith, their witness identifications, including order, following the close of the other party's case-in-chief or rebuttal case.

244.    The other party will identify any objections to such witnesses via e-mail by 7:30 p.m., and the parties will meet and confer to resolve any objections by 9:30 p.m. that same evening.  If good faith efforts to resolve any objections fail, the objecting party may bring its objections to the Court's attention prior to the witness being called to the witness stand.  If later events cause the need to remove a witness from a party's witness list, the parties agree to notify the other side as soon as possible.

245.    During adjournments in the trial, including breaks during the trial and overnight, the offering party may discuss with a witness his or her testimony on direct examination until the witness is passed for cross-examination and cross-examination has commenced, but is prohibited from discussing with the witness his or her testimony during cross-examination.

**C.    Deposition Testimony**

246.    Unless otherwise agreed to between the parties, the party offering deposition testimony (other than for the purpose of impeachment or cross examination) shall identify the deposition testimony to be offered, *i.e.,* transcript page and line numbers exchanged designations, by 6:30 p.m. at least four (4) calendar days prior to the testimony being offered into the record.  The party receiving the designations

shall inform the opposing party of any objections and counter-designations by 6:30 p.m. three (3) calendar days prior to the testimony being offered into the record, and by 8:30 p.m. that same day, the introducing party will identify any objections to the other party's counter-designated testimony.  The parties shall meet and confer to resolve any objections to designated testimony by 9:30 p.m. that same day to permit sufficient time to resolve any objections per the Court's procedure below.

> Counsel shall confer prior to trial to determine what testimony will be offered by deposition.  If there are objections that remain to be resolved, the party calling the witness by deposition shall, no later than two (2) calendar days before the witness is to be called at trial, submit, on behalf of all parties: (i) A copy of the entire deposition testimony of the witness at issue, clearly highlighting the designations, counter-designations, and pending objections; and (ii) a cover letter clearly identifying the pending objections as well as a brief indication (i.e., no more than one sentence per objection) of the basis for the objection and the offering party's response to it.  Failure to comply with these procedures, absent an agreement by the parties and approval by the Court, will result in waiver of the use of the deposition testimony or waiver of objection to the use of the deposition testimony.

The party introducing the deposition testimony shall be responsible for editing the deposition video to include the testimony and any counter-designation testimony.

247.    To the extent that deposition designations or counter-designations are admitted into evidence, they must either be played by video or read in open court.  If a party opts to introduce deposition testimony, any counter-designation of that same witness's testimony must be admitted in the same medium, and the testimony designated by both sides will be played or read consecutively in the sequence in which the testimony was originally given at deposition.  If an exhibit is referenced in a

deposition designation, the exhibit is admitted into evidence if it is included on any party's trial exhibit list and is not otherwise objected to, subject to Section VI.

248.  A party may not affirmatively use deposition designations for a party's own officers and employees unless such party first satisfies a Fed. R. Evid. 804 hearsay exception.  A party may counter-designate or counter-counter designate on such testimony as necessary for purposes of completeness based on what the opposing party has designated.

249.  To the extent deposition designations are read or played in open court, each side will be charged the time taken to read or play its designations (or counter-designations). Specifically, any affirmative designations offered by a party will count against that party's trial presentation time whereas any counter-designations by the other party will count against the party who made the counter-designations. The time charged for designations played by video will be measured by the amount of time it takes to play the testimony.  All irrelevant and redundant material, including colloquy between counsel and objections, will be eliminated when the deposition is played or read at trial.

250.  The above procedures regarding deposition designations do not apply to portions of deposition transcripts and/or video of a witness used for impeachment or cross-examination of that witness.  Any deposition testimony of a witness may be used at trial for the purpose of impeachment or cross-examination of that witness, regardless of whether a party specifically identified that testimony on its list of deposition designations, if the testimony is otherwise competent for such purpose.

D.   **Exhibits and Demonstratives**

251.   Each party shall provide to the other side a list of all exhibits, non-documentary demonstratives (*e.g.,* poster boards), and live product demonstrations (such as physical exhibit(s), physical prior art, or physical products) for direct examination, but not for cross examination, by no later than 6:30 p.m. the day before the party intends to call each witness.  The parties shall exchange objections to these exhibits by 8:30 p.m. on the day they are received.  The parties shall meet and confer regarding any objections to these exhibits at 9:30 p.m. on the day they are received.

252.   The parties shall exchange copies of all documentary, graphic, slide, animation, and any other form of demonstratives they plan to use at trial during direct examination, but not for cross-examinations, by 6:30 p.m. in PDF (or, for animation, live) form the day before their anticipated use.  Any objections to the demonstrative exhibits shall be provided by 8:30 p.m.  The parties shall meet and confer telephonically or in person in an attempt to resolve any objections to the demonstrative at 9:30 p.m.

