## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

INTERNATIONAL CONSTRUCTION
PRODUCTS LLC,

    Plaintiff,

 v.

Caterpillar Inc., et al.,

    Defendants.

Case No. 15-cv-108-RGA-SRF

## PLAINTIFF INTERNATIONAL CONSTRUCTION PRODUCTS LLC'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANT CATERPILLAR INC.'S MOTION FOR JUDGMENT AS A MATTER OF LAW PURUANT TO FRCP 50(a)

OF COUNSEL:

William A. Isaacson (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
David E. Cole (*pro hac vice*)
PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
wisaacson@paulweiss.com
jphillips@paulweiss.com
amauser@paulweiss.com
dcole@paulweiss.com

Dated:  April 14, 2024

PAUL, WEISS, RIFKIND,
 WHARTON & GARRISON LLP
  Matthew D. Stachel (No. 5419)
  1313 N. Market Street, Suite 806
  Post Office Box 32
  Wilmington, DE 19899-0032
  Tel.:  (302) 655-4410
  mstachel@paulweiss.com

*Attorneys for Plaintiff International
Construction Products LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

SUMMARY OF ARGUMENT ....................................................................................................1

ARGUMENT .............................................................................................................................1

I.       The Jury Has More Than Sufficient Evidence to Find for ICP on Its *Per Se* Group
         Boycott Claim. ..............................................................................................................1

         A.       ICP's Claim Satisfies the Legal Standard for a Group Boycott
                  Claim. ...............................................................................................................1

         B.       There Is Sufficient Evidence for the Jury To Find a Single
                  Overarching Agreement, with Horizontal Participation, to Stop
                  Competition by ICP. ..........................................................................................4

C.       The Evidence Supports the Existence of a Single Conspiracy with Horizontal
         Components. ..................................................................................................................7

IV.      The Jury Has Sufficient Evidence to Find Tortious Interference with Contract. ..............13

V.       The Jury Has More Than Sufficient Evidence to Find that Caterpillar Caused
         ICP's Losses...................................................................................................................16

VI.      The Jury Has More Than Sufficient Evidence to Award Damages to ICP. ......................18

         A.       ICP's Damages Are Not Speculative. .................................................................. 18

         B.       Illinois Law Does Not Preclude Damages for New Businesses. .......................... 20

CONCLUSION............................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*,
  33 F.3d 194 (3d Cir. 1994)...................................................................................3

*ALPO Petfoods, Inc.* v. *Ralston Purina Co.*,
  997 F.2d 949 (D.C. Cir. 1993) ............................................................................19

*Am. Tobacco Co.* v. *U.S.*, U.S. 781 (1946) .................................................................5

*Anderson News, LLC* v. *Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)...............................................................................13

*Angelico v. Lehigh Valley Hosp., Inc.*,
  184 F.3d 268 (3d Cir. 1999) ...............................................................................14

*APS Holmes Grp. LLC* v. *Sorkin*,
  2023 Il App .........................................................................................................16

*Bank Fin., FSB* v. *Brandwein*,
  36 N.E.3d 421 (Ill App. Ct. 2015) ......................................................................16

*Blumenthal* v. *United States*,
  332 U.S. 539 (1947).............................................................................................13

*Bray* v. *Bank of Am. Corp.*,
  784 F. App'x 738 (11th Cir. 2019) ......................................................................13

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977).............................................................................................14

*Carepoint Health Sys.* v. *RWJ Barnabas Health, Inc.*,
  2023 WL 7986429 (D.N.J. 2023) ........................................................................14

*Cargill, Inc.* v. *Monfort of Colo., Inc.*,
  479 U.S. 104 (1986).............................................................................................14

*Church of Scientology Int'l v. Eli Lilly & Co.*,
  848 F. Supp. 1018 (D.D.C. 1994) .......................................................................18

*DNAML Pty, Ltd.* v. *Apple Inc.*,
  25 F. Supp. 3d 422 (S.D.N.Y. 2014)....................................................................14

*Dupree* v. *Younger*,
  598 U.S. 729 (2023)...............................................................................................1

*In re Estate of Albergo*,
   656 N.E.2d 97 (Ill. App. Ct. 1995) .......................................................................17

*Euroholdings Capital & Inv. Corp* v. *Harris Trust & Sav. Bank*,
   2008 WL 4346397 (N.D. Ill. Mar. 18, 2008) ...................................................17, 18

*Gelboim* v. *Bank of Am. Corp.*,
   823 F.3d at 775 .......................................................................................................13

*U.S.* v. *Gen. Motors Corp.*,
   384 U.S. 127 (1966) ..................................................................................................2

*Grako* v. *Bill Walsh Chevrolet-Cadillac, Inc.*,
   229 N.E. 3d 869 (Ill. App. Ct. 2023) .....................................................................17

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 652 (7th Cir. 2002) ....................................................................................4

*In re IH 1, Inc.*,
   2015 WL 5679724 (D. Del. 2015) ..........................................................................19

*Int'l Constr. Products, LLC* v. *Caterpillar Inc.*,
   2022 WL 4465376 (D. Del. 2022) ............................................................................5

*Intell. Ventures I, LLC* v. *Motorola Mobility, LLC*,
   72 F. Supp. 3d 496 (D. Del. 2014) ...........................................................................1

*Interstate Circuit, Inc. v. United States*,
   306 U.S. 208 (1939) ..................................................................................................5

*InterVest, Inc.* v. *Bloomberg, L.P.*,
   340 F.3d 144 (3d Cir. 2003) .....................................................................................4

*Ivey* v. *Transunion Rental Screening Solutions, Inc.*,
   186 N.E.3d 1076 (Ill. App. Ct. 2021) .....................................................................20

*Ivey* v. *Transunion Rental Screening Solutions, Inc.*,
   215 N.E.3d 871 (Ill. 2022) ......................................................................................20

*Klor's, Inc.* v. *Broadway-Hale Stores*,
   359 U.S. 207 (1959) .............................................................................................2, 14

*Langer* v. *Becker*,
   176 Ill. App. 3d 745 (Ill. Ct. App. 1998) ...............................................................16

*Lifewatch Servs.* v. *Highmark Inc.*
   902 F.3d 323 (3d Cir. 2018) ...................................................................................14

*Marra* v. *Phila. Hous. Auth.*,
    497 F.3d 286 (3d Cir. 2007)..................................................................1

