## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTERNATIONAL CONSTRUCTION PRODUCTS, LLC, | |
| Plaintiff, | |
| v. | Civil Action No. 15-108-RGA |
| CATERPILLAR INC., et al, | |
| Defendants. | |

### MEMORANDUM OPINION

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, DE; William A. Isaacson, Amy J. Mauser, and David E. Cole, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Washington, D.C.

     Attorneys for Plaintiff.


David J. Baldwin and Peter C. McGivney, BERGER HARRIS, Wilmington, DE; Joseph A. Ostoyich and Danielle Morello, CLIFFORD CHANCE LLP, Washington, D.C.; Paul C. Cuomo, Heather Souder Choi, and Adam Dec, BAKER BOTTS LLP, Washington, D.C.

     Attorneys for Defendants.


April 15, 2024



ANDREWS, U.S. DISTRICT JUDGE:

Before me is Caterpillar's motion for summary judgment (D.I. 602). I held oral argument on March 19, 2024. I have considered the parties' briefing (D.I. 603, 641, 660). For the reasons set forth below, Caterpillar's motion for summary judgment is DENIED-in-part and GRANTED-in-part.

## I.    BACKGROUND

### A.    Procedural History

Discovery was split into two phases in this case. (D.I. 320 at 2). Phase I was "limited to fact discovery on the issue of the existence of a conspiracy," and Phase II "focus[ed] on expert discovery and the issues of market definition, antitrust injury, and damages." (*Id.*). After Phase I discovery ended, Caterpillar filed a motion for summary judgment on the Sherman Act Section 1 claims, alleging there was no evidence of an agreement to threaten IronPlanet. (D.I. 391 at 27). Caterpillar also moved for summary judgment on the state law tortious interference claim, alleging that Caterpillar did not threaten or coerce IronPlanet and that Caterpillar's conduct was justified because it was an investor in AAS and IronPlanet. (D.I. 391 at 35-40). I denied Caterpillar's motion for summary judgment on all grounds. (D.I. 456).

Caterpillar also moved to exclude the opinions of ICP's expert economist, Dr. Leitzinger. (D.I. 392). Caterpillar argued, "Dr. Leitzinger (1) ignored the parties' used equipment data, (2) did not employ any peer-accepted economics methodology in forming his opinions, and (3) relied on dismissed allegations and considered as coconspirators parties who are not defendants and were not specifically alleged by ICP to be coconspirators." (D.I. 456 at 47) (cleaned up). I denied this motion as well. (D.I. 456, 457).

Phase II of discovery concluded on October 10, 2023. (D.I. 590 at 2).

ICP moved to amend its complaint for the fourth time to add a new theory under Section 1 of the Sherman Act: negative tying. (D.I. 563). I denied ICP's motion (D.I. 680), so I will not address any arguments related to negative tying.

Two claims thus remain in this case, a Sherman Act Section 1 claim and a state law tortious interference claim. (D.I. 603 at 1). Now, Caterpillar moves for summary judgment on both ICP's Sherman Act Section 1 claim and tortious interference claim. (D.I. 603).

### B.  Factual Background

In 2013-14, Caterpillar was the world's leading manufacturer of construction and mining equipment, diesel and natural gas engines, industrial gas turbines, and diesel-electric locomotives, with 2013 sales and revenue totaling $56 billion. (D.I. 399-1 Ex. 4 at 1). The construction equipment Caterpillar manufactures includes wheel loaders and excavators. (D.I. 604 Ex. 4 at 6). Caterpillar, through its "Construction Industries" division, was the largest manufacturer of heavy equipment sold worldwide in 2013-14. (D.I. 399-1 Ex. 4 at A-107; D.I. 399-1 Ex. 6 ¶ 25). Caterpillar made 25-30% of the wheel loader and excavator sales nationally. (D.I. 604 Ex. 6).

Rather than sell directly to end-user customers, Caterpillar sold its new heavy equipment to a network of independently owned dealers. (D.I. 399-1 Ex. 4 at 7; D.I. 419-1 at 23:6-24, 25:19-21 (Levenick); D.I. 399-1 Ex. 8 at 182:3-20 (Guilford)). These dealers sold to end-users and offered them service and parts. (D.I. 399-1 Ex. 6 ¶ 33). In 2014, Ring Power was one of Caterpillar's largest dealers, with its headquarters in St. Augustine, Florida, and locations in north and central Florida. (D.I. 419-19 at 33:2-6 (Fowler); D.I. 396-1 Ex. 1 ¶ 17). Thompson Tractor (hereinafter, "Thompson") was a Caterpillar dealer with locations in Alabama and the Florida Panhandle. (D.I. 419-20 at -69-70).

3

IronPlanet operated an exclusively online platform for selling and auctioning used heavy construction equipment. (D.I. 419-12 at -037). In 2013, IronPlanet reported a total revenue of $58 million and an EBITDA of -$3.4 million. (D.I. 399-1 Ex. 5 at -707).

Tim Frank and Eric Teague started ICP in 2013. (D.I. 644 Ex. 24 Tr.23:4-24:18). ICP's business model was to import equipment from LonKing, a Chinese manufacturer, and to sell the equipment directly to consumers using an online platform. (*Id.*). Chinese wheel loaders were priced 30-40% lower and excavators 15-20% lower than Caterpillar's wheel loaders and excavators. (D.I. 644 Ex. 16 at 85-87, 89). ICP expected to sell LonKing's equipment at prices "30% to 45% less" than the prices of other manufacturers' new equipment. (D.I. 644 Ex. 17 at 425). Before ICP's business model of selling equipment online direct to consumers, the only model for manufacturers to go to market was through local dealers. (D.I. 644 Ex. 39.)

In October 2013, Tim Frank first contacted IronPlanet about the possibility of IronPlanet assisting ICP in implementing its vision for an "online direct sales model" of distribution for Chinese-manufactured, new heavy construction equipment in North America. (D.I. 419-24). Because ICP was a new entrant in the heavy construction equipment market and did not have an established network of equipment dealers, IronPlanet's online sales platform was "critical" to ICP's business. (D.I. 419-23 at 59:5-7 (Frank)).

On Monday, March 3, 2014, ICP and IronPlanet signed a Hosted Store Agreement in which IronPlanet agreed to "develop, operate, and maintain" a section of its website featuring and offering ICP's new equipment for sale directly to customers. (D.I. 399-3 Ex. 28 at 1). The Hosted Store Agreement had an initial term of one year, followed by automatic renewal for up to two successive one-year terms, unless either party gave ninety days' written notice prior to the start of the new term. (*Id.* at 5). The Agreement included a "Termination for Cause" provision,

4

which allowed either party to terminate the Agreement upon giving thirty days' written notice "if the other party breaches any material provision of this Agreement and fails to cure such breach within such thirty (30) day period." (*Id.*).

Prior to ICP's launch, ICP prepared a 5-year pro forma that estimated North America sales for 2014-2018. (D.I. 644 Ex. 66). ICP's Eric Teague helped prepare the pro forma. (D.I. 644 Ex. 40 Tr.166:3-17). The pro forma assumed that ICP could comply with EPA requirements. (D.I. 644 Ex. 40 Tr. 173:19-176:11).