253.   Any unresolved objections shall be brought to the Court's attention for resolution no later than the start of the trial day on which the exhibit or demonstrative is intended to be used.  This provision does not apply to exhibits or demonstratives created during testimony or to be used for cross examination, neither of which need to be provided to the other side in advance of their use.  This provision also does not apply to demonstratives previously used during trial. In addition, blow-ups or highlights of exhibits or parts of exhibits or testimony are not required to be provided to the other side in advance of their use.

E.     **Copies**

254.   Prior to the start of direct examination of a particular witness, the party conducting the direct examination will provide the other party with one (1) copy of binder(s) containing all exhibits and demonstrative exhibits that they intend to use with that witness on direct examination and will provide the three (3) required copies to the Court.  The parties agree that this provision does not require advance disclosure of exhibits to be used to impeach or on cross-examination of any witness.  However, prior to the start of the cross-examination of any witness, the parties agree to provide the other with one (1) copy of witness binder(s) that contain all of the exhibits expected to be used on cross-examination of that witness and will provide all required copies to the Court.

VIII.  **PLAINTIFF'S STATEMENT OF INTENDED PROOF**

255.   A brief statement of what ICP intends to prove in support of its claims at trial is set forth below.  This statement is not exhaustive, and ICP reserves the right to prove any matters identified in the pleadings, in interrogatory and other discovery responses, in its expert reports, and in the accompanying statements of the facts and legal issues to be litigated at trial.

256.   ICP may also provide additional proof(s) to rebut any alleged proof(s) offered by Caterpillar before and during trial, in response to rulings by the Court, or for other good cause.[114]

---

[114]   Plaintiff reserves the right to revise its statement of intended proof based on Defendant's revisions to the pretrial submissions, including the statement of uncontested facts or Defendant's statements of contested issues of law or fact.

**A.      Caterpillar unreasonably restrained trade**

257.    ICP will prove by a preponderance of the evidence that Caterpillar entered into an unlawful agreement or conspiracy with others, including IronPlanet, Ring Power Corporation, and/or Thompson Tractor Company to restrain trade by causing IronPlanet to terminate its Hosted Store Agreement with ICP, and that these actions constituted a group boycott.

258.    ICP will prove by a preponderance of the evidence that this conspiracy was an unreasonable restraint of trade, which caused anticompetitive effects, including reducing competition in the relevant heavy construction equipment markets and foreclosing the possibility of effective entry into those markets by new entrants.

259.    ICP will prove by a preponderance of the evidence that this restraint of trade caused ICP to suffer injury to its business by causing ICP to go out of business shortly after IronPlanet terminated the parties' relationship.

**B.      Caterpillar tortiously interfered with ICP's contract with IronPlanet**

260.    ICP will prove by a preponderance of the evidence that Caterpillar tortiously interfered with ICP's contract with IronPlanet.

261.    ICP will prove by a preponderance of the evidence that it had a valid and enforceable contract with IronPlanet, specifically, the March 3, 2014 Hosted Store Agreement, under which IronPlanet agreed to create, host, and maintain a hosted section of the IronPlanet website known as a "Hosted Store" that would feature equipment being distributed by ICP, and agreed that ICP would have exclusive rights to such a Hosted Store for the distribution of equipment made by Lonking and certain other Chinese manufacturers.  The Hosted Store Agreement required IronPlanet to promote the Hosted Store and to train its sales personnel about ICP

and the equipment it was distributing.[115]   The Hosted Store Agreement also required IronPlanet to provide potential customers with pre-sales support, pre-sales customer service, and summary education about ICP and the construction equipment it was selling.[116]

262.   ICP will prove by a preponderance of the evidence that Caterpillar was aware of the Hosted Store Agreement.

263.   ICP will prove by a preponderance of the evidence that Caterpillar intentionally induced IronPlanet to breach the Hosted Store Agreement.

## C.   <u>Relief</u>

264.   ICP will prove by a preponderance of the evidence that ICP sustained damages as a result of Caterpillar's antitrust violation and its tortious interference with ICP's agreement with IronPlanet.

265.   ICP will show that it is entitled to compensatory damages for Caterpillar's violation of Section 1 of the Sherman Act.

266.   ICP will show that it is entitled to compensatory damages for Caterpillar's tortious interference with ICP's contract with IronPlanet.

267.   ICP will show that it is entitled to punitive damages for Caterpillar's tortious interference with ICP's contract with IronPlanet.

268.   ICP will show that it is entitled to reasonable costs and expenses incurred in this action, including attorney's fees and expert fees.