*Mfg. Co.* v. *Tarmac Roofing Sys., Inc.*,
    63 F.3d 1267 (3d Cir. 1995)................................................................19

*Nat'l Soc. of Prof. Eng'rs* v. *United States*,
    435 U.S. 679 (1978)..........................................................................14

*Norcon Power Partners, L.P.* v. *Niagara Mohawk Power Corp.*,
    92 N.Y.2d 458, 705 N.E.2d 656 (1998)..............................................16

*Nw. Wholesale Stationers, Inc.* v. *Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985)............................................................................2

*O.E.M. Glass Network, Inc.* v. *Mygrant Glass Co., Inc.*,
    2023 WL 2563689 (E.D.N.Y. 2023).....................................2, 3, 13, 19

*Pace Elecs., Inc.* v. *Canon Comput. Sys., Inc.*,
    213 F.3d 118 (3d Cir. 2000)...............................................................14

*Petruzzi's IGA Supermarkets, Inc.* v. *Darling-Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993)...............................................................5

*PLS.com, LLC* v. *Nat'l Ass'n of Realtors*,
    32 F.4th 824 (9th Cir. 2022) ...............................................................14

*In re Polyurethane Foam Antitrust Litig.*,
    152 F. Supp. 3d (N.D. Ohio 2015).......................................................13

*Rossi* v. *Standard Roofing, Inc.*,
    156 F.3d 452 (3d Cir. 1998)..................................................2, 6, 10, 14

*Speakers of Sport, Inc.* v. *ProServ, Inc.*,
    178 F.3d 862 (7th Cir. 1999) ...............................................................17

*Strasburg* v. *Brauvin Realty Servs., Inc.*,
    691 N.E.2d 834, 95 Ill. App.3d 17 (Ill. App. 1 Dist. 1998)....................15

*Theatre Enters., Inc.* v. *Paramount Film Distrib. Corp.*,
    346 U.S. 537 (1954)............................................................................5

*Toys "R" Us, Inc.* v. *FTC*,
    221 F.3d 928 (7th Cir. 2000) ................................................................2

*Tunis Bros. Co.* v. *Ford Motor Co.*,
    823 F.2d 49 (3d Cir. 1987)....................................................................5

*U.S. Horticultural Supply, Inc.* v. *Scotts Co.*,
   2004 WL 1529815 (E.D. Pa. 2004) ........................................................14

*W. Penn Allegheny Health Sys.* v. *UPMC*,
   627 F.3d 85 (3d Cir. 2010)......................................................................14

*United States* v. *Warner*,
   690 F.2d 545 (6th Cir. 1982) ..................................................................13

*United States* v. *Weber*,
   437 F.2d 327 (3d Cir. 1970).....................................................................13

*Wolf v. Buss (America) Inc.*,
   77 F.3d 914 (7th Cir. 1996) ....................................................................17

*ZF Meritor LLC* v. *Eaton Corp.*,
   2013 WL 6729509 (D. Del. 2013) ..........................................................19

**Other Authorities**

   Fed. R. Civ. P. 50(a)(1)..............................................................................1

## SUMMARY OF ARGUMENT

The standard for judgment as a matter of law "largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree* v. *Younger*, 598 U.S. 729, 731–32 (2023). "The Court should grant the motion for judgment as a matter of law only if, viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." *Intell. Ventures I, LLC* v. *Motorola Mobility, LLC*, 72 F. Supp. 3d 496, 502 (D. Del. 2014). Judgment as a matter of law is "a 'sparingly' invoked remedy," *Marra* v. *Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007), and is appropriate only if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party on [an] issue." Fed. R. Civ. P. 50(a)(1).

In denying Caterpillar's motion for summary judgment on ICP's *per se* antitrust conspiracy claim and its tortious interference with contract claims, this Court concluded there was sufficient evidence from which a reasonable factfinder could find in ICP's favor. When ICP closed its case-in-chief, ICP had proved the facts set forth in its summary judgment opposition and more. Based on that evidence and the applicable law, a reasonable factfinder has sufficient evidence to find in ICP's favor on both its claims. Caterpillar's motion should be denied.

## ARGUMENT

I.   **The Jury Has More Than Sufficient Evidence to Find for ICP on Its *Per Se* Group Boycott Claim.**

A.   **ICP's Claim Satisfies the Legal Standard for a Group Boycott Claim.**

The Supreme Court "has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Nw. Wholesale Stationers, Inc. v.*

*Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985). "Cases to which [the Supreme] Court has applied the *per se* approach have generally involved joint efforts by a firm or firms to disadvantage competitors by either directly or indirectly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *Id.* at 294; *Rossi* v. *Standard Roofing*, Inc., 156 F.3d 452, 463 (3d Cir. 1998). "In these cases, (1) 'the boycott often cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete;' (2) 'frequently the boycotting firms possessed a dominant position in the relevant market;' and (3) the conduct was not justified by 'plausible arguments that they were intended to enhance overall efficiency and make markets more competitive.' Each factor need not be met to merit *per se* treatment." *O.E.M. Glass Network, Inc.* v. *Mygrant Glass Co.*, *Inc.*, 2023 WL 2563689, at *7 (E.D.N.Y. 2023) (quoting *Nw. Wholesale Stationers*, 472 U.S. at 295). Only one must be atisfied. *Rossi*, 156 F.3d at 464  (applying *per se* standard based on third factor).

For a group boycott to be subject to *per se* treatment, not all participants in the boycott must be competitors, and Caterpillar does not need to be one, although, as explained below, it is for used equipment sales. As long as the competitor element is satisfied for at least two parties, the *per se* rule applies. *U.S.* v. *Gen. Motors Corp.*, 384 U.S. 127 (1966) (conspiracy involving horizontal and vertical elements resulted in a *per se* violation); *Klor's, Inc.* v. *Broadway-Hale Stores*, 359 U.S. 207 (1959) (illegal agreement between appliance retailer and its suppliers to boycott retailer's competitor); *Rossi*, 156 F.3d 452 ("a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers"); *Toys "R" Us, Inc.* v. *FTC*, 221 F.3d 928, 934 (7th Cir. 2000) ("The critical question here is whether . . . there was a horizontal agreement among the toy manufacturers, with [the defendant] in the center as the ringmaster, to boycott the warehouse clubs"); *O.E.M. Glass*

*Network*, 2023 WL 2563689, at *8 n.10 ("Courts have found that upstream suppliers that participated in a horizontal group boycott scheme are also subject to liability on a *per se* basis"). The ABA Model Jury Instruction, ABA Section of Antitrust Law, ABA Model Jury Instructions in Civil Antitrust Cases, C-44, follows this law.  D.I. 713 at 40 (ICP's proposed instruction).