The parties dispute whether ICP would have complied with the EPA requirements. EPA and/or CARB[1] emissions standards apply to new machines and non-road compression ignition (NRCI) engines sold in the U.S. (D.I. 604 Ex. 7 ¶¶ 29, 32). "Section 203 of Title II of the Clean Air Act as well as 40 CFR 1068.101 and 1068.301 prohibit the importation and/or introduction into commerce of non-EPA certified NRCI engines and therefore construction equipment powered by non-certified engines. Similar prohibitions apply to non-CARB certified NRCI engines." (*Id.* at ¶ 44). Engine manufacturers can apply for EPA/CARB certification by submitting an application electronically to EPA and CARB (*Id.* at ¶ 41). There are four sets of emissions standards that become progressively more stringent: Tier 1, Tier 2, Tier 3, and Tier 4. (*Id.* at ¶ 33). EPA has a transition program (TPEM) that allows equipment manufacturers to keep selling non-Tier 4 compliant engines during the transition period to Tier 4. (D.I. 644 Ex. 68 Tr. 68:8-23). ICP expected that LonKing would use Tier 4 compliant engines from Cummins, an engine manufacturer. (D.I. 604 Ex. 7 at ¶ 102; D.I. 644 Ex. 68 Tr. 64:20-65:2).

---

[1] CARB is the California Air Resources Boad.  Broadly-speaking, its regulatory responsibilities in relation to air quality are similar to the EPA's, but limited to California.

On March 4, 2014, ICP's store went live on IronPlanet's website and on March 5, ICP

announced its partnership with IronPlanet publicly at ConExpo, a large industry trade show. (D.I.

399-3 Ex. 29; D.I. 419-39). After ConExpo, a trade publication reported, "The ICP strategy

model could be very disruptive for the North American equipment business." (D.I. 644 Ex. 53 at

4). Caterpillar's internal documents expressed that ICP's business strategy would be a way to

"avoi[d] the time involved in building a traditional distribution network" and "the type of

disruption [Caterpillar was] worried about." (D.I. 644 Exs. 61 at 427, 62 at 736).

On April 1, Ring Power's Senior Vice President Frank Fowler sent an email with the

subject line, "*Confidential: Iron Planet," to Randy Ringhaver, Ring Power's CEO, and others,

announcing,

> As I reported at the board meeting, Iron Planet is offering new Chinese equipment
> for sale on their web site.
>
> I also have heard they are trying to sell to end users through their field salesmen. If
> so, not good. I spoke to Jerome [Guilford] last night and he indicated Cat is not
> happy with what they have seen and heard as well.
>
> Jerome also told me Peter Blake from Ritchie was trying to set up a meeting with
> Cat to discuss how they could possibly work together.
>
> As soon as I confirm all the rumors I will call Greg Owens to verify and find out
> what is going on. Probably tomorrow.

(D.I. 419-61).

The following day, Wednesday, April 2, kicked off a series of phone calls in quick

succession among representatives from Caterpillar, its dealers, and IronPlanet.

At 12:14 pm, Ring Power's Frank Fowler spoke on the phone with Thompson's Used

Equipment buyer, Billy Seals, for a little over two minutes. (D.I. 419-62 at -386, lines 306-07).

Two hours later, at 2:18 pm, Fowler spoke with IronPlanet's Greg Owens for a little over twenty

minutes. (*Id.*, line 317).

At 4:58 pm, Fowler called Caterpillar's Richard Longbottom and their phones were connected for around twenty seconds. (D.I. 419-63 at 3, lines 96-97). Starting at 6:28 pm, Fowler exchanged phone calls with Thompson's Used Equipment Manager Richard Lindley multiple times over the course of an hour (D.I. 419-64 at -417, lines 2890, 2892, 2895), speaking with him at least once. At 7:29 pm, after Fowler and Lindley's calls, Caterpillar's Longbottom called Fowler again and the two spoke for around four minutes. (D.I. 419-62 at -386, lines 331-33).

Finally, later that night, Fowler called IronPlanet's Greg Owens, and the two spoke for ten minutes. (D.I. 419-56 at -061). Owens then immediately called IronPlanet's President of Sales, Jeff Jeter, and its General Counsel, Doug Feick. (*Id.*). Owens then called Fowler a final time. (*Id.*).

The next day, Thursday, April 3, IronPlanet's head of development, Jeff Barca-Hall sent an email to Jeter, Owens, and Feick, with the subject line "ICP items are no longer visible on IronPlanet, but can still be purchased via ICPDirect.com." (D.I. 419-65)

Friday April 4, the day after IronPlanet removed ICP's items from its website, Jeff Jeter informed ICP's Tim Frank for the first time that IronPlanet was considering terminating its relationship with ICP. (D.I. 419-68; D.I. 419-23 at 49:24-52:8 (Frank)). On April 7, IronPlanet informed ICP it was terminating their agreement. (D.I. 644-75, 76).

ICP wanted to sell four pieces of equipment it had imported for ConExpo. (D.I. 645 ¶ 23). To this end, ICP's Jim Teague secured a "Listing Agreement" with IronPlanet. (D.I. 644-81). The Listing Agreement was limited to the four pieces of equipment and did not require IronPlanet to host a storefront for the equipment. (*Id.*). ICP did not end up going through with the Listing Agreement. (D.I. 645 ¶ 25).

On April 30, 2014, ICP's Jim Teague sent an email to Tim Frank and LonKing employees that included the line, "We have lost one sale and are in danger of losing the second strictly due to poor quality of production and final factory inspections." (D.I. 644 Ex. 31). Teague also complained, "To date 100 percent of wheel loaders deliveries have failed!" (*Id.*). The May 15, 2014 ICP/LonKing Discussion Agenda included, "Several reports have been submitted to LonKing outlining many product defects causing the machines to become inoperative and customer dissatisfaction." (D.I. 644 Ex. 34 at 3). ICP employees felt that these problems would have worked themselves out over time because they were just initial "growing pains and learning curves." (D.I. 644 Ex.48 Tr. 339:19-341:8; Ex. 41 Tr. 258:3-10)

Liquidity Services Inc. (LSI) bought the rest of ICP's assets over a year after ICP had failed and launched Iron Direct. (D.I. 644 Ex. 24 Tr. 24:23-25:20). LSI operated "online auction marketplaces for surplus and salvage assets." (D.I. 644 Ex. 87 at 1).

## II.   LEGAL STANDARD

### A.  Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

8

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute .... " Fed. R. Civ. P. 56(c)(l). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 461. When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

The Supreme Court has instructed, "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." *Poller v. Columbia Broadcasting Sys., Inc.*, 368 U.S. 464,473 (1962). "[I]f the opponent has exceeded the 'mere scintilla' threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent." *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

9

### B. Sherman Act Section 1

Section 1 of the Sherman Act provides, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Not every agreement to restrain trade violates the antitrust laws." *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 435 (3d Cir. 2023). "Despite its broad language, Section 1 only prohibits contracts, combinations, or conspiracies that unreasonably restrain trade." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 356 (3d Cir. 2004). Thus, to prevail on a Section 1 claim, a plaintiff must prove two elements: (1) "that the defendant was a party to a 'contract, combination ... or conspiracy,'" and (2) "that the conspiracy to which the defendant was a party imposed an unreasonable restraint on trade." *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 218 (3d Cir. 2008).