269.   ICP will show that it is entitled to any other relief the Court may deem just and proper.

---

[115] Hosted Store Agreement §§ 1.2, 2.2(a).
[116]  Hosted Store Agreement §§ 1.1, 2.2(b); Op. at 7-8.

270.   To the extent necessary, ICP will rebut any allegation by Caterpillar that it is entitled to costs and/or attorneys' fees.

## IX.   **DEFENDANT'S STATEMENT OF INTENDED PROOF**

271.   If necessary, Caterpillar intends to prove in support of its pleadings and affirmative defenses at trial the points included in the short statement below.  This statement is not exhaustive, and Caterpillar reserves the right to prove or rebut any matters identified in the pleadings, in interrogatory and other discovery responses, in expert reports, and in the accompanying statements of the facts and legal issues to be litigated at trial. Caterpillar specifically reserves the right to raise all of its affirmative defenses, as well as any defenses of previously dismissed defendants, which were incorporated by reference in Caterpillar's answers to the Third Amended Complaint.

272.   Under the current Scheduling Order, the parties are submitting this Proposed Pretrial Order while multiple motions, including dispositive motions, are pending. Caterpillar reserves its right to supplement, amend, or otherwise modify its statement of intended proof to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

273.   Should the case proceed to trial, it will be Plaintiff ICP's burden to prove the elements of any claims.

274.   In response to ICP's presented proof(s), Caterpillar may also provide additional proof(s) to rebut any alleged proof(s) offered by ICP before and during trial, in response to rulings by the Court, or for other good cause.

275.   Should it be necessary, Caterpillar intends to prove that it did not commit any violation of federal anti-trust laws or violations of Illinois law for tortious interference.

276.   Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that Caterpillar never entered into any unlawful agreement or conspiracy with anyone to boycott IronPlanet or interfere with ICP's business.

277.   Should it be necessary, Caterpillar intends to prove that any actions it took, or discussions it had, related to AAS or IronPlanet were based on its independent business considerations as an investor in those businesses, and were entirely legal and justified under state and federal law.

278.   Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that IronPlanet was not pressured by Caterpillar, or anyone else, to terminate any agreement with ICP, and that IronPlanet offered to continue doing business with ICP after April 2014.

279.   Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that ICP chose not to do business with IronPlanet to bolster potential claims that ICP thought it had against Caterpillar or others.

280.   Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that ICP continued to do business in the United States after April 2014.

281.   Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that IronPlanet was not the only means for ICP to enter whatever product or geographic markets ICP attempts to establish at trial.

282. Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that the only equipment ICP and Lonking had available for sale during the relevant time period was equipment that was not legally allowed to be sold in the United States under EPA and California Air Resources Board regulations.

283. Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that no actions that Caterpillar or others took amounted to an unreasonable restraint of trade in the sale of heavy construction equipment by ICP, IronPlanet, or anyone else.

284. Should it be necessary, Caterpillar intends to prove there were no anticompetitive effects, and no antitrust injury, caused by any alleged actions taken by Caterpillar or anyone else in whatever product or geographic markets ICP may attempt to establish at trial, including proving that during the relevant time period there continued to be a high level of competition in the sale of new, legal heavy construction equipment, and that Chinese equipment manufacturers were able to effectively, and legally, enter any markets claimed by ICP during the relevant time period.

285. Should it be necessary, Caterpillar intends to prove that ICP suffered no damages or lost profits as a result of any alleged actions by Caterpillar, and that ICP did not go out of business as a result of any actions by Caterpillar or the alleged termination of an agreement with IronPlanet. Rather, Caterpillar intends to prove that any alleged damages to ICP were the result of other issues, including poor equipment and support supplied by Lonking and poor planning and funding for ICP.

286. Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that ICP is not entitled to any damages (compensatory or punitive), nor is ICP entitled to costs and expenses incurred during this action (such as attorney's or expert fees).

287. Should it be necessary, Caterpillar intends to prove it is entitled to costs from ICP.

288. Should it be necessary, Caterpillar intends to prove that no actions by Caterpillar constitute but-for or proximate causation of any alleged damages to ICP, and—rather—any alleged damages were the but-for and proximate causes of actions by Lonking or others.

289. Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that Caterpillar never tortiously interfered with, or intentionally or unjustifiably induced the termination of, any alleged ICP agreement with IronPlanet.

290. Should it be necessary, Caterpillar intends to prove by a preponderance of the evidence that ICP is entitled to no other relief by the Court.

291. To the extent necessary, Caterpillar will rebut any other allegations raised by ICP during trial.

292. Caterpillar reserves its right to supplement, amend, or otherwise modify its statement of intended proof to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

X.      **CERTIFICATION OF GOOD-FAITH SETTLEMENT EFFORTS**

293.    The parties have not recently engaged in settlement discussions, and ICP is open to settlement discussions and/or mediation.  Caterpillar agrees the parties have not recently engaged in settlement discussions, and that it, too, remains open to settlement discussions and/or mediation.  The parties have agreed to participate in a mediation on March 28, 2024.