As the evidence presented at trial demonstrates, ICP has satisfied these factors.  With respect to the first factor, the group boycott here had as its object cutting off ICP from access to IronPlanet— an ecommerce platform that it needed to compete and also was the competitive threat to Caterpillar and its dealers—and the boycott was undertaken because ICP's entry was "the type of disruption" Caterpillar was "worried about"—"a Chinese equipment company figuring out how to compete here without investing in a strong distribution network."  JTX-0041; *see* PTX-0225 (ICP on IronPlanet "disruptive").  The effect of cutting off ICP from the IronPlanet meant that the threat of disruptive competition as well as the ICP business model "went away." Tr. 536:18-22, 572:2-6 (Lee); Tr. 776:6-22 (Frank).

For the second factor, the evidence showed that Caterpillar had a 30% or higher market share for new heavy construction equipment. JTX 128 at 48.  Combined with that share, the evidence established that, absent the advent of ecommerce, the barriers to entry to compete against Caterpillar were virtually insurmountable due to the requirement of a large dealer network.  Tr. 726:7-16 (Frank); Tr. 1114:20-1115:14 (Rhoda); JTX 128 at 47 (investment bankers advising on growing importance of ecommerce).  Those entry barriers gave Caterpillar the market power to maintain and raise prices.  *Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 33 F.3d 194, 209 (3d Cir. 1994) ("Notwithstanding the extent of an antitrust defendant's market share, the ease or difficulty with which competitors enter the market is an important factor in determining whether the defendant has true market power—the power to raise prices").

For the third factor which was decisive in *Rossi*, Caterpillar has not presented any arguments that cancelling the ICP contract was intended to make markets more competitive; the overwhelming evidence is that the actions here were intended to restrict competition on an e-commerce platform with new and used heavy construction equipment. *E.g.* JTX-0041, JTX-0042, PTX-164, PTX-178; Tr.485:20-486:3 (Jeter) (Caterpillar and their dealers concerned about IronPlanet participating in the new equipment market); Tr. 3331:21-334:3 (Guilford) (Koziner's "preferable" position was "IronPlanet would have to tell Caterpillar, we're not going to be selling new equipment"); Tr. 1459:25-1460:6 (Koziner) ("this distribution issue that we were concerned about, about new equipment being sold on the platform. . . this is going to be a non issue"); Tr. 1275:21-1276:6, 1276:15-20, 1280:10-17 (Levinick) (disruptive ecommerce was the future).

### B.   There Is Sufficient Evidence for the Jury To Find a Single Overarching Agreement, with Horizontal Participation, to Stop Competition by ICP.

ICP can establish a group boycott conspiracy by direct that is "explicit and requires no inferences to establish the proposition or conclusion being asserted," *InterVest, Inc.* v. *Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003), or circumstantial evidence and inferences drawn from the defendants' activities. *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 652, 662 (7th Cir. 2002) ("Circumstantial evidence … including ambiguous statements … are not to be disregarded [at summary judgment] because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial evidence"). No formal agreement is necessary to constitute an unlawful conspiracy." *Am. Tobacco Co.* v. *U.S.*, U.S. 781, 809 (1946). "[B]usiness behavior is admissible circumstantial evidence from which the fact finder may infer agreement." *Theatre Enters., Inc.* v. *Paramount Film Distrib. Corp.,* 346 U.S. 537, 540 (1954).

ICP has proffered direct evidence, as well as circumstantial evidence by showing both "conscious parallelism" and "plus factors." *Petruzzi's IGA Supermarkets, Inc.* v. *Darling-*

*Delaware Co.*, 998 F.2d 1224, 1232 (3d Cir. 1993).  These plus factors "tend to exclude the possibility that the [alleged co-conspirators] acted independently." *Tunis Bros. Co.* v. *Ford Motor Co.*, 823 F.2d 49, 51 (3d Cir. 1987).  "These 'plus factors' include:  (1) 'evidence implying a traditional conspiracy,' *e.g.*, evidence 'relating to the defendants' opportunity to conspire and the solicitation of others to partake in common action,' (2) evidence that 'defendants had a motive to conspire,' and (3) evidence that defendants 'acted contrary to their self-interest.'" *Int'l Constr. Products, LLC* v. *Caterpillar Inc.*, 2022 WL 4465376, *19 (D. Del. 2022).  ICP's expert, Jeffrey Leitzinger, testified concerning these plus factors.   Tr. 1304:12-19; 1326:9-1327:7; 1367:4-17. Caterpillar argues that there is insufficient evidence of a single horizontal conspiracy because ICP presented no evidence the dealers communicated with each other about IronPlanet.  Caterpillar is wrong on the law and the facts.

The Supreme Court has affirmed horizontal antitrust conspiracies where the evidence showed that the conspirators participated in the conspiracy in ways that would have been economically self-defeating unless other conspirators did the same.  *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) (finding concerted action in the absence of communications between eight distributors where a theatre company wrote letters to those distributors restricting terms of their licensing for second run films and each distributor acceded to the theater company's demands that would have been economically self-defeating unless other distributors did the same).

Similarly, in *Toys "R" Us*, Toys R Us invited toy manufacturers to stop selling toys wholesale to clubs with no evidence of communications among the manufacturers, only vertical agreements with Toys "R" Us.  Nonetheless, the court found a horizontal conspiracy where there was unity of interest because the manufacturers were giving up a profitable channel of distribution with a consequent reduction in output.

Similarly, in *Rossi*, 156 F.3d, Rossi was stymied by several roofing and siding distributors concerned that "the entrance of a new price cutting competitor could destabilize the market and substantially cut into their profit margins." *Id.* at 456. Two of Rossi's competitors and the manufacturer that supplied "the most important product in the market" combined to eliminate Rossi. *Id.* The Third Circuit reversed the grant of summary judgment for defendants, concluding that "the defendants' characterization of the conspiracy Rossi alleges as vertical, and not horizontal, cannot withstand scrutiny." *Id.* at 462.