Courts apply either a per se, quick look, or rule of reason analysis to evaluate whether a restraint of trade is unreasonable under Section 1 of the Sherman Act. *Winn-Dixie Stores,* 89 F.4th at 435; *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 158 (3d Cir. 2003). Under the per se rule, some types of agreements "are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985). Agreements that are likely to be subject to per se treatment are group boycotts, also called concerted refusals to deal. (*Id.*). If the per se standard applies, "The plaintiff need only prove that the defendants conspired among each other and that this conspiracy was the proximate cause of the plaintiff's injury." *InterVest, Inc.*, 340 F.3d at 159.

"The quick-look approach, by contrast, is an intermediate standard of antitrust scrutiny, under which a court instead presumes the plaintiff has met her initial burden. It applies only where per se condemnation is inappropriate, but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint. Said another way, it applies if an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets, and it does not apply if the contours of the market ... are not sufficiently well known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition." *Winn-Dixie Stores*, 89 F.4th at 438–39 (cleaned up).

All other agreements are analyzed under the rule of reason. "In order to survive summary judgment in cases where [the rule of reason analysis] applies, the plaintiff must show concerted action, antitrust injury, evidence that the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets, and evidence that the objects of and the conduct pursuant to that conspiracy were illegal." *InterVest, Inc.*, 340 F.3d at 159 (cleaned up).

Antitrust injury requires two elements: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) (internal quotation marks omitted) (internal citations omitted).

### C. Tortious Interference

"Recovery under an action for tortious interference with a contractual relation requires that a plaintiff plead and prove (1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) that defendant was aware of the contract, (3) that defendant intentionally and unjustifiably induced a breach of the contract, (4) that the wrongful conduct of

11

defendant caused a subsequent breach of the contract by the third party, and (5) that plaintiff was damaged as a result." *Bank Fin., FSB v. Brandwein*, 36 N.E.3d 421, 430 (Ill. App. Ct. 2015). Plaintiff bears the burden of proof for each element. *See id.*; *Ivey v. Transunion Rental Screening Sols., Inc.*, 186 N.E.3d 1076, 1085 (Ill. App. Ct. 2021). To establish the fifth element, damages, Plaintiff must show (i) Plaintiff sustained damages, (ii) the damages resulted from a breach of contract, and (iii) a proper measurement of those damages. *Ivey*, 186 N.E.3d at 1090. "While damages do not need to be calculated with mathematical precision, basic contract theory requires reasonable certainty and precludes damages based on conjecture or speculation.". *Id.*

## III.   DISCUSSION

### A.   Sherman Act Section 1

Caterpillar moves for summary judgment that Caterpillar did not violate Section 1 of the Sherman Act on four grounds. First, Caterpillar argues there was no refusal to deal by IronPlanet. (D.I. 603 at 20). Second, Caterpillar argues ICP cannot support a rule of reason claim. (D.I. 603 at 26). Third, Caterpillar contends ICP did not suffer antitrust injury. (D.I. 603 at 21). Fourth, Caterpillar argues ICP's damages are speculative. (D.I. 603 at 29).

ICP counters each of the arguments. It also responds that the rule of reason is not a case-ending argument, because it has two alternative theories as to why there is liability. One, that I should apply the per se standard to evaluate the alleged conspiracy. (D.I. 641 at 18). Two, that, in the alternative, I should apply the quick look approach. (D.I. 641 at 29).

### 1.   Refusal to Deal

Caterpillar argues that regardless of whether the per se or rule of reason analysis applies, I should grant summary judgment because there is no refusal to deal. (D.I. 603 at 20). Caterpillar cites *Untracht v. Fikri*, 454 F. Supp. 2d 289 (W.D. Pa. 2006), in which the court held that the

Plaintiff had no antitrust standing because Plaintiff was not "shut out of competition in the market" due to Defendant's actions but rather "chose to voluntarily foreclose" an "active avenue of competition." *Id.* at 310.

Caterpillar argues that because ICP, not IronPlanet, decided to end the business relationship, there is no refusal to deal and thus ICP has no antitrust claim. (D.I. 603 at 20). Caterpillar is referring to ICP's backing out of the Listing Agreement. (*Id.*). Caterpillar contends that in May 2014, IronPlanet was willing to conduct business with ICP because it signed an agreement (the Listing Agreement) to sell four pieces of ICP's equipment on its website. (*Id.*). Caterpillar argues it was ICP who refused to conduct business with Caterpillar because ICP backed out of the agreement in June 2014. (D.I. 605 Ex. 67).[2] Caterpillar also points to an email from ICP's President Tim Frank telling his colleague Jim Teague to "use anyone but IP" to sell the equipment. (D.I. 605 Ex. 77).

Caterpillar cites three cases in support of its position that there was no refusal to deal because IronPlanet was willing to conduct business with ICP through the Listing Agreement after terminating the HSA   (D.I. 603 at 21); *see All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740 (11th Cir. 1998); *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 704 F.2d 787, 792 (5th Cir. 1983); *Dealer Computer Servs., Inc. v. Ford Motor Co.*, 2006 WL 801033 (S.D. Tex. Mar. 28, 2006). All three cases are inapposite.

In *All Care Nursing*, twelve Palm Beach County Hospitals set up a Preferred Provider Program (PPP). 135 F.3d at 744. Nursing agencies could submit bids to become part of the PPP *Id.* Each of the hospitals would contract its nursing services to the preferred nursing agencies

---

[2] Caterpillar cites an email from ICP's Jim Teague to IronPlanet's Justin Whitlock in which Teague asks Whitlock to confirm he received Teague's message "to hold off on the Auction and expenses."

before going to non-preferred agencies. *Id.* Plaintiffs sued, alleging that the PPP violated the Sherman Act. *Id.* The court found there was no refusal to deal because all nursing agencies could have bid to be part of the PPP and because hospitals still dealt with non-preferred agencies. *Id.* at 748. The conspiracy in *All Care Nursing* is very different than the one ICP alleges in this case. ICP did not lose the HSA in a bidding process where it was never offered a contract—it lost the HSA because Caterpillar and others caused IronPlanet to cancel it. Nor are there facts suggesting that IronPlanet dealt with ICP after the termination of the HSA in any meaningful way, as the Listing Agreement was a limited agreement, unlike the HSA which would have allowed ICP to operate its whole business.

*J.T. Gibbons* involved a conspiracy between Crawford, a manufacturer of valves and pipe fittings, and Capital and Read, distributors of Crawford products. 704 F.2d at 789-90. Crawford, Capital, and Read refused to deal with Gibbons, a seller of Crawford valves and pipe fittings. *Id.* at 790. Gibbons threatened to sue Crawford over the refusals to deal, to which "Crawford responded by arranging a meeting and offer from Crawford's Birmingham distributor." *Id.* Gibbons declined because it had acquired "another source of supply through Potomac Valve and Fitting, Crawford's Maryland distributor" *Id.* The court held there was no refusal to deal because there was no failure to obtain the product, increased costs, or transportation delays. *Id.* at 793. I read *J.T. Gibbons* to support that there was a refusal to deal in this case. After Caterpillar cancelled the HSA, ICP did not have another way of carrying out its business plan. The court in *J.T. Gibbons* reasoned that there was no refusal to deal because there were no "consequences" to Plaintiff. *J.T. Gibbons,* 704 F.2d at 793. Here, ICP suffered a consequence—the failure of its business.

Caterpillar cites *Dealer Computer* for the proposition that "an unacceptable offer is not, by itself, a refusal to deal." 2006 WL 801033, at *4. In that case Ford and Dealer Computer Services (DCS) had a licensing agreement that had expired. *Id.* The court held there was no refusal to deal because DCS rejected the new contract Ford offered, even though its terms were "not unreasonable." *Id.* But here, the Hosted Store Agreement between ICP and IronPlanet had not expired; IronPlanet cancelled it unilaterally.