XI.     **AMENDMENTS OF THE PLEADINGS**

294.    Neither party intends to request an amendment to its pleadings at the present time.

XII.    **OTHER MATTERS**

A.      **Treble Damages**

295.    In connection with the parties' discussions concerning *in limine* motions, Caterpillar agreed that it will not make any reference to ICP's potential recovery of treble damages and attorneys' fees should ICP prevail on its antitrust claim.

B.      **Length of Trial**

296.    This matter is scheduled for a five to seven-day jury trial beginning at 9:30 a.m. on April 5, 2024,[117] with the subsequent trial days beginning at 9:00 a.m.  Until the case is submitted to the jury for deliberations, the jury will be excused each day at 4:30 p.m.  The parties agree to allocate equal time per side in which to present their respective cases.[118]

297.    The Courtroom Deputy will keep a running total of trial time used by counsel.

---

[117] This date is subject to change pending the Court's ruling on ICP's request for a continuance.
[118] This proposal is subject to change pending further guidance from the Court.

### C.    Motions *in Limine*

298.    Per D.I. 119 at 11, the parties' motions *in limine* ("MIL"), including oppositions

and replies thereto, are set forth in the proposed pretrial order as follows:

- **Exhibit 10**: Plaintiff's MIL No. 1
    - Exhibit 10a – Plaintiff's Motion
    - Exhibit 10b – Defendant's Opposition
    - Exhibit 10c – Plaintiff's Reply

- **Exhibit 11**: Plaintiff's MIL No. 2
    - Exhibit 11a – Plaintiff's Motion
    - Exhibit 11b – Defendant's Opposition
    - Exhibit 11c – Plaintiff's Reply

- **Exhibit 12**: Plaintiff's MIL No. 3
    - Exhibit 12a – Plaintiff's Motion
    - Exhibit 12b – Defendant's Opposition
    - Exhibit 12c – Plaintiff's Reply

- **Exhibit 13**: Defendant's MIL No. 1
    - Exhibit 13a – Defendant's Motion
    - Exhibit 13b – Plaintiff's Opposition
    - Exhibit 13c – Defendant's Reply

- **Exhibit 14**: Defendant's MIL No. 2
    - Exhibit 14a – Defendant's Motion
    - Exhibit 14b – Plaintiff's Opposition
    - Exhibit 14c – Defendant's Reply

- **Exhibit 15**: Defendant's MIL No. 3
    - Exhibit 15a – Defendant's Motion

   o Exhibit 15b – Plaintiff's Opposition

   o Exhibit 15c – Defendant's Reply

**D.** ***Voir Dire*, Jury Instructions, and Verdict Form**

299. The parties are separately submitting to the Court proposed *voir dire*, preliminary and final jury instructions, and verdict forms.  Under the current Scheduling Order, the parties are submitting this Proposed Pretrial Order while multiple motions, including dispositive motions, are pending.  Caterpillar reserves its right to supplement, amend, or otherwise modify its voir dire, jury instructions, and verdict form to reflect any proceeding, finding, order, or other development in this matter, expressly including but not limited to any development regarding Caterpillar's pending Motions related to Summary Judgment, Sanctions, or to Exclude ICP's Experts.

**E.** **Jurors and Jury Procedures**

300. There shall be eight jurors.  The Court will conduct jury selection through the "struck juror" method, beginning with the Court reading *voir dire* to the jury panel in the courtroom, continuing by meeting with jurors individually in chambers or at sidebar and there addressing any challenges for cause, and concluding with peremptory strikes.

301. On the first day of trial, each member of the jury will be provided a notepad/pen for notes.  The parties agree that the jurors shall be permitted to write notes by hand on their notepads during the trial, and that jurors be permitted to bring their notepads into the deliberation room.  The parties further propose that the jurors' notepads be collected by the clerk each evening after daily recess and collected and destroyed without review after the jury's discharge.

### F.    Objections to Expert Testimony

302.    The parties request that the Court should rule at trial on any objections to expert

testimony as outside the scope of prior expert disclosures.

### G.    Other Stipulations

303.    The parties agree that written responses to interrogatories and requests for

admission may be used at trial consistent with the Federal Rules of Civil Procedure

and Federal Rule of Evidence even if such responses have not been verified by the

responding party.

**IT IS HEREBY ORDERED** that this Final Pretrial Order shall control the subsequent

course of the action, unless modified by the Court, to prevent manifest injustice.

SO ORDERED  this _____ day of _____, 2024.

_____
Honorable Richard G. Andrews
U.S. District Court Judge