That is exactly the kind of conspiracy that ICP presented evidence of at trial. The evidence shows that Cat and its dealers used the threat of cancelling the proposed ICP- Cat Auction Services and the pressure of withholding present or future used equipment for auction on IronPlanet. That pressure is against the dealers' self-interest unless they joined together and IronPlanet complied by terminating its deal with ICP. The merger was projected to create up to $200 million in new sales, JTX-130 at 2, as well as a $5 billion opportunity from Cat dealer equipment alone, JTX 59 at 3, 4. It was also predicted to generate multiples of three to ten times the parties' investments. Tr. 693:15-25; PTX 90; JTX 128 at 78, and even offered the promise of a future IPO. Id. at 1218:14-19. Without a merger, Cat Auction's business was not sustainable. Tr. 1016:18-25. Ending or threatening to end the sale of used equipment on IronPlanet was economically detrimental to the dealers who were risking profitable sales unless IronPlanet acceded.[1]

---

[1] Caterpillar's veto rights allowed it to dictate its requirements for a merger. Tr. 268:10-14 (Guilford); Tr. 684:22-685:12 (Hoeft) and the Cat Auction negotiation team included Richard Longbottom and Pablo Koziner of Caterpillar JTX 33 at 4 Tr 1068:4-12 (Owens).

C.     **The Evidence Supports the Existence of a Single Conspiracy with Horizontal Components.**

**Dealers Are Horizontal Competitors in the Sale of New Equipment.** Caterpillar dealers compete for new equipment sales, making them horizontal competitors. Tr. 1213:20-1214:2 (Trettle) ("we have large customers here that cross over the dealer territory boundaries. So at times we will get into some competitive situations . . . it can be something we run into in the ordinary course of business"); *id.* 678:14-18 (Hoeft) ("There are times when neighboring dealers could be viewed as competitors. We have customers that work in both territories"); *id.* 1442:7-16 (Koziner) ("there are no restrictions" on Caterpillar dealers selling outside their territories, there may be a fee, but no restrictions).

**There Are Conspiratorial Communications Between Ring Power and Thompson.** The evidence at trial shows conspiratorial communications between Ring Power and Thompson. On Tuesday, April 1, 2014, Ring Power's Frank Fowler emailed other Ring Power executives about IronPlanet "offering new Chinese equipment for sale on their web site," commenting on the news, "If so, not good." JTX-0159. Fowler wrote (and Guilford's phone logs confirm) that he "spoke to Jerome [Guilford] last night and he indicated Cat is not happy with what they have seen and heard as well," and that Guilford had told him Ritchie Bros. had reached out to Caterpillar "trying to set up a meeting with Cat to discuss how they could possibly work together." (*Id.*). Fowler stated he intended to call IronPlanet's Greg Owens the next day "to verify and find out what is going on." (*Id.*). Phone logs demonstrate that the next day, April 2, Fowler contacted or spoke with the following people on the phone, in chronological order, over the course of a single day: (1) Thompson's used equipment buyer, Billy Seals, (2) IronPlanet's Greg Owens, (3) Caterpillar's Richard Longbottom, (4) Thompson's used equipment manager, Richard Lindley, (5) Caterpillar's Longbottom, and (6) IronPlanet's Owens. PTX-0002 at 9; PTX-0004 at 159; JTX-0146 at 17-18;

PTX-0302 at 60-61.  The next day, IronPlanet suddenly, and without informing ICP, removed all traces of ICP from its website.  IronPlanet's head of development, Jeff Barca-Hall, emailed IronPlanet's Jeter, Owens, and General Counsel Doug Feick: the ICP items are no longer visible on our site. PTX-184.  The following week, a sales representative from Thompson (Richard Lindley) informed an IronPlanet sales representative (George Massey) that it could not move forward with ongoing negotiations over an equipment sale until it had received written confirmation from IronPlanet's Vice President of Sales, Jeff Jeter, on formal IronPlanet letterhead, that IronPlanet had terminated its ICP relationship.  PTX-0195.

The evidence also shows that on June 3, 2014, Kenny Bishop of Thompson stated the role Caterpillar dealers had played in pressuring IronPlanet in an email to Caterpillar's Stephan Downing:  "This is the company that showed up on Iron Planet's website.  After much uproar from Cat dealers they took it off." PTX-225.  Jeter testified that "I knew directly also that there were Caterpillar dealers that would have concern over us selling unused or new equipment." Tr. 487:11-24 (Jeter); Tr. 486:11-17 (Guilford) ("Caterpillar and their dealers were concerned about IronPlanet participating in the new market").  Mr. Fowler (Ring Power) and Mr. Lindley (Thompson) also spoke four times on March 27, 2014.  PTX-0004 at 151.

The evidence adduced at trial also demonstrates the implausibility of IronPlanet's action absent a conspiracy.  Not a single contemporaneous document was introduced at trial indicating that IronPlanet terminated the agreement only 30 days after it was executed because of lack of performance or sales by ICP, and the ICP personnel testified uniformly that no one from IronPlanet informed them that there were any issues.  Nor does the termination letter indicate that it is for cause.  On April 3, 2014, personnel from IronPlanet and from ICP were working toward "adding the next grouping of new products to our website and IronPlanet's ICP store." JTX-049.  By the

end of April 3, the ICP store was gone from the IronPlanet site and IronPlanet's Jeff Barca-Hall thanked the IronPlanet personnel (including the ones working earlier that day to add products to the website) for "the scramble these past few hours to react to this **sudden** decision." JTX-0184.