ICP explains the Listing Agreement is not comparable to the Hosted Store Agreement and thus that it does not prevent a finding of a refusal to deal. (D.I. 641 at 22). The Hosted Store Agreement, ICP contends, was the critical element of ICP's business model that would have "allowed ICP to compete against Caterpillar and its dealers." (D.I. 641 at 22-23). In contrast, ICP argues the Listing Agreement was merely one option out of several that ICP considered for unloading the four pieces of equipment it showed at ConExpo. (D.I. 641 at 23). ICP contends it is the termination of the Hosted Store Agreement, which was critical to ICP's business, that establishes the refusal to deal. (D.I. 641 at 23).

I am not convinced by Caterpillar's arguments that IronPlanet's willingness to enter into the Listing Agreement means there was no refusal to deal. None of the authority Caterpillar cites is analogous to the facts of this case. I am persuaded by ICP's arguments that the Hosted Store Agreement, not the Listing Agreement, was what would have enabled ICP to compete. The Listing Agreement was a one-time agreement between IronPlanet and ICP to sell the four pieces of LonKing equipment ICP had imported for ConExpo. (D.I. 644 Ex. 81). It did not require ICP to create a storefront. (*Id.*). In contrast, the Hosted Store Agreement would have enabled IronPlanet to carry out its business model. (D.I. 644 Ex. 44). It required IronPlanet to "develop, operate and maintain a Hosted section of the IP Site featuring the Equipment (the "Hosted

15

Store") to enable ICP to sell Equipment to purchasers." (*Id.*). The Hosted Store Agreement had a term of one year, with the default of automatic renewal for up to two years thereafter. (*Id.* at § 5.1). As ICP argues, the two agreements are "apples and oranges." (D.I. 641 at 22). The fact that ICP later rejected the option to sell four pieces of equipment does not mean that ICP failed to establish a refusal to deal, because "the relevant question is whether the purported boycott limited supply to the extent that [Plaintiff's] competitiveness was diminished, not whether [Plaintiff] was absolutely deprived of supply." *O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.*, 2023 WL 2563689, at \*9 (E.D.N.Y. Mar. 17, 2023).

I will deny summary judgment on the basis that there was no refusal to deal by IronPlanet.

### 2. Rule of Reason

Caterpillar argues that I should grant summary judgment that ICP cannot make out its Sherman Act claim under the rule of reason for two reasons. First, ICP did not define a relevant geographic or product market. Second, Caterpillar did not have market power in any relevant market. (D.I. 603 at 27-29).

"The rule of reason requires the fact-finder to weigh all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir. 1993) (cleaned up). "To determine whether a restraint violates the rule of reason... a three-step, burden-shifting framework applies. Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant makes this showing, then the burden

16

shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018) (internal citations omitted).

A plaintiff can meet its initial burden of proving anticompetitive effect with direct or indirect evidence. "Direct evidence of anticompetitive effects would be proof of actual detrimental effects [on competition] such as reduced output, increased prices, or decreased quality in the relevant market. Indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 542 (internal citations omitted). The inquiry into market power and market definition is needed for vertical restraints on trade if a plaintiff chooses to prove anticompetitive effect through indirect evidence.[3] If the rule of reason is applied in this case, it would be because the jury has found the conspiracy at issue is a vertical restraint on trade.[4] Therefore, ICP is required to define the relevant market to show anticompetitive effects.

Caterpillar's argument is that ICP did not show any direct or indirect evidence of anticompetitive effect. Caterpillar argues ICP did not meet its burden to define a geographic and

---

[3] I note that the Supreme Court in *Ohio v. Am. Express Co.* considered the market definition before evaluating direct evidence of anticompetitive effects. 585 U.S. 529, 544 n.7 (2018). The Court explained it did so because the restraints were vertical, and "[v]ertical restraints often pose no risk to competition unless the entity imposing them has market power, which cannot be evaluated unless the Court first defines the relevant market." *Id.* The Court distinguished prior cases in which market definition was not required for direct evidence of anticompetitive effects by stating those cases involved horizontal restraints. *Id.* "Given that horizontal restraints involve agreements between competitors not to compete in some way, this Court concluded that it did not need to precisely define the relevant market to conclude that these agreements were anticompetitive." *Id.*

[4] If the jury does not find there is a conspiracy with a horizontal component because Ring Power and Thompson did not conspire with each other, then the conspiracy would involve at most a vertical restraint. Vertical restraints on trade are subject to the rule of reason. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007)

product market.[5] (D.I. 603 at 27). Caterpillar argues Dr. Leitzinger conceded he did not opine on relevant markets. (D.I. 604-3 Ex. 3 20:10-22:22). Caterpillar contends I have already held that ICP "fail[ed] to plead a geographic market" under the rule of reason in its Second Amended Complaint.[6] (D.I. 238 at 18 n.3). Caterpillar argues ICP still failed to define a geographic market in its Third Amended Complaint because ICP simply repeated the same insufficient allegations. (*Compare* D.I. 162 ¶¶ 36, 53-60, 70 *with* D.I. 246 ¶¶ 36, 53-60, 70).[7]

Caterpillar argues that ICP has not defined a product market for new or used heavy construction equipment. (D.I. 603 at 28). Caterpillar argues that ICP did not ask any of its experts to opine on a market definition for new or used equipment markets. (*Id.*). Caterpillar cites to *Premier Comp Sols. LLC v. UPMC*, 377 F. Supp. 3d 506 (W.D. Pa. 2019) for the proposition that "[c]onstruction of the relevant market… must be based on expert testimony." *Id.* at 526. Caterpillar contends that because "plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally

---

[5] ICP seems to be keeping its options open whether the competition was going to be with used equipment, new equipment, or both.

[6] I previously stated,

> If the rule of reason applies, the second amended complaint fails to plead a geographic market for new heavy construction equipment. Specifically, there are no allegations in the complaint regarding the geographic confines in which a potential buyer of new heavy construction equipment rationally looks for that equipment. Instead, the complaint is replete with allegations regarding where ICP would like to sell new heavy construction equipment, that is, online through IronPlanet. (*See, e.g.*, D.I. 162 at ¶¶ 54-60). "The geographic market is not comprised of the region in which the seller attempts to sell its product, but rather is comprised of the area where his customers would look to buy such a product." *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 726 (3d Cir. 1991).

(D.I. 238 at 20 n.3) (cleaned up).

[7] Indeed, the two complaints state the exact same allegations I held were insufficient to prove a relevant geographic market.

18

insufficient." (D.I. 603 at 28 (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).

Caterpillar argues it does not have market power in any relevant market because it is undisputed Caterpillar only had 25-30% of the North America new wheel loader and excavator sales, which declined from 2014-2018. (D.I. 603 at 29). Caterpillar also argues ICP's expert did not opine on ICP's market power, so ICP fails to show any proof of market power. (*Id.*).

I agree ICP has not met its burden of defining the relevant product or geographic market. ICP does not dispute that it did not define a relevant geographic or product market. (D.I. 641 at 30-32). ICP's Third Amended complaint failed to define a relevant geographic market because it included only the same allegations I held were insufficient in its Second Amended Complaint. ICP does not dispute that none of its experts provided testimony regarding a geographic or product market. (D.I. 641 at 30-32).