Given all of this evidence, the jury can reasonably conclude that both Ring Power and Thompson—horizontal competitors—pressured IronPlanet to terminate its agreement with ICP as part of an overarching conspiracy.[2] The implausibility of IronPlanet's action absent a conspiracy only 30 days into the contract became more extreme at trial. That short duration showed that Owens and Jeter's testimony that IronPlanet terminated the ICP contract due to low sales was purely pretextual. *See Rossi*, 156 F.3d at 478 (pretextual excuses are evidence of conspiracy). There is more: Owens testified that he discussed ICP on an April 2 phone call with Frank Fowler of Ring Power and told him that it was "an experimental deal" and "*we would see if we got any traction or not.*" Tr. 1251:9-18 (emphasis added); JTX-0146 at 17. The next day, the ICP store was gone from the IronPlanet site because of "this sudden decision." PTX 184. IronPlanet CTO Barca-Hall tried to explain away the "scramble" on April 3, but ultimately admitted that he received orders to remove the store because "we changed our mind." Tr. 1296:5:24-1296. One

---

[2] All the evidence described in the Court's summary judgment decision was admitted at trial. In addition, at trial, Longbottom of Caterpillar proposed to Koziner, Guilford and Gosselin telling IronPlanet to cancel the ICP deal, JTX-041, Caterpillar discussed that they would communicate their concerns to IronPlanet through Bill Hoeft of Ziegler, PTX-0160, who did that, PTX-0164, and Owens of IronPlanet communicated back to Caterpillar by March 31 that "if we can come to some form of agreement, then the ICP initiative would go away, JTX-130. This was followed the next day by a call, confirmed by an internal email, between Guilford and Fowler of RingPower that "Cat is not happy" and that Fowler would call Owens. PTX-0181. After this on April 2, Fowler contacted or spoke with IronPlanet's Greg Owens, Caterpillar's Longbottom, and Thompson's Lindley. At trial, Jeter of IronPlanet also confirmed that "I knew directly also that there were Caterpillar dealers that would have concern over us selling unused or new equipment." Tr. 487:11-24 (Jeter); Tr. 486:11-17 (Guilford) ("Caterpillar and their dealers were concerned about IronPlanet participating in the new market"). Mr. Fowler (Ring Power) and Mr. Lindley (Thompson) also spoke four times on March 27. PTX-0004 at 151. The calls between Messrs. Guilford and Fowler were unusual because they ordinarily spoke only once or twice a year. Tr. 349:13-16 (Guilford).

week later, IronPlanet sent a legal termination letter to ICP, and the merger parties "reached agreement on the key issues." JTX-0056 at 1.

**Plus Factors Show that Caterpillar and the Caterpillar Dealers Acted in Concert.** The Court in its first summary judgment decision also found that "plus factors" supported the showing that "Caterpillar, Ring Power, Thompson, and IronPlanet engaged in consciously parallel behavior." Dkt. 456 at 37. This included evidence of traditional conspiracy, motive to conspire, and actions contrary to self interest. *Id.* at 37-41. Further, the evidence at trial showed that the dealers were risking profitable sales and (for at least Ziegler) a profitable merger and future sales to IronPlanet in the absence of concerted action. *Supra.* This evidence supports the Court's finding that "the evidence tends to exclude the possibility (1) that Caterpillar, Ring Power, and Thompson acted independently in pressuring IronPlanet, and (2) that IronPlanet acted independently in terminating its relationship with ICP." *Id.* at 37.

**For Used Equipment, Caterpillar and The Dealers Were All Horizontal Competitors.** Caterpillar dealers and Caterpillar sell used equipment through auction sites or otherwise and therefore are horizontal competitors as sellers of used equipment. PTX 0092 at 1 (Caterpillar document: "In a real sense, all dealers are competitors in the used market"); Tr. 285:6-12 (Guilford) (agreeing all dealers are competitors in the used market); Tr. 678:14-20 (Hoeft) (used competition is "fair game" between dealers); PTX 94 at 5 (43 North America dealers selling used equipment, including Ring Power, Ziegler and Thompson).

The conspirators were specifically concerned that ICP would compete for used equipment sales by offering lower priced new equipment. Tr. 1049:12-17 (Lindley) (Chinese equipment is cheaper to the point that it can compete with used heavy equipment; "the reason I was concerned . . . If I can buy it for $10,000 or $20,000 less than a user Caterpillar, that's where I am going");

Tr. 1149:9-1148:10 (Koziner) ("you would be in the position where you're marketing your used equipment versus others new equipment"); JTX 0042 at 2 (Koziner: "It would appear that the objectives by the Chinese companies to engage with IP . . .  reflect . . . their desire to position Chinese machines products as an attractive alternative to used").

Before the merger IronPlanet-Cat Auction merger, Ziegler's Hoeft wore two hats, acting for both Cat Auction Services and Ziegler in the merger negotiations.  Tr. 696:7-19.  There were many communications between Caterpillar and Mr. Hoeft about Caterpillar's concerns about competition from ICP.  *Id.* 1219:20-12:20-9; PTX-0153 ("Cat has indicated this would kill the deal"); Tr. 700:1-6, 700:10-19, 704:3-10 (Hoeft knew Caterpillar and Cat dealers had significant concerns); PTX-0160 at 1 (Hoeft to "respond about ICP" to IronPlanet); PTX-0153 (Hoeft knew Caterpillar would "kill the deal").  Ultimately Mr. Hoeft communicated to IronPlanet the concerns of "Caterpillar and Cat dealers" (which at a minimum, included Ziegler) about IronPlanet conducting auctions "for a Caterpillar competitor."  PTX-0164 at 1.

IronPlanet felt pressure to terminate ICP and join the conspiracy.  As IronPlanet stated in its S-1:  "If our high volume sellers stop selling used heavy equipment through our marketplace, or sell significantly lower volumes of equipment, our business would be harmed . . . certain of these high volume sellers are affiliated with holders of our preferred stock . . . including Caterpillar Financial Services Corporation . . . and Ring Power."  PTX-0055 at 16; PTX 92 at 3 ("It will be critical to keep Cat Finance on board with this – they are IP's largest customer – and to get a few more key dealers on board, such as Randy Ringhaver [of Ring Power]; PTX-188 (IronPlanet document: "We're pitching a deal with Thompson/have proposal on their desk . . . Until we have a statement Richard/Thompson is in the holding pattern with us"); Tr. 1084:1-7 (Bishop) (IronPlanet was a "partner" of Thompson); PTX 94 at 5; (Owens:  Caterpillar dealers are

"predominantly where the inventory is").  After a merger, the plan was for higher Cat Dealer inventories on IronPlanet, including from Ziegler.  JTX-130 at 2; Tr. 1245:23-1246:3 (Owens).