I do not need to reach the question of market power since ICP has not met its burden of defining the relevant market.[8] I will grant summary judgment that ICP cannot make out a Sherman Act Section 1 claim under the rule of reason.

### 3. Per Se

ICP argues it has presented sufficient evidence of a hub-and-spoke group boycott which should be subjected to per se treatment. (D.I. 641 at 19).

A group boycott, of the sort to which courts give per se treatment, is characterized as "efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive

---

[8] Nevertheless, I note that ICP's expert does not offer an opinion that Caterpillar has market power.

19

struggle."[9] *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985) (cleaned up).

One type of group boycott is a hub and spoke conspiracy. "A hub and spoke conspiracy involves a hub, generally the dominant purchaser or supplier in the relevant market, and the spokes, made up of the distributors involved in the conspiracy. The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435 n.3 (6th Cir. 2008); *see Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010). "[T]he critical issue for establishing a per se violation with the hub and spoke system is how the spokes are connected to each other." *In re Ins. Brokerage Litig.*, 618 F.3d 300, 327 (3d Cir. 2010).

ICP contends that the alleged conspiracy is a hub-and-spoke conspiracy. ICP argues I have already stated the conspiracy at issue is "a coordinated pressure campaign against IronPlanet to compel it to terminate its relationship with ICP," and "IronPlanet's online sales platform was 'critical' to ICP's business." (D.I. 456 at 7, 24). ICP lays out the parts of this alleged hub-and-spoke conspiracy by arguing Caterpillar, the manufacturer, was the hub, Ring Power and Thompson, the distributors,[10] were the spokes, and that they all agreed to pressure IronPlanet to terminate its agreement with ICP. (D.I. 641 at 19-20).

---

[9] Generally-speaking, group boycott cases sometimes involve suppliers and sometimes involve customers. The legal principles do not seem to vary based on whether suppliers or customers are the issue.

[10] Caterpillar states that I already found that there was insufficient evidence involving Ziegler, a third Caterpillar dealer. (D.I. 660 at 9, citing D.I. 456 at 31). At the cited page, however, I did not exclude Ziegler from the conspiracy.

ICP contends I have already found that the conspiracy included a horizontal component because I held at the first summary judgment stage that "there was sufficient evidence from which a factfinder could infer that Caterpillar conspired with at least Thompson, Ring Power, and IronPlanet to remove ICP as a competitor in the new heavy construction equipment market." (D.I. 456 at 31). ICP recites the evidence I considered during the first round of summary judgment motions to contend that there is sufficient evidence to stablish the rim of the conspiracy. (D.I. 641 at 20). First, ICP cites the series of phone calls between Ring Power's Fowler and "(1) Thompson's used equipment buyer, Billy Seals, (2) IronPlanet's Greg Owens, (3) Caterpillar's Richard Longbottom, (4) Thompson's used equipment manager, Richard Lindley, (5) Caterpillar's Longbottom, [and] (6) IronPlanet's Owens." (D.I. 456 at 35). ICP cites that the context and timing of the phone calls reinforced the conspiracy. (D.I. 641 at 20). The phone calls were placed after Fowler sent an email to other Ring Power executives about IronPlanet selling LonKing's equipment, and right before IronPlanet removed all traces of ICP from its website. (D.I. 456 at 36). ICP also argues that there was a horizontal agreement because, as ICP's expert concedes, Ring Power, Thompson, and Caterpillar each on their own did not have enough leverage to affect IronPlanet's behavior. (*Id.*).

ICP argues that the alleged conspiracy between IronPlanet, Caterpillar, Ring Power, and Thompson is like other conspiracies subjected to per se condemnation. ICP contends the conspiracy in *United States v. Gen. Motors Corp.*, 384 U.S. 127 (1966) included both horizontal and vertical elements because a group of automobile dealers conspired with General Motors, the manufacturer, to stop all dealers in Los Angeles from selling automobiles to discounters. *Id.* at 129, 140-141. ICP argues that the court found "[e]limination, by joint collaborative action, of discounters from access to the market is a per se violation of the Act." *Id.* at 145.

21

ICP also cites *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 462 (3d Cir. 1998) for the proposition:

> The common principle we glean from [per se] cases is that a conspiracy is horizontal in nature when a number of competitor firms agree with each other and at least one of their common suppliers or manufacturers to eliminate their price-cutting competition by cutting his access to supplies.

*Rossi* involved a conspiracy in which roofing and siding distributors and the manufacturer that supplied 'the most important product in the market" agreed not to supply products to Plaintiff Rossi, a roofing and siding distributor, so that he could not obtain "the products he needed to successfully compete against them." *Id.* at 456.

Caterpillar presents two arguments for why ICP has not established a per se claim. First, Caterpillar argues that there is no evidence of the "rim" portion of the hub-and-spoke conspiracy between Ring Power and Thompson. (D.I. 660 at 8-9). Second, Caterpillar argues that ICP did not present evidence of horizontal competition in the new equipment or old equipment market between Ring Power and Thompson. (*Id.* at 9). I assume Caterpillar is making the argument that the spokes in the hub-and-spoke conspiracy must be competitors, and there is no evidence Ring Power and Thompson are competitors.[11] *See Howard Hess Dental*, 602 F.3d at 255 ("The rim of the wheel is the connecting agreements among the horizontal competitors (distributors) that form the spokes."). Without citing to the record, Caterpillar contends that the two dealers are not competitors. Caterpillar argues, (1) Ring Power operates in north and central Florida and Thompson operates in Alabama and the Florida Panhandle, and (2) the dealers have different used equipment available at different times that they consign to IronPlanet, so they are not competing to sell used equipment. (D.I. 660 at 9).

---

[11] There is no contention that IronPlanet is a competitor.

Caterpillar does not cite any case law explaining why Ring Power and Thompson are not competitors within the meaning of Sherman Act Section 1. The Supreme Court in *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) laid out the test for whether independent entities are capable of conspiring under Section 1 of the Sherman Act and applied it in the context of a parent corporation and its subsidiary. The court in *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010) explains the *Copperweld* test:

> Because the inquiry is one of competitive reality, it is not determinative that two parties to an alleged § 1 violation are legally distinct entities. Nor, however, is it determinative that two legally distinct entities have organized themselves under a single umbrella or into a structured joint venture. The question is whether the agreement joins together "independent centers of decisionmaking." If it does, the entities are capable of conspiring under § 1, and the court must decide whether the restraint of trade is an unreasonable and therefore illegal one.

*Id.* at 196 (internal citations omitted). The court explained that the types of entities that are generally not "independent centers of decisionmaking" are a parent corporation and its subsidiary, a Vice President and President of the same firm, and a corporation and its unincorporated divisions. *Id.* at 196-97. No such relationship exists between Ring Power and Thompson, two separate companies that are thus independent centers of decision making.

In *Am. Needle,* the Supreme Court held that two football teams, the Saints and the Colts, were competitors in the intellectual property market because, "When each NFL team licenses its intellectual property, it is not pursuing the common interests of the whole league but is instead pursuing interests of each corporation itself." *Id.* at 197 (internal quotations and citations omitted). Here, Ring Power and Thompson are acting in their own best interests in preventing ICP from selling new LonKing equipment through IronPlanet.