    **4.**    **Anyone Who Commits an Act in Furtherance of the Conspiracy Is A Co-Conspirator.**

    "Once the existence of a conspiracy is shown, the evidence linking an individual defendant to that conspiracy need only be slight."  *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d at 968, 978 (N.D. Ohio 2015); *United States* v. *Weber*, 437 F.2d 327, 336 (3d Cir. 1970).  Anyone who commits any "overt act in furtherance of the antitrust conspiracy" is properly considered a co-conspirator.  *Bray* v. *Bank of Am. Corp.*, 784 F. App'x 738, 741 (11th Cir. 2019).  To be implicated in a conspiracy, an entity need not know about all aspects, or even all members of that conspiracy.  *Blumenthal* v. *United States*, 332 U.S. 539, 558 (1947).  Nor must all participants act in a uniform manner.  *Anderson News, LLC* v. *Am. Media, Inc.*, 680 F.3d 162, 191 (2d Cir. 2012).

## II.    For A *Per Se* Group Boycott Claim, Harm to Competition Is Presumed.

    "Antitrust injury does not require proof of harm to competition where, as in the case of a *per se* violation, such harm is not a prerequisite to recovery."  *OEM Glass Network*, 2023 WL 2563689 at *12.  "Requiring a defendant to demonstrate that an injury stemming from a *per se* violation of the antitrust laws caused an actual adverse effect on a relevant market in order to satisfy the antitrust injury requirement comes dangerously close to transforming a *per se* violation into a case to be judged under the rule of reason[.]"  *Gelboim* v. *Bank of Am. Corp.*, 823 F.3d at 775 (quoting *Pace Elecs., Inc.* v. *Canon Comput. Sys., Inc.*, 213 F.3d 118, 123-24 (3d Cir. 2000)); *see also Nat'l Soc. of Prof. Eng'rs* v. *United States*, 435 U.S. 679, 692 (1978) (*per se* illegal agreements are those "whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality").

## III.    There Is Sufficient Evidence for a Jury to Find Antitrust Injury.

Caterpillar's argument that a reasonable jury could not find antitrust injury ignores a long line of cases holding that a competitor suffers antitrust injury from business losses resulting from an antitrust conspiracy. *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14 (1977) ("competitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened"); *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 117-18, (1986) (competitor can adequately allege antitrust injury when it alleges that it has been injured by a competitor's predatory pricing); *PLS.com, LLC* v. *Nat'l Ass'n of Realtors*, 32 F.4th 824, 840 (9th Cir. 2022) ("the same reasoning applies to group boycotts" as the Supreme Court's decision in *Cargill*); *Lifewatch Servs.* v. *Highmark Inc.* 902 F.3d 323, 342 (3d Cir. 2018) "consumers and competitors" capable of satisfying antitrust injury requirement).[3]

## IV. The Jury Has Sufficient Evidence to Find Tortious Interference with Contract.

There sufficient evidence that Caterpillar not only wrongfully interfered with ICP's Hosted Store Agreement with IronPlanet, but did so wantonly and willfully. Tortious interference with contract under Illinois law requires proof of the following elements: (1) the existence of a valid, enforceable contract between the plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional and unjustified inducement of the third party to breach the contract; (4) a subsequent breach by the third party resulting from defendant's wrongful conduct; and (5) damages suffered by the plaintiff as a result of the breach. *Strasburg*

---

[3] *See also W. Penn Allegheny Health Sys.* v. *UPMC*, 627 F.3d 85, 102 (3d Cir. 2010) (same); *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268, 275 (3d Cir. 1999) (reversing summary judgment where a concerted effort to exclude competitor from the market was alleged and his injury flows directly from this action"); *Klor's*, 359 U.S. 207 (group boycott claim by injured competitor); *Rossi* 156 F.3d 452 (same); *U.S. Horticultural Supply, Inc.* v. *Scotts Co.*, 2004 WL 1529815 (E.D. Pa. 2004) (distributor whose agreement was not renewed by a supplier—allegedly because distributor also handled a competitor's products—has antitrust standing); *Pace Elecs.*, 213 F.3d at 121-122 (lost profits are recoverable as antitrust damages); *Carepoint Health Sys.* v. *RWJ Barnabas Health, Inc.*, 2023 WL 7986429 (D.N.J. 2023); (competitor allegations satisfied antitrust injury requirement).

v. *Brauvin Realty Servs., Inc*., 691 N.E.2d 834, 845, 95 Ill. App.3d 17, 32–33 (Ill. App. 1 Dist. 1998).[4]  Here, there is sufficient evidence to show that Caterpillar wrongfully induced IronPlanet to breach its Hosted Store Agreement with ICP, and that ICP suffered damages.

Caterpillar argues that ICP "did not even prove a breach—it asks the jury to assume a breach based on IronPlanet's termination of the contract." Cat. Br. 14.  This argument fails. The Hosted Store Agreement required IronPlanet to create, host, and maintain a hosted store for ICP equipment on the IronPlanet website.  JTX-0035 § 1.1.  It was valid for one year from March 3, 2014 (the effective date) and renewed automatically for two more years, unless one party gave notice of its intent not to renew.  *Id.* § 5.1.  While the Agreement includes a "Termination for Cause" provision, § 5.2, IronPlanet did not invoke, and had no basis to invoke, that provision . JTX-0052.  "[W]hen a party repudiates contractual duties prior to the time designated for performance and before all of the consideration has been fulfilled, the repudiation entitles the nonrepudiating party to claim damages for total breach." *Norcon Power Partners, L.P.* v. *Niagara Mohawk Power Corp*., 92 N.Y.2d 458, 462–63, 705 N.E.2d 656, 659 (1998).[5]

Caterpillar also argues that ICP has never sued IronPlanet for breach and that IronPlanet did not tell Caterpillar there would be a "breach" of contract.  Cat. Br. 17.  Neither is  a requirement under Illinois law, even under the case Caterpillar cites—*Bank Fin., FSB* v. *Brandwein*, 36 N.E.3d 421, 430 (Ill App. Ct. 2015).  The knowledge requirement for Caterpillar, for example, is satisfied by its knowledge that ICP and IronPlanet had entered an agreement. *Id.* Caterpillar at trial admitted its knowledge of that agreement. *E.g.* Tr. 308:16-309:2 (Guilford);

---

[4]  Illinois's pattern jury instructions set forth the same elements.  2 Illinois Forms of Jury Instruction § 47.02.
[5]  The Hosted Store Agreement is governed by New York law,  JTX-0035 § 11.1; Illinois law is the same. The case Caterpillar relies on—*APS Holmes Grp. LLC* v. *Sorkin*, 2023 Il App (1st) 211668-U, at ¶ 28) concerned a contract terminable at will.