Whether two entities are competitors is a question of "competitive reality." *Am. Needle*, 560 U.S. at 196. No party has moved for summary judgment that the per se standard should or

23

should not be used. It is for the jury to assess all the facts and determine whether Ring Power and Thomoson are competitors and if there is a rim in the hub-and-spoke conspiracy.

Caterpillar also cites to the Northern District of Florida's summary judgment decision that there was no conspiracy and the Eleventh Circuit's opinion affirming the decision. *See Int'l Constr. Prod., LLC v. Ring Power Corp.*, 2023 WL 7127515 (11th Cir. Oct. 30, 2023). Caterpillar thus argues that there is no evidence of a horizontal conspiracy between Caterpillar's dealers. Caterpillar previously argued that there was collateral estoppel. At the time, the issue was whether there was sufficient evidence of a conspiracy at all, not whether it was vertical, horizontal, or both. I held, "The Florida [District] Court's finding that there was insufficient evidence to show that the dealers agreed to threaten to withhold equipment from IronPlanet does not preclude a finding that Caterpillar and/or Komatsu conspired with some or all of the dealers to pressure IronPlanet in various ways, including but not limited to threatening to withhold business from IronPlanet until it agreed to terminate its partnership with ICP." (D.I. 456 at 24). The current briefing does not make a collateral estoppel argument and therefore provides no analysis in support of one. Caterpillar does not provide any other basis for its argument.

I think the conspiracy here has a vertical component. My previous summary judgment finding that "there was sufficient evidence from which a factfinder could infer that Caterpillar conspired with at least Thompson, Ring Power, and IronPlanet to remove ICP as a competitor in the new heavy construction equipment market" establishes the spokes of the hub-and-spoke conspiracy. (D.I. 456 at 31). ICP argues that this resolves the issue. I do not agree. This finding is not enough to establish the rim of the conspiracy, because the horizontal component requires an agreement between Ring Power and Thompson (or Ziegler). However, on the record now before me, a reasonable jury could find that the phone calls between Ring Power and Thompson

24

combined with their motive to conspire is enough to establish that agreement and thus to establish a hub-and-spoke group boycott.

There is more evidence of a horizontal conspiracy between the spokes here than in cases in which courts have decided there is no rim. For example, the alleged hub-and-spoke conspiracy in *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) comprised of the insurer-brokers as the hub and insurers to which the brokers sold business as the spokes. *Id.* at 329. The alleged conspiracy was an agreement between the insurer-brokers and their insurers in which an insurer would pay "contingent commissions to become and remain a 'preferred insurer'." *Id.* at 327. The court found no horizontal conspiracy between the alleged spokes in part because there were no allegations that any of the spokes ever communicated with each other regarding the alleged conspiracy. *Id.* at 328-30; *see also Howard Hess Dental.*, 602 F.3d at 255 (affirming there is no "rim" in the alleged hub-and-spoke conspiracy because "the amended complaint lacks any allegation of an agreement among the Dealers themselves.").

Here, there is evidence that Ring Power's Fowler called Thompson's used equipment buyer and Thompson's used equipment manager right before IronPlanet took ICP's products off its platform. (D.I. 456 at 35). The court in *In re Ins. Brokerage Antitrust Litig.* also reasoned there was no rim because each spoke had a reason to independently sign the agreement, which was that it would be more profitable for the insurer to be a preferred insurer than not. 618 F.3d at 327-28. In contrast, here a reasonable jury could find Ring Power and Thompson had motive to conspire because on their own they lacked the leverage to influence IronPlanet. (D.I. 456 at 36).

A motive to conspire supported finding a horizontal conspiracy between the spokes in *United States v. Apple, Inc.*, 791 F.3d 290, 316 (2d Cir. 2015). There, Apple orchestrated a horizontal conspiracy among the Publisher Defendants to raise e-book prices. *Id.* The court

25

found that Apple knew the contracts it asked the publishers to sign would "be attractive only if the publishers acted collectively." *Id.* In other words, the Publisher Defendants had motive to conspire just as Ring Power and Thompson had in this case. However, there was more evidence that the publishers conspired than in the alleged conspiracy between Ring Power and Thompson. "[T]hat the Publisher Defendants were in constant communication regarding their negotiations with both Apple and Amazon can hardly be disputed." *Id.* at 318.

United States v. Gen. Motors Corp. is another example where the court found the rim was established because there was evidence of ongoing communication between the Chevrolet-dealers that would make up the horizontal component of the conspiracy. 384 U.S. 127, 133 (1966). The Chevrolet-dealer spokes came to an agreement during two different local Chevrolet Dealers Association meeting to convince the would-be hub, General Motors, to prevent some other dealers from selling to discounters. *Id.* at 140. After General Motors reached an agreement with the other dealers to stop selling to discounters, the Chevrolet-dealers policed the other dealers to ensure they were compliant. *Id.* at 136. Here, ICP cites evidence that Ring Power and Thompson communicated before IronPlanet removed ICP's products but does not cite any other communication as evidence of a horizontal agreement.

Still, there is some evidence to support a horizontal conspiracy between Ring Power and Thompson. It is for the jury to determine whether there is enough to convince it that there was a horizontal conspiracy with Ring Power and Thompson such that there was a hub-and-spoke conspiracy. If the jury finds an agreement between the spokes, then, as in *Rossi* and *United States v. Gen. Motors Corp.*, the conspiracy here would have both vertical and horizontal components. A number of competitor firms (Ring Power and Thompson) would have conspired with their common manufacturer, Caterpillar, to eliminate their price-cutting competition (ICP)

26

by cutting its access to customers. *Rossi*, 156 F.3d at 462. This type of conspiracy is one courts subject to per se treatment. *Nw. Wholesale Stationers*, 472 U.S. at 294. If the jury properly finds there is a hub-and-spoke conspiracy, it is a per se conspiracy.

### 4.   Quick Look

ICP argues that if I decide the per se approach does not apply, then I should apply the quick look test. (D.I. 641 at 29). I have decided that per se treatment is appropriate if the jury finds there is a hub-and-spoke conspiracy. If the jury does not find there is a hub-and-spoke conspiracy, then the resulting conspiracy would be one or more independent agreements: one between Caterpillar and Thompson, and one between Caterpillar and Ring Power. This conspiracy would be a vertical conspiracy, which would be subject to the rule of reason. *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 907 (2007)

### 5.   Antitrust Injury

Antitrust injury has two elements: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76 (3d Cir. 2010) (cleaned up). To establish the first element, "a plaintiff must show harm to competition, not just harm to the plaintiff competitor." *Id.* at 83. "To establish the second element of antitrust injury, plaintiff must prove the defendant's violation was 'a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage.'" *Insight Equity A.P. X, LP v. Transitions Optical, Inc.*, 2016 WL 3610155, at *9 (D. Del. July 1, 2016) (internal citations omitted).

### a.  Harm to Competition

Caterpillar argues that ICP has not shown harm to competition because ICP must show harm to competition, not just to itself, and the "U.S. sales of wheel loaders and excavators were competitive before, during, and after IronPlanet terminated the HSA with ICP." (D.I. 603 at 22-23). In support, Caterpillar cites that Caterpillar's share of the market was 25-30% and declining, there were multiple new entrants to a market comprised of over two dozen companies that sold wheel loaders and excavators, and Caterpillar reduced its prices and invested in improved emissions control. (D.I. 603 at 23). Caterpillar also argues that Dr. Leitzinger has not testified about harm to competition or antitrust injury, and instead testified that the harm to ICP is the antitrust injury. (D.I. 604 Ex. 3 21:14-24). What Dr. Leitzinger testified was, "I would view the lost profits that I have measured as a form of antitrust injury." (D.I. 604 Ex. 3 29:15-17).