PTX-165; PTX-141  (article announcing ICP "deal with online auction house IronPlanet"); JTX-0041 (circulating article).  It is a reasonable inference that putting economic pressure on a firm to cancel a contract—with no discussion of any justification—would result in a breach.

Next, Caterpillar argues that "ICP agreed to a new contract in May 2014 [the listing agreement], replacing that contract that was terminated in April 2014."  Cat Br. 17.  The "listing agreement bore no resemblance to the Hosted Store Agreement.  It merely allowed ICP to list four pieces of equipment  (all Tier 2 and not for sale in the U.S.) for sale on the IronPlanet website; it did not contain the "hosted store" and sales support provisions of the Hosted Store Agreement.  *Compare* PTX-0402 to JTX-0035. Tr 844:25-845:24.

Caterpillar's argument that the evidence does not show that its conduct was "unjustifiable" and wrongful also fails.  Cat. Br. 17.  Contrary to what Caterpillar argues, wrongful inducement is not limited to making false statements or fraud.  *Grako* v. *Bill Walsh Chevrolet-Cadillac, Inc*., 229 N.E. 3d 869 (Ill. App. Ct. 2023).  Instead, a claim requires "some active persuasion, encouragement, or inciting that goes beyond merely providing information in a passive way."  *In re Estate of Albergo*, 656 N.E.2d 97, 103 (Ill. App. Ct. 1995) ("Competition . . . does not privilege inducing a breach of contract**)**; *Speakers of Sport, Inc.* v. *ProServ, Inc.*, 178 F.3d 862, 865 (7th Cir. 1999); *Grako*, 229 N.E.3d at 844 ("A contractual relation is sacrosanct and takes precedence over the conflicting rights of any presumptive interferor, including his [or her] right to compete and his [or her] own prospective advantage.").

Economic pressure, including concerted economic pressure, are established bases for unjustifiable and wrongful conduct.  For example, in *Euroholdings Capital & Inv. Corp* v. *Harris Trust & Sav. Bank*, 2008 WL 4346397 (N.D. Ill. 2008), the court denied a summary judgment motion, ruling that it was sufficient that that defendant used "heavy-handed tactics" to

induce breach of a deal, including threatening to cease serving as a settlement bank.  *Id.* at *6, 15-16.  Likewise, in *Grako*, the court held "tortious interference arises … when pressure— financial or otherwise—is exerted to affirmatively induce a breach of agreement."  *Id.* at 850.

There is more than sufficient evidence for the jury to find that Caterpillar used concerted economic pressure on IronPlanet to breach its agreement with ICP—including Jeter's statement to Tim Frank that Caterpillar pressured IronPlanet and the contemporaneous documents confirming that pressure, Tr. 766:9-767:2 (Frank); PTX-0185; PTX-0187, and the phone calls and emails among Caterpillar and its dealers and IronPlanet showing Caterpillar's intent to kill the ICP/IronPlanet agreement.  PTX-0164; PTX-0153; PTX-0155; PTX-0160; JTX-0041.

Caterpillar argues that, as an IronPlanet shareholder, it had a legitimate interest in not being associated with an organization that sold new equipment. Cat. Br. 8, 17.  But even if that were a legitimate interest—and Caterpillar cites no case suggesting that it is—the jury is entitled to find that it is a pretext and that Caterpillar's real motivation was to eliminate competition. *E.g.*, *Euroholdings Capital & Inv. Corp* v. *Harris Trust & Sav. Bank*, 2008 WL 4346397, at *6 (N.D. Ill. Mar. 18, 2008) (summary judgment based on evidence of economic pressure); *Church of Scientology Int'l* v. *Eli Lilu & Co*., 848 F. Supp. 1018, 1029-30 (D.D.C. 1994) (economic pressure by defendant raised fact issue for tortious interference).

### V.  The Jury Has More Than Sufficient Evidence to Find that Caterpillar Caused ICP's Losses.

Caterpillar tries to escape liability by blaming ICP for its losses.  *First,* Caterpillar's argument that "ICP sabotaged its own sales by refusing IronPlanet's offer to advertise and auction ICP equipment after IronPlanet terminated the [Hosted Store Agreement]" is factually baseless, and in any event raises only disputed issues of fact.  Cat. Br. 15.  Caterpillar is referring to the

IronPlanet "Listing Agreement" that ICP turned down after ICP's business model was destroyed and it needed to unload four pre-production pieces of equipment from ConExpo.

As discussed above, the Listing Agreement and Hosted Store Agreement are not comparable. That IronPlanet was willing to work with ICP on far less favorable terms does nothing to undo its prior termination (under pressure) of an agreement critical to effective competition, or to change its *per se* unlawfulness. *E.g.*, *O.E.M. Glass Network, Inc.* v. *Mygrant Glass Co.*, 2023 WL 2563689, at *9 (E.D.N.Y. 2023) ("the relevant question is whether the purported boycott limited supply to the extent that [the plaintiff's] competitiveness was diminished, not whether [the plaintiff] was absolutely deprived of supply").

*Second,* Caterpillar's assertion that ICP's collapse was due to Lonking's "quality problems" fares no better. Cat. Br. 4, 13. As ICP's Wes Lee and Tim Frank testified, based on their extensive industry experience, the issues ICP encountered during the *one month* ICP was in business were typical, were expected and, but for Lonking's "loss of interest" in ICP after the termination of the IronPlanet-ICP agreement, were issues that would have been addressable with Lonking. Tr. 575:6-12, 577:3-16, 944:8-13. ICP's industry expert, Mike Rhoda agreed. Tr. 1115:15-1116:25, 1117:15-1118:13. Moreover, Caterpillar's arguments that problems with the demo equipment at ConExpo were the cause of ICP's failure rests on a foundation of lawyer argument. No matter what documents say about the problems of those equipment, no industry expert or even Caterpillar witness testified that ICP projections were unreasonable, either before or after the problems with the demo equipment. Mr. Rhoda considered the so-called "quality issues" and concluded that, had IronPlanet not terminated, it was more likely than not that ICP's business model would be successful and its projections were achievable.