ICP argues that it meets the threshold requirement of antitrust injury because it has shown the conspiracy to remove ICP as a competitor harmed competition. (D.I. 641 at 24-25). Similar to its argument about anticompetitive effects, ICP argues that the conspiracy harmed prices in the heavy construction equipment industry because ICP's wheel loaders were priced 30-40% lower and the excavators were priced 15-20% lower than Caterpillar's competing new products. (D.I. 644 Ex. 16 at 85-89, Ex. 17 at 425). ICP cites to internal Caterpillar documents to argue that Caterpillar viewed ICP as a threat to its business and price levels. ICP argues that Dr. Leitzinger explained the HSA would have disrupted the market by allowing new entrants to compete without their own dealer networks. (D.I. 644 Ex. 13 ¶¶ 39-47, 53-58).

ICP contends that Caterpillar's argument that there was no antitrust injury because "U.S. sales for wheel loaders and excavators were competitive before, during, and after IronPlanet terminated the [HSA]" fails. (D.I. 641 at 25). ICP contends that argument disregards that the

boycott of ICP prevented more significant competition. (*Id.*). I agree. Granting ICP the benefit of all reasonable inferences, it was due to the conspiracy that ICP was only able to stay in operation for a month with no impact on the market. There would have been more significant competition in the market but for unlawful action on Caterpillar's part. As the D.C. Circuit has stated, "it would be inimical to the purpose of the Sherman Act to allow [] free reign to squash nascent, albeit unproven, competitors at will." *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001).

It seems to me that preventing consumers from being able to buy lower priced equipment is "injury of the type the antitrust laws were intended to prevent." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). The impact of preventing ICP from being able to sell its equipment, priced up to 40% lower than current new options on the market, was that consumers lost the option of being able to purchase ICP's lower priced equipment. This is precisely the kind of harm courts have held is sufficient to establish antitrust injury. For example, in *Blue Shield of Virginia v. McCready,* 457 U.S. 465 (1982) the Supreme Court held Plaintiff had suffered antitrust injury by Blue Shield's scheme "to induce its subscribers into selecting psychiatrists over psychologists for the psychotherapeutic services they required." *Id.* at 483. The loss of choice of providers was sufficient to constitute antitrust injury. *Id.*

Conversely, the Third Circuit has held that in the absence of a harmful effect on price, there is no injury when the alleged injury is a competitor being able "to operate at a lower cost." *Philadelphia Taxi Ass'n, Inc v. Uber Techs., Inc.*, 886 F.3d 332, 344–45 (3d Cir. 2018) (finding the Taxi Association did not suffer antitrust injury due to Uber entering the market and being able to offer consumers lower prices). The court opined Plaintiff was asking that antitrust law be applied for "the express opposite purpose of antitrust laws: to compensate for their loss of profits

29

due to increased competition from Uber." *Id.* at 344. Here, then, ICP asks for the application of antitrust law a proper purpose: to seek compensation for a conspiracy that kept ICP from entering the market, offering lower priced products, and increasing competition. ICP has suffered antitrust injury.

### b. Material Cause

Caterpillar argues that ICP cannot prove Caterpillar was the material cause of ICP's injury. Caterpillar cites *PharmacyChecker.com v. Nat'l Ass'n of Boards of Pharmacy* for the proposition that "[w]hile legality is not formally an element of the antitrust inquiry, several courts around the country have found that a plaintiff cannot suffer an antitrust injury if its asserted harm is based in illegal conduct." *PharmacyChecker.com*, 2023 WL 2973038, at *13 (S.D.N.Y. Mar. 28, 2023). Caterpillar also contends that there is no antitrust injury if the harm is "caused by the federal statutory and regulatory scheme adopted by the United States government, not by the conduct of the defendants." *In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).

Caterpillar argues that because ICP did not establish any evidence that it or LonKing complied with EPA/CARB regulatory requirements, it cannot be the material cause of any harm to ICP. (D.I. 603 at 25-26). Caterpillar argues that it cannot be the cause of any harm to sales ICP suffered from equipment it could not legally import or sell in the United States. (D.I. 603 at 26).

ICP argues that there is evidence ICP could have complied with EPA regulations. ICP contends that ICP planned to sell an allowed amount of Tier 3 machines in 2014 and 2015, and then mostly Tier 4 equipment by 2015 and 2016. (D.I. 644 Ex. 40 at 172-176, Ex. 68 at 198:19-201:9, Ex. 69). In other words, ICP argues it would have sold EPA compliant machines. (D.I. 641 at 26). ICP also contends Caterpillar's internal documents confirm that ICP and LonKing

30

would comply with EPA requirements. (*Id.* at 13, citing D.I. 644 Ex. 17 at 426-27, Ex. 19 at 294).

Second, Caterpillar argues that it is not the proximate cause of any antitrust injury to ICP. (D.I. 603 at 26). Caterpillar cites to *Xerox*, in which the Third Circuit held that Xerox, the Defendant, "had nothing to do" with Van Dyk's purported antitrust injury of its struggling business. *Van Dyk Rsch. Corp. v. Xerox Corp.*, 631 F.2d 251, 254 (3d Cir. 1980). The court there found that Van Dyk's failing business was instead due to causes like its machines lacking capabilities consumers desired, a failed merger agreement, and funding difficulties, none of which involved Xerox. *Id.* at 253-57. Caterpillar argues that like in *Xerox*, it had nothing to do with LonKing's significant quality issues and shipping delays, ICP's engagement with investors or customers, or ICP's merger with LSI. (D.I. 603 at 26). Therefore, Caterpillar's argument goes, it cannot be the proximate cause of ICP's purported antitrust injuries.

Plaintiff replies that none of the events Caterpillar alleges were the cause of ICP's injuries. (D.I. 641 at 27). Plaintiff argues that LonKing's quality problems were expected "growing pains" that would have worked themselves out, and LSI's acquisition of IronDirect and failure to sell the remaining ICP equipment as salvage does not mean the HSA would have failed. (D.I. 644 Ex. 48 at 339:19-341:8, Ex. 41 at 257:22-258:10). Plaintiff argues the HSA was based on a completely different business model which, unlike IronDirect's business model, would have included a buyer base. (D.I. 644 Ex. 34 at 27:20-23).

On one hand, Caterpillar argues ICP has no evidence of EPA compliance and that LonKing's quality issues and a host of other problems were the cause ICP's injuries. On the other, ICP argues there was evidence ICP would have complied with EPA regulations and that the smattering of other problems Caterpillar brings up are simply growing pains that would have

31

been ironed out over time. There are multiple disputes of material fact here. Both parties cite evidence from the record to support their asserted facts. There is a dispute of material fact whether ICP and/or LonKing could have complied with the EPA regulations. And there is a dispute of material fact whether it was LonKing's quality issues, any other cause Caterpillar points to, or the alleged conspiracy that caused ICP's injuries. I thus will deny summary judgment that there is no antitrust injury because Caterpillar was not the material cause of ICP's injuries.

### 6. Damages Are too Speculative

Caterpillar argues ICP's damages are too speculative and I should grant summary judgment. (D.I. 603 at 29-30). Damages in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 573 n.31 (1990). An antitrust plaintiff must only "provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir. 1982). This is because "the wrongdoer may not object to the plaintiff's reasonable estimate of the cause of injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946).