*Third,* EPA compliance issues were not the cause of ICP's losses.  Caterpillar erroneously asserts that, due to Lonking's lack to Tier 4 equipment in 2014. failure to produce and provide ICP with U.S. Tier-4-compliant heavy construction equipment, ICP's claims fail because the trial evidence does not permit a reasonable jury to find that Caterpillar caused injury to ICP.  This assertion is based on Caterpillar's view that, if ICP and Lonking did not have Tier 4 equipment available during the one-month period in 2014 that ICP pursued its intended business model on the IronPlanet platform, then they would never have had Tier 4 equipment during the entire 2014 to 2018 damages period.     As the trial record shows, ICP and Lonking were planning for the introduction of Lonking equipment.  Tr. at 552:7-553:13, 582:9-16; 553:14-23 (Lee); Tr. 755:7-11, 755:23-756:2, 826:11-24, 831:17-832:2, 832:11-25, 833:1-834:17, 977:14-16 (Frank); Tr. at 1120:15-1122:22, 1123:9-1124:7, 1124:17-19, 1161:10-14, 1161:10-14, 1162:15-25, 1164:6-10, 1204:4-18, 1208:7-11 (Rhoda).  Rhoda also offered the opinion that "compliance with Tier 4 emission standards would not have been a significant issue preventing ICP's success and accomplishing the goals in the forecast."  *Id.* at 1161:5-9.  Caterpillar itself realized EPA requirements were not an obstacle to ICP's business plan succeeding.  Caterpillar's Strategic Services Division's March 2014 "Competitive Update" regarding "Chinese Machinery Competitors" included its assessment that "LonKing will have Tier 4 machines available in the first quarter of 2015."  JTX-0057 at 16.  And the same Division again provided that same assessment in its March 20 "Competitive Pulse"  JTX-0043 at 2; Tr. at 367:7-10.

## VI. The Jury Has More Than Sufficient Evidence to Award Damages to ICP.

### A.    ICP's Damages Are Not Speculative.

Caterpillar's argument that no reasonable jury could award ICP damages on either of its claims (Br. 18) is unavailing.  As this Court has ruled:

>To deny recovery to a businessman who has struggled to establish a business in the face of wrongful conduct by a competitor simply because he never managed to escape from the quicksand of red ink to the dry land of profitable enterprise would make a mockery of the private antitrust remedy....

*ZF Meritor LLC* v. *Eaton Corp.*, 2013 WL 6729509, at *4 (D. Del. 2013); *see also Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931).

Damages in antitrust cases do not have to be calculated with certainty because they are "rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *Texaco Inc.* v. *Hasbrouck*, 496 U.S. 543, 573 n.31 (1990); *Stelwagon Mfg. Co.* v. *Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1273 (3d Cir. 1995). An "antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations," and even proof that lacks "exactness" can satisfy the "liberal proof-of-damages rule in antitrust cases." *Moore* v. *James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982).

And, as here, courts have found a company's actual, pre-litigation projections sufficiently reliable. *E.g., ALPO Petfoods, Inc.* v. *Ralston Purina Co.*, 997 F.2d 949, 954 (D.C. Cir. 1993) (affirming damages award based on the plaintiff's projections "prepared in the ordinary course of business"); *In re IH 1, Inc.*, 2015 WL 5679724, at *2 (D. Del. 2015) ("valuations based on contemporaneously prepared management projections" are preferred). Here, ICP's projections are further supported by the testimony of ICP's executives and its expert. JTX-0001; Tr. 536:12-537:1, 553:25-556:6 (Lee); Tr. 804:25-806:19, 807:808:10; 813:12-827:12, 832:18-833:14 (Frank); 1108:12-1109:1 (Rhoda).

Caterpillar's argument that it is speculative whether ICP would ever have Tier 4 equipment to sell that would be compliant with EPA regulations (CAT Br. 18) is itself speculative. As discussed above, there is sufficient evidence for the jury to conclude that ICP and Lonking would

19

easily have had Tier 4 equipment to sell as early as 2015.  Caterpillar's argument that ICP's projections did not reflect the "quality problems" with some of the initial Tier 4 is based on lawyer argument rather than experienced industry witnesses and does not support taking the issues away from the jury and precluding ICP being awarded damages.

### B. Illinois Law Does Not Preclude Damages for New Businesses.

As Caterpillar did in its summary judgment motion and it does now in its JMOL motion, Caterpillar mischaracterizes Illinois' "new business rule" as barring ICP's claims.  Caterpillar (again) relies on an intermediate Illinois appellate court's decision considering the "new business" rule in *Ivey* v. *Transunion Rental Screening Solutions, Inc.*, 186 N.E.3d 1076 (Ill. App. Ct. 2021), but again fails to mention the results of the subsequent ruing by the Illinois Supreme Court.  In affirming the judgment, the Illinois Supreme Court also held in *Ivey* that the new business rule "is simply an application of the general principle that a plaintiff alleging breach of contract bears the burden to establish damages with reasonable certainty." 215 N.E.3d 871, 878 (Ill. 2022).  The court rejected a blanket rule against claims of lost profits from a new business: "If a business, old or new, presents evidence to support that inference, it may recover." *Id.* at 878-79.  Here, unlike the *Ivey* plaintiff, ICP was not "attempting to sell a new and untested product to a new market," *id.* but rather heavy construction equipment like that already sold in the United States by domestic manufacturers, but under a different brand (at a cheaper price).[6]

### CONCLUSION

The Court should deny Caterpillar's Rule 50(a) motion in its entirety.

---

[6]  The Seventh Circuit observed in *MindGames, Inc.* v. *W. Publishing Co.*, 218 F.3d 652, 657 (7th Cir. 2000)—a case Caterpillar (again) cites—a stricter application of the "new business" rule has "been abandoned in most states that once followed it."  *Id.* at 656-57.

OF COUNSEL:

William A. Isaacson (*pro hac vice*)
Jessica E. Phillips (*pro hac vice*)
Amy J. Mauser (*pro hac vice*)
David E. Cole (*pro hac vice*)
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
(202) 223-7300
wisaacson@paulweiss.com
jphillips@paulweiss.com
amauser@paulweiss.com
dcole@paulweiss.com

Dated:  April 14, 2024

PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP

By:   */s/ Matthew D. Stachel*
        Matthew D. Stachel (No. 5419)
        1313 N. Market Street, Suite 806
        Post Office Box 32
        Wilmington, DE 19899-0032
        Tel.:  (302) 655-4410
        mstachel@paulweiss.com

*Attorneys for Plaintiff International*
*Construction Products LLC*