Caterpillar argues that ICP's damages model is unreliable because it ignores that ICP, not IronPlanet, terminated the business relationship. (D.I. 603 at 30). Caterpillar is referring to the fact that ICP turned down the Listing Agreement and the arguments Caterpillar made concerning refusal to deal. I have already addressed how the Listing Agreement is not comparable to the

32

HSA, and how ICP deciding to not proceed under the Listing Agreement does not negate ICP

establishing IronPlanet's refusal to deal. I will deny summary judgment on this ground.

Caterpillar also contends that the damages are unreliable and speculative because Dr.

Leitzinger bases his calculation on the ICP pro forma. (D.I. 603 at 30). Caterpillar argues Dr.

Leitzinger concedes the pro forma was not based on underlying data, and that he used it because

ICP counsel instructed him to do so. (*Id.*). These are arguments Caterpillar made in its Daubert

motion seeking to exclude Dr. Leitzinger's testimony that the pro forma was reasonable. I

granted the Daubert motion for that limited portion of Dr. Leitzinger's report. (D.I. 705).

However, Dr. Leitzinger's use of the pro forma and his concession it was not based on

underlying data does not mean that the pro forma itself is unreliable. I expect the jury will hear

testimony they can use to assess the reliability of the pro forma. For example, the jury might hear

from Mr. Rhoda, ICP's industry expert. In his expert report, Mr. Rhoda uses his experience in

the heavy construction industry to explain why he thinks the sales projections are reasonable.

ICP's fact witnesses are also expected to testify about the reasonableness of the projections. The

reasonableness of the ICP sales projections is a question of fact for the jury.

Caterpillar also argues that I should grant summary judgment because ICP's injuries are

too remote. (D.I. 603 at 30). Caterpillar argues, "Plaintiffs whose injuries are once-removed from

any conduct of the defendant and were, instead, caused by an entity that is not joined as a

defendant are precluded from obtaining monetary damages in antitrust cases because their harm

is too remote." (*Id.*). Plaintiffs cite to *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 929

(3d Cir. 1986).

In *Link*, the alleged conspiracy was that "Mercedes forced its dealers to purchase parts

exclusively from Mercedes and, further, that Mercedes and its dealers conspired to fix the price

of parts to non-warranty customers at suggested retail prices." *Id.* The Appellants were representatives of a class that had repairs done by the Mercedes dealers. *Id.* at 920. The district court had found that if Appellants were damaged, it was due to Mercedes' overcharging the dealers for parts being passed on to them. The Third Circuit in *Link* applied *Illinois Brick's* principle that "only the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party injured in his business or property," and barred Appellants from recovering damages. *Id.* at 930 (quoting *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977)). The takeaway from *Illinois Brick* and *Link* is that plaintiffs cannot recover for increased prices that have been "passed-on" to them. *Link*, 788 F.2d at 930.

*Link* does not apply to the conspiracy at issue here for the simple reason that there was no passing on of overcharges. The conspiracy alleged is that Caterpillar, IronPlanet, Ring Power, and Thompson all conspired together to boycott ICP. ICP's theory of damages is about its lost sales, not that there was an intermediary passing on increased charges.

I will deny summary judgment that ICP's damages are too speculative or that its injury is too remote.

### B. Tortious Interference

Caterpillar moves to dismiss the tortious interference claim on three grounds. First, Caterpillar argues since the only jurisdictional basis for the tortious interference claim is supplemental jurisdiction, and since ICP's Sherman Act claim fails, I should dismiss the tortious interference claim. (D.I. 603 at 31). I will not dismiss ICP's Sherman Act claim, so Caterpillar's argument is moot.

Second, Caterpillar contends Caterpillar's actions were not the cause of ICP's injuries due to ICP turning down the Listing Agreement and other factors such as its untested business

34

model and inability to comply with EPA regulations. (*Id.*). This is the same argument Caterpillar has made with respect to ICP's Sherman Act claim, and I reject it now for the same reasons I rejected it with regard to the Sherman Act claim.

Third, Caterpillar argues ICP's damages for tortious interference are too speculative to survive summary judgment due to the Illinois "new business rule." (D.I. 603 at 31-32). The parties dispute whether the new business rule is a rule or standard, and whether Florida or Illinois law applies. The Illinois new business rule as Defendant lays it out is:

> The new business rule precludes expert witnesses from speculating about possible lost profits where no historical data demonstrates a likelihood of future profits. Courts applying this rule allow recovery for profits lost due to a business interruption or tortious interference with a contract, but require the business be established before the interruption so that the evidence of lost profits is not speculative. The reason for the rule is that a new business has yet to show what its profits actually are.

(D.I. 603 at 33) (citing *Ivey*; 186 N.E.3d at 1085 (internal quotations and citations omitted)).

ICP argues that Illinois does not apply the new business rule as a brightline rule but considers that the business is new in assessing if damages are reasonable. (D.I. 641 at 34-35). ICP notes that *Ivey* was later appealed to the Illinois Supreme Court, which clarified: "The term 'rule' is perhaps imprecise. The new business rule is simply an application of the general principle that a plaintiff alleging breach of contract bears the burden to establish damages with reasonable certainty." *Ivey v. Transunion Rental Screening Sols., Inc.*, 215 N.E.3d 871, 878 (Ill. 2023). I agree that, under Illinois law, being a new business is part of the overall consideration of whether damages are reasonable.

Caterpillar contends that if Florida law applies, ICP's damages are still too speculative to survive summary judgment. (D.I. 603 at 34-35). This is because although Florida does not apply a new business rule, it takes into consideration that the business is new as a factor in the reasonable certainty standard for damages. (*Id.*).

Since both states apply the so called "new business rule" as an evidentiary standard, I find it unnecessary to decide now which law applies to the tortious interference damages.[12] Under either standard, a reasonable jury could find that ICP's damages are not speculative.

Caterpillar argues that ICP's damages fail under the new business rule because ICP has no prior track record of profits. (D.I. 603 at 34). Caterpillar argues that Dr. Leitzinger's damages are based on the pro forma, which is a prediction of future profits not based on underlying data. (*Id.*). Caterpillar also argues that Dr. Leitzinger does not opine on damages "specifically accrued by the alleged interference with the HSA." (*Id.*). I do not think Dr. Leitzinger needs to state explicitly that his damages are for the tortious interference claim. To establish damages, Plaintiff must show that (1) Plaintiff sustained damages, (2) the damages resulted from a breach of contract, and (3) a proper measurement of those damages. *Ivey*, 186 N.E.3d at 1090. Dr. Leitzinger explains that his damages are ICP's lost profits due to the "illegal termination of the IronPlanet partnership." (D.I. 644-101 ¶ 46). If ICP's damages are reasonable, this is sufficient for the jury to be able to award damages for tortious interference.

I have already explained that the reasonableness of the ICP sales projections is a question of fact for the jury. The fact that ICP was a new business does not change my mind, because the jury can consider that ICP was a new business in its deliberations. "[T]here is no inviolate rule that a new business can never prove lost profits." *Ivey*, 215 N.E.3d at 1086.

I will deny summary judgment that ICP's tortious interference damages are too speculative.

## IV.   CONCLUSION

I already issued an appropriate order.  (D.I. 720).

---

[12] For trial, the parties appear to have agreed that Illinois law applies.